Deborah L. Williams
Federal Public Defender
Southern District of Ohio
David C. Stebbins (OH Bar No. 0005839)
Julie C. Roberts (MA Bar No. 688233)
Adam M. Rusnak (OH Bar No. 0086893)
Assistant Federal Public Defenders
10 West Broad Street, Suite 1020
Columbus, OH 43215
David_Stebbins@fd.org
Julie_Roberts@fd.org
Adam_Rusnak@fd.org
614.469.2999 Telephone
614.469.5999 Facsimile

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Scott Alan Lehr,<br><br>                    Petitioner,<br><br>  vs.<br><br>Charles L. Ryan, et al.,<br><br>                    Respondents. | No. CV-19-01127-PHX-DWL<br><br>DEATH-PENALTY CASE |

**PETITION FOR WRIT OF HABEAS CORPUS**

**28 U.S.C. § 2254**

1
2

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................i

INTRODUCTION ..................................................................................................1

I.     FACTUAL BACKGROUND ........................................................................3

II.    SOCIAL HISTORY ...................................................................................17

III.   PROCEDURAL HISTORY ........................................................................22

IV.   STATE COURT PRESUMPTION OF CORRECTNESS..........................27

V.    EXHAUSTION...........................................................................................27

VI.   THE AEDPA IS UNCONSTITUTIONAL .................................................29

VII.  FEDERAL CONSTITUTIONAL CLAIMS ...............................................32

CLAIM ONE...........................................................................................................32

      The admission of evidence related to all ten victims deprived Lehr of
      fundamentally fair trials in 1996 and 2009, in violation of his rights
      under the Fifth, Sixth, and Fourteenth Amendments. ...................................32

CLAIM TWO...........................................................................................................44

      The joinder of the Cronin murder for resentencing along with his 2009
      guilt-phase retrials uniquely and profoundly prejudiced Lehr, depriving
      his trial and sentencing of the due process, fundamental fairness,
      impartial jury, and fair and individualized sentence to which he was
      entitled under the Fifth, Sixth, Eighth, and Fourteenth Amendments. .......44

CLAIM THREE........................................................................................................56

      Lehr's trial counsel, at both his 1996/1997 trials and his 2009 retrial,
      committed numerous errors, to Lehr's grave detriment, and rendered
      constitutionally ineffective assistance, sufficient to undermine
      confidence in the verdicts reached, in violation of Lehr's rights under
      the Sixth and Fourteenth Amendments to the United States
      Constitution.................................................................................................56

i

CLAIM FOUR ...................................................................................149

    The (F)(1) and (F)(2) Aggravating Circumstances Found By The Jury
And Applied To Lehr To Make Him Eligible For The Death Penalty
And That Were Weighed Against The Mitigating Circumstances To
Impose The Death Sentence Were Unconstitutional And His Death
Sentences Must Be Vacated ................................................................149

CLAIM FIVE....................................................................................154

    Lehr's rights under the Sixth, Eighth, and Fourteenth Amendments by
the absence of notice, and untimely amendment, of aggravating
circumstances prior to the guilt phase of trial. ...........................154

CLAIM SIX ......................................................................................162

    Lehr was denied his rights under the Sixth and Fourteenth
Amendments to the United States Constitution when the trial court
improperly restricted Lehr's cross-examination of the DNA evidence
against him.......................................................................................162

CLAIM SEVEN ...............................................................................171

    The introduction of unreliable scientific evidence rendered Lehr's trial
fundamentally unfair in violation of his rights under the Fourteenth
Amendment......................................................................................171

CLAIM EIGHT ................................................................................179

    Lehr was deprived of his right to due process under the Fourteenth
Amendment when the state consumed any remaining sample in DNA
testing without giving him prior notice and an opportunity to arrange
for independent testing. ..................................................................179

CLAIM NINE ...................................................................................186

    Lehr was denied his right to a fair trial, impartial jury, and reliable
sentencing proceedings as a result of biased jurors serving on his jury....186

CLAIM TEN .....................................................................................194

    The unduly suggestive and unreliable identification procedures used by
police to obtain the live lineup and in-court identifications by Ross
violated Lehr's due process rights............................................................194

CLAIM ELEVEN ...................................................................................... 204

    The State impermissibly shifted the burden of proof in violation of
    Lehr's rights under the Fifth, Sixth, Eighth, and Fourteenth
    Amendments to the United States Constitution. ..................................... 204

CLAIM TWELVE ...................................................................................... 208

    Throughout the penalty phase of his trial, Lehr was deprived of
    effective assistance of trial counsel in violation of the Fifth, Sixth,
    Eighth, and Fourteenth Amendments. ................................................... 208

CLAIM THIRTEEN .................................................................................. 300

    Lehr's waiver of his right to be present at all pretrial and trial
    proceedings was involuntary in violation of the Fifth, Sixth, Eighth,
    and Fourteenth Amendments. ................................................................ 300

CLAIM FOURTEEN .................................................................................. 312

    Trial counsel rendered ineffective assistance by failing to conduct an
    adequate and reasonable investigation showing Lehr unknowingly and
    involuntarily waived his presence and right to present mitigation in
    violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. .......... 312

CLAIM FIFTEEN ...................................................................................... 342

    Defense counsel performed deficiently at voir dire, violating Lehr's
    Sixth, Eighth, and Fourteenth Amendment rights ................................... 342

CLAIM SIXTEEN ...................................................................................... 363

    The trial court violated Lehr's Fifth, Sixth, Eighth, and Fourteenth
    Amendment rights by improperly limiting the defense's voir dire
    questions ............................................................................................... 363

CLAIM SEVENTEEN ................................................................................ 370

    The death-qualification jury-selection process deprived Lehr of an
    impartial jury and a fair and reliable trial, in violation of the Fifth,
    Sixth, Eighth, and Fourteenth Amendments to the United States
    Constitution........................................................................................... 370

CLAIM EIGHTEEN ................................................................................... 375

Trial counsel violated Lehr's Sixth Amendment right to autonomy and the effective assistance of counsel under *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018) by making concessions of guilt during voir dire and at trial, without discussing that strategy with Lehr and without obtaining Lehr's consent. ...........................................................................375

CLAIM NINETEEN ...........................................................................378

The trial court's instructions on premeditation and intent denied Lehr due process under the Fourteenth Amendment by lessening the prosecution's burden of proving all elements of the offense beyond a reasonable doubt. ...........................................................................378

CLAIM TWENTY ...........................................................................383

Lehr's counsel rendered ineffective assistance during the aggravation phase of Lehr's 2009 capital trial in violation of Lehr's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. .....383

CLAIM TWENTY-ONE ...........................................................................386

The aggravation- and mitigation-phase jury instructions violated Lehr's Sixth, Eighth, and Fourteenth Amendment rights. ........................386

CLAIM TWENTY-TWO ...........................................................................395

Trial counsel's ineffective assistance for Lehr's 1997 sentencing deprived him of his right to counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. ...........................................................395

CLAIM TWENTY-THREE ...........................................................................409

Lehr's first appellate attorney's later employment with the Maricopa County Attorney's Office represented a conflict of interest, rising to the level of prosecutorial misconduct and requiring the disqualification of the Maricopa County Attorney's Office from his 2009 retrial. ............409

CLAIM TWENTY-FOUR ...........................................................................413

The trial court violated Lehr's right to present all mitigating evidence to the sentencing jury in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. ...........................................................................413

CLAIM TWENTY-FIVE ...........................................................................425

iv

The trial court violated Lehr's right to present all mitigating factors to the sentencing jury in violation of the Fifth, Eighth and Fourteenth Amendments. ............................................................425

CLAIM TWENTY-SIX ...............................................................429

Lehr's Sixth Amendment right to confront witnesses against him was violated by the trial court's ruling that Tracie Hancock-Street Lujan was unavailable and permitting her prior testimony to be read into the record. ............................................................429

CLAIM TWENTY-SEVEN...........................................................435

Arizona's appellate review scheme violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. .....................435

CLAIM TWENTY-EIGHT ...........................................................442

The trial court violated state law, rendering the trial so arbitrary and fundamentally unfair, as to violate the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ......................................442

CLAIM TWENTY-NINE ............................................................444

The State violated Lehr's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution by committing prosecutorial misconduct.............................................................444

CLAIM THIRTY ....................................................................449

The cumulative prejudice of trial counsel's deficiency at all stages deprived Lehr of his right to counsel under the Sixth and Fourteenth Amendments and rendered his capital sentence unreliable in violation of the Eighth Amendment..........................................................449

CLAIM THIRTY-ONE ..............................................................451

Lehr's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution was violated by his appellate counsel's failure to raise meritorious claims on direct appeal...451

CLAIM THIRTY-TWO...............................................................459

Pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Lehr was entitled to the constitutionally effective assistance of counsel during his state post-conviction proceedings. However, his counsel performed deficiently and Lehr was prejudiced as a result. ...................................................................459

CLAIM THIRTY-THREE...................................................................467

Arizona's capital-sentence scheme violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it fails to require cumulative consideration of multiple mitigating factors and prohibits the consideration of mitigation evidence that is not proven to a preponderance of the evidence. ........................................467

CLAIM THIRTY-FOUR ...................................................................471

The Arizona death-penalty scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it fails to narrow the class of people eligible for the death penalty, and fails to provide sufficient guidance to jurors for selecting which defendants should be sentenced to death...................................................471

CLAIM THIRTY-FIVE...................................................................478

Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments by requiring the death sentence whenever one aggravating and no mitigating circumstances are found. ..........................478

CLAIM THIRTY-SIX ...................................................................480

Arizona's death-penalty statute and the trial court's jury instructions created a presumption of death and required Lehr to prove that he is entitled to life, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.......................................................480

CLAIM THIRTY-SEVEN...................................................................482

Arizona's capital sentencing scheme is unconstitutional because it does not require that the jury find that the aggravating factors outweighed mitigating circumstances beyond a reasonable doubt, and the trial court's similarly flawed instruction violated Lehr's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. ...............................................482

CLAIM THIRTY-EIGHT ........................................................................487

    Lehr was subjected to a second trial, with a different jury, which
    violates the double jeopardy guarantee of the Fifth and Fourteenth
    Amendments to the U.S. Constitution. ..........................................487

CLAIM THIRTY-NINE ........................................................................489

    Resentencing Lehr pursuant to a statute not in effect at the time of
    guilt-phase trial violated his rights to due process under the Fifth and
    Fourteenth Amendments to the U.S. Constitution. ....................489

CLAIM FORTY ...................................................................................492

    The trial court violated the Ex Post Facto Clause of the U.S.
    Constitution by sentencing Lehr under Arizona's post-Ring capital-
    sentencing statute. ............................................................................492

CLAIM FORTY-ONE ..........................................................................496

    The imposition of the death penalty on a person with brain damage
    violates the Eighth and Fourteenth Amendments .......................496

CLAIM FORTY-TWO ..........................................................................507

    Executing Lehr after his lengthy incarceration on death row would
    violate Lehr's right to be free from cruel and unusual punishment. .........507

CLAIM FORTY-THREE .......................................................................512

    Due Process requires that this Court re-evaluate Lehr's death sentences
    in light of the significant changes to Lehr's person and circumstances
    in the past twenty-two years since he was convicted and originally
    sentenced to death. ...........................................................................512

CLAIM FORTY-FOUR .........................................................................517

    Arizona's lethal injection protocol violates the Eighth Amendment's
    prohibition on cruel and unusual punishment. .........................517

CLAIM FORTY-FIVE ..........................................................................526

    Capital punishment is categorically cruel and unusual, in violation of
    the Eighth and Fourteenth Amendments to the United States
    Constitution .....................................................................................526

CLAIM FORTY-SIX ..................................................................................530

    The death penalty violates Lehr's rights under the Eighth and
    Fourteenth Amendments to the U.S. Constitution because it is
    irrationally and arbitrarily imposed; there is no meaningful distinction
    between those who receive sentences of death and those who are
    sentenced to life imprisonment.....................................................................530

CLAIM FORTY-SEVEN ...........................................................................532

    Arizona's capital-sentencing scheme discriminates against indigent,
    minority, male defendants with white victims, in violation of the
    Eighth and Fourteenth Amendments to the United States Constitution. ..532

CLAIM FORTY-EIGHT .............................................................................534

    The death penalty violates human rights and international law and
    thereby violates Lehr's rights under the Eighth and Fourteenth
    Amendments to the United States Constitution. .......................................534

CLAIM FORTY-NINE.................................................................................537

    Lehr will be denied a fair clemency process in violation of the Eighth
    and Fourteenth Amendments.......................................................................537

CLAIM FIFTY...............................................................................................539

    Lehr's conviction and sentences must be vacated due to the cumulative
    prejudicial effect of the errors in this case.................................................539

PRAYER FOR RELIEF .................................................................................542

Certificate of Service ....................................................................................544

# INTRODUCTION

Pursuant to 28 U.S.C. § 2254, Scott Alan Lehr respectfully petitions this Court for a writ of habeas corpus releasing him from the custody of Respondents, who are detaining him under a sentence of death pursuant to the judgments and sentences of Arizona state courts. Lehr's judgments of conviction and sentences of death were obtained and affirmed in violation of his rights under the United States Constitution.

Lehr is presently in the custody of the Arizona Department of Corrections ("ADOC") because he was sentenced to death following his convictions in 2009 for two counts of first-degree murder; he was also sentenced to terms in prison for numerous other counts. *See State v. Lehr*, 254 P.3d 379 (Ariz. 2011).

Lehr faced the unique and damaging posture of re-trial as to guilt for two murder charges, while the jury was also told, in advance, that he had previously committed another murder as part of the same series, for which that jury would also sentence him. The simultaneous piling on of other-acts evidence, aggravator-factor evidence, and knowledge of Lehr's guilt for a previous murder, combined to make a fundamentally unfair trial from the very start.

Even worse, Lehr's trial counsel failed to conduct any reasonable investigation into numerous guilt phase issues. Counsel did not consult with experts or raise effective challenges to unreliable evidence related to DNA, eyewitness identification, fingerprints, forensic pathology, jewelry, third-party suspects, and in support of joinder. Predictably, the jury returned guilty verdicts on all counts. All of these errors were unbeknownst to Lehr, as a result of the court accepting his invalid waiver of presence during trial.

Lehr's counsel further allowed Lehr to stipulate to the aggravating circumstances, which the State impermissibly amended shortly before the penalty phase. Even then counsel failed to understand that the aggravating circumstances, as applied to Lehr's case, were unconstitutional, as they did not exist at the time

1   Lehr is alleged to have committed these crimes.

2       Counsel's failures cumulated during the penalty phase, where the jury heard
3   no evidence from Lehr's family or loved ones, no evidence from medical or mental
4   health professionals, and received no documentary evidence on Lehr's character,
5   history, and background. Instead, defense counsel argued only that the State of
6   Arizona could safely and securely house Lehr for a life sentence—an argument the
7   prosecutor quickly undermined and dismantled. The trial court erroneously allowed
8   this anemic presentation despite readily available and known mitigating evidence.
9   And again, the jury listened to this evidence and weighed the decision whether to
10  sentence Lehr to death without ever seeing him in the courtroom.

11      Lehr stood no chance of a fair deliberation. A combination of trial counsel's
12  deficient performance, and the trial court's erroneous rulings, resulted in a biased
13  jury that had been pre-chosen to impose death, and selected after improperly
14  restricted questioning. Two members of the jury had family members that were
15  murder victims. One juror, who went on to become the foreperson, worked within
16  the prison industry. In the midst of trial, another juror had to be excused due to
17  misconduct.

18      On top of all of this, Lehr's trial was consumed by unconstitutional waivers,
19  prosecutorial misconduct, erroneous evidentiary rulings, improper and
20  unconstitutional jury instructions, and a number of other constitutional violations.

21      The combination of these errors rendered Lehr's trial fundamentally unfair
22  and directly call into question the reliability of his death sentences. For the reasons
23  set forth in this Petition, Lehr asks that this Court grant the writ and any other
24  appropriate relief.

25

26

27

28  ///

2

## I.     FACTUAL BACKGROUND

In 1991 and 1992, ten women were sexually assaulted, three of them murdered, in the Phoenix desert. The police would soon develop a theory that one man committed all of the crimes. What followed was an investigation that included outdated investigative practices, unreliable forensic science, three trials, and an extremely complicated legal and procedural history.

While these offenses generally involved taking women from Phoenix into the desert north of the city and sexually assaulting them, there were in fact significant dissimilarities, including variations in the size, weight, and age of the victims; discrepancies in times of day and days of the week of the attack; and differences in information given by the perpetrator when the victims entered car. (*See* Tr. Feb. 22, 2009 at 23–24, 40, 46–50.) In fact, evidence adduced at trial showed that the purported similarities in the attacks were very common in the Phoenix area, and fit many more crimes than just the ten victims attributed to Lehr. (*See, e.g.*, Tr. Feb. 12, 2009, at 45–49.)

### A.     Collins

The crimes the State would eventually link started on February 13, 1991. Wanda Collins was walking home in the area of 27th avenue and Van Buren, in Phoenix, when a man pulled up in a light blue sedan and offered her a ride. The driver told her that his name was Dave, and she told him she needed a ride. (Tr. Sep. 18, 1996 at 19, 20–25, 28–29; Tr. Sep. 24, 1996 at 88.) "Dave" agreed to drive Collins, but instead of taking her home, he took the freeway. (Tr. Sep. 18, 1996 at 22–23.) At one point, Collins pointed out to "Dave" that they passed the freeway exit for where she lived. He reached across to where she sat in the passenger seat, and grabbed her throat until she blacked out. (Tr. Sep. 18, 1996 at 25–27.) When she awoke, "Dave" turned right onto a desert road next to a ravine. (Tr. Sep. 18, 1996 at 30.) He stopped the car, got into the back seat, and told Collins to take her clothes off and climb over the seat. (Tr. Sep. 18, 1996 at 32–33.) There, he sexually

1   assaulted her. After the assault, her attacker told Collins to get out of the car and he

2   shoved her down a ravine from behind. (Tr. Sep. 18, 1996 at 37.) She crawled back

3   out of the ravine as he drove away, walked back to the highway, and signaled for

4   help. (Tr. Sep. 18, 1996 at 39–40.) She was taken to a hospital, where staff there

5   performed a sexual assault examination and she interviewed with police. (Tr. Sep.

6   24, 1996 at 71, 76, 81, 100–101.)

7   **B.    Hancock**

8       Ten days after Collins's assault on the evening of February 23, 1991, Tracie

9   Hancock-Street was on her way to her stepmother's boyfriend's house to borrow

10  some money. After that she expected to meet her boyfriend at Jack in the Box. She

11  missed the last bus, however, and began to walk. (Tr. May 1, 1997 at 27, 29–30.)

12  As she walked, a man pulled alongside her and asked if she needed a ride. She told

13  him no. He then told her that he had a daughter her age and said that he would call

14  her a cab if she didn't want a ride because it was getting dark. She agreed to a ride

15  and got in the car. He started heading the direction she told him she was going, but

16  then said he wanted to go the store and get a drink.

17      After he came out of the store, he went the wrong direction and Hancock told

18  him as much. Then, he acted like he was turning around on an access road, but

19  rather than turning around, he got on the freeway. (Tr. May 1, 1997 at 33–35.) He

20  told her that he needed a housekeeper and that she could clean his house for money

21  and then he would take her wherever she wanted to go. Hancock said that her

22  boyfriend was waiting for her and she had to get back. (Tr. May 1, 1997 at 38–39.)

23      At some point, the man turned off the freeway and turned right on to Happy

24  Valley Road. (Tr. May 7, 1997 at 42–43.) He then suggested that he would pay her

25  for sexual favors or she could clean his house. She told him no, and he started

26  tugging her toward him. (Tr. May 7, 1997 at 45–47.) He stopped the car in a flat

27  spot and went off the road. Hancock tried to open the door, but he pulled her back.

28  He then sexually assaulted her (Tr. May 7, 1997 at 47, 48, 52–56.) After that, she

1    got out of the car and ran around the back to look at the license plate. (Tr. May 7,
2    1997 at 56.) He got out of the passenger side door and said, "If you look at that
3    plate, I'll kill you." (Tr. May 7, 1997 at 57.) She remembered the letters on the
4    license plate were "ADW" and believed the numbers were "515" or "915." He told
5    her to run and picked up a rock. As she turned to run, he threw it and it glanced off
6    her chest. She ran as he picked up more rocks and threw them at her. Eventually she
7    ran away from the road and after some time encountered other people driving a
8    truck, who gave her a shirt and took her to the police department. (Tr. May 7, 1997
9    at 66, 68.)

10       At the station, however, detectives were most concerned that Hancock had
11   been arrested when she was 16 years old for prostitution, although the charges were
12   dropped. (Tr. May 7, 1997 at 70–71.) The detectives told her it would be a waste of
13   taxpayers' money for her to go to the hospital and that they would escort her to the
14   County Jail for the night. Hancock never went to the hospital. (Tr. May 7, 1997 at
15   72–73.) She also told police she would not be able to identify her attacker. (Tr. Feb.
16   11, 2009 at 193.)

17       Police later returned to Hancock on November 11, 1991, and showed her a
18   group of photographs (none of which included Lehr); she did not make an
19   identification. On June 24, 1992, police subjected Hancock to hypnosis in an
20   attempt to obtain further descriptions of the suspect and offense. (*See* Tr. Apr. 8,
21   1996.)

22       **C.    Gabriel**

23       A month after Hancock's assault, in the afternoon of March 23, 1991,
24   Suzanne Gabriel waited to catch a bus. She had missed her morning methadone
25   dose at the local clinic so she supplemented with heroin to help ease her withdrawal
26   symptoms. (Tr. May 7, 1997 at 37, 45–48.) As she waited for the bus, a man pulled
27   up and asked her if she wanted a ride, and she got into his car. (Tr. May 7, 1997 at
28   7–10.) According to Gabriel, the man looked to be about 30 years old, 6-foot-tall,

1   with brown hair, a stubble beard, and a "potbelly." (Tr. May 7, 1997 at 23–25.) He

2   drove a light brown, four-door sedan. (Tr. May 7, 1997 at 9.) He had a "cup-caddy

3   organizer" on the floorboard of the car. (Tr. May 7, 1997 at 11–12.) He said his

4   name was "Dave" and he was drinking a Dr. Pepper. (Tr. May 7, 1997 at 25, 39.)

5        He started driving, but at one point started going a different direction than

6   Gabriel wanted to go. (Tr. May 7, 1997 at 13.) When she told him he was driving

7   in the wrong direction, he did not stop. (Tr. May 7, 1997 at 13–14.) He drove onto

8   the freeway, and eventually turned off onto a dirt road. (Tr. May 7, 1997 at 14–15.)

9   He drove through the desert and then stopped. At this point Gabriel tried to get out

10  of the car. (Tr. May 7, 1997 at 15.) The man grabbed Gabriel and pulled her back

11  into the car. (May 7, 1997 at 15.) He then sexually assaulted her.

12       After the assault, he drove Gabriel to an area closer to town, where he stopped

13  the car and said, "This is close enough to civilization," and told her to "Get out."

14  (Tr. May 7, 1997 at 19–20.) As she got out, she looked at the car's license plate and

15  managed to see the letters ADW or AOW as he drove away. (Tr. May 7, 1997 at

16  21.) She walked to the nearest house and called the police. (Tr. May 7, 1997 at 21–

17  22.)

18       A detective took Gabriel to the hospital that night, where a sexual assault

19  examination was performed. (Tr. Oct. 29, 1996 at 13–14.) Over a month later, police

20  showed her a photo array, which did not include a photograph of Lehr—she made

21  no identification. (Tr. May 7, 1997 at 58.) Police also had Gabriel participate in a

22  hypnosis session in hopes of obtaining further descriptions. (*See* Tr. Apr. 8, 1996.)

23       **D.    Zingaro**

24       In the afternoon on April 4, 1991, Cathy Zingaro started to walk home after

25  work. (Tr. Sep. 24, 1996 at 175.) As she walked, a man stopped his two-door,

26  medium to "big" tan, car, said she looked tired and asked her if she wanted a ride

27  home. (Tr. Sep. 24, 1996 at 176–78.) According to Zingaro, he was white, with dark

28  hair and eyes and was not obese, but kind of hefty, between 30-40 years old, with

6

hair a bit below the ear and a couple days' growth of beard on his face. (Tr. Sep. 24, 1996 at 177.) She said yes, opened the passenger-side door, and got into the car. (Tr. Sep. 24, 1996 at 178.) They exchanged names, and the man said his name was "Dave." (Tr. Sep. 24, 1996 at 180.) They made small-talk, and as they drove he asked if she knew about any housekeepers or agencies because he needed one for his wife and his two kids. (Tr. Sep. 24, 1996 at 180.) He said his children were age seven and nine, and that he also "had some horses." (Tr. Sep. 24, 1996 at 181.) They talked about the housekeeping duties, and Zingaro asked if he was looking for somebody, to which he said yes, and then he asked if she wanted to meet his wife. (Tr. Sep. 24, 1996 at 181–82.) He started driving again, and at one point Zingaro became concerned because "Dave" veered off and headed to a side street. He said, "It's the wrong way," and then got back on the road, which eased her concern. (Tr. Sep. 24, 1996 at 182.)

As they continued to drive, "Dave" turned off onto a dirt road near a tree and some rocks; there he stopped the car. (Tr. Sep. 24, 1996 at 185.) He said, "This looks like a good place to fuck." (Tr. Sep. 24, 1996 at 186.) She said, "I don't think so," and asked him to turn the car around. He put his hands around her throat and said, "Are you going to cooperate?" (Tr. Sep. 24, 1996 at 186.) The man then sexually assaulted Zingaro. Her attacker was unable to get an erection, saying, "It's not working." (Tr. Sep. 24, 1996 at 36.) Eventually he stopped, walked around the car, and pulled his jeans up. (Tr. Sep. 24, 1996 at 37.) He then grabbed Zingaro by her neck and pulled her out of the car, where the assault occurred. (Tr. Sep. 24, 1996 at 37.) He choked her, and she blacked out. (Tr. Feb. 9, 2009 at 67; Sep. 24, 1996 at 37.) When she woke up, she was lying on the ground with her head on a rock. She was naked except for her socks. She got up, started running toward a barb wire fence, crawled through it, and ran up a little hill to the freeway. She stopped a car, and the person who picked her up drove her to a convenience store where she called police and was able to get to a hospital. (Sep. 24, 1996 at 39–41.)

A week after her assault, Zingaro met with a "forensic artist" and completed a composite sketch of her attacker. (Tr. Feb. 9, 2009 at 91–92; Trial Ex. 250.001.) Police then broadcast a television reenactment of the offense that featured Zingaro's composite sketch; the reenactment was broadcast four times, on April 28, April 30, May 1, and May 2 of 1991. (Tr. Dec. 15, 1994 at 121, 122.)

On May 24, Zingaro called the police and reported that she was "pretty sure" she saw her attacker at a local convenience store. Police did not ask Zingaro about this potential suspect until five months later, when they showed her a single photograph of the suspect, David Kroll. She said he could possibly be her attacker, but she wasn't sure.

When police went to the Zingaro crime scene, they recovered a McDonald's paper cup. The State's analyst identified a latent fingerprint on the cup. When the State's analyst first compared the latent lift from the cup to Lehr's fingerprint, she was unable to make an identification. (Tr. Feb. 23, 2009 at 40.) Three years later, however, she claimed to use "new technology" to declare a "match" of the fingerprint lifted from the McDonald's cup to Lehr. (Tr. Sep. 25, 1996 at 106, 121, 125, 134, 138.) Subsequent investigation reveals that the prints in fact do not match, as the analyst originally opined. (*See infra* Claim 3(E).)

**E.    Thompson**

Six months later, Jennifer Thompson was walking to her aunt's house the morning of October 24, 1991, when a man driving a beige, four-door car stopped and asked if she knew where a particular employment agency was located. (Tr. May 8, 1997 at 9–10.) They talked for a few minutes, and he offered her a job cleaning his house. (Tr. May 8, 1997 at 11.) He said that he had a wife and three children, along with some horses, and they needed a housekeeper. (Tr. May 8, 1997 at 11, 15.) There was a baby seat in the back. The car had a beige interior, an automatic transmission, and a drink caddy sitting on the hump in the middle of the car. There were also a couple packs of cigarettes. (Tr. May 8, 1997 at 12.)

The man drove Thompson to her aunt's house, but her aunt was not home, so the man asked her if she wanted to come meet his family. (Tr. May 8, 1997 at 15.) She initially said no, but changed her mind when he promised to bring her back home right after the visit. (Tr. May 8, 1997 at 15.) They drove into the desert, and he told her not to worry because he was just going the "back way" to his house. (Tr. May 8, 1997 at 16.) He eventually stopped the car and sexually assaulted Thompson (Tr. May 8, 1997 at 17–18.) After the assault, the man got out of the car and ordered Thompson to follow him; when she got out of the car, he picked her up by the neck and hit her head against the ground. (Tr. May 8, 1997 at 25.) She briefly lost consciousness; when she awoke, the man came back over to her and choked her with his hands. (Tr. May 8, 1997 at 25–26.) She lost consciousness again, and by the time she awoke a second time, the man was gone. (Tr. May 8, 1997 at 25–26.) She walked to a nearby race track. (Tr. May 8, 1997 at 28.) She was treated at a hospital that day. (Tr. May 12, 1997 at 10.)

Five days after her assault, police showed Thompson a photo lineup (which included Kroll, the suspect from Zingaro's case, but not Lehr); she did not make a positive identification. On November 7, at that point two weeks after her assault, she completed a composite sketch. On February 26, 1992, the police subjected Thompson to hypnosis. (Tr. Apr. 8, 1996.)

**F.  Christorf**

Margaret Christorf was last seen between 2:00 and 3:00 a.m. on November 8, 1991, at a Circle K convenience store in Phoenix. (Tr. Oct. 2, 1996 at 53–54.) She appeared very drunk, and her bra was more or less exposed. (Tr. Oct. 2, 1996 at 57–58.) The last a store worker saw of her, she was talking to someone in a truck, possibly trying to get a ride, but he did not actually see her get in the truck and drive away. (Tr. Oct. 2, 1996 at 63.) Later that morning, a man walking his dog in the citrus grove near his home would discover Christorf's body. (Tr. Sep. 26, 1996 at 159–61.) Her sweater was totally unzipped, her bra unsnapped and lifted up above

9

her breasts, and her pants were pulled down. Her hair was matted with what looked like blood and there appeared to be injury to her skull. (Tr. Sep. 26, 1996 at 141–142.)

### G.    Ailshire

Ten days after Christorf's body was found, on November 18, 1991, Jennifer Ailshire got home from school between 3:00 and 3:30 p.m., but her father was not there. (Tr. Oct. 7, 1996 at 20.) She decided she was going to walk to her father's friend's house to see if her father was there. Around 9:00 that night, she caught a bus and went to the family friend's house, found that her father was not there, and then walked back to the bus stop. She waited about 5–10 minutes, but no bus came, so she started walking. (Tr. Oct. 7, 1996 at 21–22.) She walked a mile or two when a man drove out of a parking lot and asked if she wanted a ride. (Tr. Oct. 7, 1996 at 23–24.) The car was a "big car," a Cadillac or Buick. It was tan or beige and a four-door. Both of the seats were bench seats, covered in velvet-like material, and the interior of the car was light brown. The car was an automatic and there was a tray between the two seats on the floor containing coins and an ashtray. (Tr. Oct. 7, 1996 at 31–32.) She said no and kept walking, but he circled around and asked her again. She said yes this time because it was cold. (Tr. Oct. 7, 1996 at 25–26.) Ailshire noticed there was a blue-grey baby seat in the back as well as a little pink sweater. (Tr. Oct. 7, 1996 at 28–29.)

She told the man where she lived, and he started driving. At one point, she told him he was not going the right way. He stopped at a convenience store because he said he needed something to drink. (Tr. Oct. 7, 1996 at 30.) He returned to the car with a bottle of Dr. Pepper and a little bag. (Tr. Oct. 7, 1996 at 32.) When they left the store, the man did not turn around and said he knew a shortcut or another way to get there. (Tr. Oct. 7, 1996 at 33.) He turned into a desert area, and after a mile or two, he turned right onto a dirt road. He said he was stopping because he had to go to the bathroom. (Tr. Oct. 7, 1996 at 41–43.) He drove the car around a

1    tree, got out, came around the passenger side, opened the door, and lifted Ailshire

2    out. He said, "You're going to do what I say now." (Tr. Oct. 7, 1996 at 44–45.) He

3    then sexually assaulted Ailshire.

4         When the assault was over, Ailshire was putting her clothes back on when he

5    took her shoe and threw it away from the car. When she went after the shoe, he

6    drove away, going back up the dirt road. Ailshire walked until she came to a

7    retirement home and knocked on the door. (Tr. Oct. 7, 1996 at 20.)

8         Police responded to the retirement home, and Ailshire was taken the hospital.

9    (Tr. Oct. 2, 1996 at 125–27.) When interviewed, Ailshire described her attacker as

10   a white male, about 30 years of age, with light brown collar-length hair. He had a

11   medium length mid-chest beard, said he was very fat, and wore white tennis shoes.

12   (Tr. Oct. 2, 1996 at 147–48.) A sexual assault examination kit was performed. (Tr.

13   Oct. 2, 1996 at 110–11, 122.)

14        Two days after her assault, Ailshire completed a composite sketch. Around

15   this time, police also met again with both Hancock and Collins.

16        **H.    Cronin**

17        In January, 1992, Belinda Cronin lived with her step-brother and another

18   roommate in Phoenix. (Tr. Oct. 10, 1996 at 57.) Her car was not working, and she

19   hitchhiked quite a bit. At about 7:00 p.m. on January 20, 1992, she paged Larry

20   Stark. Stark called her back, they talked briefly. He never heard from her again.

21   Cronin told her roommate that she called Stark to ask him if she could come over

22   and borrow some money. (Tr. Oct. 15, 1996 at 42.) She left at about 10:15 p.m. that

23   evening, intending to hitchhike to Stark's house, and never returned. (Tr. Oct. 15,

24   1996 at 43–44.)

25        Cronin's body was discovered on June 11, 1992. (Tr. Oct. 8, 1996 at 34–35.)

26   The body was badly decomposed, missing one arm and both legs, it had mummified

27   skin on certain parts of it, and bones were found in different locations around the

28   body and further south in the desert, evidently carried off by animals. (Tr. Oct. 9,

1996 at 17–18.) There was no way to tell whether the death had occurred at the spot that the remains were found. (Tr. Oct. 9, 1996 at 47.) The assumption was that Cronin died some months earlier because there were essentially no soft tissue organs remaining. (Tr. Oct. 1, 1996 at 25.) Forensic anthropology evidence indicated that Cronin had been dead for somewhere between three and six months. (Tr. Oct. 9, 1996 at 84.)

### I.     Morales

A month after Cronin went missing, Michelle Morales was last seen on the afternoon of February 7, 1992. (Tr. Oct. 16, 1996 at 7–8, 20, 29.) She hitchhiked on occasion, and that day she was dropped off at a convenience store at about 2:05 p.m. so she could use the telephone. (Tr. Oct. 16, 1996 at 29–31.)

Twelve days later, on February 19, some cowboys found Morales's body in the desert. (Tr. Oct. 15, 1996 at 74–75.) Her body was lying under a bush 100 yards from a dirt road. (Tr. Oct. 15, 1996 at 76–82.) Police found shoe prints and a rock with hair stuck to it near her body. (Tr. Oct. 15, 1996 at 99.) They also found a pair of black stretch pants in the open desert nearby. (Tr. Oct. 15, 1996 at 108.) Morales was nude from the waist down, with her top pushed up over her breasts, and lying face down under a bush. (Tr. Oct. 15, 1996 at 118–19.) There was no blood or semen detected on Morales' blouse or pants. (Tr. Oct. 16, 1996 at 57.) Initial testing revealed semen in Morales' anus, but further testing yielded negative results, which indicated either a very low concentration or degradation of the sample. (Tr. Oct. 16, 1996 at 62-64.) Morales's body exhibited signs of blunt-force head trauma and sexual assault. (Tr. Oct. 16, 1996 at 80, 105.)

### J.     Ross

At about 11:15 p.m. on February 23, 1992, a man offered Elizabeth Ross a ride as she walked home. (Tr. Oct. 21, 1996 at 7.) She accepted the ride and got into his car. (Tr. Oct. 22, 1996 at 40.) The man drove a gray, four-door, compact car, with a child's car seat in the back seat. (Tr. Oct. 21, 1996 at 9–10.) Ross noticed

1   that the car's radio knobs were missing. (Tr. Oct. 21, 1996 at 14.) The man told her

2   he was married and lived out near Sun City. (Tr. Oct. 21, 1996 at 15–16.)

3         The man drove for some distance, and eventually turned along a dirt road

4   until he said something like, "this is as good a place as any," and stopped the car.

5   (Tr. Oct. 21, 1996 at 18.) There he sexually assaulted Ross, and demanded she

6   perform sex acts or he would leave her in the desert. (Tr. Oct. 21, 1996 at 19.) At

7   one point the man said, "Let's go for a walk," and pulled Ross out of the car. (Tr.

8   Oct. 21, 1996 at 24.) They walked away from the car into a gully or wash, where he

9   made Ross sit on a rock and perform oral sex. (Tr. Oct. 21, 1996 at 25.) He told her

10  that after she "finished the job" he would take her back to town. (Tr. Oct. 21, 1996

11  at 25.)

12        When the assault was over, the two smoked cigarettes. (Tr. Oct. 22, 1996 at

13  44.) The man then said, "Let's go," and Ross started walking back to the car. (Tr.

14  Oct. 22, 1996 at 45.) She dropped her sweater, and when she picked it up the man

15  hit her over the head. (Tr. Oct. 22, 1996 at 45.) The next thing Ross remembered

16  was walking in the desert during the day and falling down. (Tr. Oct. 21, 1996 at 29.)

17  A trucker the next morning found her and helped her. (Tr. Oct. 17, 1996 at 48, 64.)

18        Ross told emergency personnel at the scene that her attacker was a white

19  male; between 20 and 30 years old; about six-foot-one; with a light brown mustache

20  and a beard that was full at the chin and thin on the sides; and reddish brown hair

21  that hung a little past his shoulders. (Tr. Oct. 16, 1996 at 72–73.) The next day, she

22  spoke with detectives while she was at the hospital. She told police that her attacker

23  had about 4-days' growth of beard around his chin, and a light brown mustache.

24  (Tr. Oct. 22, 1996 at 48.) She also tentatively identified the man's car as a Nissan

25  sedan from a vehicle identification encyclopedia. (Tr. Oct. 22, 1996 at 50.)

26        **K.    Investigation**

27        Because two victims had reported the potential letters on their attacker's

28  license plate, police searched motor vehicle records and discovered that Lehr owned

13

1  both a General Motors car with a plate containing the alleged plate letters and a

2  Nissan sedan. (Tr. Oct. 23, 1996 at 63–67.) At that point, police pulled Lehr's

3  driver's license photographs taken in 1989 and in March of 1992. From that, they

4  prepared a photographic lineup. (Tr. Oct. 23, 1996 at 71, 72.)

5       Police brought Ross in and showed her three photo arrays on June 23, 1992

6  (despite her having already completed and viewed a composite sketch of her

7  attacker): one contained Lehr's March 1992 driver's license photograph, another

8  his 1989 photograph, and a third contained no photograph of Lehr (it is unknown

9  whether the third array contained alternative suspects). After looking at the array

10  containing his March 1992 photo, Ross tentatively picked out that photo saying, "it

11  sort of looks like [Lehr], but not really. His hair and beard look correct, but I'm not

12  positive it's him." (Tr. Dec. 15, 1994 at 5, 8–15, 20, 23.)

13       The following day, police surveilled Lehr before arresting him. (Tr. Oct. 24,

14  1996 at 5–6.; Tr. Dec. 14, 1994 at 31, 33, 36; Tr. Oct. 22, 1996 at 129–33.) The

15  same day, police put together a live lineup. (Tr. March 9, 2009 at 49–50.) It

16  consisted of Lehr and five other men. (Tr. Dec. 14, 1994 at 31, 33, 36.) Cathy

17  Zingaro participated in the lineup procedure 15 months after her assault. She

18  initially could not identify anyone, but when prompted to view the lineup a second

19  time she asked #3, Lehr, to step forward. After leaving the room, she picked Lehr.

20  (Tr. Feb. 9, 2009 at 99; *see also* Tr. Mar. 4, 2009 at 159.) Thompson also

21  participated in the lineup, eight months after her own assault, and she identified

22  Lehr. (Tr. Feb. 11, 2009 at 79.) Ailshire also participated, but said Lehr "looked

23  like" her attacker, "I think it's him, but I can't be sure." (Tr. Dec. 14, 1994 at 60–

24  61.). Gabriel said, "it looks like No. 3," but that she "seemed somewhat hesitant to

25  positively" make the identification. (Tr. Dec. 14, 1994 at 63–69.) Tracie Hancock

26  was only 60 percent sure when she picked Lehr. (Tr. Dec. 14, 1994 at 69.)

27       Police searched Lehr's house on June 26. (Tr. Oct. 24, 1996 at 37.) While

28  there, detectives spoke with Lehr's wife, Renee Lehr. (Tr. Oct. 26, 1996 at 141–

43.) They asked her whether Lehr had given her any gifts in the time period of the investigation, and Renee brought out a small plastic box and a ring. (Tr. Oct. 26, 1996 at 143.) Two years before, Cronin had showed her mother's friend, Annette Myott Hansen, a ring she had found. (Tr. Oct. 10, 1996 at 29–30; 38.) Hansen would claim the ring found in Lehr's home was the one Cronin had shown her. (Tr. Oct. 24, 1996 at 35–36.) This was the only evidence the State had to tie Lehr to Cronin's murder. Evidence developed in post-conviction shows the ring was not unique, contrary to testimony put on by the State. (PCR Pet. Ex. EE at 3). Lehr himself testified during his 1996 trial that he bought the ring at a garage sale in December of 1991, along with some other trinkets and jewelry, that he gave his wife the jewelry for Christmas and later tried to pawn the ring. (Tr. Nov. 19, 1996 at 26–28.) When the pawn shop would only give him $5, he decided to keep it. (Tr. Nov. 19, 1996 at 26–28.) He recalled his twin daughters fighting over the ring on the way home from the pawn shop, so he and his wife decided to give the girls rings for Christmas, which is how he remembered that he owned the ring before Christmas, 1991. (Tr. Nov. 19, 1996 at 29.) Lehr's wife, Renee, similarly testified that Lehr gave her the ring prior to Christmas, 1991. (Tr. Oct. 29, 1996 at 116.)

**L.     DNA**

During the investigation, the Arizona Department of Public Safety ("DPS") conducted DNA analysis using one of the earliest forms of the technology, "Restriction Fragment Length Polymorphism," or "RFLP" technology. (Tr. Oct. 30, 1996 at 61.) DPS went through a validation process to use this technology, but there were concerns with its validity. For example, DNA samples loaded in different concentrations could have led to false positives. (*See e.g.*, Tr. July 5, 1995 at 80–84.) The final end product for the DNA results sometimes yielded additional information where there should have not been any. If this happened, DPS should not have analyzed the results. Yet DPS and the State offered the evidence of a "match" in various cases. (Tr. July 5, 1995 at 139–41, 143.) The precision studies

done by DPS, which helped to develop a standard error of measurement for announcing results, also contained sloppy scientific work, including results that appeared to have been doctored and/or fabricated. (Tr. Nov. 5, 1996 at 18, 20.)

In April of 1992, the laboratory had already started conducting DNA testing on evidence collected from the crimes at issue here. The State obtained results which suggested Lehr was a contributor to DNA samples collected from the scenes. But the earlier problems with DPS were reflected in Lehr's case. For example, some of the results in Lehr's case included additional data that should not have been expected. (Tr. Nov. 4, 1996 at 40–42.) Further, DPS had not established the principles or rules for announcing match statistics, or how commonly a resulting DNA profile would statistically appear, in accordance with authoritative studies on the issue. (Tr. Nov. 4, 1996 at 77.) Even though, in a vacuum, some of the results obtained by DPS may have seemed valid, the problems with DPS laboratory's overall accuracy and reliability left open questions on the laboratory's baseline ability to rely on this testing. (Tr. Nov. 7, 1996 at 60–61.)

In 2002, the State would—on its own and without ever consulting with Lehr's counsel at the time—conduct updated testing on evidence from three cases that the Arizona Supreme Court eventually remanded for re-trial. (*See* ROA 813 at 5.) The results of that new testing included Lehr as a potential contributor of the DNA, but the questions regarding the reliability of this evidence still remained. (*See e.g.*, Tr. Feb. 24, 2009 at 212–20 (raising potential issues with chain of custody of the evidence); Tr. Mar. 17, 2009 (referencing issues with cross-contamination).)

## M.    Indictment and charging

On July 6, 1992, a Maricopa County grand jury issued an indictment charging Lehr for crimes related to the ten cases. (ROA 1.) Early in the proceedings the state filed its notice of intent to seek death if Lehr was convicted on any of the three first degree murder cases, but alleged no specific aggravating circumstances it would seek to prove. (ROA 5.)

## II.    SOCIAL HISTORY

Scott Alan Lehr was born on July 6, 1959 in Monroe, Wisconsin at St. Clare Hospital. His mother, Yvonne Lehr (1936–2000), was unmarried. While she had a healthy pregnancy and delivery, she was left abandoned by Lehr's father. She spent time with many of the young men on a local air force base, and believed the father to be Claude Brown. Claude was supposed to pick her up and take her away to get married and start a family. Yvonne packed her bags and waited, but he never came. It turned out that he was on his second marriage and already had a family. It was not until Lehr's second trial that a paternity test confirmed that a Claude Brown living Arlington, Texas, was indeed Lehr's father.

When Lehr was less than a year old, his mother again became pregnant with Lehr's only sister, Rhonda (Lehr) Rojko, born September 23, 1960. For reasons unknown to the family, Yvonne moved to Kansas City, Missouri, pregnant. She left baby Lehr with an aunt for three months while she settled in. Yvonne supported her little family by working as a medical photographer for minimum wage at a local hospital. She had no financial help from the children's fathers. When Lehr and Rhonda were old enough to go to school, they became "latch key kids." Yvonne often worked late or went out on dates after work. Rhonda cooked for the children, then just five and six. She also cleaned the house.

Yvonne was never a very open mother. She was cold. She was very young and the children got in her way of having the life she wanted. Yvonne told them she could have done so much more with her life without them. The children felt unwanted and it was scarring. There were also instances of the children not being properly cared for: When Lehr was just two or three years old, he fell down the stairs and suffered a head injury require stiches across the back of his head. Upon returning home, he fell a second time, splitting open the stiches. Yvonne was different than her sisters. They mothered warmly and were more protective. Aunt Dianne recognized this difference between herself and her sister and still wishes

17

that the children had come to her with their problems. Lehr was always detached from Yvonne as a child. When she got older, Yvonne felt guilty. She made up for it. She was a doting grandmother and helped her adult children financially.

While working at the hospital, Yvonne met Dr. Sid Blubaugh. Sid became a long-term fixture in Lehr household. He dated Yvonne from the time Lehr was 8 until he was 16. By day, he was a prominent physician. By night, he sat around on Yvonne's couch drinking to excess and watching football. For nearly ten years, he terrorized the Lehr children. He enacted draconian punishments for arbitrary reasons. Lehr was made to sit in a freezing cold bath tub for three hours and forced to get every speck of dirt out of the car by hand, no vacuum. Young Rhonda was coerced into rubbing lotion onto Sid's bare back. In addition to this physical and emotional abuse, there are allegations Sid also sexually abused the children.

During his first trial, defense attorney Michael Reeves developed a close relationship with Lehr. Lehr reportedly shared that he had been physically and sexually abused by Sid; Reeves also suspected possible abuse by Lehr's own mother. Similarly, psychologist Donna Schwartz-Maddox, who conducted an evaluation of Lehr, reported that Lehr's mother sometimes walked around the house naked and allowed Sid to show inappropriate pictures of her to the children. There were family game nights of spin the bottle and naked twister. In addition, Sid's abuse extended to emasculating Lehr, calling him a "sissy" and a "fag" and ridiculing him for not loving sports. Sid was a misogynist and was known for saying things like, "All women are alike, if you turn them upside down, they all look the same." Yvonne never stopped Sid from abusing the children, further neglecting their needs. She had financial security with Sid and put up with him in exchange for that. In 1973, Yvonne and the children followed Sid from Kansas City to Phoenix.

In the summer, Lehr would escape to Wisconsin and his grandfather, William "Bill" Lehr's farm. The two were inseparable. Lehr was "Bill's boy." He had always

wanted a boy who would take over the farm. Lehr would help his grandfather take care of the chickens, pigs, and dairy cows. William Lehr (1911–1979) was a bachelor who lived alone. He played accordion in local polka bands and cards every afternoon in the bar downtown. Lehr would ride along in his shiny red Pontiac convertible, drink soda, and eat candy while his grandpa chatted with his friends and hit on women. William was a womanizer. This is what broke up his marriage with Lehr's grandmother, Myrl Trotter (1915–1966). After the divorce, he had a few live-in girlfriends that he referred to as "the housekeepers."

Lehr spent a lot of time alone on the farm. He walked up and down the railroad tracks that cut through shady trees and split the property in half. But Lehr would also play with his sister and cousins, often getting into mischief. Lehr was once electrocuted to unconsciousness when he touched a live fence wire on the farm at age six or seven.

When he was young, Lehr suffered from Tourette's syndrome. He was teased at school for his ticks, which included mouth and arm movements. He also felt compelled to touch doorways and clear his throat. At home, he was punished by Sid who said Lehr could stop if he wanted to. Rhonda remembers him shaking his knee nervously. He eventually grew out of his behaviors but continued to have obsessive thoughts about order and cleanliness that preoccupy much of his time to this day. His cell must be spotless and everything in its place. He feels compelled to touch certain things repeatedly and he obsesses over tasks until they are completed perfectly. Lehr has a clinical diagnosis of obsessive compulsive disorder.

As a child, Lehr was not very energetic. He watched a lot of television. Rhonda says that if he were a kid today he would have played video games. Lehr was a loner and not very happy. Because they moved a lot they didn't make a lot of friends. Lehr didn't care to do much with other children when they were in Kansas City. He tried to act tough and like he didn't care about anything.

As a teenager Lehr's personality opened up. His cousin Donna said he was

"a charmer." He had friends and a good personality. At age 15, Lehr began habitually smoking marijuana, which he reportedly continued until the day he was arrested. He later reported that he used it to "bury unpleasant memories." Despite this, he was a good kid. He performed fairly well in school, although he cared for it very little. He did well enough that he got into the Arizona State University and attended for a year and a half. His high school math teacher, Jerry Kopke, remembers him as being a good student. Kopke was also the high school tennis coach. Lehr played varsity all four years and Kopke remembers him as a good tennis player and has only positive memories of Lehr. Lehr was also involved in the Washington High School FFA.

Lehr started classes at Arizona State University after high school but, after three semesters, decided it was not for him. During this time, Lehr had a work-study job cleaning in the wood shop. He also went through jobs at an IHop, as a racquet stringer, a valet, at Loves BBQ, McDonald's, One Ave Marble Club, Jack in the Box, and at a roller rink.

Lehr finally settled into a job at the Phoenix Baptist Hospital where his mother worked. He was an x-ray orderly and trained to receive his nurses' aid certification. He was promiscuous and dated many women while working at the Hospital. He also worked as a valet for a year with his old friend Mark Effinger.

In 1983, Lehr met Kimberley Lynn Holley. Kim infatuated Lehr and she pressured him into marriage and children before he was ready. In 1985 the couple had twin daughters named Danielle and Teal. When the girls were two years old, Kim abandoned the family to join the Army. She announced her intentions on Christmas day and left Lehr as a single father. By all accounts, Lehr was a wonderful father to his little girls. They were happy and healthy. He raised the girls with the help of his mother, Yvonne and sister Rhonda.

When Kim was pregnant with the twins, he became serious about making money. His Uncle Randy in Wisconsin had taught him the tree trimming business

as a boy and he saw it as the family business. He found a partner, Alan Teeples, whom he had met through a former girlfriend Kim Teeples. They knocked on doors looking for work. Alan eventually gave up, but Lehr kept going and ultimately things picked up and he had a regular clientele. In 1984, he fell 20 feet out of a tree onto his head and back and he had a momentary loss of consciousness.

Lehr's cousin Donna Whitney and her husband moved to Arizona from Wisconsin to help when Kim left. The little twins would sit on Donna's lap and cry because mommy was at "Army school." Donna and Lehr had always been close, but her husband was a bad influence on Lehr. They went into the tree trimming business together and let their cannabis habit get in the way of their success. Soon, they were smoking cannabis all day and no longer looking for work.

Donna had worked with Renee Dishong at a store called Smitty's. Donna introduced Lehr and Renee and the pair quickly fell in love. Soon after, Renee found out she was pregnant. Lehr felt the family was struggling financially and did not want a third child. When Renee wanted to have the baby, they decided to get married and formalize their family. On Valentine's Day, 1990, Lehr and Renee were married and had a third child, daughter Sedona, later that year on October 11, 1990.

Renee treated Teal and Danielle like her own and, ultimately, the family thrived. Due to financial struggles and a series of bad luck, the family had to move quite frequently in the early 1990s. They sold the house Lehr had shared with Kim and ended up unsettled. Houses in poor repair, in bad school districts, and that were too small all kept them uprooted. Without a permanent address and phone number Lehr could not keep up his tree trimming business. The family went on food stamps. His inadequacy as a breadwinner impacted him mentally. Yvonne told Rhonda she thought Lehr was depressed for the year before he was arrested. Lehr became more introverted. Due to the family's struggles, Lehr and Renee were arranging a move to Prescott for a new start when he was arrested in July of 1992.

1     **III.   PROCEDURAL HISTORY**

2       Lehr's case was defined and infected by the improper joinder of all these

3 unrelated cases, and the cross-admission of evidence and testimony at trial. There

4 remains significant doubt that evidence from any one victim and crime would have

5 been sufficient to sustain a conviction. Yet, taken together, the evidence against

6 Lehr was compounded and redoubled, fundamentally altering the nature of the case

7 against him, and depriving him of one of the core tenets of due process: that he be

8 judged solely on the evidence demonstrating that he committed a specific crime,

9 and not convicted and sentenced by the jury's passions, biases, preconceptions, or

10 notions of Lehr's propensity for misconduct.

11     **A.   Lehr's 1996 & 1997 trials**

12       Lehr's first trial initially joined together all ten victims and their related

13 charges: 39 counts, including sexual assault, kidnapping, attempted first degree

14 murder, sexual assault and kidnapping against children, aggravated assault, sexual

15 conduct with a minor, and three counts of first degree murder. (ROA 1.)

16       On November 10, 1994, Lehr filed a motion to sever the charges into ten

17 separate trials, each corresponding to a different victim. (ROA 91.) The State

18 opposed, arguing that the cases were properly joined because they were "of a same

19 or similar nature," meaning that, under Rules 404(b) and/or 404(c) of the Arizona

20 Rules of Evidence, evidence of each offense would admissible at any and all other

21 trials to prove identity, motive, common scheme or plan, and (under Rule 404(c) as

22 related to sexual offenses) sexual propensity. Thus, the State concluded, severance

23 would be unnecessary. (ROA 100.)

24       The State subsequently sought to sever only the cases of Hancock, Gabriel,

25 and Thompson, on the basis that those three witnesses had undergone pretrial

26 hypnosis. (ROA 217.) This motion to sever was granted, but severance was denied

27 as to the remaining victims. (ROA 223.) Lehr subsequently moved to dismiss the

28 charges concerning Morales, or in the alternative to sever those counts for a separate

1   trial. This motion was also denied. (ROA 259; ROA 259; ROA 272.)

2   Despite the partial severance, the State nevertheless sought to persuade the

3   juries in both trials using evidence from all ten victims: it gave notice of its intent

4   to introduce evidence of other "bad acts" under Rule 404(b) at both trials. (ROA

5   227.) As such, at Lehr's 1996 and 1997 trials, both juries considered evidence and

6   testimony relating to all ten victims: testimony from Thomas and Gabriel was

7   introduced at the 1996 trial related to the remaining seven victims, while testimony

8   from those seven was elicited at the trial on the three previously hypnotized victims.

9   (*See* Tr. Oct. 23, 1996 at 38–50 (testimony of Gabriel); Tr. Oct. 24, 1996 [1:42 p.m.]

10  at 5–28 (testimony of Thompson).)

11  The proceedings were consolidated for sentencing. (Tr. July 8, 1997 [10:43

12  a.m.] at 8; ROA 556.) After a brief mitigation phase (discussed in more detail

13  below), the court concluded that the State had proven all three aggravating

14  circumstances beyond a reasonable doubt: that Lehr had been convicted of another

15  offense for which under Arizona law a sentence of life imprisonment was

16  imposable, based on the other murders in the same trial (A.R.S. § 13-703(F)(1));

17  that Lehr was previously convicted of a felony involving the use or threat of

18  violence, based on the attempted murder and assault charges from the 1997

19  hypnosis trial (A.R.S. § 13-703(F)(2)); and that Lehr had committed the murders in

20  an especially heinous, cruel, or depraved manner (A.R.S. § 13-703(F)(6)). (ROA

21  567 at 3–5.) The court also concluded that no statutory mitigating factors existed,

22  and that the non-statutory mitigating factors which Lehr did prove did not, taken

23  alone or together, outweigh the aggravating circumstances. (ROA 567 at 12–17.)

24  Lehr was sentenced to over 700 years in prison, and the court imposed

25  sentences of death for all three of the first-degree murder counts. (ROA 567 at 18.)

26  As described below, Arizona Supreme Court affirmed these convictions in

27  part, but reversed and remanded for a new trial the charges related to Collins,

28  Christorf, and Morales, due to the trial court's erroneous limitation of cross-

1   examination regarding the validity of the State's DNA analysis. *State v. Lehr* ("*Lehr*
2   *I*"), 38 P.3d 1172 (Ariz. 2002). It also found insufficient evidence to support the
3   (F)(6) aggravator. *Id.* at 1186.

4          Subsequently, following the United States Supreme Court's decision in *Ring*
5   *v. Arizona*, 536 U.S. 584 (2002), the Arizona Supreme Court further vacated,
6   remanding for resentencing only, the death sentence imposed for the murder of
7   Cronin. *State v. Lehr* ("*Lehr II*"), 67 P.3d 703 (Ariz. 2003).

8          **B.     Lehr's 2009 retrial and resentencing**

9          This complicated procedural posture only worsened the prejudice faced by
10  Lehr from the amalgamation of the charges against him. On remand, two critical
11  errors combined to infect Lehr's re-trial at a fundamental level.

12         First, the State sought leave for, and the trial court allowed, the admission of
13  prior "bad act" evidence involving all of Lehr's prior convictions and pending
14  remanded charges. The State claimed that this evidence was admissible to prove
15  modus operandi, identity, and continuing aberrant sexual propensity. (ROA 627;
16  ROA 630; ROA 654.) Lehr opposed, and also again moved to sever his cases into
17  one trial per victim. (ROA 649; ROA 650.) Instead of holding an evidentiary
18  hearing on the matter, the trial judge relied on transcripts from the prior trials
19  involving the various witnesses, and after argument ruled that all of the prior bad
20  act evidence was admissible, and denied any severance. (ROA 712.) As a result, the
21  jury at Lehr's retrial heard nearly all of the evidence admitted at his first two trials
22  in 1996 and 1997—even though his retrial only involved charges related to Collins,
23  Christorf, and Morales.

24         Second, the trial court granted the State's request to combine these guilt-
25  phase retrials with the resentencing for the murder of Cronin. Initially, it appears
26  that the trial court neglected to rule on how to handle the Cronin resentencing; it
27  later invited the State to brief the issue of consolidating that matter with Lehr's
28  retrial for the charges as to Christorf, Morales, and Collins. (*See* ROA 714, at 1–2.)

1    In response to the court's inquiry, the State filed a supplemental memorandum

2    seeking to join the two proceedings, and admit evidence concerning Cronin's

3    murder at Lehr's retrial. (ROA 713.) Lehr objected (ROA 732), but the court

4    ultimately denied the objection and allowed the cases to be combined, and the

5    evidence to be admitted (ROA 746, at 3–7). As such, the jury that was asked to

6    consider anew the question of Lehr's guilt for the murders of Christorf and Morales

7    was told from the outset, even during voir dire, that Lehr had already been convicted

8    of the first degree murder of Cronin —in addition to hearing the highly prejudicial

9    testimony from seven other unrelated victims. Then once it had adjudged his guilt

10   for the deaths of Christorf and Morales, this jury would need to decide the question

11   of whether Lehr should be sentenced to death for the murders of Christorf and

12   Morales while also being asked to decide Lehr's punishment for Cronin's murder

13   as well.

14       The jury convicted Lehr of both counts of first-degree murder for Christorf

15   and Morales, as well as counts of sexual assault and kidnapping for these victims

16   and Collins. (ROA 937, 938, 939, 942, 943, 944, 945.)

17       For the first-degree murder charges, the State had previously given notice of

18   its intent to seek death based on the (F)(2) and (F)(6) aggravators, as well as (F)(8),

19   for a case involving multiple homicides. (ROA 618.) Lehr moved to strike the (F)(6)

20   and (F)(8) aggravators (ROA 733), and the State conceded as to the (F)(8)

21   aggravator (ROA 739), and later withdrew (F)(6). (*See* ROA 929.) Yet, just prior to

22   the aggravation phase of the trial, the State sought to amend its notice to allege that

23   Lehr's prior non-capital convictions and current capital and non-capital convictions

24   qualified as (F)(1) aggravators. The trial court allowed the amendment. (*See* ROA

25   946.)

26       During the aggravation phase, the jury found that the State proved the (F)(1)

27   and (F)(2) aggravators. (ROA 932.) After the penalty phase, the jury sentenced Lehr

28   to death for the murders of Christorf and Morales, (ROA 966; ROA 967), which the

1    trial court imposed (ROA 974), but deadlocked as to Cronin (ROA 968). The State

2    withdrew its death penalty allegation involving Cronin and Lehr was sentenced to

3    life in prison for that offense. (ROA 978; ROA 1004.)

4        On appeal—his third proceeding before the Arizona Supreme Court—Lehr

5    again raised numerous challenges to his conviction and sentences, including

6    objections to the joinder of multiple crimes for the retrial and sentencing

7    proceedings and the continued prejudicial introduction of prior bad-act evidence, as

8    well as challenges to his waiver of presence, improper DNA evidence, jury

9    misconduct, erroneous jury instructions, and ineffective assistance of counsel at the

10   mitigation phase. (*See* DA2 82 at iii–iv.) The Arizona Supreme Court rejected these

11   challenges and affirmed Lehr's convictions and sentences, including his two

12   sentences of death. *State v. Lehr* ("*Lehr III*"), 254 P.3d 379 (Ariz. 2011).

13       Lehr further challenged his convictions and sentences in post-conviction

14   proceedings under Arizona Rule of Criminal Procedure 32.1, alleging multiple

15   instances of the denial of the effective assistance of counsel and the denial of

16   constitutional rights, and further objecting to irregularities in the DNA testing and

17   deprivation of due process and Lehr's right to a fair trial by the joinder and cross-

18   admission at each of his trials of all the evidence conglomerated against him. (*See*

19   PCR Pet.; PCR Pet.'s Mot. to Am., Apr. 28, 2016 (hereinafter "PCR Pet.'s Mot. to

20   Am."); PCR Pet. Reply; PCR Pet.'s Mot. for Reh'g.) The post-conviction court

21   denied relief on all counts, (PCR Order at 50), and denied rehearing (PCR Ruling

22   Den. Reh'g.) Lehr filed a petition for review in the Arizona Supreme Court. (PFR

23   3.) It denied review without comment in a one-page order dated January 11, 2019.

24   (PFR 29 at 1.)

25       Lehr now files this Petition for Writ of Habeas Corpus containing a detailed

26   analysis of the facts and law underlying each of the following claims to relief. This

27   Petition is timely filed in accordance with this Court's order of July 19, 2019. (ECF

28   No. 17.)

## IV.   STATE COURT PRESUMPTION OF CORRECTNESS

Lehr hereby challenges the presumption of correctness that might otherwise, in different circumstances, attach to certain findings of fact made by the state courts in his case.

As detailed throughout this Petition—and as evidentiary development will further illustrate—numerous factual findings made by the state courts in Lehr's cases, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, any factual findings made by the trial court, by the Arizona Supreme Court on the several direct appeals, and by the post-conviction court.

Findings of fact by the state courts at trial, on the direct appeals, and during post-conviction proceedings, if any are found to exist, are not fairly supported by the record. Further, other exceptions to the presumption of correctness also exist, including but not limited to: that the state courts' fact finding procedures were inadequate to afford Lehr's constitutional claims full and fair consideration; that material facts were not adequately developed in state-court proceedings; that Lehr did not receive full, fair, and adequate hearings in state court; and that state-court proceedings otherwise denied Lehr due process of law.

## V.   EXHAUSTION

Several of the federal constitutional claims alleged herein have been exhausted in proceedings before the Arizona state courts. Some claims, however, were not fully presented to the state court, were not ripe for review, or could only be raised in this forum. It is Respondents' burden to demonstrate that Lehr failed to exhaust a particular claim. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *Brown v. Maass*, 11 F.3d 914, 914 (9th Cir. 1993) (per curiam).

To the extent that any claims are procedurally defaulted, because the doctrine

of procedural default is based on comity, not jurisdiction, this Court retains the power to consider the merits of those claims. *See, e.g.*, *Reed v. Ross*, 468 U.S. 1, 9 (1984). The Court may review the merits of procedurally defaulted claims because Lehr can demonstrate legitimate cause for the failure to properly exhaust, and prejudice from the alleged constitutional violations, or demonstrate that a fundamental miscarriage of justice would result if the claims were not heard on the merits. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). To the extent Respondents argue that any of the Arizona courts' decisions were based on state procedural grounds, those grounds were neither adequate nor independent. *See generally Stewart v. Smith*, 536 U.S. 856 (2002) (per curiam); *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991).

Some claims in this petition were not raised or properly exhausted due to the ineffective assistance of prior counsel, or for other reasons that also excuse default. Lehr will show, with evidentiary development, that he has cause to overcome the default of the claims he raises. Further, as he will explain in the related motions, Rules 6 (discovery), 7 (expansion of the record), and 8 (evidentiary hearing) of the Rules Governing Section 2254 Cases in the District Courts should give a habeas petitioner reasonable means and the ability to investigate to form a sufficient basis to support the claims in his petition. *See McCleskey v. Zant*, 499 U.S. 467, 498 (1991).

Lehr also respectfully reserves the right to timely request a limited stay and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), to return to state court and present unexhausted claims.

Finally, additional claims may be identified after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these proceedings, Lehr will present any additional claims through amendments or supplements to the petition.

/

1

## VI.    THE AEDPA IS UNCONSTITUTIONAL

As an initial matter, the principle that every prisoner must have all of his constitutional claims heard by a court is central to fundamental fairness and the integrity of the U.S. justice system. *See Bounds v. Smith*, 430 U.S. 817, 822–23 (1977). One method of ensuring that a prisoner's constitutional claims are heard is through the writ of habeas corpus. The passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), however, substantially changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the separation of powers, which results in prisoners remaining in prison, and often, as in Lehr's case, under a sentence of death, without review of alleged constitutional defects in these convictions and sentences.

### A.    AEDPA unconstitutionally suspends the writ of habeas corpus

Congress cannot define prisoners' rights so narrowly that it, in effect, suspends the writ of habeas corpus. The writ of habeas corpus is guaranteed by the United States Constitution in the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. The Suspension Clause is a structural limitation on the power of Congress. Like bills of attainder and ex post facto laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred." *See United States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void." *Id.* at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

Because AEDPA prevents federal courts in certain circumstances from granting relief, even when it is undisputed that a conviction or sentence is

1  unconstitutional, it suspends the writ of habeas corpus. *See* 28 U.S.C. § 2254. Under

2  the tenets of AEDPA, the federal court must determine whether, for example, the

3  complete deprivation of a jury in a capital case is a "reasonable" or "unreasonable"

4  constitutional violation.

5      As retired Ninth Circuit Court of Appeals Judge Alex Kozinski has

6  explained:

> Prior to AEDPA taking effect in 1996, the federal courts provided a
> final safeguard for the relatively rare but compelling cases where the
> state courts had allowed a miscarriage of justice to occur. . . . The
> federal court safety-valve was abruptly dismantled in 1996 when
> Congress passed and President Clinton signed the Antiterrorism and
> Effective Death Penalty Act. Hidden in its interstices was a provision
> that has pretty much shut out the federal courts from granting habeas
> relief in most cases, even when they believe that an egregious
> miscarriage of justice has occurred.

13  Hon. Alex Kozinski, Preface, 44 GEO. L.J. ANN. REV. CRIM. PROC. iii, xli (2015)

14  (footnote omitted).

15      **B.**    **AEDPA violates the separation-of-powers doctrine**

16      Congress cannot impinge on the federal courts' duty to say what the law is.

17  Yet Congress does so when it requires Article III courts to ignore any part of the

18  Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*,

19  5 U.S. (1 Cranch) 137, 178 (1803). True, Congress has the power to constrain

20  courts' authority. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993). "The

21  judicial Power of the United States, shall be vested in one supreme Court, and in

22  such inferior Courts as the Congress may from time to time ordain and establish."

23  U.S. Const. art. III, § 1. Congress must not, however, manipulate the "test for

24  determining the scope of [habeas corpus]," because the writ "is designed to restrain"

25  Congress, and because the writ is "an indispensable mechanism for monitoring the

26  separation of powers." *Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008).

27      The separation-of-powers doctrine found in Article III "serves both to protect

28  the role of the independent judiciary within the constitutional scheme of tripartite

government . . . and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (citations and internal quotation marks omitted). When it was confronted with an unconstitutional provision, the Supreme Court in *Marbury* asked whether courts are bound by "an act of the legislature" that is "repugnant to the constitution"; the Court answered, "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177

"[I]f Congress does provide for habeas in the federal courts, Congress cannot . . . instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain the law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc). Because AEDPA requires courts to ignore unlawful detentions if the prisoner does not meet certain provisions, it unconstitutionally suspends the writ of habeas corpus. The question before this Court should simply be whether Lehr's constitutional rights were violated in such a way that he is entitled to relief. Adding the gloss of "unreasonable" versus "reasonable" constitutional violations robs the writ of its power to remedy constitutional wrongs.

### C.    Conclusion

AEDPA unconstitutionally suspends the writ of habeas corpus and violates the separation-of-powers doctrine because it dictates that federal courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also, AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable." This is inconsistent with a judge's duty "to enforce the laws and

1   protect the rights of our citizens against arbitrary state action." *Id.* In these ways,

2   AEDPA is not only unconstitutional, but in fact it "is a cruel, unjust and unnecessary

3   law that effectively removes federal judges as safeguards against miscarriages of

4   justice. It has resulted and continues to result in much human suffering. It should

5   be repealed." Kozinski, J., *supra*, xlii (footnote omitted).

6   ## VII.  FEDERAL CONSTITUTIONAL CLAIMS

7       Lehr petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas

8   corpus releasing him from the custody of Respondents pursuant to the judgments

9   and sentences of the state courts of Arizona, on the grounds that the judgments and

10   sentences were obtained and affirmed in violation of his rights under the

11   Constitution of the United States. In support of this request, Lehr offers the

12   following:

13                   **CLAIM ONE**

14   **The admission of evidence related to all ten victims deprived Lehr of fundamentally fair trials in 1996 and 2009, in violation of his**

15   **rights under the Fifth, Sixth, and Fourteenth Amendments.**

16       Lehr incorporates by specific reference all facts, allegations, and arguments

17   made elsewhere in this Petition.

18       The joinder and cross-admission of evidence related to all ten victims fatally

19   flawed Lehr's trials, depriving Lehr of the guarantee of fundamental fairness, an

20   impartial jury, and due process of law under the Fifth, Sixth, and Fourteenth

21   Amendments.

22   ### A.   Exhaustion

23       Lehr repeatedly objected to the use of Rule 404 evidence at his trials, and

24   raised this issue on both of his direct appeals and in post-conviction.

25       On his first direct appeal, Lehr challenged the introduction of Rule 404

26   evidence to support the charges involving the murder of Morales. (DA1 42 at 97–

27   108.) Because the Arizona Supreme Court reversed Lehr's convictions involving

28   Morales on the basis of improperly precluded cross-examination, it did not address

1    arguments relating to the admission of Rule 404 evidence. *Lehr I*, 38 P.3d at 1181–
2    83.

3        On his direct appeal from his 2009 trial, Lehr also challenged the admission
4    of Rule 404 evidence. (DA2 82 at 26–41, 45–49.) The Arizona Supreme Court
5    rejected this claim, but addressed only Lehr's arguments under Arizona law and
6    rules of evidence; it did not discuss Lehr's constitutional violations. *Lehr III*, 254
7    P.3d at 385–86.

8        In his post-conviction petition, Lehr again challenged the use of Rule 404
9    evidence as having deprived him of a fundamentally fair trial consistent with the
10   Fifth and Fourteenth Amendments of the United States Constitution. (PCR Pet. at
11   30–38.) The post-conviction court denied these claims as well. It concluded that the
12   claims, as to both the 1996/1997 trials and the 2009 retrial, were precluded under
13   Ariz. R. Crim. Proc. 32.2(a)(2), since they were "finally adjudicated on the merits
14   on appeal." (PCR Order at 31.) To the extent that the post-conviction court
15   addressed the substantive merits of these claims, it similarly rejected them solely
16   on the basis of Arizona state laws and rules of evidence. (*See* PCR Order at 32–33,
17   37–38.)

18       Lehr sought review from the Arizona Supreme Court of the denial of his post-
19   conviction petition, again raising a constitutional challenge to the admission of Rule
20   404 evidence during his trials. (PFR 3 at 29–31, 38–43.) The Arizona Supreme
21   Court denied review without comment in a one-page order. (PFR 29 at 1.)

22       Because this claim has not been adjudicated by the Arizona state courts on
23   the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to
24   this Court's review of the claim. If the Arizona state courts' ruling instead
25   constituted a decision on the merits, then the state courts' rejection of the claim was
26   contrary to, or involved an unreasonable application of, clearly established federal
27   law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1).
28   In addition, it constituted an unreasonable determination of the facts in light of the

1    evidence presented. *See* 28 U.S.C. § 2254(d)(2).

2        **B.    Merits**

3        Denial of due process in a criminal trial "is the failure to observe that

4    fundamental fairness essential to the very concept of justice." *Lisenba v. California*,

5    314 U.S. 219, 236 (1941). Due process is denied when "the absence of that fairness

6    fatally infected the trial; the acts complained of must be of such quality as

7    necessarily prevents a fair trial." *Id.* The admission of highly prejudicial, unhelpful

8    prior bad-acts testimony, of dubious relevance, deprived Lehr of this fundamental

9    guarantee.

10       In general, state-court evidentiary rulings are subject to federal habeas review

11   only if they either infringe upon a specific federal constitutional or statutory

12   provision or deprive the defendant of a fundamentally fair trial. *Jammal v. Van de*

13   *Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991); *Kealohapauole v. Shimoda*, 800 F.2d

14   1463, 1466 (9th Cir. 1986). But admission of evidence may be so arbitrary or so

15   prejudicial as to render a defendant's trial fundamentally unfair. *Walters v. Maass*,

16   45 F.3d 1355, 1357 (9th Cir. 1995). A party seeking to invoke evidentiary error as

17   a basis for habeas relief must show that such error had a "substantial and injurious

18   effect on the verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

19       With respect to prior bad acts evidence specifically, the admission violates

20   due process where there are "no permissible inferences that the jury may draw from

21   the evidence." *Jammal*, 926 F.2d at 920. In other words, admission of prior bad act

22   evidence can offend due process when the jury can draw no inference from the

23   evidence *other than* the inference that the defendant's conduct in the case at issue

24   was in conformity with his previous conduct. *See McKinney v. Rees*, 993 F.2d 1378,

25   1384 (9th Cir. 1993).

26       In assessing the admission of such testimony, courts consider the relevance

27   of the evidence of the other bad acts to motive or intent; the opportunity for the jury

28   to weigh the credibility of the witness's account of the other acts, and the judge's

34

1    use of cautionary jury instructions to limit the jury's consideration of the other bad
2    acts. *Johnson v. Runnels*, No. C 02-5537 CW (PR), 2006 WL 823060, at *8 (N.D.
3    Cal. Mar. 29, 2006), aff'd, 320 F. App'x 688 (9th Cir. 2009).

4         The evidence admitted at Lehr's trial was of such salacious and damaging
5    character, and led to such confusion among the jurors, that it "violated those
6    fundamental conceptions of justice which lie at the base of our civil and political
7    institutions, and which define the community's sense of fair play and decency." *See*
8    *Dowling v. United States*, 493 U.S. 342, 353 (1990)

9         At his trial in 1996, testimony from, or relating to, all seven victims joined
10   together was presented to the jury. The result was a powerful buttressing of
11   evidence that was in many of the cases, if considered independently, quite
12   insubstantial. For example, almost no evidence—other than the impermissible
13   inference of Lehr's propensity to commit these crimes—supported Lehr's
14   involvement in the murder of Morales. DNA results were inconclusive. *See Lehr I*,
15   38 P.3d at 519. A hair obtained from her body was found to be dissimilar to Lehr's.
16   (Tr. Oct. 16, 1996 at 71, 78.) No palm fronds—which the State had maintained as
17   characteristic of the crimes—were found at the scene of Morales's murder. (Tr. Oct.
18   29, 1996 at 57.) The last time Morales was seen alive, she was observed leaving a
19   Circle K gas station with a white male who did not at all fit Lehr's description, in a
20   full-size black truck, a vehicle unlike any that Lehr ever owned. (Tr. Nov. 19, 1996
21   at 8–9.)

22        Absent the damning Rule 404 testimony, no evidence presented in the 1996
23   trial supports Lehr's conviction for Morales's homicide. Indeed, on appeal, the
24   Arizona Supreme Court noted that, while the similarities between the murder of
25   Morales and the other crimes charged against Lehr had certain "likenesses," they
26   were not "striking enough to overcome" the prejudice from the other errors the court
27   found at that trial. *Lehr I*, 38 P.3d at 1182. The court was also particularly concerned
28   with the use of Rule 404 evidence to convict Lehr for Morales's murder, "given that

1    Morales was last seen getting into a large black truck with a man who did not fit

2    [Lehr's] description." *Id.* Furthermore, DNA testing from Morales proved

3    inconclusive. (Tr. Nov. 8, 1996 at 66–67.)

4            Further, Lehr's convictions at his first trial were also supported by evidence

5    from two of the three hypnotized victims, whose trials had been severed. Victim

6    Gabriel was permitted to testify about her assault. (*See* Tr. Oct. 23, 1996, at 37–50.)

7    Victim Thompson was also permitted to testify about her assault. (*See* Tr. Oct. 24,

8    1996, at 5–28.)

9            The admission of prior bad act testimony under Rule 404 was even more

10   damaging at Lehr's 2009 retrial. In that case, Lehr was to be tried only for the

11   charges relating to Christorf, Morales, and Collins. Yet the jury instead heard

12   evidence relating to nearly all of the victims from his first trial, including evidence

13   relating to the murder of Cronin. Although the Arizona Supreme Court had found

14   sufficient evidence to support these prior convictions, that does not mean their

15   admission at Lehr's retrial as "other acts" comported with the requirements of due

16   process.

17           The prior offenses were hardly identical in character: the crimes are similar

18   only insofar as each involved a smaller female victim accepting a ride from an

19   unknown male, being driven into the desert north of Phoenix, and sexually

20   assaulted. Even the State's own expert, Robert Emerick, retained at Lehr's 2009

21   trial in order to comment on the allegedly similar character of the various offenses,

22   conceded that there were in fact significant dissimilarities, including variations in

23   the size, weight, and age of the victims; discrepancies in times of day and days of

24   the week of the attack; and differences in the stories used by the perpetrator to fool

25   the victims when they first entered his car. (*See* Tr. Feb. 22, 2009 at 23–24, 40, 46–

26   50.) In fact, evidence adduced at trial showed that the factual similarities in the

27   attacks were very common in the Phoenix area, and fit many more crimes than just

28   the ten victims attributed to Lehr. (*See, e.g.*, Tr. Feb. 12, 2009, at 45–49.) Moreover,

the declaration of Dr. Mark Cunningham (PCR Pet. Ex. R), offered in post-conviction, debunks the theory put forth by Dr. Emerick, that the crimes with which Lehr was charged were similar in that they were all dissimilar.

The opportunity for the jury to weigh the credibility of the witness's account of the other acts also weighed against admission. For example, the court permitted the reading of Hancock's testimony from the 1997 trial after finding her "unavailable" to testify due to her First Amendment objections to the death penalty (*see* Claim 26.) The reading of this testimony into the record by the prosecutor directly prevented the jury from weighing the credibility of her account of the acts.

Further, despite the State's own expert testimony the offenses failed to meet the criteria for Rule 404 evidence, the testimony was undoubtedly extremely prejudicial. The jury at Lehr's 2009 trial heard weeks of evidence related to five other victims who were not part of this case, including from police investigators, DNA experts, and the victims themselves. The State urged the jury to listen to these prior sexual assaults, and concluded that that since Lehr had committed these offenses, he must also have committed the crimes against Christorf, Morales, and Collins. (*See, e.g.*, Tr. Mar. 24, 2009, at 134–38.) The jury heard graphic descriptions of the attacks, including accounts of Lehr's purported violence and deviant behavior. State's expert Dr. Emerick opined, bizarrely, that Lehr's crimes reflected an abnormal sexual interest because they were all so *different*, testifying that "the differences are the norm of sexual deviants." (Tr. Feb. 22, 2008 at 58.) Under this view, nearly any prior sexual misconduct, no matter how different, would be admissible to prove Lehr's guilt. This goes far beyond the admissible inferences that a jury can draw from Rule 404 evidence.

Moreover, the admission of the Rule 404 evidence inflicted even further prejudice on Lehr on account of the trial court's faulty limiting instructions to the jury (to which counsel objected, *see* Tr. Jan. 13, 2009 at 41–45; Tr. Mar. 18, 2009 at 63; Tr. Mar. 24, 2009 at 123–24.) Although the court's pretrial ruling admitting

1     the evidence analyzed the facts and case law only with respect to the testimony's

2     relevance to modus operandi and identity, (*see* ROA 701; ROA 731; Tr. Feb. 9,

3     2009 at 12–15), the court continually instructed the jury that it could consider the

4     prior bad act evidence "to establish the Defendant's motive, opportunity, intent,

5     preparation, plan, knowledge, and identity," (Tr. Feb. 9, 2009 at 18–19: *see also*

6     *infra*, Claim 2.)

7        Before trial began, the judge himself had called the initial stipulated

8     instruction "confusing," (Tr. Jan. 15, 2009 at 182–83), and during voir dire noted

9     that the jurors were having "the most problem[s]" with "the notion that they're

10    going to be hearing other acts evidence," including the fact of Lehr's conviction for

11    Cronin's murder. (*See* Tr. Jan. 15, 2009 at 182–83.) In fact, the jurors themselves

12    frequently explained their confusion on this point during voir dire: one commented

13    that "I just feel that if he's already been convicted of one murder, I just—he should

14    have gotten the death penalty." (Tr. Jan. 14, 2009 at 37.) Another confessed: "If I

15    already know somebody is convicted of a crime that might prejudice me against the

16    way that I think about the rest of the things he's accused of." (Tr. Jan. 14, 2009 at

17    40–43.) Another explained: "I feel that this man is guilty," and "[i]n view of the

18    previous conviction[s] . . . I find it would be very difficult for me to be fair to him."

19    (Tr. Jan. 21, 2009 at 39.)

20        The result of this irrelevant, highly prejudicial, inflammatory, and sensational

21    other-acts testimony, which lacked any but the most superficial similarities to the

22    charges at trial, together with inadequate guidance from the trial judge, was that

23    Lehr was denied a fundamentally fair trial, in front of an impartial jury, where he

24    would be judged "in accord with the traditional and fundamental standards of due

25    process." *See Holmes v. South Carolina*, 547 U.S. 319, at 329–31 (2006).

26        In its closing, the State argued that the evidence could be considered as proof

27    of premeditation, absence of a sudden quarrel, knowledge, and intent to kill, none

28    of which were a part of the trial court's original ruling. (Tr. Mar. 24, 2009 at 134–

38.) Indeed, references to Lehr's other convictions permeated the State's closing, inviting the jurors to consider the question of Lehr's guilt in the shadow of the fact of Lehr's other bad acts. (*See, e.g.*, Tr. Mar. 24, 2009 at 55–56, 59, 61–71.) The State even asked the juror's to "consider the fact that we have DNA that was found" on Ross and Thompson (*Id.* at 78.) Defense counsel objected to the expansive scope of the prosecution's invocation of the Rule 404 evidence, particularly as a part of the State's rebuttal, (*see id.* at 123–24), to no avail. The State repeatedly referenced the other-acts evidence against Lehr, and the poorly-worded jury instruction, to create a generalized aura of guilt around the defendant. (*See, e.g.*, Tr. Mar. 24, 2009, at 134–35, 141–142 ("It is his way, and it's violent."); *see also esp. id.* at 145–48.)

In its final arguments, the State cast the jury in the role of the "next" victim, demanding that the jury not "buy into" the defense's theory of the facts: "[The defense is] telling you your car awaits"; "Don't get in that car." (Tr. Mar. 24, 2009, at 147.) Whatever legitimate purpose the State may have made of the Rule 404 evidence against Lehr, its closing aptly demonstrates that it went well beyond: the prior testimony and evidence against Lehr used to paint a holistic picture of Lehr as a coercive, untrustworthy, sadistic killer, and to exhort the jury to convict him on *that* basis, and not on the factual question of his guilt for the charges at issue. This is precisely what Due Process cannot countenance.

Recent decisions denying habeas relief on the basis of allegedly improperly admitted evidence at trial help demonstrate precisely what makes this case so unique in warranting relief. For example, in *Jamal*, the Ninth Circuit found no denial of due process for the admission of other acts evidence, where the jury *could* properly draw a constitutional inference; the jury *was* properly instructed; the evidence was *not* highly inflammatory, and instead was "relatively sterile"; and the other act evidence concerned "nothing illegal or immoral," and so was "simply not the type of evidence that 'necessarily prevents a fair trial.'" *Jamal*, 926 F.2d at 920–21. Lehr's case is different in every dimension. *See also, e.g.*, *Terrovona v.*

39

1    *Kincheloe*, 912 F.2d 1176, 1180–81 (9th Cir. 1990) (admission of other bad act

2    testimony did not violate due process where trial court balanced probative weight

3    against prejudicial effect and gave jury cautionary instruction); *Butcher v. Marquez*,

4    758 F.2d 373, 378 (9th Cir. 1985) (admission of uncharged offenses does not violate

5    constitutional rights where jury had opportunity to weigh credibility of complaining

6    witness and judge admonished jury to consider incident only as evidence of intent,

7    not as evidence of bad character).

8        Throughout these cases, the key inquiry is whether the admitted testimony

9    permits some reasonable inference *other than* a propensity to commit the charged

10   conduct. *See, e.g.*, *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986) (admission

11   of prior bad act evidence permissible, since it was "especially probative of identity

12   because . . . it did suggest that [the defendant] possessed a unique *modus operandi*");

13   *Walters*, 45 F.3d at 1357–58 (no due process problem where admitted evidence of

14   past bad conduct showed that the defendant had lured a prior victim with a "ploy"

15   that was the "same" as was the case at trial, and the evidence was accompanied by

16   a proper limiting instruction).

17        The decision by the Ninth Circuit in *McKinney v. Rees* is particularly

18   instructive. In that case, the defendant's mother had been found dead, killed by a

19   knife wound. The defendant owned several knives, and is alleged to have had a

20   "fascination" with knives, as well fixation on violence and war-like imagery. 993

21   F.2d at 1381–82. The State argued that this evidence was admissible to show that

22   the defendant in fact owned a knife at the time of the murder, and to show that he

23   had lied about his ownership, thus help to prove opportunity. *Id.* at 1382.

24        The Ninth Circuit disagreed. Because the knife was no longer in the

25   defendant's possession at the time of the crime, it was "irrelevant to any element of

26   the prosecution's case, including opportunity . . . [t]he only inference the jury could

27   have drawn from such evidence is that . . . he was the type of person who would

28   own a knife." *Id.* Because there was no permissible inference the jury could draw,

other than the impermissible conclusion regarding the defendant's propensity for knife ownership and knife violence, the admission "could have violated due process." *Id.* at 1384. The court thus further considered the nature of the admissions: the evidence was "emotionally charged," in that it "help[ed] paint a picture of young man with a fascination with knives and with a commando lifestyle"; the evidence was "not relevant to the questions before the jury," and instead "served only to prey on the emotions of the jury, to lead them to mistrust [the defendant], and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive"; what's more, the case against the defendant, not counting this propensity evidence, "was solely circumstantial." *Id.* at 1385.

As a result, the court concluded that the defendant's trial "was impermissibly tainted by irrelevant evidence such that it [was] more than reasonably likely that the jury did not follow its instructions to weigh the evidence carefully, but instead skipped careful analysis of the logical inferences raised by the circumstantial evidence, and convicted [the defendant] on the basis of his suspicious character and previous acts." *Id.* This rendered the defendant's trial "so infused with irrelevant prejudicial evidence as to be fundamentally unfair." *Id.* at 1386.

The same result obtains in Lehr's case. The Rule 404 evidence admitted against him served no purpose other than to lead the jury to draw impermissible conclusions about Lehr's propensity to commit violent rapes and murders. It could not aid the jury's determination of the identity of the perpetrator, as the State claimed, when the attacks were in fact so different, and when the shared facts of the crimes are merely the normative details expected to be found—and, indeed, were in fact found—in numerous other sexual assaults in the Phoenix area. (*See e.g.*, PCR Pet. Ex. X at 15–27 (presentence investigation report of Carl Gardei where he admitted picking up approximately twenty women in Phoenix during 1991 and 1992, driving them out to the desert, sexually assaulting the women by demanding oral, vaginal, and anal sex, and then leaving them in the desert).)

At the same time, the evidence against Lehr—at least as to some of the victims—was hardly overwhelming. Only a single piece of evidence, a common piece of cheap jewelry, connected him to Cronin's murder. Only a single thumbprint, which, as described below, competent counsel could easily have refuted, tied him to the crime against Zingaro. Unduly suggestive and unreliable eyewitness identification is all that ties him to several others. Yet the jury's ability to carefully assess and untangle these cases of circumstantial evidence was overwhelmed by the highly inflammatory character evidence admitted against him—"just the sort of evidence likely to have a strong impact on the minds of jurors." *See McKinney*, 993 F.2d at 1386. And transcripts from the trial, particularly from the 2009 voir dire, described above, further suggest that the trial court's limiting instruction was of no help. Instead, the jury heard an "emotionally charged" litany of prior acts, all of which they were told should be ascribed to Lehr, enticing them, impermissibly, to convict Lehr on the other charges against him based on the conclusion that he is simply the kind of person who violently rapes and murders. But "[i]t is part of our community's sense of fair play that people are convicted because of what they have done, not who they are." *Id.* at 1386.

As mentioned above, the State's closing only made matters worse. The State urged the jury to consider the Rule 404 evidence as proof of premeditation, absence of a sudden quarrel, knowledge, and intent to kill, going far beyond the original stipulated use of the other-acts evidence. (*See* Tr. Mar. 24, 2009 at 134–35 ("Now it's kind of all wrapped up into whether or not it's also premeditation, or sudden quarrel, heat of passion . . . "Grabbed by the throat. Lost consciousness. Is that ringing a bell here about what happened?").) The State went on to reference evidence from the other crimes admitted against Lehr, urging the jury to "look at all the facts together," asking the jury to divine absence of sudden quarrel, intent, premeditation, reflection, and planning from these other cases, and to apply them to convict Lehr for the charges at trial.

The prejudice from the introduction of the Rule 404 evidence at the guilt phase was not contained to that phase but instead infected the rest of the trial. During the penalty phase, the court also instructed the jury they could consider "the testimony and exhibits the Court admitted in evidence during the trial of this case. . .," (Tr. Apr. 14, 2009 at 114), as well as "anything related to the defendant's character, propensity, history or record, or circumstances of the offense." (Tr. Apr. 14, 2009 at 116.) Again, Lehr's counsel objected, with no success. (*See* Tr. Apr. 14, 2009, at 19–20.) The State's penalty-phase closing again swept together all of the evidence against Lehr, from the earlier trials and from the charges at issue, obfuscating details and painting Lehr's culpability with a broad, and deeply prejudicial, brush. (*See* Tr., Apr. 14, 2009, at 141, 145–46, 148–50.) Again the State told the jury it was "being offered a ride," by the defense arguing "that you should give him life"; again, the jury was told "not to get in that vehicle." (*Id.* at 146–48.) Even Lehr's own counsel contributed to the "lumping" (*see id.* at 156) of the evidence against Lehr, to his extreme detriment: "What Scott Lehr did, not just to Margaret Christorf, Michelle Morales, and Belinda Cronin, but what he did to Miss Ross, to Miss Ailshire, to Miss Hancock, to all those other victims, was horrible. Horrible, horrible, horrible." (*Id.* at 152.) Lehr's defense counsel did him no favors here, as he argues in more detail elsewhere in this Petition. (*See* Claim 3.) The result was that the jury went into the weighing determination of whether Lehr deserves a death sentence armed with the prejudicial Rule 404 evidence.

The key question is not "whether the jurors were 'right in their judgment, regardless of the error or its effect upon the verdict'"; rather, this Court must inquire "'what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened.'" *Id.* at 1385–86 (quoting *Brecht*, 507 U.S. at 643 (Stevens, J.,

concurring)).

In short, where the trial court's decision to admit evidence of prior crimes is "so prejudicial" that it renders the trial fundamentally unfair, habeas relief is proper. *Walters*, 45 F.3d at 1357. Such was the case at Lehr's capital trial. The testimony presented to the jury painted a picture of ten different crimes, similar only in superficial ways common to all crimes of such a nature. The only permissible inference for the jury to draw is that Lehr had committed prior rapes and sexual assaults, sometimes with violence, and accordingly to convict him based on his propensity to commit such crimes, not based on the admissible evidence before it for each individual charge. The Constitution cannot tolerate such a result. This Court should grant the writ.

## CLAIM TWO

**The joinder of the Cronin murder for resentencing along with his 2009 guilt-phase retrials uniquely and profoundly prejudiced Lehr, depriving his trial and sentencing of the due process, fundamental fairness, impartial jury, and fair and individualized sentence to which he was entitled under the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The joinder of Lehr's retrial on the question of guilt related to the charges for Christorf, Morales, and Collins, with the capital resentencing for his conviction related to Cronin, was uniquely damning, and deprived his retrial and sentencings of the fundamental fairness, due process of law, impartial jury, and individualized sentencing entitled to him by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### A.    Exhaustion

Lehr challenged the joinder of his capital retrial and resentencing repeatedly at the time of trial. As counsel explained to the trial court: "[o]ur position from day one has been the Arizona Supreme Court remanded Cronin for resentencing. They

1   remanded Christorf, Morales, and Collins for a retrial. Never did they indicate that
2   you should join those two together." (Tr. Jan. 26, 2009 at 166–67.)

3       Lehr further challenged this highly prejudicial joinder in his direct appeal to
4   the Arizona Supreme Court following his 2009 trial. (DA2 82 at 42–45.) The
5   Arizona Supreme Court rejected this claim, but addressed only Lehr's arguments
6   under Arizona law and rules of evidence; it did not discuss Lehr's alleged
7   constitutional violations. *Lehr III*, 254 P.3d at 386–87.

8       Lehr also challenged the joinder of his retrials and capital resentencing in
9   post-conviction. (PCR Pet. at 34, 37–38.) Further, in his Amended Post-Conviction
10  Petition, Lehr argued specifically that joinder of his resentencing for the murder of
11  Cronin with the retrials of Christorf, Morales, and Collins violated his due process
12  rights. (PCR Pet.'s Mot. to Am. at 7–12.) He further specified that "confusion
13  permeated the voir dire process in this case in 2009." (PCR Pet.'s Mot. to Am. at
14  8.) He argued that there was no individualized voir dire to clear up the confusion,
15  and that the court was "very aware" that there was "a serious concern pertaining to
16  undue prejudice." (PCR Pet.'s Mot. to Am. at 8.)

17      The post-conviction court rejected any notion that the jury was biased by the
18  inclusion of the resentencing for Cronin, since "[j]urors are presumed to follow the
19  law and the instructions given." (PCR Order at 38.) Even so, the court found this
20  claim precluded. (PCR Order at 43.) It also re-affirmed that joinder was proper,
21  again declining to rule on Lehr's constitutional claim. (PCR Order at 43–44.)

22      Lehr also raised this issue in his Motion for Reconsideration of the court's
23  denial of his post-conviction petition, through the lens of the ineffective assistance
24  of prior counsel, which led to the conviction for Cronin's murder that came to be
25  joined with the retrials, as well as substantive violations of Lehr's right to due
26  process. (PCR Pet.'s Mot. for Reh'g at 19–30.) The court denied reconsideration,
27  explaining without citation that "the concept of 'fairness' is different from the
28  constitutional guarantee of 'fundamental fairness.'" (PCR Ruling Den. Reh'g at 2.)

1    Lehr sought review from the Arizona Supreme Court of the denial of his post-

2   conviction petition, again raising a constitutional challenge to the joinder of his

3   resentencing for the murder of Cronin with his retrials on the charges related to

4   Christorf, Morales, and Collins. (PRF 3 at 31–36.) The Arizona Supreme Court

5   denied review without comment in a one-page order. (PRF 29 at 1.)

6    Because this claim has not been adjudicated by the Arizona state courts on

7   the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to

8   this Court's review of the claim. If this instead constituted a decision on the merits,

9   then the state court's rejection of the claim was contrary to, or involved an

10  unreasonable application of, clearly established federal law, as determined by the

11  United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted

12  an unreasonable determination of the facts in light of the evidence presented. *See*

13  28 U.S.C. § 2254(d)(2).

14   **B.    Merits**

15   The joinder and simultaneous trial of multiple offenses offends due process

16  when it renders a defendant's trial "fundamentally unfair." *Featherstone v. Estelle*,

17  948 F.2d 1497, 1503 (9th Cir. 1991). The Court must consider, "on a count by count

18  basis," whether the trial of a particular count "was fundamentally unfair in light of

19  that count's joinder with one or more charges." *Id.*

20   The Ninth Circuit has observed that joinder of multiple counts poses a high

21  risk of prejudice, since "[i]t is much more difficult for jurors to compartmentalize

22  damaging information about one defendant derived from joined counts, than it is to

23  compartmentalize evidence against separate defendants joined for trial," and

24  because studies have established "that joinder of counts tends to prejudice jurors'

25  perceptions of the defendant and of the strength of the evidence on both sides of the

26  case." *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986). This concern

27  can take on a constitutional dimension when it renders a trial fundamentally unfair.

28  *Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir. 1998).

Due process concerns are particularly relevant when the jury is repeatedly encouraged to consider the multiple charges "in concert," for example "as reflecting the modus operandi characteristic of [a defendant's] criminal activities." *Id.* When so incited, "the jury could not reasonably have been expected to compartmentalize the evidence so that evidence of one crime did not taint the jury's consideration of another crime, when the State's closing argument and the import of several of the instructions it heard urged it to do just the opposite." *Id.* (internal quotation marks, citation, and alterations omitted).

Such is the case with Lehr's 2009 trial. The joinder of his retrial with his capital resentencing for Cronin was highly prejudicial.

From the outset, the jury was given contradictory instructions as to how to assess the impact of Cronin's murder. Voir dire was almost entirely focused on Lehr's other criminal acts, it was so confusing that is was ineffective, and jurors likely left the voir dire process with an incorrect understanding of their role in the trial. If the purpose of voir dire was to make the entire case a disordered jumble that focused on the multitude of atrocities Lehr was accused of, without benefiting Lehr in any way, it succeeded. But if the defense wanted to find out which jurors could understand and respect the duty to compartmentalize, and could find out which jurors could be empathetic and open-minded, it failed entirely. (*See* Claim 15 (alleging ineffective assistance of counsel during voir dire).)

The defense recognized that the unusual procedural posture created by the joinder would make voir dire confusing, since the jurors would be staying for a penalty phase regardless of their decision on the present case. (*See, e.g.*, Tr. Jan. 13, 2009 at 42.) To address the situation, the parties agreed to a script that was read to the jurors at the beginning of each small-group voir dire session. Yet far from clarifying the situation, and far from helping the defense counsel find good jurors for Lehr's case, the script was so confusing that the only thing the jurors likely understood from it was that Lehr had committed a lot of other crimes:

The case you are to hear in this matter has several facets. In addition to the previously provided information concerning the three phases of a capital trial, you may also hear evidence for other purposes: First, sentencing concerning Belinda Cronin. Testimony and evidence may be admitted as evidence of aggravation or the defendant's eligibility for the death penalty concerning his conviction for the first-degree murder of Belinda Cronin between January 20 and June 11, 1992. The testimony and evidence admitted for this purpose may include evidence and testimony relevant to the alleged aggravators that the State has alleged as death-eligible facts that would allow for the sentence of death. The evidence and testimony may include the defendant's prior convictions for sexual assaults, sexual conduct with a minor, sexual assault of a 14-year-old, kidnappings, attempted murders in the first degree, and aggravated assaults. The evidence and testimony may also be considered in relation to the State's allegation that the murder of Belinda Cronin was especially heinous, cruel, or depraved.

Second, charges regarding guilt or innocence relative to victims Christorf, Collins, and Morales. The testimony and evidence that you hear may only be relevant to the charges concerning the alleged sexual assault of Wanda Collins and the alleged murders of Margaret Christorf and Michelle Morales.

Third, other acts evidence. You may hear testimony and evidence concerning other acts the State alleges the defendant has committed. These acts may be admitted for the purposes of determining the defendant's motive, intent, and identity and character trait giving rise to an aberrant sexual propensity to commit the alleged crimes charged. One of these acts may be the facts surrounding the defendant's previous conviction of first-degree murder of a Belinda Cronin between January 20 and June 11, 1992, as well as his prior convictions.

I've just read you more information that may be coming out at trial.

(Tr. Jan. 13, 2009 at 68–69; *see also* Tr. Jan. 14, 2009 at 24, 119–21; Tr. Jan. 15, 2009 at 18; Tr. Jan. 20, 2009 at 20; *see also* ROA 932.) Unlike jury instructions, jurors were not given written copies of this to read.

This script failed to achieve what it needed to. It did not help the jury understand that they would hear about different crimes, and that as jurors they would have to be able to compartmentalize that information. It did not help them

1    understand that they would hear about some shocking crimes—including the rape

2    of a child—and have to be able to consider that evidence only for limited reasons.

3    It did not help them understand that considering this information for limited

4    purposes meant that they would have to be able to ignore it completely when

5    making certain decisions. The defense's concern was that the jury would not

6    understand that they would be handling the Cronin sentencing phase, regardless of

7    their decision in trial. (*See, e.g.*, Tr. Jan. 6, 2009 at 91–92; Jan. 7, 2009 at 18–24;

8    Jan. 12, 2009 at 38–42.) And yet this script does not explain that.

9         The trial judge even recognized the difficulty the jury was having with the

10   voir dire stipulation, calling it "confusing" and noting that the jurors were having

11   "the most problem[s]" with "the notion that they're going to be hearing other acts

12   evidence," including the fact of Lehr's conviction for Cronin's murder. (Tr. Jan. 15,

13   2009 at 182–83.)

14        Not only did the confusing script not clarify anything nor help the parties

15   determine which jurors would be best for the case, but it required the parties and

16   court to repeatedly (at least 21 separate times) address the Cronin case and other

17   convictions to try to clarify the situation—drawing undue attention to Lehr's

18   criminal history and making it a focus of the entire voir dire. (Tr. Jan. 13, 2009 at

19   94, 128–29, 135–136, 156; Tr. Jan. 14, 2009 at 37, 39–43, 71, 72–74, 86–87, 128–

20   30, 163–64, 165–66, 185–87, 190–93; Tr. Jan. 15, 2009 at 20, 31–32, 33–37; Tr.

21   Jan. 20, 2009 at 50–52, 74–75; Jan. 21, 2009 at 34–35, 46–50, 50–51.) Despite all

22   of these attempted explanations, jurors continuously voiced confusion. (*See, e.g.*,

23   Tr. Jan. 13, 2009 at 171; Tr. Jan. 14, 2009 at 86, 165, 192; Tr. Jan. 15, 2009 at 33;

24   Tr. Jan. 21, 2009 at 46–51.)

25        The jurors themselves frequently explained their confusion on this point

26   during voir dire: one commented that "I just feel that if he's already been convicted

27   of one murder, I just—he should have gotten the death penalty." (Tr. Jan. 14, 2009,

28   at 37.) Another confessed: "If I already know somebody is convicted of a crime that

49

might prejudice me against the way that I think about the rest of the things he's accused of." (Tr. Jan. 14, 2009, at 40–43.) Another explained: "I feel that this man is guilty," and "[i]n view of the previous conviction[s] . . . I find it would be very difficult for me to be fair to him." (Tr. Jan. 21, 2009, at 39.)

Consider how Juror 11—who sat on the petit—understood her role. "I didn't understand at the time that he's been found guilty. And all that is now, it's sentence of life and death. I guess now I know today definitely clear about what this is all about." (Tr. Jan. 13, 2009 at 171.) Her understanding was that as jurors they would only be deciding Lehr's sentence. No one corrected her, and instead the attorney moved on to ask her questions about a relative. Letting this statement stand uncorrected implied that her understanding was correct. And such a comment would not just influence her, but all the other jurors present who heard her say it and heard no one correct her. Jurors 5, 10, and 15, were present during this portion of voir dire and were ultimately sat on the petit jury.

Then, consider also Juror 39: during his small-group voir dire, with seated Jurors 38, 40, 42, and 47 present, he explained that he was confused about the situation. (Tr. Jan. 14, 2009 at 165.) The defense attorney and judge tried to explain, but moved on without ensuring that he understood. (Tr. Jan. 14, 2009 at 165–66.) But toward the end of voir dire, after yet another explanation from the judge, the defense attorney returned to Juror 39 to see if he understood. (Tr. Jan. 14, 2009 at 191–92.) Juror 39's response was telling: "it's *new to me* that there's going to be this other evidence of another crime that he's already been convicted of. *Until now* I didn't know that we were considering that, so that was *new to me*." (Tr. Jan. 14, 2009 at 192 (emphasis added).) Thus, despite the script and the multiple attempted explanations, it took this juror until almost the very end of voir dire to understand this one part of the complicated situation.

Other jurors continued to express confusion during the third and final stage of voir dire. (*See* Tr. Jan. 21, 2009 at 46–50 (Juror 50); 50–51 (Juror 58).) Many

jurors said nothing or very little during voir dire, including Juror 5 who was on the petit. It is impossible to know whether they understood or had mistaken understandings such as that they were only there for a sentencing trial and that Lehr was already guilty of all the charged crimes, like Juror 11 had believed. Thus, this confusion not only impacted Lehr's right to effectively voir dire the jurors, but it likely led to an erosion of his presumption of innocence throughout the entire trial.

In short, the joinder of Cronin's murder, and the admission of testimony concerning the crime, with Lehr's retrials for Christorf, Morales, and Collins, predisposed the jury to find Lehr guilty of the crimes for which he was supposedly entitled to an entirely new trial, as many jurors admitted during voir dire. This cross-contamination was especially inappropriate where Cronin's murder was not that similar to the other charges: there was no evidence of sexual assault, the head injury was inconsistent with those identified on Morales and Christorf, and in fact her body was considerably decomposed, making it difficult for the jury to understand how she was related other than by assuming that, since Lehr was guilty of her murder, he must be a murderer, and therefore guilty of the other crimes charged against him.

The State's closing only made matters worse. The State urged the jury to consider evidence of Cronin's murder as proof of premeditation, absence of a sudden quarrel, knowledge, and intent to kill, going far beyond the original stipulated use of the other-acts evidence. (*See* Tr. Mar. 24, 2009 at 134–35 ("Now it's kind of all wrapped up into whether or not it's also premeditation, or sudden quarrel, heat of passion . . . "Grabbed by the throat. Lost consciousness. Is that ringing a bell here about what happened?").) The State referenced evidence from the other crimes admitted against Lehr, urging the jury to "look at all the facts together," asking the jury to divine absence of sudden quarrel, intent, premeditation, reflection, and planning from these other cases, and to apply them to convict Lehr for the charges at trial. The State further referenced the murder of Cronin specifically, asking the jury to draw from those facts the absence of a sudden

1  quarrel, as well as the manner of her death, the mode of attack, and to assume that
2  she was sexually assaulted. (Tr. Mar. 24, 2009 at 141–42.)

3      Indeed, the State's closing interweaves the charges at trial with all the prior
4  evidence, crafting a comprehensive narrative for the jury that Lehr had committed
5  all of these crimes, and that they could be sure that Lehr had committed the cases
6  then at trial because they could conclude that he had committed the prior offenses,
7  including the murder of Cronin. (*See, e.g*., Tr. Mar. 24, 2009 at 56 ("The burden of
8  proof on the other acts. And again, we have to prove to a lesser standard. We just
9  have to prove that he committed these other acts by clear and convincing evidence,
10 which is basically what we must persuade you by the evidence, that the claim of a
11 fact is highly probable. And if we've done that, then you can consider that evidence
12 in making your determination, and using that "other act" evidence to determine the
13 charges in Counts 1 through 7."); *see also* Tr. Mar. 24, 2009 at 59 ("And what's at
14 the CAP canal? The tree. And what happens at the tree? [Zingaro] is raped, and
15 [Cronin's] body is found. And north of that, what's the next exit? Carefree
16 Highway. And what's found in the desert just southeast of I-17 and Carefree
17 Highway? [Morales's] body.").)

18     This prejudicial effect of this evidence and argument was not cured by any
19 of the jury instructions offered by the court. Instead, Lehr's 2009 jury was given
20 contradictory and seemingly irreconcilable instructions about how to assess the
21 evidence of Lehr's prior crimes. In general, limiting instructions in relation to
22 joinder of charges are looked upon with "skepticism about the[ir] efficacy": "To
23 tell a jury to ignore the defendant's prior convictions in determining whether he or
24 she committed the offense being tried is to ask human beings to act with a measure
25 of dispassion and exactitude well beyond mortal capacities." *Lewis*, 787 F.2d at
26 1323 (quoting *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985)).
27 When, as here, instructions do not "specifically admonish the jurors that they could
28 not consider evidence of one set of offenses as evidence establishing the other,"

1    *Bean*, 163 F.3d at 1084, prejudice is likely.

2    This Court should be particular skeptical that any of the jury instructions
3    could counteract the powerful prejudice infecting Lehr's 2009 trial. At the start of
4    the 2009 trial, the court offered the following seemingly-contradictory instructions:
5    it first admonished the jury, with regard to other-acts evidence, "only [to] consider
6    these [prior] acts to establish the Defendant's motive, opportunity, intent,
7    preparation, plan, knowledge and identity," and "not . . . to determine the
8    Defendant's character or character trait, or to determine that the Defendant acted in
9    conformity with the Defendant's character or character trait." It then immediately
10   followed this instruction with the following: "Evidence of other acts has been
11   presented. You may consider this evidence in determining whether the Defendant
12   had a character trait that predisposed him to commit the crimes charged." (*See, e.g.*,
13   Tr. Jan. 27, 2009, at 45–46.) While a lawyer may be able to distinguish between
14   Rule 404(b) evidence and Rule 404(c) evidence, it strains belief to imagine how a
15   jury was able to parse these two conflicting instructions, especially when no further
16   clarifying information was provided. These same confusing instructions, still
17   lacking any guidance on resolving the apparent tension between them, were
18   repeated at the close of trial. (Tr. Mar. 24, 2009 at 35.)

19   The jury was not properly instructed on how to handle this exceedingly
20   delicate combination of charges and crimes; any assumption that the jury could
21   "compartmentalize the evidence, rather than considering it cumulatively . . . cannot
22   apply here, where the jury was not properly charged." *Bean*, 163 F.3d at 1085.

23   It cannot be stressed enough the unique, and uniquely disadvantaged, position
24   that Lehr faced when his case was remanded. As post-conviction counsel explained,
25   no other Arizona capital defendant, in the wake of the *Ring* decision, faced the
26   unusual and damaging posture of being retried as to guilt for two murders, while
27   the jury was also told, in advance, that he had previously committed another murder,
28   for which that jury would also sentence the defendant. Generally, a jury does not

hear about a defendant's prior convictions unless he actually testifies, and even then, they are presented in a more neutral way; deviation from that norm cost Lehr dearly.

The simultaneous piling on of other-acts evidence, aggravator-factor evidence, and knowledge of Lehr's pre-ordained guilt for Cronin's murder, combined to make a fundamentally unfair trial from the very start. The trial court's asthenic attempts to cure that prejudice through confusingly worded limiting instructions did nothing to alleviate this unconstitutional burden placed on Lehr. *Cf. Herring v. Meachum*, 11 F.3d 374, 378 (2d Cir. 1993) (finding that habeas petitioner had not made required showing of actual prejudice, based partly on fact that jury "was instructed on three separate occasions that evidence of one murder was not to be used to determine petitioner's guilt with respect to the other").

The trial judge acknowledged that his joinder of the charges had put Lehr's retrial into an "unwieldy posture." (Tr. Mar. 24, 2009 at 10.) This is a significant understatement. As 2009 trial counsel recognizes, in fact, "there ha[d] [not] been a case where there's been a resentencing consolidated with a retrial," ever, that he was aware of. (Tr. Mar. 24, 2009 at 18.) Whatever motivated the trial court— judicial economy, speed, administrative convenience, preconception of Lehr's guilt, perhaps—it utterly denied Lehr an unbiased, fair re-retrial and capital resentencing. The knowledge of Lehr's pre-established guilt for Cronin's murder—which was in fact based on woefully scant evidence, a lone ring that, as post-conviction counsel aptly demonstrated, was in fact "cheap and common" (PCR Pet.'s Mot. for Reh'g, at 29; *see also* PCR Pet. Ex. EE)—deeply preconditioned the jury to find Lehr guilty. *See Lucero v. Kerby*, 133 F.3d 1299, 1315 (10th Cir. 1998) ("Courts have recognized that the joinder of offenses in a single trial may be prejudicial when there is a great disparity in the amount of evidence underlying the joined offenses."); *see also Lewis*, 787 F.2d at 1322 (considering relative strength of evidence underlying joined charges as factor showing undue prejudice).

1    Lehr's 2009 retrial was fundamentally, fatally flawed. The jury was told,
2    from the outset, that he was, in sum, a murderer. How could they but find him guilty
3    of the other murder charges against him, and how could they but impose death,
4    especially in light of the weak mitigating evidence presented by his ineffective 2009
5    counsel. (*See* Claim 12.) Joinder of any case can be constitutionally inappropriate,
6    as the Ninth Circuit has repeatedly recognized, *see Lewis*, 787 F.2d at 1322; *Bean*,
7    163 F.3d at 1084; but the unique posture of Lehr's retrial deprived him of any
8    guarantee of due process, a fair adjudication by an impartial jury, and fundamental
9    fairness. The jury fell prey to "the human tendency to draw a conclusion which is
10   impermissible in the law: because he did it before, he must have done it again."
11   *United States v. Bagley*, 772 F.2d 482, 488 (9th Cir. 1985).

12   The jury's conviction of Lehr for capital murder of both Christorf and
13   Morales, as well as for the non-capital charges related to Collins, further
14   demonstrates the prejudicial effect of the joinder of those charges with resentencing
15   for Cronin. This was not a partial verdict, or a split decision. *Cf. Featherstone*, 948
16   F.2d at 1503–04 ("[I]t is apparent from the jury's discerning verdict that it followed
17   the court's instructions to regard each count as separate and distinct."). The fact that
18   the jury ultimately could not agree on whether to impose life or death for the murder
19   of Cronin does not prove that they were accurately able to segregate the cases in
20   their minds. Rather, it reveals only that the jury recognized the flimsiness of the
21   evidence supporting Lehr's guilt for Cronin's murder, and could not agree that death
22   was the appropriate punishment.

23   The combination of Lehr's guilt-phase retrials with his resentencing for
24   Cronin, including informing the jury of Lehr's pre-establish guilt for murder of
25   another woman, deprived him of the fundamental fairness and fair and impartial
26   trial and sentencing guaranteed by the Fifth, Sixth, Eighth, and Fourteenth
27   Amendments. The joinder had a "substantial and injurious effect or influence in
28   determining the jury's verdict." *Brecht*, 507 U.S. at 637. Lehr is entitled to relief.

1

**CLAIM THREE**

**Lehr's trial counsel, at both his 1996/1997 trials and his 2009
retrial, committed numerous errors, to Lehr's grave detriment,
and rendered constitutionally ineffective assistance, sufficient to
undermine confidence in the verdicts reached, in violation of
Lehr's rights under the Sixth and Fourteenth Amendments to the
United States Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments
made elsewhere in this Petition.

Lehr received ineffective assistance of counsel ("IAC") from his trial
attorneys, both at his initial trials in 1996 and 1997, as well as at his retrial in 2009.
As described in more detail below, Lehr's counsel failed to effectively combat the
joinder and cross-admission of the evidence of the various counts against him,
conglomerating the multiple cases into singular proceedings, where each otherwise-
weak case was reinforced by the highly prejudicial information of the other charges
against Lehr. Further, counsel failed to raise any effectual challenge to the State's
evidence; failed to investigate, develop, and present evidence of their own that
would have undermined the State's case; and otherwise failed to implement any sort
of strategy to effectively counter the State's multiple uses of questionable forensic
evidence to convict Lehr. The deficient performance of Lehr's counsel should cause
this Court to question the confidence that can be placed in these verdicts, and Lehr
is therefore entitled to issuance of the writ.

A claim attacking the performance of counsel at trial is subject to the two-
prong standard established in *Strickland v. Washington*: counsel's performance
must be deficient, and such deficient performance must have prejudiced the defense.
466 U.S. 668, 686–87 (1984). First, the inquiry under the deficiency prong is
"whether counsel's assistance was reasonable considering all the circumstances."
*Id.* at 688. Performance is deficient when the attorney renders objectively
unreasonable assistance. *Id.* at 687–88. When assessing the second prong, a court

56

1   must decide whether "counsel's errors were so serious as to deprive the defendant

2   of a fair trial, a trial whose result is reliable." *Id.* at 687. And "despite the strong

3   presumption of reliability," the question to be asked is whether "the result of the

4   particular proceeding is unreliable because of a breakdown in the adversarial

5   process that our system counts on to produce just results." *Id.* at 696.

6       As explained more fully in each subsection below, the state court's

7   conclusions, that Lehr's counsel were not ineffective, and/or that Lehr was not

8   prejudiced, contravened clearly established federal law. "Clearly established federal

9   law means the governing legal principle or principles set forth by the Supreme Court

10   at the time the state court renders its decision." *Xiong v. Felker*, 681 F.3d 1067,

11   1073 (9th Cir. 2012) (citation omitted). "Circuit court precedent may be persuasive

12   in determining what law is clearly established and whether a state court applied that

13   law unreasonably." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citation

14   omitted). In addition, the court's conclusions constituted unreasonable

15   determinations of the facts in light of the evidence presented. *See* 28 U.S.C. §

16   2254(d)(2).

17       **A.**    **Joinder: Lehr received constitutionally ineffective assistance of**

18              **counsel at his 1996/1997 trials, and his 2009 retrial and**

19              **resentencing, because trial counsel failed to effectively challenge**

20              **the admission of prior bad-act evidence under Rule 404; failed to**

               **secure the severance of the Lehr's retrials with his capital**

21              **resentencing for the murder of Cronin; and failed to support their**

               **arguments with expert testimony.**

22       Lehr incorporates by specific reference all facts, allegations, and arguments

23   made elsewhere in this petition.

24       Lehr received constitutionally ineffective assistance of counsel at both of his

25   capital trials, because his attorneys failed to mount an effective challenge to the

26   admission of highly prejudicial prior bad-act evidence under Rule 404; because they

27   failed to do more to secure severance of the counts at his trials; and especially

28   because his 2009 counsel did not effectively challenge the joinder of the Cronin

1    resentencing with his guilt-phase retrial. Counsel in 2009 did not secure expert
2    assistance, did not properly support their challenges to the court's rulings, and did
3    not capably address the issue with the jury, both at voir dire and during trial, to
4    Lehr's great prejudice and in violation of his rights under the Fifth, Sixth, Eighth,
5    and Fourteenth Amendments. *See Strickland*, 466 U.S. 668.

6                    **1.    Exhaustion**

7         Lehr's post-conviction petition alleged a claim for constitutionally
8    ineffective assistance of counsel, based on his trial counsel's failure adequately to
9    challenge the highly prejudicial Rule 404 evidence introduced against him at both
10   trials, and for their failure to do more to sever Lehr's resentencing for the murder
11   of Cronin from his retrials for Christorf, Morales, and Collins, as well as for failing
12   to seek out and produce expert testimony to support their claim that the offenses
13   were not sufficiently similar. (PCR Pet. at 34–38, 50–52.) His Amended Petition
14   also faulted the 2009 trial attorneys for failing to support and argue the issue of
15   joinder, starting from voir dire and continuing through the trial. (*See* PCR Pet.'s
16   Mot. to Am. at 7–12.)

17        The post-conviction court inexplicably rejected Lehr's argument as to his
18   first trial, because it concluded that the Arizona Supreme Court "wiped clean the
19   sentencing slate when it reversed the convictions [for Christorf, Morales, and
20   Collins, and the sentence as to Cronin] in *Lehr I and II*, and the responsibility for
21   providing [Lehr] with effective representation after remand was borne only by
22   subsequent counsel." (PCR Order at 8, 31.) Although this may be a correct
23   statement of the law as to the remanded charges, it cannot be the case that any and
24   all ineffective representation by Lehr's 1996 and 1997 counsel was rendered
25   irrelevant, and the state court's decision otherwise is an unreasonable determination
26   of the facts and contrary to clearly established federal law. *See* 28 U.S. § 2254(d).
27   Lehr was still sentenced to over 700 years in prison on the charges from the first
28   trials that were affirmed, and those convictions went on to infect his retrial and

1   resentencing, and to serve as aggravators in his capital cases. Post-conviction
2   counsel was surely able to raise a challenge to the representation provide by 1996
3   and 1997 counsel, and this Court may assess now whether their performance was
4   constitutionally deficient.

5       As to the claim for ineffective assistance in this regard by Lehr's 2009
6   counsel, the post-conviction court rejected the claims on several bases. First, it held
7   the challenge precluded under Ariz. R. Crim. P. 32.2(a)(2), since the claims should
8   have been raised on appeal. (PCR Order at 31.) This was an error of state law, and
9   so the procedural bar is not an adequate state ground that would prevent this Court
10  from considering the claim. *See State v. Spreitz*, 39 P.3d 525, 526 (2002) ("Rule 32
11  set forth the proper procedure for resolving claims of ineffective assistance of
12  counsel"); *State v. Duffy*, No. 2 CA-CR 2018-0071, 2019 WL 5687443, at *2 (Ariz.
13  Ct. App. Nov. 1, 2019) (explaining that if a defendant "believes particular decisions,
14  acts, or omissions of his defense attorney at trial rendered his counsel ineffective,
15  such a claim must be raised in a petition for post-conviction relief brought pursuant
16  to Rule 32, Ariz. R. Crim. P.").

17      Moreover, post-conviction counsel argued that any default was excused by
18  the ineffective assistance of appellate counsel, and Lehr asserts the same basis in
19  this Petition. (*See* Claim 31.) The post-conviction court rejected this argument as
20  well, holding that appellate counsel made a "strategic decision" in assessing the
21  relative strength of the cases against Lehr, and choosing only to raise this issue as
22  to Morales. (PCR Order at 32.)

23      Addressing the merits, the post-conviction court declared that 2009 trial
24  counsel were not ineffective for failing to call an expert, since it is "rank
25  speculation" to surmise that an expert would have changed the mind of the trial
26  court with respect to the cross-admissibility of Rule 404 testimony, especially since
27  the cross-admissibility was affirmed on appeal (under Arizona state law), and the
28  prior convictions themselves had been upheld. (PCR Order at 32.)

As to the joinder of Cronin's resentencing, the court concluded that trial counsel "made a reasonable strategic decision to challenge at every opportunity the joinder of the retrials with the resentencing," and so "neither prong of *Strickland* has been established, and the claim is not colorable." (PCR Order at 33.) The court ultimately emphasized that since joinder was proper (because it was upheld under Arizona state law on appeal), there could be no prejudice to Lehr. (PCR Order at 43–44.) With respect to voir dire specifically, the court found that 2009 trial counsel "made a strategic decision about how to handle voir dire in order to benefit his client." (PCR Order at 47.) And, since his own counsel had made the decision "to tell the jury all of the negative information," Lehr could not "make a colorable claim" that his jury was not impartial, or that counsel had acted ineffectively. (PCR Order at 47.)

Lehr sought review from the Arizona Supreme Court of the denial of his post-conviction petition, raising the same issues. (PRF 3 at 29–41.) The Arizona Supreme Court denied review without comment in a one-page order. (PRF 29 at 1.)

The state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Additionally, the court's denial rested on an unreasonable determination of the facts. *See id.* § 2254(d)(2).

### 2. Merits

Trial counsel's failure to mount a significant or well-supported challenge to the admission of prior bad acts evidence, and the joinder of charges (both in the 1996 trial, and for resentencing in the 2009 trial), fell below professional standards of reasonableness.

Lehr's trial counsel, both at his 1996/1997 trials and his 2009 retrial, made several key mistakes that profoundly prejudiced Lehr's ability to receive a fair trial by an impartial jury, ultimately rendering the verdicts against him unworthy of confidence. First, in his initial trials, Lehr's counsel were ineffective in their anemic

1  challenges to the joinder and cross-admission of highly prejudicial evidence of all

2  the charges against Lehr. To be sure, Lehr's counsel complained about the joinder.

3  (*See, e.g.*, Tr. Jan. 30, 1998 at 19–21.) But effective assistance of counsel requires

4  more than mere unsupported objection. Counsel did not retain an expert; nor did

5  they assert any argument, at trial, that the joinder and cross-admission violated

6  Lehr's constitutional rights (irrespective of whether the consolidation comported

7  with the Arizona rules of evidence).

8       Lehr's counsel in 2009 committed even more grievous error, given that they

9  were or should have already been well aware of the deleterious impact that

10  consolidation had on Lehr's chances at a fair trial. Again, counsel raised the

11  question of whether the joinder and cross-admission of other acts evidence might

12  be problematic, (*see, e.g.*, Tr. July 22, 2005, at 35–36), but did nothing further to

13  make out the argument for the court. No constitutional arguments were raised; no

14  expert was called; and no live testimony regarding the other acts was heard, as the

15  court decided the case on the transcripts from the prior trial. (*See* Tr. Feb. 22, 2008,

16  at 4–6.)

17       As Lehr's post-conviction petition demonstrates, effective counsel could and

18  should have employed the services of an expert to counter the State's purported

19  expert, Richard Emerick. Trial counsel "has a duty to make reasonable

20  investigations or to make a reasonable decision that makes particular investigations

21  unnecessary." *Strickland*, 466 U.S. at 691. Moreover, an accused in a capital case

22  is entitled to the assistance of experts, *see Ake v. Oklahoma*, 470 U.S. 68 (1985),

23  and counsel "have an obligation to conduct an investigation which will allow a

24  determination of what sort of experts to consult," *Caro v. Calderon*, 165 F.3d 1223,

25  1226–27 (9th Cir. 1999). *See also Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th

26  Cir.1995) ("An attorney must provide factual support for the defense where such

27  corroboration is available . . . Failure to pursue such corroborating evidence with

28  an adequate pretrial investigation may establish constitutionally deficient

1    performance." (internal quotation marks omitted)).

2    The declaration of Dr. Mark Cunningham (PCR Pet. Ex. R), offered in post-

3    conviction, debunks the theory put forth by Dr. Emerick, that the crimes with which

4    Lehr was charged were similar in that they were all dissimilar. As Dr. Cunningham

5    explains, Dr. Emerick's testimony dramatically overstated the similar nature of the

6    crimes charged against Lehr: "aspects of these offenses that appear at first glance

7    to be 'signature' features of a particular offender may represent no more than

8    normative or expected features of an abduction rape." (PCR Pet. Ex. R at ¶ 8.)

9    What's more, Dr. Emerick's assertion, "that the common element of the offenses is

10   their 'dissimilarity,' renders the concept of 'common scheme or plan' so ubiquitous

11   as to be meaningless." (PCR Pet. Ex. R at ¶ 10.)

12   Dr. Cunningham's declaration explains in lucid detail the flaws in Dr.

13   Emerick's analysis, the insufficiency of his experience, and "his lack of candor and

14   transparency" in detailing his professional history. (PCR Pet. Ex. R at ¶ 34.) Yet,

15   because Lehr's trial counsel did not produce their own expert, the trial court was

16   left with only Dr. Emerick's opinion that Lehr had a "character trait giving rise to

17   an aberrant sexual propensity to commit the offense charged," see Ariz. R. Evid.

18   404(c).

19   Lehr's 2009 counsel were similarly ineffective for failing to sever his guilt-

20   phase retrial from the resentencing for Cronin's murder. As explained above in

21   Claim 2, the combination of these cases worked dramatic prejudice on Lehr's ability

22   to receive a fair trial. As an initial matter, 2009 counsel should have argued that the

23   court should impose a life sentence for Cronin's murder, and not conduct any

24   resentencing proceedings at all, since life imprisonment was the maximum

25   punishment to which Lehr had been exposed based on the 1996 jury's verdict alone.

26   *See State v. Ring*, 25 P.3d 1139, 1151 (Ariz. 2001), *reversed by Ring*, 536 U.S. 584.

27   (*See also* Claim 38.) And regardless, as post-conviction counsel explained, trial

28   counsel could have done considerably more to challenge the flawed resentencing

process. Although they objected, they produced no expert, such as post-conviction counsel's Dr. Cunningham, to challenge the claims that the alleged crimes were sufficiently similar. Nor did they attack the joinder using the available procedural mechanisms, such as file a special action prior to trial. As post-conviction expert Larry Hammond explained, there is "no reason why the [Cronin] resentencing could not have been done separately before a different jury." (PCR Pet. Ex. N at 19.) Indeed, Lehr's trial counsel confess that they were not prepared to address the issue of joinder, especially by use of an expert, and felt blindsided by Dr. Emerick's testimony.

Counsel's deficient performance fell below an object standard of reasonableness, and, but for counsel's errors, there is a reasonable probability that the result would have been different in one or more of the cases against Lehr. *See Strickland*, 466 U.S. at 694. The effect from the joinder of Cronin at Lehr's re-retrial was damning. Lehr could not receive a fair re-hearing on the charges that the Arizona Supreme Court had ordered to be re-retried. This highly prejudicial impact is sufficient "to undermine confidence in the outcome" at Lehr's retrial, *see id*., as this Court should recognize. *See Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (*Strickland* prejudice requires showing a "reasonable probability that counsel's failures . . . affected the outcome of the proceeding"). Lehr cannot be sentenced to death on the basis of the jury's passions and his lawyers' ineffectiveness. For these reasons, Lehr is entitled to issuance of the writ.

### 3. The state court's decision was contrary to clearly established law and an unreasonable determination of the facts.

The post-conviction court's rejection of Lehr's claim of ineffective assistance of counsel resulted from an unreasonable determination of the facts, and is contrary to clearly established federal law.

First, the post-conviction court applied the incorrect standard under *Strickland* for assessing ineffective assistance of counsel. The court considered only

an outcome-determinative standard, whether "the outcome of the appeal would have been different." (PCR Order at 32.) The court rejected Lehr's argument that his trial attorneys should have called their own expert to refute the State's expert as to the similarity of the "other acts" evidence introduced against Lehr at both his 1996/1997 trials and his 2009 retrial, finding it "rank speculation" to claim that an expert could have refuted the State's expert, and caused the trial court to "arrive[] at a contrary ruling" on the question of cross-admissibility. (PCR Order at 32.)

This analysis is contrary to clearly established federal law. A successful claim for ineffective assistance of counsel does not require a showing that the trial would absolutely have had the opposite outcome. Rather, Lehr need only show that "there is a reasonable probability that counsel's failure to investigate, and to locate and produce witnesses, affected the outcome of the proceeding." *Brown*, 137 F.3d at 1157. A "reasonable probability" does not mean a guarantee of a contrary result; rather, it is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The state court's more stringent test was an incorrect application of controlling Supreme Court precedent, and for that reason alone, this Court is not bound by the limitation of § 2254(d).

Further, the state court erred in refusing to consider the question of counsel's deficient performance from the 1996 & 1997 trials. The Arizona Supreme Court affirmed some of Lehr's convictions and sentences; Lehr was permitted to challenge his counsel's performance with respect to those charges, at least, in his post-conviction proceedings. Claims for ineffective assistance of counsel can be brought for non-capital as well as capital charges, of course. *See Daire v. Lattimore*, 812 F.3d 766 (9th Cir. 2016 (en banc) (per curiam); *see also Premo v. Moore*, 562 U.S. 115, 126 (2011) ("Whether before, during, or after trial, when the Sixth Amendment applies, the formulation of the standard [for deficient performance, as an element of ineffective assistance of counsel] is the same: reasonable competence in representing the accused."). In addition, the convictions affirmed in *Lehr I* were

1   then used (inappropriately, *see* Claim 4) as aggravators in Lehr's capital retrial,

2   further explaining Lehr's attack on his counsel's performance in the course of that

3   earlier trial.

4         The post-conviction court's conclusion that allegations related to 1997 trial

5   counsel "are moot," is a clearly unreasonable interpretation of facts and law: the

6   court insisted that "the remedy for [those attorneys being ineffective] would be a

7   resentencing, which Defendant has already received." (PCR Order at 31.) Not so.

8   The remedy for ineffective assistance of counsel at Lehr's 1996/1997 trial would

9   be a *new trial*, which Lehr did not receive as to seven of the ten alleged victims.

10        The state post-conviction court's decision was also an unreasonable

11  determination of the facts. As the court itself conceded, the question of the propriety

12  of the joinder of claims in Lehr's retrial was a "question of fact." (PCR Order at

13  32.) Whether or not trial counsel made a strategic decision not to call an expert to

14  assist with challenge of joinder is also a question of fact. The post-conviction court

15  similarly ruled against Lehr on this question without the benefit of any evidentiary

16  hearing. *See, e.g.*, *Hurles v. Ryan*, 650 F.3d 1301, 1312 (9th Cir. 2011) ("We have

17  repeatedly held that where a state court makes factual findings without an

18  evidentiary hearing or other opportunity for the petitioner to present evidence, 'the

19  fact-finding process itself is deficient' and not entitled to deference [under

20  AEDPA]."); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ("[W]here the

21  state courts plainly misapprehend or misstate the record in making their findings,

22  and the misapprehension goes to a material factual issue that is central to

23  petitioner's claim, that misapprehension can fatally undermine the fact-finding

24  process, rendering the resulting factual finding unreasonable."); *Williams v.

25  Woodford*, 859 F. Supp. 2d 1156 ("Under this circuit's precedent, '[i]f a state court

26  makes evidentiary findings without holding a hearing and giving a petitioner an

27  opportunity to present evidence, such findings clearly result in an 'unreasonable

28  determination' of the facts.'").

65

It was unreasonable for the court to make factual findings absent an evidentiary hearing, and indeed the conclusions it reached—that the crimes were sufficiently similar, and that Lehr's counsel need not support their arguments with any expert testimony in this instance—was itself unreasonable, as demonstrated by the expert evidence produced in post-conviction.

**B.** **Eyewitness ID: Trial counsel performed deficiently and to Lehr's prejudice, by failing to challenge the State's eyewitness identification evidence in violation of Lehr's rights under the Sixth and Fourteenth Amendments to the U.S. Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this petition.

Lehr's trial counsel performed deficiently, and to his prejudice, during the trial phase of his capital trial. *See Strickland v. Washington*, 466 U.S. 668 (1984). Lehr's trial counsel failed to conduct a reasonable investigation of the eyewitness identifications made by witnesses in this case; failed to request, retain, consult with, or present an eyewitness identification expert on his behalf; failed to effectively cross-examine the State's eyewitness identification witnesses; failed to put on any defense that might have assisted the jury in determining the credibility, accuracy, and reliability of the State's evidence; and failed to request jury instructions regarding the eyewitness identifications the jury did hear. Due to trial counsel's failures, Lehr suffered prejudice, as the jury were exposed to the in-court identifications of Lehr but never heard evidence showing that the pretrial eyewitness identifications in Lehr's case were unduly suggestive, that police failed to follow their own procedures, and that numerous factors likely affected the reliability of the pretrial eyewitness identifications, and thus the in-court identifications. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony."); *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

1          **1.    Exhaustion**

2          This claim was not raised in state court. Lehr alleges he can overcome any

3     default of this claim by showing cause and prejudice, including because of the

4     ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 9;

5     *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland*, 466 U.S. at 687–88.

6     Lehr will demonstrate through his filings and at an evidentiary hearing that post-

7     conviction counsel fell below the standards of minimally competent capital

8     attorneys and that those failures prejudiced him. Alternatively, he alleges that any

9     procedural bar is not adequate or independent or that imposing default would be a

10    miscarriage of justice. Because this claim has not been adjudicated by the Arizona

11    state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply

12    to this Court's review, and the Court may consider the merits of the claim de novo.

13         **2.    Factual Background**

14              **a.    Investigation & pretrial eyewitness identifications**

15         The offenses for which the State charged Lehr began on February 13, 1991,

16    with the sexual assault of Wanda Collins. (Tr. Feb. 2, 2009 at 55–70.) Police

17    obtained a description from Collins shortly after the assault. Just ten days later,

18    Tracy Hancock was sexually assaulted, but she told police she would not be able to

19    identify the suspect. (Tr. Feb. 11, 2009 at 193.) One month later, on March 23, 1991,

20    Suzanne Gabriel was sexually assaulted; she described her attacker to police. (Tr.

21    May 7, 1997 at 6.) Over a month after Gabriel's assault, police showed her a photo

22    array, which did not include a photograph of Lehr; no identification was made. (Tr.

23    May 7, 1997 at 58.)

24         Then just twelve days after Gabriel's assault, Cathy Zingaro was sexually

25    assaulted, on April 4, 1991. (Tr. Feb. 9, 2009 at 60.) Zingaro met with a "forensic

26    artist" and completed a composite sketch one week after her sexual assault. (Tr.

27    Feb. 9, 2009 at 91–92; Trial Ex. 250.001.) Police then prepared a television

28    reenactment of the offense that featured Zingaro's composite sketch; the television

program was broadcasted on April 28, April 30, May 1, and May 2, 1991. (Tr. Dec. 15, 1994 at 121, 122.) About one month after her assault, the police re-interviewed Zingaro regarding her attack and also showed a photo array to Gabriel. She made no identification (this photo array did not include Lehr). Shortly after, on May 24, 1991, Zingaro contacted police and reported she was "pretty sure" she saw her attacker at a local Starmart, a convenience store. Almost five months later, police asked Zingaro to review a single photograph of alternate suspect David Kroll. Zingaro said he could possibly be her attacker, but she wasn't sure.

Meanwhile, on October 24, 1991, Jennifer Thompson was sexually assaulted and provided police with a description of her attacker. (Tr. Feb. 11, 2009 at 45.) Five days later, police showed Thompson a photo lineup (which included a photo of Kroll, but not Lehr); she did not make a positive identification. On November 7, 1991, two weeks after her sexual assault, Thompson completed a composite sketch. Thompson was re-interviewed at her home the following day. Shortly thereafter, on November 11, police met with Hancock and showed her a group of photographs (none of which included Lehr); she did not make an identification.

On November 8, 1991, Margaret Christorf's body was found, after she was reported missing the previous day by her boyfriend, William Gordon McFadden.

Jennifer Ailshire's sexual assault occurred on November 18, 1991. (Tr. Feb. 17, 2009 at 59.) Two days after her sexual assault, Ailshire completed a composite sketch. Thompson's composite sketch aired on television on December 3, December 5, and December 7, 1991. (Tr. Dec. 15, 1994 at 121.) Around this time, police again met with both Hancock and Collins.

The family members of Belinda Cronin report their last known contact with her around January 20, 1992.

In February 1992, Hancock saw one of the composite sketches released on television and felt it looked like the man who had kidnapped and assaulted her almost a year prior.

1    Michelle Morales was last seen alive on February 7, 1992. Police found her
2    body in the desert twelve days later.

3    Later that month, Elizabeth Ross was sexually assaulted on February 23,
4    1992. (Tr. Mar. 9, 2009 at 24.) Two days after her assault, Ross provided police
5    with a description of her attacker. The following day, police returned and Ross
6    completed a composite sketch of her attacker. (Tr. Mar. 9, 2009 at 45.)

7    On February 26, 1992, the police subjected Thompson to hypnosis. (Tr. Apr.
8    8, 1996.)

9    On March 1, 1992, Hancock provided police with a description of her
10    attacker—almost one year after her assault. (Tr. Feb. 11, 2009 at 218.)

11    Later that month, on March 23, 1992, one year after her assault, police
12    showed Gabriel two composites drawings, previously completed by Thompson and
13    Ross. Just a few days later on March 25, 1992, Gabriel viewed a photographic
14    lineup, which did not include a photograph of Lehr. She did not make an
15    identification. The next day, Mary Manoz was sexually assaulted but escaped from
16    the vehicle; she provided a description of her attacker to the police.

17    On June 12, 1992, Belinda Cronin's body was found, badly decomposed in
18    the desert. The medical examiner estimated she had been dead for five to six
19    months. (*See* Tr. Feb. 18, 2009 at 191.)

20    The composite sketch completed by Thompson again aired on television on
21    June 16, 18, 19, and 20, 1992. (Tr. Dec. 15, 1994 at 121.)

22    On June 19, 1992, police ran a search through the Department of Motor
23    Vehicles looking for someone registered as owning both a General Motors vehicle,
24    license plate containing the segment "ADW," and a Nissan vehicle, which were
25    similar to the types being described by the witnesses. (Tr. Oct. 23, 1996 at 66–68.)
26    Lehr was identified as a possible owner of both types of vehicles. On June 22, 1992,
27    police began to conduct surveillance of Lehr. (Tr. Oct. 23, 1996 at 76.) He was
28    taken into custody three days later.

In the midst of the investigation of Lehr, police conducted a photographic array with Ross on June 23, 1992. (Tr. Dec. 15, 1994 at 6.) The police officer showed Ross three different photo arrays: one contained a driver's license photograph of Lehr, taken in March of 1992; another contained a photo of Lehr from an older driver's license that had been issued in July 1989; and the third array contained no photograph of Lehr. (Tr. Dec. 15, 1994 at 6–11.) After looking at the photo array containing Lehr's March 1992 photo, Ross picked out that photo, which was the third photo, stating "it sort of looks like Number 3, but not really. His hair and beard look correct, but I'm not positive it's him." (Tr. Dec. 15, 1994 at 12–16.) She was unable to identify anyone in either of the next two, photo arrays, even though one of them also included a photograph of Lehr. (Tr. Dec. 15, 1994 at 5, 8–15, 20, 23.)

On June 24, 1992, police subjected Hancock and Gabriel to investigative hypnosis. (*See* Tr. Apr. 8, 1996.)

On June 25, 1992, the police coordinated a live lineup including Lehr at the Maricopa County Jail Complex on Durango. (Tr. Dec. 14, 1994 at 33.) The lineup occurred sixteen months after Hancock's assault, fifteen months after Gabriel's and Zingaro's assaults, eight months after Thompson's assault, seven months after Ailshire's assault, and four months after Ross's assault. Officer Chapman and Lieutenant Heath prepared the lineup by selecting participants, both correctional officers and inmates at the jail, that "had similar characteristics to that of Scott Lehr." (Tr. Mar. 4, 2009 at 152–53.) The officers knew that Lehr was the suspect in the case. (Tr. Dec. 14, 1994 at 31–32.) There were six participants in the lineup and Lehr was placed in the third position. (Tr. Dec. 14, 1994 at 30–37, 41–42.) Prior to viewing the lineup, the police kept each witness in a separate room with a detective. (Tr. Mar. 4, 2009 at 155.) Lieutenant Heath read each of witness an admonition prior to entering the lineup room. (Tr. Mar. 4, 2009 at 156; Trial Ex. 335.)

1    The witnesses viewed the lineup in the following order: Manoz[1] did not make

2    an identification (Tr. Dec. 14, 1994 at 47); Zingaro viewed the lineup, then asked

3    to view the lineup a second time, and then identified Lehr (Tr. Dec. 14, 1994 at 47–

4    54); Thompson made an identification of Lehr (Tr. Dec. 14, 1994 at 55–57); Ross

5    made an identification of Lehr (Tr. Dec. 14, 1994 at 57–59); Ailshire said "it looks

6    like number three" and "I think it's him, but I can't be sure" (Tr. Dec. 14, 1994 at

7    60–61); Gabriel said "it looks like No. 3" but police reported "[s]he seemed

8    somewhat hesitant to positively say it was No. 3." (Tr. Dec. 14, 1994 at 61–62); and

9    Hancock asked to view participants number two and three a second time and then

10   said she "thought it looked like No. 3" but was only about sixty percent sure (Tr.

11   Dec. 14, 1994 at 63–69). Lastly, Steven Young, the store clerk who allegedly sold

12   items to the suspect during the Ailshire offense (Tr. Oct. 8, 1996 at 82), was

13   "absolutely positive it was #2. He said there was no doubt in his mind." For each of

14   the above identifications, the witnesses viewed the lineup one at a time, then exited

15   the lineup room, and then made their identification. (Tr. Dec. 14, 1994 at 48, 50.)

16   Police formally arrested Lehr later that day.

17   A week after the live lineup, and sixteen months after her assault, Collins

18   viewed a photographic array with five total photos, including one of Lehr. (Tr.

19   March 4, 2009 at 249; Trial Ex. 14.) Upon reviewing the photographic array, Collins

20   indicated the photograph of Lehr "looks like him" and added "[i]t's been a long

21   time, but it looks like him." (Tr. Feb. 2, 2009 at 254.)

**b.    1994 *Dessureault* hearing[2]**

23   On November 10, 1994, defense counsel Seplow filed a motion for a

---

[1] Lehr was not charged with Manoz's assault.

[2] In Arizona, the trial court must "determine from clear and convincing evidence whether [a line-up] contained unduly suggestive circumstances." *State v. Dessureault*, 453 P.2d 951, 955 (Ariz. 1969). "[T]he burden is on the prosecution to establish from all the circumstances surrounding the pretrial identification that it

1    *Dessureault* hearing challenging identifications made by victims in both the photo

2    arrays and live lineup. (ROA 110; ROA 113.) The *Dessureault* hearing commenced

3    on December 14, 1994. (ROA 110; Tr. Dec. 14, 1994.) Detective Frank DiModica,

4    Officer Randy Chapman, Lieteneant R. Heath, Detective Michael Johnson,

5    Detective Jerry Bruen, Officer Michelle Dyer, and Evidence Technician Don Ely

6    testified regarding the Ross photograph arrays, the live line-up, Collins'

7    photographic array, the composite sketches, and the interviews of the victims. (Tr.

8    Dec. 14, 1994.) The following eyewitness witnesses also testified at the *Dessureault*

9    hearing regarding their pretrial identifications: Thompson (Tr. Dec. 14, 1994 at

10   136–54); Ross (Tr. Dec. 15, 1994 at 35–66); Zingaro (Tr. Dec. 15, 1994 at 76–106);

11   Ailshire (Tr. Jan. 3, 1995 at 6–32); Gabriel (Tr. Jan. 3, 1995 at 32–70). The

12   videotapes of the hypnoses of Thompson, Ross, and Zingaro were also viewed by

13   the court. (Tr. Dec. 15, 1994 at 128.)

14       The defense presented no evidence at the *Dessureault* hearing. (Tr. Jan. 3,

15   1995 at 122.) At the close of the hearing, the defense argued that the fact that Ross

16   was shown photo two days before the live lineup that included pictures of Lehr and,

17   that Lehr was the only person in common between the photographs and the physical

18   line-up, tainted the identification of Lehr by Ross at both the live lineup and at trial.

19   (Tr. Jan. 3, 1995 at 122–24.)

20       The trial court found that the State had shown by clear and convincing

21   evidence that the circumstances of the lineups and the pretrial identification

22   proceedings did not contain unduly suggestive circumstances. Therefore, the Court

23   ───────────────

24   was not such as to be unduly suggestive." *Id.* If the trial court determines
     circumstances of the pretrial identification were unduly suggestive or the
     prosecution failed to meet their burden, then "it is the prosecution's burden to

25   satisfy the trial judge from clear and convincing evidence that the proposed in-court
     identification is not tainted by the prior identification." *Id.* Third, "if requested, the

26   court must instruct the jury that before returning a verdict of guilty it must be

27   satisfied beyond a reasonable doubt that the in-court identification was independent
     of the previous pretrial identification or if not derived from an independent source,

28   it must find from other evidence in the case that the defendant is the guilty person
     beyond a reasonable doubt." *Id.*

held that it would "permit the victims to make an in-court identification and would permit evidence of the pretrial identifications subject to cross-examination on both of these matters." (ROA 123; Tr. Jan. 3, 1995 at 124.)

### c.    1996 and 1997 Trials

The ten victims were severed into two trials, with the three witnesses who underwent hypnosis being joined for a second trial in 1997. During the 1996 trial, when asked to make an in-court identification of her attacker, Collins denied ever seeing Lehr and instead pointed to a male with blonde hair in the back of the courtroom. (Tr. Sept. 18, 1996 at 42.) Witnesses Hancock, Gabriel, Zingaro, Thompson, Ailshire, and Ross all made in-court identifications.

### d.    2009 Trial

Trial counsel in 2009 did not file any pretrial motions seeking to challenge the admissibility of the eyewitness identifications.[3] The trial court permitted Lehr to remain absent from his entire capital trial, until the reading of the final sentencing verdict. As a result, Lehr stipulated to every in-court identification made during his 1996 and 1997 trials. (Tr. Jan. 27, 2009 ("we already agreed with Mr. Lehr present, that for every witness that identified him in the '96–'97 trial proceeding, that we would stipulate."); *see also* Tr. Feb. 2, 2009 at 25).) Because Wanda Collins did not previously identify Lehr during the 1996 trial, the court prepared a stipulation, with input from the parties, to read to the jury stating that she identified Lehr in a photo lineup, but then in a prior proceeding, she could not identify him. (Tr. Feb. 2, 2009 at 21, 28.) The pretrial identifications made by the other witnesses, Hancock, Zingaro, Thompson, Ailshire, and Ross, presented as Rule 404 witnesses, were all included as part of their testimonies.

---

[3] The court held a brief *Dessereault* hearing to determine whether Wanda Collins was inadvertently in the courtroom at the same time as Lehr during pretrial proceedings. (Tr. Jan. 26, 2009.) The court found no prima facie showing she could have observed Lehr. (Tr. Jan. 26, 2009 at 125.)

### 3.      Deficient Performance

Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Moreover, an accused in a capital case is entitled to the assistance of experts. *See Ake v. Oklahoma*, 470 U.S. 68 (1985). Here, counsel failed to research or investigate the eyewitness identifications and failed to consult with an eyewitness identification expert. By failing to investigate and consult an expert, trial counsel were left unprepared to challenge the State's eyewitness identification procedures and witnesses, including their in-court identifications. Trial counsel should have known that the eyewitness identifications against Lehr required careful research, thorough investigation, and the reliance on experts; however, counsel did nothing to prepare. *See United States v. Wade*, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.")

Every accused has a due process right to a fair identification procedure. *See Brathwaite*, 432 U.S. at 113; *Biggers*, 409 U.S. at 198 ("the likelihood of misidentification which violates a defendant's right to due process."); *State v. McCall*, 677 P.2d 920, 927 (Ariz. 1983). If an in-court identification is tainted by improper pretrial identification procedures, there is a high likelihood of irreparable misidentification and a denial of due process under the Fourteenth Amendment to the United States Constitution. *See Simmons v. United States*, 390 U.S. 377, 384 (1968).

In determining whether a pretrial identification procedure is fair, the court must consider the totality of the circumstances. *Biggers*, 409 U.S. at 199; *see State v. Rojo-Valenzuela*, 352 P.3d 917, 920 (Ariz. 2015) (applying the *Biggers* totality of the circumstances when analyzing the reliability of an identification). These factors include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior

description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200.

Based on this clear case law outlining the importance of ensuring a fair and reliable eyewitness identification, trial counsel should have investigated whether the procedures used were unduly suggestive and if the circumstances surrounding the identifications could render them unreliable. Seven witnesses participated in eyewitness identification procedures throughout the course of the police's investigation. Three of the witnesses were juveniles: Thompson (age 13), Ailshire (10), and Ross (14). Three witnesses, Hancock, Thompson, and Gabriel, were subjected to investigative hypnosis. Four witnesses, Thompson, Ailshire, Ross, and Zingaro, completed composite sketches of their assailants prior to viewing lineups. These composite sketches aired on local television and were seen by other witnesses prior to making their identifications. Two witnesses, Collins and Ross, viewed photographic lineups including the photograph of Lehr. The photographic lineup reviewed by Collins only included five photographs, contrary to proper procedures. Six witnesses, Zingaro, Thompson, Ross, Ailshire, Gabriel, and Hancock, participated in a live lineup including Lehr. One witness, Ross, viewed two photographic lineups containing photographs of Lehr just two days prior to viewing the live lineup including Lehr. As outlined below, these identifications and the procedures used were unduly suggestive and directly call into question the reliability of the eyewitness identifications. In addition, the suspect and vehicle descriptions given by each witness were often inconsistent and the descriptions further varied among all seven women.

Trial counsel, for both the 1996 and 2009 trials, should have investigated the eyewitness identifications and consulted with an eyewitness identification expert. The failure to do was an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S.

1    at 687. Moreover, where no reasonable investigation was conducted, as is the case
2    here, there can be no informed strategic decision by counsel worthy of deference.
3    *Id.* at 691. Such a failure prejudiced Lehr, as "nearly half a century of scientific
4    research teaches that eyewitness testimony can be one of the greatest causes of
5    erroneous convictions." *Dennis v. Secy., Pennsylvania Dept. of Corr.*, 834 F.3d 263,
6    313 (3d Cir. 2016) (McKee, J., concurring).

7                 a.    **Failure to consult or present testimony of an**
8                       **eyewitness identification expert.**

9          Trial counsel's performance fell below an objective standard of
10   reasonableness when they failed even to consult, or present testimony, from an
11   eyewitness identification expert. *See Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th
12   Cir. 2008) ("It is especially important for counsel to seek the advice of an expert
13   when he has no knowledge or expertise about the field."); *Draughon v. Dretke*, 427
14   F.3d 286, 296 (5th Cir. 2005) (finding counsel ineffective for failing to investigate
15   forensic evidence that "deprived [the petitioner] of a substantial argument, and set
16   up an unchallenged factual predicate for the State's main argument"); *Dugas v.
17   Coplan*, 428 F.3d 317, 329–31 (1st Cir. 2005) (finding deficient performance when
18   counsel did not hire expert on forensic issue central to State's case despite not
19   knowing about the issue himself); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995)
20   ("[A] reasonable defense lawyer would take some measures to understand the
21   laboratory tests performed and the inferences that one could logically draw from
22   the results."); *Dees v. Caspiri*, 904 F.2d 452, 454–55 (8th Cir. 1990) ("[C]ounsel
23   had a duty to make a diligent investigation of the forensic evidence and its potential
24   weaknesses" and "to garner the expertise necessary to cross examine [the State's
25   expert].")

26         Courts have long recognized concerns regarding the reliability of eyewitness
27   identifications. *See Wade*, 388 U.S. 218. In response, "the scientific community has
28   made significant strides in understanding this phenomenon." *Dennis*, 834 F.3d at

321 (McKee, J., concurring). "A combination of basic and applied research on human visual perception and cognition has revealed that the reliability of eyewitness identifications is largely contingent on the conditions under which memories are created, stored, and then later recalled." *Id.*

An eyewitness identification expert could have helped explain that "[r]esearch has shown that certain variables can impact the processes of these memory functions with serious implications for the reliability of the subsequent memories." *Id.* These variables include system variables, which are the "procedures and practices law enforcement use to elicit eyewitness identifications" and estimator variables, which are "the conditions present during memory formation or storage." *Id.* at 321, 330.

A system variable at issue in Lehr's case is the failure of the police to use a blinded, or double-blind, identification procedure for the photo arrays and the live lineup:

> Blinding occurs when the officer administering an identification procedure, such as a photo array, knows who the suspect is but cannot determine when the witness is viewing the suspect's photo. 'In one common 'blinded' procedure, the officer places each photo in a separate envelope or folder and then shuffles the envelopes/folders so that only the witness sees the images therein.' This blinding can also be doubled: for example, when an officer who neither knows the suspect's identity nor position in the photo array shows the array to an eyewitness. Such blinding is used to prevent the officer from giving the witness conscious or unconscious cues that can affect the witness' identification.

*Id.* at 321 (internal citation omitted). As explained below, the police officers conducting the photo arrays and the live lineup knew the suspect was Lehr and knew his position in the lineups and arrays.

Another system variable is photo array and lineup construction. *Id.* at 324 ("Researchers have also found that the way that a photo array or live lineup is constructed can affect the reliability of the resulting identifications."). As outlined below, the photo array shown to Collins was not properly constructed, as it only contained five photographs, not six per department policy; two of the three

photograph arrays shown to Ross included pictures of Lehr; and the live lineup participant selection was also not properly constructed as the participants impermissibly made Lehr stand out. Moreover, the police also utilized simultaneous, versus sequential, photo and live lineups, another construction issue. *See id.* at 325 (citing *State v. Henderson*, 27 A.3d 872, 898 (N.J. 2011) ("if multiple suspects are in the lineup, the reliability of a positive identification is difficult to assess, for the possibility of 'lucky' guesses is magnified.")).

Yet another system variable is interactions with the witnesses and witness feedback. *See Dennis*, 834 F.3d at 325 (McKee, J., concurring). As explained below, police had witnesses give their feedback outside of the lineup room, not while they were viewing the lineup participants. Three of the witnesses underwent hypnosis in an attempt to obtain further descriptions. Lastly, multiple viewings are a crucial system variable, since "[a]llowing a witness to view a suspect more than once during an investigation can have a powerful corrupting effect on that witness' memory. It creates a risk that the witness will merely identify a suspect based on her past views of him rather than her memory of the relevant event." *Id.* at 328. This is exactly what police did in the Ross case by showing her three photo arrays, two of which contained pictures of Lehr, just two days prior to having her participate in the live lineup.

An eyewitness identification expert could have also explained estimator variables, which include, but are not limited to, "the amount of stress on the observer, the presence of weapons, and visibility conditions." *Id.* at 329. As explained in detail below, estimator variable played a key role in each of the witnesses' identifications. Of particular importance here is stress: "high levels of stress at the time of memory formation can negatively impact a witness' ability to accurately identify the perpetrator." *Id.* The length of time between the assaults and the live lineup, or the "retention interval," is also an important estimator variable. *Id.* at 331. "A meta-analysis of fifty-three facial memory studies found 'that

1    memory strength will be weaker at longer retention intervals than at briefer ones.'"
2    *Id.* (citing Kenneth A. Deffenbacher et al., *Forgetting the Once-Seen Face:*
3    *Estimating the Strength of an Eyewitness's Memory Representation*, 14 J.
4    Experimental Psychol.: Applied 139, 142 (2008); *see also* Carol Krafka & Steven
5    Penrod, *Reinstatement of Context in a Field Experiment on Eyewitness*
6    *Identification*, 49 J. Personality & Soc. Psychol. 58, 65 (1985) (finding a substantial
7    increase in the misidentification rate in target-absent arrays from two to twenty-four
8    hours after event)). Lastly, the "exposure duration, distance, and lighting affect the
9    accuracy of eyewitness identifications." *Id.* at 332.

10       Due to trial counsel's failure to consult with an expert in eyewitness
11   identification, this science and research was never applied to the identifications
12   made in Lehr's case. They failed to do so, despite the fact that Arizona state courts
13   recognize the admissibility of eyewitness expert testimony. *See State v. Forde*, 315
14   P.3d 1200, 1219 (2014) ("We have repeatedly held that while an expert may educate
15   a jury by testifying about behavioral characteristics affecting the accuracy of
16   eyewitness identification, the expert may not usurp the jury's role by offering
17   opinions concerning the accuracy, reliability, or credibility of a particular witness.")
18   By failing to even consult with an eyewitness identification expert, let alone present
19   an expert testimony, trial counsel's performance fell below an objective standard of
20   reasonableness.

21
22

     **b.**  **Failure to investigate, consult an expert, and present evidence challenging the witness descriptions and identification procedures.**

23       A reasonable fact investigation, including a consultation with an eyewitness
24   identification expert and a specialist in challenging hypnosis, would have prepared
25   trial counsel to challenge the reliability, and thus admissibility, of the pretrial and
26   in-court identifications at trial. Such an investigation and expert consultation would
27   have revealed the following systemic and estimator variables in regard to each
28   eyewitness identification:

79

### i. Wanda Collins

Wanda Collins' assault occurred on February 13, 1991. (Tr. Feb. 2, 2009 at 55–70.) The State read Collins' testimony from the 1996 trial during the 2009 trial. (Tr. Feb. 2, 2009 at 55–70.) According to Collins, she got into an older model blue sedan with no interior door handles. (Tr. Feb. 2, 2009 at 140.) The attacker reached over, grabbed her by the throat, and choked her into unconsciousness. (Tr. Feb. 2, 2009 at 98–99.)

Collins' description of her attacker changed over time. Immediately after the assault, for example, Collins had described her attacker to police as being a 6-foot-tall white male with dark blonde hair, clean shaven, around 200 pounds in his 30's with a "pot belly." (Tr. Feb. 2, 2009 at 129–30, 137–40.) In the first trial, Collins identified a man in the gallery audience as her attacker and specially indicated that Lehr (who was in court during that trial) was not the man that attacked her. (Tr. Sept. 18, 1996 at 42; *see also* Tr. Feb. 2, 2009 at 123–28, 130–33; Tr. Feb. 10, 2009 at 77–78.) Collins later changed her description of her attacker when interviewed by police to include a full beard.

An eyewitness identification expert could have reviewed these facts and explained the multiple factors that likely affected the reliability of Collins's identifications. First, Collins was choked unconscious and experienced severe trauma. An expert could have explained that experiencing trauma does not improve one's memory to recall specific facts. Collins also lost consciousness, which means she had no ability to make observations for a period of time. Upon awaking, she would have been in a "fight or flight" mode, which impacts the brain's ability to remember details.

On July 1 or 2, 1992, Detective Frank DiModica put together a photographic lineup for Collins to review—sixteen months after her assault. (Tr. Feb. 2, 2009 at 248; Trial Ex. 14.) DiModica included a photograph of Lehr in this photographic lineup. (Tr. Mar. 4, 2009 at 249; Trial Ex. 14.) Contrary to police policy, this

1    photographic line up only included five photographs. (Trial Ex. 14.)

2        DiModica read the photograph array advisement card to Collins prior to
3    showing her the photographic array. (Tr. Mar. 4, 2009 at 250; Trial Ex. 15.) Upon
4    reviewing the photographic array, Collins indicated the photograph of Lehr "looks
5    like him" and added "[i]t's been a long time, but it looks like him." (Tr. Feb. 2, 2009
6    at 254.) She then initialed and dated the back of the lineup card. (Tr. Mar. 4, 2009
7    at 254.) Collins did not participate in the live line-up.

8        An eyewitness identification expert could have educated the jury on multiple
9    factors likely affecting the reliability of Collins's identifications. First, the photo
10   identification occurred sixteenth months after her assault. This long delay certainly
11   would have impacted Collins' ability to accurate identify her attacker. There were
12   also issues of credibility that trial counsel could have addressed regarding Collins'
13   participation with the police, including that she gave police a false name and had
14   pending criminal charges at the time of the offense and investigation. (Tr. Feb. 2,
15   2009 at 167.)

16       Second, Collins was impermissibly shown a five-person photo array. (*See*
17   Trial Ex. 14.) The Phoenix Police Department's own policy states photo arrays
18   should include six people. An eyewitness identification expert could have explained
19   the impact of this deviation from the department's own procedure and discussed the
20   importance of having a reasonable selection of photographs when complying a
21   photo array for identification purposes. For example, some jurisdictions use as
22   many of eight photograph selections in order to ensure a reliable and reasonable
23   identification.

24       An eyewitness identification expert could also have explained the research
25   and differences regarding the use of a simultaneous, versus sequential, photo
26   identification procedures. A simultaneous line-up requires the viewer to engage in
27   deductive reasoning, or a process of elimination. For this reason, sequential
28   identifications can be more reliable because it requires the viewer to make a

decision for that single photo of an individual.

An eyewitness identification expert could have also explained the benefits of law-enforcement employing double-blind eyewitness procedures. In Lehr's case, police officers conducting the photo array knew he was the suspect in the arrays. In order to avoid an unduly suggestive identification, research shows that using a double-blind procedure ensures the officer cannot intentionally or unintentionally influence the viewer's ultimate selection.

Lastly, an eyewitness identification expert could have educated the jury on what qualifies as a "positive" identification. For example, Collins' comment that the photograph in position number three "looks like him" creates a question whether this was indeed an accurate identification. Rather than consult with or call an eyewitness identification expert, however, this portion of Collins' testimony went unchallenged and the jury was left with the impression that Collins made a positive photo identification of Lehr.

### ii.      Tracy Hancock

Tracy Hancock's sexual assault occurred on February 23, 1991. (Tr. Feb. 11, 2009 at 193.) Hancock's assault occurred at night: "it was dark" but "it wasn't completely dark." (Tr. Feb. 11, 2009 at 218; Tr. Feb. 12, 2009 at 39.)

In November 1991, Detective Dyer with the Phoenix Police Department re-interviewed Hancock and "showed her a group of photographs and asked her if anyone in the photographs looked like the suspect that sexually assaulted her."

On March 1, 1992, Hancock first provided a description of her attacker—almost one year after her assault. (Tr. Feb. 11, 2009 at 218.) Hancock informed Detective DiModica during this interview that she saw a composite sketch released on television in February 1992 and felt that it looked like the man who had kidnapped and sexually assaulted her. At this time, one year after her assault, Hancock provided police with a description of the suspect who attacked her, and his vehicle, including numbers she believed to be included in the license plate. (Tr.

1  Feb. 11, 2009 at 248–249.)

2  On June 24, 1992, police subjected Hancock to hypnosis. (Tr. Apr. 8, 1996

3  at 23.) While under hypnosis, Hancock provided inconsistent statements from her

4  previous descriptions; for example, she now described a 2-door car, not a 4-door

5  car; she stated for the first time that the gear shift was on the steering column; she

6  also identified new facial features not previously mentioned such as a cold sore or

7  mole on his bottom lip, nasty teeth, and thin lips.

8  On June 25, 1992—sixteen months after the sexual assault, and one day after

9  her hypnosis session—Hancock viewed a live line-up. (Tr. Mar. 4, 2009 at 170;

10  Trial Ex. 24.) Hancock selected Lehr, in position number three, after viewing the

11  live line-up, but was only sixty-percent certain of her selection. (Tr. Mar. 4, 2009

12  at 170.)

13  At the 2009 trial, Hancock's testimony was read into the record. Notably,

14  defense attorney Cleary waived the reading of her cross-examination. (Tr. Feb. 12,

15  2009 at 52.)

16  An eyewitness identification expert could have helped to explain the factors

17  likely affecting the reliability of Hancock's suspect, car, and license plate

18  descriptions. First, Hancock had experienced trauma and feared for her life. An

19  expert could have explained how experiencing trauma does not improve one's

20  memory to recall specific facts. Second, Hancock's assault occurred at night, while

21  dark. An expert could have explained the social science supporting the principle

22  that darkness provides a challenge to viewing key suspect features.

23  An eyewitness identification expert could have explained to the jury the

24  concept of post-event contamination. Then, trial counsel could have had the

25  scientific support to argue that Hancock's identification had been tainted by

26  viewing media coverage regarding subsequent assaults as well as a composite

27  sketch of the alleged suspect. An eyewitness identification expert could have

28  assisted counsel in explaining how Hancock's descriptions changed prior to and

1   after the State subjected her to hypnosis.

2   An eyewitness identification expert could have explained the issues that
3   likely affected the reliability of Hancock's live lineup identification. For example,
4   Hancock had been interviewed while under hypnosis the day prior to the live lineup.
5   In addition, counsel would have been able to argue that Hancock engaged in relative
6   judgment when viewing the line-up: rather than identifying a suspect she compared
7   suspects and engaged in a process of elimination. (Tr. Feb. 12, 2009 at 46.)
8   Hancock's testimony that she "also had another person from the lineup step
9   forward" shows how she engaged in this comparison or process of elimination
10  during the live line-up. (Tr. Feb. 12, 2009 at 46.) Hancock also stated at the lineup
11  that "it looked like number two's legs but three's face." Moreover, an eyewitness
12  identification expert could have further explained it was unusual to have the witness
13  make the identification after exiting the room rather than immediately while
14  viewing the suspect.

15  At the time of the live line-up, Hancock was only sixty-percent sure of her
16  selection. (Tr. Mar. 4, 2009 at 170.) Hancock's testimony at trial, however, misled
17  the jury because she now claimed "I suppose I might have said 100 percent but I
18  felt sorry to say 100 percent." (Tr. Feb. 12, 2009 at 50.) An eyewitness identification
19  expert could have explained the concept of witness confidence. And then reasonable
20  counsel would have emphasized to the jury that Hancock's original certainty at the
21  time of the live line-up was only sixty-percent; which is just slightly better than
22  guessing (i.e., fifty percent)—the identification could not reasonably be considered
23  "positive."

### iii.    Suzanne Gabriel

25  Suzanne Gabriel's sexual assault occurred on March 23, 1991. (Tr. May 7,
26  1997 at 6.) The same day, Gabriel provided descriptions of both the vehicle (Tr.
27  May 7, 1997 at 10, 21, 26–28, 50) and suspect (Tr. May 7, 1997 at 23–25.) After
28  driving her to the desert, Gabriel was assaulted. During the sexual assault, Gabriel

was facing away from her attacker. (Tr. May 7, 1997 at 17, 19.) Gabriel was participating in a methadone clinic, but missed her morning methadone dose on the morning of the assault; she was beginning to feel ill, so injected heroin. (Tr. May 7, 1997 at 37, 45–48.)

Over a month after her assault, police showed Gabriel a photographic lineup, which did not include a photograph of Lehr. (Tr. May 7, 1997 at 58.) She thought photographs in position one or five looked like the suspect but she could not be positive. (Tr. May 7, 1997 at 59.)

On March 23, 1992, one year after her assault, police showed Gabriel a composite drawing (completed by Thompson and as depicted in PPD Crime Bulletin dated October 25) and the composite drawn by Ely from Maricopa County Sheriff's Office (Ross's composite).

Just a few days later, on March 25, 1992, Gabriel viewed another photographic lineup, which did not include a photograph of Lehr. She did not make an identification.

On June 24, 1992, police subjected Gabriel to a hypnosis session. (Tr. Apr. 8, 1996 at 4.)

The day after her hypnosis, on June 25, 1992—fifteen months after the sexual assault—Gabriel participated in the live lineup. (Tr. May 7, 1997 at 32.) Gabriel testified at trial that she saw her attacker in the lineup, standing in position three. (Tr. May 7, 1997 at 34.) Gabriel also made an in-court identification of Lehr at trial. (Tr. May 7, 1997 at 37.)

An expert could have reviewed the facts and helped explained factors likely affecting the reliability of Gabriel's identifications. First, Gabriel experienced severe trauma and a high degree of stress and fear. An expert could have explained that experiencing trauma does not improve one's memory to recall specific facts. Second, Gabriel admitted she was a participant in a methadone program and used heroin earlier that day to help alleviate her withdrawal symptoms. (Tr. May 7, 1997

85

at 37.) Trial counsel could have further argued that Gabriel's state of mind, perceptions, and memory could have been altered given the use of these substances.

Gabriel also provided various descriptions of her attacker that were inconsistent with Lehr. For example, Gabriel testified that her attacker "did not seem all that large to me…maybe five-10, five-11…not somebody six-foot-two." (Tr. May 7, 1997 at 24.) In fact, Lehr is six-foot-two. Gabriel also stated her attacker had green or light brown eyes (Lehr's eyes are brown).

An eyewitness identification expert could have explained to trial counsel how Gabriel's descriptions changed prior to and after the State subjected her to multiple re-interviewing attempts, including during hypnosis.

An eyewitness identification expert could further have explained how certain factors—such as the concept of post-event contamination—were relevant to Gabriel's live lineup identification, which was taken over fifteen months after her assault and the day after she underwent hypnosis. Police specifically showed Gabriel two composite sketches of the alleged suspect before she participated in the live lineup. An eyewitness identification expert could have explained how post-event information can affect subsequent identifications and lineup procedures.

Moreover, Gabriel's live lineup identification should be considered, at best, a tentative identification. After exiting the live lineup room, Gabriel stated the person in position three "looks like" her attacker. When asked if she was sure, Gabriel commented "it could be." When asked what percentage she felt certain of her pick, Gabriel stated she was "eighty-five to ninety percent positive." Trial counsel could have argued this is not a particularly strong identification.

### iv.   Cathy Zingaro

Cathy Zingaro's sexual assault occurred on April 4, 1991. (Tr. Feb. 9, 2009 at 60.) Zingaro testified the assailant put his hands around her throat and "[t]he world was going black" and "I couldn't see." (Tr. Feb. 9, 2009 at 67.) After the sexual assault, Zingaro testified she again was choked and lost consciousness; she

1  awoke with a head injury. (Tr. Feb. 9, 2009 at 78.) Zingaro provided descriptions

2  of both the vehicle (Tr. Feb. 9, 2009 at 82–83) and suspect (Tr. Feb. 9, 2009 at 93–

3  97) in the hours following her assault (Tr. Feb. 9, 2009 at 91.)

4     On April 11, 1991, Zingaro met with a "forensic artist" and completed a

5  composite sketch that was "close to" a likeness of her alleged attacker. (Tr. Feb. 9,

6  2009 at 91–92; Trial Ex. 250.001.) Zingaro testified she was "piecing [facial

7  features] together and putting them one by one together" to build the composite.

8  (Tr. Feb. 9, 2009 at 93.)

9     On May 7, 1991, the police re-interviewed Zingaro regarding her attack. Over

10  two weeks later, Zingaro contacted police and reported she was "pretty sure" she

11  saw her attacker at a local Starmart. Police didn't approach Zingaro regarding this

12  possible suspect, however, until five months later when they asked Zingaro to

13  review a single photograph of suspect David Kroll. Zingaro said he could possibly

14  be her attacker, but she wasn't sure.

15     On June 25, 1992—almost fifteen months after the assault—Zingaro

16  participated in the live lineup. (Tr. Feb. 9, 2009 at 97.) She could see all the

17  participants at one time. (Tr. Feb. 9, 2009 at 98; Trial Ex. 24.) When asked if she

18  needed to see any of the participants a second time, she asked to see number three.

19  The police officer asked the participant in position three, Lehr, to step forward.

20  After leaving the line-up room, Zingaro opined that the person in position number

21  three, Lehr, assaulted her. (Tr. Feb. 9, 2009 at 99; *see also* Tr. Mar. 4, 2009 at 159.)

22     An eyewitness identification expert could have explained the factors relevant

23  to Zingaro's identification that would have assisted counsel in arguing her

24  description of the suspect was unreliable. Zingaro testified she was beginning to

25  black out at one point and then lost consciousness after the assault. (Tr. Feb. 9, 2009

26  at 67, 78.) An expert could have testified that experiencing trauma does not improve

27  one's memory to recall specific facts and experiencing a loss of consciousness

28  hindered her ability to make observations for a period of time. For example, Zingaro

originally described her attacker as being 5'6" but then selected Lehr in the live line-up, who was 6'2". Zingaro also equivocated on the suspect's skin tone at the time of the live lineup. She also identified a two-door car when Lehr's car was four-door. These inconsistencies could have been further discussed and explored by counsel after having the appropriate scientific foundation from an eyewitness identification expert.

An eyewitness identification expert could have also explained concepts related to composite sketches, and a reasonable defense lawyer would have then argued the completion of such sketches impermissibly tainted Zingaro's subsequent identifications. First, when constructing the composite, the artist had Zingaro identify individual features; however, studies show that the human brain processes facial recognition not by individual facial features but by the face as a whole. (*See* Tr. Feb. 10, 2009 at 232–35.) Second, an eyewitness identification expert could have explained that research shows that completing a composite sketch actually results in witnesses being less accurate in later identifying the actual suspect.

An eyewitness identification expert could have further explained the importance of using double-blind procedures during identifications. In Lehr's case, law-enforcement conducting the photo array knew who the suspect was in the various arrays. In order to avoid an unduly suggestive identification, reasonably competent counsel would have argued police failed utilize a double-blind procedure ensuring the officer cannot intentionally or unintentionally influence the viewer's ultimate selection. This problem is particularly noticeable in Zingaro's case, where she makes a possible identification of suspect Kroll on October 30, 1991 even though he was ultimately eliminated as a suspect.

Lastly, an eyewitness identification expert could have educated the jury on the questionable aspects of the live lineup. First, it was unusual to have the witness make the identification after exiting the room rather than immediately while viewing the suspect. For example, immediately following the viewing, Zingaro

88

1    noted the person in position three, Lehr, appeared to have more of a tan than at the
2    time of her assault. But when Zingaro was later exiting the building, she commented
3    that the person in position three had the "same looks as he did when he assaulted
4    her." As another example, immediately after viewing the live lineup, Zingaro
5    commented: "I absolutely do not want to be wrong about picking him," which
6    indicated she may be unsure about her selection. But later when exiting the building
7    with Officer Chapman, Zingaro seemed more confident and was "certain" it was
8    the participant in position three. Chapman, however, did not ask Zingaro about her
9    specific confidence level, as he did with other participants.

10                              **v.    Jennifer Thompson**

11           Jennifer Thompson's sexual assault occurred on October 24, 1991. (Tr. Feb.
12   11, 2009 at 45.) Thompson was thirteen years old at the time. (Tr. Feb. 11, 2009 at
13   48.) Following the offense, Thompson provided a description of her attacker and
14   his vehicle. (Tr. Feb. 11, 2009 at 49, 53, 72.) Thompson testified she lost
15   consciousness after the sexual assault, briefly awoke, and then passed out again.
16   (Tr. Feb. 11, 2009 at 62–63.)

17           On October 29, 1991, police showed Thompson a photo lineup, which did
18   not include Lehr's photograph; she did not make a positive identification.

19           On November 7, 1991, Thompson completed a composite sketch – a full two
20   weeks after the assault. The next day, Detective DiModica re-interviewed
21   Thompson at her home.

22           On February 26, 1992, the police subjected Thompson to hypnosis. (Tr. Apr.
23   8, 1996.) She provided additional information regarding the description of her
24   attacker and his vehicle.

25           On June 25, 1992–eight months after the sexual assault–Thompson
26   participated in the live line-up. (Tr. Feb. 11, 2009 at 77.) Thompson identified Lehr,
27   who was standing in position three. (Tr. Feb. 11, 2009 at 79.) Officer Chapman who
28   was conducting the live lineup testified that Thompson made a positive

identification coupled with an emotional reaction. (Tr. Mar. 4, 2009 at 159.) Defense counsel declined to cross-examination Thompson at trial. (Tr. Feb. 11, 2009 at 81.

An eyewitness identification expert could have reviewed these facts and helped to explain the factors relevant to the reliability of Thompson's identification. First, Thompson experienced unconsciousness and severe trauma. An expert could have explained that experiencing trauma does not improve one's memory to recall specific facts. Thompson also lost consciousness, which means she had no ability to make observations for a period of time. Upon awaking, she would have been in a "fight or flight" mode, which impacts the brain's ability to remember details.

Thompson also provided various descriptions when she was re-interviewed by police after completing a composite sketch and while she underwent hypnosis over three months after the assault. An eyewitness identification expert could have helped trial counsel understand how Thompson's descriptions changed prior to and after the police subjected her to multiple re-interviewing attempts, including during hypnosis. Trial counsel could have then presented these compelling arguments to the jury.

An eyewitness identification expert could have also explained the science regarding composite sketches. First, Thompson's sketch was completed two weeks after her assault, after her memory was not as fresh. Second, studies show that children do not produce reliable composite sketches; because of this, some police departments have a policy not to obtain composite sketches by young children. Third, the composite was completed after she had been exposed to a photographic lineup where she presumably focused on the faces of multiple people. Fourth, the artist had Thompson identify individual features when constructing the composite; however, studies show that the human brain processes facial recognition not by individual facial features but by the face as a whole. Because of this, it is very difficult for a person to identify features in isolation. Lastly, an eyewitness

1    identification expert could have explained that completing a composite sketch
2    actually results in a witness being less accurate in later identifying the actual
3    suspect, which would call into question the reliability of Thompson's live line up
4    identification. Thompson also participated in the live line up eight months after her
5    assault.

6        Lastly, an eyewitness identification expert could have explained the science
7    regarding the unreliability of eyewitness identifications of adults by juveniles. The
8    expert could have explained that it is well-documented that juveniles do not make
9    reliable identifications of adults.

10                          **vi.    Jennifer Ailshire**

11       Jennifer Ailshire's sexual assault occurred on November 18, 1991. (Tr. Feb.
12   17, 2009 at 59.) Ailshire was ten years old at the time. (Tr. Feb. 17, 2009 at 60.)
13   Ailshire provided a description of her attacker and his vehicle shortly after the
14   assault. (Tr. Feb. 17, 2009 at 66, 85–92.) The assault occurred at night (Tr. Feb. 17,
15   2009 at 63, 78); Ailshire testified to seeing her attacker with the benefit of the car
16   dome light, when passing streetlights, and in the moonlight. (Tr. Feb. 17, 2009 at
17   95.)

18       Two days after her sexual assault, Ailshire completed a composite sketch.
19   Seven months after the assault, Ailshire participated in the live lineup. (Tr. Feb. 17,
20   2009 at 92.) Ailshire tentatively said that "one of them was familiar" but his facial
21   hair was different. (Tr. Feb. 17, 2009 at 94.) Officer Chapman testified that Ailshire
22   said "she thinks it's No. 3, Scott Lehr." (Tr. Mar. 4, 2009 at 161.) On October 7,
23   1996, Ailshire made an in-court identification. (Tr. Feb. 17, 2009 at 63, 78, 96.)

24       An eyewitness identification expert could have reviewed these facts and
25   helped to explain the factors relevant to Ailshire's identification. Ailshire had
26   experienced trauma and feared for her life. An expert could have explained that
27   experiencing trauma does not improve one's memory to recall specific facts.
28   Second, Ailshire's assault occurred at night, while dark. An expert could have

explained how darkness affects witnesses' opportunity to view key suspect features.

An eyewitness identification expert could have also explained the principles regarding composite sketches; then reasonably competent counsel could have argued the completion of the composite sketch impermissibly tainted Ailshire's subsequent identifications. As mentioned above, studies show that children do not produce reliable composite sketches; because of this, some police departments have a policy not to obtain composite sketches by young children. The composite artist had Ailshire identify individual features out of a book when constructing the composite (Tr. Feb. 17, 2009 at 106); however, studies show that the human brain processes facial recognition not by individual facial features but by the face as a whole. Because of this, it is very difficult for a person to identify features in isolation. Lastly, an eyewitness identification expert could have explained that research shows that completing a composite sketch actually results in witnesses being less accurate in later identifying the actual suspect, which would call into question the reliability of Ailshire's live line up identification.

Even though Ailshire did not make a live lineup identification, the testimony elicited at trial made her identification seem more certain. An eyewitness identification expert could have explained that such a response to viewing a live lineup is insufficient to count as an identification. For example, upon reviewing the live lineup, Ailshire said "it looks like number three . . . but I can't be sure." She thought he had "the same eyes and the same build" but "his hair is not the same and he's not as fat and he has no beard." In addition to these differences, she also said "I can't be sure about his nose because I didn't get to see his nose that well." In sum, Ailshire thought the man in position three had different head hair, body size, facial hair, and nose. Ailshire also participated in the live line up seven months after her assault. With the help of an expert, trial counsel would have been able to raises concerns with this alleged identification.

Lastly, an eyewitness identification expert could have explained the

1  unreliability of eyewitness identifications of adults by juveniles. The expert could
2  have explained that it is well-documented that juveniles do not make reliable
3  identifications of adults.

4                    **vii.    Elizabeth Ross**

5          Elizabeth Ross's sexual assault occurred on February 23, 1992. (Tr. Mar. 9,
6  2009 at 24.) Ross was fourteen years old at the time. (Tr. Mar. 9, 2009 at 25.) On
7  February 25, 1992, two days after the assault, police interviewed Ross. Ross
8  provided a description of her attacker and his vehicle. (Tr. Mar. 9, 2009 at 26, 46.)
9  The attack occurred at night and it was "dark." (Tr. Mar. 9, 2009 at 32, 43.) Ross
10  testified she lost consciousness after the sexual assault. (Tr. Mar. 9, 2009 at 41, 44.)
11  Ross lacked memory of events following the assault. (Tr. Mar. 9, 2009 at 44.) When
12  explaining her inconsistent descriptions of the attacker's vehicle, Ross explained:
13  "I was confused. I was very injured. My head wasn't right. I wasn't clear." (Tr. Mar.
14  9, 2009 at 53.)

15          Three days after her sexual assault, Ross completed a composite sketch of
16  her attacker. (Tr. Mar. 9, 2009 at 45.) Detective Johnson requested the composite
17  artist, Ely, to adjust Ross's original composite to include longer hair, a full beard,
18  and wire glasses.

19          On June 23, 1992—four months after the assault—police officers asked Ross
20  to view three separate photo lineups. Police showed Ross three separate photo
21  lineups: two of the photo lineups included photographs of Lehr (one in position
22  number two; and a second with Lehr in position number three). The third photo
23  lineup did not include any photographs of Lehr. After reviewing the photograph
24  array containing Lehr's Mar. 1992 photo, Ross picked out that photo stating "it sort
25  of looks like Number 3, but not really. His hair and beard look correct, but I'm not
26  positive it's him." (Tr. Dec. 15, 1994 at 5, 8–15, 20, 23.)

27          On June 25, 1992, just two days after viewing the photo lineups including the
28  pictures of Lehr, Ross participated in the live lineup. (Tr. Mar. 9, 2009 at 49–50.)

Ross viewed the lineup and made a positive identification of Lehr, who was standing in position three. (Tr. Mar. 9, 2009 at 50.) On October 21, 1996, Ross made an in-court identification. (Tr. Mar. 9, 2009 at 50.)

An eyewitness identification expert could have reviewed these facts and explained the factors that likely affected the reliability of Ross's identifications. First, Ross experienced unconsciousness and severe trauma. She was in the hospital for a number of days following the assault and did not provide a description until two full days after her assault. An expert could have explained that experiencing trauma does not improve one's memory to recall specific facts. Ross also lost consciousness, which means she had no ability to make observations for a period of time. Upon awaking, she would have been in a fight or flight mode, which impacts the brain's ability to remember details. Second, Ross's assault occurred at night and she testified that "I really couldn't see the full face" until the car stopped at a stop light and his face was lit by traffic lights. (Tr. Dec. 15, 1994 at 42.) An expert could have explained the research regarding witnesses' opportunities to view key suspect features in the dark.

Ross also provided various descriptions of both the suspect and vehicle used in the assault. Many of her descriptions were inconsistent. For example, she first reported the assault occurred in a pickup truck and then later a sedan. She also reported the suspect had blue/green eyes (Lehr has brown eyes). During various interviews, she changed the description of her attacker as being clean shaven, having a mustache, and later, having a beard. An eyewitness identification expert could have helped trial counsel understand and then effective argue how Ross's descriptions changed across her multiple interviews.

An eyewitness identification expert could have explained the reliability of composite sketches and how composite sketches may affect the reliability of future identification procedures in an investigation. First, studies show that children do not produce reliable composite sketches; because of this, some police departments have

a policy not to obtain composite sketches by young children. Second, Don Ely, an Evidence Technician at the Maricopa County Sheriff's Office testified that he asked Ross to describe individual facial features in order for him to complete the composite sketch. (Tr. Jan. 3, 1995 at 113.) As discussed above, studies show that the human brain processes facial recognition not by individual facial features but by the face as a whole. Because of this, it is very difficult for a person to identify features in isolation. Lastly, an eyewitness identification expert could have explained that completing a composite sketch actually results in witnesses being less accurate in later identifying the actual suspect, which would call into question the reliability of Ross's subsequent photographic lineup and live line up identifications.

An eyewitness expert also could have explained eyewitness protocols and procedures, which reasonably competent counsel would have then used to argue that Ross's photographic lineup was unreliable and also impermissibly tainted her subsequent identifications. Ross participated in the photographic lineup four months after her assault. She was shown three photographic line ups, two of which included photographs of Lehr. For the photographic array with Lehr in position three, Ross stated it sort of looks like the guy but not really. An eyewitness identification expert could have explained how including the photograph of the same suspect in multiple photographic lineups may affect a witness's identification. Moreover, if the police department failed to use a double-blind procedure, this could have caused an unduly suggestive identification.

While Ross made an identification during the live lineup, an eyewitness identification expert could have educated the jury on eyewitness protocols and procedures, which reasonably competent counsel would have then used to argue how Ross viewing two photographs of Lehr in the photographic lineups, two days prior to the live lineup, impermissibly tainted her live line up identification. Police knew that Lehr had been in position three in one of the photographic lineups shown

to Ross and then again placed him in position three for the live lineup. An eyewitness identification expert could have explained that Ross's positive identification, and emotional reaction to seeing Lehr in the live lineup, was directly influenced by Ross viewing photographs of Lehr just two days prior. Moreover, Ross's testimony regarding her certainty in the identification was contradictory. At first she stated that nothing in the photos shown to her two days before the live lineup caused her to pick Lehr out of the live lineup because she could never forget his face. (Tr. Dec. 15, 1994 at 47–53.) However, on cross-examination, Ross stated that she was not sure if the picture in the photo lineup that she had chosen, which was Lehr, was the perpetrator. (Tr. Dec. 15, 1994 at 61–65.) Ross's own testimony indicates an inconsistency in her level of certainty; however, this went unexplored by counsel.

Lastly, an eyewitness identification expert could have also explained the science on the unreliability of eyewitness identifications of adults by juveniles. The expert could have explained that it is well-documented that juveniles do not make reliable identifications of adults.

### viii.    Live Lineup Procedures

In 1992, Randy Chapman worked in the homicide bureau at the Phoenix Police Department. (Tr. Mar. 4, 2009 at 143.) Chapman knew the police had identified Scott Lehr as a suspect. (Tr. Mar. 4, 2009 at 144–45.) Chapman conducted the live lineup at the Maricopa County Sheriff's Office with several victims of the sexual assault and produced a report. (Tr. Mar. 4, 2009 at 151–53.) Chapman and Lieutenant Heath "got volunteers" to participate in the live lineup – three inmates and two detention officers – that "had similar characteristics to that of Scott Lehr." (Tr. Mar. 4, 2009 at 152–53.) They were dressed in similar clothing and Chapman opined that were similar in "hairstyle, physical features." (Tr. Mar. 4, 2009 at 153.)

The procedure involved opening the door, walking into a dark room, and

1   looking into a twelve-foot panel of glass that is lit on the other side where the men
2   participating in the live lineup stood. (Tr. Mar. 4, 2009 at 155.) The police kept each
3   witness/victim in a separate room with a detective. (Tr. Mar. 4, 2009 at 155.) Prior
4   to viewing the lineup, Lieutenant Heath read each of them an admonition. (Tr. Mar.
5   4, 2009 at 156; Trial Ex. 335.) After entering the room, each individual would step
6   forward, then step back. (Tr. Mar. 4, 2009 at 156.) "Then they were instructed that
7   we will go outside of the room, and they can tell me what their observations were,
8   if any." (Tr. Mar. 4, 2009 at 155–56.) They were specifically instructed not to say
9   anything, or make an identification, while in the room viewing the lineup. (Tr. Mar.
10  4, 2009 at 156.)

11      An eyewitness identification expert could have explained how the police
12  department failed to follow proper procedures when selecting participants for the
13  lineup. With this knowledge, trial counsel could have argued the live lineup
14  identifications were unduly suggestive and rendered the live lineup identifications
15  unreliable. First, the men selected for the live lineup were not of similar
16  characteristics. Witnesses described their attacker as a male in their 30's, but one
17  participant was as young as nineteen and another twenty-one-years old—clearly
18  younger than all descriptions given of the attackers. Multiple witnesses described
19  someone under six-foot tall, with one witness describing the attacker as five-foot-
20  six, yet all but one participant were six-foot-tall or higher. Even worse, Lehr was
21  placed next to the tallest participant, making him appear shorter. In addition,
22  witnesses described someone with a pot belly or a beer belly, yet multiple
23  participants were quite thin. The police report documenting the live lineup, listed
24  the participant characteristics:

25      Position #1: 3/10/65 (27 years old)
        Six-foot, 175 pounds
26      Brown/Blue

27      Position #2: 2/6/1961 (31 years old)
        Six-foot-four
28      235 pounds

97

Brown/Brown

Position #3: 7/6/59 (32 years old)
Six-foot-two, 175 pounds
Brown/Brown
Position #4: 9/3/70 (21 years old)
Five-foot-eleven, 176 pounds
Brown/Brown

Position #5: 2/29/63 (29 years old)[4]
Six-foot, 205 pounds
Brown/Brown

Position #6: 5/2/73 (19 years old)
Six-foot, 195 pounds
Brown/Hazel

(*See* Tr. Dec. 15, 1994 at 36–38.) Because trial counsel never consulted with or presented the testimony of an eyewitness identification expert, the discrepancies among the live lineup participants were never presented for the court's consideration pretrial or for the jury's consideration during the trial. Such an expert could have explained that the live lineup participant selections did not comply with known police procedures for conducting reliable identification lineups.

An eyewitness identification expert could have further explained the science underpinning eyewitness protocols and procedures for the live lineup. Here, police used a simultaneous lineup, which requires the viewer to engage in deductive reasoning, or a process of elimination. For this reason, sequential identifications can be more reliable because it requires the viewer to make a decision for that single individual, rather than engaging in a process of elimination. Second, the police department did not ensure a double blind process; Chapman, who conducted the lineup, knew that Lehr was their suspect. Third, it was unusual to have the witness make the identification after exiting the room rather than immediately while

---

[4] The birthday listed for this participant in the police report is 2-29-63. However, 1963 was not a leap year so there was no 29th of February in 1963. *See* Calendar for Year 1963 (United States), TimeAndDate.Com, https://www.timeanddate.com/calendar/?year=1963 (last visited Nov. 25, 2019).

viewing the suspect. Lastly, an eyewitness identification expert could have explained the science behind the unreliability of eyewitness identifications of adults by juveniles.

### c. Trial counsel failed to request an eyewitness identification jury instruction.

Because of this, if eyewitness identification testimony is admitted at trial, the need for jury instructions detailing how the jurors should evaluate the eyewitness identification is essential. *Dennis*, 834 F.3d at 341–42 (McKee, J., concurring). Here, trial counsel, at the 1996 and 1997 trials and in 2009, failed to request and secure a specific eyewitness identification jury instruction. (*See* Tr. Nov. 20, 1996 at 6–19; Tr. May 15, 1997 at 5–18; Tr. Mar. 24, 2009 at 26–43.)

Not only did the juries receive no instructions on how to evaluate the eyewitness identifications, they were also given no instructions explaining the scope of system or estimator variables that impact eyewitness identifications. *See Dennis*, 834 F.3d at 342 (McKee, J., concurring) ("Jurors need to be informed of the applicable variables before they will be in a position to exercise the caution . . . Without those detailed instructions, jurors simply are in no position to fully appreciate that '[t]he witness' recollection of [a] stranger can be distorted easily by the circumstances or by later actions of the police.'") (internal citation omitted).

### 4. Prejudice

But for counsel's errors, there is a reasonable probability that the outcome of Lehr's capital trial would have been different because the trial court would have determined that the State's eyewitness identification evidence was unduly suggestive and unreliable and should be excluded. *See Hinton v. Alabama*, 571 U.S. 263, 276 (2014) (finding a reasonable probability that defense counsel "would have hired an expert who would have instilled in the jury a reasonable doubt as to Hinton's guilt.") As the discussion below demonstrates, there is a reasonable probability that trial counsel's errors undermined confidence in the outcome of his

1   trial. *See Brown*, 137 F.3d at 1157.

2     Trial counsel did not reasonably investigate or consult an expert in order to
3   prepare for the *Dessureault* hearing in 1994; then counsel failed to even request
4   such a hearing in 2009. Had trial counsel conducted an investigation and consulted
5   an expert, they would have properly challenged the pretrial eyewitness
6   identifications and sought to keep the in-court identifications out of the trial. Trial
7   counsel did not conduct any investigation or consult an expert, however, and thus
8   presented no evidence showing the pretrial identification procedures were unduly
9   suggestive, and thus unreliable. In addition, because trial counsel failed to
10  investigate or consult with an eyewitness identification expert, they were
11  unprepared to challenge and vigorously cross-examine the testimony of the State's
12  witnesses who presented the photographic array and the live lineup identifications.
13  As a result of this failure, the jury not only heard unrebutted and uncontested
14  evidence of the pretrial eyewitness identifications, but also saw the prejudicial in-
15  court identifications.

16    Trial counsel in 1996 were ineffective for failing to consult with an
17  eyewitness identification expert to properly challenge the pretrial identifications
18  during the *Dessureault* hearing. For example, during cross-examination, Seplow
19  failed to question DiModica on the department's policy of using five, versus the
20  standard six, photographs in a photographic lineup. (Tr. Dec. 14, 1994 at 23–28.)
21  He discussed that several of the witnesses underwent hypnosis but lacked the expert
22  assistance needed to fully challenge how these hypnosis sessions tainted subsequent
23  identifications. (Tr. Dec. 14, 1994 at 133–36.) On cross-examination of DiModica
24  who testified to the use of composite sketches, Seplow asked about the composite
25  sketches but did not challenge the reliability of these composites or elicit testimony
26  on how completing composites may subsequent taint witness identifications. (Tr.
27  Dec. 14, 1994 at 126–29.) Seplow did not cross-examination Chapman or Heath on
28  any identification procedures used during the live lineup. (Tr. Dec. 14, 1994 at 73–

84; Tr. Dec. 14, 1994 at 94–107.) Seplow did argue that showing Ross two photographic arrays containing pictures of Lehr just two days prior to her participation in the live lineup tainted her identification but he did not argue any of the other unduly suggestive procedures or circumstances surrounding the other pretrial identifications. (Tr. Jan. 3, 1995 at 123.) Seplow did not cross-examine Ely, who completed the composite sketch in Ross, on his knowledge regarding completion of composite sketches by juveniles or how composite sketches may impact subsequent witness identifications. (Tr. Jan. 3, 1995 at 116–21.) Had the trial judge heard the evidence regarding the system and estimator variables at play in Lehr's identifications, the trial court would have appropriately found counsel the procedures were unduly suggestive, and the identifications unreliable; then, the extremely prejudicial in-court identifications would have thus been properly excluded. Once the identifications were admitted, trial counsel's failure to investigate or consult an expert then left all testimony of the pretrial identifications unrebutted and uncontested.

Even worse, 2009 trial—aware of the prior identification issues raised during the 1994 *Dessureault* hearing and 1996 and 1997 trials—failed to request a *Dessureault* hearing to challenge the introduction of Collins' pretrial identification and also failed to challenge the reliability of the identifications during the pretrial hearings concerning the "other acts" witnesses: Hancock, Zingaro, Thompson, Ailshire, and Ross. (*See* ROA 650.) As a result, Lehr was prejudiced by the introduction of both the pretrial and in-court eyewitness identifications. The identifications of Lehr by these witnesses is directly relevant to the jury's consideration whether clear and convincing evidence supports a finding that a defendant committed the other acts. *See* Ariz. R. Evid. 404(c)(1)(A); *State v. Terrazas*, 944 P.2d 1194, 1196 (Ariz. 1997). Indeed, one of the key considerations for Rule 404 evidence is the strength of the evidence that defendant committed the other acts. *See* Ariz. R. Evid. 404(c)(1)(A).

1        The State specifically relied on the eyewitness descriptions in support of its

2   motion in limine to admit other act evidence (ROA 658 at 3–6) and relied on the

3   witness testimony from the 1996 trials, which included descriptions of their pretrial

4   and in-court identifications (ROA 661.) As the prosecutor himself explained:

5   "Certainly DNA evidence is powerful evidence. *But so much more powerful* were

6   the identifications like [Ailshire's] dramatic identification." (Tr. Jan. 26, 2009 at

7   143 (emphasis added).) The State emphasized the alleged strength of eyewitness

8   identifications regarding the cars used in the assaults, the contents of items in the

9   vehicles, the license plate numbers of the vehicles, and the physical descriptions of

10  the assailant. (*See e.g.*, Jan. 26, 2009 at 144–45.) All of this argument went

11  unrebutted and unchallenged due to trial counsel's failures.

12       The failure of 2009 counsel to challenge introduction of Ross's live lineup

13  identification, made after viewing two photographic lineups containing Lehr's

14  photographs, is notably deficient as counsel knew the circumstances surround this

15  identification were unduly suggestive. *See Simmons*, 390 U.S. at 383 ("It must be

16  recognized that improper employment of photographs by police may sometimes

17  cause witnesses to err in identifying criminals."). The Supreme Court specifically

18  critiqued eyewitness identifications when the suspect "was the only person in this

19  lineup who had also participated in the first lineup." *Foster v. California*, 394 U.S.

20  440, 443 (1969). There, the Court found "[t]he suggestive elements in this

21  identification procedure made it all but inevitable that [the eyewitness] would

22  identify petitioner whether or not he was in fact 'the man.' In effect, the police

23  repeatedly said to the witness, 'This is the man.'" *Id.* The Supreme Court concluded

24  "This procedure so undermined the reliability of the eyewitness identification as to

25  violate due process." *Id.* Moreover, the Arizona Supreme Court found this

26  "arrangement was arguably unduly suggestive" when discussing the Ross

27  identification(s) in 2002. *Lehr I*, 38 P.3d at 1183.

28       2009 trial counsel therefore performed deficiently and to Lehr's prejudice for

failing to investigate the underpinnings of the eyewitness identification testimony they knew the State would rely on, especially a theory that served as direct evidence against Lehr for some of the "other act" offenses. As a result, counsel both failed to reasonably and effectively cross-examine the State's witnesses and failed to present the testimony of an expert who could have helped to explain the factors that render eyewitness identifications unduly suggestive or unreliable.

Moreover, counsel's failure for not ensuring the juries were properly instructed regarding eyewitness identifications prejudiced Lehr because "[s]tudies have documented that jurors tend to misunderstand how memory works and often believe it to be much more reliable and less susceptible to outside influence than it actually is." *Dennis*, 834 F.3d at 341 (McKee, J., concurring). The failure to instruct the jury at all creates a reasonable probability that the errors undermine confidence in the outcome of Lehr's trials. *Brown*, 137 F.3d at 1157 (citing *Strickland*, 466 U.S. at 694); *see also Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) ("The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.")

In addition, due to trial counsel's failure to investigate, counsel lacked the relevant information necessary to convince Lehr not to "waive" his right to confrontation as to the 1996 in-court trial identifications. Had Lehr known that the eyewitness identifications could be found to be unduly suggestive and unreliable, and thus, the witnesses prevented from making in-court identifications, he may not have stipulated to the prior in-court identifications.

The prejudice from counsel's failures at the guilt phase was not contained to that phase but instead infected the rest of the trial. *See Bemore,* 788 F.3d at 1175–76 (finding that deficient performance at the guilt phase "could well have contributed to the outcome of the penalty phase" and that the prejudice inquiry must

be viewed cumulatively). Counsel's failure to defend against this evidence at the guilt phase therefore prejudiced Lehr at the aggravation phase as well. Despite the unusual posture of this case, the 1996 and 1997 convictions—supported by unreliable eyewitness identifications—still matter. The convictions for offenses stemming from the 1996 and 1997 trials committed against Christorf, Ailshire, Cronin, Morales, Hancock and Thompson were used as the (F)(1) aggravators. (Tr. Mar. 27, 2009 at 40–41.) Two counts of aggravated assault against Hancock were then used as the (F)(2) aggravator. As such, the "proof" of Lehr's identifications in the sexual assaults supported the jury's finding for the weight to give "other act" evidence and the convictions were then used to impose Lehr's death sentences.

Furthermore, the failure to refute the eyewitness identifications at the beginning of trial prejudiced Lehr at the penalty phase, where the jurors were asked to weigh the aggravating and mitigating evidence. They went into that weighing determination with the impression that Lehr was identified by the victims, a misconception that was so prejudicial it likely weighed heavily against Lehr's mitigation. *Cf. Stevens*, 489 F.3d at 898. Counsel's failures at the guilt phase therefore had repercussions at every phase of the trial and prejudiced Lehr throughout in violation of Lehr's rights under the Sixth and Fourteenth Amendments to the United States Constitution.

## C.  DNA: Trial counsel performed deficiently and to Lehr's prejudice by failing to challenge the State's DNA evidence.

Lehr's trial counsel performed deficiently, and to his prejudice, during the trial phase of his capital trial. Lehr's 2009 trial counsel failed to conduct a reasonable investigation of the DNA evidence presented in his case; failed to present a DNA expert on his behalf; and failed to effectively cross-examine the State's DNA forensic scientists or consult with a DNA expert for assistance with cross-examination; and failed to put on any defense that may have assisted the jury in determining the credibility, accuracy, and reliability of the State's forensic

1  evidence. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

2      Due to counsel's failures, Lehr suffered significant prejudice, as the jury

3  never heard the evidence that Lehr's first trial lawyers had uncovered regarding the

4  Arizona Department of Public Safety's ("DPS") unreliable DNA testing practices

5  and, in particular, the 2009 jury was never able to weigh the DNA evidence with

6  that knowledge in mind, both during the trial phase as well as during Lehr's

7  sentencing phase, where the jury was tasked with weighing the "other act" evidence.

8              **1.    Exhaustion**

9      Post-conviction counsel raised several DNA-related claims in Lehr's post-

10 conviction petition (*see* PCR Pet. at 53; PCR Am. Pet. at 2–7); these claims were

11 further raised in Lehr's Petition for Review to the Arizona Supreme Court. (PFR 3

12 at 47.) Post-conviction counsel requested additional discovery and specifically

13 alleged that trial counsel "did not challenge the tests performed, did not seek or call

14 expert testimony concerning the extraction procedure or test results, did not request

15 to have the extraction re-tested [as to the 2002 retesting]," but trial counsel in 2009

16 "did refer to contamination of DNA samples" (PCR Order at 40.) Post-conviction

17 counsel also faulted prior counsel for not calling a DNA expert.

18     The post-conviction court addressed this claim on the merits, finding that trial

19 counsel's determination as to whether to use an expert was a reasonable strategic

20 decision and that cross-examination regarding DNA testing was, in sum, adequate.

21 (PCR Order at 43 (explaining that trial counsel cross-examined DPS criminalists on

22 case-specific perceived testing flaws so the jury heard those admissions and

23 argument)). The state further found the claim to be "undeveloped." (PCR Order at

24 41.) The Arizona Supreme Court did not address this issue when it denied Lehr's

25 petition for review. (PFR 29.)

26     Because the state court disallowed an evidentiary hearing and development

27 of the factual record in a manner that contravenes 28 U.S.C. § 2254(d), Lehr should

28 be entitled to supplement the state court record with some new facts within the

1   limits that exhaustion permits. *See Williams v. Woodford*, 859 F. Supp. 2d 1154,
2   1161 (E.D. Cal. 2012) (where the Chief Circuit Judge Kozinski, sitting by
3   designation, granted expansion of record where state court denied evidentiary
4   hearing and its decision was based on an unreasonable determination of the facts
5   under § 2254(d)(2)); *Lor v. Felker*, No. CIV S–08–2985, 2012 WL 1604519 (E.D.
6   Cal. May 7, 2012) (where state court improperly decided issues of fact without
7   granting evidentiary hearing, its decision ran afoul of § 2254(d)(2) and habeas
8   petitioner would be granted a hearing and permitted to expand the record).

9       Moreover, to the extent post-conviction counsel failed to develop the factual
10   support for this claim, Lehr alleges he can overcome any default of this claim by
11   showing cause and prejudice, including because of the ineffective assistance of
12   post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Murray*, 477 U.S. at 488–89;
13   *Strickland*, 466 U.S. at 687–88.

14       **2. Factual Background**
15           **a.   Arizona Department of Public Safety utilized one of**
16               **the first forms of DNA technology and developed its**
                 **protocol surrounding this technology.**

17       At the time of the original DNA testing in this case, the Arizona Department
18   of Public Safety ("DPS") Crime Laboratory utilized primitive forensic DNA
19   techniques. In general terms, the analysis first conducted in this case utilized
20   "Restriction Fragment Length Polymorphism" or "RFLP" technology. (Tr. Oct. 30,
21   1996 at 61.) It involved looking at five genetic locations or probes. (Tr. Oct. 30,
22   1996 at 21.) Each probe contained a piece of DNA with a specific sequence that has
23   been developed as the complementary or second strand of the DNA molecule. Using
24   a particular probe, its complementary sequence can be located. (Tr. Oct. 30, 1996
25   at 31–33.)

26       The first step of DNA analysis involves extracting it from a piece of evidence.
27   The laboratory then uses a restriction enzyme that recognizes specific sites on the
28   DNA molecule and cuts it at those points, resulting in different-sized fragments of

1 DNA. Then, the cut-up DNA is put into an electrophoresis gel, through which an
2 electrical current is passed, causing the DNA fragments to move through the gel.
3 (Tr. Oct. 30, 1996 at 39–41.)

4 Next, the DNA fragments are transferred to a piece of nylon membrane
5 through a process called "Southern Blotting." Then a probe, or piece of DNA that
6 is labeled with radioactivity, is brought into contact with the membrane in order to
7 find the complementary sequence of DNA that it is designed to attach to. (Tr. Oct.
8 30, 1996 at 31–41.) The radioactive banded membrane is then placed between the
9 two pieces of x-ray film and exposed. As the radioactive molecule is decaying, it
10 gives off light energy sufficient to expose the outer piece of x-ray film (termed
11 autoradiogram or "autorad"). (Tr. Oct. 30, 1996 at 42–43.) These autorads contain
12 a series of bands in particular locations that are called molecular size markers or
13 "ladders" because they assist in determining the fragment size of the known or
14 evidentiary samples. On all autorads, there is also a control lane that is run by all
15 laboratories in the United States to confirm that the procedure proceeded correctly.
16 (Tr. Oct. 30, 1996 at 43–44.)

17 In order for a laboratory to undertake this analysis, it develops protocols and
18 procedures focused so that results are both reliable and replicable—working as
19 intended. As with any novel science, this technology was challenged in advance of
20 Lehr's 1996 capital trial.

21 **b.    1990's testing in Lehr's case**

22 **i.    RFLP testing involving Christorf**

23 The DNA analysis in relation to Lehr's case started four years before his first
24 trial. Susan Narveson worked at Arizona DPS as the supervising criminalist. (Tr.
25 Oct. 30, 1996 at 5.) She was responsible for managing the DNA Analysis Unit of
26 the DPS Crime Lab, and her responsibilities included the assignment of all
27 casework and the oversight of all quality assurance and quality control issues. (Tr.
28 Oct. 30, 1996 at 7–8.) She initiated her analysis on April 1, 1992 on some

questioned samples that police submitted concerning Christorf's case: blood stains from Christorf and a potential alternative suspect named McFadden, a known consensual partner of Christorf, a vaginal swab, and a piece of fabric from a jacket on which analysts identified semen. (Tr. Oct. 30, 1996 at 64, 66, 68.) Her described objective was to see whether McFadden could be excluded as a source of semen identified on the vaginal swab and jacket. (Tr. Oct. 30, 1996 at 61.) She obtained information at five genetic loci from the vaginal swab and at four locations from the piece of fabric from the jacket. (Tr. Oct. 30, 1996 at 70.)

Narveson testified that the first step in declaring a match or non-match is a visual identification by the analyst working on the case. The second step would be to compare the size values generated by the computer for the patterns that visually match. To confirm a visual match by computer, the size of the controls and matching patterns must agree within plus or minus 2.5% of the values that would govern for that corresponding band. In the upper region of the gel, the sizing variability is slightly greater; plus or minus 3.8%. (Tr. Oct. 30, 1996 at 76–78.) She decided McFadden's DNA did not match the pattern of the DNA on the vaginal swab or the blue jacket. (Tr. Oct. 30, 1996 at 57–58.)

Subsequently, after obtaining a known sample of Lehr's blood in June 1992, Narveson did an inspection of the results obtained from Lehr's DNA sample, compared that with the results obtained for the male fraction of the vaginal swab and blue jacket of the Christorf autorad and determined that there was a visual match. She then proceeded with the computer comparison of the sizing of each of those DNA bands and compared the corresponding band from each of the patterns to confirm the visual match. (Tr. Oct. 30, 1996 at 66, 68.)

Because the first analysis on the first chromosome, or "D1-S7" location of the male fraction of the vaginal swab had too much DNA loaded in the lane, Narveson went back, took a smaller portion of the sample and ran a duplicate analysis. She was not able to set up a duplicate sample from the stain on the blue

1    jacket, however, because she had used all of the available sample on the first run of

2    testing. (Tr. Oct. 30, 1996 at 72–73.) She found that on the reloaded autorad, the

3    banding patterns on the male fraction of the vaginal swab was consistent with Lehr's

4    sample at five genetic locations. (Tr. Oct. 31, 1996 at 5–10, 14, 16–23, 29, 31–33.)

5        Narveson further testified that, based on her experience, the random

6    probability of finding a match across five genetic locations was "extremely remote."

7    (Tr. Oct. 31, 1996 at 54–55.) She stated that the method of calculating the frequency

8    of occurrence of a duplicate set of DNA bands, called the "Modified Ceiling

9    Principle," is based upon a formula defined in the National Research Council

10    ("NRC") report of 1992. (Tr. Oct. 31, 1996 at 57–58.) Calculating the frequency of

11    occurrence based on the Modified Ceiling Principle for the set of DNA bands that

12    made up the DNA profile for male fraction of the vaginal swab, Narveson found

13    that the DNA profile occurred within a frequency of approximately one in eleven

14    million individuals. (Tr. Oct. 31, 1996 at 62–63.)

15           **ii.**    **RFLP testing involving Ross**

16        Meanwhile, David Allan Duplissa, who was employed by the DPS Crime

17    Lab as a DNA analyst, received some samples in connection with the Ross case on

18    April 1, 1992. He received a known blood stain from Ross, two vaginal swabs, and

19    a stain made from a vaginal aspirate. He also received a piece of pink fabric stained

20    with blood. At the time the Ross autorad was created, there were no known suspects

21    to compare any DNA profiles to. (Tr. Nov. 5, 1996 at 25, 33–35.)

22        But roughly two months later, Duplissa obtained a known blood sample from

23    Lehr and was asked to compare it to the male fractions in the Ross case. (Tr. Nov.

24    5, 1996 at 65–66.) He found matches between the known blood sample of Lehr and

25    the male fractions of the vaginal swab and vaginal aspirate at five probes. (Tr. Nov.

26    5, 1996 at 69, 71–72, 74–75; Tr. Nov. 6, 1996 at 6–8, 10–12, 19–21.)

27           **iii.**    **RFLP testing involving Gabriel**

28        Duplissa also analyzed the Gabriel case. In that case, he found a match

between the known blood standard of Lehr and the male fractions of the two vaginal vault swabs at five probes. (Tr. Nov. 6, 1996 at 23, 26–29, 31–32, 34–38, 40–41.)

### iv.    RFLP testing involving Morales

Duplissa similarly analyzed the autorads produced in the Morales case. In November of 1992, he received the victim's known blood sample, an anal swab, and a vaginal swab. (Tr. Nov. 6, 1996 at 48–49.) Lane 7 contained the male fraction of the anal swab and lane 8 contained the male fraction from the vaginal swab. No results were reached from this probe. (Tr. Nov. 6, 1996 at 53–54.)[5] But Duplissa would eventually testify that lane 7, which was the male fraction of the Morales anal swab, had "an indication or hint of an area of intensity in the same locations as a band, the top band of Scott Lehr's . . . and even fainter hint of the bottom band." (Tr. Nov. 6, 1996 at 4.)

Duplissa could not call the bottom area of seeming intensity a band, but as to the top area, "it[] [was] borderline, what you would call a band or a not . . . Today I would probably call it inconclusive. I would call it inconclusive in the sense that it was a band." (Tr. Nov. 6, 1996 at 5–6.) On another probe, D10-S28, the male fraction of the anal swab had a very faint band lining up in the same visual location as the top band of Lehr and then an even fainter shadow below for the bottom. (Tr. Nov. 6, 1996 at 7.) Since the bottom one was too faint, the entire profile or pattern was found to be inconclusive. The remaining probes did not reveal any bands of Lehr that could be lined up with any bands in the male fractions of the evidentiary samples. Duplissa did, however, testify later that Lehr could not be excluded as a possible donor—the defense's objection to this determination was overruled. (Tr.

---

[5] The defense objected to any further use of the Morales autorads and test results under the Arizona Rules of Evidence, because they were more prejudicial than probative. (Tr. Nov. 6, 1996 at 57.) The defense further objected to any use of the word "match" in connection with the Morales autorads. (Tr. Nov. 6, 1996 at 58–59.) The trial court overruled the defense's objections but did direct that if there was going to be testimony about an alignment or visual comparison, the word "match" was not to be used by the State. (Tr. Nov. 6, 1996 at 61–62.)

1    Nov. 6, 1996 at 7–10.)

2                 **v.**     **RFLP testing involving Collins**

3       As to Collins, it was determined that Lehr matched the male fractions of the

4    two vaginal swabs at five probes. (Tr. Nov. 6, 1996 at 11, 14–24.) Duplissa would

5    testify that using the Modified Ceiling Method calculation for the Gabriel, Collins,

6    and Ross cases, the randomness of occurrence for any of these matches would one

7    in eleven million. (Tr. Nov. 6, 1996 at 29–31.)

8                 **vi.**     **RFLP testing involving Thompson**

9       Terry Hogan, a criminalist at the DPS Crime Lab, received items of evidence

10    on the Thompson case at the same time as Narveson and Duplissa. (Tr. Nov. 13,

11    1996 at 28, 34–37). The known blood sample of Lehr matched the male fraction of

12    the DNA from the vaginal swab at four probes, the last probe being inconclusive.

13    (Tr. Nov. 13, 1996 at 5, 9–14.) The male fraction from a sock recovered from the

14    crime did not match Lehr. (Tr. Nov. 13, 1996 at 52–57.) Using the same method to

15    calculate the randomness or commonness of occurrence of this particular profile at

16    four probes, Hogan would testify that the frequency of occurrence would be one in

17    800,000. (Tr. Nov. 13, 1996 at 16–17.)

18                **vii.**     **RFLP testing involving Zingaro**

19       Later that month, Hogan also received evidence from the Zingaro case. (Tr.

20    Nov. 13, 1996 at 18.) The known blood sample of Lehr did not match either the

21    male fraction of the cervical swab or the male fraction of the vaginal vault swab; in

22    fact, no DNA showed up on any of the male fractions. (Tr. Nov. 13, 1996 at 18, 23,

23    26, 29–39.)

24           **c.  The state court holds a consolidated *Frye* hearing.**

25       The State used the RFLP technology in Lehr's case and others, and facing

26    challenges from multiple individuals, the State filed a motion to consolidate several

27    pending DNA cases for a joint hearing on the admissibility of DNA statistics. At

28    the same time, the defense teams also filed a motion to preclude the use of DNA

1   evidence, or in the alternative an evidentiary hearing, under *United States v. Frye*,

2   394 F. 1013 (D.C. Cir. 1923).

3        In late June and early July of 1995, the state court conducted a consolidated

4   DNA hearing with various defendants for which DNA evidence was an issue in

5   their cases, including Lehr. Of particular importance, Dr. Aimee Hayes Bakken was

6   a witness for the defense at the hearing, and testified, in part, that the DPS protocol

7   was based upon both incomplete and incorrect validation studies. (Tr. Jul. 5, 1995

8   at 57–58.)

9        Dr. Bakken also noted that, on various DPS autoradiographs, the same DNA

10  samples were loaded in different concentrations which could lead to an exclusion—

11  or, more importantly, a false positive. (Tr. Jul. 5, 1995 at 80–84.) She further

12  observed extra bands in the control lanes where there should only be two bands.

13  Under DPS protocol, if the control lane did not run correctly, DPS should not have

14  assessed the autorad. Yet Dr. Bakken testified that DPS offered such autorads as

15  evidence of a match in various cases. (Tr. Jul. 5, 1995 at 139–41, 143.)

16       The state court ultimately reached several conclusions: first, deciding at that

17  time that Arizona remained a *Frye* test state based upon *State v. Bible*, 175 Ariz.

18  549, 858 P.2d 1152 (1993); and second, that the principles and theories underlying

19  DNA analysis and DNA RFLP procedures in particular were generally accepted in

20  the scientific community. (ROA 198, Oct. 16, 1995, Consolidated DNA Ruling.)

21  The court explained:

22       The Court finds, based on all the evidence presented at the consolidated
     DNA *Frye* hearing, that the DPS Lab's testing protocol is generally
23       accepted as reliable in the relevant scientific community. There has
     been no substantial evidence produced that the Lab's protocol is not
24       scientifically sound and designed to produce reliable results. Whether
     the given tests in a particular case were properly performed is for
25       determination on a case-by-case basis. Therefore, any attacks on lab
     analysis error, individual case matching, or lab "slop" or matters to be
26       handled by the trial court, if raised, as they go to the *weight, not the
     admissibility* of the evidence.
27

28  (ROA 198 at 1.) The court further found that a method of calculating the frequency

112

of a DNA RFLP profile was generally accepted in the scientific community as a means of calculating random match probabilities. It determined that qualitative expert testimony regarding the meaning of a "match" should therefore be admissible and that such testimony could be offered instead of, or in addition to, statistical calculations. (Oct. 16, 1995, Consolidated DNA Ruling at 10.)

### d.     Trial I

Approved by the court in the consolidated *Frye* hearing, the State therefore was permitted to present the RFLP DNA evidence at Lehr's first trial.[6] When Narveson testified, the prosecutor informed the court that, since he believed most of the issues in the *Frye* hearing had already been settled, he would be objecting to the defense going into some of those areas on cross-examination as confusing and a waste of time. (Tr. Nov. 4, 1996 at 5–6.)

Thus, when defense counsel started on cross-examination about changes DPS made to the FBI's DNA testing protocol, the prosecutor objected to the whole line of questioning, claiming that it was not relevant to the proceeding since the issues had already been decided by Judge Reinstein in the consolidated DNA hearing. (Tr. Nov. 4, 1996 at 11–13.) Despite the fact that defense counsel pointed out the distinction between admissible evidence and attacking that evidence for its weight, the trial court determined that the consolidated hearing findings were not reviewable by the jury and granted the State's motion in limine precluding any testimony on the reliability of the protocol used by the DPS laboratory. (Tr. Nov. 4, 1996 at 24–25.)

Defense counsel explained that, initially, the defense wanted to explore whether DPS was actually following the DPS protocol as Narveson had testified, and wanted to question her about exceptions that DPS had made to that protocol in DPS's validation studies and database. (Tr. Nov. 4, 1996 at 24–25.) The trial judge

---

[6] The Hancock, Gabriel and Thompson cases, because of issues relating to hypnosis, were severed and tried separately.

113

1    nevertheless rejected their request, announcing that "[w]e're not going to go into it.

2    It's already been gone into." (Tr. Nov. 4, 1996 at 41.) The defense asked for a stay

3    of proceedings to file a special action with the Arizona Supreme Court, which was

4    denied. (Tr. Nov. 4, 1996 at 44.)

5          When the defense was able to resume its cross-examination of Narveson, she

6    acknowledged that if two bands somehow failed to appear or appeared in the wrong

7    place in the "national control sample" lane, she would not use the autorad. (Tr. Nov.

8    4, 1996 at 9.) She also agreed that the DPS protocol provided that if the "national

9    control" bands and the DPS (MBE) control bands are not found in a visually

10   expected position on the genetic location being probed, and if there were not two

11   bands per lane, the autorad cannot be assessed further. Narveson confirmed that the

12   control lanes for some of the autorads in Lehr's case had more than two bands and

13   that the additional bands were *not* in a position that she would expect to see bands,

14   at least on a control sample. (Tr. Nov. 4, 1996 at 40–42.)

15         At the end of the day on November 4, 1996, defense counsel put on the record

16   that, on the cross-examination of Narveson, the defense also wanted to go into the

17   fact that the authoritative NRC report required that, for a laboratory to use the

18   Modified Ceiling Principle, it must establish sixteen to twenty databases, and that

19   the DPS had not done so. The defense also wanted to explore the quality of the DPS

20   databases in terms of the validation and precision studies, so the jury could assess

21   how much weight to give to Narveson's testimony. (Tr. Nov. 4, 1996 at 77.) Again,

22   the trial court denied the requested cross-examination, finding it precluded by the

23   order in the consolidated DNA hearing. (Tr. Nov. 4, 1996 at 78–81, 84–85.)

24         In response to the trial court's denial of the requested cross-examination,

25   defense counsel further put on the record that, aside from the cross-examination of

26   Narveson, the defense had also intended to call their own witness to address the

27   issues that the trial court now found precluded. Counsel argued that the order in the

28   consolidated DNA hearing left the door open for the defense to explore these areas,

particularly the validation studies, because the order stated that the defense would be allowed to attack lab analysis error, individual case matching, and lab sloppiness. It was the sloppiness of the validation studies, the precision studies, and the databases that the defense would have attacked if it were allowed to, both on cross-examination and through the presentation of its expert witnesses. (Tr. Nov. 5, 1996 at 6–7.) The defense explained that it would demonstrate that the precision studies, which were used by DPS to develop its match window of plus or minus 2.5% and plus or minus 3.8%, contained very sloppy work, including autorads that were doctored and the results of which were fabricated. (Tr. Nov. 5, 1996 at 11–12.) The trial court nevertheless reaffirmed its prior rulings excluding such evidence. (Tr. Nov. 5, 1996 at 18, 20.)

On November 7, Dr. Bakken testified. (Tr. Nov. 7, 1996 at 4–5.) She reviewed the autorads in this case and visited the DPS laboratory. She had the opportunity to appraise DPS's protocol and the documentation that went into developing that protocol. She also reviewed the autorads that were used to validate the protocol the DPS used. (Tr. Nov. 7, 1996 at 19–20.)

Considering the six cases that she examined, Dr. Bakken noted a recurring problem with extra bands appearing in the control lanes, which, in her opinion, should have caused DPS to stop the tests and redo them or, at a minimum, perform further testing of the flawed controls to identify the problem. (Tr. Nov. 7, 1996 at 25.) Specifically, there were five bands in the national K-562 control lane on the Ross autorad from probe D1-S7. (Tr. Nov. 7, 1996 at 32–33.) There were also various extra bands in the K-562 control lane of probes D2-S44, D1-S7 and D17-S79 in the Christorf case. (Tr. Nov. 7, 1996 at 45–49.) In the Thompson case, Dr. Bakken testified that under the two main bands for D1-S7 that one expects for the K-562 control, there were two other bands. (Tr. Nov. 7, 1996 at 54–55.) She also noted faint extra bands on the DPS (MBE) control lane on the D1-S7 probe. (Tr. Nov. 7, 1996 at 56–57.)

1   Dr. Bakken further explained that letters DPS received from the vendor of

2 the K-562 national control did not provide satisfactory answers as to why there were

3 extra bands. (Tr. Nov. 7, 1996 at 29.) She opined that it should be determined

4 exactly where the extra bands were coming from—for instance, if they were

5 contaminants from another human's DNA or a viral or bacterial DNA—before

6 having any confidence in the results on the human samples. (Tr. Nov. 7, 1996 at

7 30–31.)

8   During Dr. Bakken's testimony, she also analyzed the autorad from D1 7-

9 S79 (Ex. 329) on the Morales case. (Tr. Nov. 7, 1996 at 24.) When questioned about

10 the blue mylar transparencies (introduced by the State and provided to the jurors for

11 their notebooks), which contained a photocopy of one autorad on the left and a

12 photocopy of another autorad on the right, Dr. Bakken observed that the autorad

13 containing the Lehr results on the left had been expanded or enlarged

14 photographically in order to appear as if the bands on the left and right autorads

15 lined up next to each other and ran the same length. (Tr. Nov. 7, 1996 at 26–27.)

16 During this testimony, the prosecutor offered to stipulate that the autorad on the left

17 was "four pixels different" or larger than the one on the right. The court said that

18 the defense did not need to accept such a stipulation. (Tr. Nov. 7, 1996 at 26–27.)

19   Defense counsel objected to the misimpression that had been left with the

20 jury regarding the autorad exhibits passed out by the prosecution. Specifically, there

21 had been no explanation by the State that any of the test results had been enlarged,

22 and the defense had never been informed of it. Defense counsel asked the court to

23 withdraw all of the mylars and copies that had been enlarged from the jury's

24 notebooks and remove them from evidence. Defense counsel pointed out that the

25 lack of explanation that the left autorad had been blown up by the State left jurors

26 with the extremely misleading impression that the autorads on the left were the same

27 size as the autorads on the right so that they could take a ruler and line up Lehr's

28 known reference sample with the markings or bands on the sample where the victim

1  and evidence lanes were run. (Tr. Nov. 7, 1996 at 42–43.)

2      The prosecutor denied any misconduct as to the enlargement of the exhibits,

3  arguing that another expert had originally been scheduled to testify before the

4  defense's DNA expert, Dr. Bakken, and would have explained that there were four

5  pixels difference between the autorad on the left and the one on the right. (Tr. Nov.

6  7, 1996 at 43–44.) The trial court agreed with defense counsel's position that

7  enlarging one of the autorads on the exhibits was misleading, but it declined to grant

8  the defense-requested mistrial, withdraw the exhibits from the juror's notebooks, or

9  even give a curative instruction. (Tr. Nov. 7, 1996 at 45–48.)

10      When the direct examination of Dr. Bakken by the defense resumed, the

11  prosecutor asked that certain testimony be taken outside the presence of the jury so

12  that the trial judge could first make an assessment as to its relevancy. The trial court

13  granted the State's request and the following direct examination was taken outside

14  the presence of the jury:

15      First, when asked if she were to consider the autorads in the Collins case in a

16  vacuum, not considering anything else, Dr. Bakken agreed that their quality was

17  fairly good. However, she stated that she could not, as a scientist, rely on those

18  autorads given everything she had experienced with the DPS laboratory since

19  accuracy and reliability must be demonstrated through a lab's validation studies as

20  a baseline. Because of the background of DPS having a number of different kinds

21  of problems that were demonstrated in the creation of the database and other

22  validation studies, Dr. Bakken could not have confidence that the product DPS was

23  putting out, such as the results in the Collins case, was reliable. (Tr. Nov. 7, 1996

24  at 60–61). Dr. Bakken described a number of different problems, the first being the

25  question of extra bands, a very important issue in terms of creating the population

26  database, since the actual band size from these population studies is what forms the

27  basis for the comparison of how rare or common a particular suspect's DNA

28  banding pattern is. (Tr. Nov. 7, 1996 at 62.)

Second, the results of the precision studies that DPS did in order to determine the size of the match window were quite unexpected, in that one would predict more variation in the size of the band when it was run on two different gels. Yet DPS's study found exactly the opposite. Dr. Bakken testified that when she asked Ms. Narveson about it, Narveson conceded, "Yeah, that was really weird, wasn't it?" (Tr. Nov. 7, 1996 at 63–64.) DPS did nothing to try to find out why the test came out with this result, contrary to what every other laboratory has found.

Third, laboratory personnel demonstrated significant difficulty during those validation studies, and since then in their casework, in determining how much DNA is loaded in each sample, resulting in the loading of different amounts in different lanes. Dr. Bakken noted that this problem was critical, since too high an amount could slow down the migration of the DNA and, if that sample is then compared with a normal or subnormal amount of DNA, in terms of comparing a suspect's specimen with evidentiary samples, it may create either false positives or false negatives. (Tr. Nov. 7, 1996 at 64–65.)

None of these issues was presented to the jury. At the finish of this proposed testimony, which consumed approximately ten minutes of court time, the trial court reiterated its earlier decision to exclude this evidence. It concluded that it would be "extremely confusing to the jury, it opens the door to what very easily may consume a great deal of time in issues that are not going to be of substantial assistance to them by this witness." (Tr. Nov. 7, 1996 at 75–76.)

On resumed direct examination before the jury, Dr. Bakken stated that, as to Collins's autorad, she would have to analyze it according to DPS protocol, examining the control samples and the reference samples and finally the evidentiary lanes. Based on the context of all the autorads that she had examined, she stated she would not be able to render a judgment as to whether or not she could call this a match, because there had been so many problems in other autoradiographs, that she did not have confidence as to whether or not this one looked good by accident or

1    whether it was really a true, accurate and reliable result. (Tr. Nov. 8, 1996 at 6–7.)

2                    **e.      Trial II**

3          The State's DNA analysts similarly testified during Lehr's second trial in

4    1997, which involved the severed cases of Hancock, Gabriel, and, Thompson, who

5    had undergone hypnosis. (*See* Tr. Apr. 30, 1997 – Tr. May 16, 1997.) RFLP testing

6    had been completed in the cases of Gabriel and Thompson, and those results were

7    presented to the jury by Duplissa (Tr. May 12, 1997 at 34–58, 80–104, Tr. May 13,

8    1997 at 3–93, Tr. May 14, 1997 at 3–31) and Hogan (Tr. May 14, 1997 at 41–91.)

9    Dr. Bakken did not testify for the defense.

10                   **f.      Direct Appeal 1**

11         Lehr was convicted of all counts at these two trial, including three homicides

12   and four sexual assaults in the capital proceeding, and a separate trial for counts

13   relating to three of the sexual assaults. On appeal, Lehr raised, among other claims,

14   a challenge to the limits placed upon cross-examination at trial, which violated his

15   fundamental right to confront adverse witnesses under the Sixth and Fourteenth

16   Amendments to the United States Constitution. (DA1 42 at 81–89.)

17         The Supreme Court of Arizona agreed. *Lehr I*, 38 P.3d at 1178. The Arizona

18   Supreme Court concluded that it could not say "beyond a reasonable doubt that this

19   error had no effect on seven of the thirty-seven verdicts in this case, including two

20   of the first-degree murder convictions . . ." *Id.* The court critically distinguished

21   between the concepts of weight and admissibility and faulted the State's argument

22   for not recognizing that "very often the same proof used to establish admissibility

23   also impacts weight and credibility." *Id.* at 1179. Therefore, ". . . the jury must be

24   allowed to hear such evidence if it is to properly perform its function as factfinder."

25   *Id.* at 1180. "Cross-examination concerning the DPS protocol would have provided

26   information with which the jury could weigh testimony concerning the DNA

27   results. Because the restrictions in this case crossed the line from reasonable to

28   excessive, they breached the defendant's right to confront adverse witnesses." *Id.*

1    at 1181.

2     The court further agreed that the judge's ruling precluding Lehr from

3    presenting expert testimony regarding the protocol, validation studies, and match

4    window amounted to reversible error. *Id*. The court understood that "DNA analysis

5    was a significant part of the evidence against [Lehr] in six of the ten cases, including

6    two of the three homicides. In fact, DNA was the only physical evidence linking

7    [Lehr] to those two murders. As the prosecutor said in closing argument, 'It's when

8    you get to the DNA you know he's guilty of the murders.'" *Id*.

9     The decision, however, only upended the convictions related to three of the

10   victims—Morales, Christorf, and Collins. As to the others, even though the same

11   DNA evidence was used to prove Lehr's guilt, the court determined "there was

12   credible eyewitness identification, physical evidence apart from DNA, or other

13   corroborating facts clearly implicating [Lehr]." *Id*. The case was remanded for

14   retrial on charges related to these three victims. On independent review of Lehr's

15   death sentence for the murder of Cronin, which the court did not reverse, the court

16   affirmed Lehr's death sentence. *Id*. at 1185–86.

17    Before the mandate issued, the United States Supreme Court decided *Ring*,

18   536 U.S. at 609. In light of *Ring*, the Arizona Supreme Court also vacated Lehr's

19   death sentence for Cronin's murder and remanded that case for resentencing only.

20   *Lehr II*, 67 P.3d at 706.

21      **g.**   **Retesting and Retrial**

22    Two months after the Arizona Supreme Court reversed Lehr's convictions

23   for Morales, Christorf, and Collins, on March 7, 2002, Roger Schneider, a Forensic

24   Scientist with the Phoenix Police Department's Crime Laboratory, received "sticks"

25   from the vaginal and anal swabs in the Morales case with a request from the

26   prosecutor to conduct DNA analysis using newer technology. The State neither

27   notified Lehr nor his counsel it was conducting this analysis. (*See* ROA 813 at 5)

28   (indicating that it was the prosecutor's opinion ". . . that the defense has never asked

to participate testing previously, analyze & consume the remaining samples.").

Before Lehr's first trial, Duplissa noted a foul odor coming from the anal and vaginal swabs collected from Morales—associated with a decomposing body and/or sample degradation. (Tr. Mar. 3, 2009 at 102.) These issues created problems for conducting DNA analysis using RFLP technology. In 1992, Duplissa ultimately determined that the results of the comparison between the two samples and Lehr were "inconclusive." (Tr. Mar. 3, 2009 at 96–105; Tr. Mar. 4, 2009 at 88, 103.) When Duplissa conducted this prior testing, he consumed the entire samples from the cotton swabs, but saved the "sticks" from which he had removed the cotton swabs. (Tr. Mar. 4, 2009 at 71–73.) In 2002, Schneider consumed the entire sample (what was left of the sticks); as a result, all that remained for possible additional testing was the extraction. (Tr. Mar. 17, 2009 at 36–47, 63, 68–69, 122–23.)

In May of 2002, the State retested other DNA evidence. Duplissa, still a forensic scientist with DPS, performed a second analysis of the sperm fraction of the cervical sample from Collins using PCR/STR[7] technology that resulted in a match to Lehr's DNA at 14 of 14 alleles. (Tr. Mar. 4, 2009 at 59–64.) Duplissa would also conduct DNA analysis with PCR/STR technology on samples collected from Christorf's vaginal sample that matched Lehr at 14 of 14 alleles and eliminated the prior alternative suspect, McFadden, as a possible donor. (Tr. Mar. 3, 2009 at 189–93; Tr. Mar. 4, 2009 at 42–43; Trial Ex. 380.)

Over objections regarding the chain of custody and hearsay (see Tr. Feb. 24, 2009 at 212–20, Tr. Feb. 25, 2009 at 4–12, Tr. Mar. 17, 2009 at 48–50) as well as due process, the STR and RFLP DNA evidence was presented at Lehr's second trial. Trial counsel in 2009 did not challenge the performed tests (neither past nor

---

[7] PCR/STR refers to DNA analysis known as "short tandem repeat" which utilizes a technology known as a "polymerase chain reaction" to amplify a portion of the DNA sample and permit comparison at 14 loci on a much smaller sample than previously necessary for analysis with the RFLP method. (Tr. Mar. 3, 2009 at 172–86.)

1    present), did not seek or call expert testimony concerning the extraction procedure

2    or test results, and did not request to have the extraction(s) retested. (*See* Claim 3(C)

3    (alleging ineffective assistance of counsel regarding DNA).) Despite these facts,

4    Lehr's trial lawyers in 2009 did refer to contamination of DNA samples to the jury.

5    (*See e.g.*, Tr. Mar. 4, 2009; Mar. 17 2009 (seeking to demonstrate that cross-

6    contamination during testing could render the testing results suspect).)

7          As described above, Lehr was convicted on all counts at his 2009 retrial. The

8    jury then sentenced him to death for his convictions as to Morales and Christorf; it

9    could not reach a consensus with respect to Cronin, and the death specification was

10   ultimately withdrawn and Lehr was sentenced to life in prison.

11              **3.    Merits**

12         Lehr's substantive DNA claims, detailed below, also summarize the DNA

13   evidence and its use at trial. (*See* Claims 6, 7, 8.) There, Lehr explains that the state

14   court premised its decision on two principal erroneous findings: that (1) trial

15   counsel adequately challenged the DNA lab protocols before the trier of facts (PCR

16   Order at 43); and (2) the Arizona Supreme Court's decision in its opinion in *Lehr I*,

17   finding error in precluding cross-examination of the DNA evidence, was harmless

18   as to certain victims because other evidence implicated Lehr. (PCR Order at 43).

19   As has been discussed elsewhere in this Petition, that other evidence includes

20   inherently unreliable eyewitness identifications, and a recovered fingerprint relating

21   to Zingaro's case, which—contrary to the State's argument at trial—does not match

22   Lehr.

23         The 2009 trial lawyers had available to them evidence that the DPS lab made

24   errors in the 1990s as to testing and protocols, and thus results from the lab could

25   not be trusted. This evidence was never presented to any of Lehr's juries. The

26   impact of this evidence, if presented at Lehr's 2009 retrial, cannot be understated.

27   The jury would have heard, for example, that DPS utilized processes during DNA

28   testing that could yield false positives, the lab calling DNA "matches" when it

1   should not have, and that the DPS DNA protocol was based on incomplete and

2   incorrect validation studies. (*See* Tr. Jul. 5, 1995 at 57–58, 8–84, 139, 141, 143.)

3   This evidence undermining the State's case would have enabled counsel to

4   effectively combat the new DNA testing done before retrial, to explain to the jury

5   why it should harbor reasonable doubt as to Lehr's guilt.

6        Trial counsel's failure to combat against this evidence is even more damning

7   in light of *Lehr I*. There, the Arizona Supreme Court agreed with Lehr that his right

8   under the Confrontation Clause of the Sixth Amendment was violated "because the

9   judge's ruling precluded him from presenting expert testimony regarding the

10   protocol, validation studies, and match window." *Lehr I*, 38 P.3d at 1181.

11       The evidence *Lehr I* discussed is what trial counsel ignored and did not

12   present at Lehr's second trial. Post-conviction counsel also presented to the post-

13   conviction court significant evidence of other laboratory mistakes, statistical errors,

14   substandard work, falsified reports, falsified proficiency testing, and fraud. (PFR 3

15   at 48.)

16       Given that the DNA analysis was such a significant part of the evidence

17   against Lehr in six of the ten cases, including two of the three homicides, trial

18   counsel in 2009 had no strategic basis for not attacking this evidence at its roots. In

19   fact, 2009 trial counsel did not even contact prior counsel; if they had, Lehr's prior

20   counsel would have directed them to Dr. Bakken, so that 2009 counsel could have

21   more fully investigated these issues. (PCR Pet.'s Mot. to Am. Ex. A, Decl. of

22   Reeves at 2–3, Apr. 20, 2016.) There is no reasonable basis for not doing so.

23       But for counsel's errors, there is a reasonable probability that the outcome of

24   Lehr's capital trial would have been different. The jury would have heard evidence

25   that the State's unreliable DNA evidence was subject to shoddy work, supporting

26   the defense's "garbage in, garbage out" theory—that errors in the sampling and

27   processing of the DNA evidence necessarily resulted in unreliable and questionable

28   results, even where the tests showed so-called "matches". (*See e.g.*, Tr. Mar. 17,

2009 at 74.); *see also Hinton v.* Alabama, 571 U.S. 263, 276 (2014) (finding a reasonable probability that defense counsel "would have hired an expert who would have instilled in the jury a reasonable doubt as to Hinton's guilt.").

Although 2009 defense counsel did work with and consult a DNA expert (*see* Tr. Oct. 24, 2008 at 37), they never disclosed who that person was, (*see* Tr. Oct. 31, 2008 at 20). And no defense DNA expert was called at trial, for reasons counsel declined to explain. (*See* Tr. Oct. 31, 2008 at 21.) What's more, 2009 counsel failed to undermine the State's "other act" offenses at Lehr's 2009 retrial by means of the knowledge and opportunity handed to them from the Arizona Supreme Court—that is, they failed to raise issues regarding the weight of the DNA evidence, even if they could not exclude the DNA evidence from admission for the jury's consideration. *See Bemore v. Chappell*, 788 F.3d 788, 1151, 1175–76 (9th Cir. 2015) (deficient performance at the guilt phase "could well have contributed to the outcome of the penalty phase" and finding that the prejudice inquiry must be viewed cumulatively).

The DNA evidence, both STR and RFLP testing, was used in the other sexual assaults to support the jury's finding for the weight to give "other act" evidence, and the sexual assaults were also used in support of the (F)(1) and (F)(2) aggravators. Any challenge that could undermine the weight and reliability of this DNA testing would have impacted the jury's verdicts on each of the counts and diminishing the prejudicial impact of these prior convictions on the jury's ultimate conclusions.

Counsel's failure to defend against the DNA evidence at the guilt phase therefore prejudiced Lehr at the aggravation phase as well. The jury deliberated under the assumption that the DNA results were wholly reliable, absent any expert opinion to the contrary, a fundamental misunderstanding that denied Lehr a fair trial.

The post-conviction court found that Lehr's 2009 trial counsel made a strategic decision not to call a DNA expert to testify at trial, and that trial counsel,

1    in 2009, "challenged the DNA lab protocols before the trier of fact ([Tr. Mar. 4,
2    2009; Tr. Mar. 17, 2009]), specifically seeking to demonstrate that cross-
3    contamination during testing could render the testing results suspect. In that regard,
4    trial counsel cross-examined DPS criminalists on case-specific perceived testing
5    flaws so the jury heard those admissions and arguments." (PCR Order at 43.)

6          These conclusions, however, are unreasonable determinations of fact and
7    contrary to clearly established federal law. First, despite counsel not calling a DNA
8    expert at Lehr's 2009 trial, there already was an expert, Dr. Bakken, who would
9    have been able to testify regarding the issues with DPS's DNA protocol and the
10   RFLP DNA testing in the 1990s. 2009 trial counsel never contacted Lehr's prior
11   trial lawyers, nor did they consult with Dr. Bakken about her findings. (*See* PCR
12   Pet.'s Mot. to Am. Ex. A, Decl. of Reeves at 2–3, Apr. 20, 2016.) There is no
13   reasonable basis for failing to do so. And even if there was, there is no evidence
14   counsel utilized an expert at the 2009 trial to assist with the cross-examination of
15   the State's multiple DNA experts.

16         The Court in *Ake v. Oklahoma* recognized the importance of defense experts
17   and explained that defense experts – in that particular case addressing psychiatric
18   evidence – can conduct a professional examination on issues relevant to the defense,
19   help determine whether a defense is viable, present testimony, and/or to assist in
20   preparing the cross-examination of a State's witness. 470 U.S. 68, 82 (1985).
21   Effectively challenging the State's forensic evidence thus not only may include a
22   testifying expert, but, at a minimum, a consulting one. And although trial counsel
23   attempted to raise the issue of cross-contamination during cross-examination, that
24   is not enough for assessing the reliability of scientific evidence. For example, the
25   Supreme Court in *Daubert* did not cite cross-examination by itself; it noted that
26   "[v]igorous cross-examination, presentation of contrary evidence, and careful
27   instruction on the burden of proof are the traditional and appropriate means of
28   attacking   shaky   but   admissible   evidence."   *Daubert   v.   Merrell   Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

Moreover, 2009 trial counsel did not present, or cross-examine the State's experts, with the evidence that the Supreme Court of Arizona said that Lehr's trial counsel should have had an opportunity to cross-examine on the evidence developed at the *Frye* hearing before Lehr's first trial. While the DNA evidence was admissible before the trier of fact, that evidence in particular was enough to undermine confidence in the verdict and undercut the weight of such evidence. The failure to do present anything on this point so is unreasonable and violated Lehr's constitutional right to the effective assistance of counsel. The post-conviction court's conclusion on this issue was contrary to clearly established federal law, namely *Strickland*, and an unreasonable determination of facts. The writ should be granted.

**D.   Ring: Trial counsel performed deficiently and to Lehr's prejudice, by failing to effectively challenge the State's use of jewelry evidence in the Cronin murder.**

Lehr's trial counsel performed deficiently, and to his prejudice, during the trial phase of his capital trial. Lehr's 2009 trial counsel failed to conduct a reasonable investigation of the jewelry evidence presented in his case; failed to present and/or consult an expert on his behalf to challenge this evidence; and failing to put on any defense that may have assisted the jury in determining the credibility, accuracy, and reliability of the State's evidence. Due to counsel's failures, Lehr suffered prejudice because not only is there both reasonable and residual doubt Lehr committed the Cronin murder, but because trial counsel failed to effectively challenge this evidence his 2009 jury was pre-conditioned to convict and/or render a death sentence when it was told, in voir dire, that Lehr had already been convicted for Cronin's murder.

**1.   Exhaustion**

Post-conviction counsel raised this claim in Lehr's initial post-conviction petition and petition for review with the Arizona Supreme Court. (*See* PCR Pet. at

46; PFR 3 at 44.) The post-conviction court addressed this claim on the merits. (PCR Order at 36.) The Arizona Supreme Court denied review without comment in a one-page order. (PRF 29 at 1.)

Because the state court disallowed an evidentiary hearing and development of the factual record in a manner that contravenes 28 U.S.C. § 2254(d), Lehr should be entitled to supplement the state court record with some new facts within the limits that exhaustion permits. *See Williams v. Woodford*, 859 F. Supp. 2d 1154, 1161 (E.D. Cal. 2012) (where the Chief Circuit Judge Kozinski, sitting by designation, granted expansion of record where state court denied evidentiary hearing and its decision was based on an unreasonable determination of the facts under § 2254(d)(2)); *Lor v. Felker*, No. CIV S–08–2985, 2012 WL 1604519 (E.D. Cal. May 7, 2012) (where state court improperly decided issues of fact without granting evidentiary hearing, its decision ran afoul of § 2254(d)(2) and habeas petitioner would be granted a hearing and permitted to expand the record).

## 2.    Applicable Facts

Belinda Cronin disappeared on January 20, 1992, after she left her apartment intending to hitchhike to a friend's house. This was the last time she was seen alive. Her remains were found almost six months later near the Central Arizona Project Canal and I-17. The body was severely decomposed. Her skull was fractured in several places, and the evidence of cause of death was blunt force trauma to the head.

In the police investigation of this case, there was no description of the suspect and no description of the vehicle used by the suspect. Clothing was scattered at the scene. A forensic anthropologist estimated that the victim had been dead for three to six months. A watch with a white face and yellow and blue band was found. A silver-chained necklace with a pendant was also found on the victim.

Annette Myott Hansen, a friend of the Cronin family, testified in the 1996 and 2009 trials, describing a ring that she had been shown one day by the victim.

1   Hansen had worked with the victim's mother, whose name was Brenda Atchison,

2   at the Scottsdale Insurance Company in 1991–92. (Tr. Feb. 23, 2009 at 163.) In the

3   fall or winter of 1991, the victim had come to visit her mother at work and showed

4   her a ring that she had found. (Tr. Feb. 23, 2009 at 165.) After the victim

5   disappeared and her body was found, Hansen was talking to Atchison about "some

6   of the things that they found by or on Belinda, or what not. And I asked -- I said

7   'did they find the ring?'." (Tr. Feb. 23, 2009 at 167.) A detective came to Hansen

8   shortly after that conversation and showed her a ring. (Tr. Feb. 23, 2009 at 168.)

9   Describing the ring at the 1996 trial and again at the 2009 retrial, Hansen described

10  the ring on both occasions as "the style -- the style that it -- to me, what always

11  called 'the antique setting,' and had a filigree-style cut into the metal or -- and the

12  settings. Usually, the older the antique styles had -- where they had the diamonds

13  at, the settings on them always impressed me. And that's what always stuck in my

14  mind about that ring, particularly." *(*Tr. Feb. 23, 2009. at 169.)

15       Hansen admitted that she was not an expert on rings. (Tr. Feb. 23, 2009 at

16  174.) She was not shown any other ring or rings, so it is unknown if she were able

17  to pick it out of a group of several rings. She only saw one ring only once, when the

18  victim showed it to her in October of 1991. (Tr. Feb. 23, 2009 at 174.) The next

19  time she saw it again was eight months later when the detective showed one ring to

20  her. (Tr. Feb. 23, 2009 at 175.)

21       At neither trial did Lehr's lawyers take the ring for examination to an expert

22  jeweler. On October 24, 2013, post-conviction counsel took David Wyatt of Master

23  Creations Jewelry, an expert jeweler since 1982, to the Maricopa County

24  Courthouse Clerk's evidence room. Wyatt stated in his declaration presented to the

25  state court: ". . . I was asked to determine if the ring is of filigree style. The ring is

26  clearly NOT a filigree style ring." (PCR Pet. Ex. EE at 3.) Wyatt further described

27  the ring:

28       It is my opinion that this ring is not unique in any way. The ring appears
         to be assembled in a common way with a 14K white gold common head

1
2
 (for the center stone), and a 14K yellow gold shank that accommodates two accent stones. This ring was probably assembled in the 1960's or 1970's with diamonds that are probably much older than that.

3
(PCR. Pet. Ex. EE at 3.)

4
### 3. Merits

5
6
7
8
9
10
11
12
13
14
 An expert like David Wyatt was willing and able to provide this opinion at the time of Lehr's trial. Lehr's trial counsel rendered ineffective assistance in not challenging the ring. The only issue for the 2009 jury in the Cronin case was the resentencing issue, life or death. The Cronin case is particularly troubling in Lehr's situation, not only because the resentencing in her murder case was combined with the guilt/innocence issues on the other retried counts, as described above, but also because the only piece of evidence connecting Lehr to the Cronin case was a ring. There was no DNA evidence connecting Lehr to this crime. There was no eyewitness, photo or live lineup identification testimony, and no other corroborating evidence against Lehr with regard to Cronin's murder.

15
16
17
18
19
20
21
22
23
24
 Thus, given that this was the *only* piece of evidence linking Lehr to Cronin's murder, trial counsel's failure to do *anything* to challenge the ring fell below the accepted standard of reasonably effective representation. It is very probable that Hansen misidentified the ring, especially as it was the only ring shown to her by the police, and as she was not at all a jewelry expert. There is reason to conclude that when a detective came to her to show her "a ring" that had been found "somewhere," she jumped to the conclusion without any basis that this ring was somehow linked to someone whom the police suspected in the disappearance of Cronin. It is a fair inference to draw that Hansen wanted to help the investigation and agree it was the ring she had seen for a few seconds some eight months before.

25
26
27
28
 The Cronin case created a unique problem of prejudice for the 2009 jury. First, there is both reasonable and residual doubt that Lehr is the perpetrator in this case at all. Second, the admission of this case into the 2009 trial unfairly tipped the scales against Lehr. The 2009 jury was told in voir dire that Lehr was already found

guilty of the Cronin murder. The 2009 jury's consideration of the other decisions it had to make in this case was tainted by this early knowledge that Lehr was a convicted murderer – unfairly so. It was a key part of the 2009 jury trial, because it was the case where the jury was told Lehr had already been convicted of murder.

The state post-conviction court rejected this claim, determining—unreasonably—that the facts of the trial did not justify any further effort on behalf of Lehr's trial counsel. The court declared that "[a]lthough trial counsel could have 'exercised due diligence' and attempted to secure testimony from a jeweler—as did PCR counsel—about the professional definition of 'filigree,' that was not the issue. The issue was not the accuracy of the 'filigree' characterization but the accuracy of the witness's recollection of the ring, both whether and why she remembered it having been in the possession of the victim, [Cronin]. The ring, found in Defendant's home, provided strong circumstantial evidence connecting defendant to the murder victim." (PCR Order at 36.)

But in so concluding, the post-conviction court overlooked key aspects of Wyatt's affidavit and the proffered evidence. Namely that a jeweler would have provided the jury with evidence to undercut what the state court characterized as "strong circumstantial evidence" and Hansen's memory: the ring is in fact not unique in any way (PCR. Pet. Ex. EE at 3); and impeaching Hansen's memory of the ring, when she only saw it a single time, would have provided the jury with critical reasonable doubt that even if a similar ring was recovered from Lehr's home, it was plausibly not the victim's. Moreover, the post-conviction court ignored the fact that Lehr wife, Renee, testified that Lehr gave her the ring prior to Christmas, 1991. (Tr. Oct. 29, 1996 at 116.) However, Cronin was last seen on January 20, 1992. The state court accordingly made unreasonable determination of the facts under § 2254(d).

Had counsel rendered effective assistance in 1996, there is a reasonable probability that the jury would have acquitted Lehr of Cronin's murder in the first

place, or that the Arizona Supreme Court would have reversed his conviction on that count when it excluded the DNA evidence from the 1996/1997 trial. Then, the 2009 jury deliberating on guilt/innocence as to the Christorf and Morales murders would not have been told—before hearing evidence on those crimes—that Lehr had already been "convicted" of the murder of Cronin. And, further, at the very least, the 2009 jury could have harbored additional residual doubt as to Lehr's guilt for Cronin's murder, changing the sentencing calculus as it contemplated whether to sentence Lehr to death for his other convictions. In short, the whole dynamic of the 2009 trial would have been different.

> **E.    Fingerprint: Trial counsel rendered ineffective assistance when they failed to act to rebut the State's fingerprint evidence related to Zingaro's case at Lehr's 1996/1997 trials, and when that evidence was re-introduced at his 2009 retrial.**

Lehr's trial counsel performed deficiently, and to his prejudice, during the trial phase of his capital trial. Lehr's 2009 trial counsel failed to conduct a reasonable investigation of the fingerprint evidence presented in his case; failed to present and/or consult a forensic fingerprint expert on his behalf; failed to effectively cross-examine the State's latent print examiner; and failed to put on any defense that may have assisted the jury in determining the credibility, accuracy, and reliability of the State's forensic evidence. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

> **1.    Exhaustion**

This aspect of the claim was not raised in state court. Lehr can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Lehr will demonstrate through his filings and at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that

those failures prejudiced him. Alternatively, any procedural bar is not adequate or independent, and imposing default would be a miscarriage of justice.

Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

## 2. Merits

The Supreme Court "imposes a special obligation upon a trial judge to ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho Tire Co.*, 526 U.S. at 147 (alteration in original) (internal quotations omitted); *cf. United States v. Martinez*, 3 F.3d 1191, 1197–98 (8th Cir. 1993) ("In order to determine whether scientific testimony is reliable, the court must conclude that the testimony was derived from the application of a reliable methodology or principle in the particular case.").

At both Lehr's 1996 and 2009 trials, the State presented evidence through the testimony of a fingerprint examiner. This admission unfairly prejudiced Lehr, rendering his trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Gimenez v. Ochoa*, 821 F.3d 1136, 1143–45 (9th Cir. 2016) ("We join the Third Circuit in recognizing that habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of this evidence 'undermined the fundamental fairness of the entire trial.'" (citation omitted)); *Han Tak Lee v. Glunt*, 667 F.3d 397, 403–04 (3d Cir. 2012).

By not challenging this evidence, Lehr's trial counsel failed to render constitutionally effective assistance, to Lehr's severe detriment.

At Lehr's 1996 and 2009 trials, the State presented the testimony of Karen Jones, a latent print examiner with the Phoenix Police Department. (Tr. Sep. 25, 1996 at 106; Tr. Feb. 23, 2009.) She analyzed a latent print lifted taken off of a McDonald's cup recovered from the Zingaro crime scene. (Tr. Feb. 23, 2009 at 9.)

1    Another individual, Mark Hatcher, lifted the print. (Tr. Feb. 23, 2009 at 9.) When

2    Jones attempted to make a comparison of the lifted print to "numerous subjects" in

3    April of 1991, she was unable to make an identification. (Tr. Sep. 25, 1996 at 125.)

4    And in 1992, when she used the latent print in its natural form and compared it with

5    Lehr's known fingerprint, she "did not see any point of identification" that she

6    "thought were going to be Scott Lehr's. So at that time, [she] made an analysis that

7    they were not Scott Lehr's prints." (Tr. Sep. 25, 1996 at 129–30.) In particular, she

8    did not see "ridge structures" that she needed to determine if they were made by the

9    same person, so she declared it as a non-identification. (Tr. Sep. 25, 1996 at 130.)

10          Later, in 1994, Jones created a Polaroid enlargement of Lehr's right

11   thumbprint. (Tr. Sep. 25, 1996 at 128.) Jones was asked to re-examine the prints at

12   that time. (Tr. Sep. 25, 1996 at 128.) When she did, she concluded the latent print

13   was made by the right thumb of Lehr. (Tr. Sep. 25, 1996 at 138.) She reaffirmed

14   this opinion in 2009. Trial counsel—in both of Lehr's trials—never used an expert

15   witness to rebut Jones's testimony, or to help prepare them for cross-examination.

16          This was deficient performance. In light of the State's reliance on Jones's

17   purported expertise with print comparisons, it was incumbent on trial counsel to

18   consult with an expert in the same field before making an informed decision as to

19   whether such an expert might be used productively at trial. *See, e.g.*, *Dees v.*

20   *Caspari*, 904 F.2d 452, 454 (8th Cir. 1990) ("[C]ounsel ha[s] a duty to make a

21   diligent investigation of the forensic evidence and its potential weaknesses."); *see*

22   *also* 1989 ABA Guideline 11.4.1(7) (obligating counsel to "secure the assistance of

23   experts where it is necessary or appropriate for . . . preparation of the defense," an

24   "adequate understanding of the prosecutor's case," or preparing "rebuttal of any

25   portion of the prosecution's case at the guilt/innocence phase").

26          This is especially true because consulting with a fingerprint expert would not

27   "detract from" Lehr's defense strategy. *Dugas v. Coplan*, 428 F.3d 317, 331 (1st

28   Cir. 2005). To the contrary, demonstrating that the fingerprint did not originate from

1  Lehr would bolster the defense's strategy to prove Lehr had nothing to do with the

2  sexual assault of Zingaro. Had trial counsel consulted with a forensic expert, they

3  would have proffered evidence or at least cross-examined Jones regarding her errors

4  and the complexities of latent print analysis.

5  The deficient performance was prejudicial. Trial counsel in 2009 could have

6  shown that the analysis conducted in the 1990s was flawed and that Jones's analysis

7  is unreliable. A qualified and trained expert in the forensic fingerprint field has

8  conducted a print comparison and concluded that Lehr is *not* the source of the latent

9  print lifted off of the McDonald's cup recovered from the Zingaro crime scene. This

10  expert has also identified multiple prejudicial flaws with Jones's testimony.

11  For example, Jones did not testify to the total number of points "in

12  agreement" to arrive at her conclusion. (*See e.g.*, Tr. Sep. 25, 1996 at 138.) The

13  Department of Justice has published reporting guidelines for this type of analysis

14  and trial counsel never referenced these materials. *See* Department of Justice,

15  *Approved Uniform Language For Testimony and Reports For the Forensic Latent*

16  *Print Discipline*.[8] The term "agreement" is used when comparing features of a print.

17  If Lehr's trial counsel diligently investigated this evidence, an expert would have

18  testified that Lehr is *excluded* as the source of the McDonald's cup print. There are

19  sufficient friction skin ridges in disagreement to conclude that the two impressions

20  (Lehr's thumbprint and the cup's latent print) came from different sources. *Id*. at 2.

21  Counsel never cross-examined Jones on how the points of comparison on the

22  print are not the same, and trial counsel never questioned about the points "in

23  agreement." Nor did counsel ask if the "match" was ever verified by other

24  examiners as is pattern and practice in this particular forensic field. The Scientific

25  Working     Group     on     Friction     Ridge     Analysis,     Study     and     Technology

26  

27  [8] Available at https://www.justice.gov/file/1037171/download (last visited Dec. 16,

28  2019).

("SWGFAST"), the predominant working group for this field, has published standards for such processes. *See* SWGFAST, Document 14, *Standard for the Application of Blind Verification of Friction Ridge Examinations*.[9] This process involves another competent examiner, provided with no, or limited, contextual information, having no expectation or knowledge of the determinations of the original examiner—to conduct his or her own analysis. *Id.* at ¶ 1.2.

This problem was never raised nor explored during Lehr's trial. Both the State's failure to present evidence on this point, as well as defense counsel's failure to challenge this evidence, rendered it too unreliable to admit for the jury's consideration. (*See* Tr. Feb. 23, 2009 at 33–45.) And, it is clear that this issue was important to the jury, because it asked a question on this very point during Lehr's proceedings. (*See e.g.*, Tr. Sep. 26, 1996 at 15.)

An expert further would have rebutted Jones's contention that there are points in agreement, and if the expert examined and reported on each specific minutia, the expert would have concluded that the marks do not agree, and therefore Jones's original conclusion is the right conclusion: the marks do not "match" Lehr. (*See* Trial Ex. 65; Trial Ex. 66.)

The main problem with fingerprint analysis continues to be a theme in forensic science: subjectivity. The process is inherently subjective, and much more so in the 1990s when this analysis was originally performed, at which time examiner would examine the quality of each individual "ridge" in the questioned prints. The features compared in the analysis are not predetermined for reliability in any scientific sense of that word, but are instead chosen by the examiner at the time of the analysis based on which features can—in that analyst's opinion—be most easily read.

---

[9] Available at
https://www.nist.gov/system/files/documents/2016/10/26/swgfast_blind-verification_2.0_121124.pdf (last visited Dec. 16, 2019).

1    In the absence of any other forensic evidence as to Zingaro, the jury was left
2    with *only* the fingerprint analysis, unrebutted and unchallenged. In *Hinton v.*
3    *Alabama*, the United States Supreme Court found counsel's performance deficient
4    when trial counsel failed to obtain an adequate expert. 571 U.S. 263, 274–75 (2014).
5    There the Court recognized the risk of wrongful convictions based on faulty
6    forensic science and that "[t]his threat is minimized when the defense retains a
7    competent expert to counter the testimony of the prosecution's expert witnesses."
8    *Id*. at 276. Courts have similarly recognized that effective assistance requires
9    defense counsel to elicit expert testimony "where there is substantial contradiction
10   in a given area of expertise." *Richey v. Mitchell*, 395 F.3d 660, 685 (6th Cir. 2005)
11   (quoting *Knott v. Marbry*, 671 F.2d 1208, 1213 (8th Cir. 1982)). "[W]herein
12   lawyers altogether fail to hire an expert" there is the "most egregious type" of
13   ineffectiveness. *Id.* at 362.

14   An adequate investigation and a qualified defense expert could have
15   effectively countered the fingerprint testimony that ultimately led to Lehr's
16   conviction for Zingaro's assault. The admission of this unreliable evidence and the
17   ineffective assistance of his trial counsel violated Lehr's due process rights, and he
18   is entitled to relief.

19       **F.    Forensic Experts: Trial counsel rendered ineffective assistance of**
20              **counsel when they failed to consult any of the many forensic**
21              **experts that were available and would have equipped counsel to**
22              **adequately challenge the State's evidence against Lehr, in both**
                **the 1996/1997 trials and the 2009 retrial.**

23   Lehr's trial counsel performed deficiently, and to his prejudice, during the
24   trial phase of his capital trial. Lehr's 2009 trial counsel failed to conduct a
25   reasonable investigation of the myriad of "forensic science" presented in his case;
26   failed to present and/or consult experts on his behalf in those fields; failed to
27   effectively cross-examine the State's experts; and failed to put on any defense that
28   may have assisted the jury in determining the credibility, accuracy, and reliability

1  of the State's forensic evidence. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.
2  137 (1999).

3  **1.    Exhaustion**

4  This aspect of the claim was not raised in state court. Lehr can overcome any
5  default of this claim by showing cause and prejudice, including because of the
6  ineffective assistance of appellate and state-post conviction counsel. *See Martinez*
7  *v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986);
8  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Lehr will demonstrate
9  through his filings and at an evidentiary hearing that appellate and post-conviction
10  counsel fell below the standards of minimally competent capital attorneys and that
11  those failures prejudiced him. Alternatively, any procedural bar is not adequate or
12  independent and imposing default would be a miscarriage of justice.

13  Because this claim has not been adjudicated by the Arizona state courts, the
14  limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's
15  review, and the Court may consider the merits of the claim de novo.

16  **2.    Merits**

17  Over the last twenty-five years, forensic science has changed dramatically.
18  Scientific methodologies and conclusions that were once considered accurate and
19  reliable are now discredited: for example, arson science, shaken baby syndrome,
20  microscopic hair analysis, and bite-mark analysis (to name a few). *See Melendez-*
21  *Diaz v. Massachusetts*, 577 U.S. 305, 319 (2009) ("Serious deficiencies have been
22  found in the forensic evidence used in criminal trials."). Lehr has already discovered
23  the fingerprint evidence used against him for Zingaro's conviction is faulty. But the
24  State also used other forensic disciplines, including forensic anthropology, forensic
25  pathology, entomology, and forensic shoe-print analysis. Lehr's prior counsel failed
26  to consult with other guilt-phase experts relevant to the forensic evidence the State
27  presented at Lehr's trial. Given the centrality of this evidence to the State's cases,
28  counsel could not reasonably have declined to retain or at least consult experts in

1    those fields. *See Dees v. Caspiri*, 904 F.2d 452, 454 (8th Cir. 1990).

2         As an example, Dr. Larry Shaw, medical examiner and pathologist, testified
3    for the State regarding the cause of death for victims Cronin and Christorf (Tr. Feb.
4    18, 2009 at 123–99.) Another pathologist, Phillip Keen, performed the autopsy on
5    Morales. The defense never challenged any of their findings with its own forensic
6    pathologist. Yet trial counsel highlighted this evidence during closing arguments.
7    (*See e.g.*, Tr. Mar. 24, 2009 at 92–93 ("Dr. Shaw was asked, 'What about these
8    fractures on both sides? Could a person receive them by falling, being pushed
9    violently and hitting them? Yeah, that's a possibility.'"); *see also* Tr. Mar. 24, 2009
10   at 103–04 ("It was his hypothesis that it could be two separate strikes, or one strike
11   on an irregular object that caused the skull fractures. There's two skull fractures. He
12   said it could be two strikes -- one, two -- or it could be one on an irregular surface
13   that would cause two of them simultaneously. He talked about how that would cause
14   certainly, the big one would cause -- well, both of them would cause immediate loss
15   of consciousness.").) Lehr will demonstrate that a competent pathologist, had they
16   been consulted and/or retained, would have challenged the assumptions.

17        As another example, Walter Birkby testified during Lehr's first trial as a
18   forensic anthropologist for the State. (Tr. Oct. 9, 1996 at 66.) His testimony was
19   read in at Lehr's second trial. (Tr. Feb. 26, 2009 at 62; Trial Ex. 378.) He examined
20   near skeletonized remains, including a skull, for the State, looking for indications
21   of trauma. (Tr. Oct. 9, 1996 at 69; 72.) Counsel objected to his testimony as
22   cumulative of Dr. Shaw, the medical examiner, and represented Lehr was not
23   arguing about "what happened to the skull." (Tr. Oct. 9, 1996 at 73.) Birkby opined
24   that ". . . excessive forces that would have been brought to bear rather sharply and
25   rapidly in the head here by something that is broad enough, blunt enough that it
26   really doesn't leave a pattern-type injury, but does produce massive cranial
27   fracturing of that skull." (Tr. Oct. 9, 1996 at 76.) He further explained that "it may
28   have been from a single blow by a large blunt object . . ." (Tr. Oct. 9, 1996 at 76.)

He walked through an entirely unrebutted analysis regarding the skeletonized remains and skull. (Tr. Oct. 9, 1996 at 66–117.) In regard to both pathologists and the forensic anthropologist, defense counsel presented an alternative theory to the State's cause of death, but never provided scientific support for the alternative theory. (*See* Tr. Mar. 24, 2009 at 104–05) ("Those injuries are more consistent with someone either -- someone violently falling onto a rock, being pushed down onto a rock. Not lifting up a rock and smashing it down on the head.")

Time of death was also an issue in the case for Morales. The State presented Dr. Michael Douglas to talk about insects recovered from her body. This too, trial counsel emphasized in his closing. (Tr. Mar. 24, 2009 at 101 ("[Morales] could have been recently killed. But what do they do to try to determine her time of death? They collected the maggots. And you heard Dr. Michael Douglas talk about those maggots.").) Trial counsel even implored the jury to "use their common sense" with this scientific evidence. (*See* Tr. Mar. 24, 2009 at 103 ("Does that seem reasonable, that flies can be out there for a week, starting to smell, starting to decompose, and no flies come along? Not even one to lay eggs? It's more reasonable – you're told to use your common sense. It's more likely that those flies found her much closer to her time of death.").) But again, counsel did not consult to confirm this theory, or call their own expert at trial, and instead relied simply on cross-examination. Counsel argued his theory with zero scientific support of his own to show the jury. As further evidentiary development will show, the failure to consult experts on any of these issues and others prejudiced Lehr.

Lehr does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *Strickland*, 466 U.S. at 694; *see also Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002); *Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999). Lehr is therefore entitled to relief. The forensic evidence was key to Lehr's

1   convictions and the State relied heavily upon it. Counsel's failure to subject the

2   State's forensic evidence to meaningful adversarial testing undermines confidence

3   in the outcome of the case. *See Strickland*, 466 U.S. at 694.

4         **G.**    **Third-Parties: Lehr was denied effective assistance of counsel,**

5                 **both at his 1996/1997 trials and his 2009 retrial, when his counsel**

6                 **failed to adequately investigate and present evidence of other**
              **persons who may have committed the crimes charged to Lehr.**

7         Presenting evidence to show that a third party committed the crime with

8   which the accused is charged is a common defense when trying criminal cases.

9   Under Arizona law, such evidence is admissible regarding third-party culpability

10  "that tends to create a reasonable doubt as to the defendant's guilt." *State v.*

11  *Machado*, 246 P.3d 632 (Ariz. 2011); *State v. Gibson*, 44 P.3d 1001 (Ariz. 2002).

12  Lehr was convicted of crimes as to ten victims. Yet in 1991 and 1992, when those

13  crimes took place, police investigated other similar murders and other similar sexual

14  assaults that were not committed by Lehr. There were leads from those cases to

15  other men who may have committed these crimes, but trial counsel did not present

16  any evidence of third-party culpability to the 1996, 1997, or 2009 juries.

17            **1.**    **Exhaustion**

18        Lehr raised this claim in his post-conviction proceedings. (PCR Pet. at 39.)

19  The post-conviction court denied the claim on the merits. (PCR Order at 33.) The

20  state court's rejection of this claim was contrary to, or involved an unreasonable

21  application of, clearly established federal law, as determined by the Supreme Court.

22  *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable

23  determination of the facts in light of the evidence presented. *See* 28 U.S.C. §

24  2254(d)(2).

25        Lehr's trial counsel denied him his rights under the Sixth and Fourteenth

26  Amendments to the United States Constitution. Counsel's performance in preparing

27  and presenting evidence of third party culpability fell below the performance of a

28  reasonably competent attorney and undermined confidence in his trial. *See*

1    *Strickland*, 466 U.S. at 687.

2         **2.    Merits**

3         In 2006, the Supreme Court analyzed third-party defenses in *Holmes v. South*
4    *Carolina*, 547 U.S. 319 (2006). The Court faulted an approach to assessing the
5    probative value of the evidence of third-party guilt. *Id.* at 324. As the Court
6    explained, "by evaluating the strength of only one party's evidence, no logical
7    conclusion can be reached regarding the strength of contrary evidence offered by
8    the other side to rebut or case doubt." *Id.* at 331. Further, the Second Circuit has
9    held that a trial judge's exclusion of the third-party culpability testimony that a
10   defendant proffered to substantiate a defense amounted to constitutional error—a
11   violation of the defendant's constitutional right to present crucial exculpatory
12   evidence. *See Alvarez v. Ercole*, 763 F.2d 223 (2d Cir. 2014). And, even though the
13   Supreme Court has not characterized this violation as "structural" error, when the
14   error is constitutional in nature, the prosecution must shoulder the burden of proving
15   the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S.
16   18, 24 (1967). Aligning with these theories, Arizona courts have similarly held that
17   challenges to this type of evidence as improper character evidence is inapplicable
18   when the defense offers third-party culpability evidence. *Machado*, 246 P.3d 632.

19        A defendant must therefore be able present a complete defense, including
20   presenting evidence that law-enforcement failed to diligently investigate the guilt
21   of a third party who plausibly committed the crimes at issue. In *Alvarez*, the Second
22   Circuit found a Sixth Amendment violation where, at trial, the defense attempted to
23   cross-examine a detective about specific investigative leads and the prosecution's
24   objection on hearsay grounds was sustained. 763 F.3d at 228. The trial judge
25   forbade the defense counsel from questioning the officer about the leads. *Id*. In
26   addition, the trial judge ruled that the proposed questioning "was barred by a state
27   evidentiary rule requiring a 'clear link' between evidence implicating a culpable
28   third party and the defendant's charged crime." *Id*. Alvarez eventually sought

habeas relief after unsuccessful challenges in state courts, and the Second Circuit wrote, "[w]e agree with the District Court that the [state] trial court's decision to prohibit Alvarez from questioning [the detective] about [the leads] was" not "a 'reasonable limit[] on . . . cross-examination . . . .'" *Id*. This limitation was thus a violation of Alverez's Sixth Amendment right to cross-examination under the Sixth Amendment. The erroneous hearsay rule "precluded Alvarez from fleshing out his main defense theory: that the police investigation into the murder was flawed and had improperly disregarded a promising alternative suspect." *Id*. at 232.

In Lehr's case, 2009 trial counsel attempted to introduce what the State concedes was "significant evidence" of third-party guilt of several suspects. (Resp. to PCR Pet. at 67.) During the 2009 proceedings, the trial court affirmed the prior court's decision to deny third-party evidence as law of the case; but granted leave to request reconsideration of the rulings based on *Gibson*, 44 P.3d 1001. (Tr. Feb. 2, 2009 at 31–34; Tr. Feb. 9, 2009 at 5.) Trial counsel never sought reconsideration to introduce any relevant third-party evidence, however.

*Gibson* clarified a prior decision that there is no special test or standard necessary to determine the admissibility of third-party culpability evidence. *Gibson*, 44 P.3d 1001. Rather, the evidence can be admitted if the evidence is relevant under Ariz. R. Evid. 401, which sets a low bar requiring evidence have a "tendency to make the existence of any fact that is of consequence . . . more probable or less probable." If the evidence is relevant, it is admissible, subject to a substantial prejudice analysis under Ariz. R. Evid. 403. The *Gibson* court further held that "[t]he proper focus in determining relevancy is the effect the evidence has upon the *defendant's* culpability. To be relevant, the evidence need only *tend* to create a reasonable doubt as to the defendant's guilt." *Gibson*, 44 P.3d at 1004 (emphasis in original).

There was specific evidence in Lehr's case that tied others to some of these crimes, and counsel erred in not presenting that evidence of alternative perpetrators.

Some of these third-party suspects were even included as witnesses listed before Lehr's 1996 trial:

- Stephen Twain Reidel a.k.a. Larry Donald Brookshire (picked up as a suspect on the Zingaro case and had blood drawn pursuant to an identification by Zingaro);

- Larry D. Stark, M.D. (was with Cronin shortly before her death and admitted sex with her for money);

- Carl Gardei (convicted rapist whose crimes mirrored ones charged against Lehr during the same time period);

- Flannigan (in the grand jury panel that indicted Lehr for these crimes; owned a car that matched the description and partial plate number of the suspected car used in some of the crimes; bore a resemblance to Lehr).

- Tofek Kokali (in jail at the time of Lehr's incarceration in Maricopa County Jail and charged with similar crimes).

(PCR Pet. Ex. W.)

Counsel's failure to present evidence on these alternate suspects was furthered hindered by the State's failure to disclose relevant materials they had gathered on these alternate perpetrators. Despite the State's knowledge of these other suspects and other very similar crimes, the State did not disclose all the investigations to trial counsel. The State thus violated its obligations of mandatory material discovery disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), in not disclosing all investigations of other suspects. Lehr was denied his Constitutional rights when the post-conviction court did not hold a hearing on the *Brady* issue. *See Williams v. Ryan*, 623 F.3d 1258, 1266–67 (9th Cir. 2010) (petitioner was entitled to an evidentiary hearing based on the state's purported suppression of jailhouse letters).

Evidence does exist that tends to create a reasonable doubt as to Lehr's guilt for all ten charged offenses. Consider, for example, Carl Gardei. (*See* PCR Pet. Ex. T. at 52.) Gardei admitted to assaulting twenty women during the time the crimes in this case were occurring. Gardei picked his victims up in the southern and central parts of Phoenix, drove them into the desert, and sexually assaulted them, orally,

143

vaginally, and anally.

His specific convicted and charged crimes included:

- **October 1, 1990**. A woman accepted a ride home from Gardei. Instead of taking her home, he drove her out to the desert and raped her. (PCR Pet. Ex. X at 15.);

- **March 15, 1991**. Gardei picked up a sex-worker in downtown Phoenix, drove out to the desert and raped her. He told her "that he had already killed two other girls" and that she should do as he wished. (*Id.*) He also told her, "I hope you like the rain, because tonight you're gonna die in it." (*Id.*);

- **June 4, 1991.** Gardei picked a woman up in Phoenix and offered her $60 if she would go with him to his home in Glendale. (*Id.* at 16–17.);

- **February 5, 1992.** Gardei picked up another sex-worker and before "she realized it, they were on the freeway. She told him she did not want to go out this far but he kept driving." (*Id.* at 16.) She noticed at one point the inside door handle had been broken off and the handle to the window was gone. (*Id.*)

Gardei admitted he had picked up sex workers to obtain sexual release and that he did not always pay them. He told police he "took them out to the desert because he wanted a secluded place in case they got upset and tried to cause a scene." (PCR Pet. Ex. X at 15.) Gardei does have specific evidence linking him to at least one victim: Collins. She reported that the sexual assault occurred in a car and "described the vehicle as a light blue, American made sedan *with no inside door handles*." (emphasis added). Gardei specifically admitted he had rigged the interior doors of his car so that his victims could not escape. Collins' sexual assault happened around the same time Gardei committed his crimes, and Collins fit his victim profile: she was a sex worker, picked up in the same areas Gardei preyed upon, and the assault fit the way he committed his crimes. To be sure, DNA from Collins's cervical vault swab was consistent with Lehr's DNA. But this ignores the possibility of lab contamination (*see* Claim 7) or that Lehr had consensual sex with Collins and did not assault her, but that in fact Gardei did. (*See* PCR Pet.'s Mot. for Reh'g at 25.)

Gardei's DNA was never compared to DNA found in any cases. And while

144

his physical and facial characteristics resembled Lehr, his photo was never shown to the victims in these cases. The evidence regarding Gardei would have tended to create a reasonable doubt as to Lehr's guilt.

Prior to his first trial, one of Lehr's trial attorneys requested documents concerning Gardei from the Maricopa County Clerk of Court on January 4, 1994. (PCR Pet. Ex. Y.) The trial lawyers did nothing, however, to pursue this third party defense and to present evidence regarding Gardei in front of any jury. In 2008, the Maricopa County Attorney's Office also sent discovery to Lehr's trial lawyers. (PCR Pet. Ex. Z.) This evidence was never presented to the jury in 2009, however.

Another example of third-party evidence relates to Larry Stark. Trial counsel in 2009 made a feeble attempt to present evidence in Cronin's murder that Larry Stark killed Cronin. Stark admitted having a "sex for money" relationship with her, and there was also evidence Stark's son had had sex with the victim for money as well on the very night she disappeared. The trial court improperly limited cross-examination of Stark during the 2009 trial, violating Lehr's rights under the Sixth and Fourteenth Amendments. (*See e.g.*, Tr. Feb. 24, 2009 at 114–126.) And appellate counsel did not raise this issue of third-party culpability on appeal.

Lastly, the failure to raise third-party culpability for Christof's case was particularly egregious. This murder involved at least two other possible investigated perpetrators: "Mitch" aka Colonel Mani and William "Bill" McFadden. "Mitch" physically abused Christof in the past. The 1996 trial lawyers attempted to admit this evidence, but the trial judge denied it. (Tr. Oct. 2, 1996 at 4–30.) Appellate counsel did not raise this as an issue on appeal.

Counsel similarly failed to present evidence on McFadden, Christof's boyfriend at the time. McFadden gave inconsistent statements to police during his interviews. For example, during his first interview with police, he indicated he last had sexual intercourse with Christof eight to ten days prior to her leaving the house. Then in a subsequent interview he reported it had been four or five days prior. Then

1   minutes later, he changed his story yet again, this time reporting he had slept with

2   Christorf the night she left the home. Police considered McFadden a suspect.

3       It is known, however, that the 1996 and 1997 trial attorneys did not have

4   adequate time and resources to pursue these crucial third party defenses. (*See*, *e.g.*,

5   PCR Pet. Ex. C at ¶¶ 9, 13.) While Lehr's 2009 trial lawyers had notice and time to

6   prepare, they did nothing to try and challenge the viability of the 1996 and 1997

7   convictions, nor did they use any other third-party exculpatory evidence to create a

8   reasonable doubt at the guilt phase. Even worse, Lehr's trial lawyers *waived* cross-

9   examination on almost all other-act witnesses, never asking these witnesses about

10   other possible suspects. The juries thus were never presented with the evidence of

11   other perpetrators. In particular, as to Gardei and Stark, the evidence as to those two

12   men would have tended to create a reasonable doubt in all of Lehr's trials.

13       Yet another example is the case of Mary Manoz, used as reverse 404(b)

14   evidence in 1996, to show that Lehr had not committed the offense against her. (*See*

15   PCR Pet. Ex. CC.) Manoz was picked up in a car and raped in the same Happy

16   Valley Road area on March 26, 1992. During the investigation of that case, police

17   located a car that matched a description Manoz provided. Lehr did not own nor did

18   he ever drive such a car. (Tr. Nov. 5, 1996 at 4–17.) In addition, Manoz did not

19   identify Lehr during the live lineup on June 25, 1992. Lehr's lawyers did not present

20   this evidence at all during the 2009 trial. The perpetrator of the Manoz crimes was

21   another viable third-party defendant not adequately pursued at the trial level. Like

22   Manoz, Christine Love was another case in this same time period with similar facts.

23   (PCR Pet. Ex. AA.) The State did not charge Lehr with this offense. Despite this

24   evidence, trial counsel never investigated or presented information on the alternate

25   suspect responsible for Love's assault. (PCR. Pet. at 44.)

26       All of the evidence that 1996, 1997, and 2009 trial counsel had in their

27   possession presented plausible facts to support alternative third-party suspects as to

28   multiple crimes in this case. Trial counsel failed to utilize this evidence to

1   undermine confidence in the jury's verdict for the crimes implicating the third-party

2   suspects. Counsel's failure to present third-party suspect evidence undermines

3   confidence in the outcome of the case. *See Strickland*, 466 U.S. at 694.

4         First, the post-conviction court's conclusion that allegations related to 1997

5   trial counsel "are moot," is a clearly unreasonable interpretation of facts and law:

6   the court insisted that "the remedy for [those attorneys being ineffective] would be

7   a resentencing, which Defendant has already received." (PCR Order at 31.) Not so.

8   The remedy for ineffective assistance of counsel at Lehr's 1996/1997 trial would

9   be a *new trial*, which Lehr did not receive as to seven of the ten alleged victims.

10        Second, the post-conviction court's decision fails to apply the proper

11   standard under *Strickland*. The court concluded there was no prejudice "as the

12   evidence admitted at trial (and retrial) was sufficient to support findings of

13   Defendant's guilt beyond a reasonable doubt as to each conviction." (PCR Order at

14   34.) Under the clearly established federal law in *Strickland*, counsel's deficient

15   performance prejudices a defendant when "[t]here is a reasonable probability that,

16   but for counsel's unprofessional errors, the result of the proceeding would have

17   been different." 466 U.S. at 687–88, 694. The state court impermissibly applied a

18   "sufficient to support findings…of guilt beyond a reasonable doubt." (PCR Order

19   at 34.) At no point did the court cite to any other prejudice standard for an

20   ineffective-assistance claim, and at no point did the court cite to a case applying the

21   correct *Strickland* standard. Any standard other than that explicitly laid out in

22   *Strickland* is contrary to clearly established Supreme Court precedent. *See Williams*,

23   529 U.S. at 397.

24        Third, by limiting its analysis to only "the evidence admitted at trial (and

25   retrial)," the state court unreasonably applied clearly established law, which directs

26   the reviewing court to look at the totality of evidence. *See Lambright v. Schriro*,

27   490 F.3d 1103, 1121 (9th Cir. 2007) (holding that "in evaluating prejudice," a court

28   "must" ultimately evaluate whether "the difference between what was presented

1   and what could have been presented is sufficient to 'undermine confidence in the

2   outcome' of the proceeding.") (quoting *Strickland*, 466 U.S. at 694). By failing to

3   consider "what could have been presented," the state court unreasonably applied

4   the *Strickland* standard.

5      Lastly, the post-conviction court's ruling does not limit this Court's review

6   because it resolved material factual disputes without holding a hearing. *See Taylor*,

7   366 F.3d at 1000–01 (holding that a state court's factual determinations are

8   unreasonable when it makes evidentiary findings without holding a hearing); *Hurles*

9   *v. Ryan*, 752 F.3d at 790 ("We have repeatedly held that where a state court makes

10  factual findings without an evidentiary hearing or other opportunity for the

11  petitioner to present evidence, the fact-finding process itself is deficient and not

12  entitled to deference [under AEDPA]." (quotation marks omitted)).

13      **H.    Cumulative prejudice**

14      Each of the above sub-claims presents sufficient evidence of deficient

15  performance by Lehr's trial counsel, and the prejudice that accrued against him on

16  account of their professional lapses.

17      Yet, even if none of the above issues was of sufficiently prejudicial effect "to

18  undermine confidence in the outcome" of Lehr's trial, *see Strickland*, 466 U.S. at

19  694, the Court should consider all of the aspects of Lehr's claim together.

20      To establish prejudice, Lehr must show "that there is a reasonable probability

21  that, but for counsel's unprofessional errors, the result of the proceeding would have

22  been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a

23  probability sufficient to undermine confidence in the outcome." *Id.* A petitioner

24  challenging his conviction need only demonstrate a reasonable probability that the

25  guilty verdict might have been affected by the ineffective assistance of counsel. *Id.*

26  at 695.

27      The court must consider the totality of counsel's errors or omissions in order

28  to determine whether the petitioner has satisfied Strickland's prejudice prong. *See*

1   *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986); *See also (Terry) Williams*, 529

2   U.S. at 397–98. A petitioner need only show, based on a consideration of the totality

3   of the evidence, "a reasonable probability that at least one juror would have struck

4   a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

5          For all of the reasons above, trial counsel failed to effectively challenge the

6   State's guilt phase presentation. Counsel failed to investigate and support their

7   arguments with proper expert testimony to enable effect challenges and cross-

8   examination. They failed to meaningfully challenge the State's threadbare and

9   questionable evidence of eyewitness identification, its DNA practices, its

10  questionable forensic evidence, or to meaningfully pursue theories of third-party

11  culpability. Had they done so, there is a reasonable possibility, sufficient to

12  undermine confidence in the outcome of the case, that at least one juror would have

13  reached a different result. The post-conviction court failed to address all of these

14  issues cumulatively, and improperly failed to grant a hearing at which counsel could

15  have presented the issues.

16                              **CLAIM FOUR**

17          **The (F)(1) and (F)(2) Aggravating Circumstances Found By The**
    **Jury And Applied To Lehr To Make Him Eligible For The Death**
18  **Penalty And That Were Weighed Against The Mitigating**
    **Circumstances To Impose The Death Sentence Were**
19  **Unconstitutional And His Death Sentences Must Be Vacated**
20

21          Lehr incorporates by specific reference all facts, allegations, and arguments

22  made elsewhere in this Petition.

23          Lehr was made eligible for a sentence of death by the State's proof of, and

24  reliance on, aggravating circumstances that did not exist at the time Lehr is alleged

25  to have committed these crimes. The imposition of an enhanced sentence based on

26  factors that did not exist or were not proscribed at the time these crimes were alleged

27  to have occurred violates the Constitution's ex post facto clause, rendering Lehr's

28  death sentences invalid.

149

1

## A.    Exhaustion

Although Lehr's 2009 counsel challenged the aggravating circumstances that the State sought to present on several bases at trial, Lehr did not raise this specific constitutional challenge in state court. His failure to do so is excused because of his counsel's constitutionally ineffective performance at trial, and by the ineffectiveness of his appellate counsel for not raising this claim with the Arizona Supreme Court. (*See* Claim 31.). *See Martinez*, 566 U.S. at 9; *Murray*, 477 U.S. at 488–89 (1986); *Strickland*, 466 U.S. at 687–88; *see also Mapes*, 171 F.3d at 427 (analyzing whether omitted issues were "significant and obvious"); *Gray*, 800 F.2d at 646 (noting that if "appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance").

## B.    Merits

Lehr was alleged to have killed Margaret Christorf on or about November 8, 1991 (Tr. Feb. 18, 2009 at 46) and Michelle Morales between February 7, 1992, when she was last seen alive (Tr. Oct. 16, 1996 at 7–8, 20, 29), and February 19, 1992, when her body was found (Tr. Feb. 11, 2009 at 111). At the time he allegedly committed such murders in 1991 and/or 1992, Arizona law permitted the imposition of the death sentence only if, after a conviction of first-degree murder, the sentencer also found "one or more of the aggravating circumstances enumerated in subsection F of this section and that there are no mitigating circumstances sufficiently substantial to call for leniency." A.R.S. § 13-703(E) (1991 and 1992 editions.)

In 1991 and 1992, A.R.S. § 13-703(F) explained the aggravating circumstances that would permit a sentencer to impose the death penalty for first-degree murder. Subsections 13-703(F)(1) and (F)(2) set forth the aggravating circumstances that the prosecution alleged were applicable to Lehr: "Aggravating circumstances to be considered shall be the following: 1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable. 2. The defendant was

previously convicted of a felony in the United States involving the use or threat of violence on another person." A.R.S. §§ 13-703(F)(1)-(2) (1991 and 1992 editions.)

At the time Christorf and Morales were killed, in 1991 and 1992, Lehr had not been "convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable," as required by A.R.S. § 13-703(F)(1). Section 13-703(F)(1) specifically requires proof that the defendant "has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable." Absent proof beyond a reasonable doubt of all the elements of this statutory aggravating circumstance, this statutory aggravating circumstance could not have made Lehr eligible for a sentence of death for the murders of either Christorf or Morales, nor could it have otherwise been weighed as evidence to support a death sentence.

The State could not and did not prove that Lehr had been convicted of "another offense . . . for which a sentence of life imprisonment or death was imposable" in 1991 or 1992. The first time Lehr was convicted of any offense for which "life or death was imposable" under (F)(1) was on November 25, 1996 when he was convicted of the crimes at his first trial. (*See* ROA 439 through ROA 461.) This conviction occurred long after the alleged murders of Christorf or Morales in 1991/1992.

Similarly, at the time Christorf and Morales were killed in 1991 and 1992, Lehr had not been "previously convicted of a felony in the United States involving the use or threat of violence on another person," as was required under A.R.S. § 13-703(F)(2). Absent proof beyond a reasonable doubt that Lehr had been "previously convicted of a felony . . . involving the use or threat of violence on another person" there was not a valid and constitutional aggravating circumstance that could make Lehr eligible for a sentence of death, or that could otherwise be weighed as evidence to support a sentence of death.

At the capital sentencing proceeding in 2009, however, the prosecution was

permitted to present evidence and the jury was permitted to consider as potential (F)(2) aggravating circumstances two aggravated assaults on Hancock that were alleged to have occurred on or about February 23, 1991. (ROA 618 at 2; ROA 934 at 33.) Lehr had not been convicted of these (F)(2) offenses upon Hancock until May 16, 1997—many years after the alleged murders of Christorf and Morales in 1991 or 1992. (*See* ROA 531; ROA 532; ROA 533; ROA 534; ROA 535.)

In sum, at the time Christorf and Morales were killed in 1991 and/or 1992:

- Lehr had no prior convictions that qualified as an (F)(1) or (F)(2) aggravating circumstance.

- There existed no circumstances or convictions that the state could have proven that would have constituted a valid aggravating circumstance under either §§ 13-703(F)(1) or (F)(2) that could have aggravated his sentence for the murders of Christorf and Morales into a death sentence.

- Lehr was not on notice that he could or would be subject to the enhanced punishment of a sentence of death under (F)(1) or (F)(2) for the murders of Christorf or Morales, because neither (F)(1) nor (F)(2) applied to him in 1991 or 1992; he was only on notice that, should he commit and/or be convicted of a first-degree murder in 1991 or 1992, the maximum sentence he would face would be life imprisonment.

In other words, in 1991 and 1992, there existed no set of facts that could have proven to demonstrate the existence of an (F)(1) or (F)(2) aggravating circumstance to validly or constitutionally "aggravate" a sentence of life imprisonment to the greater sentence of death. In order for Lehr to be eligible for a sentence of death, either of those aggravating circumstances would have had to have been found by the jury by proof beyond a reasonable doubt. *See Ring v. Arizona*, 536 U.S. 584, 609 (2002). Because no set of facts could have been proven to support those statutory aggravating circumstances, they are invalid and the sentences of death

1 they supported are likewise invalid.

2    Yet when the jury in 2009 imposed the sentence of death on Lehr for the first-

3 degree murders of Christorf and Morales that occurred in 1991/1992, the jury

4 specifically relied on these convictions that post-dated the first-degree murders—

5 convictions that only occurred in 1996 or 1997 and cannot constitutionally be used

6 to enhance the punishment to death for crimes that were alleged to have been

7 committed in 1991 and 1992. (*See* ROA 947 at 2–3.)

8    Additionally, the jury's verdict forms for the (F)(2) aggravating circumstance

9 did not include the language of the statute, which required a finding that a defendant

10 had been "previously convicted" of a felony involving violence on another person.

11 (ROA 947.) The forms merely stated that Lehr "has been convicted" of such a

12 felony—not that he had been "previously convicted" of such offenses at the time he

13 allegedly committed the first-degree murders.

14    In this case, then, both the (F)(1) and (F)(2) aggravating circumstances found

15 by the jury to make Lehr eligible for the death sentence and as aggravating evidence

16 in support of his two death sentences were unconstitutional. They retroactively

17 enhanced the punishment for the offenses of first-degree murder, for which Lehr

18 could not have received, and was not eligible to receive, a death sentence at the time

19 those offenses occurred in 1991 or 1992.

20    Under the ex post facto clause of Art. I § 10 of the United States Constitution,

21 and under the due process clause of the Fourteenth Amendment and its incorporated

22 ex post facto principles, it was unconstitutional for the jury to "aggravate" Lehr's

23 convictions for first-degree murder in this way. In 1991 and 1992, at the time Lehr

24 allegedly committed these first-degree murders, the facts required to prove the

25 existence of the (F)(1) and (F)(2) aggravating circumstances simply did not exist.

26 And Lehr was not on notice in 1991 and 1992 that any sentence for first degree

27 murder could be enhanced to a death sentence based on then non-existent

28 convictions. It was therefore unconstitutional to increase his potential penalty from

life imprisonment to a potential death sentence from life to death, and to use these same non-existent convictions as aggravating circumstances to be weighed by the jury in determining the appropriate sentence.

Because the alleged (F)(1) and (F)(2) "aggravating circumstances" simply did not exist in 1991/1992, because Lehr had not been "convicted" of any felony at that time, those circumstances could not constitutionally be applied to him in 2009 to enhance his sentence to death. Lehr's death sentences are therefore unconstitutional under clearly established federal law as established by Supreme Court precedent. *See*, *e.g.*, *Peugh v. United States*, 569 U.S. 530 (2013); *Carmell v. Texas*, 529 U.S. 513 (2000); *Miller v. Florida*, 482 U.S. 423 (1987); *Calder v. Bull*, 3 U.S. 386 (1798).

Lehr unconstitutionally suffered a punishment (death) and an increased punishment (from life to death) that was not available at the time of his alleged offenses in 1991 and 1992. The use of the (F)(1) and (F)(2) circumstances retroactively enhanced his punishment and allowed for consideration of evidence and proof that simply was not available and did not exist at the time of the alleged first-degree murders. His death sentences therefore were obtained in violation of the due process clause of the Fourteenth Amendment and Art. I § 10 of the Constitution.

Lehr's death sentences must therefore be vacated, given the invalidity and/or unconstitutionality of these (F)(1) and/or (F)(2) aggravating circumstances. *See Johnson v. Mississippi*, 486 U.S. 578 (1988).

## CLAIM FIVE

**Lehr's rights under the Sixth, Eighth, and Fourteenth Amendments by the absence of notice, and untimely amendment, of aggravating circumstances prior to the guilt phase of trial.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Lehr did not receive notice of the aggravating circumstances in this case prior

154

1  to the guilt phase at his second capital trial in 2009, to his great detriment. This was
2  an extraordinarily complex case, and Lehr simply was not afforded adequate notice
3  to prepare for the penalty phase of his trial. Failing to provide Lehr with an accurate
4  notice of the aggravating circumstances prior to the guilt phase was a clear
5  constitutional violation, and no fair-minded jurist could reach a conclusion to the
6  contrary. Habeas corpus relief is therefore warranted.

7  ### A.    Exhaustion

8  Lehr raised a challenge to the notice and amendment of the aggravating
9  factors in his case during direct appeal to the Arizona Supreme Court. (DA2 82 at
10  64–72.) The Arizona Supreme Court agreed that the State's conduct violated
11  Arizona statutory law and court rules, but found that the error was harmless. *Lehr*
12  *III*, 254 P.3d at 392, ¶ 66–70. The court further found that the error did not violate
13  the Sixth Amendment. *Id.* at 393, ¶ 70.

14  Lehr also raised a general challenge to the notice of aggravators, arguing that
15  he was not initially indicted of a capital crime, and was never given proper
16  subsequent notice of the aggravating circumstances charged against him. (DA2 82
17  at 81–82.) The Arizona Supreme Court summarily rejected Lehr's claim regarding
18  notice as being foreclosed under existing precedent, and did so without a reasoned
19  explanation. *Lehr III*, 254 P.3d at 395.[10]

20  ### B.    Procedural Background

21  Lehr was not provided sufficient notice of the aggravating circumstances in
22  his case prior to his guilt phase. The version of Ariz. R. Crim. P. 15.1 applicable to
23  Lehr's trial did not require the prosecution to disclose the aggravating circumstance
24  until after a conviction had already been returned at the guilt phase of trial. *See State*
25  *v. Anderson*, 111 P.3d 369, 389, ¶¶ 79–80, n.13 (Ariz. 2005). Furthermore, although

26
27  _____
28  [10] Lehr's appellate counsel acknowledged that this claim was foreclosed under state
   court precedent, but raised the claim to ensure that it was preserved for federal
   review. (*See* DA2 82 at 79–80.)

1    the State originally filed its notice of aggravating circumstances for Lehr's retrial
2    in 2003 (ROA 618), the State amended them following the guilt phase of Lehr's
3    second trial. (ROA 928, ROA 929; Tr. Mar. 27, 2009 at 40–41.) Accordingly, Lehr
4    did not receive an accurate notice of the aggravating circumstances that would be
5    alleged.

6    Prior to Lehr's retrial in 2009, on July 28, 2003, the State filed its notice of
7    aggravating factors in Lehr's case following remand from the Arizona Supreme
8    Court. In this notice, they alleged the (F)(2), (F)(6) and (F)(8) aggravating
9    circumstances as to each of the three alleged murder victims: Morales, Christorf,
10   and Cronin. (ROA 618.) Specifically, as to the (F)(2) aggravator,[11] the State asserted
11   that Lehr "was previously convicted of serious offenses, whether preparatory or
12   completed" and then listed each and every conviction upheld from Lehr's first two
13   trials. (ROA 618 at 1.) The State did not allege that any of these prior convictions
14   qualified as an (F)(1) aggravator. The (F)(6) and (F)(8) aggravators were withdrawn
15   prior to trial. *Lehr III*, 254 P.3d at 392, ¶ 63. Nothing else was filed by the State
16   prior to trial.

17   After completion of the guilt phase, Lehr filed objections to the aggravation
18   phase proceedings and State's proposed jury instructions that sought to amend the
19   State's 2003 notice by changing the previously alleged (F)(2) aggravators to (F)(1)
20   aggravators and/or to (F)(2) aggravators for offenses "involving the use or
21   threatened use of violence." (ROA 928 at 2.) The State asserted it was entitled to
22   amend the notice. (ROA 929.) After argument, the trial court overruled Lehr's
23   objections. Despite recognizing that its ruling was "fraught with potential error,"

24

25

26   [11] The (F)(2) aggravator was amended by the legislature in 1993 and significantly
     expanded to include prior convictions involving a "serious offense, whether
27   preparatory or completed." A.R.S. §§ 13-703(F)(2); 13-703(H) (1993). Prior to that
     time, and applicable to Lehr's case that involved crimes committed in 1991 and
28   1992, the (F)(2) aggravator applied to only prior convictions "involving the use or
     threat of violence on another person." A.R.S. § 13-703(F)(2) (1992).

1   the court permitted the State to amend its prior notice to allege for the first time the

2   State could alleged the (F)(1) aggravator: "I am going to allow you to proceed in

3   the aggravation phase on all of those (F)(1) convictions, which include three

4   murders as well as other offenses for which a penalty of life imprisonment or death

5   is imposable." (Tr. Mar. 27, 2009 at 40–41, 48.) The court also permitted the State

6   to amend its notice to allege Lehr's convictions for two counts of aggravated assault

7   against Hancock as the (F)(2) aggravator. The court's reasoning was that although

8   the amendment was late, Lehr failed to prove he was prejudiced. (ROA 946 at 3.)

9   The jury was so instructed and found them to be proven beyond a reasonable

10  doubt.[12] (Tr. Apr. 1, 2009 at 75–78, 92–93.)

11      **C.    Merits**

12          The process of notifying Lehr of the aggravators at issue in his case was

13  flawed in three interrelated ways: (1) Lehr was never actually indicated of capital

14  murder, in that the aggravating circumstances were never submitted to a grand jury,

15  and Lehr was not given notice at the time of his indictment of what the aggravators

16  would be; (2) Lehr was further not given notice of the aggravating circumstances

17  until far too late in the process, denying him the ability to meaningfully prepare a

18  defense; (3) the State's late amendment of the notice of aggravating circumstances

19  was far too late to comport with the requirements of due process and fair notice,

20  and did not even comply with Arizona state law. The State's failure to include the

21  aggravating circumstances within Lehr's indictment caused the indictment to be

22  constitutionally infirm in that it failed to give Lehr sufficient notice of the charges

23  he would have to prepare himself to meet. Further, the late amendment to the notice

24  of aggravators further deprived Lehr of his right to notice and an opportunity to

25  prepare a defense.

26

27

28  [12] The trial court also erred in accepting Lehr's invalid waiver stipulating to every 1996 and 1997 conviction, which were then used to prove the two aggravating circumstances. (Tr. Apr. 1, 2009 at 8-38.) (*See* Claims 13, 14.)

1    Furthermore, the manner in which the trial court handled the issue created a
2    Sixth Amendment violation separate and apart from the State's delayed notice of
3    the amendment. The trial court essentially found that even if the amendment
4    violated Lehr's rights, the violation was permissible because Lehr was supposedly
5    not prejudiced. (ROA 946 at 3–5.) That line of reasoning is completely indefensible.
6    Trial courts are supposed to follow the law—this is the entire point of having a
7    neutral judge presiding over a case. Whether a violation is prejudicial is an issue for
8    a reviewing court to decide. Trial courts have an obligation to protect the rights of
9    the accused, not disregard them on the ground that an admitted violation will do no
10   harm. The amendment violated Lehr's rights, and simply allowing the violation to
11   take place on the ground that it was purportedly harmless deprived Lehr of his right
12   to a fundamentally fair trial as guaranteed by the Sixth Amendment.

13   The Sixth Amendment of the United States Constitution, incorporated to the
14   states through the Fourteenth, provides that, "[i]n all criminal prosecutions, the
15   accused shall enjoy the right . . . to be informed of the nature and cause of the
16   accusation." U.S. Const. amend. VI. Accordingly, the United States Supreme Court
17   has held that in order to satisfy the notice component of the Sixth Amendment, an
18   indictment must "furnish the accused with such a description of the charge against
19   him as will enable him to make his defense." *See United States v. Cruikshank*, 92
20   U.S. 542, 558 (1875). The right to prepare a defense is similarly guaranteed by the
21   Sixth Amendment. *United States v. Wright*, 259 F. App'x 50, 53 (9th Cir. 2007).

22   As Lehr explained in his brief to the Arizona Supreme Court, the State's
23   wholly belated mid-trial amendment deprived him of his right to notice and an
24   adequate opportunity to prepare a defense. (DA2 82 at 67.)

25   The sufficiency of an indictment is measured by (1) whether it "contain[s]
26   the elements of the offense intended to be charged, and sufficiently apprises the
27   defendant of what he must be prepared to meet"; and (2) whether the record shows
28   "with accuracy to what extent he may plead a former acquittal or conviction."

1    *Russell v. United States*, 369 U.S. 749, 763–64 (1962).

2       Arizona's enumerated aggravating factors "operate as the functional

3 equivalent of an element" of the greater offense of capital murder. *Ring v. Arizona*,

4 536 U.S. 584, 609 (2002) (internal quotation marks omitted). Any fact serving to

5 increase the punishment for a crime must be treated as an element of the offense.

6 *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). This rule serves the important

7 purpose of ensuring that a State cannot circumvent the protections of the Sixth and

8 Fourteenth Amendments simply by "redefining the elements that constitute

9 different crimes by characterizing them as factors that bear solely on the extent of

10 punishment." *Apprendi*, 530 U.S. at 485 (internal quotation omitted).

11       In Arizona, the maximum sentence for first-degree murder at the time of

12 Lehr's trial was imprisonment for life. A.R.S. § 13-752. But, if the jury finds at least

13 one aggravating factor and determines that there are no mitigating circumstances

14 sufficiently substantial to warrant leniency, the defendant is eligible to receive a

15 punishment of death. A.R.S. §§ 13-752(C)–(D), (G). Thus, in Arizona, aggravating

16 factors "operate as 'the functional equivalent,'" of the greater offense of capital

17 murder, and are required to be included within the charging document in accordance

18 with the Sixth, Eighth, and Fourteenth Amendments. *See Ring*, 536 U.S. at 609; *see*

19 *also Cruikshank*, 92 U.S. at 558 (the Sixth Amendment requires an indictment to

20 include "every ingredient of which the offence is composed"); *see also Apprendi*,

21 530 U.S. at 476 (explaining that "any fact (other than prior conviction) that

22 increases the maximum penalty for a crime must be charged in an indictment").

23       While "[c]onvictions are no longer reversed because of minor and technical

24 deficiencies [in the charging papers] which did not prejudice the accused . . . the

25 substantial safeguards to those charged with serious crimes cannot be eradicated

26 under the guise of technical departures from the rules." *Russell*, 369 U.S. at 763.

27 Accordingly, the burden rests upon the State to prove that this failure to provide

28 sufficient notice was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 640

1   (1993).

2      Lehr was first indicted for three counts of first-degree murder, three counts

3   of attempted first-degree murder, two counts of aggravated assault, seven counts of

4   kidnapping, and 22 counts involving sexual assault. (ROA 1.) The indictment did

5   not refer to capital murder, aggravating circumstances, or otherwise reflect the

6   State's intention to seek a death sentence. (*See id.*)

7      To be included in the charging document, each and every element of the

8   alleged offense must have been subjected to a probable cause determination either

9   by a grand jury, in the case of an indictment, or by a judicial officer at a preliminary

10  hearing. Here, there were no aggravating circumstances alleged in the indictment;

11  thus, Lehr was not charged with a capital crime. Because the aggravating

12  circumstances alleged in Lehr's case were not subject to a probable cause

13  determination by a neutral arbiter, Lehr's death sentence violates the Fifth, Sixth,

14  Eighth, and Fourteenth Amendments of the Constitution. The violation of Lehr's

15  constitutional rights cannot be cured short of remanding to the grand jury for further

16  proceedings.

17     At his retrial, Lehr was given notice of the aggravating factors that might be

18  used against him in 2003. (*See* ROA 816.) But it was only after the State's late

19  amendment, immediately before the beginning of the aggravation phase, that Lehr

20  was finally "apprise[d] . . . of what he must be prepared to meet," *Russell*, 369 U.S.

21  at 763, to defend against a charge of capital murder based on the aggravators that

22  were ultimately proved during the subsequent phases of his trial. (*See* ROA 928,

23  ROA 929; Tr. Mar. 27, 2009 at 40–41.)

24     Because the indictment failed to provide Lehr with sufficient notice of the

25  charges against him, Lehr's sentence is constitutionally infirm, and he is entitled to

26  relief.

27

28

1

2

### D.   The Arizona Supreme Court's denial of this claim contravenes clearly established federal law.

3     This Court should conclude that Lehr's constitutional rights were violated.

4   The Arizona Supreme Court's denial of this claim was contrary to, or involved an

5   unreasonable application of, clearly established federal law, and was based on an

6   unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

7     This decision did not constitute an adjudication on the merits; accordingly,

8   the limitations on available relief, as prescribed by 28 U.S.C. § 2254(d), do not

9   apply to this Court's review of this claim. No deference is warranted because there

10   was no reasonable basis for the state court's rejection of Lehr's claim. *See*

11   *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Even so, should the Arizona

12   Supreme Court's rejection of the claim be construed as a decision on the merits,

13   then the court's denial of this claim was contrary to, or involved an unreasonable

14   application of, clearly established federal law, and was based on an unreasonable

15   determination of the facts. *See* 28 U.S.C. § 2254(d). In either case, § 2254(d)

16   presents no bar on relief.

17     The Arizona Supreme Court's determination that no Sixth Amendment

18   violation occurred is not entitled to deference under 28 U.S.C. § 2254(d), and as a

19   result AEDPA poses no bar to habeas corpus relief. In addition, Lehr also argued

20   on appeal that the amendment violated his rights under the Fifth, Eighth, and

21   Fourteenth Amendments. (DA2 82 at 64, 72.) The Arizona Supreme Court

22   nevertheless limited its analysis to whether a Sixth Amendment violation had

23   occurred. *Lehr III*, 254 P.3d at 393, ¶ 70. Although the state court is presumed to

24   have impliedly rejected Lehr's claims on the merits, the presumption can be

25   rebutted. *Johnson v. Williams*, 568 U.S. 289, 301 (2013). The presumption has been

26   rebutted in this case because it is evident from the Arizona Supreme Court's opinion

27   that these additional constitutional bases for relief were simply disregarded. *Lehr*

28   *III*, 254 P.3d at 393, ¶ 70.

Accordingly, review in this Court is de novo to the extent that Lehr's claim is based on the Fifth, Sixth, and Fourteenth Amendments because there was no merits determination in state court. *See Williams*, 568 U.S. at 302.

## CLAIM SIX

**Lehr was denied his rights under the Sixth and Fourteenth Amendments to the United States Constitution when the trial court improperly restricted Lehr's cross-examination of the DNA evidence against him.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Limits placed upon cross-examination of the State's DNA evidence at Lehr's trials in 1996 and 1997 violated his fundamental right to confront adverse witnesses under the Sixth and Fourteenth Amendments to the United States Constitution.

Lehr presented this claim in during his first direct appeal. (DA1 42 at 81.) The Arizona Supreme Court agreed on the merits that Lehr's rights had been violated, but engaged in faulty harmless-error analysis, leading it to reverse Lehr's convictions only as to some the charges against him, and to sustain his convictions related to victims Ross, Gabriel, and Thompson. *Lehr I,* 38 P.3d at 1179.

### A.    Merits

As described above, the State successfully foreclosed any defense inquiry into the DPS's DNA testing protocols during the 1996 and 1997 trials. The State argued these issues had been decided by the consolidated DNA hearing. (*See* Tr. Nov. 4, 1996 at 5–6, 13–14.) The defense objected and argued Lehr's right to confront the evidence against him, attack the credibility of the State's witnesses, and to assist the jury in determining what weight to give this testimony. (Tr. Nov. 4, 1996 at 19–20.)

At Lehr's first trial, during the testimony of every State DNA witness, the defense unsuccessfully sought to cross-examine the State's witnesses on issues with the DPS lab's DNA protocol. Lehr also attempted to present such evidence through

1    his own DNA expert, Dr. Aimee Bakken, but was prevented from doing so.

2         Specifically, the trial court ruled that the jury could not hear any testimony

3    regarding exceptions that DPS had made to the FBI protocol in developing its own

4    protocol, the creation and quality of DPS databases, including the validation and

5    precision studies that had been conducted by DPS to validate its testing procedures

6    and the accuracy of match windows. The stated basis for the court's rulings was

7    that exploring such issues by the defense would be confusing to the jury and a waste

8    of time, and therefore such evidence would be precluded pursuant to Rule 403,

9    Arizona Rules of Evidence. (*See* Tr. Nov. 4, 1996 at 19–20, 41, 78–81, 84–85; Tr.

10   November 5, 1996 at 18, 20; Tr. Nov. 7, 1996 at 60–65, 75–76; Tr. Nov. 13, 1996

11   at 51.)

12        The trial court's rulings on this issue deprived Lehr of the right to confront

13   critical scientific identification evidence against him and to present evidence in his

14   own defense. The relevance of this identification evidence was not "substantially

15   outweighed by the danger of unfair prejudice, confusion of the issues or misleading

16   the jury" and therefore the evidence should not have been excluded.

17        The right of confrontation, which includes the right to offer the testimony of,

18   and cross-examine, witnesses is a fundamental right. *Pointer v. Texas*, 380 U.S.

19   400, 403–04 (1965). The Confrontation Clause of the Sixth Amendment to the

20   United States Constitution extends to state prosecutions through the Due Process

21   clause of the Fourteenth Amendment, *id.* at 403, and guarantees a defendant the

22   right to confront the witnesses against him.

23        Confrontation Clause error will warrant habeas relief only if the error was

24   not harmless. The "inquiry is whether, assuming that the damaging potential of

25   the cross-examination were fully realized," the error was harmless. *Id*. As this is a

26   federal habeas proceeding, the error is harmless unless it had "substantial and

27   injurious effect or influence in determining the jury's verdict." *Brecht v.*

28   *Abrahamson*, 507 U.S. 619, 638 (1993) (quotation marks omitted). Relevant factors

to consider include the importance of the witness' testimony, whether the excluded testimony was cumulative, the presence of evidence corroborating or contradicting the testimony on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Fowler v. Sacramento County Sheriff's Dept*, 421 F.3d 1027, 1041–42 (9th Cir. 2005). The core inquiry is whether the admission of evidence without proper cross-examination affected the reliability of the fact-finding process. *Van Arsdall*, 475 U.S. at 684.

The error here was not harmless. The prosecutor, with the trial court's acquiescence, succeeded in blocking every effort by the defense to confront the State's DNA evidence and attack the credibility of the State's DNA witnesses during the 1996/1997 trials. The importance of the State's DNA testimony cannot be understated; it was presented as uncontested direct evidence of Lehr's guilt for the relevant offenses, and its burnishing effect on the State's case spilled over even to those charges that were not supported by DNA testing. As the prosecutor declared in his closing during the first trial, "it's when you get to the DNA that you know he's guilty . . ." (Tr. Nov. 20, 1996 at 72). The excluded testimony was not cumulative, as the trial court prevented *any* cross-examination or defense expert testimony on the DPS DNA testing problems. The concerns with DPS's DNA protocol could have been discussed by Dr. Bakken, but the trial court prevented such testimony as well.

True, as the Arizona Supreme Court found, charges as to three of the victims—Gabriel, Thompson, and Ross—were supported by other evidence, such as eyewitness identification or other circumstantial proof. But this evidence against Lehr as related to these victims was hardly airtight; in fact, the State's case against Lehr for those victims was speculative, unreliable, and unpersuasive. The linchpin for conviction required the uncontested DNA evidence.

Accordingly, Lehr is entitled to habeas relief regarding those convictions that

the Arizona Supreme Court did not remand for which DNA evidence supported: Gabriel, Thompson, and Ross Lehr is entitled to a trial at which he will be allowed to confront and present contrary evidence to this significant scientific evidence against him. What's more, he is entitled to a new sentencing hearing on his capital charges as well, as the convictions for Thompson and Ross were used in support of the aggravators to secure Lehr's death sentence. Given the centrality of the DNA evidence in Lehr's case and the impact these convictions had on the sentencing determination, "the error 'had [a] substantial and injurious effect or influence in determining the jury's verdict,'" *Brecht*, 507 U.S. at 623 (citation omitted). This Court should find the error was not harmless and that Lehr is entitled to relief.

**B.    The Arizona Supreme Court's decision is contrary to, and an unreasonable application of, clearly established federal law, and an unreasonable determination of the facts.**

First, the Arizona Supreme Court's decision that the confrontation clause violation was harmless as to the convictions related to Thompson, Gabriel, and Ross, in light of the overall strength of the State's case, and the relative importance of the DNA evidence, is contrary to clearly established federal law and an unreasonable determination of the facts. The Arizona Supreme Court's decision is the last reasoned opinion addressing Lehr's constitutional claim, so this court looks to that opinion on habeas review. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). In order to conclude that the Arizona Supreme Court unreasonably applied clearly established Supreme Court precedent, the court must find that the Arizona Supreme Court's decision was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 410 (2000).

In *Washington v. Texas*, the Supreme Court held:

The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the true lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This

165

1   right is a fundamental element of due process of law.

2   388 U.S. 14, 19 (1967). The Supreme Court has further held that the "main and

3   essential purpose" of the confrontation clause is to give the accused an opportunity

4   to cross-examine the witnesses against him. *Davis v. Alaska*, 415 U.S. 308, 315–16

5   (1974). In particular, the right to cross-examination often is implicated in the

6   context of an accused's attempt to test the credibility of an adversary witness. *Van*

7   *Arsdall*, 475 U.S. at 678–79. At the most fundamental level, the right to

8   confrontation through cross-examination allows the accused to test the believability

9   of a witness and the truth of his testimony. *Davis*, 415 U.S. at 316; *Crawford v.*

10  *Washington*, 541 U.S. 36, 61 (2004) (explaining the confrontation clause is intended

11  to allow the reliability of testimony to be assessed "by testing in the crucible of

12  cross-examination").

13      In *Van Arsdall*, 475 U.S. at 678, the Supreme Court explained that "[t]he

14  Confrontation Clause of the Sixth Amendment guarantees the right of an accused

15  in a criminal prosecution 'to be confronted with the witnesses against him . . . *to*

16  *secure for the opponent the opportunity of cross-examination.*" (*citing Davis v.*

17  *Alaska*, 415 U.S. 308, 315–316 (1974) (internal quotations and citations omitted)).

18  In that case, the defendant was barred from impeaching a prosecution witness

19  through questioning about the dismissal of an unrelated criminal charge in exchange

20  for the witness's agreement to testify. *Id*. at 676. Outside of the jury's presence, the

21  witness admitted to the agreement but denied that it affected his testimony. *Id*. The

22  Court in *Van Arsdall* recognized that the trial court unquestionably erred in

23  preventing the defendant from cross-examining the witness on this point, but it did

24  not reverse—the Court remanded because the lower court had not addressed the

25  harmlessness of the error. *Id*. at 684. The testimony at issue was purely cumulative,

26  marginally relevant, and questionably reliable given the witness's extreme state of

27  intoxication during the events at issue and the rest of the prosecution's case was

28  strong. *Id*. at 675–76.

There is no doubt that the constitutional violation occurred in Lehr's case, as the Arizona Supreme Court acknowledged. *Lehr I*, 38 P.3d at 1180–81 ("[Lehr] also argues that his Sixth Amendment rights were violated because the judge's ruling precluded him from presenting expert testimony regarding the protocol, validation studies, and match window. We agree."). But the court unreasonably applied these principles to conclude that it need only reverse *some* of the charges supported by the tainted, limited cross-examination.

Second, in *Lehr I*, the Arizona Supreme Court affirmed Lehr's convictions and sentences for the counts related to seven victims, but reversed his convictions concerning Morales, Christorf, and Collins because the trial court improperly restricted Lehr's cross-examination of the State's DNA expert. 38 P.3d at 1181–83. The state court undertook a harmless error analysis and determined that: "For all but three of the victims, there was credible eyewitness identification, physical evidence apart from DNA, or other corroborating facts clearly implicating [Lehr]. The error in precluding evidence from the *Frye* hearing was harmless as to them and we need not disturb the verdicts." *Id*. at 1181.

In rendering this decision, the Arizona Supreme Court decision impermissibly ignored the significant role that DNA evidence played in securing the convictions as to victims Ross, Gabriel, and Thompson, as such, the violation of Lehr's right to confront this DNA evidence could not be considered harmless. The state court's denial of this claim thus was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

The Arizona Supreme Court correctly found the "the restrictions in this case . . . breached the defendant's right to confront adverse witnesses" and that "the trial court abused its discretion when it found that the probative value of this evidence was outweighed by the risk of juror confusion." *Lehr I*, 38 P.3d at 1181.

The court erred, however, in its application of the harmless error doctrine. It

limited its analysis simply to determining "whether there was other substantial evidence supporting the convictions." *Id.* By doing so, the Arizona Supreme Court's decision contravened clearly established federal law. The United States Supreme Court has clarified that whether an error is harmless in a particular case "*depends upon a host of factors*, all readily accessible to reviewing courts." *Van Arsdall*, 475 U.S. at 684 (emphasis added). Rather than consider a "host of factors," the Arizona Supreme Court improperly limited its analysis to only one. It ignored such facts as "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted." *See id.* The failure of the Arizona Supreme Court to consider any of these factors, and instead to restrict its harmless-error review to just one factor—"other substantial evidence supporting the convictions"—runs directly contrary to clearly established federal law, and further reflects an unreasonable determination of the facts.

Additionally, when the Arizona Supreme Court *did* consider that one factor (other evidence supporting the convictions), the court unreasonably applied federal law to the facts to find the error harmless, and no reasonable jurist would conclude otherwise. *See Williams*, 529 U.S. at 413. Contrary to findings of the Arizona Supreme Court, the DNA evidence was a significant part of the evidence against Lehr in more than six of the ten cases. In particular, it was also a significant part of the evidence in the cases of Ross, Gabriel, and Thompson. The Arizona Supreme Court's decision therefore reflects an unreasonable determination of the facts under § 2254(d)(2).

The DNA evidence related to these three victims was fundamental to the investigation and prosecution of Lehr. Samples in connection with the Ross case were first analyzed on April 1, 1992. The laboratory received a known blood stain from Ross, two vaginal swabs, and a stain made from a vaginal aspirate. The

1    laboratory also received a piece of pink fabric stained with blood. At the time the

2    Ross DNA evidence was created, there were no known suspects to compare any

3    DNA profiles to. (Tr. Nov. 5, 1996 at 25, 33–35.) But roughly two months later, a

4    DPS analyst obtained a known blood sample from Lehr and was asked to compare

5    it to the male fractions in the Ross case. (Tr. Nov. 5, 1996 at 65–66.) He found

6    matches between the known blood sample of Lehr and the male fractions of the

7    vaginal swab and vaginal aspirate at five probes. (Tr. Nov. 5, 1996 at 69, 71–72,

8    74–75; Tr. Nov. 6, 1996 at 6–8, 10–12, 19–21.) The same analyst would also

9    analyze the Gabriel case. In that case, he found a match between the known blood

10   standard of Lehr and the male fractions of the two vaginal vault swabs at five

11   probes. (Tr. Nov. 6, 1996 at 23, 26–29, 31–32, 34–38, 40–41.) And in the third case,

12   of Thompson, a criminalist at the DPS Crime Lab conducted analysis on evidence

13   recovered from her crimes. (Tr. Nov. 13, 1996 at 28, 34–37.) The known blood

14   sample from Lehr matched the male fraction of the DNA from the vaginal swab at

15   four probes, the last probe being inconclusive. (Tr. Nov. 13, 1996 at 5, 9–14.) Using

16   the same method as others to calculate the randomness or commonness of

17   occurrence of this particular profile at four probes, the analyst testified that the

18   frequency of the occurrence would be one in 800,000. (Tr. Nov. 13, 1996 at 16–

19   17.)

20        At Lehr's first trial, the prosecutor emphasized the DNA evidence in his

21   closing, the Arizona Supreme Court even referenced parts of the closing: "It's when

22   you get to the DNA you know he's guilty of the murders, because of the DNA found

23   in [Christorf], with the bashed-in head, because of the DNA in [Ross], with the

24   bashed head." (*See Lehr I,* 38 P.3d at 1181; Tr. Nov. 20, 1996 at 72.)

25        The DNA evidence was critical in all of the cases here, and the prosecutor

26   knew it. He emphasized this fact again as he finished his closing to the jury:

27        The evidence is here. The evidence was gathered in laboratories. The
         evidence is still there, in those membranes, and in those sexual assault
28        slides and we brought you photographs of those sexual assault kits. It's

169

1
2
3
4
5

here. It's there. It's here and it's reliable. There is only one conclusion. Only one. Every one of the arrows, every one of the fingers of the evidence, every one of these had a finger on them, every piece, every rock, every DNA autoradiograph, pointing right over there, don't need much of a road map for that, overwhelming. Overwhelmingly identification time and time again, personal from the victims and physically from the evidence.

6   (Tr. Nov. 20, 1996 at 80.)

7        The prosecutor, believing this evidence was important, raised the DNA

8   evidence as to Ross and Thompson again in his opening during the 2009 trial. (Tr.

9   Jan. 27, 2009 at 75 ("On the other acts you are going to hear about the DNA, Ross,

10  Thompson, and the comparable results there. Okay? The Defendant was not

11  excluded by those but then there was some rarity also involved in the numbers

12  applied to the population.").)

13       At the same time, the so-called "other substantial evidence supporting the

14  convictions" was hardly substantial or reliable. The eyewitness identifications are

15  far from overwhelming. (*See* Claim 3(B) and 10 (presenting evidence showing

16  identifications to be unduly suggestion and unreliable).) To the contrary, the

17  identifications—in particular as to these three cases—are problematic. Police

18  showed Ross three photographic arrays, two of which contained photographs of

19  Lehr. When viewing one of the arrays containing Lehr's photograph, Ross made a

20  tentative identification stating "it sort of looks like Number 3, but not really. His

21  hair and beard look correct, *but I'm not positive it's him.*" Ross did not identify Lehr

22  in the second photograph array containing his picture and did not make an

23  identification in the third array. (*See* Tr. Dec. 15, 1994 at 5, 8–15, 20, 23 (emphasis

24  added)). Just two days later, police had Ross participate in a live line-up and she

25  made a positive identification of Lehr. At this point, Ross had already been shown

26  Lehr's photograph in two photograph arrays, just two days prior to the live lineup.

27  The Arizona Supreme Court even agreed this constituted an unduly suggestive

28  identification procedure. *Lehr I*, 38 P.3d at 1183. Thompson participated in the live

1   line-up—eight months after the sexual assault—and made an identification of Lehr.

2   (Tr. Feb. 11, 2009 at 77.) However, the reliability of Thompson's identification is

3   called into question due to her age as a juvenile and previously completing a

4   composite sketch—two factors that negatively impact the ability to render a reliable

5   identification. And finally, Gabriel made a tentative identification during the live

6   line-up when she said during her identification procedure, "it looks like No. 3," but

7   "[s]he seemed somewhat hesitant to positively say it was No. 3." (Tr. Dec. 14, 1994

8   at 61–62.) As described in detail in Claim 3(B) and Claim 10, none of these

9   eyewitness identifications are reliable and certainly not strong enough to hold these

10  convictions alone absent the DNA evidence.

11      Moreover, the Arizona Supreme Court's reliance on "other corroborating

12  facts" or circumstantial evidence pale in comparison to the strength of the State's

13  uncontested DNA evidence that was presented to secure the convictions for Gabriel,

14  Thompson, and Ross Indeed, the prosecutor repeatedly emphasized the DNA

15  evidence as to these cases in his closing. (*See e.g.*, Tr. Nov. 20, 1996 at 72, 80.)

16      The Arizona Supreme Court's decision finding harmless error for the

17  violation of Lehr's confrontation rights as to three of the alleged victims is in error.

18  The court's conclusion is contrary to clearly established federal law, and reflects an

19  unreasonable determination of the facts. Lehr is therefore entitled to issuance of the

20  writ.

21                                  **CLAIM SEVEN**

22  **The introduction of unreliable scientific evidence rendered Lehr's
    trial fundamentally unfair in violation of his rights under the**

23  **Fourteenth Amendment.**

24      Lehr incorporates by specific reference all facts, allegations, and arguments

25  made elsewhere in this Petition.

26      The introduction of questionable, erroneous, and unreliable DNA testing, in

27  Lehr's 1996 and 1997 trials as well as in his 2009 trial, rendered his trials

28  fundamental unfair and deprived him of his due process rights under the Fifth and

1    Fourteenth Amendments. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991);

2    *Gimenez v. Ochoa*, 831 F.3d 1136, 1143–45 (9th Cir. 2016). Lehr raised this claim

3    in his post-conviction proceedings. (*See* PCR Pet. at 53–54; PCR Pet.'s Mot. to Am.

4    at 2.) Lehr also raised an accompanying ineffective assistance of trial counsel claim,

5    which the post-conviction court found "undeveloped." (PCR Order at 41.)

6        The state court considered Lehr's claim that he was convicted based on false

7    and erroneous DNA evidence and denied the claim on the merits. (PCR Order at

8    42.) Lehr filed a Petition for Review to the Arizona Supreme Court, which was

9    subsequently denied without comment in a one-page order. (PFR 29 at 1.)

10       The state court's rejection of these claims was contrary to, or involved an

11   unreasonable application of, clearly established federal law, as determined by the

12   Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

13   unreasonable determination of the facts in light of the evidence presented. *See id*.

14   § 2254(d)(2). Moreover, the post-conviction court's ruling does not limit this

15   Court's review because it resolved material factual disputes without holding a

16   hearing. *See Taylor*, 366 F.3d at 1000–01 (holding that a state court's factual

17   determinations are unreasonable when it makes evidentiary findings without

18   holding a hearing).

19       **A.    Merits**

20       At Lehr's trials, the State presented evidence through the testimony of

21   multiple forensic scientists in regard to both RFLP and STR DNA results. Because

22   this testimony was scientifically unreliable, it should have been excluded. The

23   admission of this evidence rendered Lehr's trials fundamentally unfair, and thus

24   violated his due process rights. *See McGuire*, 502 U.S. at 67–68; *Gimenez v. Ochoa*,

25   831 F.3d 1136, 1143–45 (9th Cir. 2016) ("We join the Third Circuit in recognizing

26   that habeas petitioners can allege a constitutional violation from the introduction of

27   flawed expert testimony at trial if they show that the introduction of this evidence

28   'undermined the fundamental fairness of the entire trial.'" (citation omitted)); *Han*

1   *Tak Lee v. Glunt*, 667 F.3d 397, 404–04 (3d Cir. 2012). The Constitution "imposes

2   a special obligation upon a trial judge to ensure that any and all scientific testimony

3   . . . is not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

4   at 147 (alteration in original) (internal quotations omitted); *cf. United States v.*

5   *Martinez*, 3 F.3d 1191, 1197–98 (8th Cir. 1993) ("In order to determine whether

6   scientific evidence is reliable, the court must conclude that the testimony was

7   derived from the application of a reliable methodology or principle in the particular

8   case."). As such, the erroneous admission of flawed and reliable expert testimony

9   can render a trial fundamentally fair, and habeas relief is appropriate.

10       All three trials implicate the DNA evidence in this case. In his 1996 trial, the

11   State presented alleged DNA "matches" with Lehr for victims Collins, Christorf,

12   Ross, and Morales. In the 1997 trial, both Thompson and Gabriel's sexual assault

13   cases involved DNA evidence. But the DNA evidence from the 1996 and 1997 trials

14   presented serious problems with its reliability and DPS's ability to accurately and

15   reliably conduct this—at the time—primitive testing. As Lehr's 1996 and 1997 trial

16   counsel explains: "We found proof that DPS personnel had falsified records in the

17   DPS's initial protocol database. This database was used to show whether DPS could

18   accurately and reliably perform DNA analysis. Our discovery completely

19   invalidated any claim by DPS that their work was scientifically validated." (PCR

20   Pet.'s Mot. to Am. Ex. A, Decl. of Reeves at 1, Apr. 20, 2016.) And, in addition to

21   the discovery found by Reeves and Lehr's defense team in the 1990s, post-

22   conviction counsel uncovered PPD Crime Lab and DNA reports setting out audits

23   for the Arizona DPS Central Regional Crime Lab (CRCL). The audits show the

24   continuing problems with the DPS lab. (PCR Pet.'s Mot. to Am. Ex. B, Internal

25   Audit of DNA Protocols.) Lehr's juries in 1996, 1997, and 2009 never heard any of

26   this. The report was authored and created by post-conviction counsel's investigator,

27   James Williams, "based on his exhaustive reviews of audits disclosed under the

28   Freedom of Information Act (FOIA)." (PCR Pet.'s Mot. to Am. at 4.)

In addition to the evidence of falsified DPS records in general, defense counsel Reeves found severe errors in the DNA analysis of samples unique to Lehr's case. As such, the DNA findings in the non-capital cases of Collins, Thompson, and Ross, and in the capital case of Christorf are unreliable and may be falsified. (*See* PCR Pet.'s Mot. to Am. Ex. A, Decl. of Reeves, at 3–5, Apr. 20, 2016.) Any issues as to the original RFLP testing are still relevant even with retesting from the Collins (non-capital), Morales (capital) and Christorf (capital) cases. The retesting of Collins, Morales, and Christorf in particular are problematic because the prior testing likely tainted the updated testing, and a representative from the defense was never consulted or present when such retesting was completed by the State. (*See* Claim 8.)

Even more, the convictions of Thompson and Ross were based on the same unreliable 1990's DNA evidence and were used as aggravating factors to make Lehr eligible for the death penalty in 2009. This evidence was put before the jury and weighed by those men and women when deciding whether to vote for life or death. Those two convictions involved almost exclusively the unreliable RFLP DNA evidence in the first trials in 1996 and 1997. Yet, despite the fact that the Arizona Supreme Court reversed all other cases involving DNA evidence, it allowed these two convictions to stand. This was unconstitutional error. Just as with the reversed cases, the same error occurred with these two convictions when the trial court, in 1996 and 1997, prevented cross-examination concerning the DPS protocol. The same cross-examination "would have provided information with which the jury could weigh testimony concerning the DNA results." *Lehr I*, 38 P.3d at 1181. And, "[b]ecause the restrictions in this case crossed the line from reasonable to excessive, they breached defendant's right to confront adverse witnesses." *Id*. The reliance on Thompson and Ross's offenses as Rule 404 evidence, and the use of Thompson and Ross's convictions in support of the (F)(1) and (F)(2) aggravating circumstance— supported by the impermissible DNA evidence introduced at the first trial—

174

rendered Lehr's 2009 capital trial fundamentally unfair.

During Lehr's 2009 trial, counsel should have been able to present contrary evidence regarding the RFLP and STR reliability as well as cross-examine the various forensic scientists on this issue. The 2009 jury not only considered these offenses—supported by unreliable and questionable RFLP DNA evidence—under Rule 404, but also used the convictions in support of the aggravators to qualify Lehr for the death penalty. The Arizona Supreme Court reversed the three cases in *Lehr I* because the "DNA analysis was a significant part of the evidence in six of the ten cases, including two of the three homicides." *Id*. The findings of the Arizona Supreme Court that the DNA evidence presented in Lehr's 1996 and 1997 trials was fundamentally flawed is still applicable to the offenses of Thompson and Ross, which also relied on the erroneous DNA analysis, and directly impacted his 2009 retrial.

Thus, because there is evidence the initial RFLP testing was falsified and/or erroneous, no subsequent retesting would cure that. It rendered Lehr's trial fundamentally flawed and unconstitutional for the jury's verdict and sentences to be premised on the problematic initial DPS lab protocol originating in the 1990s. Evidence exists to show that the unreliable RFLP results were erroneous and false, which were not retested by the State and contributed to improperly found convictions in the Gabriel, Thompson, and Ross cases. It is a violation of fundamental fairness to use the unreliable Thompson and Ross non-capital offenses as Rule 404 evidence and the convictions from those cases in support of the aggravators used to impose the death penalty. Lehr's trial was filled with unreliable scientific testimony. The admission of this unreliable evidence violated Lehr's due process rights, and he is entitled to habeas relief.

**B.     The post-conviction court's ruling was contrary to clearly established federal law and an unreasonable determination of the facts.**

Post-conviction counsel presented a claim that the DNA evidence in Lehr's

case is erroneous and tainted and the introduction of such evidence rendered Lehr's trial fundamentally unfair. (*See* PCR Pet. at 53–54; PCR Pet.'s Mot. to Am. at 2.) As the Arizona Supreme Court explained in *Lehr I*, Lehr's trial was rendered fundamentally unfair because "Cross-examination concerning the DPS protocol would have provided information with which the jury could weigh testimony concerning the DNA results. Because the restrictions in this case crossed the line from reasonable to excessive, they breached the defendant's right to confront adverse witnesses." *Lehr I*, 38 P.3d at 1181.

The post-conviction court, however, rejected the claim on the merits. (PCR Order at 42–43.) The court denied the claim that Lehr was convicted based on false and erroneous DNA evidence for three reasons: (1) it found the claim precluded because Lehr did not raise it on direct appeal; (2) even if not precluded, it found the presented evidence did not constitute newly-discovered evidence as the existence of the DNA and the testing results were known to Lehr and used during both trial proceedings; and (3) even if Lehr had raised the issue on appeal, it would have failed because, the Court said, counsel did not produce evidence the State's DNA evidence was invalid, false or erroneous—the claim was based on nothing more than speculation and conjecture. (PCR Order at 42.)

As a threshold issue, the post-conviction court's ruling does not limit this Court's review because it resolved material factual disputes without holding a hearing. *See Hurles v. Ryan*, 650 F.3d 1301, 1312 (9th Cir. 2011) ("We have repeatedly held that where a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding process itself is deficient' and not entitled to deference [under AEDPA]."); *Taylor*, 366 F.3d at 1001 ("[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the

1  resulting factual finding unreasonable."); *Williams v. Woodford*, 859 F. Supp. 2d
2  1156 ("Under this circuit's precedent, '[i]f a state court makes evidentiary findings
3  without holding a hearing and giving a petitioner an opportunity to present
4  evidence, such findings clearly result in an 'unreasonable determination' of the
5  facts.'").

6      Here, disputed factual issues include, but are not limited to: the uncovered
7  PPD Crime Lab and DNA reports setting out audits for the Arizona DPS Central
8  Regional Crime Lab (CRCL) showing continuing problems with the DPS lab. (Mot.
9  to Am. PCR Pet. Ex. B, Internal Audit of DNA Protocols) and when this evidence
10 could have been found; the extent that the DNA evidence from the 1990s provided
11 the direct support for the convictions of Gabriel, Thompson, and Ross considering
12 the unreliability of their identifications (*see* Claim 3(B), Claim 10); and the possible
13 contamination of any retesting completed in the cases of Collins, Morales, and
14 Christorf as a result of the erroneous protocols and procedures that ran rampant at
15 DPS during the 1990s. Rather than grant an evidentiary hearing, the post-conviction
16 court substituted its own, unsupported, factual findings. To the extent that post-
17 conviction failed to introduce relevant factual evidence into the record, Lehr will
18 demonstrate through his filings and at an evidentiary hearing that post-conviction
19 counsel fell below the standards of minimally competent capital attorneys and that
20 those failures prejudiced him. Alternatively, he alleges that any procedural bar is
21 not adequate or independent or that imposing default would be a miscarriage of
22 justice. To the extent any issues have not been adjudicated by the Arizona state
23 courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this
24 Court's review, and the Court may consider the merits of that claim de novo.

25     Additionally, the state court's rejection of Lehr's due process claim regarding
26 the introduction of erroneous DNA evidence was contrary to, or involved an
27 unreasonable application of, clearly established federal law. *See* 28 U.S.C. §
28 2254(d)(1). "Clearly established federal law means the governing legal principle or

1   principles set forth by the Supreme Court at the time the state court renders its
2   decision." *Xiong v. Felker*, 681 F.3d 1067, 1073 (9th Cir. 2012) (citation omitted).
3   "Circuit court precedent may be persuasive in determining what law is clearly
4   established and whether a state court applied that law unreasonably." *Stanley v.*
5   *Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citation omitted.)

6       Federal law clearly established Lehr's due process right to have accurate and
7   reliable scientific evidence introduced at his trial. Denial of due process in a
8   criminal trial "is the failure to observe that fundamental fairness essential to the
9   very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236 (1941). Due
10  process is denied when "the absence of that fairness fatally infected the trial; the
11  acts complained of must be of such quality as necessarily prevents a fair trial." *Id.*
12  The admission of highly prejudicial, erroneous, and inaccurate DNA evidence,
13  deprived Lehr of this fundamental guarantee. The post-conviction court's opinion
14  is devoid of any mention of the body of federal case law that determines whether
15  there has been a due process violation. The court did not merely unreasonably apply
16  clearly established federal law; it wholesale ignored it. *See, e.g., Milke v. Ryan*, 711
17  F.3d 998, 1006–07 (9th Cir. 2013) (a state court acts contrary to clearly established
18  federal law when it asks the wrong questions and ignores the inquiry required by
19  Supreme Court precedent.).

20      Accordingly, the post-conviction court's decision was based on an
21  unreasonable determination of facts in light of the evidence presented. Further, this
22  determination contravened clearly established law. *See Kumho Tire Co.*, 526 U.S.
23  137. Because Lehr has demonstrated that his claims are not precluded by the
24  limitations on relief in § 2254(d), this Court considers the claim *de novo*. *See Panetti*
25  *v. Quarterman*, 551 U.S. 930, 953 (2007); *Frantz v. Hazey*, 533 F.3d 724, 735–36
26  (9th Cir. 2008) (§ 2254(d) limits the authority granted in § 2241 for granting relief;
27  however, once a petitioner is able to show that his claims are not precluded by §
28  2254(d), then this Court is permitted to consider the presented constitutional claim

1 | *de novo*).

## CLAIM EIGHT

**Lehr was deprived of his right to due process under the Fourteenth Amendment when the state consumed any remaining sample in DNA testing without giving him prior notice and an opportunity to arrange for independent testing.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Lehr was deprived of his right to due process under the Fourteenth Amendment when the state conducted new DNA testing of evidence in Morales's case, without giving him prior notice and an opportunity to arrange for independent testing; and then consumed the remaining sample, thereby preventing any future testing by Lehr. Here, the State acted in bad faith and the trial court erred by admitting the DNA evidence in Morales's case. *See Youngblood v. Arizona,* 488 U.S. 51, 57 (1988). The admission prejudiced Lehr because absent the new DNA testing, there was insufficient evidence to uphold Lehr's convictions for Morales, as acknowledged by the Arizona Supreme Court. *See Lehr I,* 38 P.3d at 1182–83.

### A.    Exhaustion

Lehr presented this claim during his second direct appeal. (DA2 82 at 52.) The Arizona Supreme Court denied this claim on its merits. *Lehr III*, 254 P.3d at 388. The court's denial was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). The state court's denial was also based upon unreasonable factual determinations in light of the record before it. *See id*. § 2254(d)(2).

### B.    Factual Background

When law enforcement was called to the scene of Morales's body, she was found face down, underneath a bush, and partly nude. (Tr. Oct. 15, 1996 at 89.) She was wearing a green top that had been pushed up over her breasts and no other clothing. Her scalp had been torn and the bone of the skull was visible. (Tr. Oct. 15,

1    1996 at 118–119.)

2        Dr. Phillip Keen, Chief Medical Examiner of Maricopa County, examined

3    her body. (Tr. Oct. 16, 1996 at 120; Tr. Oct. 21, 1996 at 72.) The body was partly

4    clothed and exhibited signs suggestive of sexual assault. (Tr. Oct. 21, 1996 at 67,

5    70–71.) The body had advanced decomposition of the head and neck where it had

6    been invaded by maggots. (Tr. Oct. 21, 1996 at 73.) The doctor's significant

7    findings were those of injuries to the head and scalp, a skull fracture and evidence

8    of bruising consistent with a sexual assault which included bruising of the vaginal

9    wall and labia. (Tr. Oct. 21, 1996 at 77; Tr. Feb. 24, 2009 at 126–29, 134, 143–44.)

10   Dr. Keen testified that the time of death was anywhere from nine or ten days to

11   three to four weeks earlier. (Tr. Oct. 21, 1996 at 97.) Keen took a blood sample,

12   anal and vaginal swab but did not show that he conducted an "oral swab." (Tr. Feb.

13   24, 2009 at 152–55, 183–84.)

14       Mahesh Patel, a Forensic Scientist with the Phoenix Police, initially

15   conducted serology and semen analysis of the samples taken from Morales (Tr. Feb.

16   24, 2009 at 195–200.) Patel testified that the "vaginal and oral" swabs were negative

17   for semen and the anal swab was positive for semen. Patel could not conduct a blood

18   typing on the latter sample but opined that the PGM was 1+, 1+.[13] This was

19   consistent with Morales. He returned all samples to evidence impound upon

20   completion. (Tr. Mar. 2, 2009 at 127–30, 134.) The anal and vaginal samples were

21   resubmitted for DNA analysis on July 23, 1993. (Tr. Mar. 2, 2009 at 134.)

22       David Duplissa testified that Morales's anal and vaginal swabs had a foul

23   odor he associated with a decomposing body and/or sample degradation that created

24   problems for conducting DNA analysis using the rudimentary RFLP technology of

25   the time. He ultimately concluded that the results of DNA testing the swabs and

26   _____

27   [13] PGM stands for phosphoglucomutase, an enzyme found on the surface of some
     types of cells (like red blood cells or sperm cells). It is a protein with two variants
28   (i.e. 1+, 1- or, as another example, 2+, 1-). A person is thus a combination of those
     two variants. PGM-typing is generally no longer used.

1   comparing the results to Lehr were "inconclusive." (Tr. Mar. 3, 2009 at 96–105; Tr.

2   Mar. 4, 2009 at 88, 103.) Duplissa testified that he consumed the entire samples in

3   conducting this testing, but saved the swab "sticks" from which he had removed the

4   cotton swabs. (Tr. Mar. 3, 2009 at 122; Tr. Mar. 4, 2009 at 71–73.)

5       Years later, in 2002, Roger Schneider, a forensic scientist with the Phoenix

6   Police Department, received the "sticks" from the vaginal and anal swabs with an

7   order from the prosecution to conduct DNA analysis using STR technology. His

8   testing consumed the sample itself, but the "extract," or material he extracted during

9   the testing, was maintained for possible testing. (Tr. Mar. 17, 2009 at 36–47, 63,

10   68–69, 122–23.)

11       **C.    *Merits***

12       To safeguard a defendant's due process right to present a complete defense,

13   the Supreme Court has developed "what might loosely be called the area of

14   constitutionally guaranteed access to evidence." *California v. Trombetta,* 467 U.S.

15   479, 485 (1984). Whether a due process violation occurs depends in part upon the

16   nature of the evidence at issue. Where the government suppresses or fails to disclose

17   material exculpatory evidence, the good or bad faith of the prosecution is irrelevant.

18   In either instance due process is violated. *See Brady v. Maryland,* 373 U.S. 83

19   (1963); *United States v. Augurs,* 427 U.S. 97 (1976).

20       When material exculpatory evidence is not preserved and its evidentiary

21   value "was apparent before the evidence was destroyed," and the evidence is "of

22   such nature that the defendant would be unable to obtain comparable evidence by

23   other available means," the government has violated due process irrespective of

24   whether it acted in bad faith. *Trombetta,* 467 U.S. at 488–89.

25       Finally, when the government fails to preserve evidence that is "potentially

26   exculpatory," the due process clause "requires a different result": as the Supreme

27   Court explained, "when we deal with the failure of the State to preserve evidentiary

28   material of which *no more can be said than that it could have been subjected to*

*tests, the results of which might have exonerated the defendant.*" *Youngblood v. Arizona,* 488 U.S. 51, 57 (1988) (emphasis added.) In such situations the failure to preserve such "potentially useful evidence" does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58.

*Youngblood* narrowly held that when the exculpatory value of lost evidence is uncertain, the defendant must show that the police acted in bad faith when they disposed of the evidence before due process mandates some form of remedy such as dismissal of the case. Thus, *Youngblood* does not require consideration of whether a defendant has comparable alternatives, such as trusting the state laboratory's DNA protocol in extracting the samples, as the trial court held here, and then testing the DNA extracts. In *Youngblood* the Court found no evidence in the record of bad faith, and so it went no further in its analysis. Lower courts have applied various formulations after *Youngblood* as to when, if ever, in the absence of bad faith, a defendant is entitled to dismissal for failure to preserve evidence.

Before trial, Lehr moved to preclude the DNA evidence from the 2002 tests. (Tr. Jan. 1, 2009 at 48.) After a hearing, the trial court found no evidence of bad faith on the State's part and no evidence that retesting would have exonerated Lehr or had a tendency to exonerate him. The court denied Lehr's motion, but permitted him to "attack the manner in which the test was conducted and argue to the jury that consumption of the initial sample deprived [Lehr] of the ability to test the original sample." *Lehr III*, 254 P.3d at 389. The trial court also noted that Lehr was "welcome to retest the extraction." (*Id.* at 388.) In denying Lehr's motion for reconsideration, the court further noted that he had "not challenged the test performed, or sought expert testimony concerning the extraction procedure or test results, nor requested to have the extraction re-tested." (*Id.*) The court found that "no showing can be made that any re-testing was likely to exonerate [Lehr] or produce different results" and therefore Lehr was not prejudiced. *Id.*

Lehr demonstrated bad faith[14] on the part of the State. Bad faith necessarily turns on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. *See Youngblood*, 488 U.S. at n.56. After the opinion from the state court reversing Lehr's conviction on the Morales charges was filed on January 30, 2002, *see Lehr I*, 38 P.3d at 1172, the prosecutor sought to retest evidence. The prosecutor's opinion "[was] that the defense has never asked to participate in testing previously, analyze & consume the remaining samples." (ROA 813 at 5.) The prosecutor in this case, now retired, was a seasoned death penalty litigator and had to have known that Lehr was represented by counsel when on March 7, 2002 he ordered Schneider to consume the sample without either contacting counsel or advising him to follow lab policy to arrange with the defense for testing with an independent DNA laboratory. (Tr. Mar. 17, 2009 at 43.) A prosecutor's level of experience is also relevant to the consideration of whether the prosecutor committed misconduct. *See Le v. Mullin*, 311 F.3d 1002, 1029 (10th Cir. 2002) (Henry, J., concurring). The laboratory analyst also advised that it was lab policy to not permit a defense expert to observe the DNA testing, but that if asked by opposing counsel the policy of the lab was to "find an independent laboratory that could do the testing." The prosecutor and the lab knew the value of the evidence, and knew that Lehr was represented by counsel, and yet disregarded those facts to disobey the laboratory's own policy and proceed with testing the evidence

---

[14] Lehr has shown bad faith in this instance. Nevertheless, Lehr submits the "bad faith" rule is an unworkable and unconstitutional standard that demands revisiting. "[I]n the years preceding *Youngblood* virtually no state or federal court has held that subjective bad faith on the part of the state was required to find a fundamental fairness violation of the federal or state constitutions; instead, the courts looked to state culpability as only *one factor* to be considered in assessing whether a due process violation had occurred. Matthew H. Lembke, Note, *The Role of Police Culpability in Leon and Youngblood*, 76 Va. L. Rev. 1213, 1240–41 (1990). Others have noted, "The majority opinion in *Youngblood v. Arizona* created a rule with no basis in historical or legal precedent." Daniel R. Dinger, Note, *Should Lost Evidence Mean a Lost Chance to Prosecute?: State Rejections of the United States Supreme Court Decision in Arizona v. Youngblood*, 27 Am. J. Crim. L. 329, 382 (2000).

absent any defense oversight. The trial court erred in misapplying the law as well as finding, as a matter of fact, these actions did not constitute bad faith.

Finally, the trial court erred by incorrectly concluding that Lehr failed to suffer any prejudice. The trial court denied the motion for reconsideration indicating that the "DNA extracts were preserved and are available for testing" so "there's no prejudice." (ROA 818.) To the contrary, Lehr was unable to independently conduct the DNA extraction procedure completed by the state crime laboratory. His ability to test the extract that had already been tested by the crime laboratory did not ameliorate this prejudice. Nor did his counsel's opportunity to, as the trial court put it, "make brownie points" on cross examination. (Tr. Jan. 5, 2009 at 48–49.) Even more, State witnesses throughout Lehr's trial shifted the burden to Lehr, failed to provide a curative instruction, and impressed upon the jury that Lehr had an obligation to independently test the materials he was now challenging (Tr. Mar. 2, 2009 at 30–35; Mar. 17, 2009 at 63–64.)

The erroneous ruling by the trial court on this evidence was prejudicial. The state's bad faith should have led to exclusion of the evidence and in turn dismissal of the Morales charges, since absent the DNA testing there was insufficient evidence to uphold Lehr's convictions for Morales, as acknowledged by the Arizona Supreme Court. *See Lehr I,* 38 P.3d at 1182–83. Lehr has an absolute due process right to discovery of potentially exculpatory evidence. *See Brady,* 373 U.S. at 88. And the State's actions violated the Fourteenth Amendment by failing to preserve evidence irrespective of whether it is clearly exculpatory when the state acts in bad faith. *Youngblood,* 488 U.S. 51.

### D.   The state court's decision is contrary to clearly established federal law and an unreasonable determination of facts.

In a single paragraph, the Arizona Supreme Court affirmed the trial court's decision, writing:

The trial court did not abuse its discretion in denying Lehr's motion to

1   preclude the DNA evidence. Because there is no evidence that the swab
2   sticks were exculpatory (indeed, they proved to be inculpatory, because
    the DNA extracted from them matched Lehr's), the key question is
3   whether the State acted in bad faith. Lehr argues that he has shown bad
4   faith because the State, without contacting his counsel, authorized
    testing that consumed the sticks. This does not establish bad faith,
5   particularly because the State retained the DNA extracted from the
    swab sticks and made it available to Lehr for independent testing.

6   *Lehr III*, 254 P.3d at 388. The state court's decision resulted in both unreasonable

7   fact findings and unreasonable application of clearly established federal law.

8          First, as outlined above, Lehr presented evidence showing the State acted in

9   bad faith. Clayton, the prosecutor in this case, had been prosecuting capital case in

10  Arizona for years. As the lead prosecutor on Lehr's case in 1996, he was acutely

11  aware of the lack of evidence supporting Morales's conviction. The Arizona

12  Supreme Court similarly affirmed the insufficiency of evidence in support of

13  Morales's convictions. *Lehr I*, 38 P.3d at 1182–83. Even worse, the lab disregarded

14  its own procedures by ignoring lab policy that allowed defense counsel to request

15  independent laboratory testing. Because defense counsel was never consulted, this

16  independent testing was never an option.

17         Accordingly, the Arizona Supreme Court's denial of this claim is contrary to

18  and an unreasonable application of clearly established law. Lehr will show through

19  his filings and at an evidentiary hearing, that the State, in bad faith, violated Lehr's

20  due process rights by failing to preserve or by destroying evidence. *Youngblood,*

21  488 U.S. 51.

22         Moreover, the Arizona Supreme Court's decision relied on an unreasonable

23  determination under § 2254(d)(2). *See Taylor*, 366 F.3d at 1001 ("[W]here the state

24  courts plainly misapprehend or misstate the record in making their findings, and the

25  misapprehension goes to a material factual issue that is central to petitioner's claim,

26  that misapprehension can fatally undermine the fact-finding process, rendering the

27  resulting factual finding unreasonable."). The trial court unreasonably determined

28  there was no prejudice where the extract was available to test because it overlooked

the fact Lehr's defense argued the original testing was unreliable and only by testing the original samples would Lehr be able to confirm or deny that theory. Counsel's opportunity to ask questions about this process on cross-examination did not ameliorate that prejudice, and where State witnesses through Lehr's trial shifted the burden to Lehr, the trial court failed to provide a curative instruction on these issues, and the State impressed upon the jury that Lehr had an obligation to independently test the materials he was now challenging, the error permeated rendered his trial fundamentally unfair. This Court should review this claim de novo, find that Lehr's due-process rights were violated, and grant him relief.

**CLAIM NINE**

**Lehr was denied his right to a fair trial, impartial jury, and reliable sentencing proceedings as a result of biased jurors serving on his jury.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Sixth Amendment guarantees the right to trial "by an impartial jury." *Turner v. Louisiana*, 379 U.S. 446, 471–72 (1965). In this case, several jurors who convicted and sentenced Lehr to death exhibited bias and impartiality by applauding the testimony of a key DNA expert witness called by the State and engaging in other allegations of misconduct. In addition, one juror gave a victim/witness "two thumbs up" after her testimony. The trial court violated Lehr's right to an impartial jury by denying his requests for a mistrial due to this juror misconduct.

**A.     Exhaustion**

Lehr presented this claim in the fifth argument of his direct appeal. (DA2 82 at 57.) The Arizona Supreme Court denied this claim on the merits. *Lehr III*, 254 P.3d at 389–90. Lehr also raised the issue of jury bias in his petition for relief, where he argued several additional instances where jurors displayed impartiality. (PFR 3 at 54.) The post-conviction court found these allegations "unsubstantiated" and "not colorable," and rejected them without further analysis. (PCR Order at 40.) The

1  Arizona Supreme Court denied review of Lehr's Petition for Review in a one-page
2  order without comment. (PFR 29 at 1.)

3    The Arizona Supreme Court's rejection of this claim was contrary to, or
4  involved an unreasonable application of, clearly established federal law, as
5  determined by the United States Supreme Court. In the alternative, it was an
6  unreasonable determination of the facts in light of the evidence presented.
7  Moreover, to the extent post-conviction counsel failed to develop the factual
8  support for this claim, Lehr alleges he can overcome any default of this claim by
9  showing cause and prejudice, including because of the ineffective assistance of
10 post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Murray*, 477 U.S. at 488–89;
11 *Strickland*, 466 U.S. at 687–88.

12
13
    **B.**    **Factual Background: the jury that convicted and sentenced Lehr to death exhibited bias and impartiality against him.**

14     At Lehr's 2009 trial, the State called David Duplissa to offer expert testimony
15 about DNA evidence. At the conclusion of his testimony, several members of the
16 jury stood up and applauded. (Tr. Mar. 4, 2009 at 141.) The trial court inquired
17 whether the applause was due to the testimony being over or due to Duplissa's
18 performance. (Tr. Mar. 4, 2009 at 141.) At least one juror was heard to say
19 "performance." (Tr. Mar. 4, 2009 at 141–42.) Defense counsel moved for a mistrial
20 and argued the following:

21
22
23
    In regards to what happened after Duplissa was discharged as a witness, I think the record would reflect that a number of the jurors began clapping, and a couple of them, from my perspective, stood up and were applauding, and the Court made a comment: I don't want you to say, you know, whether it's for the performance or glad he's done.

24     And the – one of the jurors said: It was for his performance.

25
26
    I think that this is some evidence of jurors that have begun to make up their mind or have made up their mind, and I would request a mistrial. I think the jurors acted improperly in doing that.

27 (Tr. Mar. 4, 2009 at 163.)

28     Alternatively, defense counsel requested that Juror 5 be removed from the

jury for answering "performance" after being asked about the reason for applauding Duplissa's testimony: "She's clearly lost any pretense of fairness by looking at this fairly and impartially, and I request she be discharged." (Tr. Mar. 4, 2009 at 164.) Lehr also asked for permission to question the remaining jurors individually. (*Id.* at 163–67, 187–95.)

The trial court agreed that the clapping by the jurors was "very unusual" and disconcerting." (Tr. Mar. 4, 2009 at 165.) However, despite at least one juror stating openly in court that the applause was due to performance, the trial court did not view the "unorthodox" behavior of the jury as an indication of bias against Lehr. (Tr. Mar. 4, 2009 at 166.) "I'm not going to grant a mistrial because I don't believe this is grounds for a mistrial if the jurors avow that they can continue to be fair and impartial." (Tr. March 4, 2009 at 166.)

Although the request for a mistrial was denied, the trial court did recognize that "at some point we need to talk" to the jury "because we don't want to have an incomplete record as to what that was all about, nor do we want to allow anybody to deliberate now unless and until we've asked them if they can still remain fair – excuse me – impartial, open-minded, and not prejudice guilt or innocence until they have heard all of the evidence." (Tr. Mar. 4, 2009 at 166.)

Upon further discussions that day, defense counsel again argued that Juror 5 be removed for standing up and clapping. Defense counsel reasoned that "juror cannot be fair and impartial. That juror needs to be removed." (Tr. Mar. 4, 2009 at 188.) Defense counsel also pointed out that Juror 3 was clapping alongside Juror 5. (Tr. Mar. 4, 2009 at 189.) In addition to Jurors 3 and 5, there were "one or two others" who also admitted that their clapping was due to performance." (Tr. Mar. 4, 2009 at 189.)

Because it was more than one or two jurors clapping, defense counsel requested to individually question every member of the jury. (Tr. Mar. 4, 2009 at 190.) Even based on what had already been displayed in the courtroom, defense

counsel renewed the request for a mistrial "because they clapped when the State's witness identifies our client of at least one sexual assault and murder." (Tr. Mar. 4, 2009 at 192.)

Defense counsel requested that the jury be questioned first thing the following morning. (Tr. Mar. 4, 2009 at 194.) The court declined, however, because it wanted to finish the testimony of Ross first, as it considered her to be "a volatile witness capable of leaving at any moment." (Tr. Mar. 4, 2009 at 194.) The next day the State called Ross to offer prior bad acts testimony. While the parties were discussing the logistics of questioning the jury, the court alerted them to another instance of misconduct: As Ross excited the courtroom, Juror 5 gave her a signal of "two thumbs up." (Tr. Mar. 5, 2009 at 63.) According to the court's bailiff, Juror 5 also spoke to Ross at the conclusion of her testimony, but she was unable to make out what was said. (Tr. Mar. 5, 2009 at 64.) Defense counsel argued that Juror 5 giving thumbs up to a State witness was an additional ground for a mistrial. (Tr. Mar. 5, 2009 at 66.)

The trial court then held a hearing where it individually questioned all jurors regarding what had occurred on March 4, 2009 with Duplissa and on March 5, 2009, with Ross.

Juror 1 admitted that they clapped at the conclusion of Duplissa's testimony. (Tr. Mar. 5, 2009 at 68.) The reason given was the witness's performance. (Tr. Mar. 5, 2009 at 68.) Juror 3 admitted to clapping at the conclusion of Duplissa's testimony and said it was based on his performance. (Tr. Mar. 5, 2009 at 75.) Juror 3 also heard Juror 5 speaking and giving a gesture to Ross at the conclusion of her testimony. (Tr. Mar. 5, 2009 at 77.) Juror 5 admitted she clapped and testified that the clapping was due to the "performance" of the witness. (Tr. Mar. 5, 2009 at 82.) Juror 5 also admitted to feeling sorry for Ross: "She was having a difficult time, and I gave her a thumbs up." (Tr. Mar. 5, 2009 at 83.) Juror 8 admitted to clapping at the conclusion of Duplissa's testimony but did not make any comment about the

applause being based on performance. (Tr. Mar. 5, 2009 at 92.) Juror 9 testified to not showing any "outwardly" applause but admitted to clapping, "like a half maybe." (Tr. Mar. 5, 2009 at 96.)

In total, five jurors admitted to clapping at the conclusion of Duplissa's testimony. Jurors 1, 3, and 5 all admitted the applause was based on the performance of the State's expert witness.

Based on the jury's responses, defense counsel renewed his motion for a mistrial and in the alternative, requested the removal of Jurors 1, 3 and 5 due to their inability to be impartial. (Tr. Mar. 5, 2009 (pm) at 87–89.)

In response, the court admitted "I'm not going to sit here and say the fact that they applauded was appropriate." (Tr. Mar. 5, 2009 (pm) at 95.) The court also acknowledged "I've never had it happen at trial." (Tr. Mar. 5, 2009 (pm) at 95.) Nevertheless, the court denied the request for a mistrial, because "every juror said they could be fair and impartial to all phases, including the guilt phase." (Tr. Mar. 5, 2009 [PM] at 95.)

After the mistrial was denied, defense counsel moved to have Jurors 1, 3, and 5 removed for cause. (Tr. Mar. 5, 2009 [PM] at 96.) The State agreed to defense counsel's request as to Juror 5 and she was removed from the jury by stipulation. (Tr. Mar. 5, 2009 [PM] at 97.) The court left Jurors 1 and 3 on the jury based on their assurances that they remained fair and impartial. (Tr. Mar. 5, 2009 [PM] at 99.)

Thus, the record in this case indicates that Jurors 1, 3, 8, and 9 all applauded following the testimony of State expert Duplissa, who presented DNA evidence, and then deliberated both on Lehr's guilt and sentence in this case.

A post-trial investigation uncovered an additional instances of juror bias and impartiality. For example, the jury that convicted and sentenced Lehr to death held a post-trial party that was attended by prosecutor Clayton. (PCR Pet. at 53.)

The post-trial behavior of the jurors is important for two reasons: First, it is

1  further evidence of the jury's alignment with the prosecution. This behavior also

2  undercuts the assurances the jurors gave about their impartiality after they

3  applauded a key State witness.

        **C.**    **Merits: The trial court in this matter abdicated its responsibility**

4                  **and failed to ensure that Lehr was given what the Constitution**

5                  **mandates: a fair trial and impartial jury.**

6        Under the Sixth and Fourteenth Amendments, a defendant has a right to an

7  unbiased and impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *see also*

8  *Groppi v. Wisconsin*, 400 U.S. 505, 509 (1971) (internal citations omitted); *Irvin v.*

9  *Dowd*, 366 U.S. 717, 721–23(1961). "[A] juror who has formed an opinion cannot

10  be impartial." *Reynolds v. United States*, 98 U.S. 145, 155 (1878). The "presence

11  of a biased juror cannot be harmless: the error requires a new trial without a showing

12  of actual prejudice." *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000)

13  (citations omitted); *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001).

14        In the usual sense, a biased juror is one who has a predisposition against or

15  in favor of the defendant. Applauding the testimony of a witness for the State due

16  to his performance was clearly improper and a classic example of jury bias.

17        "A court confronted with a colorable claim of juror bias must undertake an

18  investigation of the relevant facts and circumstances." To comport with due process,

19  the investigation must also be sufficient to resolve the misconduct at issue. *Dyer v.*

20  *Calderon*, 151 F.3d 970, 974 (9th Cir. 1998).

21        While the trial judge conducted some investigation here, it was woefully

22  inadequate and also inconsistent given the circumstances of this case. Indeed, the

23  trial judge's comments reveal that he was intending to encourage the jurors to deny

24  any bias, admitting later that "[t]he reason I made my comment [to the jury] was to

25  try to deflect the possibility that [the jurors] were clapping because [Duplissa] was

26  good." (Tr. Mar. 4, 2009 at 164.) This comment demonstrates that Lehr's trial judge

27  was attempting to downplay the importance of the clapping, hoping that the jurors

28  would follow his lead and profess that the clapping was simply because the lengthy

testimony was finally over. The fact that they declared the opposite—that they were clapping specifically for Duplissa's "performance"—further demonstrates the inappropriateness of their conduct.

During individual examination of the entire jury, Jurors 1, 3, 5, 8, and 9 admitted to clapping when the State's DNA witness finished testifying. Juror 5 also admitted to giving a thumbs up sign to Ross, who testified for the State.

The trial court denied the motion for mistrial, recognizing that the applause was inappropriate, but relying on the assurances the jurors gave that their minds had not been made up, that they could evaluate all witnesses by the same standards, and that they could continue to give Lehr a fair trial and remain open-minded. The State stipulated to Juror 5's removal for cause, and the court accepted the stipulation, noting "I did find her answers much more troubling than anybody else's." (Tr. Mar. 5, 2009 ([PM] at 97.)

On direct appeal, Lehr argued that the trial court's refusal to grant a mistrial or to dismiss other jurors denied him his Sixth Amendment right to a fair and impartial jury. (DA2 82 at 57) The Arizona Supreme Court acknowledged that "[s]everal jurors stood and applauded after the State's DNA expert completed his testimony." *Lehr III*, 254 P.3d at 389. The court addressed this claim on the merits and reviewed it under an abuse of discretion standard. In denying relief, the court opined that the "trial court carefully questioned all jurors" who "affirmed their ability to remain fair and impartial." *Id.* at 390.

True, reviewing courts normally defer to the assessment of the trial judge, who listens to the prospective juror's tone of voice and sees their demeanor. In this case, however, the record alone is sufficiently persuasive to outweigh any presumptive deference. While it is true the trial court did question the jurors and attempted to gain assurances of their impartiality, he had a duty to dismiss any juror who displayed bias against Lehr or partiality in favor of the State. Although the jurors' answers seem certain, they were also inconsistent and unbelievable.

1    Believing that jurors can stand in applause in response to a key witness for the State,
2    and then shift back to a fair and impartial mindset, requires extraordinary—and
3    undeserved—faith in their self-control.

4            Releasing Juror 5 from her service was appropriate but came nowhere close
5    to protecting Lehr's right to a fair trial. Of those who applauded the testimony of a
6    witness for the State, Jurors 1, 3, 8, and 9 were not dismissed and participated in
7    both phases of the jury deliberations. "[E]ven a single partial juror violates a
8    defendant's constitutional right to fair trial." *United States v. Angulo*, 4 F.3d 843,
9    848 (9th Cir. 1993). Releasing Juror 5 and not Jurors 1, 3, 8, and 9 who exhibited
10   similar biased conduct against Lehr was not a decision designed to protect his
11   fundamental right to a fair and impartial jury.

12           Significantly, the trial court released Juror 5 who, like the other applauding
13   jurors, assured the court she remained impartial and had not formed an opinion of
14   Lehr's guilt. Nonetheless, despite her assurances, the trial court removed Juror 5
15   because she demonstrated a bias towards the State. The same protective action
16   should have been taken against the other jurors whose biased actions spoke far
17   louder than their spoken assurances given in response to leading questions from the
18   judge.

19           The trial court in this matter abdicated its responsibility and failed to ensure
20   that Lehr was given what the Constitution mandates, a fair trial and impartial jury.
21   A mistrial should have been declared since five of the jurors admitted to applauding
22   the testimony of an expert witness testifying for the State. Lehr was denied due
23   process and a fair trial by a fair and impartial jury as guaranteed by the Fifth, Sixth,
24   Eighth, and Fourteenth Amendments. As such, Lehr is entitled to habeas relief.

25   **D.    The state court's decision to the contrary represented both an
26          unreasonable fact finding and unreasonable application of clearly
            established federal law.**

27           The state court's decision to the contrary resulted in both unreasonable fact
28   findings and unreasonable application of clearly established federal law. Promises

that a juror can be fair or follow the law are insufficient under the Constitution. "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Morgan*, 504 U.S. at 727. The Arizona Supreme Court's opinion failed to search beyond the promise to be fair, to follow instructions, to inquire into the dogmatic beliefs and actions of the jurors as required by *Morgan*.

### E. Further factual development is necessary and will be addressed in Lehr's motion for discovery.

After Lehr's trial, an investigation conducted by post-conviction counsel alleged more troubling facts that further undercuts the assurances from the jurors about their impartiality. A post-trial party organized by the jury was attended by one of the prosecutors who tried the case. Further, there are allegations that the prosecutor in Lehr's case, Clayton, later dated one of the jurors from Lehr's trial. (*See* PCR Pet. at 53.) Both of these are troubling indicators that Lehr's jury was further biased against him, and he could not receive a fair trial.

Lehr intends to request leave to conduct discovery and will address the grounds for this request at that time. The need for an evidentiary hearing on this issue will be addressed in a motion following the completion of discovery, should any be granted, or upon the denial of the motion for discovery.

### CLAIM TEN
### The unduly suggestive and unreliable identification procedures used by police to obtain the live lineup and in-court identifications by Ross violated Lehr's due process rights.

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The trial court improperly allowed introduction of Ross's unduly suggestive and unreliable eyewitness identification testimony in violation of Lehr's due process rights under the Fifth and Fourteenth Amendments. *See Manson v.*

1   *Brathwaite*, 432 U.S. 98, 113 (1977); *Neil v. Biggers*, 409 U.S. 188, 198 (1972);

2   *Simmons v. United States*, 390 U.S. 377, 384 (1968). The police department's

3   identification procedures were unduly suggestive when they showed Ross three

4   separate photo arrays and two of those arrays included photographs of Lehr; and

5   then, just two days later, had Ross participate in a live lineup including Lehr. These

6   unduly suggestive procedures tainted Ross's photo array, live lineup, and in-court

7   identifications. When viewing the totality of the circumstances, Ross's

8   identifications are unreliable, and thus should not have been admitted in evidence.

9       **A.     Exhaustion**

10      Lehr raised this claim during pretrial proceedings in 1994 and on direct

11  appeal. (DA1 42 at 109–12.) The Arizona Supreme Court denied the claim on the

12  merits. *Lehr I*, 38 P.3d at 1183. The state court's rejection of this claim was contrary

13  to, or involved an unreasonable application of, clearly established federal law, as

14  determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it

15  constituted an unreasonable determination of the facts in light of the evidence

16  presented. *See* 28 U.S.C. § 2254(d)(2).

17      **B.     Factual Background**

18      Ross testified that, during the evening of February 23, 1992, she was walking

19  on Indian School Road when a man pulled up and asked if she needed a ride. (Tr.

20  Dec. 15, 1994 at 36–37; Tr. Mar. 9, 2009 at 24, 32, 43.) Ross was fourteen years

21  old at the time. (Tr. Mar. 9, 2009 at 25.) She agreed to the ride, after the man offered

22  to take her to his house to ride horses. When he started to head out of town, she felt

23  something was not right and even though it was night, she was able to get a good

24  look at him when he stopped at a red light. Ross testified she lost consciousness

25  after the sexual assault. (Tr. Mar. 9, 2009 at 41, 44.) After they got out of town, he

26  raped her in the car and then took her out of the car and assaulted her. (Tr. Dec. 15,

27  1994 at 39–40, 45–46.)

28      Two days after her assault, Ross provided police with a description of her

1    attacker and his vehicle. (Tr. Mar. 9, 2009 at 26, 46.) Ross lacked memory of events

2    following the assault. (Tr. Mar. 9, 2009 at 44.) When explaining her inconsistent

3    descriptions of the attacker's vehicle, Ross explained: "I was confused. I was very

4    injured. My head wasn't right. I wasn't clear." (Tr. Mar. 9, 2009 at 53.) Three days

5    after the assault, on February 26, 1992, Ross completed a composite sketch of her

6    attacker. (Tr. Mar. 9, 2009 at 45.)

7         On June 23, 1992—four months after the assault—Deputy Todd Bates

8    compiled and showed Ross three separate photo arrays. One of the photo arrays

9    contained a driver's license photograph of Lehr, taken in March of 1992; another

10   contained a photo of Lehr from an older driver's license that had been issued in July

11   1989; and the third photo array contained no photograph of Lehr. (Tr. Dec. 15, 1994

12   at 5, 8–11.) Bates was aware Lehr was a suspect. After looking at the photo array

13   containing Lehr's March 1992 photo, Ross picked out that photo, which was in the

14   third position stating "it sort of looks like Number 3, but not really. His hair and

15   beard look correct, but I'm not positive it's him." She was unable to identify anyone

16   else in either of the next two, photo arrays. (Tr. Dec. 15, 1994 at 5, 8–15, 20, 23.)

17   Deputy Bates claimed that he did not know that an in-person lineup containing Lehr

18   was going to be held two days later. (Tr. Dec. 15, 1994 at 26.)

19        Just two days after viewing the photo arrays including the pictures of Lehr,

20   Ross participated in the live lineup. (Tr. Mar. 9, 2009 at 49–50.) Detective Randy

21   Chapman assisted in the live lineup that took place at Durango Jail on June 25,

22   1992. (Tr. Dec. 15, 1994 at 30–37.) There were six participants and Lehr was placed

23   in the third position. (Tr. Dec. 15, 1994 at 41–42.) Ross viewed the lineup and made

24   an identification of Lehr. (Tr. Mar. 9, 2009 at 49–50; Tr. Dec. 15, 1994 at 58, 59.)

25        On November 10, 1994, defense counsel Seplow filed a motion for a

26   *Dessureault* hearing pursuant to *State v. Dessureault*, 453 P.2d 951 (Ariz. 1969),

27   challenging identifications made by victims in both photo and live lineups. (ROA

28   110; ROA 113.) The *Dessureault* hearing commenced on December 14, 1994.

1   (ROA 110.) During the hearing, the court heard testimony from the police officers
2   and witnesses involved in the identifications. During the hearing, Deputy Chapman
3   acknowledged that, if a witness had previously seen a photo array before attending
4   a live lineup, it would taint the live lineup identification. (Tr. Dec. 15, 1994 at 76.)
5   At the close of the *Dessureault* hearing, the defense argued that the fact that Ross
6   was shown photo lineups two days before the live lineup that included pictures of
7   Lehr and, that Lehr was the only person in common between the photographs and
8   the physical lineup, tainted the identification of the Lehr by Ross at both the live
9   lineup and for any in-court identification. (Tr. Dec. 15, 1994 at 122–124.) The trial
10  court found that the State had shown by clear and convincing evidence that the
11  circumstances of the lineups and the pretrial identification proceedings did not
12  contain unduly suggestive circumstances. The court therefore decided to permit
13  evidence of the pretrial identifications and allowed the in-court identifications by
14  Ross. (ROA 115; Tr. Jan. 3, 1995 at 122–24.)

15      Ross testified during the 1996 trial regarding her sexual assault and made an
16  in-court identification. The facts testified to were similar to those presented during
17  the 2009 trial, where the State presented Ross as a Rule 404 witness. 2009 counsel
18  failed to file any pretrial motions regarding Ross's pretrial identification. (*See*
19  Claim 3(B) (alleging ineffective assistance of counsel for failure to investigate
20  eyewitness identification evidence).) During her testimony in 2009, Ross was not
21  questioned regarding the photo array. The prosecutor did question Ross regarding
22  the live lineup and Ross testified she picked the person in position number three,
23  Lehr. (Tr. Mar. 9, 2009 at 47–49.) Because Lehr had waived his presence, the court
24  entered a stipulation as to the prior in-court identification. (Tr. Mar. 9, 2009 at 50.)

25      **C.   Merits: The introduction of Ross's pretrial and in-court**
26          **identifications violated Lehr's due process rights.**

27      Every accused has a due process right to a fair identification procedure. *See*
28  *Brathwaite*, 432 U.S. at 113; *Biggers*, 409 U.S. at 198 ("the likelihood of

misidentification which violates a defendant's right to due process."); *State v. McCall*, 677 P.2d 920, 927 (Ariz. 1983), *cert. denied*, 467 U.S. 1220 (1984). If an in-court identification is tainted by improper pretrial identification procedures, there is a high likelihood of irreparable misidentification and a denial of due process under the Fourteenth Amendment to the United States Constitution. *See Simmons*, 390 U.S. at 384.

"[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. Even when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012) (internal citations omitted). "Instead of mandating a per se exclusionary rule, the Court held that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239 (citing *Biggers*, 409 U.S., at 201; *Brathwaite*, 432 U.S. at 116.)

In determining whether a pretrial identification procedure is fair, the court must consider the totality of the circumstances. *Biggers*, 409 U.S. at 199; *see State v. Rojo-Valenzuela*, 352 P.3d 917, 920 (Ariz. 2015) (applying the *Biggers* totality of the circumstances when analyzing the reliability of an identification). These factors include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200.

Here, police used "an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 238–39; *see also Simmons*, 390 U.S. at 383 ("It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals."). Ross was shown three

1   photo arrays two days before the live lineup. (Tr. Dec. 15, 1994 at 122–24.) Two of
2   three the photo arrays presented to Ross included pictures of Lehr. (Tr. Dec. 15,
3   1994 at 5, 8–11.) Then, just two days later, police asked Ross to participate in the
4   live lineup including Lehr. Lehr was the only person in common between the
5   photographs and the physical lineup. This procedure tainted the identification of the
6   Lehr by Ross at both the live lineup and at trial.

7       The Supreme Court specifically found this type of eyewitness identification
8   violated due process when the suspect "was the only person in this lineup who had
9   also participated in the first lineup." *Foster v. California*, 394 U.S. 440, 443 (1969).
10  The Court clarified that "[t]he suggestive elements in this identification procedure
11  made it all but inevitable that [the eyewitness] would identify petitioner whether or
12  not he was in fact 'the man.' In effect, the police repeatedly said to the witness,
13  'This is the man.'" *Id.* The Supreme Court concluded "[t]his procedure so
14  undermined the reliability of the eyewitness identification as to violate due
15  process." *Id.*

16      As outlined below, and as further evidentiary development will show, the
17  totality of the circumstances weighs against the reliability of Ross's photograph
18  lineup, live lineup, and in-court identifications. For example, Ross's ability to view
19  her attacker at the time of the crime may have been impacted due to the dark
20  conditions and viewing her attacker using only street lights. (*See* Tr. Dec. 15, 1994
21  at 42.) Ross's degree of attention was compromised by the trauma and loss of
22  consciousness. Ross even testified: "I was confused. I was very injured. My head
23  wasn't right. I wasn't clear." (Tr. Mar. 9, 2009 at 53.) As a result, Ross's prior
24  descriptions of the suspect were inconsistent, including stating her attacker had blue
25  eyes (Lehr has brown), and widely ranging statements regarding her attacker's
26  facial hair. In addition, when first viewing the photo array containing Lehr's
27  photograph, Ross was not certain. (Tr. Dec. 15, 1994 at 5, 8–15, 20, 23) (looking at
28  the photo array containing Lehr's photo and stating "it sort of looks like Number 3,

but not really. His hair and beard look correct, but I'm not positive it's him.".) The fact Ross was later certain during the live lineup does not weigh in favor of reliability because her ability to accurately identify the assailant had been tainted by showing her multiple photos of Lehr two days prior.

Moreover, Ross first testified that nothing in the photos shown to her two days before the live lineup caused her to pick Lehr out of the live lineup because she could never forget his face. (Tr. Dec. 15, 1994 at 47–53.) However, on cross-examination, Ross admitted that she was not sure if the picture in the photo lineup that she had chosen was the perpetrator. (Tr. Dec. 15, 1994 at 61–65.) Lastly, as the state court rightly recognized the length of time between the crime and the confrontation—approximately four months—weighs against reliability. *See Biggers*, 409 U.S. at 199–200. In sum, these factors all weigh against the reliability of Ross's photo identification and subsequent live lineup identification.

The procedures used to obtain the identifications from Ross were unduly suggestive and the circumstances surrounding the identifications render them unreliable. Because of the admission of Ross's photo array, live lineup, and in-court identifications, the 1996 and 2009 juries heard powerful uncontested eyewitness testimony when in reality, her identifications were obtained through unduly suggestive procedures and under unreliable circumstances. (*See* Claim 3(B)(4) (outlining prejudiced suffered from admission of eyewitness identifications).) As such, the identification procedure applied to the Ross case violated Lehr's due process rights and the admission of such evidence now entitles him to relief.

### D.   The state court's decision is contrary to clearly established federal law and is based on an unreasonable determination of facts.

The Arizona Supreme Court's decision finding the Ross pretrial and in-court identifications reliable was an unreasonable application of clearly established federal law and an unreasonable determination of facts. 28 U.S.C. § 2254(d).

The Arizona Supreme Court correctly found the "arrangement was arguably

unduly suggestive" when discussing Ross viewing photo arrays including photographs of Lehr and then participating in the live lineup and identifying Lehr just two days later. *Lehr I*, 38 P.3d at 1183. However, the Arizona Supreme Court questioned "whether the identification is reliable in spite of any suggestiveness." *Lehr I*, 38 P.3d at 1183 (citing *Brathwaite*, 432 U.S. at 114). The court continued that "[i]f the lineup procedure was unduly suggestive, *and* the lineup identification was not reliable enough to avoid a substantial likelihood of misidentification, then the testimony must be excluded." *Lehr I*, 38 P.3d at 1183 (emphasis in original). The court then concluded the identification was reliable.

As outlined below, and as further filings and evidentiary development will show, the Arizona Supreme Court's decision regarding the reliability of the lineup and in-court identifications was contrary to, and an unreasonable application of, clearly established federal law and based on an unreasonable determination of the facts.

The Arizona Supreme Court's conclusion that "[Ross] was attentive out of fear for her own safety" and thus made a *more* reliable identification, *Lehr I*, 38 P.3d at 1184, is an unreasonable determination of facts as the science shows experiencing trauma can negatively impact memory. *See Dennis v. Secy., Pennsylvania Dept. of Corr.*, 834 F.3d 263, 329 (3d Cir. 2016) (McKee, J., concurring) (explaining that "high levels of stress at the time of memory formation can negatively impact a witness' ability to accurately identify the perpetrator.") Ross experienced unconsciousness and severe trauma. She was in the hospital for a number of days following the assault and did not provide a description until two full days after her assault. Ross also lost consciousness, which means she had no ability to make observations for a period of time. Upon awaking, she would have been in a fight or flight mode, which impacts the brain's ability to remember details.

The Arizona Supreme Court's conclusion that "getting a few good glances" of the suspect while passing under street lights weighed in favor of reliability is also

an unreasonable determination of the facts. *Lehr I*, 38 P.3d at 1184. Ross's assault occurred at night and she testified that "I really couldn't see the full face" until the car stopped at a stop light and his face was lit by traffic lights. (Tr. Dec. 15, 1994 at 42.) The state court unreasonably credited this statement by Ross that she got one good look at Lehr's face as increasing the reliability of her identification.

The Arizona Supreme Court's conclusion that Ross "gave an accurate and detailed description of her assailant" weighing in favor of reliability is also an unreasonable determination of the facts. *Lehr I*, 38 P.3d at 1184. Ross provided various descriptions of both the suspect and vehicle used in the assault. Many of her descriptions were inconsistent. For example, she first reported the assault occurred in a pickup truck and then later a sedan. She also reported the suspect had blue/green eyes while Lehr has brown eyes. During various interviews, she changed the description of her attacker as being clean shaven, having a mustache, and later, having a beard.

The Arizona Supreme Court incorrectly, and unreasonably, found that Ross "saw a photo spread and did not identify anyone." *Id.* at 1183. As Ross's testimony makes clear, after looking at the photograph array containing Lehr's March 1992 photo, Ross picked out that photograph stating "it sort of looks like Number 3, but not really. His hair and beard look correct, but I'm not positive it's him." (Tr. Dec. 15, 1994 at 5, 8–15, 20, 23.) While this is not a certain identification, to determine these facts mean she "did not identify anyone" is unreasonable.

Then the court found "[t]he victim further testified that she recognized the defendant the moment she entered the lineup viewing room, and was absolutely certain." *Lehr I*, 38 P.3d at 1184. The state court weighed this circumstance in favor of reliability. Reaching this conclusion, after finding the procedures leading to this live lineup identification were unduly suggestive, is an unreasonable determination of the facts. This circumstance weighs *against* the reliability of Ross's live lineup and in-court identifications because she had just been shown two photo arrays

1    containing Lehr's pictures just two days prior to the live lineup. Moreover, by
2    incorrectly presuming there was no identification during the photo lineup, the
3    Arizona Supreme Court unreasonably ignored the fact that Ross's initial
4    identification of Lehr—while viewing the photograph lineups—was not certain at
5    all. The Arizona Supreme Court's finding here is thus an unreasonable
6    determination of the facts.

7         The Arizona Supreme Court also ignored important facts in determining
8    whether the totality of the circumstances support the reliability of Ross's photo
9    lineup, live lineup, and in-court identifications. Ross prepared a composite sketch
10   of her assailant. (Tr. Mar. 9, 2009 at 45.) Science shows that completing a composite
11   sketch results in witnesses being less accurate in later identifying the actual suspect,
12   which would call into question the reliability of Ross's subsequent photographic
13   lineup, live lineup, and in-court identifications. Lastly, the Arizona Supreme Court
14   failed to consider the fact Ross was a juvenile at the time she made the
15   identifications. Scientific research shows that juveniles do not make reliable
16   identifications of adults. The failure to even consider these facts when conducting
17   the totality of circumstances analysis was unreasonable.

18        In their analysis, the only factor giving the Arizona Supreme Court pause "is
19   the passage of four months between the crime and the identification." *Lehr I*, 38
20   P.3d at 1184. The court minimized the importance of this factor, which was an
21   unreasonable determination of the facts.

22        The Arizona Supreme Court's decision relied on an unreasonable
23   determination under § 2254(d)(2). *See Taylor*, 366 F.3d at 1001 ("[W]here the state
24   courts plainly misapprehend or misstate the record in making their findings, and the
25   misapprehension goes to a material factual issue that is central to petitioner's claim,
26   that misapprehension can fatally undermine the fact-finding process, rendering the
27   resulting factual finding unreasonable."). Because the state court's ruling turned on
28   unreasonable factual findings, and contravened clearly established federal law, it is

1   no bar to de novo review and relief. Accordingly, this Court should review this

2   claim de novo, find that Lehr's due-process rights were violated, and grant him

3   relief.

### CLAIM ELEVEN

4

5   **The State impermissibly shifted the burden of proof in violation of Lehr's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

6

7   Lehr incorporates by specific reference all facts, allegations, and arguments

8   made elsewhere in this Petition.

9   Lehr was deprived his rights to a fair trial, fair sentencing, and impartial jury

10  under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

11  Constitution when the prosecutor at his first trial engaged in improper argument,

12  and impermissibly urged the jury to place the burden on Lehr to present certain

13  evidence of his own guilt.

14      **A.    Exhaustion**

15  Lehr raised this claim in his first direct appeal. (DA1 42 at 112.) The Arizona

16  Supreme Court denied the claim on the merits as a matter of state law, but did not

17  rule on Lehr's claim of federal constitutional error. *Lehr I*, 38 P.3d at 1184–85. But

18  to the extent this Court may find that the Arizona Supreme Court adjudicated the

19  merits, the state court's denial of this claim was contrary to, or involved an

20  unreasonable application of clearly established federal law, as determined by the

21  Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

22  unreasonable determination of the facts in light of the evidence presented. *See* 28

23  U.S.C. § 2254(d)(2). But because the Arizona Supreme Court overlooked the

24  federal claim, this Court can review it de novo. *See Johnson v. Williams*, 568 U.S.

25  289, 303 (2013).

26      **B.    Factual Background**

27  The police recovered a paper McDonald's cup from Zingaro's crime scene.

28  The State's fingerprint expert, Karen Jones, testified on direct examination that she

1   had originally compared Lehr's prints with those found on the cup in April 1991
2   (she also later testified at Lehr's 2009 trial). (*See e.g.*, Tr. Feb. 23, 2009 at 40.) At
3   the time she first analyzed the lifted print, she had been unable to make an
4   identification to Lehr. Three years later, Jones then used "new technology," an
5   enlarged Polaroid photo, to compare the latent fingerprint from the cup with Lehr's
6   thumbprint and then found a "match" (Tr. Sep. 25, 1996 at 106, 121, 125, 129, 134,
7   138.)

8        After Jones gave her testimony, the prosecutor asked her if the prints were
9   on file and could be checked by any latent print examiner or if other experts outside
10  of the Phoenix Police Department could verify the identifications or non-
11  identifications that she had made. Lehr's trial counsel objected, arguing that the
12  prosecutor was trying to shift the burden of proof to the defense to produce
13  fingerprint experts, and moved for a mistrial, which the trial court denied. (Tr. Sep.
14  26, 1996 at 24–25.)

15       The prosecutor explained that his purpose in asking the question was because
16  the fingerprint examiner's job was on the line: "Whether there's other people in her
17  line or work *or whether the defense could hire them*, or whatever the case might be,
18  she has her reputation on the line and she has to make that call to the Police
19  Department. Phoenix Police Department's reputation is also on the line in making
20  a bad call. So that's the reason for bringing that out as she's not the only expert in
21  the entire world." (Tr. Sep. 26, 1996 at 26–27 (emphasis added)).

22       **C.    Merits**

23       Prosecutors occupy a unique position in the justice system and are likewise
24  subject to uniquely rigorous standards. Although a prosecutor "may strike hard
25  blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from
26  improper methods calculated to produce a wrongful conviction as it is to use every
27  legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78,
28  88 (1935). Thus, his interest in a criminal prosecution is not to win a case, but "that

justice shall be done." *Id.* at 88; *see also United States v. Kojayan,* 8 F.3d 1315, 1323 (9th Cir. 1993) (explaining that a "prosecutor's job isn't just to win, but to win fairly, staying well within the rules"). As the Supreme Court has acknowledged, "the average jury, in a greater or less degree, has confidence that these obligations . . . will faithfully be observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused then they should properly carry none." *Berger*, 295 U.S. at 88. A prosecutor oversteps "the bounds of that propriety and fairness which should characterize the conduct of such an officer" when he makes "improper insinuations and assertions calculated to mislead the jury." *Id.* at 84–85.

To prevail on a prosecutorial misconduct claim, a petitioner must demonstrate that the prosecutor's conduct either (1) prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (citing *Griffin v. California*, 380 U.S. 609 (1965)), or (2) rendered the trial fundamentally unfair, *see Berger*, 295 U.S. at 78. When evaluating the instances of prosecutorial misconduct, the reviewing court must consider the cumulative effect of the harm. *See id.* at 89 (awarding a new trial because of "probable cumulative effect" of instances of prosecutorial misconduct).

Here, the conduct of Lehr's prosecutor both prejudiced Lehr's substantive rights and rendered his trial fundamentally unfair.

The State's willingness to make inappropriate insinuations prejudiced Lehr by rendering his guilt and penalty-phase proceedings unfair. The thumbprint on the McDonald's cup was the only physical evidence tying Lehr to the charges related to Zingaro, and the State was unable to match the print on the cup to Lehr until it had the cup for two years. The defense should have been able to challenge the fingerprint evidence without it being improperly suggested to the jury that the Lehr had the burden to produce his own fingerprint expert and had failed to do so.

This error, along with others in this petition, violated Lehr's rights to due

process, confrontation, and a fair trial and violated the rules of court and evidence that protect those constitutional rights. *See Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012) (explaining that "[e]ven when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, '[t]he cumulative effect of multiple errors can violate due process'" (quoting *United States v. Nobari*, 574 F.3d 1065, 1081 (9th Cir. 2009))). The State's misconduct during Lehr's trial had a substantial and injurious effect on Lehr's convictions and sentences. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Lehr is thus entitled to habeas relief.

### D.     The state court's decision is contrary to clearly established federal law and is based on an unreasonable determination of facts.

On direct appeal, Lehr's argument was two-fold: first, that the prosecutor improperly shifted the burden and proof; and 2) the trial court abused its discretion in overruling Lehr's objection to the burden-shifting comments, which violated his rights under the Fifth, Sixth, and Fourteenth Amendments. (DA1 42 at 113.)

The Arizona Supreme Court rejected this claim in a single paragraph:

> We rejected a similar argument in *State ex rel. McDougall v. Corcoran*, 153 Ariz. 157, 160, 735 P.2d 767, 770 (1987). There, we held that discussing a defendant's failure to produce evidence is permissible so long as it does not constitute a comment on his or her silence. *Id.* We concluded that "[t]he inference that may be drawn from [the defendant's] failure to produce evidence – that the facts were unfavorable to him – is not unreasonable." *Id.* We find no error.

*Lehr I*, 38 P.3d at 1185. Because the Arizona Supreme Court rejected this claim on state-law grounds, its denial is no bar to this Court's de novo review.

If, in the alternative, the Arizona Supreme Court adjudicated the merits of this federal claim, that adjudication was unreasonable. The court concluded that the prosecutor may freely comment on the defendant's failure to produce evidence by relying on the *McDougall* case. This case, however, deals with a defendant who obtained a second breath sample following his arrest for a DUI, and then failed to

1    present evidence of that second sample at his trial. *State ex rel. McDougall*, 735

2    P.2d at 770. Notably, the prosecutor's comment on the defendant's failure to

3    produce this second sample occurred during the defendant's cross-examination

4    after he took the stand. In Lehr's case, there was no evidence that Lehr had obtained

5    his own fingerprint analysis, and was then withholding results from the court. The

6    questioning from the prosecutor also did not occur in the context of his cross-

7    examination and therefore implicated his Fifth Amendment rights. By relying on

8    *McDougall*, the court failed to answer the question whether the impermissible

9    burden shifting constituted prosecutorial misconduct, and whether the trial court's

10   overruling of the defendant's objection was an abuse of discretion.

11          The Arizona Supreme Court's decision is an unreasonable application of

12   clearly established federal law and an unreasonable determination of facts. 28

13   U.S.C. § 2254(d). Moreover, review in this Court is de novo to the extent that Lehr's

14   claim is based on the Fifth, Sixth, and Fourteenth Amendments, and there was no

15   merits determination in state court. *See Williams*, 568 U.S. at 302.

16                              **CLAIM TWELVE**

17   **Throughout the penalty phase of his trial, Lehr was deprived of**
     **effective assistance of trial counsel in violation of the Fifth, Sixth,**
18   **Eighth, and Fourteenth Amendments.**

19          Lehr incorporates by specific reference all facts, allegations, and arguments

20   made elsewhere in this Petition.

21          Counsel's performance in investigating, preparing, and presenting the

22   penalty phase of Lehr's 2009 trial fell below the performance of a reasonably

23   competent attorney and undermined confidence in the outcome of the sentencing

24   proceedings. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel

25   failed to conduct a reasonable mitigation investigation, and therefore presented a

26   significantly incomplete mitigation case. The acts and omissions of counsel

27   prejudiced Lehr and denied him due process, a fair trial, and the effective assistance

28   of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Strickland*,

446 U.S. 688. The cumulative effect of these failures undermines confidence in the accuracy and reliability of Lehr's death verdict and non-capital sentences.

### A.    Exhaustion

Lehr raised this claim in his post-conviction petition. (PCR Pet. at 15–24.) The post-conviction court denied the claim on the merits. (PCR Order at 8–29.) Lehr filed a petition to review and the Arizona Supreme Court denied review without comment in a one-page order. (PRF 29 at 1.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

To the extent the Court determines that specific subclaims included below were not raised in state court, Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Murray*, 477 U.S. at 488–89 (1986); *Strickland*, 466 U.S. at 687–88; *see also Mapes*, 171 F.3d at 427 (analyzing whether omitted issues were "significant and obvious"); *Gray*, 800 F.2d at 646 (noting that if "appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance"). Lehr will demonstrate through his filings and at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. To the extent any issues have not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of that claim de novo.

### B.    The right to effective assistance of counsel at capital sentencing.

"There is no more important hearing in law or equity than the penalty phase

of a capital trial." *Correll v. Ryan*, 539 F.3d 938, 946 (9th Cir. 2008) (internal quotation marks and citation omitted). A capital jury must be afforded the necessary tools to assess "the character and record of the individual offender[.]" *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (internal quotation marks and citation omitted); *see also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment…requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.")). As the Supreme Court has explained, "If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Eddings*, 455 U.S. at 112 (explaining that petitioner's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death" (citation omitted)).

The assistance of competent and qualified counsel is necessary to safeguard these fundamental principles. *See, e.g., Strickland*, 466 U.S. at 685 ("[C]ounsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." (citation omitted)). Under *Strickland*, counsel is constitutionally ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.

Deficient performance occurs when counsel objectively performed

unreasonably in comparison with prevailing professional norms. *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). The ABA Guidelines can be particularly helpful in identifying the professional norms that obtained at the time of trial. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010) ("We long have recognized that the '[p]revailing norms of practice as reflected in American Bar Association standards and the like…are guides to determining what is reasonable….'" (omissions in original) (quoting *Strickland*, 466 U.S. at 688)). Rule 6.8 of Arizona Rules of Criminal Procedure required counsel to be familiar with the ABA Guidelines to be eligible for appointment. Ariz. R. Crim. P. 6.8(b)(1)(iii) (2000).

To show prejudice, a petitioner does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694); *see also Jennings*, 290 F.3d at 1016 (citing *Strickland*, 466 U.S. at 694 (explicitly rejecting preponderance standard)); *Lord*, 184 F.3d at 1085. "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also Williams (Terry) v. Taylor*, 529 U.S. 362, 397–98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (granting relief based on cumulative impact of multiple errors by counsel); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1439 (1995) (holding cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial, rendering proceedings improper and warranting habeas relief). Even if this Court finds that no single error here amounts to prejudice, it should nonetheless apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176, *as amended by* 421 F.3d. 1154 (9th Cir. 2005) (citing *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)).

"Because of the potential consequences of deficient performance during capital sentencing," the Court must be sure "not to apply a more lenient standard of performance to the sentencing phase than . . . to the guilt phase of trial." *See Kwan Fai Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992) (per curiam).

For all of the reasons below, Lehr's defense counsel failed to afford him these rights throughout the penalty phase of his trial.

## C.    Deficient Performance

Pursuant to *Strickland*, *Williams*, and *Wiggins*, in addition to the prevailing professional norms, trial counsel had an obligation to conduct a thorough investigation of Lehr's character, history, and background in order to present compelling and relevant mitigating evidence during his penalty phase proceedings. On July 8, 2003, the trial court appointed the Office of the Legal Defender (OLD) to Lehr's case. (ROA 615.) James Cleary, lead counsel, and Mark Tallan, co-counsel, unreasonably prepared for Lehr's penalty phase proceedings. As the filings and evidentiary development will show, trial counsel failed to: 1) assemble and maintain a qualified defense team, 2) develop effective communication and a positive working relationship with Lehr, 3) investigate and present mitigating evidence, including consulting and hiring experts regarding Lehr's mental health, cognitive impairments, and family and personal background; 4) present readily available mitigating evidence from the 1997 sentencing; 5) object to numerous erroneous penalty phase jury instructions; and 6) make the case for life throughout the entirety of the penalty phase proceedings. Due to the lack of meaningful investigation, and unreasonably acquiescing to Lehr's uncooperative attitude, Lehr's counsel presented evidence during the penalty phase that did more harm than good. Trial counsel's failures, independently, and collectively, constitute deficient performance under *Strickland*, 466 U.S. 668. *See Williams*, 529 U.S. at 396–98; *Wiggins v. Smith* 539 U.S. 510 (2003).

Moreover, Lehr's uncooperative attitude and expressed willingness to be

sentenced to death as quickly as possible did not excuse trial counsel's duty to reasonably investigate mitigating evidence, including consultation with experts. A defendant's lack of cooperation does not eliminate the trial counsel's duty to investigate. *See Hamilton v. Ayers*, 583 F.3d at 1118 (9th Cir. 2009) (citing ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980)) ("the duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's desires to plead guilty"); *see also Douglas v. Woodford*, 316 F.3d at 1089 (9th Cir. 2003) ("Although the client's desires are not to be ignored altogether, it may be inappropriate for counsel to acquiesce to the client's demands"); *Karis v. Calderon*, 283 F.3d at 1136 (9th Cir. 2002) (determining that defendant's lack of cooperation did not excuse counsel from further investigating mitigation evidence to present to the jury); *Stankewitz v. Woodford*, 365 F.3d at 721–22 (9th Cir. 2004) (a client's opposition to calling family members or experts as witnesses does not excuse an attorney from interviewing experts and family members or from investigating documents containing mitigating evidence). (*See infra,* Section (E)(4) (outlining why an uncooperative client does not relieve trial counsel of their duty to investigate mitigating evidence).)

Trial counsel unreasonably cut short their investigation based on Lehr's uncooperative attitude and his interference in directing family members not to testify during the penalty phase. Such acquiescence, without conducting a full investigation, seeking alternative sources to present information, and consulting with experts, falls below the objective standard of reasonableness for a competent attorney. *See e.g., Blanco v. Singletary*, 943 F.2d 1477, 1503 (11th Cir. 1991) ("The ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsels' eagerness to latch onto Blanco's statements that he did not want any witnesses called.")

Lehr essentially gave up. Such a fatalistic approach to his trial did not entitle trial counsel to similarly abandon their constitutional duties; counsel's acquiescence was unreasonable and not strategic, and in violation of Lehr's right to effective assistance of counsel. As outlined in Claim 14, Lehr's desire to "waive" mitigation and ultimately receive the death penalty should not have controlled trial counsel's decisions when investigating, consulting with experts, or preparing relevant mitigation to present to the sentencing jury. Federal law clearly establishes under *Strickland* that all capital defendants are entitled to a reasonably competent investigation, even if they are uncooperative, or difficult. A finding that Lehr did not cooperate with trial counsel does not excuse counsel's failure to investigate mitigation, including consultation with experts, or to find alternative sources of information in support of mitigation.

### 1. Trial counsel unreasonably failed to assemble and adequately manage a qualified defense team.

The assistance of competent and qualified counsel is necessary to safeguard these fundamental principles. *See, e.g.*, *Strickland*, 466 U.S. at 685 ("[C]ounsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." (citation omitted)). Although "[l]ead counsel bears overall responsibility," it is beyond dispute that "the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines." American Bar Ass'n Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.4(B) & cmt., 31 Hofstra L. Rev. 913, 999, 1002 (2003) (footnote omitted). Lead counsel's failure to assemble and manage a functional defense team fell below prevailing professional norms and resulted in an unreasonable mitigation investigation. *See, e.g.*, *Correll*, 539 F.3d at 942; *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001); *Williams*, 529 U.S. at 399.

1        Lehr's capital trial and resentencing occurred shortly after the Supreme

2   Court's decision in *Ring*. As a result, trial counsel had little experience in

3   conducting comprehensive mitigating investigations and presenting a full penalty

4   phase hearing to a sentencing jury. Trial counsel Tallan had only done one prior

5   case post-*Ring* and did not understand the extent of work required to prepare for a

6   penalty phase hearing jury. Dawn Whitt, the mitigation specialist, was also new to

7   the type of "scorched earth" mitigation investigation that is expected and required

8   for mitigation hearings in front of a sentencing jury. At the time of Lehr's trial,

9   Whitt did not understand the depth of investigation needed and the importance of

10  presenting a complete mitigation presentation to the sentencing jury.

11       The mitigation specialist is "an indispensable member of the defense team

12  throughout all capital proceedings." 2003 ABA Guideline 10.4 cmt., 31 Hofstra L.

13  Rev. at 959. Here, Dawn Whitt, the original mitigation specialist assigned to Lehr's

14  case, left OLD during the middle of the investigation in July 2007. Her replacement

15  had been recently promoted and lacked significant capital mitigation experience.

16  The 2003 ABA Guidelines, in effect at the time of Lehr's trial, required that counsel

17  "demand on behalf of the client all resources necessary to provide high quality legal

18  representation." 2003 ABA Guideline 10.4(d). Lehr's counsel had the responsibility

19  to request that an experienced mitigation investigator be hired to lead the mitigation

20  investigation in Lehr's case after Whitt left OLD. While a supervisor oversaw the

21  new mitigation specialist's work, this supervisor was not the mitigation specialist

22  appointed to the case nor was she attempting to make regular contact with Lehr or

23  his family. During a pretrial conference, Cleary even admitted "the major problem

24  has been the lack of fine resources in our office." (Tr. Jan. 7, 2004.) Counsel's

25  failure to ensure that Lehr had a consistent team that had the experience to pursue

26  the mitigation investigation resulted in an incomplete and disjointed mitigation

27  presentation at trial.

28       The failure to assemble a qualified and coherent defense team haunted trial

1   counsel throughout the penalty phase and led to an unreasonable investigation and

2   the failure to present compelling mitigating evidence to the jury, as outlined below.

3
4

**2.   Trial counsel unreasonably failed to maintain a relationship and meaningful communication with Lehr.**

5   The inability of Lehr's defense team to develop a meaningful relationship

6   with Lehr impeded their ability to conduct a full mitigation investigation. The result

7   of that insufficient investigation was an internally contradictory and confusing

8   mitigation presentation that gave the jury no reason to consider a sentence less than

9   death.

10   "[A]dequate consultation between attorney and client is an essential element

11   of competent representation of a criminal defendant" *Correll*, 539 F.3d at 943

12   (quoting *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983); *see also*

13   *Summerlin v. Schriro*, 427 F.3d 623, 633 (9th Cir. 2005) (en banc). For this reason,

14   competent trial counsel must "maintain close contact with the client." 2003 ABA

15   Guideline 10.5(A), 31 Hofstra L. Rev. at 1005. The need to establish and maintain

16   a relationship with the client and the client's family is acute in a capital case, where

17   the defendant will be asked to disclose "the often personal and painful facts

18   necessary to present an effective penalty phase defense[.]" 2003 ABA Guideline

19   10.5 cmt., 31 Hofstra L. Rev. at 1008. For this reason,

20          Client contact must be ongoing, and include sufficient time spent at the
           prison to develop a rapport between attorney and client. An occasional
21          hurried interview with the client will not reveal to counsel all the facts
           needed to prepare for trial, appeal, post-conviction review, or clemency.
22          Even if counsel manages to ask the right questions, a client will not—
           with good reason—trust a lawyer who visits only a few times before
23          trial.

24   2003 ABA Guideline 10.5 cmt., 31 Hofstra L. Rev. at 1008.

25   Here, trial counsel failed to meet with Lehr to sufficiently establish the

26   necessary rapport. They acquiesced to Lehr's desire to stay at the ADOC Facility

27   in Florence, Arizona until shortly before trial. Counsel was preparing for trial in

28   Phoenix, over sixty miles away from their client. As such, counsel lacked the ability

to regularly meet with Lehr. Instead of building a relationship with Lehr, counsel visited when they could and rarely had one-on-one time with their client. The mitigation specialist acknowledges it was difficult to schedule regular visits at ADOC and it would have been easier to see Lehr more frequently had he been housed at the jail in Phoenix. Adequate consultation could simply not be accomplished with Lehr located so far away.

Trial counsel failed to take the necessary steps to secure the trust of Lehr by maintaining consistency of contact. Whitt, the mitigation specialist, directly responsible for identifying, compiling, and preparing mitigating evidence, only met with Lehr once a month. Whitt also resigned from OLD during the middle of preparation for the trial, in July 2007, and was replaced with a mitigation specialist with little capital mitigation investigation experience. This lack of consistency made it impossible for Lehr's trial team to develop rapport with Lehr and with his family, a critical element to a successful mitigation investigation. Due to this interruption, neither mitigation specialist was able to develop a relationship of trust with Lehr that would allow them to develop important mitigating evidence, involving Lehr's social and familial history. By switching mitigating investigators in the middle of trial preparation, the trial team also lost crucial information and knowledge about Lehr's background and psycho-social history that was not transferred between the two investigators. Moreover, trial counsel failed to oversee and fulfill this role themselves, instead relying on their mitigation investigators to conduct all of the mitigation investigation.

Trial counsel's failure to understand Lehr's mental health symptoms and unique cognitive functioning further impaired the defense team's ability to establish and maintain a relationship with Lehr. Lehr did not undergo any mental health evaluations in advance of his 2009 capital trial. Even absent an evaluation, counsel could have, at minimum, consulted with a mental health professional to provide the defense team critical information in understanding how to best form a relationship

and develop effective communication with Lehr, who has multiple mental health disorders and brain injury. *See* 2003 ABA Guideline 10.4 cmt., 31 Hofstra L. Rev. at 959 (finding that the mitigation specialist "may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.") Counsel's failure to conduct such an evaluation or consultation was unquestionably deficient where a comprehensive mental health evaluation is critical to any capital sentencing proceeding, as explained in greater detail below.

### 3.    Trial counsel unreasonably failed to investigate and present compelling mitigating evidence.

Capitally charged individuals have a constitutionally protected right to the presentation of mitigating evidence. *Williams,* 529 U.S. at 367; *Summerlin*, 427 F.3d at 630 (finding the Sixth Amendment imposes on a capital defense attorney "a duty to investigate, develop, and present mitigation evidence during penalty phase proceedings."); *see also Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999) ("[I]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase."); *Robinson v. Schriro*, 595 F.3d 1086, 1108 (9th Cir. 2010) ("In preparing for the penalty phase of a capital trial, defense counsel has a duty to 'conduct a thorough investigation of the defendant's background' in order to discover all relevant mitigating evidence." (quoting *Correll*, 539 F.3d at 942)). Such an investigation is necessary to develop information that will humanize the defendant in the eyes of the sentencing jury. *See Porter v. McCollum*, 558 U.S. 30, 41 (2009).

"It is unquestioned that under the prevailing professional norms" at the time of Lehr's 2009 trial, "counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter*, 558 U.S. at 39 (quoting *Williams*, 529 U.S. at 396); *see also Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998) (noting that counsel's obligation to conduct meaningful mitigation investigation was not a

1  novel concept in 1981); *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992)

2  (recognizing in 1992 that "[t]o fail to present important mitigating evidence [on

3  defendant's background and family history] in the penalty phase [of a capital case

4  when] there is no risk of doing so – can be . . . devastating").

5       Counsel's duty is not "[d]ischarged merely by conducting a limited

6  investigation of these issues or by providing the sentencing court with a cursory or

7  'abbreviated' presentation of potentially mitigating factors." *Lambright*, 490 F.3d

8  at 1120; *see also Wiggins*, 539 U.S. at 524; *Douglas*, 316 F.3d at 1090 (finding trial

9  counsel…"introduced some of [the defendant's] social history, [but] did so in a

10  cursory manner that was not particularly useful or compelling").

11      Moreover, without conducting a thorough mitigation investigation, including

12  consultation of experts, counsel cannot make strategic decisions about the

13  mitigation presentation. "An uninformed strategy is not a reasoned strategy. It is, in

14  fact, no strategy at all." *Correll*, 539 F.3d at 949; *see also Lambright*, 490 F.3d at

15  1116 ("[A] decision not to present…particular mitigating evidence is unreasonable

16  unless counsel has explored the issue sufficiently to discover the facts that might be

17  relevant to his making an informed decision.")

18      Here, trial counsel failed to fully investigate and develop Lehr's compelling

19  mitigating evidence, and then presented cursory and incomplete evidence during

20  the penalty phase as a result. The failure is particularly unreasonable in this case

21  because trial counsel had the benefit of reviewing the limited mitigation that had

22  been presented at the first trial yet failed to further investigate, examine, develop,

23  or present this evidence. *See Wiggins*, 539 U.S. at 525 (holding that counsel's

24  mitigation investigation was unreasonable where counsel failed to pursue important

25  evidence of which he had notice).

26      Trial counsel failed to investigate Lehr's mental health symptoms, or consult

27  with a mental health professional, despite knowing Lehr exhibited "red flag" mental

28  health symptoms and had been diagnosed with a paranoid personality disorder in

1997 (*see* Tr. July 8, 1997 (AM) at 10, 14–15, 27). Trial counsel failed to investigate possible brain injury even though they knew that Lehr had suffered a head injury when he was just two or three years old and experienced head trauma as an adult. Even worse, counsel failed to develop a full social history or consult with a mental health professional in spite of evidence that Lehr's childhood involved allegations of trauma and abuse. Counsel could have also presented "favorable mitigation" from Lehr's family and loved ones but failed to do so. Counsel knew Lehr was a good father and husband but failed to call any mitigation witnesses, such as Lehr's sister, cousins, aunts, or ex-wives, to provide concrete proof of these mitigating factors.

In sum, trial counsel failed to conduct any meaningful investigation and failed to prepare and present compelling mitigation notwithstanding the "known evidence [that] would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Instead, trial counsel "failed to act while potentially powerful mitigating evidence stared [him] in the face. *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009); *see also Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015) ("[I]f what counsel knows or should know suggests that further investigation might yield more mitigating evidence, counsel must conduct that investigation."); *White v. Ryan*, 895 F.3d 641, 668 (9th Cir. 2018) (observing that the 1989 Guidelines "admonishe[d] counsel not to 'sit idly by, thinking that investigation would be futile'" (citing 1989 ABA Guideline 11.4.1 cmt.)).

As detailed below, the disparity between the mitigation evidence that trial counsel presented and what they could have presented demonstrates the deficiencies of their performance. *See Stankewitz*, 365 F.3d at 716 ("[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.").

1

2

3

### a.   Trial counsel unreasonably failed to investigate and hire an expert to discuss Lehr's psychological, neurodevelopmental, and mental health background.

#### i.   Deficient Performance.

4   Trial counsel failed to hire and consult with mental health experts in

5   preparation for Lehr's capital trial. "[M]ental health experts are essential to

6   defending capital cases. Neurological and psychiatric impairment, combined with a

7   history of physical and sexual abuse, are common among persons convicted of

8   violent offenses on death row." 2003 ABA Guideline 4.1 cmt., 31 Hofstra L. Rev.

9   at 956. For this reason, the ABA Guidelines obligate counsel in capital cases to

10   consider expert witnesses who can "provide medical, psychological, sociological,

11   cultural or other insights into the client's mental and/or emotional state and life

12   history[.]" 2003 ABA Guidelines, Guideline 10.11(F)(2), 31 Hofstra L. Rev. at

13   1056.

14   There is no question that Lehr's trial counsel were aware of Lehr's potential

15   mental health problems that warranted investigation and consultation with experts.

16   The trial attorneys from Lehr's first trial did not conduct any meaningful mitigation

17   investigation, as outlined in Claim 22. These 1997 attorneys, however, did hire Dr.

18   Woods, a psychiatrist, who administered an MMPI-2 test and diagnosed Lehr with

19   a "paranoid personality" disorder. (Trial Ex. 225.) By the time Dr. Woods

20   administered the test on June 17, 1997 though, counsel then only had three weeks

21   to prepare for the sentencing hearing. (Tr. July 8, 1997 (AM) at 26.) Due to their

22   delay, it was too late for the 1997 trial lawyers to follow up on these test results and

23   investigate further mental health mitigation that may have made a difference. There

24   was enough time, however, for 2009 trial counsel to investigate and develop this

25   further, but they failed to do so.

26   In addition, trial counsel were aware of multiple red flags that something was

27   amiss with Lehr's mental health. They knew Lehr was presenting with a fatalistic

28   attitude and an expressed desire to quickly receive the death penalty (Tr. Apr. 13,

2009 at 7), even if it meant waiving vital constitutional rights. Lehr was distrustful and unwilling to cooperate with his attorneys. (*See* PCR Pet. Reply, Supp. Decl. of Reeves at ¶ 2, Oct. 31, 2016.) Lehr's ex-wife, Renee Dishong, reported that Lehr had a history of depression, experienced mood swings, was generally quiet, and did not have many close friends. Dishong's statement also raised suspicions that Lehr had suffered abuse as a child, possibly from his mother's boyfriend. Then, counsel discovered a 1992 letter that Lehr wrote to his wife indicating "classic mitigation" including childhood abuse and mental health symptoms likely rooted in this early childhood trauma. (*See* PCR Pet. Ex. P.) Counsel also had evidence that Lehr had suffered a head injury as a child and as an adult. Despite all of these red flags, counsel failed to investigate, consult an expert, or evaluate their client for potential mental health impairments.

It is clear trial counsel had more than adequate notice that they needed to investigate Lehr's mental health, but they failed to do so. *See Hendricks*, 70 F. 3d at 1037–39 ("where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance."); *see Porter*, 558 U.S. at 40 (finding deficient performance where counsel "ignored pertinent avenues for investigation of which he should have been aware"); *see also Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1998) ("Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult.").

Trial counsel further failed to retain a mental health expert to conduct a full evaluation of Lehr, or at minimum, to review known evidence on Lehr's mental health symptoms. Lehr's attorneys failed to conduct a proper investigation into his mental health, and thus failed to obtain any mental health expert assistance, accordingly, such a decision is not entitled to deference in this instance. *See Summerlin*, 427 F.3d at 630 (internal quotation marks omitted) ("[W]e need not

defer to counsel's choices at trial unless "those choices [were] made after counsel . . . conducted reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary.")

Trial counsel's failure to investigate Lehr's mental health, and failure to consult with any mental health experts was unreasonable and constitutionally deficient, particularly when faced with so many concerning red flags.

### ii.    Prejudice

Had trial counsel consulted a mental health expert, they would have discovered that Lehr suffers from a range of mental health disorders. Dr. Donna Schwartz-Maddox, a psychiatrist, conducted an extensive record review and evaluation of Lehr. (PCR Pet. Ex. K.) As part of this evaluation, she outlined facts from Lehr's developmental history. For example, Lehr grew up in a single-family household, with a working mother who was largely absent. Her live-in boyfriend reportedly abused both Lehr and his sister, emotionally, physically, and sexually. (*See* PCR Pet. Ex. K at 2.) Schwartz-Maddox opined that Lehr's early childhood development directly contributed to his mental health symptoms, attachment disorder, disassociation, and other sequela of trauma. (PCR Pet. Ex. K.)

Dr. Schwartz-Maddox diagnosed Lehr with Obsessive Compulsive Disorder, Tourette's Disorder, Paranoid Personality Disorder, and Minor Neurocognitive Disorder, among other diagnoses. (PCR Pet. Ex. K.) She further found that "evidence of his obsessive compulsive disorder and the history of impairment from his Tourette's disorder and neurocognitive impairment were present at time of crime. (PCR Pet. Ex. K.) Due to his obsessive compulsive disorder, Lehr experiences recurrent and intrusive obsessions and compulsions in his daily life. (PCR Pet. Ex. K at 6.) He seeks to have order and control over his life, which includes ruminating over lists and developing strict rituals for activities of daily living. (PCR Pet. Ex. K at 7.) Deviating from these daily patterns and rituals can be a source of stress and anxiety for people with obsessive-compulsive disorder.

Dr. John J. Toma, a psychologist, also conducted an evaluation and diagnosed Lehr with Obsessive Compulsive Disorder and Paranoid Personality Disorder. (PCR Pet. Ex. J.) In addition to obsessive compulsive disorder, Lehr was also experiencing depression, including feelings of helplessness and hopelessness. (PCR Pet. Reply, Ex. B: Suppl. Report of Dr. Toma at 2, Oct. 31, 2016.) Dr. Toma recommended a PET scan, as he surmised serious mood, thought, and perceptual disturbances that Lehr was able to mask and manage only when he was isolated on death row. (PCR Pet. Ex. J.)

The constellation of these neurological, neurodevelopmental, and psychiatric symptoms have adversely affected Lehr across multiple areas of his life, including academically, emotionally, and socially. These symptoms were aggravated by a home life that included an overworked single-mother, social isolation, abuse and neglect, and frequent moves in residences and schools. Because of these circumstances, Lehr's mental health symptoms went undiagnosed and untreated. Even worse, the instability to which he was exposed aggravated the underlying biological and psychiatric conditions that defined aspects of Lehr's life and development.

Utilizing an expert would have been important to contextualize and explain the effects of Lehr's personal background to the jury. A mental health expert could have shed light on how Lehr's childhood impacted him and helped to humanize him to the jury. Instead, the jurors "heard almost nothing that would humanize [Lehr] or allow [them] to accurately gauge his moral culpability." *Porter*, 558 U.S. at 41. Additionally, presenting this evidence of Lehr's unique mental health impairments would have impacted the trial court's decision to allow Lehr to waive his constitutional rights at trial; such evidence demonstrates that Lehr's waivers were not informed, knowing, voluntary, and intelligent. (*See* Claims 13, 14.)

As the filings and evidentiary development will show, trial counsel's failure to investigate, consult with the necessary and appropriate experts, and present

evidence of Lehr's mental health background was wholly deficient. The failure to present this mitigating evidence prejudiced Lehr by preventing the jury from hearing that, at the time of the offense, Lehr suffered from a range of mental health problems, which impacted his cognitive functioning and reduced his moral culpability.

### b.   Trial counsel unreasonably failed to investigate and hire an expert to discuss Lehr's brain damage.

#### i.   Deficient Performance

Trial counsel failed to consult with a neuropsychiatrist, neurologist, neuroradiologist, or other brain injury expert even though they had evidence that Lehr suffered a head injury as a young child and an adult. Trial counsel further failed to consult with a neuroimagist or request neuroimaging, such as an MRI or PET scan, in order to present concrete evidence of brain injury to the jury. The decision not to pursue these paths of mitigation was not based on adequate investigation or sound strategic judgment. "[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at 1117 (quoting *Stankewitz*, 365 F.3d at 719–20).

The use of brain scans, in particular MRIs, to investigate and present evidence of brain damage was widespread before Lehr's 2009 trial. Brain injury is considered "classic mitigation evidence," and "Arizona courts place significant weight on brain injuries as mitigating evidence." *Correll*, 539 F.3d at 944, 950 & n.3. The 2003 ABA Guidelines emphasize the need to investigate potential brain impairment, noting that brain scans may be necessary. *See* 2003 ABA Guideline 4.1 cmt. The Ninth Circuit has also made clear that, "where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks v.*

*Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *see Smith*, 379 F.3d at 943 (recognizing the jury knew of defendant's impulsivity and lack of emotional control, but finding counsel ineffective for failing to explain how organic brain damage "caused this 'kind hearted' person to commit such a shocking crime").

Lehr's trial counsel knew he had risk factors for and signs of brain damage. When Lehr was approximately two or three years old, he fell on the stairs and cracked his head open. The mitigation specialist had collected numerous family photos from Lehr's family members. In these photographs were at least two images showing Lehr's head injury as a young child. The photographs depict the stitches across the back of his head from this injury. Experienced trial counsel and mitigation specialists should have known that this event, particularly for such a young child, would have impacted Lehr's brain functioning and development. Lehr also suffered an electrocution as a child and lost consciousness. There were also reports that Lehr had fallen out of a tree while working as a tree trimmer and possibly incurred another head injury as an adult. Despite this evidence, trial counsel failed to research or consult an expert to help shed light on Lehr's brain injuries. Lehr's mental health symptoms outlined above should have also put counsel on notice that Lehr was experiencing some form of cognitive impairment.

The failure to investigate Lehr's brain injury despite these "red flags" is objectively unreasonable. In *Frierson v. Woodford*, the Ninth Circuit reversed a denial of a habeas petition based on ineffective assistance of counsel, in part because trial counsel "ignored the red flag of possible brain damage caused by multiple childhood head injuries by failing to consult a neurologist." 463 F.3d 982, 991 (9th Cir. 2006). Lehr's trial counsel did not have the expertise to make the independent determination that exploring Lehr's brain injuries and seeking brain imaging would not prove relevant, and it was unreasonable insofar as it was based on a lack of a proper investigation. *See Correll*, 539 F.3d at 949 ("An uninformed strategy is not a reasoned strategy. It is, in fact, not a strategy at all.").

Despite evidence of Lehr's brain injuries as a child and an adult, trial counsel failed to research or even consult with an expert regarding possible brain damage. Counsel's failure to investigate Lehr's reported brain injuries, and to consult with a neurologist or other brain injury expert was unreasonable and constituted deficient performance.

### ii.    Prejudice

Had counsel hired an expert, evidence of Lehr's brain damage could have been presented to the jury. Dr. Joseph C. Wu, a psychiatrist and neuroradiologist, analyzed brain imaging of Lehr that had been completed at the recommendation of neuropsychologist, Dr. Toma. On September 24, 2013, a PET scan was conducted, and on November 6, 2013, Lehr was transported for a MRI DTI scan. Dr. Wu authored a neurocognitive imaging report analyzing these scans. (PCR Pet. Ex. L.)

When reviewing the PET scan, Dr. Wu found "decreases in neocortical metabolism relative to cerebellum . . . asymmetrical metabolic decreases in left temporal cortex relative to right . . . decreases in parietal cortex relative to frontal cortex, and decreases in frontal pole and anterior cingulate metabolism." (PCR Pet. Ex. L at 3.) The MRI DTI scan showed significant brain defects and abnormalities: "FA decreases in the corpus callosum are consistent with traumatic brain injury as well as schizophrenia. The FA decreases in the anterior thalamic radiation are consistent with schizophrenia and bipolar disorder." (PCR Pet. Ex. L at 4.) Dr. Wu concluded that there were abnormalities and defects with Lehr's brain, most likely caused by traumatic brain injury:

> The abnormalities shown by Lehr's PET scan and his MRI DTI and MRI neuroquant analysis corroborate the presence of a damaged brain most likely due to traumatic brain injury and are also consistent with Tourette's syndrome as well as psychotic diseases such as schizophrenia and psychotic bipolar disorder. The most notable reason for head trauma being the foremost cause of these brain abnormalities is the asymmetrical nature of the abnormalities. Head trauma also significantly increases the likelihood of developing other disorders such as schizophrenia or bipolar disorder.

(PCR Pet. Ex. L at 6.) Dr. Wu concluded that the "brain damage makes Lehr more vulnerable to the synergistic interaction of an impaired brain and stress from childhood victimization to result in a greater likelihood of violent behavior and an impaired ability to regulate impulses, including use of substances." (PCR Pet. Ex. L at 6.)

Lehr was prejudiced by trial counsel's failure to consult the appropriate expert and to obtain brain imaging. Consultation with a neuropsychiatrist, neurologist, neuroradiologist, or other brain injury expert was necessary to determine the extent of Lehr's brain damage, yet counsel failed to hire an expert who could opine as to Lehr's risk for brain damage, and thus recommend neuroimaging. This failure was particularly unreasonable given the evidence of Lehr's brain injuries. Also critical is that such brain imaging could explain Lehr's impulsivity and fatalistic approach towards his trial and sentencing, including his decisions to waive his presence, mitigation, and allocution at trial. (*See* Claims 13, 14.) Moreover, brain imaging evidence could have also informed the jury's decision at the guilt phase by providing evidence that Lehr did not act with intent to kill and/or premeditation beyond a reasonable doubt.

As the filings and evidentiary development will show, counsel's decision to abandon the investigation at a critical juncture, with red flags of brain damage abounding, was unreasonable and constituted deficient performance, to Lehr's prejudice.

> c. **Trial counsel unreasonably failed to investigate, prepare, and present evidence of Lehr's character and background, and develop a comprehensive social history.**

Trial counsel failed to investigate Lehr's social history, and thus failed to present compelling evidence on Lehr's character, history, and background during the penalty phase of his capital trial. There was so little mitigating evidence presented during the penalty phase that the State even voiced concern: "[the jury

1  have] heard nothing, basically, about his past…." (Tr. April 13, 2009 at 16.)

2      The Eighth Amendment requires the sentencer to consider the defendant's
3  character, history, and background during the penalty phase of a capital trial. *Boyde*
4  *v. California*, 494 U.S. 370, 377–78 (1990); *see also Eddings*, 455 U.S. at 112
5  (noting that consideration of the capital defendant's life history is a
6  "constitutionally indispensable part of the process of inflicting the penalty of
7  death.") (quotation marks and citation omitted)).

8      To put on a competent mitigation presentation, counsel must "use lay
9  witnesses as much as possible to provide the factual foundation for the expert's
10  conclusions…These witnesses can also humanize the client…." 2003 ABA
11  Guideline 10.11 cmt. Accordingly, it "is imperative that all relevant mitigating
12  information be unearthed for consideration at the capital sentencing phase."
13  *Wharton v. Chappell*, 765 F.3d 953, 970 (9th Cir. 2014) (quoting *Caro*, 165 F.3d at
14  1227). "To that end, trial counsel must inquire into a defendant's social background,
15  family abuse, mental impairment, physical health history, and substance abuse
16  history; obtain and examine mental and physical health records, school records, and
17  criminal records; consult with appropriate medical experts; and pursue relevant
18  leads." *Wharton*, 765 F.3d at 970 (quoting *Hamilton*, 583 F.3d at 1113).

19      Due to counsel's failures, the sentencing jury heard no compelling evidence
20  of Lehr's character, background, and social history, and was thus deprived of the
21  ability "to make an individualized assessment of the appropriateness of the death
22  penalty." *Penry*, 492 U.S. at 319. Trial counsel knew Lehr's family members could
23  provide relevant mitigating information yet failed to fully investigate the issues,
24  failed to develop a trusting relationship with Lehr or his family members, and thus
25  failed to develop a comprehensive social history to present to the jury regarding
26  Lehr's unique character and background. While Lehr's mitigation specialist
27  interviewed some family members and friends, that investigation was incomplete
28  and was not sufficient to constitute a reasonable investigation. *See Hamilton*, 583

F.3d at 1114 (finding ineffective assistance where counsel conducted some lay-witness interviews but failed to further investigate). To the extent Lehr convinced his family not to cooperate, trial counsel could have investigated documentary evidence and also consulted with a mental health professional, such as a psychologist or social worker, to prepare a compelling social history to present to the jury.

> **i.    Failure to present compelling lay witnesses at trial.**

Trial counsel failed to present any compelling and relevant mitigating evidence from Lehr's family or close family friends during the penalty phase. To be sure, trial counsel did introduce two family-related witnesses during the penalty phase proceedings. However, the mitigation witnesses counsel did present regarding Lehr's background failed to present information "to the jury in a sufficiently detailed and sympathetic manner." *Douglas*, 316 F.3d at 1087–89. For example, to show Lehr was a good husband and father, counsel relied on the testimony of Kathryn Cooper, a court conciliator with Conciliation Services within the Maricopa County Superior Court, who conducted a custody evaluation for Lehr in 1993. (Tr. April 7, 2009 at 21–23.) Counsel introduced the letter prepared by Cooper in which Lehr is noted to be "a very good parent to the girls" and the "family evaluators were impressed with the Father's ability to express a high level of parental sensitivity." (Trial Ex. 404 at 3.) In conclusion, the evaluator recommended Lehr receive visitation with his children at least once a month, despite his incarceration. (Trial Ex. 404 at 4.) Counsel pointed to this letter and testimony to demonstrate that Lehr's first wife left him with two daughters, Danielle and Teal; that Lehr served as their primary caregiver; and that Lehr was a good father. However, there was no testimony from Lehr's daughters themselves, his ex-wife, or his immediate or extended family to provide corroboration and meaningful examples to this mitigating factor.

The only other "family" witness counsel presented was Claude Brown, Lehr's biological father. Brown provided superficial testimony, at best, during the mitigation hearing. (Tr. April 13, 2009 at 43–60.) His testimony showed Lehr was born out of wedlock and raised in a single-parent home but provided little to no information about the fact or circumstances of Lehr's upbringing, childhood, or personal and family background. Brown made no specific plea to save his son's life and offered no meaningful details regarding Lehr's childhood or upbringing.

Trial counsel failed to develop and maintain positive working relationships, not only with Lehr, but also with his family members. They further failed to explain to Lehr, as well as his family, the reasons for presenting mitigating evidence and the scope of mitigating evidence that could have been presented. For example, trial counsel could have limited mitigating evidence to "positive" mitigation emphasizing Lehr's humanity as a good father, nephew, cousin, and son, and that his family valued his life. Therefore, to the extent trial counsel failed to call family witnesses to present mitigating evidence of Lehr's background because they were following Lehr's orders that they not cooperate, such a failure to investigate was not reasonable or strategic. It was unreasonable for counsel to abandon their duty to provide effective assistance of counsel by acquiescing to Lehr's request not to investigate or call his family members as witnesses. *See Douglas*, 316 F.3d at 1089 ("Although the client's desires are not to be ignored altogether, it may be inappropriate for counsel to acquiesce to the client's demands").

By acquiescing to Lehr's request without making reasonable efforts, counsel abdicated their constitutional duty to provide effective assistance of counsel. (*See infra*, Section (E)(4) (discussing trial counsel's duty to investigate and present mitigation despite an uncooperative client).) Instead of investigating the reasons driving Lehr's decisions to limit the investigation and presentation of mitigating evidence, trial counsel improperly accepted his expressed desire to limit mitigation without further investigation. *See also* Claim 14 (discussing how counsel's failure

1    to investigate mental health evidence impacted his waivers).

2               **ii.    Failure to introduce any documentary evidence.**

3          Moreover, trial counsel failed to introduce any persuasive documentary

4    evidence to highlight aspects of Lehr's character, background, and history. The trial

5    court specifically authorized the release of records to defense counsel (*see* ROA

6    644), but trial counsel failed to introduce documents regarding Lehr's personal

7    background and development at the penalty phase. For example, counsel could have

8    introduced Lehr's school records they had received, showing Lehr graduated from

9    high school and attempted some college courses. Records also showed Lehr

10   participated on the school tennis team. As discussed below in Section (C)(4)(a),

11   letters had been written by Lehr's family discussing Lehr's character and

12   background and reflecting their love and support for Lehr. This information could

13   have humanized Lehr to the jury and allowed the jury to understand his moral

14   culpability. Rather, the jurors "heard almost nothing that would humanize [Lehr] or

15   allow [them] to accurately gauge his moral culpability." *Porter*, 558 U.S. at 41.

16         Lehr's reluctance to have his family testify had no bearing on trial counsel's

17   ability to request, compile, review, and introduce documentary evidence regarding

18   his background. Rather than investigate what records were available and could be

19   introduced, trial counsel did nothing. As a result, when the defense rested, the jury

20   had not heard or received any evidence regarding Lehr's personal or family

21   background or his psychological or neurodevelopmental impairments.

22             **iii.   Failure to present a comprehensive social**
23                      **history**

24         Trial counsel could have utilized the services of a mental health professional

25   to assist in preparing and presenting Lehr's mitigating evidence, but failed to do so.

26   Despite Lehr's uncooperative attitude, trial counsel had a duty to conduct an

27   investigation and seek out other sources to develop and present compelling

28   mitigating evidence. *See Silva v. Woodford*, 279 F.3d 825 at 847 (9th Cir. 2002) ("if

232

a client forecloses certain avenues of investigation, it arguably becomes more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial.").

An expert, such as a psychologist, clinical social worker, or similar professional, could have interviewed or reviewed previous interviews of Lehr's family and friends, evaluated records, identified mitigation themes from those sources, and testified to Lehr's comprehensive social history. *See DeBruce v. Comm'r*, 758 F.3d 1263, 1272–78 (11th Cir. 2014) (counsel ineffectively failed to employ social worker, investigator or other specialist to help him investigate potential mitigating evidence, and petitioner was prejudiced, and entitled to habeas corpus relief). Absent live testimony from Lehr's family, such an expert could have explained to the jury Lehr's complex childhood background, including evidence of childhood trauma, and how Lehr's specific upbringing impacted his development and behaviors as an adult.

### iv.    Prejudice

Had trial counsel done a thorough investigation, developed positive relationships with Lehr and Lehr's family, and fully explained the options for presenting evidence during mitigation to both Lehr and his family members, trial counsel would have known which witnesses to call, what evidence to introduce, and the key topics to raise as part of mitigation. Even absent such lay witnesses, trial counsel could have still have presented a professional expert, such as a psychologist or social worker, to present Lehr's complex social history.

Had counsel properly investigated Lehr's social history, they could have presented the jury with relevant evidence, including:

- Lehr was born out of wedlock to a young, single-mother, who was left abandoned by Lehr's biological father.

- Lehr developed attachment issues due to his upbringing. His mother was never very open, or warm. At one point, Lehr was pushed off to live with

an aunt for three months. He also suffered a head injury requiring stiches across the back of his head when he was just two or three years old.

- Lehr experienced early childhood trauma, including abuse by his mother's live-in boyfriend. Despite this abuse, Lehr's mother moved the children to Phoenix to be with him.

- Lehr did have some positive influence in his life, from a grandfather, aunts, and cousins, who loved and cared for him. But when Lehr's mother moved the family to Kansas City, and then Phoenix, Lehr only saw his extended family during the summers when he visited the family farm back in Wisconsin.

- Lehr did fairly in school, but didn't care for it. He played tennis quite well and graduated from high school. He even enrolled in college for just over a year.

- Lehr worked odd jobs trying to make ends meet before receiving his nurses aid certification and working full-time in a hospital.

- Lehr fell in love, got married, and had twin girls. The twins were left in his care as a single-father after his wife abandoned the family to join the Army.

- Lehr sought to make a living for his family and started his own tree-trimming business, modeled off the business run by his family back in Wisconsin.

- Eventually, Lehr met and fell in love with his wife Renee Dishong. When she became pregnant, they got married, and had a third daughter a few months later. The family struggled financially but by all reports, Lehr was a good husband and good father.

- During all of this time, Lehr struggled with mental health problems, which included symptoms of depression, isolation from others, obsessive

1    compulsive disorder, and Tourette's syndrome, and he also experienced
2    numerous head injuries, yet these disorders went undiagnosed.
3  (*See supra*, Section II (providing a full social history).)

4       Had counsel adequately investigated and prepared for mitigation, Lehr's jury
5  would "have been faced with a strikingly different and more accurate picture" of
6  Lehr's life circumstances as outlined above. *Hovey v. Ayers*, 458 F.3d 892, 927 (9th
7  Cir. 2006). Moreover, such information could have reduced Lehr's moral
8  culpability in front of the jury: "[E]vidence about the defendant's background and
9  character is relevant because of the belief, long held by this society, that defendants
10 who commit criminal acts that are attributable to a disadvantaged background, or to
11 emotional and mental problems, may be less culpable than defendants who have no
12 such excuse." *Brown*, 479 U.S. at 545.

13      The filings and further evidentiary development show that testimony from
14 Lehr's family and close family friends, as well as a professional assessment of
15 Lehr's social history, would have produced this important mitigating evidence. This
16 evidence would have helped to humanize Lehr to the jury and provided the jury
17 with concrete proof of his character, family, and background as well as evidence to
18 gauge his moral culpability. Accordingly, there is a reasonable probability that trial
19 counsel's deficient performance undermined confidence in the outcome of his trial.
20 *Brown*, 137 F.3d at 1157.

21          **4.      Trial counsel failed to introduce readily available evidence**
22          **from the 1997 sentencing hearing.**

23      Even without the live testimony of Lehr's family members or mental health
24 professional, readily available evidence of Lehr's character, background, and
25 family history existed but was not introduced. *See Karis*, 283 F.3d at 1136 (("[T]he
26 fact that [the defendant and his mother] did not offer this information regarding the
27 abuse did not excuse counsel from further investigation."). Trial counsel could have
28 conducted further investigation, and presented compelling mitigating evidence, but

1   failed to do so. For example, trial counsel failed to introduce testimony from Lehr's

2   1997 sentencing hearing and failed to introduce letters written by Lehr's family

3   members that were included in the 1997 presentence investigation report. (ROA

4   569 at 21–30.) The defense also did not introduce any available photographs of Lehr

5   with his children. (*See* Tr. Apr. 13, 2009 at 16.) Such evidence was admissible in

6   Lehr's penalty phase,[15] and would have presented the jury with compelling

7   evidence on Lehr's character, background, and family history.

8        When this evidence was presented in 1997, it was presented for the

9   consideration of a judge. The Supreme Court in *Ring* made clear that such evidence

10   is more properly considered by juries. Trial counsel's failure to present this

11   evidence in 2009 thus deprived the sentencing jury of their essential function of

12   considering all relevant mitigating evidence. Moreover, trial counsel had no

13   strategic reason for failing to include the mitigating evidence available in the

14   family's 1997 letters, prior testimony, and prior statements. The failure was thus

15   objectively unreasonable, and constituted deficient performance.

16                 **a.**    **Failure to introduce evidence from the 1997 trial.**

17   **Lehr's Sister, Rhonda Rojko's 1997 Testimony:** Trial counsel argued that

18   Lehr had a loving relationship with his sister, Rhonda Rojko, by pointing out that

19   she was on his approved list for visitation. (*See* Tr. Apr. 14, 2009 at 80.) Rojko was

20   never called to testify. Inexplicably, trial counsel declined to introduce Lehr's

21   sister's trial testimony from 1997, in which she provided key mitigating evidence

22   regarding Lehr's personal and family history.

23        During the midst of the mitigation phase, trial counsel still had no plan for

24   presenting evidence from Lehr's sister:

25          THE COURT:     What have you decided to do, if anything, regarding

26

27   [15] Arizona Revised Statute § 13-751(C) grants a defendant the right to "present any information that is relevant to any [ ] mitigating circumstances" "regardless of its

28   admissibility under the rules of evidence in criminal trials." *See also Green v. Georgia*, 442 U.S. 95, 97 (1979).

| | |
|---|---|
| | his sister? |
| CLEARY: | I have to make a decision on that. I will make my decision by the end of the week, I guess…assuming that the defendant's sister persists in refusing to come down here and cooperate, is to have her testimony read from the proceedings in 1997. |

(Tr. April 7, 2009 at 90–91.)

On April 13, 2009, however, Cleary stated without explanation that "we have changed our mind" about reading Rojko's testimony from the 1997 trial to the jury. (Tr. Apr. 13, 2009 at 16.) The State—not trial counsel—voiced concern with excluding her testimony: "I may request the Court to have Rhonda's testimony read because I think it does tell a little more about the defendant and it makes him a little more human." (Tr. Apr. 13, 2009 at 16.) The State urged the court to review the transcripts but the judge determined he was "not going to compel the defense to put in her prior testimony." (Tr. Apr. 13, 2009 at 63.) Cleary offered no explanation to the court for refusing to introduce Rojko's 1997 testimony.

The introduction of Lehr's sister's testimony would have provided additional proof to the jury that Lehr was a good father and son as well as highlighted some details from Lehr's childhood and upbringing. Rojko explained that Lehr never knew his biological father and they were raised in single-parent household, where their mother worked full-time to try to provide for her children. (Tr. July 8, 1997 (PM) at 4, 14.) Over the summers, Lehr would visit Wisconsin and stay with their maternal grandfather, maternal aunt, and cousins. (Tr. July 8, 1997 (PM) at 11.) Rojko also provided key information showing that not all aspects of Lehr's childhood were pleasant, specifically mentioning their mom's boyfriend who she believes was a bad influence on Lehr. (Tr. July 8, 1997 (PM) at 10, 14–15.)

Rojko testified that Lehr was a good father and "family-type person." She saw him interact with his children, mostly while raising the two twin girls, which he did by himself since they were two years old. (Tr. July 8, 1997 (PM) at 5.) "[H]e did a great job. They loved him. He loved them. They were always together. His

life was for them." (Tr. July 8, 1997 (PM) at 5.) She believed he was a good husband to his ex-wife, Renee Dishong. (Tr. July 8, 1997 (PM) at 7.) He was a good son to their mother; he was always present on holidays, even dressing up as the Santa Claus or the Easter Bunny. (Tr. July 8, 1997 (PM) at 8.) Their mother would help Lehr financially and also help baby-sit the kids. (Tr. July 8, 1997 (PM) at 11–12.)

Rojko also shared moving testimony showing Lehr was loved, which would have further humanized him to the jury. She emphasized that Lehr's daughters loved for their father and "it would just devastate those girls to have anything happen to Scott." (Tr. July 8, 1997 (PM) at 6–7, 8.) Rojko added "it would be terrifying" if the State were to execute her brother; "I love him, and I'd like to see him stay." (Tr. July 8, 1997 (PM) at 8–9.) Rojko believes Lehr's execution would have the same effect on her mother as well. (Tr. July 8, 1997 (PM) at 9.)

The State's frustration with defense counsel's failure to present Rojko's testimony, which included information relevant to Lehr's personal background, was apparent: "I would tell you this would be the first time in the four capital cases I've tried where the State is asking the Court to consider allowing mitigation evidence for the jury to hear because the defense chooses not to put it in." (Tr. April 13, 2009 at 34.) Ultimately, the State also declined to admit Rojko's testimony.

**Lehr's Cousin, Donna Bartle's 1997 Letter**: Lehr's maternal cousin, Donna Bartle, wrote a compelling letter asking for Lehr to be sentenced to life in prison rather than to be sentenced to death in 1997 (ROA 569 at 21):

> My name is Donna Bartle. I am a cousin to Scott A. Lehr. I am asking that you please consider Scott's sentence to be life in prison rather then execution.
>
> I spent a lot of time with my cousin while we were growing up. We really had fun together when Scott and his sister Rhonda, would come to Wisconsin and visit. As we had gotten older, he moved and lived in separate states, but we would always keep in touch with each other. I love my cousin dearly.
>
> In 1987, I relocated to Phoenix Az. I moved in and lived with my cousin Scott for approximately one year. At that time he had been recently separated from his wife and had become a single parent to his twin

238

daughters.

I remember Scott being a wonderful father to his girls. People everywhere would comment about how cute the girls were dressed and what a nice Dad they had. Their family would get stopped at the grocery store, the library, the shopping malls and the parks. It was very special to see the love, the love, [sic] Danielle and Teal had and shared with their father.

Evenings at the Lehr home were unique. Scott would cook very delicious meals and they would sit at the table and have dinner together and talk about events of their day. After clean-up, it was time for baths. And then, I think came the best part of the families day, it was time to read. Scott would read to Danielle and Teal nearly every night, it was a very special time all of them shared together. Their home was filled with love, discipline and respect for each other.

I moved from Phoenix in the Spring of 1990, as I remember, my cousin Scott, was a terrific father.

I only hope that you can see his need to stay alive, especially for his children. Please Judge Gerst, find it in your heart to keep my cousin alive.

(ROA 569 at 21.)

**Lehr's Aunt, Sandra Thompson's 1997 Letter**: Lehr's maternal aunt, Sandra Thompson, wrote a letter describing her relationship with her nephew and asking the court to spare his life in 1997. (ROA 569 at 22–24.) Thompson explained her relationship with Lehr dating back to his birth, babysitting for him while he was young, and then staying in touch through phone calls after Lehr and his family moved away. (ROA 569 at 22.) Thompson never recalled Lehr being a trouble maker or "causing pain to anyone in anyway." (ROA 569 at 22.)

Lehr would come to Wisconsin over the summers and stay with his grandfather. (ROA 569 at 22.) Lehr was "helpful and willing to learn about farm work. He seemed eager to drive [the] tractor and help Grandpa." (ROA 569 at 22.)

Thompson also wrote of Lehr's relationship with his daughters, Teal and Danielle. (ROA 569 at 22–23.) After the birth of his girls, "he seemed to be even more caring and sensitive to people[']s needs. He was always so eager to spend time with his girls and care for them. He enjoyed being a father in every aspect.

Whenever I was around, he was always beaming with pride for his daughters." (ROA 569 at 23.)

She further explained the impact of Lehr's arrest on his daughters, noting that they "missed and loved their Daddy" and hoped he would get to come home. (ROA 569 at 23.)

Thompson explained the purpose of her letter and made a compelling plea to save her nephew's life:

> I hope this helps you understand what a warm caring person Scott is, and also hope you truly consider not giving Scott the Death Penalty. Scott is my first nephew and will always be very special in my heart, and to think of him dying before his time is devastating to me. I have spent many days and evenings in a depression over his incarceration and I can't put into words the devastation if he was put to death by our Justice System.

(ROA 569 at 23.) Thompson then explained her reasons for opposing the death penalty and that she did not feel the state should take a life under any circumstances: "That is for God to decide when our time is up." (ROA 569 at 23–24.) She expressed that "when the court kills a young father of three beautiful girls it is the most devastating of all. I can't even begin to deal with the reality of such a deed." (ROA 569 at 24.) Thompson closed by asking the court to consider the effect of Lehr's execution on their family. (ROA 569 at 24.)

**Family Friend, Steve Garcia's 1997 Letter**: Steve Garcia submitted a letter asking the court to spare Lehr's life. (ROA 569 at 25.) Garcia considered Lehr's mother, Yvonne Lehr, a "very close friend throughout the years" and explained he got to know Lehr well during the 1980's. (ROA 569 at 25.)

While Garcia's letter shared his personal views of the death penalty and vouched for Lehr's innocence, the letter also shared compelling insight into Lehr's character and background:

> I knew Scott as a young man who came to work with us at Digital Equipment Corporation in the 1982. He was a very conscience employee, hard working and always going out of his way to help other

employees. Through Yvonne, Scott's mother, I got to know Scott well during the l980's. As a parent he was extremely loving, patient and dutiful to his children. As a self employed person, Scott worked hard to become successful. He believed in the American dream and worked hard to achieve self sufficiency. He bought a home and grew his one person business slowly and solidly. In the ten years (1981-1991) that I knew Scott I never saw any signs of deviancy, delinquency or behavior that would predict the crimes that he has been convicted. I really viewed Scott as model son. Yvonne, his mother, was so proud of his success. She described him as a wonderful father and a good husband but most of all, she was so proud of his ability to build his own business and be successful as a family man.

(ROA 569 at 25.) Garcia asserted he never observed any behavior that would "indicate a psychotic nature capable of these crimes." (ROA 569 at 25.) He argued the government should invest money on preventative measures "to detect the potential killers and intervene before something drastic happens" rather than "spending all the money on appeals." (ROA 569 at 26.) Garcia closed his letter by stating "The Scott Lehr I knew would not commit these crimes. So if this is a different Scott – then something changed in him. It is more practical for Society and the victim's families to understand why rather than just takes [sic] his life."

**Lehr's Mother, Yvonne Lehr's 1997 Letter**: Lehr's mother, Yvonne Lehr, wrote a three-page letter to the court, however, only two pages are legible in the record on appeal. (ROA 569 at 27–30.) In the letter, Lehr's mother conveyed her belief in Lehr's innocence but also pleaded for her son's life and provided compelling insight into Lehr's character, background, and family history:

Never as a child, teen or adult had any kind of violence been witnessed in Scott. As a teen he was not a fighter, as an adult he never even spanked his children, never inflicted physical pain on anyone. No way can I conceive that on the night before his first-wedding anniversary with Renee, while planning a ski trip to celebrate, would he go out and begin this violent, heinous crusade that would continue over a year. The violence just somehow does not fit.

Scott was left with the twins Teal and Danielle when they were two years old and he spent the next three years being a single parent until he met and married Renee. During this period of time I watched Scott raise the girls with sensitivity, understanding, love and devotion,

241

> traveling with them, playing with them, reading to them and providing their everyday needs. These girls thrived in the care of their father, they were open and spontaneous children exhibiting a natural trust and acceptance of people. When he met and married Renee their lives were even more enriched with a step-mother who loved them as her own. And then a baby sister, Sedona.
>
> During Scott[']s years of incarceration I have taken the girls to visit him in jail. These visits were at the request of the girls to see their father, they talked to him by phone and corresponded with him by letters. The love for their father is unconditional. This makes me think about how I will explain to them that abortion is wrong, it takes lives, or that Dr. Kevorkian is wrong in assisting people in taking their own lives, but government sanctioned murder is ok.
>
> I believe in Scott's innocence…

(ROA 569 at 28.) Lehr's mother's letter than critiqued the evidence presented at Lehr's first trials and asserted her belief in Lehr's innocence. (ROA 569 at 30.) She also enclosed two photograph's of Lehr's daughters, Teal, Danielle, and Sedona. (ROA 569 at 27.)

**Lehr's Ex-Wife, Renee Dishong's Statement to Police & 1996 Testimony**: When Lehr's ex-wife, Renee Dishong, was unable to testify, the defense failed to offer her existing statement given to police following Lehr's arrest in 1992 or her prior testimony from the 1996 trial, where she was called as witness by the State. (*See* Tr. April 13, 2009 at 17.)

Phoenix Police Department Officer Randy Chapman and Detective Gregory interviewed Dishong shortly after Lehr's arrest on June 25, 1992; her statement is included in the Phoenix Police Department's July 2, 1992 dated report for DR No. 10641049. While the police questioned Dishong regarding relevant facts for their investigation, the statement to police also included helpful information for mitigation, such as red flags of symptoms indicating problems with his mental health and/or brain injury. For example, the officer's summarized their conversations with Dishong:

> Renee said that Scott had grown up in Wisconsin. He has one sister. Both he and his sister come from separate fathers. Scott advised Renee that both he and his sister were born illegitimately. Renee said that

242

Scott's mother has never been married. Scott came to Arizona when he was fourteen years old. He told Renee that his mother had followed a doctor from Wisconsin out here. After being in Arizona for a short time, Scott's mother told Scott and his sister that she intended to marry the doctor. Both Scott and his sister protested this. Ultimately it was found that the doctor had been molesting Scott's sister. Scott also told Renee that the doctor had shown him photographs of his mother nude. Renee said apparently Scott hated the doctor, and did not want his mother to marry the doctor. Renee had an uneasy feeling that perhaps Scott also was molested by this doctor. Scott had never told her this, it was just her impression.

Renee explained that she is Scott's second wife. His first wife, Kim and he divorced around 1985. There were two children as a result of that marriage. They are seven years old twin girls. Scott has custody of the girls, because Kim, after the divorce, joined the army reserve. Scott convinced Kim that it would be better if he had custody of the girls, rather than her dragging them all over the country in the army reserve. Renee described Scott and Kim's current relationship as cordial. She said that they speak on a friendly basis, and there is never any harsh words between the two of them. Kim has visitation rights to both girls.

Renee said that she currently works for United Parcel Services. She obtained that job on May 29th, of 1991, and June 26th was to be her last day at work. She said that she had turned in a two week notice about two weeks ago. She said her and Scott had intended to move from Phoenix to Prescott, Arizona. It was her intention to seek employment in Prescott. I asked what Scott had intended to do in Prescott. She said that Scott was going to come to Phoenix for three days a week and continue his tree trimming business.

Renee explained that Scott has had a tree trimming service ever since she has known him. He is a self employed tree trimmer. He generally works in the morning hours, and is home by 2:00 and 3:00 in the afternoon. When asked how work was, she advised that he works fairly steady, but sometimes there is long lay offs, due to the nature of the job. I asked her about winter time. She advised that Scott works less frequent in the winter.

Police then discussed the family moving four separate times in the year of 1991. Renee explained there was a valid reason for moving, such as the home being too big for their needs, not being able to do a lease purchase, or simply Dishong not liking the home.

Dishong's statement also described some martial conflict. She recalled on March 17, 1992, St. Patrick's Day, she returned home after breakfast with her

mother, and "found a note which had been written by Scott and left on the television set. The note said something to the effect of, I can't take it anymore, and I'm not going to live here any longer." Dishong believed that Lehr had left her. However, March 18, 1992, Lehr called and told her he was in Malibu, California but he returned home later that day. However, Dishong said Lehr had never become violent with her or struck her. Lehr never threatened her.

Dishong's statement to police includes details regarding Lehr's personal background and mental health:

> She described him as being a family man. She said that he is a good father and a good husband. She went on to say that he is occasionally moody and quiet at times. She felt that he may be depressed over their money problems, or just depressed in general. She said that he definitely does have mood swings, and is often times quite [sic]. However, she reiterated that he is never violent or threatening towards her. She said that he rarely raises his voice.

Dishong continued that Lehr did not have a best friend. He has a casual acquaintance by the name of Alan. Renee reported that Lehr occasionally drinks, such as on their anniversary or a special occasion. He would drink a mixed drink or cocktail; she had not seem him drink wine or wine coolers.

The State called Dishong to testify during the 1997 trial. While her testimony was largely limited to factual issues regarding the police investigation, she did discuss aspects of Lehr's history that could have informed trial counsel's investigation. For example, Dishong explained that Lehr had his own tree-trimming service and would pass out flyers to help attract business. (Tr. Oct. 29, 1996 at 122–23.) Dishong testified Lehr had one sister, no brothers, and that he grew up locally in Phoenix and they went to the same high school, Washington. (Tr. Oct. 29, 1996 at 124–25.) While Dishong also testified regarding alibis for two offenses, these facts also show that Lehr was a good husband and father. For example, Dishong testified to the twin girls' birthday party on Sunday, February 23, 1992 that was held at their house with her brother, his wife, their two children, her dad, Lehr's

1   mother, his sister, and his cousin. (Tr. Oct. 29, 1996 at 139.) Also, in February 1991,

2   Dishong went on a ski trip with her husband for their anniversary. (Tr. Oct. 29, 1996

3   at 145–46.) On cross-examination, counsel moved for admission of a number of

4   family photographs depicting Lehr with his family. (Tr. Oct. 29, 1996 at 143–45.)

5                    **b.     Failure to investigate "classic mitigation" evidence.**

6            Trial counsel obtained a letter that Lehr allegedly wrote to his ex-wife, Renee

7   Dishong, shortly after his arrest in 1992. (PCR Pet. Ex. P.) The letter discussed

8   aspects of Lehr's mental health and personal background. (PCR Pet. Ex. P.) On

9   October 22, 2007, trial showed the letter to Judge Timothy Ryan, who was serving

10  as the "mitigation master." (Tr. Oct. 22, 2007 at 5–8.) Trial counsel knew that this

11  letter would constitute crucial mitigation. (Tr. Oct. 22, 2007 at 5–8.) Trial counsel

12  needed to determine the scope of allegations in the letter, consult with experts

13  regarding the content of the letter, and speak candidly with Lehr and his family

14  members regarding the letter's content. The letter would have led reasonable

15  counsel to investigate the issues of mitigation more deeply, but here, trial counsel

16  failed to do so.

17          A year later, the letter was again discussed on the record with Judge Klein

18  and prosecutor Clayton on November 26, 2008. At this time, trial counsel asked for

19  a continuance to conduct a mitigation investigation, and Cleary indicated that he

20  was going to put this type of mitigation into evidence even if the client did not want

21  it presented. (Tr. Nov. 26, 2008 at 18.) Judge Klein read the letter and called it

22  "classic mitigation, [and that] it would almost be malpractice to ignore it." (Tr. Nov.

23  26, 2008 at 24.) The judge told the defense attorneys to get the information in the

24  letter to a "defense mitigation expert." (Tr. Nov. 26, 2008 at 29.) He ordered that

25  the letter be given to the State. (Tr. Nov. 26, 2008 at 41.) This was never done,

26  because on December 11, 2008, trial attorney Cleary told Judge Klein that he had

27  decided not to disclose or admit the letter, nor was he going to make it available to

28  experts. (Tr. Dec. 11, 2008 at 3–10). The judge then ordered that the letter did not

have to be produced and commented that the "bases for using the letter as a need for a further continuance is no longer viable." (Tr. Dec. 11, 2008 at 9).

Trial counsel performed deficiently by failing to investigate the letter between first discovering it in October 2007 until again discussing the letter with the court in November 2008. As discussed above, despite Lehr's uncooperative attitude, there were multiple avenues available for trial counsel to investigate the full scope of Lehr's background and history, and options to present such evidence to the jury. Moreover, even though the letter contains potentially "adverse evidence," that does not mean counsel did not perform deficiently in failing to investigate and present expert testimony that was overwhelmingly beneficial. *See Sears v. Upton*, 561 U.S. 945, 951 (2010) (per curiam); *Williams*, 529 U.S. at 396; *cf. Porter*, 558 U.S. at 43.

Trial counsel's efforts to investigate, however, were further hampered by the trial court denying the continuance before trial counsel had the opportunity to conduct the needed investigation. Cleary argued to the court: "we were asking for a continuance because we had only recently got that letter. The Court did not grant the continuance…" (Tr. April 7, 2009 at 101.) The trial court should have allowed a continuance so defense counsel could have fully investigated the allegations raised in the letter. Instead, the court forced counsel's ineffectiveness by requiring disclosure of the letter prior to allowing counsel the ability to fully investigate, obtain and consult with experts, and determine the relevance and strategy for presenting such mitigating evidence raised in the letter. Instead of allowing time for this investigation, and consultation with experts, the trial court placed defense counsel in an untenable position. Even worse, after knowing they were not going to present the letter, trial counsel had even more of an obligation to use the existing, available, mitigation presented in 1997.

The details in the letter describing Lehr's troubled upbringing, allegations of physical, emotional, and sexual abuse, mental health symptoms, and other trauma

sequela were all beneficial factors that could have helped to educate the jury on Lehr's specific characteristics. Due to trial counsel's deficient performance, however, none of this information was presented to the jury.

### c.     Prejudice

Trial counsel performed deficiently by failing to introduce readily available evidence regarding Lehr's character, background, and history. Instead, trial counsel did nothing. Had the jury been presented with a complete picture of Lehr's character, childhood, mental health, and personal background, there is a reasonable probability that at least one of Lehr's jurors would have imposed a different sentence. *Hovey*, 458 F.3d at 927.

During the closing argument, the State seized on the lack of evidence supporting the mitigating factor that Lehr was a good father and husband. (Tr. April 14, 2009 at 136–38.) Clayton argued counsel failed to prove these factors by a preponderance of the evidence through the introduction of Cooper's testimony and the custody report. (Tr. April 14, 2009 at 138.) Because trial counsel failed to investigate, develop positive relationships with Lehr and Lehr's family, prepare any mitigating evidence on Lehr's personal and family background, or introduce the readily available evidence from Lehr's family, there was no other evidence supporting these mitigating factors.

Because of the inadequate investigation and insufficient presentation, counsel failed to give the jury an adequate understanding of Lehr's background and how his childhood informed his behaviors and actions. Trial counsel offered the jury no coherent mitigation theme to weigh against the aggravating circumstances that the jury had already found. Had Lehr's jury been presented with a more accurate picture of Lehr's character, background, and family, there is a reasonable probability that at least one of Lehr's jurors would have voted to impose a different sentence. *Hovey*, 458 F.3d at 927. Because counsel failed to present critical and compelling mitigation, counsel's deficient performance undermines confidence in

1  the outcome of Lehr's mitigation phase. *See Douglas*, 316 F.3d at 1091.

### 5. Trial counsel unreasonably failed to request a natural life sentence option.

Trial counsel performed below an objective standard of reasonableness when failing to request a natural life sentence option prior to the penalty phase.[16] The defense argued that because of Lehr's prior sentences he would never get out of prison, regardless of the sentence they imposed. (*See*, *e.g.*, Tr. Apr. 14, 2009 at 116; Tr. Apr. 6, 2009 at 47–61.) But Lehr's counsel did not object to the two sentencing options the jury was given on the capital counts (death or life with parole eligibility), or request that the jury be instructed on a natural life option at sentencing. (*See* ROA 928, 934.) By failing to request a sentence option that included natural life (without parole), as permitted under the revised Arizona statute, trial counsel's performed deficiently, and to Lehr's prejudice.

### a. Deficient Performance

The jury had only two options at Lehr's sentencing on the capital counts: the death penalty; or a life sentence with a possibility of parole after 25 years. (*See* ROA 966–68; ROA 949 at 1.) The jury's only alternative to death was a sentence that would have made Lehr eligible for parole on the first-degree murder counts

---

[16] This subsection of Lehr's claim was not raised in state court. Lehr can overcome any default of this claim by showing cause and prejudice, including the denial of the effective assistance of appellate and post-conviction counsel. *See Martinez*, 566 U.S. at 9 (2012); *Murray*, 477 U.S. at 488–89; *Strickland*, 466 U.S. at 687–88; *see also Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999) (analyzing whether omitted issues were "significant and obvious"); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985) (noting that if "appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance"). Lehr will demonstrate through his filings and at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, any procedural bar is not adequate or independent or imposing default would be a miscarriage of justice. Because these claims have not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claims de novo.

after serving 25 years. But the sentencing law in effect at the time of the second trial allowed for a third option: natural life without the possibility of parole. A.R.S. § 12-752 (2009). After convicting Lehr of aggravated first-degree murder, the jury may have found a natural life option a more palatable alternative and spared his life. But defense counsel did not object or request that the jury be given an option of natural life. (*See* ROA 928; ROA 934.)

The offenses of which Lehr was convicted were alleged to have occurred in 1991 and 1992. At that time, the sentencing laws of Arizona allowed for two sentencing options for first-degree murder: the death penalty; or a life sentence with a possibility of parole after 25 years. A.R.S. § 13-703(A) (1992). (*See also* State's Memo on Range of Sentence, July 11, 1997, ROA 558.) At the time of Lehr's first trial and sentencing, Arizona's sentencing laws also allowed for a natural life sentence. A.R.S. § 13-703(A)(1996). By the time of Lehr's second trial and sentencing, Arizona's capital sentencing law had been dramatically revamped, but retained the three sentencing options for first-degree murder: death, life with parole, or natural life. A.R.S. § 13-752(A) (2009).

When the Arizona Supreme Court remanded Lehr's 1996 death sentence for a new sentencing proceeding, it instructed the trial court to apply the state's new capital sentencing law: "we vacate Lehr's death sentence and remand for resentencing under revised A.R.S. sections 13-703 and 703.01 (Supp. 2002)." *Lehr II*, 67 P.3d at 706. This new sentencing law provided for determinations by a jury, not a judge, and allowed for three different sentences: natural life (life without parole), life with parole eligibility after a number of years, or death. A.R.S. § 13-703 (2002) (later codified at A.R.S. § 13-752 (2009)). The law in effect at the time of the alleged offenses, however, allowed for a sentence of life with parole eligibility after a number of years or death. A.R.S. § 13-703(A) (1992). (*See also* ROA 558.)

The legislative history of the sentencing law makes clear that Lehr should

have been sentenced under the law applicable at the time of his sentencing and not the one applicable at the time of the murders. *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 174, § 1. The Arizona legislature had to overhaul its capital sentencing law in 2002 in response to *Ring v. Arizona*, which held its prior law unconstitutional. 536 U.S. 584 (2002). The new 2002 capital sentencing statute changed much of the procedure, but continued to include three sentencing options for first-degree murder as it had since the mid-1990s (death, life with parole, natural life). *See* A.R.S. § 13-703 (Supp. 2002). The "Applicability" provision of the new 2002 death penalty statutes explained "Sections 13-703 and 13-703.02, Arizona Revised Statutes, as amended by this act, and section 13-703.01, Arizona Revised Statutes, as added by this act, apply to any sentencing or resentencing proceeding on any first degree murder case that is held after the effective date of this act." 2002 Ariz. Legis. Serv. 5th Sp. Sess. Ch. 1 (S.B. 1001) (Sec. 7(A)). The legislature clearly intended that the new law would be applied regardless of the date of the offense.

In contrast, the legislature also explained how two separate portions of the statute, regarding Supreme Court review, should apply to future sentencings and resentencings. *Id*. at Sec. 7(B)-(C). The legislature explained that one section, § 13-703.04, would apply when "the offense was committed *before* the effective date of this act," and another section, § 13-703.05, would apply when "the offense was committed *on or after* the effective date of this act." *Id*. (emphases added). Thus, the legislature understood what it was doing by proscribing that "*any* sentencing or resentencing on *any* first degree murder case" would apply § 13-703. *Id*. at Sec. 7(A) (emphasis added). "Any" clearly includes cases where the offenses pre-date the statute.

In Lehr's case, the trial court did not apply the sentencing law in effect at the time of the sentencing, despite the legislature's clear intent and the instructions from the Arizona Supreme Court. Nor did it apply the sentencing law that was in effect at the time of the offenses. Instead, the court applied part of each—the procedure

1    from 2009 and the available sentences from 1992. And defense counsel sat quietly

2    by as the jury was incorrectly told that sparing his life meant Lehr could be eligible

3    for parole on these counts.

4         Further, although sometimes defendants are entitled to use the sentencing law

5    in effect at the time of their offense to avoid an ex post facto violation, this was not

6    such a time. "[I]t has long been recognized by [the United States Supreme Court]

7    that the constitutional prohibition on *ex post facto* laws applies only to penal statutes

8    which disadvantage the offender affected by them." *Collins v. Youngblood*, 497

9    U.S. 37, 41 (1990). A natural life sentence was less than the maximum sentence

10   allowable under the law at the time of Lehr's alleged offense, and in this situation

11   the new law would have advantaged him. But even if having a natural life option

12   available at sentencing was somehow deemed to disadvantage Lehr, it has long been

13   the law in the Ninth Circuit that defendants may choose to waive their ex post facto

14   rights in order to receive a particular sentence. *See*, *e.g.*, *Rose v. Palmateer*, 395

15   F.3d 1108, 1113 (9th Cir. 2005).

16        The defense's failure cannot be chalked up to some kind of strategic decision

17   in the hopes of getting a sentence with parole eligibility for Lehr. Regardless of

18   whether the defense communicated it effectively to the jury or whether the jury

19   believed it, Lehr was in fact already sentenced to spend the rest of his natural life in

20   prison. There was no practical difference between a natural life sentence and a life

21   sentence with parole eligibility in this case—except a jury would be more likely to

22   choose the natural life sentence instead of death. As such, trial counsel performed

23   below an objective standard of reasonableness when failing to request a natural life

24   sentence option for the jury's consideration.

### b.    Prejudice

26        Lehr was prejudiced by trial counsel's failure because at the penalty phase

27   the judge gave the jury only two sentencing options on the capital counts: the death

28   penalty; or life with a possibility of parole after 25 years. (ROA 966–68; 949 at 1.)

1    So in the minds of the jury, when considering the appropriate sentence in the 2009

2    trial, their only option other than death was parole eligibility after 25 years.

3        Had trial counsel requested a natural life sentence option there is a reasonable

4    probability that the outcome of the proceeding would have been different. *See*

5    *Strickland*, 466 U.S. at 694–95. Having a natural life sentence option would have

6    decreased the likelihood of a death sentence in Lehr's case. Justice Stevens

7    explained "A recent poll indicates that support for the death penalty drops

8    significantly when life without the possibility of parole is presented as an alternative

9    option. And the available sociological evidence suggests that juries are less likely

10   to impose the death penalty when life without parole is available as a sentence."

11   *Baze v. Rees*, 553 U.S. 35, 78–79 (2008) (Stevens, J., concurring). Indeed, trial

12   counsel presented evidence to the jury that Lehr would never get out of prison. (*See*,

13   *e.g.*, Tr. Apr. 14, 2009 at 116.)

14       Although the defense presented evidence that Lehr would never get released

15   from prison regardless of the sentence imposed in the capital cases, (*see*, *e.g.*, Tr.

16   Apr. 6, 2009 at 47–61), no one knows what weight the jury gave to that evidence.

17   The jury may have given that no weight and had a genuine fear that Lehr could soon

18   get released on parole if they did not impose the death penalty. Indeed, the defense

19   actually let testimony stand unchallenged that implied that Lehr would be eligible

20   for release during his lifetime on the other charges. (*See* Tr. April 6, 2009 at 66.)

21       Lehr was prejudiced by his counsel's failure to request a natural life option

22   at sentencing, because there is a reasonable probability that the jury would not have

23   chosen the death penalty if they were given the alternative option of a natural life

24   sentence without the possibility of parole. *See Baze*, 553 U.S. at 78–79.

25           **6.      Trial counsel unreasonably failed to object to numerous**

26                   **erroneous penalty-phase jury instructions.**

27       There were a number of problems with the jury instructions in Lehr's penalty-

28   phase trial. (*See* Claim 21.) Lehr's counsel, unfortunately, failed to object to them,

depriving Lehr of his rights to effective counsel, a fair trial, an impartial jury, due process, and equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[17]

**First**, defense counsel unreasonably failed to request that the jury be given objective standards for weighing the aggravating and mitigating circumstances during the penalty phase. (*See* Claims 21, 34.) The death penalty cannot be imposed arbitrarily, or without sufficient ways to distinguish between which convicted murderers get death and which do not—and any reasonably competent capital defense attorney should be well aware of the decades of Supreme Court precedent affirming this principle. *See e.g.*, *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988); *Spaziano v. Florida*, 468 U.S. 447, 460 (1984) *overruled on other grounds by Hurst v. Florida*, 136 S. Ct. 616 (2016); *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

In spite of this clear, long-standing principle, the defense allowed the jury to be given only the circular instructions that they should vote for life if they find the mitigation circumstances sufficient to vote for life. (Tr. Apr. 14, 2009 at 120.) The defense should have demanded that the jury be given specific guidance on how to weigh the aggravated and mitigated circumstances, including demanding that the

---

[17] This claim was not raised in state court. Lehr can overcome any default of these claims by showing cause and prejudice, including the denial of the effective assistance of appellate and post-conviction counsel. *See Martinez*, 566 U.S. at 9 (2012); *Murray*, 477 U.S. at 488–89; *Strickland*, 466 U.S. at 687–88; *see also Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999) (analyzing whether omitted issues were "significant and obvious"); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985) (noting that if "appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance"). Lehr will demonstrate through his filings and at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, any procedural bar is not adequate or independent or imposing default would be a miscarriage of justice. Because these claims have not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claims de novo.

1    jury be instructed that the death penalty should only be imposed in murders that are

2    "above the norm."

3         The defense failed to object to the circular instruction, and failed to demand

4    other instructions to provide objective guidance to the jury. It is reasonably probable

5    that if the jury had not been given unfettered and unguided authority to sentence

6    Lehr to death, at least one juror would have chosen a life sentence instead.

7         *Second*, defense counsel allowed the jury to be instructed that Lehr had the

8    burden of proving that any mitigation was "sufficiently substantial to call for

9    leniency," (*see* Tr. Apr. 14, 2009 at 120), and that the jury "shall impose a sentence

10   of death" if they find "no mitigating circumstances sufficiently substantial to call

11   for leniency" (Tr. Apr. 14, 2009 at 121). (*See* Claims 21, 36.) Defense counsel

12   should have been on notice that such an instruction placing the burden on the

13   defense was unconstitutional. Just a few years before Lehr's 2009 trial the Supreme

14   Court had held the Kansas death penalty statute constitutional because it required

15   the State to prove that the aggravators outweighed the mitigators, and thus did not

16   have a presumption of death. *See Kansas v. Marsh*, 548 U.S. 163, 173 (2006).

17        It is reasonably probable that a juror would have found that the aggravators

18   did not outweigh mitigators and voted for a sentence of life if they had not been

19   incorrectly instructed that they should presume a death sentence.

20        *Third*, defense counsel did not ask for an instruction that if the jury found

21   any mitigating circumstance it could not impose the death penalty unless the State

22   proved beyond a reasonable doubt that the mitigating circumstance was not

23   sufficient to call for leniency. (*See* Claim 37.) In fact, the defense allowed—with

24   no objection—the jury to be instructed that "even if you believe that the aggravating

25   and mitigating circumstances are of the same quality or value, you are not required

26   to vote for a sentence of death and may instead vote for a sentence of life in prison."

27   (Tr. Apr. 14, 2009 at 120.)

28        The Supreme Court has made clear that it is not enough that a jury find the

existence of at least one aggravating circumstance beyond a reasonable doubt, a determination regarding the relative weight of the aggravating and mitigating circumstances is also a factual finding necessary to a defendant's eligibility for a sentence of death. *Hurst*, 136 S. Ct. at 622. And while *Hurst* was decided after Lehr's trial, the precedential foundation for its holding had been established law for years by 2009. *See*, *e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 498 (2002) (Scalia, J., concurring) (charges against the accused, and the corresponding maximum penalty he faces, must be determined "beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.").

It is reasonably probable that at least one juror would have voted for a life sentence instead of death if they had been properly informed that the State had to prove that the aggravation outweighed the mitigation beyond a reasonable doubt

***Fourth***, the defense did not request special verdict forms or otherwise request that the jury make specific findings on the mitigation circumstances. (*See* ROA 966–68 (penalty-phase verdict forms); Claims 21, 27.)) The Supreme Court required decades ago that "the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." *Gardner v. Florida*, 430 U.S. 349, 361 (1977). Reasonably effective defense counsel would have been aware of this requirement and would have requested it in this case. Not only did it increase the chance that Lehr may have had his sentence vacated on appellate review, but writing out the specific factors may have influenced how the jurors thought about them—and would have ensured that the jurors considered every factor and did not miss any. *See*, *e.g.*, Kenneth F. Ripple, *Legal Writing in the New Millennium: Lessons from a Special Teacher and a Special 'Classroom,'* 74 Notre Dame L. Rev. 925, 926 (1999) (explaining the concept of jurists deciding on an opinion, and then changing the opinion while writing it down because it "just won't write.") There is a reasonable probability that the process of writing out the factors may have caused a juror to vote for a life

1    sentence.

2        **Fifth**, Lehr's counsel should have requested that the jury be instructed that

3    they could consider mercy or sympathy during the penalty phase, and should have

4    objected to the instruction telling the jury not to consider sympathy. (*See* Claim 21.)

5    It is well-established that jurors must be able to consider *any* and *all* mitigation. *See*

6    *Lockett v. Ohio*, 438 U.S. 586, 587 (1978). And, it is well-established that "a simple

7    plea for mercy" is proper mitigation. *See Darden v. Wainwright*, 477 U.S. 168, 185–

8    86 (1986). Indeed, there was little mitigation presented in this case so a plea for

9    mercy may have been the most effective strategy. But the jury was not instructed

10   that they could consider mercy, and they were—without resistance—instructed that

11   they could *not* consider things such as sympathy. (Tr. Apr. 14, 2009 at 119.)

12       There is no strategic reason not to request a penalty-phase instruction that the

13   jury could consider mercy, and to try to stop the court from prohibiting the jury

14   from considering sympathy. And there is a reasonable probability that if the jury

15   had not been instructed otherwise, at least one juror would have been compelled to

16   spare Lehr's life based on mercy alone.

17       **Sixth**, Lehr's counsel should have requested that the jury be told they could

18   consider residual doubt in deciding whether to impose a life sentence. (*See* Claim

19   21.) Residual doubt is undoubtedly one of the "circumstances of the offense" which

20   the jury must be permitted to consider. *See Lockett*, 438 U.S. at 587. Yet, the court

21   did not tell the jury this and the defense did not ask for a jury instruction on this. It

22   is reasonably probable that a single juror would have found there was some residual

23   doubt and spared Lehr's life on that basis.

24       **Seventh**, Lehr's counsel allowed the court to instruct the jury that they could

25   only consider mitigation factors that were proven to a preponderance of the

26   evidence and that extenuated or reduced his culpability or blameworthiness. (Tr.

27   Apr. 14, 2009 at 115, 119; *see* Claim 33.) But the Supreme Court requires that jurors

28   consider *any* and *all* mitigation. *See Lockett*, 438 U.S. at 587. Reasonably effective

counsel would have objected to these instructions that unconstitutionally limited the mitigation evidence the jury could consider. Under these instructions a juror who wanted to be merciful on account of Lehr's family relationships would have had to ask herself whether those relationships made Lehr less culpable of the murders, and ignored this desire to be merciful if not. Defense counsel should have objected. It is reasonably probable that this error impacted at least one juror's decision.

**Eighth**, Lehr's counsel should have objected to instructions that required the jury to impose death if one aggravating circumstance was found and no mitigating circumstances were found. (ROA Apr. 14, 2009 at 121 ("You shall impose a sentence of death if you have found one or more aggravating circumstances and then determine that there are no mitigating circumstances or no mitigating circumstances sufficiently substantial to call for leniency."); *see* Claims 21, 35.) This instruction unconstitutionally places a "thumb on death's side of the scale, thus creating the risk of treating the defendant as more deserving of the death penalty. *Sochor v. Florida*, 504 U.S. 527, 532 (1992) (internal citations omitted).

It is reasonably probable that if the jurors had not been instructed to presume that the death penalty was the appropriate sentence, a juror would have chosen life instead.

**Ninth**, Lehr's counsel should have requested an instruction that the jury should consider multiple mitigation factors cumulatively. (*See* Claim 33.) There is no doubt that juries can, and should, consider mitigation cumulatively during the penalty phase as part of its duty to consider any and all mitigation. *See Lockett*, 438 U.S. at 587. Yet the instructions here did not tell the jury this, and there is a reasonable probability that a juror incorrectly considered the mitigation on a one-by-one basis instead of in their totality, and voted for a death sentence because of it.

**Tenth**, the defense failed to object to instructions telling jurors: "Any verdict of life imprisonment or death must be unanimous." (Tr. Apr. 14, 2009 at 122; *see*

*also* Tr. Apr. 14, 2009 at 123 ("In order to return a verdict, all 12 of you must agree on the sentence to be imposed.").) The instructions offered no option for the jury if they could not reach a unanimous decision, effectively requiring the jury to continue deliberations until they reached a unanimous agreement. As argued in Claims 21 and 34, this instruction is unduly coercive and misleads the jury into believing they have to reach a unanimous decision.

Counsel should have objected and requested that the judge clarify that the jury had a third option—not reaching a unanimous decision. Such an instruction would have clarified that the jurors did not have to deliberate until they reached a unanimous verdict. This failure prejudiced Lehr: had counsel objected to the instructions, there is a reasonable probability that the court would have reworded the instructions and that, in turn, at least one juror would have voted differently.

**Eleventh**, Lehr's counsel should have asked for an instruction that the jury consider the proportionality of a death sentence on Lehr as compared to other defendants. (*See* Claim 21.) It is a bedrock principle of the Eighth Amendment that disproportionate punishments are cruel, unusual, and prohibited. *See*, *e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 102–3 & n.7 (1976). If the jury had heard how infrequently the death penalty is imposed, and heard about other similar cases that resulted in life sentences, it is reasonably probable that at least one juror would have spared Lehr the death sentence.

In conclusion, defense counsel failed to protect Lehr's constitutional rights by allowing numerous erroneous and harmful jury instructions during the penalty phase of his trial. Counsel's unreasonable performance prejudiced Lehr by increasing the risk that his jury would return a death sentence. *Cf. Taylor v. Kentucky*, 436 U.S. 478, 488–89 (1978) (holding that the "arguments of counsel cannot substitute for instructions by the court"). Because there is a reasonable probability that at least one juror would have voted for a life sentence instead of death but for these instructions, Lehr's sentence must be vacated. *See Wiggins v.*

1   *Smith*, 539 U.S. 510, 537 (2003).

2          **7.      Trial counsel unreasonably failed to present a case for life.**

3          Trial counsel's deficiencies were not limited to their failure to assemble and

4   maintain a qualified defense team, develop and maintain a relationship and

5   communication with the client, investigate and present compelling mitigating

6   evidence on Lehr's character, mental health, brain injury, and family background,

7   to consult with the necessary and appropriate experts, and to ensure the appropriate

8   sentence and jury instructions. Leading up to and conducting the mitigation hearing

9   itself, trial counsel failed to make a case for life. As the following conduct

10  demonstrates, "[t]his case is more akin to those situations in which defense counsel

11  failed to present any mitigating evidence at all." *Smith v. Stewart*, 189 F.3d 1004,

12  1008 (9th Cir. 1999).

13         Except where noted, the factual allegations in the following subclaims were

14  not raised previously as part of the ineffective assistance of counsel sentencing

15  claim, but because de novo review is warranted, this court may consider the facts

16  that were not presented below. Alternatively, ineffective assistance of post-

17  conviction counsel excuses any default. *See Martinez*, 566 U.S. at 9; *Dickens*, 740

18  F.3d at 1317–22.

19         **a.      Failure to litigate the case before the resentencing**
20                  **proceedings began**

21         Trial counsel failed to properly prepare for the penalty phase by neglecting

22  to file motions in limine or other motions attempting to limit the State's evidence

23  or to allow introduction of Lehr's mitigating evidence. For example, trial counsel

24  failed to ensure a specific colloquy on the record regarding Lehr's alleged "waiver"

25  of mitigation and presence during the penalty phase. (*See* Claims 14, 24.) Had

26  counsel done so, the trial court would not have accepted Lehr's invalid waivers.

27         In light of the difficulty of preserving errors during the "heat of battle,"

28  competent counsel "file[s] written motions in limine prior to trial raising any issues

that counsel anticipate will arise at trial." 2003 ABA Guideline 10.8 cmt., 31 Hofstra L. Rev. at 1033. Moreover, capital counsel "has a duty…to preserve issues calling for a change in existing precedent; the client's life may well depend on how zealously counsel discharges this duty. Counsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices." 2003 ABA Guideline 10.8 cmt., 31 Hofstra L. Rev. at 1032 (footnote omitted).

### b.      Failure to argue for life in opening.

Trial counsel failed to persuasively argue for a life sentence during the opening argument at the penalty phase. Had counsel done the proper investigation, they could have argued for a life sentence based on Lehr's character and background showing he is not "the worst of the worst." For example, Lehr's mental health disorders, brain injury, and early childhood trauma, impact his behavior and development and thus, his moral culpability. Counsel could have further argued that Lehr's family love and support him and would testify to his role as a good father, son, and brother.

Instead, Cleary's opening argument in the penalty phase spanned three pages. (Tr. Apr. 6, 2009 at 34–38.) Cleary first discussed technical aspects of the jury instructions, such as the burden of proof. (Tr. Apr. 6, 2009 at 34–35.) Then Cleary simplistically outlined the mitigating factors that would be presented. (Tr. Apr. 6, 2009 at 34–37.) Cleary ended his opening statement with a comment that: "the evidence will show the existence of mitigating circumstances that call for leniency." Cleary's opening statement during the penalty phase was a missed opportunity to argue passionately to the jury about why the mitigating evidence they were going to present should compel the jurors to vote for life.

### c.      Failure to introduce the testimony of victim Tracie Hancock-Street Lujan showing her opposition to the death penalty.

Tracie Hancock-Street Lujan (hereinafter "Hancock") refused to testify against Lehr during the guilt phase due to her opposition to the death penalty. (Tr.

1   Mar. 27, 2009 at 59–67.) Due to this, the court determined she was unavailable and

2   read her 1996 trial testimony into the record. (Tr. Feb. 11, 2009 at 193; Tr. Feb. 12,

3   2009 at 39; *see also* Claim 26.) Defense counsel sought to present Hancock as a

4   mitigation witness but declined when they had "been stiffed by Kelly Luther

5   [Hancock's attorney], she will not return our calls, so I don't have anything to add."

6   (Tr. Apr. 13, 2009 at 116.)

7        Only after the State finished presenting their evidence did Cleary broach the

8   subject of introducing Hancock's prior testimony from when she was questioned by

9   the court regarding her unavailability. (Tr. Apr. 14, 2009 at 96.) Trial counsel was

10  so unprepared they did not have the transcript of her testimony. (Tr. Apr. 14, 2009

11  at 97.) The court declined to admit Hancock's testimony because nothing was raised

12  by the prosecution that would allow trial counsel to introduce her testimony on

13  rebuttal. (Tr. Apr. 14, 2009 at 97.) Had trial counsel been adequately prepared, they

14  would have had Hancock's testimony showing her opposition to the death penalty

15  for Lehr prepared to be admitted during their mitigation presentation.

16       Later that day, Hancock's attorney returned Cleary's communication and

17  advised that Hancock did not want to come back to court but understood her prior

18  testimony was given under oath and is public record and "she would have nothing

19  to say" about the use of her testimony for "whatever purpose they think is

20  appropriate." (Tr. Apr. 14, 2009 at 102–03.) At this point, Cleary moved to reopen

21  mitigation "to have her statements from the unavailability hearing be read to the

22  jury, as a witness and not a victim," (Tr. Apr. 14, 2009 at 103) (citing *State v.*

23  *Stauffer*, 58 P.3d 33 (Ariz. 2002) (distinguishing between the testimony of a 404(b)

24  and (c) witness and not a victim).) Cleary indicated Hancock's testimony was

25  relevant to the "issue of life or death" and because her convictions were used as the

26  (F)(2) aggravators. (Tr. Apr. 14, 2009 at 103–04.) Cleary was not prepared to

27  present any authority saying a witness or victim in a capital case is entitled to give

28  the jury their opinion on the death penalty for the purposes of mitigation. (Tr. Apr.

14, 2009 at 106.) Cleary conceded that her testifying would open the door for the state to call other aggravator witnesses in rebuttal to state their opinion on the death penalty. (Tr. Apr. 14, 2009 at 106.) Because trial counsel was so unprepared, the trial court overruled their request to reopen mitigation to present Hancock's testimony in opposition to the death penalty. (*See also* Claim 25 (alleging constitutional violation for excluding relevant mitigating evidence from Hancock).) Therefore, the jury never heard this relevant mitigating evidence that a witness in this case did not feel the circumstances warranted the death penalty.

### d. Failure to introduce mitigation evidence that Lehr offered to plead guilty.

Trial counsel failed to raise Lehr's willingness to accept a plea offer to a life sentence as a mitigating factor. Post-conviction counsel raised this sub-claim in his amended post-conviction petition filed on April 28, 2016. (PCR Pet.'s Mot. to Am. at 12 (citing *Busso-Estopellan v. Mroz*, 364 P.3d 472 (Ariz. 2015)).) The post-conviction court held that the issue was precluded under Rule 32.2(a)(3) from consideration because appellate counsel had failed to raise the claim on appeal; that the claim as to the 1997 sentencing is moot; and then proceeded to discuss the claim on the merits. (PCR Order at 48). Lehr also raised the claim in his petition for review, (PFR 3 at 52), which the Arizona Supreme Court denied without comment in a one-page order (PFR 29 at 1.)

Lehr had agreed to plead guilty, and 1997 counsel Reeves was involved in those plea negotiations, although he failed to ensure that the record contained mention of the proposed agreement, which eventually fell through. (PCR Pet.'s Mot. to Am. at 12–13.) The prosecutor offered Lehr the opportunity to plead guilty to an unsolved murder of a young girl who disappeared in 1992 as well as plead guilty to the other crimes charged in his case. In exchange, the State offered a life sentence. The deal would have taken the death penalty off of table, which Lehr was willing to accept and expressed his acceptance of the deal. The deal fell apart,

1   however, when the prosecution required Lehr to direct police to the location of the

2   missing girl's body. While Lehr attempted to assist the authorities, the body was

3   never located. (*See* PCR Pet. Reply, Supp. Decl. of Reeves at ¶ 5, Oct. 31, 2016;

4   PCR Pet.'s Mot. to Am. Ex. A, Decl. of Reeves at ¶ K, Apr. 20, 2016.)

5          This offer to plead guilty was never presented to the jury during the first trial,

6   or at the second trial. A capital defendant has a constitutionally protected right to

7   provide the jury with mitigating evidence. *See Williams*, 529 U.S. at 393. A

8   defendant can introduce their "offer to plead guilty as mitigating evidence showing

9   acceptance of responsibility." *Johnson v. United States*, 860 F. Supp. 2d 663, 903

10  (N.D. Iowa 2012). "It is imperative that all relevant mitigating information be

11  unearthed for consideration at the capital sentencing phase. The Constitution

12  prohibits imposition of the death penalty without adequate consideration of factors

13  which might evoke mercy." *Caro*, 165 F.3d at 1226 (internal citations omitted). The

14  failure to include Lehr's willingness to accept a plea offer as a mitigating factor

15  constituted deficient performance, and prejudiced Lehr because the jury may have

16  viewed his sentence in a different light had they known he was willing to plead

17  guilty back in the early 1990s.

18        **e.    Trial counsel failed to advocate for a life verdict in**
19              **closing argument.**

20         Trial counsel failed to deliver a compelling closing argument that made the

21  case for a life sentence for Lehr. Competent counsel must "take advantage of all

22  appropriate opportunities to argue why death is not [a] suitable punishment for their

23  particular client." 2003 ABA Guideline 10.11(L), 31 Hofstra L. Rev. at 1058. There

24  is perhaps no more important moment to fulfill this obligation than closing

25  argument. (1975) (additional citations omitted)). "The right to effective assistance

26  extends to closing arguments…Closing arguments should 'sharpen and clarify the

27  issues for resolution by the trier of fact…" *Yarborough v. Gentry*, 540 U.S. 1, 5–6

28  (2003) (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975) (additional citations

1   omitted)).

2       Rather than preparing for a powerful closing argument advocating for a life

3   sentence for Lehr, Cleary debated waiving their opening closing statement entirely

4   to instead offer only a rebuttal to the State's closing. (Tr. April 14, 2009 at 97–101.)

5   Right before the jury returned to the courtroom, Cleary decided to give an opening

6   closing statement.

7       Cleary's closing argument spanned eight transcript pages. (Tr. Apr. 14, 2009

8   at 124–31.) Of that, the first four pages were mostly unrelated to Lehr and merely

9   repeated aspects of the jury instructions. (Tr. Apr. 14, 2009 at 124–27.) He did not

10  mention any mitigating circumstances until the fifth page, and then he only briefly

11  addressed them over the course of two pages. (Tr. Apr. 14, 2009 at 128–30.)

12      Cleary conceded "Lehr is convicted of horrible crimes." (Tr. Apr. 14, 2009

13  at 131.) He then further confused the jury's consideration of the mitigating evidence

14  by stating: "In reaching a reasoned, moral judgment about which sentence is

15  justified and appropriate, you must decide how compelling or persuasive are the

16  totality of the aggravating factors and the facts and circumstances of this case." (Tr.

17  Apr. 14, 2009 at 131.) Rather than directing and encouraging the jury to consider

18  whether the specific mitigating factors were sufficiently substantial for leniency,

19  Cleary's last words to the jury invited them to consider all of the facts of the case,

20  which necessarily includes the "horrible crimes." (Tr. Apr. 14, 2009 at 131.)

21      During rebuttal closing statements, Tallan similarly failed to make the case

22  for life. (Tr. Apr. 14, 2009 at 151.) Tallan needlessly admitted his client's guilt:

23  "That's not in dispute that Scott Lehr did heinous, horrible things to many women."

24  (Tr. Apr. 14, 2009 at 151.) "What Scott Lehr did . . . was horrible. Horrible, horrible,

25  horrible." (Tr. April 14, 2009 at 152; *see also* Claim 18.) Tallan needlessly repeated

26  the State's closing argument, reminding the jury of prejudicial statements against

27  Lehr rather than making the case for life. (Tr. Apr. 14, 2009 at 157 (repeating the

28  State's argument to "[k]ill him for the pain that he's done to others").)

1    Tallan than contradicted the defense's own mitigating factors that Lehr was

2    a good father and husband by frankly declaring, "Is Scott Lehr a good person? No."

3    (Tr. Apr. 14, 2009 at 157.)

4    Rather than humanizing Lehr and helping the jury connect to him, Tallan

5    emphasized the difference between Lehr and the jury: "There's some reason why

6    Scott Lehr is not like us . . . We don't kill . . . Because he's not like us. There's

7    something wrong with him. Is that a reason to kill him?" (Tr. Apr. 14, 2009 at 160.)

8    But due to counsel's failure to present any mitigating evidence regarding Lehr's

9    traumatic childhood, mental health disorders, or brain injury, the jury had no context

10   to understand or weigh Lehr's moral culpability in this way.

11   Had Lehr's counsel offered the jury some explanation as to how Lehr's

12   mitigation warranted leniency, there is a reasonable probability that at least one

13   juror would have voted for life. *See Smith v. Spisak*, 558 U.S. 139, 154–55 (2010)

14   (recognizing the importance of having fresh in jurors' minds the connection

15   between mitigating circumstances and the crimes). Had trial counsel focused on

16   why leniency was warranted, or had offered a coherent narrative for the jury to

17   understand Lehr's character and background, there is a reasonable probability that

18   the outcome of the proceeding would have been different. Lehr was thus prejudiced

19   by counsel's deficient closing argument. *See Strickland*, 466 U.S. at 694–95.

20          **f.     Failure to object to improper statements by the**
21                   **prosecutor.**

22   Trial counsel stood idly by while the State made repeated, improper

23   statements to the jury during the penalty phase. By failing to object to these

24   improper statements, trial counsel performed deficiently and to Lehr's prejudice.

25   *See Zapata*, 788 F.3d at 1115–16 (finding ineffective assistance when counsel did

26   not object to "egregious misstatements" by the prosecutor in argument that were

27   "fabricated from whole cloth [and] designed to inflame the passions of the jury").

28   Here, the conduct of William Clayton, a prosecutor with experience spanning

decades, both prejudiced Lehr's substantive rights and rendered his trial fundamentally unfair. His misconduct was not confined to a single instance but was persistent. (*See* Claim 29.) During the penalty phase, Clayton repeatedly recharacterized the jury instructions to Lehr's detriment. For example, Clayton improperly argued to the jury that growing up without a father, in a single-parent family is not "an excuse for murder." (Tr. Apr. 14, 2009 at 134.) Trial counsel failed to object.

As another example, the prosecutor told the jury they must set aside moral beliefs and that "the morals are written in our law" (Tr. Apr. 14, 2009 at 149). Trial counsel failed to object to this complete misstating of the law. The Supreme Court has made clear that "the sentence imposed at the penalty stage should reflect a *reasoned moral response* to the defendant's background, character, and crime" *See Penry*, 492 U.S. at 319 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

The prosecutor also made improper emotional appeals to the jury: "In this mitigation phase, you may have been left wanting, seemed cheated. And you may be seeing a baby seat, instead of sufficiently substantial mitigation. The State asked you not to get in that vehicle, to ride off and say, well, it was sufficient. Sufficient to imprison, as opposed to death penalty." (Tr. Apr. 14, 2009 at 148.) *See Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (finding the prosecutor "made several offensive comments reflecting an emotional reaction to the case. These comments undoubtedly were improper.").

Trial counsel rendered ineffective assistance of counsel by failing to object to improper statements made by the prosecutor during the penalty phase. These failures deprived Lehr of a fair trial and undermine confidence in the outcome. *See id.* at 1123–24. It is reasonably likely that, had trial counsel properly and forcefully objected, the prosecutor's arguments would have been curtailed, and with proper admonitions, the jury would have properly understood its role in determining the

1   need "to make an individualized assessment of the appropriateness of the death

2   penalty," including consulting their moral response to mitigation. *See Penry*, 492

3   U.S. at 319.

**8.    Trial counsel's unreasonable investigation and failure to present compelling mitigating evidence resulted in the jury hearing a constitutionally inadequate mitigation presentation.**

7       Trial counsel failed to reasonably investigate mitigation, as outlined above.

8   As a result, counsel were left unprepared to present strategic, thoughtful, and

9   compelling mitigating evidence. A mitigation strategy must be decided after a full

10  investigation; investigation cannot follow an already-decided-upon mitigation

11  strategy. *See Wiggins*, 539 U.S. at 521–22; *Strickland*, 466 U.S. at 691; *cf. Weeden*

12  *v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017) (discussing ineffective assistance

13  at guilt phase). Because counsel failed conduct a full investigation and uncover the

14  scope of mitigating evidence available, the presentation they did offer the jury was

15  not informed, strategic, or compelling.

16      Instead of hearing from Lehr's family members, co-workers, friends, or

17  colleagues, as well as medical and mental health experts, the jury only heard the

18  technical testimony of corrections officials regarding prison classifications and

19  Lehr's prison behavior. Defense counsel settled on telling the jury that Lehr would

20  serve the rest of his life in prison. The jury was thus presented with a haphazard and

21  unpersuasive collection of testimony, much of which did more harm than good.

22  "[T]he mitigation that is presented must not just support a "superficially reasonable

23  mitigation theory," *Sears v. Upton*, 561 U.S. 945, 953–54 (2010), nor may it be

24  "haphazard." *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015).

**a.    Deficient performance.**

26      Trial counsel failed to present a thoughtful and compelling case for life.

27  Instead, they presented the testimony of two criminal justice experts and five ADOC

28  employees in an attempt to show that the prison could safely and securely house

Lehr for the rest of his life. (Tr. Apr. 6, 2009 at 47–145.) Trial counsel failed to adequately research and prepare these witnesses so once they were on the stand, and subjected to the prosecutor's cross-examination, their testimony ultimately did more harm than good.

To show Lehr would spend the rest of his life in prison, an ADOC employee testified that the total years of Lehr's existing sentence would be approximately 716 years. (Tr. Apr. 6, 2009 at 60.) But on cross, the prosecutor emphasized that the Board of Executive Clemency could grant parole, which would "affect some of the computations." (Tr. Apr. 6, 2009 at 66.) Counsel's argument backfired because now the jury was left with the impression that Lehr could indeed be eligible for parole within his lifetime.

To demonstrate Lehr could be safely and securely housed in prison, ADOC employees provided dry and technical testimony on the prison's public and institutional risk assessments that are used to determine an inmate's prison classification, custody-level, and housing placement. (Tr. Apr. 6, 2009 at 115–16, 124–24.) Through this testimony, counsel hoped to show that Lehr had a low institutional risk score and that he was housed in a highly-supervised and restrictive Special Management Unit ("SMU") with limited privileges and freedoms. (*See e.g.*, Tr. Apr. 6, 2009 at 73–74; Tr. Apr. 6, 2009 at 122.) But on cross, the prosecutor undermined this argument by emphasizing the few privileges people in SMU-II do have, such as possessing televisions, cable television, food items, shaving items, and headphones for music. (Tr. Apr. 6, 2009 at 121–22.) The prosecutor also elicited testimony indicating that Lehr could be placed in a lower-custody environment, with greater freedoms and privileges. Ultimately, the jury was left with the impression that the custody-level housing Lehr was not sufficient punishment for his crimes and that his custody-level may be lowered over time.

Even worse, by putting on ADOC employees who had reviewed Lehr's correctional files, the prosecutor was able to emphasize Lehr's institutional record,

which included disciplinary infractions for fighting while in county jail (Tr. Apr. 6, 2009 at 144–45); possession of contraband including "stingers" which are heated sticks that can be used to heat water for coffee—but could also be used to shock someone (Tr. Apr. 6, 2009 at 115–16); and for "fishing," which means he was "using a line and a hook to draw some other kinds of materials into his cell" (Tr. Apr. 7, 2009 at 59). Thus the jury heard evidence that Lehr could not conform his conduct to the institutional rules, and thus posed a risk to the institution.

In addition to these ADOC witnesses, trial counsel presented two experts: Jon Sorenson, a professor in criminal justice, and Chase Riveland, a consultant with a background in corrections. Sorenson opined that due to Lehr's background, he had a decreased risk of behavioral issues in prison.[18] (Tr. Apr. 7, 2009 at 6–7.) Riveland opined that ADOC has the capacity to protect Lehr during his incarceration and there is no indication "he would be any problem to manage within the institution." (Tr. April 7, 2009 at 65–66.) The testimony of these witnesses were similarly undermined on cross-examination.

Trial counsel also called Kathryn Cooper, who conducted the custody evaluation that allowed Lehr to have visitation in jail with his two daughters back in 1993 (Tr. April 7, 2009 at 21–23; Trial Ex. 404), and Lehr's biological father, Claude Brown, who provided cursory testimony explaining his brief relationship with Lehr's mother in the 1950s and that he never knew he had a son (Tr. Apr. 13, 2009 at 44–55). Brown could speak to no details regarding Lehr's character, background, or family history, as he had never met him. (Tr. Apr. 13, 2009 at 43–55.)

_____

[18] Defense counsel moved into evidence Professor Sorenson's report on Lehr but Clayton objected because he did not question Sorenson on the report as part of cross-examination before Sorenson exited and left the courthouse. (Tr. April 7, 2009 at 17-20.) So instead, trial counsel agreed to admit Professor Sorenson's PowerPoint presentation that was shown to the jury. (Tr. April 7, 2009 at 20; Tr. April 13, 2009 at 42; Tr. Ex. 405.) Trial counsel erred by not ensuring Professor Sorenson's report was admitted into evidence.

Based on this abbreviated and anemic testimony, trial counsel proposed the following circumstances as mitigation during the penalty phase:

> The defendant was a good father to his children; The defendant was a good husband to his wife; The defendant had no prior record of criminal behavior or accusations of violence of any kind prior to his arrest in 1992; The defendant has been a model prisoner while in custody; The defendant will never be released from prison before his natural death, as his earliest release date is well into the 28th Century; The Arizona Department of Corrections can securely and safely house the defendant for the remainder of his life; The defendant never knew his biological father or paternal relatives; The defendant was born out of wedlock and raised in a single-parent home; The defendant's first wife left him with two small children, daughters, so she could join the military; Prior to his second marriage, the defendant was the primary caregiver for his two daughters; Prior to his incarceration, defendant had a loving relationship with his three daughters; Defendant has a loving relationship with his sister and has maintained such a relationship despite his lengthy incarceration.

(Tr. April 14, 2009 at 115–16.) Because defense counsel failed to reasonably and competently investigate, prepare, and present evidence supporting these mitigating factors, the jury was not provided with any proof of these mitigating factors which would qualify Lehr for a sentence less than death. The State even questioned: "where is their proof [of being a good father, a good husband, a good son]" without his sister Rhonda Rojko's testimony? (Tr. Apr. 13, 2009 at 36.)

**b.    Prejudice.**

Trial counsel's entire mitigation presentation, premised on the single flawed theory that Lehr would spend the rest of his life in prison, predictably backfired – to Lehr's prejudice. Trial counsel's presentation of these prison witnesses was not strategic and failed to make the case for a life sentence. Lehr was prejudiced by the calling of these witnesses because the jury heard damaging and prejudicial evidence, including Lehr's institutional violations, that they would not have heard otherwise.

During his closing, Prosecutor Clayton undermined trial counsel's argument that Lehr would spend the rest of his life in prison and left the jury with the

1   impression that Lehr could indeed be granted parole on his previous convictions.

2   (Tr. Apr. 6, 2009 at 66.) Clayton argued serving a life sentence was not sufficient

3   punishment by alluding to the amenities inmates access in prison and even

4   commenting, "it kind of [sounds] like room service." (Tr. Apr. 6, 2009 at 101.) He

5   reminded the jury that Lehr referred to his cell as his "suite" and had access to

6   *Penthouse* magazines. (Tr. Apr. 14, 2009 at 143.)

7       Clayton argued that Lehr could not abide by institutional rules: "Model

8   prisoner . . . he was fighting. He was angry. He had veiled threats to an officer . . .

9   he had a stinger. He had sharpened metal. He was fishing." (Tr. Apr.14, 2009 at

10  142.) Clayton highlighted testimony showing the possibility of Lehr being placed

11  in lower custody housing should be given a life sentence. (Tr. Apr.14, 2009 at 142.)

12  He emphasized that in lower-level custody "he gets fewer restrictions, staff

13  interactions, movement without cuffs and women staff there." (Tr. Apr. 14, 2009 at

14  143.) He challenged Sorenson's expert testimony that Lehr would be unlikely to

15  commit future acts of violence because he does not "fit Sorenson's mold." (Tr. Apr.

16  14, 2009 at 143.)

17      By the end of the prosecutor's closing statement, defense counsel's entire

18  mitigation presentation had been unraveled and the jury was left with the impression

19  that a life sentence was not severe enough punishment for Lehr's convictions and

20  that Lehr could not be conform his conduct in prison.

21      Moreover, knowing Lehr faced life in prison based on these maximum

22  sentences from the first trial, the 2009 jury may have felt compelled to vote for

23  death in order for some additional punishment be served for the three homicides

24  and one sexual assault they considered. *See, e.g., Witherspoon v. Illinois*, 391 U.S.

25  510, 519 n.15 (1968) ("[O]ne of the most important functions any jury can perform

26  . . . is to maintain a link between contemporary community values and the penal

27  system . . . "). In *Caldwell v. Mississippi*, 472 U.S. 320, 341 (1985), the Court

28  vacated the sentence of death finding Eighth Amendment error when "[t]he State

sought to minimize the jury's sense of responsibility for determining the appropriateness of death." Here, it is the opposite, the State sought to *maximize* the jury's sense of responsibly for determining the appropriateness of death. Clayton seized on this during his closing argument: "Scott Lehr is doing life in prison. You're here now to determine what's going to be the punishment" for Christorf, Morales, and, Cronin. (Tr. Apr. 14, 2009 at 132–33.) Trial counsel even improperly emphasized that Lehr was already serving a life sentence: "Life in prison, life in prison, life in prison, life in prison. He was given every punishment he could be given." (Tr. Apr. 14, 2009 at 152.) Trial counsel's deficient mitigation presentation ultimately did more harm the good, and ultimately gave the jury reasons to support their sentence of death.

Lehr was thereby prejudiced. The introduction of this evidence at Lehr's mitigation hearing, when combined with the absence of any evidence on Lehr's character, background, and history, clearly undermines the adversarial process and renders the outcome of his capital trial unreliable.

**D.     Cumulative consideration of counsel's failures throughout the penalty phase prejudiced Lehr.**

Examined together, defense counsel's numerous errors prejudiced Lehr. As outlined above, counsel failed to assemble and maintain a fully-qualified defense team, failed to develop and maintain a relationship with their client, failed to investigate and present mitigating evidence of Lehr's character, background, and family history, failed to consult and use the necessary and appropriate medical and mental health experts, failed to object to numerous erroneous penalty-phase jury instructions, failed to present any compelling mitigating evidence, and failed to make the case for life throughout the entirety of the penalty phase. As a result of these failures, the jury heard virtually no evidence providing "insights into [Lehr's] mental and/or emotional state and life history that may" have "support[ed] a sentence less than death." 2003 ABA Guideline 10.11(F)(2), 31 Hofstra L. Rev. at

1056. Had the jury heard any of the relevant mitigating evidence that we know now was available, there is a reasonable probability that at least one juror would have voted for life. *See Bemore*, 788 F.3d at 1176 ("Bemore need only show that counsel's errors were 'sufficient to undermine confidence in the outcome' reached by a single juror." (quoting *Strickland*, 466 U.S. at 693–694)); *see also Sears*, 561 U.S. at 954–55.

Because trial counsel failed to investigate, the mitigation presented at trial gave jurors no relevant evidence regarding Lehr's character, background, and social history, including his mental health and cognitive impairments. *See Douglas*, 316 F.3d at 1090 (finding ineffective assistance where counsel "introduced some of [the defendant's] social history" but did so in a "cursory manner that was not particularly useful or compelling"). Trial counsel should have called witnesses, both family members and family friends, who could have provided a more thorough picture of Lehr's childhood to help explain Lehr's behaviors and actions throughout his adult life. *See Powell v. Collins*, 332 F.3d 376, 400 (6th Cir. 2003) ([I]f counsel had actually conducted an investigation and produced pertinent witnesses, jurors would have heard first-hand accounts from those who knew Petitioner best"). Here, Lehr's family witnesses could have spoken first-hand to Lehr's childhood and upbringing, his mental illness and cognitive impairments, and the life he attempted to build for himself as an adult, despite these difficulties. Instead, Lehr's jury was left with no information regarding the scope of his childhood or upbringing. *See White*, 895 F.3d at 672 (noting that deficient failure to present mitigation left the sentencer with the misperception, based on the defendant's own characterization, that the defendant's childhood was normal).

Had counsel met their constitutional duty to provide effective assistance of counsel, the jury would have heard a properly contextualized mitigation story. Trial counsel could have presented a compelling mitigation narrative that connected the dots for the jury in a manner that had a reasonable probability of changing at least

1    one juror's opinion. Indeed, "[h]ad the jury been able to place [Lehr's] life history

2    on the mitigating side of the scale, there is a reasonable probability that at least one

3    juror would have struck a different balance." *Stankewitz*, 365 F.3d at 725.

4        Family and family friend witnesses could have also provided powerful

5    testimony to the jury and helped to "humanize" Lehr. *See White v. Ryan*, 895 F.3d

6    641, 671 (9th Cir. 2018). This "positive" mitigation would have shown the jury the

7    extent to which his family loved and supported Lehr as a father, son, nephew, and

8    cousin. Had trial counsel presented evidence that Lehr was loved and supported by

9    his family there would be a reasonable probability of changing at least one juror's

10    opinion that he deserved a death sentence.

11        The jury also never learned that Lehr suffers from a cluster of cognitive

12    impairments because trial counsel failed to conduct a complete investigation, failed

13    to consult with the necessary or appropriate mental health experts, failed to have a

14    neuropsychological battery administered, failed to obtain neuroimaging, and failed

15    to have additional psychological and neuroimaging tests completed. Evidence now

16    shows Lehr suffers from a number of mental health impairments and also has a

17    traumatic brain injury. Expert testimony explaining these diagnoses would have

18    provided crucial and compelling information regarding Lehr's trauma-related

19    psychiatric symptoms and cognitive impairments that manifested in his behaviors

20    and actions throughout his adult life. The evidence regarding Lehr's mental health

21    and traumatic brain injury, which could have been presented, is "'the kind of

22    troubled history [the Supreme Court has] declared relevant to assessing a

23    defendant's moral culpability.'" *White*, 895 F.3d at 672 (quoting *Wiggins*, 539 U.S.

24    at 535); *see also Tennard*, 542 U.S. at 288 ("Impaired intellectual functioning [also]

25    has mitigating dimension beyond the impact it has on the individual's ability to act

26    deliberately.").

27        Furthermore, in assessing prejudice, the Court must "reweigh the evidence in

28    aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S.

1  at 534. For example, in *Rompilla*, the United States Supreme Court reversed

2  Rompilla's sentence of death concluding:

> This evidence adds up to a mitigation case that bears no relation to the
> few naked pleas    for mercy actually put before the jury, and although
> we suppose it is possible that a jury could have heard it all and still
> decided on the death penalty, that is not the test. It goes without saying
> that the undiscovered "mitigating evidence, taken as a whole, 'might
> well have influenced the jury's appraisal' of (Rompilla's)
> culpability . . . and the likelihood of a different result if the evidence
> had gone in is 'sufficient to undermine confidence in the outcome'
> actually reached at sentencing.

9  *Rompilla*, 545 U.S. at 393. In Lehr's case, the undiscovered and unpresented

10  mitigation outlined above, taken as a whole, "might well have influenced" the jury.

11  *See id.*

12  Even if this Court finds that no single error amounts to prejudice, it,

13  nonetheless, should apply cumulative error principles to grant relief. *See Boyde v.*

14  *Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005). Here, the totality of counsel's errors

15  undermine confidence in the outcome of Lehr's penalty phase. *See Douglas*, 316

16  F.3d at 1091; *see also Strickland*, 466 U.S. at 694; *see also Eddings*, 455 U.S. at

17  112 (recognizing that a death sentence imposed without any credible evidence is

18  prejudicial). Therefore, Lehr was denied effective assistance of counsel at the

19  penalty phase in violation of his constitutional rights, and he is entitled to relief.

20  **E.    The post-conviction court's denial of this claim was contrary to, or**
21  **an unreasonable application of clearly established law and an**
22  **unreasonable determination of the facts.**

23  Lehr raised this claim in his post-conviction petition. (PCR Pet. at 15–24.)

24  The post-conviction court denied the claim on the merits. (PCR Order at 8–29.)

25  Lehr filed a petition to review and the Arizona Supreme Court denied review

26  without comment in a one-page order. (PRF 29 at 1.) The state court's rejection of

27  this claim was contrary to, or involved an unreasonable application of, clearly

28  established federal law, as determined by the Supreme Court. *See* 28 U.S.C. §

2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

The post-conviction court's decision with respect to counsel's failures at the mitigation phase stated that Lehr had shown neither deficient performance nor prejudice. (PCR Order at 7–24.) Although the post-conviction court identified that *Strickland* governed its evaluation of counsel's performance, it contravened and misapplied clearly established federal law when applying it to the facts of Lehr's case. Moreover, its analysis is replete with unreasonable factual findings. For all the reasons outlined, § 2254(d) is overcome.[19] De novo review and evidentiary development are therefore warranted.

### 1. The post-conviction court's ruling rested on resolving several material factual disputes without holding an evidentiary hearing.

At the threshold, the post-conviction court's ruling does not limit this Court's review because it resolved material factual disputes without holding a hearing. *See Taylor*, 366 F.3d at 1000–01 (holding that a state court's factual determinations are unreasonable when it makes evidentiary findings without holding a hearing); *Hurles v. Ryan*, 752 F.3d at 790 ("We have repeatedly held that where a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, the fact-finding process itself is deficient and not entitled to deference [under AEDPA]." (quotation marks omitted)).

Here, disputed factual issues include, but are not limited to, the extent that trial counsel failed to maintain a qualified capital defense team; failed to develop a working relationship with Lehr; failed to investigate Lehr's social history; failed to hire experts who could investigate such lines of mitigation, including mental illness and brain damage; failed to investigate obvious lines of mitigation; failed to object

---

[19] If this Court should find that § 2254(d) is not overcome, alternatively, Lehr will demonstrate through evidentiary development that post-conviction counsel was ineffective in failing to discover and present the evidence not in the state-court record, and therefore the new evidence may be considered by this Court.

1   to unconstitutional jury instructions; and failed to present this evidence to the
2   sentencing jury. These issues could not be resolved on the record. The post-
3   conviction court did not explain how it reconciled evidence supporting Lehr's
4   allegations that conflicted with the court's factual findings. *See Taylor*, 366 F.3d at
5   1007–08. In light of the competing evidence, the court could not simply pick the
6   facts that would leave the death sentences undisturbed and ignore the rest.

7       The post-conviction court's determination, made without holding an
8   evidentiary hearing, and ignoring critical evidence in the record, resulted in an
9   "unreasonable determination" of the facts, and therefore does not bar Petitioner's
10  claim for habeas relief. *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1001, 1008.

11      Therefore, to the extent that the state court made a determination of fact on
12  these issues, that too was unreasonable. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*,
13  *Taylor*, 366 F.3d at 999–1001 (discussing ways in which § 2254(d)(2) can be
14  satisfied). "[W]here a state court makes factual findings without an evidentiary
15  hearing or other opportunity for the petitioner to present evidence, 'the fact finding
16  process itself is deficient . . . .'" *Hurles v. Ryan*, 752 F.3d 768, 790–91 (quoting
17  *Taylor*, 366 F.3d at 1001 ("If for example, a state court makes evidentiary findings
18  without holding a hearing and giving petitioner an opportunity to present evidence,
19  such findings clearly result in an unreasonable determination of the facts.") (internal
20  quotation marks omitted)).

21                    **2.    The post-conviction court failed to consider cumulative
22                            prejudice of Lehr's ineffective assistance of mitigation
                              claims.**

23      In addition, under *Strickland* and other Supreme Court precedent, the court
24  must evaluate prejudice cumulatively. *See Strickland*, 466 U.S. at 694–95 ("The
25  defendant must show that there is a reasonable probability that, but for counsel's
26  unprofessional *errors*, the result of the proceeding would have been different.")
27  (emphasis added); *see also, e.g.*, *Williams*, 529 U.S. at 397–98. In fact, *Strickland*
28  explicitly adopted the materiality standard in *United States v. Agurs*, 427 U.S. 97

1    (1976), for a suppression-of-evidence claim. *Strickland*, 466 U.S. at 694. The
2    Supreme Court has forcefully held that the materiality standard considers
3    cumulative prejudice; in other words, when assessing materiality, the suppressed
4    evidence must be "considered collectively, not item by item." *Kyles v. Whitley*, 514
5    U.S. 419, 436 (1995).

6        Here, the post-conviction court divided Lehr's ineffective assistance of
7    counsel at sentencing claim into ten issues based on the affidavit submitted by
8    expert Hammond. (*See* PCR Pet. Ex. N.) And then the post-conviction distilled
9    these issues into two subclaims that alleged that trial counsel failed to a) investigate
10   and b) present mitigation. (PCR Order at 17, 22.) In doing so, the post-conviction
11   court considered each of those subclaims separately and did not consider all the new
12   evidence together. In taking such a piecemeal approach to its analysis of the
13   ineffective assistance of counsel at sentencing claim, the post-conviction court
14   failed to do what is required under *Strickland*: consider the errors cumulatively and
15   determine if, absent the errors, there was a reasonable probability of convincing one
16   juror to vote against death. *See Wiggins*, 539 U.S. at 536–38.

17       Clearly established federal law directs the court to weigh the deficiencies of
18   counsel cumulatively. *Harris*, 64 F.3d at 1438 (holding that the cumulative impact
19   of numerous deficiencies in defense counsel's performance was prejudicial to the
20   defense, rendering the proceedings improper and warranting habeas relief); *Mak*,
21   970 F.2d at 622 (finding that counsel's deficiencies taken in combination with two
22   other errors constituted a denial of petitioner's due process rights). Trial counsel's
23   errors at the sentencing phase should have been considered collectively to determine
24   if there was a reasonable probability that, without those errors, the outcome may
25   have been different.

26       Accordingly, in order to comply with clearly established Supreme Court
27   precedent, "[s]eparate errors by counsel at trial and at sentencing should be analyzed
28   together to see whether their cumulative effect deprived the defendant of his right

1   to effective assistance." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003).

2   "They are, in other words, not separate claims, but rather different aspects of a

3   single claim of ineffective assistance of trial counsel." *Id.* Even if prejudice does

4   not result from an individual error, it may nevertheless result from cumulative

5   errors. *See Boyde*, 404 F.3d at 1176.

6       To the extent the post-conviction court declined to find cumulative error

7   because the Arizona state courts do not recognize the doctrine of cumulative

8   prejudice, its decision contravenes *Strickland*. See 28 U.S.C. § 2254(d); *see also*

9   *White*, 895 F.3d at 671 (holding that the Arizona post-conviction court erred by

10  separately addressing the prejudice arising from individual deficiencies at

11  mitigation phase and observing that "[t]he test is whether it is reasonably likely that

12  the result of the proceeding would have been different but for counsel's 'errors'"

13  (quoting *Strickland*, 466 U.S. at 694)). This Court should find that, taken together,

14  the multiple unreasonable actions and errors of trial counsel regarding the waivers

15  of Lehr's constitutional rights warrant relief.

16          **3.    The post-conviction court's decision regarding Lehr's 2009**
17                  **ineffective assistance of counsel claims is contrary to clearly**
18                  **established law and an unreasonable determination of the**
                    **facts.**

19      The post-conviction court summarized Lehr's ineffective assistance of

20  counsel claim as alleging that Lehr's lack of cooperation did not relieve counsel

21  from their obligations, trial counsel should have investigated his mental health,

22  counsel should have used the letter authored by Lehr containing "classic

23  mitigation," and that mitigation from the first trial should have been presented at

24  the second. (PCR Order at 5.)

25      The court cited *Strickland* as requiring the defendant to "overcome the

26  presumption that, under the circumstances, the challenged action "might be

27  considered sound trial strategy." (PCR Order at 10.) The court also acknowledged

28  that the court must consider "what the record demonstrates "as well as any

'[a]ffidavits, records or other evidence…supporting the allegations of the petition'."
(PCR Order at 10) (citing Rule 32.5, Arizona Rules of Criminal Procedure.)

The court then pointed to transcript excerpts reflecting various comments made by counsel throughout the trial updating the court on their efforts to investigate mitigation. (PCR Order at 10–16.) The post-conviction court then listed the circumstances proposed as mitigation. (PCR Order at 16.) Following this recitation of facts from the record, the post-conviction court then addressed Lehr's claim in separate sub-sections: a) failure to investigate; and b) failure to present.

### a. Failure to investigate.

The court first addressed Lehr's ineffective assistance of counsel during mitigation claim for failure to investigate the defendant's background (PCR Order at 18–19) and mental health evidence (PCR Order at 19–20)

In denying the claim the post-conviction court found that "[t]he record establishes that trial counsel reviewed and analyzed the case." (PCR Order at 17.) The post-conviction court pointed to the fact that Lehr's mother, a key source of family information, had died; "the Defendant's lack of cooperation and the family's agreement not to discuss his background"; and that Lehr was born in 1959, which "created challenges in securing mitigation: over time documents are lost, destroyed, misplaced and witnesses die." (PCR Order at 17.) The post-conviction court thus ruled that:

> Defendant's counsel did everything they reasonably could to investigate mitigation despite their client's constant efforts to thwart any investigation and not cooperate with what they were trying to do. In that regard, Defendant's counsel explored all possible mitigation leads and attempted to have Defendant's input and that of his family but were silenced each step of the way. The Court finds that counsel under these circumstances conducted a reasonable mitigation investigation. Yet, even if their efforts were deficient, Defendant was not prejudiced because he would not have permitted the mitigation to be presented.

(PCR Order 17–18.) The post-conviction court then separately discussed three sub-claims related to the mitigation investigation.

1    At the outset, the court's conclusion that counsel "did everything they
2 reasonably could to investigate mitigation" is an unreasonable factual
3 determination. As outlined above, there was a vast array of mitigating evidence
4 specifically presented in 1997 that counsel made no effort to introduce into the
5 record. (*See supra*, Section (C)(4).) Moreover, by pointing to transcript as evidence
6 showing what trial counsel *did do* (PCR Order at 10–16), the post-conviction
7 unreasonably applied *Strickland* by failing to consider the mitigating evidence we
8 now know trial counsel failed to investigate, and thus present. Furthermore,
9 effective assistance under *Strickland* does not require counsel to merely "review[]
10 and analyze[] the case" (PCR Order at 17) but instead requires a complete
11 investigation into the client's character, history, and background.

12    Second, the court's finding that Lehr "would not have permitted the
13 mitigation to be presented" is an unreasonable determination of the facts. In fact,
14 Lehr was not even present in the courtroom to "prevent" the presentation of
15 evidence. *Cf. Schriro v. Landrigan*, 550 U.S. 465, 470 (2007) (finding the defendant
16 "repeatedly interrupted [counsel's] presentation to the court" and thus prevented the
17 presentation of mitigation).

### i.    The Letter (Defendant's Background)

19    The post-conviction court explained that the letter Lehr wrote to his wife,
20 Renee Dishong, described elements of childhood physical and sexual abuse. (PCR
21 Order at 18 (citing PCR Pet. Ex. P).) The post-conviction court found that
22 "Defendant had the right to make the decision not to disclose the letter and to waive
23 this presentation of mitigation." (PCR Order at 19 (citing *State v. Hausner*, 280 P.3d
24 604, 629 (Ariz. 2012)).) "Defendant himself did not want the background
25 information described in the letter disclosed in mitigation. The Court found that
26 Defendant waived presentation of what has been described as "classic mitigation."
27 (PCR Order at 19.) The Court found that at all times trial counsel acted in
28 conformity with Lehr's instructions.

First, the post-conviction court unreasonably limited its failure to investigate analysis to a single letter discovered by counsel. As outlined above, and in the post-conviction petition, trial counsel failed to investigate a host of issues, well before the letter entered the picture. The letter was not brought to the court's attention until 2007. Trial counsel were appointed in 2003. The post-conviction court's failure to consider the full scope of counsel's failure to investigate from the inception of their appointment renders its decision denying this claim an unreasonable application of clearly established law, and an unreasonable determination of the facts.

Even so, the post-conviction court's decision that trial counsel were not ineffective for failing to present the contents of "a belatedly-discovered letter that contained 'classic mitigation' evidence of childhood abuse" is contrary to and an unreasonable application of clearly established federal law and an unreasonable determination of the facts in the light of the evidence. Trial counsel had a duty to investigate the assertions raised in the letter. The post-conviction court even recognized the need to further investigation: "trial counsel had to corroborate the contents of the letter and establish a basis for its admission, or identify other witnesses who would establish the facts, and therein was the problem." (PCR Order at 18.) The need for this further investigation even resulted in trial counsel seeking a continuance. (PCR Order at 18.) But, just two weeks later, trial counsel "surprisingly informed the court that the letter would not be introduced at trial or shared with experts." (PCR Order at 19.)

The post-conviction court proceeded to dismiss this claim while ignoring the fact that the trial judge ordered disclosure of the letter prior to granting the continuance, which would have given counsel the necessary time to fully discuss the letter with experts, their client, Lehr's family members, and then conduct the necessary investigation and expert consultation. A two-week time period is not sufficient to allow trial counsel to investigate the full scope of the contents of this type of letter and determine if or how to present the letter as part of mitigation; as

1    such, the trial court's denial of the continuance thus forced counsels'

2    ineffectiveness.

3         Moreover, merely because Lehr did not wish to cooperate, and even directed

4    his immediate family not to cooperate, did not absolve trial counsel of their duty to

5    conduct a widespread investigation into the allegations raised in the letter. (*See*

6    *supra*, Section (E)(4).) Further, the post-conviction court's decision that trial

7    counsel were not ineffective for failing to investigate the letter and Lehr's

8    background because Lehr waived mitigation is unreasonable because Lehr's waiver

9    of mitigation was invalid as it was uninformed, involuntary and unknowing. (*See*

10   Claims 14, 24.)

11        The post-conviction court's finding on this issue—without holding an

12   evidentiary hearing—is contrary to and an unreasonable application of clearly

13   established federal law and an unreasonable determination of the facts in the light

14   of the evidence presented. 28 U.S.C. § 2254(d).

15                    **ii.    Mental health evidence**

16        The post-conviction court reasoned that Lehr was found competent to stand

17   trial, and make "certain waivers and stipulations" because he was found competent

18   following an evaluation by Dr. Gwen Levitt on November 25, 2008. (PCR Order at

19   21.) Based on these facts, the post-conviction court concluded "that trial counsel

20   did not perform deficiently by failing "to engage the appropriate experts." (PCR

21   Order at 22.) The post-conviction court further reasoned that Lehr would have been

22   uncooperative with any efforts to obtain evaluations "if the objective was to prepare

23   mitigation for presentation to the jury." (PCR Order at 21–22.) At no point did the

24   court cite to any standard for an ineffective-assistance claim, nor did the court cite

25   to a case applying the correct *Strickland* standard.

26        First, the claim raised by Lehr was that trial counsel were ineffective for

27   failing to present mitigating evidence on Lehr's mental health disorders, diseases

28   and defects. (PCR Pet. at 15.) Whether or not Lehr was competent to stand trial is

inapposite to the question of whether trial counsel failed to investigate, consult with experts, and present evidence of Lehr's mental health disorders and traumatic brain injury. The question of whether Lehr was competent to stand trial does not answer the question of whether trial counsel failed to investigate and present evidence of Lehr's mental health and cognitive impairments to the sentencing jury. Moreover, competency to stand trial is not necessarily competency to waive mitigation. (*See* Claim 14.) The post-conviction court's decision fails to engage in the appropriate analysis discussing how whether trial counsel was deficient for failing to investigate or present evidence of Lehr's mental health and traumatic brain injury, and how such deficiency prejudiced Lehr. As such, the decision is contrary to clearly established law and is an unreasonable determination of the facts and therefore does not bar de novo review and relief.

Second, the post-conviction court's decision was unreasonable as the court did not consider a substantial portion of the additional mitigation offered in post-conviction when determining if counsels' performance was deficient. The post-conviction court's prejudice analysis does not mention any of the new mitigating evidence either. As a result, the post-conviction court failed to reweigh any of the new mitigating evidence against the aggravating circumstances. In his post-conviction pleadings, Lehr presented the following exhibits in support of his ineffective assistance of counsel mitigation claims: PCR Pet. Exs. N, K, J, L, O, P. The court unreasonably ignored the evidence presented that Lehr had psychological evaluations showing mental health disorders (PCR Pet. Exs. J, K), and had brain imaging showing he suffers from a traumatic brain injury (PCR Pet. Ex. L). *See Taylor*, 366 F.3d at 1000–01.

As part of the "mental health evidence" section, the post-conviction court ruled that the new PCR evaluations do not qualify as "newly discovered evidence." (PCR Order at 20) (citing Rule 32.1(e).) The court found that "[t]rial counsel, through due diligence, could have discovered the evidence but failed to do so."

(PCR Order at 20.) The failure of the post-conviction court to consider the exhibits presented in support of the post-conviction ineffective assistance of counsel claim is contrary to clearly establish law and an unreasonable determination of the facts. Federal law is clear that when considering new mitigation evidence, the court must reweigh the "totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceedings*'" and determine if "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 536–37 (brackets omitted) (quoting *Williams*, 529 U.S. at 397–98). Here, the post-conviction court never weighed all the new evidence together to determine prejudice as part of Lehr's claim under Rule 32.1(a). The court also never considered the totality the failures of counsel to determine if the "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Lehr's] moral culpability." *Wiggins*, 539 U.S. at 538 (quoting *Williams*, 529 U.S. at 398.)

Lastly, the post-conviction court's assertion that Lehr would have been uncooperative with any evaluations at the time of trial because he sought to limit mitigating evidence did not absolve trial counsel of their duty to conduct a widespread investigation into Lehr's underlying mental health problems or cognitive impairments. (*See infra*, Section (E)(4).)

Therefore, the state court's denial of this claim is contrary to and an unreasonable application of *Strickland*. *See Williams*, 529 U.S. at 397–98 (finding the decision of the Virginia Supreme Court to be contrary to and an unreasonable application of *Strickland* because the decision itself simply held that the "new evidence" would not have changed the sentence; it did not re-weigh the totality of the new and old mitigation as required by *Strickland*). Moreover, the court's failure to consider evidence supporting Lehr's claim resulted in an unreasonable determination of facts, *see Taylor*, 366 F.3d at 1000–01, and also contravened *Strickland*'s requirement that it "reweigh the evidence in aggravation against the

1  totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

2  **b.  Failure to present.**

3  The post-conviction court next found that counsel *did* present mitigation

4  evidence through two experts, Chase Riveland and Dr. Jonathan Sorensen, five

5  ADOC witnesses, a Supreme Court evaluator who testified regarding visitation for

6  Lehr's children while he was in jail following his arrest, and Lehr's biological

7  father. (PCR Order at 22–23.) Based on this thin presentation of evidence, the post-

8  conviction court concluded "The record demonstrates that trial counsel did not

9  agree with or acquiesce in or 'blindly follow' defendant's instructions, but simply

10  deferred to Defendant's right to waive (or limit) mitigation." (PCR Order at 23.)

11  The post-conviction court's ruling that trial counsel did not perform

12  deficiently because "under all of the circumstances at the time made a reasonable

13  presentation given the constraints imposed by Defendant" is contrary to, and an

14  unreasonable application of, clearly established law, and an unreasonable

15  determination of the facts. (*See* PCR Order at 23.)

16  The post-conviction court's decision is an unreasonable determination of the

17  facts because the court overstated the mitigation that trial counsel presented at

18  Lehr's penalty phase hearing. The post-conviction court found that "trial counsel

19  attempted to present mitigation evidence through third parties who were not family

20  members, including a prison expert, a sociologist and a family court evaluator."

21  (PCR Order at 9 (citing *Lehr III*, 254 P.3d at 394).) As the discussion above

22  demonstrates, the presentation of this evidence did more harm than good and failed

23  to meet the minimum requirements of reasonable representation during the penalty

24  phase. (*See supra,* Section (C)(8).) Even worse, trial counsel presented "almost

25  nothing that would humanize" Lehr in the eyes of the jurors. *Porter*, 558 U.S. at 41.

26  The Supreme Court has made clear that a state court must look beyond

27  whether the mitigation presented supports a "superficially reasonable mitigation

28  theory" and look to the underlying investigation. *Sears*, 561 U.S. at 953–54 Here,

1   trial counsel failed to conduct the reasonable investigation needed. As a result, they

2   presented evidence during mitigation that ultimately did more harm than good and

3   failed to present any compelling evidence regarding Lehr's character, background,

4   and history— such a presentation is not "reasonable."

5          Moreover, trial counsel's failure to investigate prevented them from making

6   any possible strategic decision into what mitigation to present during the penalty

7   phase – as they had no grasp on the scope of evidence that was available. As such,

8   the post-conviction court's ruling that there was no showing of deficient

9   performance was an unreasonable application of *Strickland* and *Wiggins*, which

10  unambiguously provide that unreasoned "decisions" based on unreasonable

11  investigations are afforded no deference. *See Strickland*, 466 U.S. at 688; *Wiggins*,

12  539 U.S. at 521.

13         When looking at the mitigation that could have been presented, including the

14  new evidence of Lehr's mental health disorders and traumatic brain injuries as well

15  as evidence that was available from the 1997 sentencing but not presented, the

16  inescapable conclusion is that the new mitigation would have significantly "altered

17  the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at

18  700. Because the post-conviction court's ruling turned on unreasonable factual

19  findings—all made without the benefit of a hearing—and contravened clearly

20  established federal law, it is no bar to de novo review and relief.

21          **c.     Failure to include a *Busso* claim in sentencing is
22                  contrary to clearly established law and an
                    unreasonable determination of the facts.**

23         The state court's rejection of Lehr's claim that trial counsel were deficient

24  for failing to introduce mitigation evidence that Lehr offered to plead guilty was

25  contrary to, or involved an unreasonable application of, clearly established federal

26  law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition,

27  it constituted an unreasonable determination of the facts in light of the evidence

28  presented. *See* 28 U.S.C. § 2254(d)(2).

1        First, the post-conviction court's conclusion that this claim is precluded is
2   incorrect. Because the plea agreement was not in the record, there existed no way
3   in which appellate counsel could have become aware of Lehr's willingness to accept
4   the plea offer. Moreover, claims of ineffective assistance of counsel are properly
5   raised in Rule 32 proceedings. *See State v. Spreitz*, 39 P.3d 525, 526 (Ariz. 2002)
6   ("Rule 32 set forth the proper procedure for resolving claims of ineffective
7   assistance of counsel"); *State v. Duffy*, No. 2 CA-CR 2018-0071, 2019 WL
8   5687443, *2 (Ariz. Ct. App. Nov. 1, 2019) (stating that if a defendant "believes
9   particular decisions, acts, or omissions of his defense attorney at trial rendered his
10  counsel ineffective, such a claim must be raised in a petition for post-conviction
11  relief brought pursuant to Rule 32, Ariz. R. Crim. P.").

12       Second, as outlined in full in Claim 22, the ineffective assistance of counsel
13  claim as to 1997 counsel is not moot as to the remaining non-capital charges. Here,
14  it was trial counsel's ineffective representation that resulted in the jury's ignorance
15  of Lehr's acceptance of responsibility. As discussed in detail in other sections of
16  this claim, the court's dismissal of Lehr's valid ineffective assistance of counsel
17  claims on the basis of his "waiver" of mitigation and uncooperative attitude is not
18  a valid basis for excusing trial counsel's failures to fulfil their constitutional duty to
19  provide effective assistance. (*See* Claim 14; *see also infra*, Section (E)(4).)
20  Moreover, at no point did the court cite to any standard for an ineffective-assistance
21  claim, nor did the court cite to a case applying the correct *Strickland* standard when
22  denying this claim.

23       The post-conviction court's decision was also an unreasonable determination
24  of facts. The court explained that "[t]he parties differ as to whether Defendant
25  offered to plead guilty and as to which crimes." (PCR Order at 48.) This is just one
26  factual dispute related to this claim that required further review at an evidentiary
27  hearing. "[W]here a state court makes factual findings without an evidentiary
28  hearing or other opportunity for the petitioner to present evidence, 'the fact finding

1   process itself is deficient….'" *Hurles v. Ryan*, 752 F.3d 768, 790–91 (9th Cir.

2   2014). The court erred in failing to grant an evidentiary hearing as to why the jury

3   was not apprised of this non-statutory mitigator; the decision thus constituted an

4   unreasonable determination of the facts in light of the evidence presented. *See* 28

5   U.S.C. § 2254(d)(2).

> **4.    The post-conviction court's reliance on Lehr's uncooperative attitude to absolve trial counsel of their duty to investigate and present mitigation is contrary to clearly established law and is an unreasonable determination of the facts.**

9   When addressing Lehr's 2009 sentencing ineffective assistance of counsel

10  claim, the post-conviction court asserted: "The fallacy underlying Defendant's

11  claim as it relates to his resentencing is that Defendant was not seeking leniency.

12  Rather, he was seeking a verdict of death." (PCR Order at 8.) The post-conviction

13  court then relied on its finding that Lehr and his family allegedly did not cooperate

14  with the mitigation investigation to reject claims that trial counsel performed

15  deficiently in failing to investigate the defendant's background (PCR Order at 18–

16  19), mental health evidence (PCR Order at 19–20), and to present mitigating

17  evidence (PCR Order at 22–23.) The post-conviction court's reliance on the alleged

18  lack of cooperation from Lehr to absolve trial counsel of virtually all of his

19  deficiencies during the penalty phase contravenes clearly established law.

20  The defendant's lack of cooperation does not eliminate the trial counsel's

21  duty to investigate. *See Hamilton v. Ayers*, 583 F.3d at 1118 (9th Cir. 2009) (citing

22  ABA Standards for Criminal Justice 4-4.1 (2d ed.1980)) ("the duty to investigate

23  exists regardless of the accused's admissions or statements to the lawyer of facts

24  constituting guilt or the accused's desires to plead guilty"); *see also Douglas*, 316

25  F.3d at 1089 ("Although the client's desires are not to be ignored altogether, it may

26  be inappropriate for counsel to acquiesce to the client's demands"); *Karis*, 283 F.3d

27  at 1136 (determining that defendant's lack of cooperation did not excuse counsel

28  from further investigating mitigation evidence to present to the jury); *Stankewitz*,

1    365 F.3d at 721–22 (a client's opposition to calling family members or experts as
2    witnesses does not excuse an attorney from interviewing experts and family
3    members or from investigating documents containing mitigating evidence).

4         The fatalistic client is not uncommon. The ABA Standards describe
5    specifically how to deal with such a situation, precisely because it is not uncommon.
6    (PCR Pet. Ex. O.) The competent representation of the fatalistic client requires
7    special care and standards, especially when it comes to the capital case where the
8    client for a variety of reasons may indicate a desire to commit suicide or die. A
9    defendant's mental health issues, which cause these fatalistic requests become
10   especially relevant. Mental health issues that also were in existence at the time of
11   the crimes can be part of these attitudes in the client. These mental health issues can
12   lead to defective decision-making that is not in a defendant's best interest. As the
13   ABA Guideline 10.5 "Relationship with the Client" sets out "it must be assumed
14   that the client is emotionally and intellectually impaired." (PCR Pet. Ex. O.)

15        The ABA Guideline 10.5, under the heading "Counsel's Duties Respecting
16   Uncooperative Clients," states as follows:

17        Some clients will initially insist that they want to be executed – as
     punishment or because they believe they believe they would rather die
18        than spend the rest of their lives in prison; some clients will want to
     contest their guilt but not present mitigation. It is ineffective assistance
19        for counsel to simply acquiesce to such wishes, which usually reflect
     the distorting effects of overwhelming feelings of guilt and despair
20        rather than a rational decision in favor of state-assisted suicide. Counsel
     should initially try to identify the source of the client's hopelessness.
21        Counsel should consult lawyers, clergy or others who have worked with
     similarly situated death row inmates. Counsel should try to obtain
22        treatment for the client's mental and/or emotional problems, which may
     become worse over time . . . . A client who insists on his innocence
23        should be reminded that a waiver of mitigation will not persuade an
     appellate court of his innocence, and securing a life sentence may bar
24        the state from seeking death in the event of a new trial.
25

26   (PCR Pet. Ex. O.)

27        The federal courts have also made clear that an uncooperative client does not
28   relieve trial counsel of their duty to investigate and present compelling and relevant

mitigating evidence. *See Silva*, 279 F.3d 825 at 847 (finding trial counsel must "seek out and find alternative sources of information and evidence" if a client impedes aspects of the investigation.) Similarly, in *Lang*, the court found deficient representation when the trial attorney failed to explore calling an expert who could have testified to the petitioner's social history and its effects. *Lang v. Cullen*, 725 F. Supp. 2d 925, 943 (C.D. Cal. 2010).  Trial counsel also has a "concomitant duty to educate or dissuade the defendant about the consequences of his actions." *Silva*, 279 F.3d at 847.

In *Silva*, the defendant had expressly directed his attorney not to call certain witnesses, specifically his parents. The Ninth Circuit held that this could not reasonably be construed as a direction that counsel not contact the witnesses for informational purposes or that he not contact other witnesses to investigate background and history. *Silva*, 279 F.3d at 839. "Counsel's duty to investigate mitigating evidence is neither entirely removed nor substantially alleviated by his client's desire not to call particular witnesses to the stand." *Id.* Additionally, the court noted:

> Silva's attorney did not make a serious attempt to educate his client about the consequences of his decision . . . A lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of the decision and must be assured the client has made 'informed and knowing' judgment.

*Id.* at 838. The Ninth Circuit in *Silva* also held that, faced with a client directive limiting the scope of defense, an attorney "must conduct a reasonable investigation enabling him to make informed decisions about how to best represent the client." *Id.*

Moreover, the decision of whether to present certain witnesses or evidence is a strategic decision controlled by counsel. *See Taylor v. Illinois*, 484 U.S. 400, 418 (1988) (client must accept attorney's decisions regarding the conduct of the trial including the decision of whether to put certain witnesses on the stand); *Jones v.*

*Estelle*, 722 F.2d 159, 165 (5th Cir. 1983) (finding that decisions regarding "[w]hether to call a particular witness, object to evidence, offer additional evidence or rest, or [to] advance a particular defense at all" are decisions within the lawyer's control). Thus, where, as here, a convicted defendant is represented by counsel, it is counsel that controls the presentation of evidence in furtherance of the objective of the litigation – to secure a life verdict. *See Faretta,* 422 U.S. at 820 ("It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition allocate to the counsel the power to make binding decisions of trial strategy in many areas.") The Supreme Court recently reaffirmed this principle: "If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." *McCoy v. Louisiana*, 138 S.Ct. 1500, 1508 (2018).

In *Jones v. Barnes*, 463 U.S. 745, 751 (1983) the Court held that some decisions, due to their "fundamental" nature, are controlled by the defendant, such as "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." Although a prudent defendant should seek counsel's guidance before making a fundamental decision, the defendant has the "ultimate authority" to make these decisions. *Id.* at 751. However, once at trial, the strategic decisions regarding the presentation of evidence and witnesses are better left to lawyers. *See Douglas v. California*, 372 U.S. 353, 358 (1963). Indeed, the Court has recognized the superior ability of trained counsel in the "examination into the record, research of the law, and marshaling of arguments on [the defendant's] behalf [,]" *Douglas*, 372 U.S. at 358, as well as the importance of professional judgment in deciding precisely which arguments to present. *Jones*, 463 U.S. at 751.

The "adversary process could not function effectively if every tactical decision required client approval." *Gonzalez v. United States*, 553 U.S. 242, 249 (2008); *see also Florida v. Nixon*, 543 U.S. 175, 187 (2004) (noting that the obligation "to consult with the client regarding 'important decisions'…does not

require counsel to obtain the defendant's consent to 'every tactical decision'" (quoting *Strickland*, 466 U.S. at 688)). The Sixth Amendment right to counsel, steadfastly applied in capital sentencing proceedings, would be meaningless if the defendant could veto counsel's most basic strategic decisions involving mitigation. The Constitution requires a right to counsel during capital sentencing hearings because the adversarial system fails without it. *See Strickland*, 466 U.S. at 685 ("The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled.")

In *Rompilla*, defense counsel similarly failed to find useful mitigation from easily accessible sources. 545 U.S. at 381. The Supreme Court had no trouble concluding that counsel's failure constituted deficient performance despite observing that Rompilla had been uncooperative in the investigation. Rompilla had been "uninterested in helping" his counsel develop mitigation, had exited a legal visit because mitigation strategy bored him, had minimally contributed to developing mitigation, and at times, "was even actively obstructive by sending counsel off on false leads." *Id.* at 381; *see also Porter*, 558 U.S. at 40 (finding that a "fatalistic and uncooperative" client does not excuse the obligation to conduct "some sort of mitigation investigation"); *Douglas*, 316 F.3d at 1087–88 (finding deficient performance in investigating mitigation even where the defendant did not provide "useful information" and "would not provide the names of relatives or friends regarding childhood abuse"); *Karis*, 283 F.3d at 1136 ("[T]he fact that [the defendant and his mother] did not offer this information regarding the abuse did not excuse counsel from further investigation.").

The post-conviction court's finding that Lehr's alleged lack of cooperation pardons trial counsel of all of deficiencies made throughout the penalty phase contravenes, and is an unreasonable application of, clearly established law. As

1    outlined above, the federal law is clear: an uncooperative client does not excuse

2    counsel's failure to investigate, or to present mitigation.

3        Moreover, a finding that Lehr or his family did not wish to discuss possible

4    childhood abuse does not excuse trial counsel's failure to investigate other

5    significant sources of investigation of which he had knowledge and to which he had

6    easy access. *See Ayestas v. Davis*, 138 S.Ct. 1080, 1097–98 (Sotomayor, J.,

7    concurring) ("Even if Ayestas prohibited counsel from contacting his family in

8    Honduras until the start of trial was imminent, that still would not explain why

9    counsel failed to perform any other mitigation investigation." (internal citation and

10   footnote omitted)); *see also Doe*, 782 F.3d at 436–37 ("That Doe did not volunteer

11   more about the trauma he experienced during his childhood and in prison did not

12   absolve [his attorney] of the need to conduct an adequate mitigation investigation,

13   especially since Doe did identify…a number of avenues for further investigation

14   that would have proved fruitful."). The post-conviction court's finding that Lehr's

15   uncooperative attitude, and his family's, excused trial counsel's failure to

16   investigate, is thus contrary to, and an unreasonable application of, clearly

17   established law.

18       As outlined above in Section (C)(4), even without the live testimony of

19   Lehr's family members, readily available evidence of Lehr's character, background,

20   and history existed but was not introduced. Trial counsel failed to introduce Lehr's

21   sister's testimony from Lehr's 1997 sentencing hearing that would have presented

22   compelling evidence of Lehr's character, family, and background to the sentencing

23   jury. (Tr. July 8, 1997 (PM) at 4–14.) Trial counsel also failed to introduce letters

24   written by Lehr's family members that were included in the 1997 presentence

25   investigation report. (ROA 569 at 21–30.) The defense also failed to introduce any

26   photographs of Lehr's children. (*See* Tr. April 13, 2009 at 16.) In *Silva*, 279 F.3d

27   825 at 847, the court concluded: "if a client forecloses certain avenues of

28   investigation, it arguably becomes more incumbent upon trial counsel to seek out

and find alternative sources of information and evidence, especially in the context of a capital murder trial." Rather than seek out these alternative sources, which were readily available, trial counsel did nothing. The post-conviction court's finding that trial counsel's ignorance of existing mitigating evidence did not constitute unreasonable performance, is contrary to, and an unreasonable application of, clearly established law.

Accordingly, federal law clearly established under *Strickland* that all capital defendants are entitled to a reasonably competent investigation, even if they are uncooperative. The post-conviction court's decision that Lehr's uncooperative approach to mitigation meant that trial counsel could not be deficient is contrary to, and an unreasonable application of clearly established federal law, and an unreasonable determination of the facts.

### 5. The post-conviction court's ruling that Lehr's alleged waiver of mitigation prevents a finding of deficient performance is contrary to clearly established law and is an unreasonable determination of the facts.

The post-conviction court found that "Defendant waived his right to present mitigation evidence at sentencing and as detailed more particularly below, he did so voluntarily, knowingly, and intelligently." (PCR Order at 9.) When deciding Lehr's claim that trial counsel were ineffective for failing to investigate Lehr's background, including the letter he wrote to his wife, the court found that "Defendant waived presentation of what has been described as 'classic mitigation.'" (PCR Order at 19.) When considering Lehr's claim that counsel failed to present mitigating evidence, the post-conviction court similarly concluded "The record demonstrates that trial counsel did not agree with or acquiesce in or 'blindly follow' defendant's instructions, but simply deferred to Defendant's right to waive (or limit) mitigation." (PCR Order at 23.)

The post-conviction court reasoned that "Defendant was making certain mitigation-related decisions; trial counsel's actions were determined—and

1    limited—by the Defendant." (PCR Order at 23.) The post-conviction court then

2    relied on *Hausner* in support of its position that Lehr "has the absolute right to waive

3    the presentation of mitigation evidence." (PCR Order 23.)

4          The post-conviction court's ruling that trial counsel's mitigation

5    presentation—which included no compelling evidence of Lehr's character,

6    background, or personal history—could not be deficient because Lehr waived his

7    right to mitigation, is contrary to clearly established federal law and an unreasonable

8    determination of facts. First, Lehr's "waiver" of mitigation is invalid because the

9    trial court failed to conduct a specific colloquy making a determination on the

10   record regarding Lehr's attempted waiver of mitigation. (*See* Claims 14, 24 (citing

11   *Summerlin*, 427 F.3d at 639 (noting "a court must make the determination" that the

12   waiver is voluntary, knowing, and intelligent.)).) Second, the court is incorrect that

13   Lehr's waiver of mitigation was made voluntarily, knowingly, and intelligently;

14   such an invalid waiver cannot serve as the basis to excuse deficient performance.

15   (*See* Claim 14 (describing Lehr's mental illnesses and traumatic brain injury which

16   were never presented to trial judge for consideration to determine whether Lehr's

17   waivers were knowing, voluntary, and intelligent).) Third, the new mental health

18   evidence, as well as the volume of mitigating evidence subsequently developed by

19   post-conviction counsel, went uninvestigated due to trial counsel's deficient

20   performance. As such, Lehr could not consider this information when making his

21   waivers of mitigation, presence, and allocution, which rendered his waivers

22   uninformed, and thus invalid. (*See also* Claim 14, Section (C)(4).) Trial counsel had

23   a duty to try to persuade Lehr to allow the presentation of mitigating evidence, and

24   they could not have made a reasoned tactical decision, if they did not even know

25   what evidence was available. *Silva*, 279 F.3d at 847; *see also Turner v. Duncan*,

26   158 F.3d 449, 457 (9th Cir. 1998).

27         Accordingly, the post-conviction court's decision on the waiver of mitigation

28   is contrary to clearly established federal law. Moreover, the court's determination,

made without a hearing, and ignoring critical evidence in the record, resulted in an "unreasonable determination" of the facts, and therefore does not bar Lehr's claim for habeas relief. *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1001, 1008.

**6.** **The post-conviction courts analysis that Lehr could never establish prejudice due to his desire to limit mitigation contravened clearly established federal law and constituted an unreasonable determination of the facts.**

The post-conviction court concluded that Lehr could not claim he suffered *Strickland* prejudice as part of his ineffective assistance of counsel at mitigation claims based on *Schriro v. Landrigan*, 550 U.S. 465, 477 (2007). (PCR Order at 23 (declaring that *Landrigan* held "a defendant who actively thwarts mitigation efforts cannot later claim he suffered *Strickland* prejudice.").) The post-conviction court's ruling that Lehr could not claim, or prove, prejudice due to his attempt to limit mitigation was contrary to clearly established federal law and constituted an unreasonable determination of the facts.

Clearly established federal law directs the courts to consider the specific facts surrounding the defendant's decision, and behavior, when waiving the presentation of mitigating evidence. *See Stankewitz*, 698 F.3d at 1170; *Hamilton*, 583 F.3d at 1119. In *Landrigan*, the Supreme Court specifically analyzed the defendant's actions and behavior. Based on these facts, the Court found Landrigan could not demonstrate prejudice because the defendant "would have interrupted and refused to allow his counsel to present any [newly discovered mitigating] evidence." *Landrigan*, 550 U.S. at 477. While Landrigan's uncooperative attitude towards mitigation included explicitly ordering his mother and ex-wife not to testify, that is not all he did to obstruct mitigation. *Id.* at 468–70. Throughout the presentation of mitigating evidence, the defendant "repeatedly interrupted [counsel's] presentation to the court." *Id.* at 470. This disruptive behavior obstructed the presentation of mitigating evidence and thus resulted in the Court's decision.

In *Hamilton v. Ayers*, the Ninth Circuit made clear that "a defendant's refusal

to cooperate in the penalty phase *may* render counsel's limited investigation and presentation of mitigating evidence reasonable *under the circumstances*." 583 F.3d at 1118 (emphasis added). Accordingly, the trial court must look to the specific facts of the case to determine whether "the defendant *actively obstructed* counsel's investigation and *outright refused to allow* counsel to present any mitigating evidence." *Id.* at 1119 (emphasis added). In *Hamilton*, the court found that – unlike in *Landrigan* – the defendant "did not threaten to obstruct the presentation of any mitigating evidence that counsel found." *Id.*

In *Stankewitz v. Wong*, the court explained that the specific facts in *Landrigan* resulted in the conclusion that the defendant, in that case, could not claim prejudice:

> The state cited to *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), for the proposition that Goodwin's failure to present additional mitigating evidence cannot be the basis for ineffective assistance under *Strickland* because Stankewitz expressed a desire not to present such evidence. We have already rejected this expansive reading of *Landrigan*, "a post-AEDPA case [in which] the defendant actively obstructed counsel's investigation and outright refused to allow counsel to present any mitigating evidence." *Hamilton*, 583 F.3d at 1119. As we noted, the defendant in *Landrigan* explicitly instructed witnesses not to testify and repeatedly interrupted his lawyer's presentation to the court. *See id.*

*Stankewitz*, 698 F.3d at 1170, n.2. The Ninth Circuit thus made clear that "*Landrigan* is inapplicable where the defendant 'did not threaten to obstruct the presentation of any mitigating evidence that counsel found.'" *Id.* (citing *Hamilton*, 583 F.3d at 1119.)

The post-conviction court's conclusory ruling that Lehr "cannot establish *Strickland* prejudice" pursuant to *Landrigan* "because he chose not to participate in the presentation of mitigation or cooperate with counsel's efforts to investigate all possible mitigation leads" is contrary to clearly established law. (PCR Order at 23.) This is not the law of *Landrigan*, as evidenced by the application of that case in *Stankewitz* and *Hamilton*. Lehr presented with none of the same facts indicating his behavior threatened to "obstruct" or "interrupt" the mitigation phase.

The evidence clearly shows that Lehr could not have "prevented" the presentation of mitigation evidence. Indeed, due to his wavier of presence, Lehr was not even physically present in the courtroom to cause an outburst or interrupt. When he was in the courtroom, Lehr did not have any outbursts. He was polite. Thus, the court's finding that Lehr "would not have permitted the mitigation to be presented" was an unreasonable determination of the facts because Lehr was not even present in the courtroom to "prevent" the presentation of evidence. *Cf. Landrigan*, 550 U.S. at 470. The post-conviction court summarily ignored these essential facts, and thus made an unreasonable application of the clearly established law outlined above.

### 7.   The post-conviction court ignored other allegations and evidence supporting this claim.

The post-conviction court further ignored allegations that trial counsel was deficient. The post-conviction court unreasonably limited its analysis by proceeding to "consider each of the ten claims raised by Defendant's PCR expert Hammond." (PCR Order at 6.) The post-conviction court, at the conclusion of its analysis similarly affirmed that it limited its analysis to the allegations addressed by Hammond by finding "allegations (1) - (3) and (7) - (10) raised by PCR counsel Hammond in his Declaration relating to 2009 sentencing counsel are not colorable." (PCR Order at 24.) Hammond was not post-conviction counsel. Hammond's affidavit was submitted in support of the post-conviction petition. (PCR Pet. Ex. K.)

Despite listing out these ten "claims" presented by Hammond (PCR Order at 6), the post-conviction court ignored factual allegations proving "[a]dequate resources and assistance were not requested or sought out to assist counsel in handling the case and developing mitigation, social history and mental health evidence, " that the "level of defense preparation was inadequate and untimely," and that "[c]ounsel failed to develop a relationship of trust with Defendant by utilizing mitigation specialists and mental health professionals and by assembling a

1  defense team possessing specialized expertise in mental health issues." (PCR Order
2  at 6.)

3      Accordingly, the post-conviction court's decision is contrary to clearly
4  established federal law. Moreover, the court's determination, made without a
5  hearing, and ignoring critical evidence in the record, resulted in an "unreasonable
6  determination" of the facts, and therefore does not bar Lehr's claim for habeas
7  relief. *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1001, 1008.

## CLAIM THIRTEEN

9
10  **Lehr's waiver of his right to be present at all pretrial and trial
    proceedings was involuntary in violation of the Fifth, Sixth, Eighth,
11  and Fourteenth Amendments.**

12      Lehr incorporates by specific reference all facts, allegations, and arguments
13  made elsewhere in this Petition.

14      Lehr's waiver of his right to be present at all pretrial and trial proceedings
15  was involuntary as it was based upon the trial court's adherence to the Maricopa
16  County Sheriff's Office's policy that mandated he wear an electric stun belt during
17  trial. The trial court's acceptance of such an invalid waiver violated Lehr's rights
18  under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Lehr's absence tainted
19  the entire proceedings constituting both fundamental unfairness and structural error,
20  and mandating that Lehr be granted a new trial, and/or sentencing hearing.

21      **A.      Exhaustion**

22      Lehr raised this claim in his second direct appeal. (DA2 82 at 17.) The
23  Arizona Supreme Court denied the claim on the merits. *Lehr III*, 254 P.3d at 384–
24  85. This issue was also raised in Lehr's petition for review. (PFR 3 at 51–52.) The
25  Arizona Supreme Court denied review without comment in a one-page order. (PRF
26  29 at 1.) The state court's rejection of this claim was contrary to, or involved an
27  unreasonable application of, clearly established federal law, as determined by the
28  Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

1   unreasonable determination of the facts in light of the evidence presented. *See* 28

2   U.S.C. § 2254(d)(2).

3       Any deficiency in the state court record on this claim is a direct result of trial

4   counsel's prejudicially deficient representation in failing to request the needed

5   hearing and to investigate and present relevant evidence to determine whether

6   wearing the stun belt was necessary. *See Strickland*, 466 U.S. 668; *see* Claim 14

7   (alleging ineffective assistance of counsel for allowing waiver of presence.)

8           **B.      Waiver of Presence**

9       The right to be present at all critical stages of criminal proceedings is

10  guaranteed by the Fifth, Sixth, and Fourteenth Amendments. *United States v.*

11  *Gagnon*, 470 U.S. 522, 526 (1985); *State v. Levato,* 924 P.2d 445 (Ariz. 1996). A

12  criminal defendant's right to be present at every stage of his trial is rooted in the

13  Sixth Amendment's Confrontation Clause, as well as in the Fifth and Fourteenth

14  Amendments' Due Process Clauses. *Gagnon*, 470 U.S. at 526; *Illinois v. Allen*, 397

15  U.S. 337, 338 (1970) ("One of the most basic of the rights guaranteed by the

16  Confrontation Clause is the accused's right to be present in the courtroom at every

17  stage of his trial."); *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005).

18  The interests underlying a defendant's right to be present during his trial were

19  articulated by the Ninth Circuit in *Bustamante v. Eyman*:

20      The right to be present at trial stems in part from the fact that by his
        physical presence the defendant can hear and see the proceedings, can
21      be seen by the jury, and can participate in the presentation of his rights.
22      But it also rests upon society's interests in due process.

23  456 F.2d 269, 274 (9th Cir. 1972).

24      A defendant may waive his right to be present at trial. *State v. Bohn*, 570 P.2d

25  187 (1977). A waiver is an "intentional relinquishment or abandonment of a known

26  right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938). This Court must

27  indulge every reasonable presumption against the loss of the constitutional right to

28  be present at a critical stage of the trial. *Allen,* 397 U.S. at 343. As such, in order to

1   be valid, the waiver must be knowing, intelligent, and voluntary. *See Godinez v.*
2   *Moran*, 509 U.S. 389, 400 (1993). Moreover, "[t]he suspected presence of mental
3   or emotional instability eliminates any presumption that a written waiver is
4   voluntary, knowing, or intelligent." *United States v. Christensen*, 18 F.3d 822, 824–
5   25 (9th Cir. 1994). The exclusion of a defendant from all or a part of his trial
6   proceedings should be considered in light of the entire record. *Gagnon*, 470 U.S. at
7   526–27.

8       Lehr's desire to waive his appearance at all pretrial and trial proceedings was
9   a topic of conversation and debate from the inception of the case's remand to the
10  trial court. Lehr, through counsel, often voiced his desire to remain in his cell on
11  death row at the Arizona Department of Corrections until it was absolutely
12  necessary to be brought to the county jail for trial. (*See, e.g.*, Tr. Aug. 6, 2003 at 5.)
13  Once at the county jail, Lehr also indicated that he wished to not be present during
14  his entire trial and sentencing proceedings if held. The court brought Lehr into court
15  and would state Lehr had a right to be present and sought verbal confirmation of
16  Lehr's desires to waive his presence. (*See* Tr. Oct. 24, 2008 at 12–20; Tr. Oct. 31,
17  2008 at 10–15.)

18      The state, on the other hand, wanted to force Lehr to be present before the
19  jury and unsuccessfully attempted on several occasions to have the court order his
20  forced presence in court during trial. (*See* Tr. Oct. 24, 2008 at 20–29; Tr. Jan. 27,
21  2009 at 80–83.) After the guilt phase commenced, the court periodically brought
22  Lehr into court outside the presence of the jury and asked him to reiterate his desire
23  to waive his right to be present at trial. (*See* Tr. Feb. 2, 2009 at 4–30; Tr. Feb. 23,
24  2009 at 84–92; Tr. Mar. 16, 2009 at 96–110; Tr. Apr. 13, 2009 at 6–31.)

25      At no time prior to trial, or prior to the guilt and penalty phases, however, did
26  the trial court inquire further into the reasons for Lehr's waiver. At no time did the
27  trial court inquire into whether Lehr had any mental illnesses that impacted his
28  decision to waive. It was not until the penalty phase was almost over that the court

1   decided—for the first time—that it would actually ask Lehr why he wanted to waive
2   this most fundamental constitutional right. (*See* Tr. Apr. 8, 2009 at 12 ("*[f]or the*
3   *first time* I want Mr. Lehr to articulate to the court the reasons why he wants to
4   waive his presence.") (emphasis added).)

5       The trial court relied on Ninth Circuit precedent to conclude Lehr could
6   waive his presence in a capital case, provided the decision was knowing, intelligent,
7   and voluntary. (Tr. Apr. 14, 2009 at 5 (citing *United States v. Mitchell*, 502 F.3d
8   931, 986 (9th Cir. 2007).) The *Mitchell* court found that in that case, the trial court
9   "engaged Mitchell in a *lengthy colloquy* to determine whether his decision was
10  knowing and voluntary." *Id.* (emphasis added). Thus, in light of *Mitchell*, the judge
11  belatedly decided that he would like to conduct a colloquy regarding Lehr's *reasons*
12  for waiving his presence at trial: "Like the defendant in the *Mitchell* case who made
13  it clear to the judge that he was waiving his presence and why, I want Mr. Lehr to
14  do that. I want him to be able to establish, with his counsels' help, what reasons he
15  has for not wanting to be here." (Tr. Apr. 8, 2009 at 12.) On the final day of
16  testimony, the court advised Lehr that it would bring him to court – "[H]e needs to
17  articulate it to me so that our record is a little more complete than it is now." (Tr.
18  Apr. 8, 2009 at 13.) The judge thus admitted that he did not have all of the
19  information in front of him when he previously decided that Lehr could waive his
20  presence at the guilt phase and penalty phase of his capital trial and he was not
21  satisfied with the waivers.

22      Even then, however, the trial court failed to engage in the lengthy colloquy
23  contemplated by *Mitchell* and needed to properly determine whether Lehr's waivers
24  of his presence at his guilt and penalty phases were knowing, voluntary, and
25  intelligent. The court further failed to inquire into Lehr's mental health, which
26  should have been an obvious concern considering Lehr's depressive behavior and
27  attitude. Instead, the court proceeded to ask Lehr a series of "yes or no" questions
28  to determine if he understood his right to be present, right to testify on his behalf,

right to allocute, right to present statements seeking leniency from the jury, right to express remorse, right to plead for mercy – Lehr answered in the affirmative to each of these questions. (Tr. Apr. 13, 2009 at 8–9.) Lehr said he understood not being present may affect his ability to assist counsel, his ability to listen or respond to evidence, and the jury's right to observe him and "put a face on the name." (Tr. Apr. 13, 2009 at 9–10.) Lehr confirmed that no one made any promises, threatened him, or tried to persuade him to waive his presence. (Tr. Apr. 13, 2009 at 11.) He then answered "yes" that he was waiving his presence voluntarily… knowingly…willingly." (Tr. Apr. 13, 2009 at 11.)

Despite the trial court's intention to conduct a thorough colloquy and to ask Lehr his *reasons* for waiving his presence, the trial court still failed to do so. Instead, the court's recitation of basic questions requiring "yes" or "no" answers from Lehr ensured only that Lehr could repeat the answers needed to move the hearing forward rather than ensuring that Lehr "actually *does* understand the significance and consequences" of the waiver. *See Godinez*, 509 U.S. at 400–01 & n.12. Moreover, the court failed to inquire regarding Lehr's or current mental state, and trial counsel failed to properly present this evidence for the court's consideration. (*See* Claim 14.)

After the court's cursory inquiry into Lehr's understanding of his rights, the first question Lehr asked the court was about wearing jail clothes (which would mean he would not need to wear the stun belt per Maricopa County Sheriff's Office policy). (Tr. Apr. 13, 2009 at 23.) When the issue of dress came up again, Lehr interjected to confirm he would be wearing "chains" (and not a stun belt). (Tr. Apr. 13, 2009 at 27.) At this point, the fact that Lehr's waiver of presence was due to his fear of electrocution from the stun belt was finally discussed. (Tr. Apr. 13, 2009 at 30; Apr. 15, 2009 at 9–10.) The court finally asked "why do you want to appear in shackles?" (Tr. Apr. 13, 2009 at 30.) Lehr explained: "It's not what the jury might see. It's because of the electrocution device they will put around me. I have no faith

1   in it whatsoever, and I prefer to be in shackles. If I can avoid that stun belt, as you

2   call it, I'd like to do it. That's my only intention. I have no intention of acting out

3   in any way no matter what I'm dressed in. I will be as you see me here today. I

4   simply want to avoid wearing such a hideous, potentially deadly device around my

5   waist. That's all." (Tr. Apr. 13, 2009 at 30.) After hearing this, the trial court simply

6   stated: "Let me think about that. I do understand your reason, but the Court finds

7   your request to waive your presence at the sentencing phase of this case until the

8   jury returns its verdict is a knowing, intelligent, and voluntary one, and I will let

9   you waive your presence." (Tr. Apr. 13, 2009 at 30–31.)

10      Had the court inquired earlier in the trial why Lehr wished to waive his

11   presence it would have learned that his fear of wearing the stun belt was the sole

12   reason Lehr waived this right. Lehr's statements during early proceedings should

13   have alerted the trial court and led to further inquiry and hearings on both the

14   voluntariness of Lehr's waiver and the security measures necessary to safely

15   implement his right to be present.

16      Lehr's fear of wearing the stun belt is apparent throughout the trial transcript.

17   For example, in an early pretrial hearing Lehr stated: "It's just all these cuffs and

18   everything. *That's what it's all about*." (Tr. Oct. 24, 2008 at 17 (emphasis added).)

19   Similarly, on the day opening statements were presented, while the parties were

20   again discussing Lehr's absence, defense counsel indicated that his client did not

21   want to dress out for court other than in jail garb and shackles. The court indicated

22   that it would most likely require per policy that he wear a stun belt. (Tr. Jan. 27,

23   2009 at 15–22, 91–92.) The trial court should have conducted a further hearing at

24   that time to determine whether security concerns warranted the shackling of Lehr

25   in jail garb or the use of the stun belt while wearing civilian clothes. *See Deck v.*

26   *Missouri*, 544 U.S. 622 (2005), and *State v. Gomez*, 123 P.3d 1131, 1140 (Ariz.

27   2005). Instead, the trial court failed to inquire into the reasons behind Lehr's waiver

28   of presence, and thus despite Lehr's explicit concerns with wearing jail garb and

1   shackles or the stun belt, failed to conduct the proper inquiry under *Deck* and

2   *Gomez.*

3       The court recognized Lehr's decision was directly related to the Maricopa

4   County Sheriff's stun belt policy: "I want to make sure the record is clear, it was

5   his choice, that he would rather be shackled than wear a stun belt and leg braces."

6   (Tr. Apr. 14, 2009 at 109.) Then again prior to the reading of the jury's verdict, the

7   court summarized Lehr's opposition to wearing jail clothes being because "you

8   don't want to wear the stun belt because you are fearful that it could be activated

9   unnecessarily, and that you would greatly prefer to be shackled rather than have the

10  stun belt on." (Tr. Apr. 15, 2009 at 4.) Lehr confirmed to the court that his reason

11  for wanting to appear in jail garb and shackled was because "I have a fear of the

12  stun belt." (Tr. Apr. 15, 2009 at 8–9.) As discussed in Section (C)(2) of Claim 14,

13  Lehr's fear of the stun belt was rooted in his untreated and undiagnosed obsessive-

14  compulsive disorder, and further exacerbated by experiencing electrocution when

15  he was a child.

16      Lehr's waiver of presence was not voluntary because it was coerced by his

17  unique and extreme fear of wearing a stun belt. Without a valid, voluntary waiver,

18  Lehr's lack of presence was unconstitutional. *See Gagnon*, 470 U.S. at 526. Rather

19  than enforce the Maricopa County Sheriff's Office's blanket stun belt policy, the

20  trial court should have conducted a hearing on whether wearing the stun belt was

21  necessary for Lehr's guilt phase and penalty phase hearings, as required by *Deck*

22  and *Gomez*. It is clear from the forgoing that Lehr's waiver of his right to be present

23  was not voluntary since it was predicated on a uniformly enforced jail policy that

24  would require him to appear in court wearing a stun belt. Such a blanket policy

25  violates the Eighth Amendment. *See Deck,* 544 U.S. at 622; *Gomez,* 123 P.3d at

26  1131.

27      Lehr's waiver, therefore, based upon uniform adherence to this policy was

28  involuntary and a violation of the Fifth, Sixth, and Fourteenth Amendments. *See*

*United States v. Durham*, 287 F.3d 1297, 1305-06 (11th Cir. 2002) ("Another problem with this [stun belt] device is the adverse impact it can have on a defendant's Sixth Amendment and due process rights to be present at trial and to participate in his defense.") This constitutional error is structural since it involves the involuntary relinquishment of Lehr's right to be present throughout his entire pretrial and trial proceedings. *See Hegler v. Borg*, 50 F.3d 1472, 1476–77 (9th Cir. 1995); *State v. Garcia-Contreras,* 953 P.2d 536 (1998) (in-custody defendant's involuntary waiver of right to be present at jury selection held reversible error.)

### C.   The trial court's acceptance of Lehr's waiver of his right to be present at trial constitutes structural error.

Structural errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence…and no criminal punishment may be regarded as fundamentally fair.'" *Neder v. United States*, 527 U.S. 1, 8–9 (1999) (quoting *Rose v. Clark*, 478 U.S. 570, 577–78 (1986)). *See also McCoy v. Louisiana*, 138 S.Ct. 1500, 1511 (2018).

Lehr's absence infected all critical stages of his criminal proceedings – he was absent from jury selection, crucial pretrial hearings, his guilt phase, and during the penalty phase. "The absence of a defendant when his presence is required is as fundamental as the absence of his lawyer, *see Gideon v. Wainwright*, 372 U.S. 335, 344 (1963), or even of the judge. *See Tumey v. Ohio*, 273 U.S. 510 (1927)." *Mitchell*, 502 F.3d at 1009 (Reinhardt, J., dissenting). "It is impossible to determine from a review of a record whether the penalty imposed would have been different if an absent defendant had been present during the sentencing phase." *Mitchell*, 502 F.3d at 1010 (Reinhardt, J., dissenting). Accordingly, the trial court's acceptance of Lehr's waiver of his presence during all critical stages of his capital trial constitutes structural error.

Should the Court determine the trial court's acceptance of Lehr's invalid

waiver is not structural error, such error was not harmless and he can still prove prejudice. As a consequence of waiving his presence at trial, Lehr also waived his right to confront the identification witnesses, to allocute, and to challenge the aggravating circumstances. In order to waive his presence, Lehr stipulated to every 1996 and 1997 conviction, which were then used to prove the only two aggravating circumstances supporting the death sentences he ultimately received. (Tr. Apr. 1, 2009 at 8–38.)

Moreover, the trial court improperly focused its concern on Lehr being present for the reading of the verdicts, rather than the full penalty phase hearing. (Tr. Apr. 13, 2009 at 14, 27.) Even though Lehr was present for the reading of the verdicts, "he was no more than a passive audience on these occasions. The decision-making process was over." *Mitchell*, 502 F.3d at 1008 (J. Reinhardt, dissenting). The failure of Lehr to be present during the penalty phase is particularly prejudicial as "a capital defendant has an 'active role to play' during the penalty phase of his trial." *Id*. at 1010 (J. Reinhardt, dissenting).

The defendant's presence during the penalty phase "is required so that he may assist his counsel and plead for mercy from the jury. Additionally, his presence could well have significantly affected the course of the proceedings, the presentation of the mitigating and aggravating evidence." *Id*. at 1009–10 (J. Reinhardt, dissenting). Clayton, the prosecutor, articulated the prejudice engendered by Lehr's absence from trial:

> the fact that [the jury] have never heard him or see him here in court, they only see attorneys in the courtroom, the jury may feel, since he doesn't care, since his attorneys are acting on his behalf, I mean they can take it one way and say we can impose the death penalty a little easier. If they saw him in person, seeing a live human being, they may look at it a little differently and say yeah, the jury sentencing we do here is actually going to be for a live person.

(Tr. Apr. 8, 2009 at 6.) Clayton continued that he was worried about the jurors not being "able to look into his face and find some compassion." (Tr. Apr. 8, 2009 at

7.) The trial court agreed Lehr's presence could impact the jury, particularly because "he's always been polite, always been cooperative…[i]n looking at him, you don't get the impression, like we do with some defendants, that he's an explosive individual on the verge of some hugely violent catastrophic crime. And if the jury had the opportunity to see him, perhaps they would be more sympathetic or empathetically." (Tr. Apr. 8, 2009 at 10.)  Indeed, "[T]he mere presence of the defendant in the courtroom during sentencing proceedings exerts a psychological influence on the jury." *Mitchell*, 502 F.3d at 1008 (J. Reinhardt, dissenting) (citing *United States v. Canady,* 126 F.3d 352, 362 (2d Cir. 1997)).

The trial court judge similarly understood this importance yet failed to take the necessary steps to protect Lehr's right to be present by ensuring a knowing, intelligent, and voluntary waiver of that right: "by not letting them observe your human reactions, that may be very detrimental to your ability to get a verdict from the jury other than death…you have a better shot at not getting a death penalty verdict if you are physically present." (Tr. Apr. 13, 2009 at 6.) As a result of the court enforcing the Maricopa County Sheriff's Office's blanket stun belt policy, Lehr involuntarily waived his right to be present at the guilt phase and penalty phase proceedings. Such an error was structural; alternatively, Lehr was prejudiced.

**D.  The Arizona Supreme Court's rejection of this claim on direct appeal was contrary to clearly established federal law and unreasonable.**

The Arizona Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

First, the Arizona Supreme Court's de novo review of "whether [Lehr] knowingly and voluntarily waived his right to be present at trial" was contrary to, and an unreasonable application of, clearly established federal law. *See United*

*States v. Lockwood*, 165 F.3d 919 (9th Cir. 1998). As outlined above, Lehr's waiver of presence was not voluntary, knowing, or intelligent due to the court's blanket stun belt policy. Moreover, the trial court failed to consider the impact of Lehr's mental health on his wavier. *See Christensen*, 18 F.3d at 824–25. (*See* Claim 14, Section (C)(2).)

Second, the Arizona Supreme Court dismissed any reliance on the Ninth Circuit's case, *Mitchell*, 502 F.3d at 986–87, as requiring inquiry into the reasons for waiver by finding that "Although judges may sometimes appropriately inquire into a party's reasons for waiving a right, they are not constitutionally required to do so for a waiver to be valid." *Lehr III*, 254 P.3d at 385. This decision is contrary to, and an unreasonable application of, clearly established federal law. In addition to *Mitchell*, the Supreme Court has upheld waivers as knowing, voluntary, and intelligent only after the judge "inquired into his understanding of the proceedings and his awareness of his rights, and asked why he had chosen to represent himself." *Godinez*, 509 U.S. at 392. Indeed, the Court further directed that "a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Id.* at 400. By ruling the trial court was not required to inquire into the defendant's reasons for waiving his presence at his capital trial in order to "satisfy itself" that the waiver was valid, the Arizona Supreme Court's decision was contrary to clearly established federal law.

The trial court should have conducted a full colloquy, inquiring into the reasons for Lehr's waiver of his presence, in order to determine if the waiver was knowing, voluntary, and intelligent. Had the trial court done so, the judge would have learned that the waiver was due to Lehr's fear of the stun belt, which was directly related to his mental illnesses. At that time, the trial court could have made the case-specific determination of whether security concerns warranted the stun belt, as required by Maricopa County Sheriff's Office's policy, or whether Lehr's concerns could have been accommodated by having him appear in jail garb and

shackles. This could have occurred prior to the jury's deliberations on Lehr's guilt and determination of life or death. Instead, the trial court impermissibly applied Maricopa County Sheriff's Office's stun belt policy thus rendering Lehr's waiver involuntary.

The Arizona Supreme Court's decision is also an unreasonable determination of the facts. In *Mitchell*, the Ninth Circuit determined that "[i]t is clear from the record" that the defendant understood the nature of the proceedings and impact of waiving his presence. *Id.* at 985. Here, the state court record is anything but clear. The Arizona Supreme Court incorrectly asserted that the "record belies this assertion" that Lehr did not want to wear a stun belt. *Lehr III*, 354 P.3d at 384. As early as January 27, 2009, the day opening statements were presented, defense counsel indicated that his client did not want to dress out for court other than in jail garb and shackles. The court found that it would most likely require per policy that he wear a stun belt. (Tr. Jan. 27, 2009 at 15–22, 91–92.) Then prior to sentencing, the trial judge noted "you have *always* requested to be sentenced, or if you have to appear in this courtroom, to be in jail garb and shackled. Am I correct or not?" To which Lehr replied "That's absolutely correct." (Tr. Apr. 15, 2009 at 8 (emphasis added).) The issue to wear jail garb, and not a stun belt, was *always* Lehr's request. The trial court just failed to make the proper inquiry to determine the reasons for the waiver. The Arizona Supreme Court's contrary decision was an unreasonable interpretation of the facts.

Lastly, the Arizona Supreme Court rejected Lehr's argument that "if he had not waived his presence, the trial court would have required him to wear a stun belt merely because of jail policy." *Lehr III*, 254 P.3d at 385. The Arizona Supreme Court reasoned that the trial court "made a case-specific determination that security concerns warranted shackling Lehr" indicating that the trial court believed that Lehr would *not* have been required to wear the stun belt during other parts of his trial had he not waived his presence. *Id.* (citing *Deck*, 544 U.S. at 622, and *Gomez*, 123 P.3d

1    at 1140).

2        The Arizona Supreme Court overlooked the trial court's reasoning when it

3    permitted Lehr to wear shackles, and not the stun belt, at the reading of the

4    sentencing verdict. There the trial court permitted Lehr to appear in jail garb and

5    shackles only because the jury would have completed its work by that time and

6    there was no longer any concerns that the jury would be prejudiced by seeing Lehr

7    in shackles: "I distinguish our situation from [*Gomez* and other cases] because in

8    those cases the Court discussed the prejudice to the defendant if the jury can see

9    him shackled in that it could affect their determination of the ultimate issue of guilt

10   or innocence…We have a different situation because as soon as this jury comes in

11   they will have already made their decision, and their decision has been made

12   without seeing Mr. Lehr shackled." (Tr. Apr. 15, 2009 at 7–8.) The trial court would

13   not and did not permit Lehr to appear in court before the jury in jail garb and

14   shackles at any time prior to the reading of the sentencing verdict. Prior to that time,

15   Lehr could only appear if he wore the stun belt. Based on the full record, the Arizona

16   Supreme Court made an unreasonable determination of the facts in light of the

17   evidence presented.

18       Accordingly, the post-conviction court's decision is contrary to clearly

19   established federal law. Moreover, the court's determination, made without a

20   hearing, and ignoring critical evidence in the record, resulted in an "unreasonable

21   determination" of the facts, and therefore does not bar Lehr's claim for habeas

22   relief. *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1001.

23   **CLAIM FOURTEEN**

24   **Trial counsel rendered ineffective assistance by failing to conduct**

25   **an adequate and reasonable investigation showing Lehr**

26   **unknowingly and involuntarily waived his presence and right to**

27   **present mitigation in violation of the Fifth, Sixth, Eighth and**

     **Fourteenth Amendments.**

28

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Counsel's performance in investigating Lehr's background, including the impact of Lehr's mental illness and brain injury on his ability to voluntarily waive his presence, presentation of mitigating evidence, and right to allocution, fell below the performance of a reasonably competent attorney, and undermines confidence in his sentencing proceedings. *See Strickland*, 466 U.S. at 687. Defense counsel's deficient performance prevented the trial court from hearing indispensable information regarding Lehr's mental health and traumatic brain injury that demonstrate Lehr's waivers were not voluntary, knowing, or intelligent. *See Godinez v. Moran*, 509 U.S. 389, 400–01 (1993). Trial counsel's deficient performance further prevented Lehr from making informed waivers. Had counsel not performed deficiently, Lehr would not have waived so many crucial constitutional rights, and there is a reasonable probability of a different outcome at both the guilt and sentencing phases. Counsel's deficient performance therefore prejudiced Lehr, and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. *See Strickland*, 446 U.S. 688.

Lehr raised this claim in his post-conviction petition. (PCR Pet. at 24–28, 49–52.) The post-conviction court denied the claim on the merits. (PCR Order at 24–29.) Lehr raised this claim in his petition for review to the Arizona Supreme Court (PFR 3 at 14–29), which was denied without explanation (PFR 29). The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

## A.    Background

The record available to trial counsel included several red flags indicating Lehr suffered from a constellation of concerning mental health problems, including

a history of depression, mood swings, social isolation and paranoia. Trial counsel also knew that Lehr suffered head injuries, both as a child and adult, and that there were allegations of childhood abuse. Lehr's actions leading up to the 2009 trial also reflected concerning thought patterns and behaviors. For example, Lehr informed his 2009 trial counsel that he did not want to attend his trial. He told them he wanted no family members called as mitigation witnesses. He did not even want to leave his cell on death row. Lehr stated that he would "try to get the death penalty again," and took actions designed to "maximize the possibility that the jury will return that verdict." (Tr. Apr. 13, 2009 at 7.)

Despite red flags abounding regarding Lehr's mental health, trial counsel neither investigated nor presented any mental health evidence for the court's consideration. (*See* PCR Order at 26 ("At no time did counsel, the trial court, or Dr. Levitt identify any mental health issue that required further investigation.").) Had counsel investigated the obvious red flags, they would have discovered Lehr indeed has a range of mental health disorders as well as a traumatic brain injury.

Due to trial counsel's failures, the court proceeded to allow Lehr to waive his constitutional rights. At several points just before and during the 2009 trial, the trial judge ordered Lehr to appear and asked him questions about waiver, including on October 24, 2008; October 31, 2008; December 22, 2008; February 23, 2009; March 18, 2009; April 1, 2009; and April 13, 2009. During these conversations, trial counsel never raised, nor did the trial court once question, Lehr's mental health.

The court conducted a colloquy and Lehr orally waived his presence during his guilt phase. (Tr. Oct. 24, 2008.) Lehr also waived his presence at the aggravation phase and penalty phase. However, the trial judge never specifically inquired if Lehr knew the consequences of waiving mitigation. Similarly, the trial court never inquired as to Lehr's mental health.

Despite his absence for almost his entire capital trial, the court waited until the end of the penalty phase to inquire into the reasons for Lehr's waiver of

314

presence. At that late point in the proceedings, the court finally elicited Lehr's explanation that he feared being electrocuted by the stun belt – a fear rooted in and exacerbated by his mental health disorders. (Tr. Apr. 13, 2009 at 11–13.) During this same hearing, in the context of waiving his presence during the penalty phase, the trial court discussed the purpose of allocution with Lehr and consequences of not allocating, but again did not inquire into Lehr's mental health. (Tr. Apr. 13, 2009 at 8, 17–19.) Ultimately, the trial court judge did order Lehr to appear for the reading of the sentencing verdicts on April 14, 2009 but allowed him to appear in jail clothes, without the stun belt. Thus, the reading of the death verdicts were the only time Lehr's jury saw him during the entire course of his capital trial.

### B.   Evidence of Mental Health and Traumatic Brain Injury

Had defense counsel conducted a complete mitigation investigation, and engaged a mental health professional, they would have discovered, and could have presented, evidence regarding Lehr's mental illnesses and traumatic brain injury. As outlined below, Lehr's disorders impact his cognitive thinking and behaviors – and call into question his ability to waive his constitutional rights thereby undermining confidence in the outcome of his sentencing proceedings.

Dr. Schwartz-Maddox, a psychiatrist, conducted an extensive record review and evaluation. (PCR Pet. Ex. K.) Her evaluation shows that Lehr suffers from obsessive compulsive disorder and experiences recurrent and intrusive obsessions and compulsions in his daily life. (PCR Pet. Ex. K at 6.) Lehr seeks to have order and control over his life, which includes ruminating over issues and developing strict rituals for activities of daily living. (PCR Pet. Ex. K at 7.) Deviating from these daily patterns can be a source of stress and anxiety for people with obsessive compulsive disorder, such as Lehr. In addition, Lehr's early childhood trauma predisposed Lehr to his symptoms of paranoia and mistrust; this level of mistrust likely extended to his attorneys as well and he thus has difficult complying with their requests. (PCR Pet. Ex. K at 8.) Dr. Schwartz-Maddox further found Lehr's

obsessive compulsive disorder prevented Lehr from "cooperating" with his trial counsel. (PCR Pet. Ex. K at 7.)

Dr. John J. Toma, a psychologist, diagnosed Lehr with obsessive compulsive disorder and paranoid personality disorder. (PCR Pet. Ex. J.) He found Lehr was also experiencing depression "with feelings of helplessness and hopelessness" at the time of his trial. (PCR Pet. Reply Ex. C, Suppl. Report of Toma at 2, Oct. 18, 2016.) Lehr's untreated and undiagnosed mental health symptoms were only further aggravated by the stressors of his impending trial: "Symptoms of mental disorders can be increased with stress and can have differential affects [sic] on mental status and rational thinking, based upon situational stressors." (PCR Pet. Reply Ex. C, Suppl. Report of Toma at 1, Oct. 18, 2016.)

Based on his evaluation, Dr. Toma opined "that [Lehr's] waivers were likely related to his mental disorders." (PCR Pet. Reply Ex. C, Suppl. Report of Toma at 2, Oct. 18, 2016.) Lehr's decisions at trial "strongly suggest that depression might have affected his motivation at that time." (PCR Pet. Reply Ex. C, Suppl. Report of Toma at 2, Oct. 18, 2016.) Dr. Schwartz-Maddox similarly opined that Lehr's "mental illnesses affected his decisions with respect to his rights at trial." (PCR Pet. Reply Ex. B, Suppl. Decl. of Schwartz-Maddox at ¶¶ 5–7, Oct. 29, 2016.)

Dr. Toma further recommended a PET scan, as he surmised serious mood, thought, and perceptual disturbances that Lehr was able to mask and manage only when he was isolated on death row. (PCR Pet. Ex. J.) Lehr agreed to undergo brain imaging procedures, provided that no stun belts were to be used during transportation. On September 24, 2013, a PET scan was conducted, and on November 6, 2013, Lehr was transported for a MRI DTI scan. Dr. Joseph C. Wu authored a neurocognitive imaging report. (PCR Pet. Ex. L.) Dr. Wu's preliminary impression was an abnormal brain scan, and his preliminary conclusion was that "the pattern is compatible with brain injury or neuropsychiatric illness." (PCR Pet. Ex. L.)

Dr. Wu then did a "Clinical Correlation with PET scan and MRI DTI Results." (PCR Pet. Exs. L, M.) When reviewing the PET scan, Dr. Wu found "decreases in neocortical metabolism relative to cerebellum . . . asymmetrical metabolic decreases in left temporal cortex relative to right . . . decreases in parietal cortex relative to frontal cortex, and decreases in frontal pole and anterior cingulate metabolism." (PCR Pet. Ex. L at 3.) The MRI DTI scan showed significant brain defects and abnormalities: "FA decreases in the corpus callosum are consistent with traumatic brain injury as well as schizophrenia. The FA decreases in the anterior thalamic radiation are consistent with schizophrenia and bipolar disorder." (PCR Pet. Ex. L at 4.) Dr. Wu concluded as follows:

> The abnormalities shown by Mr. Lehr's PET scan and his MRI DTI and MRI neuroquant analysis corroborate the presence of a damaged brain most likely due to traumatic brain injury and are also consistent with Tourette's syndrome as well as psychotic diseases such as schizophrenia and psychotic bipolar disorder. The most notable reason for head trauma being the foremost cause of these brain abnormalities is the asymmetrical nature of the abnormalities. Head trauma also significantly increases the likelihood of developing other disorders such as schizophrenia or bipolar disorder. The brain damage makes Mr. Lehr more vulnerable to the synergistic interaction of an impaired brain and stress from childhood victimization to result in a greater likelihood of violent behavior and an impaired ability to regulate impulses, including use of substances.

(PCR Pet. Ex. L at 6.)

The above mental health disorders, in combination with Lehr's traumatic brain injury, directly impact his daily thinking and behaviors. These cognitive impairments cannot be divorced from Lehr's willingness to waive his presence, mitigation, and allocution. Due to trial counsel's unreasonable performance, none of this evidence was presented for the judge's consideration when determining Lehr's ability to knowingly, voluntarily, and willingly waive his constitutional rights.

While the court-appointed competency evaluator, Dr. Gwen Levitt, found Lehr "competent to stand trial" in a pre-screen psychological report of November

5, 2008 (*see* ROA 766), she did not conduct a more thorough analysis such as brain imaging or perform the exhaustive testing and examinations that the mental health professionals conducted during post-conviction proceedings. Moreover, the law is clear that determining competency to stand trial is *not* the same as determining whether a defendant can knowingly, voluntarily, and willingly waive his constitutional rights. *See Godinez*, 509 U.S. at 400–01 & n.12 ("The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.") (citations omitted) (emphasis in original)). Thus, despite Levitt's report, trial counsel still had a duty to conduct an investigation into Lehr's mental health.

## C.   Deficient Performance

Trial counsel failed to investigate, consult with experts, or present evidence on Lehr's mental health despite numerous red flags that would have lead competent counsel to investigate further. As outlined above, evidence now shows that Lehr has a range of mental health disorders as well as brain damage that impact his cognitive functioning and behaviors. As a consequence of counsel's deficient performance, this crucial evidence regarding Lehr's mental illnesses and brain impairments were kept from the judge's consideration when determining whether Lehr's waivers were knowing, voluntary, and intelligent. Trial counsel's failure to investigate this mental health evidence, as well as mitigation as whole, also rendered Lehr's waivers uninformed, and thus invalid. Lehr was prejudiced by counsel's failure to present this compelling evidence to the court, which would have directly impacted the judge's decision on whether to accept his waivers.

Prior to the guilt phase, trial counsel failed to conduct a thorough mitigation investigation and thus failed to develop or investigate existing concerns regarding

Lehr's mental health. *See Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005) ("legal experts agree that preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase."); *Hamilton v. Ayers*, 583 F.3d 1100, 1117 (9th Cir. 2009) (explaining defense counsel "should have retained a mental health expert and provided the expert with the information needed to form an accurate profile of [the defendant's] mental health."); *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003) ("Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired.").

Counsel was on notice that something was not right with Lehr's decision-making and should have sought expert assistance from appropriate mental health professionals. Trial counsel had Dr. Woods' 1997 testimony and report noting Lehr had a paranoid personality disorder. (Tr. July 8, 1997 (AM) at 26.) Lehr's ex-wife, Renee Dishong, also gave a statement to police indicating that Lehr had a history of depression, experienced mood swings, was generally quiet, and did not have many close friends. Lehr presented with paranoid ideation leading to mistrust of his attorneys (Tr. July 8, 1997 (AM) at 28), he lacked motivation to participate in his defense, and he said he wanted the death penalty (Tr. Apr. 13, 2009 at 7).

A constitutionally adequate investigation would have revealed the full scope of Lehr's mental health disorders and brain injury, as outlined above; such information would have been critical for counsel to present in regard to Lehr's waivers. No such investigation was undertaken by Lehr's trial counsel prior to the offer and acceptance by the trial court of his waivers. The Ninth Circuit has held that "[t]he suspected presence of mental or emotional instability eliminates any presumption that a written waiver is voluntary, knowing, or intelligent." *Christensen*, 18 F.3d at 824–25 (addressing the adequacy of a jury waiver and evidence of a defendant's manic-depressive disorder putting the district court on notice that a defendant's waiver "might be less than knowing and intelligent.")

Because of trial counsel's failure to investigate Lehr's mental health, the evidence regarding Lehr's mental health disorders and brain injury, and how those disorders impact his cognitive functioning and behaviors, were never presented to the court.

As a result, the trial judge never possessed the requisite information to properly determine if Lehr could voluntarily, intelligently, and knowingly waive the presentation of mitigating evidence, his presence, or his allocution. *Cf. Summerlin v. Schriro*, 427 F.3d 623, 644 (9th Cir. 2005) (Scannlain, J., dissenting) (finding no ineffective assistance of counsel because "the sentencing judge was aware of substantially all the evidence regarding Summerlin's mental difficulties.) The trial court was dependent upon trial counsel in determining these issues. *See Battenfield v. Gibson*, 236 F.3d 1215 at 1227–33 (10th Cir. 2001). This critical mental health information should have been presented to the trial court for its consideration in deciding whether to accept the waivers of Lehr's constitutional rights. *See Schriro v. Landrigan*, 550 U.S. 465, 482 (2007) (Stevens, Souter, Ginsburg, Breyer, J., dissenting) ("Significant mitigating evidence—evidence that may well have explained respondent's criminal conduct *and unruly behavior at his capital sentencing hearing*—was unknown at the time of sentencing. Only years later did respondent learn that he suffers from a serious psychological condition that sheds important light on his earlier actions. The reason why this and other mitigating evidence was unavailable is that respondent's counsel failed to conduct a constitutionally adequate investigation.") (emphasis added).

To the extent trial counsel failed to conduct any mental health investigation because Lehr was uncooperative, such a failure to investigate was not reasonable or strategic. An attorney cannot blindly follow a client's demands. *See Douglas v. Woodford*, 316 F.3d 1079 at 1086 (9th Cir. 2003). At minimum, trial counsel should have explored the red flags with both Lehr and his family, consulted with mental health professionals, and relied on evidence already in the record to start to develop an understanding of Lehr's complex mental health history, and then brought that

information to the court's attention. Instead of investigating, trial counsel did no investigation, or expert consultation, with respect to Lehr's mental health. (*See also* Claim 12.)

### 1. Ineffective assistance of counsel regarding waiver of mitigation.

Had counsel conducted a proper investigation, they would have discovered that Lehr's desire to limit all meaningful mitigation in an attempt to get the death penalty as soon as possible is directly attributable to the mental illnesses and brain damage as found by Drs. Toma, Schwartz-Maddox, and Wu. (PCR Exs. J, K, and L.) As a result of trial counsel's failure to investigate, the trial court could not consider all relevant information when deciding whether Lehr's purported desire to waive all meaningful mitigation was knowing, voluntary, and intelligent.

The reports of Drs. Schwartz-Maddox, Toma, and Wu were completed after exhaustive review of the record as well as comprehensive testing. (PCR Exs. J, K, L.) These reports demonstrate that Lehr suffers from a number of mental health problems, including traumatic brain injury, that were undiagnosed and untreated at the time he was waiving mitigation. The evidence shows that Lehr's cognitive impairments negatively impacted his ability to make an informed and voluntary decision as to the waiver of presenting all relevant mitigating evidence.

Lehr's mental illness and brain damage make him act impulsively and irrationally. (*See* PCR Pet. Ex. L at 6.) His obsessive compulsive disorder makes him resistant to change because he seeks to have order and control over his life. (PCR Pet. Ex. K at 7.) Lehr had been on death row for eleven years before the 2009 trial. He may have felt more secure on death row than in the general population. He may have been embarrassed to air family secrets or disclose his own mental health problems. Lehr was also experiencing depression "with feelings of helplessness and hopelessness" at the time of his trial. (PCR Pet. Reply Ex. C, Suppl. Report of Toma at 2, Oct. 18, 2016.) Lehr's thinking in wishing to waive mitigation, in an effort to

1  receive the death penalty again, is a direct manifestation of these cognitive
2  impairments.

3      This case is not unlike *State v. Bocharski*, 22 P.3d 43, 53 (Ariz. 2001), where
4  the defendant essentially gave up. The Arizona Supreme Court commented that "a
5  red flag is raised when sentencing is expedited based solely on the defendant's
6  desire to speed up the process." *Id.* There, the court held that "a waiver must be
7  balanced against the state's interest in conducting a fair trial and upholding the
8  integrity of the judicial process," and vacated the death penalty. *Id.* at 61. Here,
9  rather than conducting an investigation into Lehr's mental health when faced with
10 the red flags in Lehr's case, trial counsel did nothing—essentially joining their
11 client in "giving up."

12     Moreover, trial counsel failed to ensure the court specifically conduct a
13 colloquy with Lehr to determine whether his waiver of mitigation was an informed
14 decision that was knowing, voluntary, and intelligent. A capital defendant has a
15 constitutional right to present a mitigation defense, and a "defendant's waiver of
16 that right must be knowing, voluntary and intelligent." *Summerlin*, 427 F.3d at 639
17 (citing *Whitmore v. Arkansas*, 495 U.S. 149 (1990)). The court continued:

18     This standard does not only mean that the defendant's waiver must be
       an informed decision, but also that it must be a competent one. If a client
19     has elected to forego legal proceedings that could avert the imposition
20     of the death penalty, then a court must make the determination "whether
       he has capacity to appreciate his position and make a rational choice
21     with respect to continuing or abandoning further litigation or on the
       other hand whether he is suffering from a mental disease, disorder, or
22     defect which may substantially affect his capacity in the premises.

23 *Summerlin*, 427 F.3d at 639 (quoting *Rees v. Peyton*, 384 U.S. 312, 314 (1966))
24 (emphasis added). A review of the record shows that the trial court engaged in
25 various conversations with Lehr regarding his waiver of presence, including the
26 waiver of his presence at the penalty phase and discussing his right to allocution,
27 but the trial judge never made a specific determination on the record that Lehr's
28 waiver of mitigation was informed, voluntary, intelligent, and knowing. Even if trial

322

counsel were going to improperly concede to Lehr's desire to limit mitigation, they still had a fundamental duty to protect their client's constitutional rights by ensuring the waiver was constitutional and the determination was made by the trial judge on a sufficient record. Moreover, trial counsel never requested, and the trial court never inquired, into Lehr's mental health during any of the proceedings discussing waiver.

Trial counsel failed to investigate, consult with experts, and present evidence of Lehr's mental health and brain injury, to his prejudice. Trial counsel further failed to ensure a specific colloquy on the waiver of mitigation, including inquiry into Lehr's mental health. Had trial counsel fulfilled their duty, this key evidence calling into question the whether Lehr's waiver of mitigation was knowing, voluntary, and intelligent could have been presented for the trial court's consideration, and the court would have rightfully declined to adopt such a waiver. Had counsel adequately investigated, and not permitted Lehr's invalid waiver of compelling mitigating evidence, Lehr's jury would "have been faced with a strikingly different and more accurate picture" of Lehr's life circumstances. *Hovey v. Ayers*, 458 F.3d 892, 927 (9th Cir. 2006); (*see also* Claim 12 (detailing the scope of prejudice from trial counsel's ineffective mitigation investigation).)

## 2. Ineffective assistance of counsel regarding waiver of presence.

Trial counsel's deficient performance also prevented the trial court from hearing relevant information indicating Lehr's waiver of presence was not voluntary, knowing, or intelligent. In addition to being raised in the post-conviction petition, this subclaim was also raised in Lehr's petition for review. (PFR 3 at 50–52.) As discussed above, trial counsel failed to conduct an investigation into Lehr's mental health and cognitive deficits. Because of this deficient performance, Lehr was prejudiced, as he waived one of the most important constitutional rights during both the guilt and penalty phases.

Evidence shows that Lehr's waiver of his right to be present at trial was a

direct product of his obsessive compulsive disorder, his resulting intense fear of electrocution, and the trial court's adherence to the Maricopa County Sheriff's Office's policy that mandated he wear an electric stun belt during trial. (*See* Claim 13.) Dr. Schwartz-Maddox explained that Lehr's obsessive compulsive disorder causes Lehr to experience "recurrent and intrusive obsessions and compulsions." (PCR Pet. Ex. K at 6.) Due to this disorder, Lehr became convinced he would be electrocuted by a stun belt. (*See* PCR Pet. Reply Ex. B, Suppl. Decl. of Schwartz-Maddox at ¶¶ 5–7, Oct. 29, 2016.) Lehr's fear of the stun belt, rooted in his untreated and undiagnosed obsessive-compulsive disorder, further exacerbated by experiencing electrocution when he was a child, led to Lehr's waiver of his presence during pretrial proceedings and ultimately his capital trial.

Trial counsel failed to bring any of this evidence to the court's attention. At no time prior to the trial phase or penalty phase did the trial court inquire further into the reasons for Lehr's waiver of presence. At no time did the trial court inquire into whether Lehr had been diagnosed with any mental illnesses that impacted his ability to waive his presence. Finally, at the end of the penalty phase, the court indicated to counsel that "*[f]or the first time* I want Mr. Lehr to articulate to the court the reasons why he wants to waive his presence." (Tr. April 8, 2009 at 12 (emphasis added).) Lehr went on to explain: "It's not what the jury might see. It's because of the electrocution device they will put around me. I have no faith in it whatsoever, and I prefer to be in shackles. If I can avoid that stun belt, as you call it, I'd like to do it. That's my only intention. I have no intention of acting out in any way no matter what I'm dressed in. I will be as you see me here today. I simply want to avoid wearing such a hideous, potentially deadly device around my waist. That's all." (Tr. Apr. 13, 2009 at 30.) Lehr later confirmed to the court that his reason for wanting to appear in jail garb and shackled was because "I have a fear of the stun belt." (Tr. Apr. 15, 2009 at 8–9.)

Neither Lehr, nor his counsel, nor the trial court, possessed the requisite

mental health expertise to be able to determine the underlying reasons, causes, or contributing factors informing Lehr's involuntary waiver of presence. It was therefore incumbent on trial counsel to conduct a reasonable investigation to ensure all aspects of Lehr's mental health background were presented to the court for consideration. Had counsel done so, they would have discovered evidence of Lehr's obsessive compulsive disorder, his fear of electrocution, and how this background informed his fear of wearing the stun belt, which drove his decision to waive his presence. This information could have then been presented to the trial court prior to accepting Lehr's waiver.

Lehr was prejudiced by trial counsel's failure to present evidence challenging the voluntariness of his waiver of presence during the guilt phase. As a consequence of waiving his presence at trial, Lehr waived his right to confront the "other acts" witnesses, to challenge the eyewitness identifications, to allocute, and to challenge the aggravating circumstances. (*See e.g.*, ROA 766 at 2.) Critically, in order to waive his presence, Lehr entered a waiver stipulating to every 1996 and 1997 conviction, which were then used to prove the only two aggravating circumstances supporting the death sentences he ultimately received. (Tr. Apr. 1, 2009 at 8–38.)

Moreover, trial counsel performed deficiently by expressly resisting efforts to try to lessen the prejudicial impact on the jury that would inevitably result from Lehr's absence from the courtroom. When asked by the court if they would "try to come up with some kind of stipulation" for the Court to explain why he's waived his presence, Cleary flatly responded "No. Not really." (Tr. Apr. 8, 2009 at 16.) The trial court even found this "counterintuitive" but Cleary resisted "because I think my obligations are to my client and his desires." (Tr. Apr. 8, 2009 at 16.)

Had Lehr not waived his presence there is a reasonable probability that the outcome would have been different, particularly at sentencing. Lehr's absence from trial further isolated him from the jury and directly impacted his ability to humanize himself in front the jury during the penalty phase. Had Lehr's jury seen him, and

put a face to the person they were considering whether to execute, there is a reasonable probability they would have returned a life verdict. "[T]he mere presence of the defendant in the courtroom during sentencing proceedings exerts a psychological influence on the jury." *United States v. Mitchell*, 502 F.3d 931, 1008 (9th Cir. 2007) (J. Reinhardt, dissenting) (citing *United States v. Canady,* 126 F.3d 352, 362 (2d Cir. 1997) ("In the jury context, several courts, in rejecting the argument that the defendant's presence is useless, have pointed to the fact that the defendant's mere presence exerts a 'psychological influence upon the jury.'") (quoting *United States v. Santiago,* 977 F.2d 517, 523 n. 6 (10th Cir. 1992))). As the trial judge even noted: "you have a better chance of avoiding what could be a death penalty if the jury can see you in the flesh, can understand that you are a human being, and perhaps they will feel empathy or sympathy or sorrow for you." (Tr. Apr. 13, 2009 at 6; *see also* Claim 13 (outlining prejudice from Lehr's absence at trial).)

Lehr's counsel's errors were so serious in allowing the court to accept Lehr's wavier of presence that they deprived him of "a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Lehr was prejudiced by trial counsel's failure to present evidence challenging the voluntariness of his waiver of presence.

### 3. Ineffective assistance of counsel regarding waiver of allocution.

As outlined above, trial counsel's deficient performance prevented the trial court from hearing relevant information indicating Lehr's waiver of his right to allocution was not voluntary, knowing, and intelligent. Here, the trial court discussed the purpose of allocution with Lehr and consequences of not allocating. (Tr. Apr. 13, 2009 at 17–19.) The trial court concluded the decision to waive allocation was "a conscious decision on his part." (Tr. Apr. 13, 2009 at 19.) As discussed above, trial counsel failed to conduct a constitutionally adequate investigation into Lehr's mental health and cognitive deficits. As a result of this

1   deficient performance, Lehr was prejudiced.

2       In Arizona, "[a] criminal defendant has a right to make a statement to the jury
3   before imposition of a death sentence." *State v. Anderson*, 111 P.3d 369, 392 (Ariz.
4   2005); *see also* Ariz. R. Crim. P. 19.1(d)(7). Allocution is a critical part of the
5   sentencing process because it is an opportunity to humanize the defendant and for
6   the defendant to convey to the sentencer the reasons for mercy. *See State v. Hopson*,
7   543 P.2d 1126, 1128 (Ariz. 1975) (describing allocution as a "constitutional right");
8   *State v. Fettis*, 664 P.2d 208, 209 (Ariz. 1983) (describing that a "defendant
9   exercising his right of allocution" is one of the "minimum requirements" of
10  sentencing (citing ABA's Standards for Criminal Justice, Standard 18-6.4 (1980)).
11  Moreover, allocution is protected by the Eighth Amendment, which prohibits a
12  State from placing impermissible restrictions on the types of mitigating evidence
13  presented by the defense. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he
14  Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest
15  kind of capital case, not be precluded from considering, as a mitigating factor, any
16  aspect of a defendant's character or record and any of the circumstances of the
17  offense that the defendant proffers as a basis for a sentence less than death.").

18      Here, due to counsel failure to investigate Lehr's mental health issues, the
19  trial judge lacked relevant evidence regarding Lehr's mental health that directly
20  called into question his ability to voluntarily, knowingly, or intelligently waive his
21  right to allocute. Lehr was prejudiced by his counsel's deficient performance that
22  resulted in his waiver of allocution. Allocution is "designed to temper punishment
23  with mercy…and to ensure that sentencing reflects individualized circumstances."
24  *United States v. De Alba Pagan*, 33 F.3d 125, 129 (1st Cir. 1994). There is a
25  reasonable probability that had the sentencing jury heard a statement from Lehr that
26  humanized him, they would not have sentenced him to death.

27

28

### 4. Lehr's waivers were also uninformed, and thus invalid, due to trial counsel's deficient performance.

In addition, trial counsel failed to investigate, and failed to adequately understand the law, resulting in Lehr making unformed, and thus invalid, waivers. *See Summerlin*, 427 F.3d at 639 (noting that the standard requires not only al competent decision but also "an informed decision.")

First, the failure of trial counsel to investigate mitigation prevented Lehr from making an informed decision regarding his waivers of mitigation, presence, and allocution. The new mental health evidence, as well as the volume of mitigating evidence subsequently developed by post-conviction counsel (*see* Claim 12), went uninvestigated due to trial counsel's deficient performance. Trial counsel had a duty to try to persuade Lehr to allow the presentation of mitigating evidence, and they could not possibly have made a reasoned tactical decision, if they did not even know what evidence was available. *See Silva*, 279 F.3d at 847; *see also Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998). Had Lehr known the details of his own mental health diagnoses and brain injury, and how they impact his thinking, he could have made an informed decision about his waivers. Even more, had Lehr known the full scope of mitigation that could have been presented on his behalf during the penalty phase, he may not have waived mitigation, his presence during the penalty phase, or right to allocute. Due to trial counsel's failure to investigate mitigating evidence, Lehr did not possess all the relevant information needed to make an informed decision regarding his waiver of mitigation, presence, and allocution.

Second, Lehr's waiver of presence during the aggravation phase, and resulting waiver stipulating to the (F)(1) and (F)(2) aggravators was not valid as the waiver was uninformed because it was based on trial counsel's misunderstanding of the law. As explained in Claim 4, Lehr was made eligible for the death sentences based on aggravating circumstances that did not exist at the time he committed his crimes. The later imposition of increased punishment that was not available or

1   prescribed at the time of his actions violates the Constitution's ex post facto clause.

2   As a result of trial counsel's failure to understand the law, and thus object to the

3   (F)(1) and (F)(2) aggravators, Lehr agreed to stipulate to the aggravating

4   circumstances. (*See* Tr. Apr. 1, 2009 at 25–26.) "The failure of an attorney to inform

5   his client of the relevant law clearly satisfies the first prong of the *Strickland*

6   analysis . . . as such an omission cannot be said to fall within the wide range of

7   professionally competent assistance demanded by the Sixth Amendment." *Hill v.*

8   *Lockhart*, 474 U.S. 52, 62 (1985) (White, J., concurring) (quotation marks

9   omitted)). Accordingly, Lehr's waiver of presence at the aggravation phase, and

10  resulting waiver stipulating to the (F)(1) and (F)(2) aggravating circumstances was

11  informed, and thus invalid.

12       **D.     Cumulative effect of each individual instance of prejudice.**

13       While each instance of trial counsel's deficient performance prejudiced Lehr,

14  the cumulative effect of those unreasonable missteps was particularly pronounced.

15       Here, counsel committed multiple errors during the capital trial that gravely

16  impacted both the guilt and penalty phase proceedings. Even if each of the

17  individual errors discussed above did not constitute reversible error, in cases where

18  "no single trial error examined in isolation is sufficiently prejudicial to warrant

19  reversal, the cumulative effect of multiple errors may still prejudice a defendant."

20  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Alcala*, 334

21  F.3d at 882–83 (affirming grant of habeas relief on the basis of cumulative effect of

22  multiple errors by counsel); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002)

23  (stating that the cumulative effect of errors may be so prejudicial as to require

24  reversal); *Harris ex rel. Ramseyer*, 64 F.3d at 1439 (holding that the cumulative

25  impact of numerous deficiencies in defense counsel's performance was prejudicial).

26  Even if this Court were to find that no single error merits relief, the cumulative

27  effect of all the errors is so prejudicial that Lehr is entitled to relief. *See Boyde*, 404

28  F.3d at 1176.

Courts have repeatedly found prejudicial ineffective assistance of counsel where, as here, counsel neglected to undertaken an adequate investigation of a capital defendant's background and mental health. *See, e.g.*, *Stankewitz*, 698 F.3d at 1163; *Robinson*, 595 F.3d at 1086; *Hamilton* , 583 F.3d at 1100; *Libberton v. Ryan*, 583 F.3d 1147 (9th Cir. 2009); *Correll*, 539 F.3d at 938; *Lambright*, 490 F.3d at 1103; *Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006); *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005); *Summerlin* , 427 F.3d at 623 (en banc); *Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005); *Jennings*, 290 F.3d at 1006; *Karisa*, 283 F.3d at 1117; *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Smith v. Stewart*, 189 F.3d 1004 (9th Cir. 1999); *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998). The Supreme Court has repeatedly recognized the importance and uniquely compelling nature of evidence of brain damage in particular in finding prejudice. *See Sears*, 561 U.S. at 949, 956; *Porter*, 558 U.S. at 36, 41; *Rompilla*, 545 U.S. at 392–93. These cases control the analysis in Lehr's case as well, especially under a de novo standard of review where the strictures of § 2254(d) do not apply.

As a result of trial counsel's failure to investigate Lehr's mental health, the trial court erred in accepting Lehr's waiver of presence, his right to present mitigating evidence, and his right to allocute. Lehr was prejudiced by his trial counsel's deficient performance. Lehr's sentencing jury rendered death sentences without seeing Lehr during the guilt or penalty phase, without hearing the full scope of mitigating evidence, and without the benefit of hearing any statement from Lehr that would have humanized him to the jury. Had these waivers not been entered, there is a reasonable probability the sentencing jury "would have struck a different balance." *Wiggins*, 539 U.S. at 537; *see also Strickland*, 466 U.S. at 693 (noting that a reasonable probability of a different result is less than the preponderance more-likely-than-not standard). Had counsel presented the mental health evidence outlined above, the trial judge would not have accepted Lehr's waivers and/or Lehr

1   would not have waived his vital constitutional rights; absent these waivers, there is

2   a reasonable probability of a different result at the guilt or penalty phase. Thus, the

3   invalid waivers of Lehr's presence, mitigation, and allocution independently, and

4   cumulatively, undermine confidence in the outcome of Lehr's capital trial and there

5   is a reasonable probability of a different result.

6      **E.**    **The post-conviction court's ruling was contrary to clearly**

7   **established federal law and an unreasonable determination of the facts.**

8   The state court's rejection of Lehr's ineffective assistance of counsel claim

9   regarding his waivers of constitutional rights was contrary to, or involved an

10  unreasonable application of, clearly established federal law, as determined by the

11  Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

12  unreasonable determination of the facts in light of the evidence presented. *See* 28

13  U.S.C. § 2254(d)(2).

14      **1.**    **The post-conviction court incorrectly concluded that the**

15  **claims are precluded.**

16  First, the post-conviction court incorrectly found the waiver of presence

17  claim to be precluded under Arizona Rules of Criminal Procedure Rule 32.3(a)(2).

18  The court incorrectly concluded that the claim had been "presented and rejected by

19  the Arizona Supreme Court on appeal." (PCR Order at 24.) However, the claim

20  referenced by the post-conviction court, which was raised and rejected on direct

21  appeal, is Lehr's waiver of presence claim – not an ineffective assistance of counsel

22  claim. (*See* DA2 82 at 17; *Lehr III*, 254 P.3d at 384–85.) Therefore, the ineffective

23  assistance of counsel claim regarding Lehr's waiver of presence, which was

24  separately raised state court, is not precluded, and has not been addressed on the

25  merits by the state courts. Because this claim has not been adjudicated by the

26  Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do

27  not apply to this Court's review, and the Court may consider the merits of the claim

28  de novo.

1      Second, the post-conviction court ruled that the waiver of mitigation claim
2  "could have been raised on appeal but was not and therefore has been waived
3  pursuant to Rule 32.2(a)(3)." (PCR Order at 25.) But, an ineffective assistance of
4  trial counsel claim, which is alleged here, is properly brought in Rule 32
5  proceedings. *See State v. Spreitz*, 39 P.3d 525, 526 (Ariz. 2002) ("Rule 32 set forth
6  the proper procedure for resolving claims of ineffective assistance of counsel");
7  *State v. Duffy*, No. 2 CA-CR 2018-0071, 2019 WL 5687443, *2 (Ariz. Ct. App.
8  Nov. 1, 2019) (stating that if a defendant "believes particular decisions, acts, or
9  omissions of his defense attorney at trial rendered his counsel ineffective, such a
10 claim must be raised in a petition for post-conviction relief brought pursuant to Rule
11 32, Ariz. R. Crim. P."). Accordingly, Rule 32 is the proper vehicle for criminal
12 defendants to raise ineffective assistance of counsel claims, not direct appeal. *See*
13 Ariz. R. Crim. P. 32.2(b).

14     To the extent the Arizona Supreme Court's decision adjudicated Lehr's claim
15 as to the waiver of mitigation, the decision is contrary to clearly established federal
16 law and an unreasonable determination of facts as outlined below.

> **2.      The post-conviction court's decisions regarding Lehr's
>            waivers were contrary to clearly established federal law and
>            based on an unreasonable determination of facts.**
>
>       **a.      The state court improperly applied the *Strickland*
>                ineffective assistance of counsel standard when
>                considering this claims.**

22     Regarding the waiver of mitigation claim, the post-conviction court ruled that
23 Lehr failed to present a colorable claim showing "there was a reasonable probability
24 that the factfinder *would have been likely* to reach a different result" had Lehr been
25 present at his trial or had not waived his mitigation. (PCR Order at 26 (emphasis
26 added).) The prejudice standard applied by the post-conviction court in dispensing
27 with this claim is contrary to clearly established federal law. Under the clearly
28 established federal law in *Strickland*, counsel's deficient performance prejudices a

defendant when "[t]here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687–88, 694. Here, the post-conviction court improperly increased Lehr's burden from being a reasonable probability the result "would have been" different into "would have been *likely*" to be different. The Court in *Strickland* explicitly rejected the preponderance standard. *Id.* at 694; *see also Summerlin,* 427 F.3d at 643 ("A reasonable probability is "less than the preponderance more-likely-than-not standard.") Indeed, any standard other than that explicitly laid out in *Strickland* is contrary to clearly established Supreme Court precedent. *See Williams*, 529 U.S. at 397. The post-conviction court's prejudice analysis for this claim, which improperly inserted a higher "likely" standard, is therefore contrary to clearly established federal law.

Furthermore, the post-conviction court impermissibly adopted an outcome-determinative standard, as opposed to the *Strickland* standard. That court dismissed Lehr's claim because he failed to demonstrate that developing a meaningful relationship or ensuring his presence in court "would have been reasonably likely to achieve different verdicts at either the guilt or the penalty phases." (PCR Order at 28.) In fact, a petitioner does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *See Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694). *See also Lambright*, 490 F.3d at 1121 (holding that "in evaluating prejudice," a court "must" ultimately evaluate whether "the difference between what was presented and what could have been presented is sufficient to 'undermine confidence in the outcome' of the proceeding.") (quoting *Strickland*, 466 U.S. at 694).

At no point did the court cite to any other prejudice standard for an ineffective-assistance claim, and at no point did the court cite to a case applying the

correct *Strickland* standard. Accordingly, the post-conviction court unambiguously applied a standard that was contrary to and/or an unreasonable application of clearly established federal law, satisfying 28 U.S.C. § 2254(d)(1). *See, e.g.*, *Thomas v. Clements*, 789 F.3d 760, 767–68 (7th Cir. 2015) (holding that court's "would have led to a different result" prejudice standard was an unreasonable application of *Strickland*, when the state court did not explain why there was no prejudice or otherwise demonstrate that it had used the correct standard); *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) (holding that the state court's prejudice inquiry—whether "the result of the proceeding would have been different"—was contrary to *Strickland*).

In addition, the post-conviction court's ruling that there was no showing of deficient performance was an unreasonable application of *Strickland* and *Wiggins*, which unambiguously provide that unreasoned "decisions" based on an unreasonable investigation are afforded no deference. *See Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521. Here, the state court record is clear that trial counsel conducted no investigation into Lehr's compromised mental health and the multiple red flags that were present. Such an unreasonable investigation is therefore afforded no deference.

### b. The court's erred in concluding Lehr was competent to waive his constitutional rights.

The post-conviction court's conclusion that Lehr was competent to waive his constitutional rights based on the 2008 competency evaluation is an unreasonable determination of facts, and an unreasonable application of clearly established federal law. (PCR Order at 25.)

The post-conviction court's decision unreasonably ignored facts presented during post-conviction proceedings showing that Lehr's waivers were not knowing, voluntary, or intelligent. Instead, the court looked only to the record at trial and found: "At no time did counsel, the trial court, or Dr. Levitt identify any mental

1   health issue that required further investigation or that interfered with Defendant's
2   ability to stand trial." (PCR Order at 26.) This is exactly the point of Lehr's
3   ineffective assistance of counsel claim. Trial counsel failed to investigate and thus
4   failed to identify mental health issues requiring further investigation in order to
5   determine if Lehr's waivers were informed, intelligent, knowing, and voluntary.
6   The post-conviction court ignored whether trial counsel was deficient for failing to
7   present this information and instead relied on the absence of evidence at the trial
8   itself, the very premise of the ineffective assistance of counsel claim, to deny the
9   claim in post-conviction. This is an unreasonable application of *Strickland. See*
10  *Rompilla*, 545 U.S. at 393 (evaluating prejudice based on the evidence "taken as a
11  whole"); *Strickland*, 466 U.S. at 690 (allegations of ineffectiveness must be
12  examined in light of all the circumstances).

13      In addition, the post-conviction court's decision improperly limits its analysis
14  to whether Lehr was "competent" to waive mitigation. (PCR Order at 29.) *See*
15  *Summerlin*, 427 F.3d at 639 ("This standard does not only mean that the defendant's
16  waiver must be an informed decision, *but also* that it must be a competent one.")
17  (emphasis added). The post-conviction court failed to render any decision on
18  whether Lehr's alleged waiver of mitigation was an informed, knowing, voluntary,
19  and intelligent decision. The post-conviction court's analysis stopped short and is
20  thus contrary to clearly established federal law. As outlined above, Lehr's decision
21  was not informed as a result of his counsel's deficient performance. Whether Lehr
22  was competent to stand trial and assist with his defense, is inapposite to whether
23  Lehr's decision was informed, knowing, and voluntary. As such, the post-
24  conviction court's decision, which ignored whether Lehr made an informed
25  decision to waive mitigation, is contrary to clearly established federal law.

26      Moreover, the court improperly ruled that competency to stand trial and
27  competency to waive mitigation are one in the same. (PCR Order at 25.)
28  Competency to stand trial and the ability to make an informed, knowing, willing,

and voluntary waiver of mitigation are not the same. *Compare White v. Estelle*, 459 U.S. 1118, 1121 (1983) ("To be competent to stand trial for the purposes of the Due Process Clause, the defendant must have the 'capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.'") (internal citation omitted) *with Summerlin*, 427 F.3d at 639 ("If a client has elected to forego legal proceedings that could avert the imposition of the death penalty, then a court must make the determination 'whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.'") (citing *Rees*, 384 U.S. at 314); *see also Godinez*, 509 U.S. at 400–01 & n.12 ("The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.") (citations omitted) (emphasis in original)).

Lastly, the record contains evidence of Lehr's mental illness and organic brain defects prior to and at the time of trial, but the post-conviction court either ignored or inadequately considered this evidence, which presented a colorable claim. The post-conviction court must "evaluate the totality of the evidence—'both adduced at trial, and the evidence adduced in the (collateral) proceedings.'" *Wiggins*, 539 U.S. at 536 (emphasis added). The state court in this particular case abdicated its role and ignored the large volume of evidence that was investigated, developed and presented in the exhibits filed with the post-conviction petition, the amendments and the reply, concluding that there was no material difference between the mental health evidence produced in the post-conviction proceedings as that adduced at trial, through a single competency evaluation. *See United States v.*

*Hantzis*, 625 F.3d 575, 580 (9th Cir. 2010) (citing *United States v. Gerritsen*, 571 F.2d 1001, 1008 (9th Cir. 2009) ("We have explained that a defendant's waiver must be evaluated in light of the record as a whole[.]") (citing *United States v. Kimmel*, 672 F.2d 720, 721–22 (9th Cir. 1982)); *United States v. Erskine*, 355 F.3d 1161, 1170 & n. 11 (9th Cir.2004) (explaining that the court may look to the circumstances of prior proceedings in the case to determine whether defendant's waiver was knowing and voluntary).). The state court thus unreasonably applied clearly established law by improperly ignoring the record as a whole when determining whether Lehr's waiver was knowing and intelligent. Lehr has, therefore, satisfied the strictures of § 2254(d), and this Court must review the merits of his claim de novo.

### c.   Lehr's uncooperative attitude does not excuse counsel's deficient performance.

The post-conviction court relied on its finding that Lehr did not cooperate with the mitigation investigation to reject challenges to Lehr's failure to develop a working relationship with Lehr (PCR Order at 26–27) and failure to conduct a mental health investigation rather than blindly follow Lehr's desire to receive the death penalty (PCR Order at 28–29). The post-conviction court's reliance on the alleged lack of cooperation from Lehr to absolve trial counsel of virtually all of his deficiencies contravenes clearly established federal law. (*See* Claim 12, Section (E)(4).) The defendant's lack of cooperation does not eliminate the trial counsel's duty to investigate. *Hamilton*, 583 F.3d at 1118 ("the duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's desires to plead guilty"); *see also Douglas*, 316 F.3d at 1089 ("Although the client's desires are not to be ignored altogether, it may be inappropriate for counsel to acquiesce to the client's demands"); *Karis*, 283 F.3d at 1136 (determining that defendant's lack of cooperation did not excuse counsel from further investigating mitigation evidence to present to the jury); *Stankewitz*,

365 F.3d at 721–22 (a client's opposition to calling family members or experts as witnesses does not excuse an attorney from interviewing experts and family members or from investigating documents containing mitigating evidence); *Silva*, 279 F.3d at 847 ("if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial.")

Even if Lehr created "constraints" to the presentation of "classic mitigation" evidence, this could not excuse trial counsel from conducting a rudimentary investigation in his mental health under *Strickland*. In *Rompilla*, defense counsel similarly failed to find useful mitigation from easily accessible sources. 545 U.S. at 381. The Supreme Court had no trouble concluding that counsel's failure constituted deficient performance despite observing that Rompilla had been uncooperative in the investigation. Rompilla had been "uninterested in helping" his counsel develop mitigation, had exited a legal visit because mitigation strategy bored him, had minimally contributed to developing mitigation, and at times, "was even actively obstructive by sending counsel off on false leads." *Id.* at 381; *see also Porter*, 558 U.S. at 40 (finding that a "fatalistic and uncooperative" client does not excuse the obligation to conduct "some sort of mitigation investigation"); *Douglas*, 316 F.3d at 1087–88 (finding deficient performance in investigating mitigation even where the defendant did not provide "useful information" and "would not provide the names of relatives or friends regarding childhood abuse"); *Karis*, 283 F.3d at 1136 ("[T]he fact that [the defendant and his mother] did not offer this information regarding the abuse did not excuse counsel from further investigation.").

Federal law clearly establishes that under *Strickland* all capital defendants are entitled to a reasonably competent investigation. A finding that Lehr did not cooperate with trial counsel does not excuse their failure to investigate other

1    significant sources of investigation of which he had knowledge and to which he had

2    easy access, including the information already made public in the 1997 sentencing

3    hearing. *See Ayestas*, 138 S. Ct. at 1097–98 (Sotomayor, J., concurring); *see also*

4    *Doe*, 782 F.3d at 436–37.

### d.    Failure to consider prejudice cumulatively.

6        The post-conviction failed to consider Lehr's ineffective assistance of

7    counsel claim regarding waiver as a whole. In taking such a piecemeal approach to

8    its analysis of the ineffective assistance of counsel waiver claim, the post-conviction

9    court failed to do what is required under *Strickland*: consider the errors

10   cumulatively and determine if, absent the errors, there was a reasonable probability

11   of convincing one juror to vote against death. *See Wiggins*, 539 U.S. at 536–38.

12       Under *Strickland* and other Supreme Court precedent, the court must evaluate

13   prejudice cumulatively. *See Strickland*, 466 U.S. at 694–95 ("The defendant must

14   show that there is a reasonable probability that, but for counsel's unprofessional

15   *errors*, the result of the proceeding would have been different."); *see also, e.g.*,

16   *Williams*, 529 U.S. at 397–98. In fact, *Strickland* explicitly adopted the materiality

17   standard in *Agurs*, 427 U.S. at 97, for a suppression-of-evidence claim. *Strickland*,

18   466 U.S. at 694. The Supreme Court has forcefully held that the materiality standard

19   considers cumulative prejudice; in other words, when assessing materiality, the

20   suppressed evidence must be "considered collectively, not item by item." *Kyles*,

21   514 U.S. at 436. The post-conviction court, however, considered the prejudice from

22   each instance of deficient performance (albeit using the wrong standard) separately.

23       To the extent the post-conviction court declined to find cumulative error

24   because the Arizona state courts do not recognize the doctrine of cumulative

25   prejudice, its decision contravenes *Strickland*. See 28 U.S.C. § 2254(d); *see also*

26   *White*, 895 F.3d at 671 (holding that the Arizona post-conviction court erred by

27   separately addressing the prejudice arising from individual deficiencies at

28   mitigation phase and observing that "[t]he test is whether it is reasonably likely that

1    the result of the proceeding would have been different but for counsel's 'errors'"

2    (quoting *Strickland*, 466 U.S. at 694)). This Court should find that, taken together,

3    the multiple unreasonable actions and errors of trial counsel regarding the waivers

4    of Lehr's constitutional rights warrant relief.

5         The finding of no prejudice was likewise unreasonable, both because the state

6    court used the improper legal standard, as described below, but also because the

7    state court—to the extent it made a factual finding—relied on an unreasonable

8    determination under § 2254(d)(2). *See Taylor*, 366 F.3d at 1001 ("[W]here the state

9    courts plainly misapprehend or misstate the record in making their findings, and the

10   misapprehension goes to a material factual issue that is central to petitioner's claim,

11   that misapprehension can fatally undermine the fact-finding process, rendering the

12   resulting factual finding unreasonable."). The post-conviction court ignored the

13   prejudice demonstrated by the totality of persuasive mental health evidence that

14   trial counsel could have presented had they conducted an adequate investigation.

15        **3.    The court's ruling rested on resolving several material**
16             **factual disputes without holding an evidentiary hearing.**

17        To the extent that the state court made a determination of fact on these issues,

18   that too was unreasonable. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Taylor*, 366

19   F.3d at 999–1001 (discussing ways in which § 2254(d)(2) can be satisfied).

20   "[W]here a state court makes factual findings without an evidentiary hearing or

21   other opportunity for the petitioner to present evidence, 'the fact finding process

22   itself is deficient….'" *Hurles v. Ryan*, 752 F.3d 768, 790–91 (quoting *Taylor*, 366

23   F.3d at 1001 ("If for example, a state court makes evidentiary findings without

24   holding a hearing and giving petitioner an opportunity to present evidence, such

25   findings clearly result in an unreasonable determination of the facts.") (internal

26   quotation marks omitted)).

27        Here, trial counsel failed to develop a working relationship with Lehr (which

28   is not the same as merely communicating with him); failed to investigate obvious

lines of mitigation; failed to hire crucial experts who could investigate obvious lines of mitigation, including mental illness and brain damage; and failed to present this evidence to the trial court so the court could make an informed decision on whether Lehr's waivers of presence, mitigation, and allocution were informed, voluntary, knowing, and intelligent. These factual issues are all in dispute, and could not be resolved on the record alone.

In addition, the court's determination that Lehr was competent to waive his presence and mitigation at the time of trial is in factual dispute. (PCR Order at 25.) The court has no evidence showing what tests Dr. Levitt administered to Lehr or how these tests compared to those administered by Drs. Schwartz-Maddox, Toma, and Wu. The post-conviction court also questioned the level of "trust" developed between Lehr and his post-conviction attorneys and presented conclusions regarding Lehr's reasons for participating in testing with post-conviction counsel despite having no factual basis in the record to support such assertions. (PCR Order at 27.) Moreover, the court denied the ineffective assistance of counsel allocution claim by speculating as to what Lehr may have said during allocution and how the State may have countered his comments. (*See* PCR Order at 25.) While Lehr might well have told the jury that he would like to die as soon as possible, the jury could have decided that life in prison was more of a punishment than death. Without an evidentiary hearing, it is impossible to tell why trial counsel permitted their client to waive allocution, Lehr's specific reasons for waiving allocution, or how the new evidence regarding mental health and brain injury may have impacted his decision.

Lastly, the post-conviction court incorrectly determined that the jury "convicted Defendant on the evidence presented for three murders." (PCR Order at 26.) This determination is an unreasonable application of the facts because the 2009 jury only convicted Lehr of two murders. Thus, the post-conviction's court's calculus was incorrect and decision unreasonable.

1   In light of the competing evidence regarding trial counsel's performance
2   impacting Lehr's ability to knowingly or voluntarily waive his presence at trial and
3   mitigation, the court could not simply pick the facts that would leave the death
4   sentences undisturbed and ignore the rest. The post-conviction court did not explain
5   how it reconciled evidence in the record supporting Lehr's allegations that
6   conflicted with the court's factual findings. The court should have granted a hearing
7   for Lehr to present expert testimony on these contested issues. Therefore, the post-
8   conviction court's determination, made without a hearing, and ignoring critical
9   evidence in the record, resulted in an "unreasonable determination" of the facts, and
10  therefore does not bar Petitioner's claim for habeas relief. *See* 28 U.S.C. §
11  2254(d)(2); *Taylor*, 366 F.3d at 1001, 1008.

12  Given the foregoing violation of Lehr's federal constitutional rights, this
13  Court should issue a writ granting Lehr a new trial, a new sentencing hearing, or at
14  minimum, an evidentiary hearing.

## CLAIM FIFTEEN

**Defense counsel performed deficiently at voir dire, violating Lehr's Sixth, Eighth, and Fourteenth Amendment rights**

18  Lehr incorporates by specific reference all facts, allegations, and arguments
19  made elsewhere in this Petition.

20  Trial counsel denied Lehr effective assistance of counsel during the voir dire
21  stage by priming at least a third of the petit jury to impose the death penalty, by
22  unnecessarily agreeing to exclude anti-death penalty jurors, by allowing clearly
23  compromised jurors to sit without adequately questioning them, and by conceding
24  Lehr's guilt in his prior convictions and failing to protect his right to the
25  presumption of innocence. The acts and omissions of counsel prejudiced Lehr and
26  denied him due process, a fair trial, and the effective assistance of counsel under
27  the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Strickland*, 446 U.S. 688. The
28  examples below are some of the most salient examples of counsel's ineffectiveness.

1  The record as a whole, as well as evidentiary development, will show that counsel
2  performed deficiently, and to Lehr's prejudice, during voir dire.

3      Capital defendants have a Sixth and Fourteenth Amendment right to effective
4  assistance of counsel during voir dire. *See*, *e.g.*, *United States v. Chronic*, 466 U.S.
5  648, 659 (1984) (effective assistance of counsel required at all critical stages of
6  trial); *see also Strickland*, 466 U.S. at 668. Whether an attorney performed
7  deficiently depends on the reasonableness of counsel's actions "under prevailing
8  professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court has
9  consistently relied upon guidelines from the American Bar Association and similar
10  professional groups to inform the inquiry into reasonable professional conduct. *See*,
11  *e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010); *Bobby v. Van Hook*, 558
12  U.S. 4 (2009) (per curium); *Rompilla v. Beard*, 545 U.S. 374, 387, n.7 (2005); *see*
13  *also* American Bar Association, Guidelines for the Appointment and Performance
14  of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913 (2003) ("2003
15  ABA Guidelines). Moreover, this Court should consider counsel's conduct and the
16  resulting prejudice cumulatively. *See*, *e.g.*, *Strickland*, 466 U.S. at 695 ("In making
17  this [prejudice] determination, a court hearing an ineffectiveness claim must
18  consider the totality of the evidence before the judge or jury."); *Alcala v. Woodford*,
19  334 F.3d 862 (9th Cir. 2003) (granting relief on basis of cumulative impact of
20  multiple errors by counsel).

21      **A.    Exhaustion**

22      Lehr alleged that defense counsel had performed deficiently during voir dire
23  in his amended post-conviction petition. (PCR Pet.'s Mot. to Am. at 11.) Lehr
24  argued that defense counsel failed to "even attempt the Colorado method of jury
25  selection, where the goal is obtaining jurors who will consider individual issues of
26  guilt and/or innocence and consider mitigating factors in favor of a life sentence as
27  opposed to death." (PCR Pet.'s Mot. to Am. at 11.) Lehr argued that the voir dire
28  failed to screen as to the facts of the particular homicide cases, as to the specifics of

mitigation evidence, or as to whether the jurors would be prejudiced by the other murder conviction in assessing guilt on the charged crimes. (PCR Pet.'s Mot. to Am. at 11.) The post-conviction court denied the claim on the merits. (PCR Order at 47.)

Lehr also raised this issue in his petition for review arguing that counsel failed to conduct an adequate voir dire that would seat a fair and impartial jury, including making no attempts to rehabilitate jurors who may have opted for life. (PFR at 36–38.) The Arizona Supreme Court denied review without comment in a one-page order. (PRF 29 at 1.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. See 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d)(2).

To the extent the Court determines that specific subclaims included below were not raised in state court, Lehr alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Moreover, there was an absence of available state corrective process or circumstances exist that rendered the process ineffective, thereby excusing the failure to exhaust. *See* 28 U.S.C. § 2254(b)(1)(B). Alternatively, Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland*, 466 U.S. at 687–88. Lehr will demonstrate through his filings and at an evidentiary hearing that state court counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

1

### B.     Voir Dire Background

The court conducted voir dire in three stages. (*See* Tr. Jan. 5, 2009 at 4–6.) In stage I, over 100 potential jurors were divided into three groups and brought into the courtroom. (Tr. Jan. 6, 2009 at 25–90; Jan. 7, 2009 at 24–56.) The judge introduced the parties and read the charges against Lehr; jury questions and excusals were focused on scheduling issues. (Tr. Jan. 6, 2009 at 25–90; Jan. 7, 2009 at 24–56.) The remaining jurors then completed long-form questionnaires. (Tr. Jan. 6, 2009 at 90; ROA 983–992.)

In stage II, jurors were brought into the courtroom in groups of 15 to 16 at a time. The first small group included petit Jurors 5, 10, 11, and 15. (Tr. Jan. 13, 2009 at 64–181.) The second included petit Jurors 18, 20, 26, and 29. (Tr. Jan. 14, 2009 at 14–101.) The third included petit Jurors 38, 40, 42, and 47. (Tr. Jan. 14, 2009 at 114–211.) The fourth included petit Jurors 56 and 59. (Tr. Jan. 15, 2009 at 12–100.) The fifth included petit Juror 48. (Tr. Jan. 20, 2009 at 15–115.) The judge also heard challenges for cause at various points on these days.

In stage III, about 50 jurors remained, and the parties exercised their peremptory challenges. (Jan. 21, 2009 at 28–56.)

The court announced the final juror and alternate list: Jurors 5, 10, 11, 15, 18, 20, 26, 29, 38, 40, 42, 44, 47, 48, 56, and 59. (Tr. Jan. 2009 at 55–56.)

The jurors who were seated all said, in one form or another, that they would impose the death penalty in appropriate cases. However, no one asked Juror 5 any questions during voir dire, nor did he volunteer any answers to any of the group questions. (*See* Tr. Jan. 13, 2009 at 101, 150.)

### C.     Trial counsel performed deficiently by stipulating to the removal of anti-death penalty jurors without trying to rehabilitate them.

Lehr received constitutionally ineffective assistance of counsel during voir dire because his attorneys failed to employ appropriate techniques to rehabilitate at least four anti-death penalty jurors. At least six jurors were excused solely for their

anti-death penalty views: 31, 57, 62, 71, 72, 78. Of the six, five were women and one was a Hispanic man. (*See* ROA 814.) The Supreme Court has long held that courts may not excuse jurors simply because they are opposed to capital punishment. *See Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). "[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id*. Although courts may excuse jurors who are unable or unwilling to follow the law, "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." *Id*. at 519.

This is true even of jurors who express strong anti-death penalty views, because "[i]t is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." *Id.* at 514 fn.7.

The right not to have anti-death penalty jurors excluded is important – so important that there is a "*per se* rule requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under *Witherspoon* is eligible to serve, has been erroneously excluded for cause." *Gray v. Mississippi*, 481 U.S. 648, 659 (1987). It is also strategically important to try to have anti-death penalty jurors on the petit – it is well-documents that pro-death penalty jurors are more likely to convict during the guilt phase of a trial than anti-death penalty jurors. (*See* Claims 16, 17.)

Defense counsel, thus, has the right to question jurors who hold strong anti-death penalty views to see if they can be rehabilitated, that is to see if they can

1   indeed follow the law despite their opposition to it. *See Witherspoon*, 391 U.S. at

2   519; *see also Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Indeed, competent

3   capital counsel should try to rehabilitate jurors who oppose the death penalty. *See*

4   2003 ABA Guidelines (10.10.2(B)) ("Counsel should be familiar with techniques:

5   … for rehabilitating potential jurors whose initial indications of opposition to the

6   death penalty make them possibly excludable."); *see also* Ariz. R. Crim. P. 18.5(d)

7   ("Upon the request of any party, the court shall permit that party a reasonable

8   amount of time to conduct a further oral examination of the prospective jurors.")

9        In this case, the judge specifically said he would not strike jurors based on

10  their answers to the questionnaire unless the parties stipulated. (Tr. Jan. 5, 2009 at

11  6.) The judge explained that excusing a juror for a tainted questionnaire answer

12  without a stipulation is "reversible error." (Tr. Jan. 5, 2009 at 6.) Yet defense

13  counsel stipulated to the excusal of Jurors 57, 62, and 78 for cause based solely on

14  their answers to the questionnaire. (Tr. Jan. 12, 2009 at 11.) These jurors had each

15  expressed their opposition to the death penalty in their questionnaires.

16       Jurors 57 and 78 clearly said in their answers that they *would* follow the law

17  as instructed even if they disagreed with it. (*See* ROA 991 at 185; ROA 983 at 205.)

18  These jurors appeared to be exactly who the Supreme Court contemplated – "a juror

19  who believes that capital punishment should never be inflicted" but who "could

20  nonetheless subordinate his personal views to what he perceived to be his duty to

21  abide by his oath as a juror and to obey the law of the State." *Witherspoon v. Illinois*,

22  391 U.S. 510, 514 fn.7 (1968).

23       Compare Juror 62, who did not equivocate in her questionnaire answers.

24  (ROA 992 at 2–22.[20]) She explained that she was opposed to the death penalty, and

25  was not willing to follow the law regarding it. (ROA 992 at 13–17.) Of course, it is

26  possible that she could have been rehabilitated if the defense had not stipulated to

27  _____

28  [20] Page number for juror questionnaires refers to PDF number.

her excusal, but there was nothing in her questionnaire so indicating. In contrast, both Juror 57 and Juror 78 made explicit comments on their questionnaires indicating that they could and would follow the law despite their opposition to the death penalty, and yet the defense agreed to excuse them for cause.

At the end of the questionnaire, the jurors were asked "You will be instructed that the jurors must accept and follow the law as instructed by the Judge, whether or not you personally agree with that law. Are you willing to follow this rule of law?" (*See*, *e.g.*, ROA 991 at 185.) Both Jurors 57 and 78 checked "Yes" without qualification. (ROA 991 at 185; ROA 983 at 205.) Other parts of their questionnaires confirmed that these two jurors were willing to follow the law despite their personal disagreement. The questionnaire detailed the penalty phase process, informing them that the jury "shall" impose the death penalty "if the jury finds one or more aggravating circumstances and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." (*See*, *e.g.*, ROA 991 at 181.) Both jurors agreed that they would "be able to keep an open mind" for the penalty phases. (ROA 991 at 181; ROA 983 at 201.) Juror 78 explicitly said she would be able to follow the law about aggravated factors even though she did not agree with it. (ROA 983 at 203.)

Juror 57 did check that she was strongly opposed to the death penalty, and that her position is "so strong" that she "could not vote for the death penalty under any circumstances." (ROA 991 at 184.) However, the jurors' choices in this section of the questionnaire must not be taken at face value. The questionnaire asks jurors to check which one "comes *closest* to your feelings on the death penalty." (*See*, *e.g.*, ROA 991 at 184 (emphasis added).) Notably absent from the options is something like "I am opposed to the death penalty, but I would follow the law and impose it if required by the law." The second option on the questionnaire is "I am philosophically opposed to the death penalty. However, I would be able to vote for the death penalty if I felt it was appropriate under the facts of the case." (*See*, *e.g.*,

1  ROA 991 at 184.) The problem with this choice is that it requires a juror to agree

2  that she could feel the death penalty is "appropriate" in a case. Thus, there is no

3  option at all for a juror who would never feel that the death penalty is appropriate,

4  but who nonetheless would follow the law and impose it if required. Thus, the

5  juror's choice on which statement most closely mirrors her position should not have

6  been a basis for excluding an anti-death penalty juror for cause.

7        Given the clear statements from both Juror 57 and Juror 78 that they would

8  follow the law, reasonably effective counsel would have argued that they were

9  competent jurors under *Witherspoon* and would not have stipulated to their excusal

10  for cause. Reasonably effective counsel also would not have stipulated to the

11  excusal of Juror 62 without at least trying to rehabilitate her, particularly since the

12  judge made clear that defense counsel would be permitted to do so if they did not

13  stipulate to her excusal for cause.

14        The defense also stipulated to the removal of Juror 72 based on his answers

15  on the questionnaire and during voir dire. (Tr. Jan. 15, 2009 at 101–02, 112, 122.)

16  Juror 72 said in his questionnaire that he was against the death penalty because of

17  his Catholic beliefs, but that he "would be able to vote for the death penalty if I felt

18  it was appropriate under the facts of the case." (ROA 983 at 76–78.) He also said

19  that he could follow the law even if he did not agree with it. (ROA 983 at 79.)

20  During voir dire, Juror 72 said that he would not want to give a death sentence, and

21  then said "I'm comfortable saying I could impose a life sentence but not a sentence

22  of death." (Tr. Jan. 15, 2009 at 98–99.)

23        The defense's voir dire of Juror 72 amounts to just a handful of lines in the

24  transcript, and did not even address his feelings on the death penalty. (Tr. Jan. 15,

25  2009 at 37–38.) The defense did not ask to follow up on his final statement of the

26  State's voir dire that he could impose a life sentence but not a sentence of death, or

27  ask him to reconcile that with his questionnaire responses that he would impose the

28  death penalty in certain circumstances and would follow the law as instructed. No

1    one asked him whether, even if he was uncomfortable with it, even if he did not

2    think it was the right thing to do, would he impose the death penalty if the law

3    *required* it?

4         The defense stipulated to Juror 72's removal on the basis of his last statement

5    that he was comfortable imposing a life sentence but not a sentence of death. (Tr.

6    Jan. 15, 2009 at 101–02.) The court even alerted the defense that it should not

7    stipulate, noting that Juror 72 had said the same thing that Juror 71 had said. (Tr.

8    Jan. 15, 2009 at 101.) The defense did not withdraw the stipulation, and Juror 72

9    was excused for cause. (Tr. Jan. 15, 2009 at 101–02, 112, 122.)

10        Defense counsel abdicated their responsibility to employ appropriate

11   techniques to rehabilitate at least four anti-death penalty jurors. The result for Lehr

12   was a jury more inclined to convict and execute him. Where a "scrupled, yet

13   eligible" juror is removed in violation of *Witherspoon* and *Witt*, it constitutes

14   fundamental error, and prejudice is assumed. *Gray v. Mississippi*, 481 U.S. 648,

15   668 (1987).

16        **D.    Trial counsel performed deficiently during voir dire by allowing
17                compromised jurors to sit without adequately questioning them.**

18        Trial counsel's failure to adequately question the jurors during voir dire, and

19   failure to use the Colorado method[21] in particular, was deficient performance. (*See*

20   PCR Pet.'s Mot. to Am. at 8–12.) For example, two jurors who were sat on the petit

21   jury had murdered family members or friends. Defense counsel must be particularly

22   careful when a prospective juror or her family have been the victim of crime,

23   particularly a crime similar to what the defendant is charged with, because the juror

24   may "want[] to use her jury service to send a message of deterrence." *Dyer v.*

25   *Calderon*, 151 F.3d 970, 981 (9th Cir. 1998). Often such potential jurors "should

26   _____

27   [21] "The Colorado Method of capital voir dire is a structured approach to capital jury
     selection that is being used successfully in state and federal jurisdictions across the
28   United States." Matthew Rubensteini, *Overview of the Colorado Method of Capital
     Voir Dire*, The Champion, at 18 (Nov. 2010).

1    [be] struck without stopping to inquire into their subjective state of mind." *Id*. at

2    985. In some cases, "prejudice must sometimes be inferred from the juror's

3    relationships, conduct or life experiences, without a finding of actual bias." *Id*. at

4    984. Trial courts should assume that a juror is biased where he "has had some

5    personal experience that is similar or identical to the fact pattern at issue in the trial."

6    *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000). *See also Tinsley v.*

7    *Borg*, 895 F.2d 520, 528 (9th Cir. 1990) (explaining that "[c]ourts have been willing

8    to presume bias where a juror or his close relatives have been personally involved

9    in a situation involving a similar fact pattern").

10       In Lehr's case there were multiple jurors with "personal experience that is

11   similar or identical to the fact pattern at issue in the trial." *Gonzalez*, 214 F.3d at

12   1112. Defense counsel not only failed to move to excuse these jurors for cause, but

13   also failed to use preemptory strikes to remove these jurors, and failed to even

14   question one juror at all about her experiences.

15       Juror 29 said on her questionnaire that her "husband was shot to death, a niece

16   was murdered by her boyfriend with an ax," and her "daughter was sexual [sic]

17   raped." (ROA 989 at 112, 114.) The State asked her some limited questions about

18   her daughter's rape. (Tr. Jan. 14, 2009 at 53–55.) Juror 29 explained that the rape

19   happened when her daughter was at home with her young children, and that the

20   perpetrator was never caught. (Tr. Jan. 14, 2009 at 53–55.) She went on to explain

21   that a niece was also raped when her husband was in the service. (Tr. Jan. 14, 20019

22   at 53–55.) The State asked whether she could still be fair and impartial, and she said

23   she could. (Tr. Jan. 14, 20019 at 53–55.) These were all the questions that either

24   party or the court asked regarding her experiences with family members being

25   victims of crime.

26       Unbelievably, no one asked her any questions about her husband being shot

27   to death or her niece being murdered with an ax. Courts have found

28   unconstitutionally deficient performance when defense counsel fails to question

351

1    jurors about family members who were victims of similar crimes. *See*, *e.g.*, *Bigner*
2    *v. State*, 822 So. 2d 342, ¶¶ 29, 41 (Miss. Ct. App. 2002). There was no conceivable
3    defense strategy to ignoring these facts. The only possible explanation for the
4    defense's failure to even question her about her husband and niece's deaths was that
5    they did not review the questionnaires sufficiently enough. But courts have also
6    found that failure to adequately review juror questionnaires is constitutionally
7    deficient performance. *Knese v. State*, 85 S.W.3d 628, 632–33 (Mo. 2002).

8    Defense counsel should have moved to excuse Juror 29 for cause. *See Dyer*,
9    151 F.3d at 981; *Tinsley*, 895 F.2d at 528. Short of that, they should have inquired
10   further about her murdered family members before allowing her to sit on this jury.

11   Juror 29 was not the only juror that sat in Lehr's case with such a close
12   relationship with a murder victim. Juror 38 also noted that a friend of his was
13   murdered. (ROA 990 at 49.) Defense counsel likewise did not move to excuse Juror
14   38 for cause, and did not use a peremptory to excuse Juror 38. Defense counsel also
15   did not ask Juror 38 any questions about his murdered friend, (Tr. Jan. 14, 2009 at
16   205–06), but in his case the State had already asked him a few questions about it,
17   (Tr. Jan. 14, 2009 at 138–39). The State's questioning of him regarding the murder
18   lasted about one page – hardly the kind of in-depth exploration of an issue this
19   important that should be expected in a capital case.

20   In addition to the defense's failure to adequately question the jurors with
21   murdered friends and family, the defense failed to adequately question a juror who
22   worked within the prison industry who went on to be the foreman of the jury. (*See*
23   PCR Pet.'s Mot. to Am. at 12.) One federal judge once explained that "jurists of
24   reason would all agree that" certain individuals should be "struck without stopping
25   to inquire into their subjective state of mind." *Dyer*, 151 F.3d at 985. He listed the
26   "Chief of Police," "District Attorney," and a tough-on-crime council member
27   among those individuals. *Id*. Although not a chief of police, someone working

28

352

1  within the prison industry, if not struck immediately, should be probed further to
2  ensure his neutrality. But defense counsel here failed to do so.

3  Even one compromised or excludable juror is constitutionally unacceptable.
4  *Morgan*, 504 U.S. at 735 n.8 (citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988))
5  ("[E]ven one such juror on the panel would be one too many. . . . In any event, the
6  measure of a jury is taken by reference to the impartiality of each, individual
7  juror."). "The presence of a biased juror cannot be harmless; the error requires a
8  new trial without a showing of actual prejudice." *Fields v. Woodford*, 309 F.3d
9  1095, 1103 (9th Cir. 2002) (internal citations omitted). The presence of at least two
10 jurors with murdered friends or family and someone working within the prison
11 industry – none of whom were sufficiently questioned – requires habeas relief.

### E. Trial counsel performed deficiently during voir dire by priming at least one-third of the jury to impose the death penalty.

14 Lehr received constitutionally ineffective assistance of counsel during voir
15 dire because trial counsel violated their duty of loyalty to Lehr by conceding that
16 the case involved the exact circumstances that jurors felt would warrant death
17 instead of life. Trial counsel's representation must be objectively reasonable, judged
18 by "prevailing professional norms." *Strickland*, 466 U.S. at 687–88. "Indicia of
19 objective unreasonableness include the violation of certain basic duties inherent in
20 the representation of a criminal defendant, among them a duty of loyalty to the
21 client…" *Rickman v. Bell*, 131 F.3d 1150, 1154–55 (6th Cir. 1997) (internal
22 citations omitted). In a capital case, it is a violation of that duty of loyalty to
23 "creat[e] a loathsome image" of the client "that would make a juror feel compelled
24 to rid the world of him." *Id.* at 1157. Further, prevailing norms are that "[c]ounsel
25 who seeks to persuade a decision maker to empathize with the client must convey
26 his or her own empathy." 2003 ABA Guidelines at 1068 (10.11 Commentary).

27 In violation of these principles, during voir dire defense counsel demeaned
28 Lehr's character and expressed a "loathsome" image of Lehr and his alleged crimes

that could only serve to make a jury "feel compelled to rid the world of him." *Rickman*, 131 F.3d at 1157. The defense did not just use inflammatory terms to describe Lehr and his alleged crimes, but they used inflammatory terms that parroted what jurors had already said would warrant the death penalty. The effect was that the jury was primed to think that this was a case that fit their personal definition of a case that warrants the death penalty before they even heard the evidence.

Juror 5 said the death penalty is the appropriate penalty when a person was "proven guilty of an extremely heinous crime[.]" (ROA 987 at 98.[22]) Juror 10 said he thought the death penalty was appropriate when there were "no redeeming circumstances" and the crime was "not subject to some extenuating circumstances." (Tr. Jan. 13, 2009 at 165; *see also* ROA 987 at 203.) Defense counsel parroted back these phrases to describe Lehr.

During the group voir dire that included Jurors 5 and 10, trial counsel said that the Cronin murder was "a premeditated, intentional, no excuses, *no redeeming qualities*, *no redeeming circumstances* murder." (Tr. Jan. 13, 2009 at 156 (emphasis added).) The defense attorney followed up by asking the group whether the lack of any "*extenuating circumstances*" affects "how anyone answered their questionnaire about whether they can be fair and impartial" in the sentencing phase. (Tr. Jan. 13, 2009 at 156–58 (emphasis added).) No one volunteered a response. (Tr. Jan. 13, 2009 at 158.)

Then, trial counsel asked whether, having heard there were multiple murders and "other *heinous* acts" any of the jurors could not "fairly judge" Lehr's sentence. (Tr. Jan. 13, 2009 at 159 (emphasis added).) None of the jurors who ultimately were sat on the petit offered a response. (Tr. Jan. 13, 2009 at 159.)

---

[22] Page numbers to Juror Questionnaires refer to the PDF number.

1   Thus, the trial counsel spent this portion of voir dire convincing two jurors
2   who ultimately sat on the jury that this case would be the type of case that they
3   thought would be appropriate for the death penalty. This deficiency did not only
4   affect Jurors 5 and 10, because Jurors 11 and 15 were also present for this voir dire
5   – thus one-third of the ultimate jury were tainted by this error. (*See* Tr. Jan. 13, 2009
6   at 110–12, 118–20, 171–72, 176–77.) And while Jurors 11 and 15 had not said these
7   were the factors that would warrant the death penalty, the obvious take away for
8   them was that the defense team was conceding that this was a death-penalty
9   appropriate case, and that the jury only had to be fair and impartial in deciding to
10  impose it.

11  Defense counsel violated their duty of loyalty to Lehr by conceding that the
12  case involved the exact circumstances that jurors felt would warrant death instead
13  of life. This Court should find that defense counsel's breach of their duty of loyalty
14  to Lehr was unconstitutionally deficient performance. *See Strickland*, 466 U.S. at
15  687–88; *Rickman*, 131 F.3d at 1157.

16   **F.   Trial counsel performed deficiently by conceding Lehr's guilt on**
17   **his prior convictions and failing to protect his presumption of**
18   **innocence in the instant case.**

19  Voir dire in Lehr's case was replete with instances of the court, State, and
20  even his own counsel commenting in a way that presumed Lehr's guilt and lowered
21  and shifted the burden of proof. (*See* PCR Pet.'s Mot. to Am. at 7–12.) Defense
22  counsel's comments violated their duty of loyalty to Lehr, and their failure to object
23  violated Lehr's constitutional rights to a presumption of innocence and due process.

24  Defense counsel should not admit their client's guilt without the client's
25  permission. *See*, *e.g.*, *McCoy*, 138 S. Ct. at 1500. "It is deficient performance for an
26  attorney to concede his client's guilt without prior consultation with the client, even
27  where the concession relates to one charge out of several, and even where evidence
28  of guilt is strong." *United States v. Thomas*, 417 F.3d 1053, 1060 (9th Cir. 2005) (J.

Fletcher, concurring). Nor should defense counsel undermine the presumption of innocence that protects their clients. *See*, *e.g.*, *Williams v. Woodford*, 859 F. Supp. 2d 1154, 1164 (E.D. Ca. 2012). Most of the conceding comments related to Lehr's prior convictions, but Lehr continued to maintain his innocence, and those prior charges would eventually form the basis of the aggravation allegations in his penalty trial.

Throughout voir dire defense counsel was not simply admitting that Lehr was previously *convicted* of murder, they were repeatedly admitting that he had actually *committed* that murder, sometimes using inflammatory rhetoric:

- "Like I said, he wanted to kill her, he intended to kill her, he thought about killing her, he killed her, cold-blooded, intentional premeditated murder." (Jan. 20, 2009 at 72.)

- "Lehr – and I don't want to put any gloss on it – is a murderer." (Tr. Jan. 15, 2009 at 31.)

- Lehr "has been found guilty of it, he did it." (Tr. Jan. 20, 2009 at 73.)

- "Under these facts that you've heard in this case, as Mr. Tallan just said, which are accurate facts…" (Tr. Jan. 20, 2009 at 110.)

- "Clearly no one is going to forgive Lehr for what he did." (Tr. Jan. 14, 2009 at 171.)

- Many people were "affected like that through Lehr's actions." (Tr. Jan. 14, 2009 at 171.)

- "Given the fact that he's committed between one and three murders…" (Tr. Jan. 14, 2009 at 46.)

Defense counsel should not have conceded Lehr's guilt, even to charges that he was convicted of, when he continued to maintain his innocence and those charges would eventually form the basis of the aggravation phase. Reasonably competent defense counsel would have carefully used language to convey that Lehr had been convicted of those crimes but would not have told the jury that he was actually guilty of them.

In addition to improperly conceding Lehr's guilt, defense counsel failed to protect his presumption of innocence in the instant case. The trial judge presumed to the jury that the case would get to the final mitigation phase, implying that the judge expected that the jury would convict him and find that the aggravation was proven. (*See* Jan. 6, 2009 at 43 (during voir dire the judge told the jury "[t]he decision regarding whether a life sentence or a death sentence *will be* imposed is made by you, the jury. All the decisions regarding whether the death penalty *will or will not* be imposed are made by you, the jury, and not by me, the judge.") (emphases added); Jan. 6, 2009 at 76 (same); Jan. 6, 2009 at 79–80 (same).) But of course, the jury would not get to any sentencing stage if they acquitted Lehr, and even on the Cronin case the jury only makes that decision or life or death if they find that the State proved the aggravated factors beyond a reasonable doubt. *See* A.R.S. § 13-752(C). The defense never objected to this.

At other times the judge and parties made comments that lowered and shifted the burden of proof. For example, the judge told the prospective jurors that they should be 50/50 with regard to Lehr's guilt. (Tr. Jan. 21, 2009 at 39.) This statement erased the presumption of innocence and the State's burden of proof. The jurors should be 0/100 percent against guilt before the trial begins – that is exactly what the presumption of innocence and the State's burden means. But the defense did not object to this mischaracterization of the law.

The parties constantly told the jurors that the first stage would be the guilt/*innocence* phase. (*See*, *e.g.*, Tr. Jan. 13, 2009 at 129, 135; Jan. 14, 2009 at 128, 166, 190; Jan. 15, 2009 at 13, 20, 25, 36; Jan. 20, 2009 at 16, 21; Jan. 21, 2009 at 47.) This phrasing improperly tells the jury that they will be responsible for deciding whether Lehr is guilty or innocent. But deciding whether Lehr is innocent is not part of their job – he is presumed innocent. The jury's job in the first stage is solely to decide whether or not the State proves his guilt beyond a reasonable doubt. Thus, the jury could find that the State did not prove his guilt beyond a reasonable doubt,

without finding his *innocence*, and they should not convict. The judge should have called it something like the guilt/not guilt phase. The defense never objected to this, and the defense even sometimes characterized it this way. (*See*, *e.g.*, Tr. Jan. 13, 2009 at 129.) Reasonably competent defense counsel would have protected Lehr's presumption of innocence and would have objected to these prejudicial comments.

### G.     Lehr was prejudiced by his counsel's deficient performance during voir dire.

To show prejudice, a petitioner does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694). Moreover, this Court must cumulatively consider whether defense counsel's deficiencies as a whole throughout voir dire prejudiced Lehr's trial. *See Strickland*, 466 U.S. at 695 (prejudice from ineffective assistance of counsel decided based on the totality of the circumstances.)

In Lehr's case, numerous anti-death penalty jurors were automatically excluded without any questioning – winnowing the pool of potential jurors down to only those who were most likely to convict and most likely to impose death. This winnowed-pool of potential jurors then listened to the defense repeatedly concede Lehr's guilt to a number of serious prior convictions – including the rape of multiple children – and to the parties and judge repeatedly implying that Lehr was guilty in this case as well and that the presumption of innocence did not really apply in this case. The winnowed-pool of jurors also heard defense counsel, repeatedly, describe Lehr's case as exactly what the jurors believed would warrant the death penalty. This voir dire process created a jury that could only be left with one impression – that before the trial even started it knew the death penalty was appropriate and that the defense attorneys knew it, too.

1    From this winnowed-pool of jurors the defense left obviously biased jurors
2    such as those with murdered family and friends on his jury, and a juror working
3    within the prison industry served as the foreperson.

4    Jury selection is one of the most significant stages of a capital trial. "Many
5    scholars believe that most capital cases are won or lost during jury selection."
6    Steven C. Serio, *A Process Right Due? Examining Whether A Capital Defendant*
7    *Has A Due Process Right to A Jury Selection Expert*, 53 Am. U.L.Rev. 1143, 1147
8    & n.22 (2004) (citing various sources); *see also* John H. Blume, et al., *Probing "Life*
9    *Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1209 & n.1
10   (2001) ("The conventional wisdom is that most trials are won or lost in jury
11   selection."). Thus, counsel must utilize vigorous voir dire to fully explore each
12   prospective juror's views. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188
13   (1981) ("*Voir dire* plays a critical function in assuring the criminal defendant that
14   his [constitutional] right to an impartial jury will be honored. Without an adequate
15   *voir dire* the trial judge's responsibility to remove prospective jurors who will not
16   be able impartially to follow the court's instructions and evaluate the evidence
17   cannot be fulfilled.").

18   Far from protecting Lehr's rights, trial counsel's voir dire ensured that he
19   would have a jury ready to convict and sentence him to death. There is a reasonable
20   probability that the errors outlined above undermined confidence in the outcome of
21   his trial. Moreover, there is a reasonable probability that a jury compiled after
22   defense counsel conducted a reasonably effective voir dire would have reached a
23   different result, thus Lehr is entitled to relief.

24   **H.    The post-conviction court's decision was contrary to clearly**
25   **established federal law and an unreasonable determination of the**
26   **facts.**

27   Lehr argued to the state court that his counsel was deficient during voir dire.
28   (PCR Pet.'s Mot. to Am. at 8–12; PFR 3 at 36–38.) The post-conviction court

359

1   denied the claim by merely asserting trial counsel made a strategic decision. (PCR

2   Order at 44–48.) The Arizona Supreme Court denied review without comment in a

3   one-page order. (PRF 29 at 1.) As outlined below, the state court's decision was

4   contrary to, or involved an unreasonable application of, clearly established federal

5   law, and was also based on unreasonable factual determinations. *See* 28 U.S.C. §

6   2254.

7          The state court dismissed Lehr's claim, ruling that that "[f]aced with joinder

8   and substantial negative evidence, coupled with convictions and lengthy prison

9   time, the record demonstrates that trial counsel made a strategic decision about how

10  to handle *voir dire* in order to benefit his client." (PCR Order at 47.) The state court

11  furthered assumed that trial counsel had adopted a strategy to "tell the jury all of

12  the negative information and secure a commitment to be fair and impartial and to

13  consider a life sentence in spite of the 'horrible, heinous crimes' depicted in

14  evidence." (PCR Order at 47.) The court's conclusion that trial counsel made a

15  strategic decision is contrary to and an unreasonable application of the law, and an

16  unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). As outlined

17  below, the court got the facts wrong – for a number of reasons it is clear that defense

18  counsel was not attempting to commit these jurors to consider a life sentence in

19  spite of these crimes.

20         The first, and most obvious problem with assuming that the defense was

21  employing this strategy is that the trial court had *explicitly forbade* them from

22  employing this strategy.[23] (*See*, *e.g.*, ROA 796.)

23         The second problem with the court's strategy assumption is that the defense

24  did not ask the jurors whether they could consider a life sentence in spite of the

25  nature of the case. The defense only asked whether they could be fair and impartial.

26  (Tr. Jan. 13, 2009 at 156–59.) The distinction should be crucial for a capital defense

27  _____

28  [23] Lehr argues that the trial court's limitation on voir dire questions violated his
    right to question prospective jurors in Claim 16.

attorney. Certainly a juror can confidently think that they can fairly and impartially impose the death penalty on someone convicted of a heinous crime with no redeeming or extenuating circumstances. What the defense needed to know is what the defense did not ask: whether the juror could seriously consider a life sentence for such a case. *See*, *e.g.*, 2003 ABA Guidelines at 1049 (10.10.2(B)) (defense counsel "should be familiar with techniques: (1) for exposing those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the defendant is death-eligible…").

The third problem with the strategy is that, taken literally, one of the defense's questions asked jurors to do the opposite of commit to considering a life sentence. The defense attorney asked the jurors whether the lack of redeeming or extenuating circumstances changed how anyone answered their questionnaire. (Tr. Jan. 13, 2009 at 158.) But Juror 10's questionnaire said those were the factors that would support the death penalty. (ROA 987 at 203.) Far from asking Juror 10 to commit to considering a life sentence, the defense asked Juror 10 to re-commit to thinking that this case supported the death penalty.

The fourth problem is that the defense attorney's inflammatory comments were made during general questioning of the group in a way that required jurors to raise their hands to answer the questions. Even if the defense was trying to get jurors to commit to still consider life in spite of the case being exactly what they previously reported would be a death-appropriate case, the defense could not reasonably expect to do that through group questioning that required volunteers. In particular, although the defense attorney parroted back Juror's 5's use of the term "heinous," (*see* ROA 987 at 98; Tr. Jan. 13, 2009 at 159), the defense attorney did not ask Juror 5 *any* direct questions. (Tr. Jan. 13, 2009 at 150.) The State and Court also had not asked Juror 5 any direct questions so there was nothing other than Juror 5's questionnaire response to work from. (*See* Tr. Jan. 13, 2009 at 101.) How can one

assume the defense attorney was trying to commit Juror 5 to consider a life sentence when he never even directly addressed Juror 5?

These facts do not support the state court's finding that this was part of a defense strategy to commit jurors to consider a life sentence in spite of the nature of the case. Perhaps the court was mistakenly looking at a different section of voir dire, when a different group of jurors were present, where defense counsel called Lehr's alleged crimes "heinous," and asked whether in light of that any jurors felt that "the only sentence I could give is death." (Tr. Jan. 14, 2009 at 164–65.) This particular exchange seems to support the state court's theory that defense counsel was acting pursuant to a strategy to get the jurors to commit to considering a life sentence in spite of the nature of the case. But the problem is that this is not what defense counsel did in the earlier section of voir dire. Jurors 5, 10, 11, and 15 were not present in this later stage to answer that question.

This kind of deficient performance violates the constitution irrespective of whether the defense attorney acted in bad faith: "If the effect [defense counsel] created was unintentional, it matters not to [the condemned], who has been convicted and sentenced to death; it was just as fatal." *Rickman v. Bell*, 131 F.3d 1150, 1157 (6th Cir. 1997). Here, the defense may have had a strategy to commit the jurors to consider life in spite of the nature of the case (and in spite of the trial court's explicit prohibition on such a strategy), but defense counsel did not employ that strategy in its group voir dire when Jurors 5, 10, 11, and 15 were present. Whatever strategy they did employ was certain to do nothing but prime those jurors to believe that this was one of those cases where they should apply the death penalty.

Thus, the court's finding that trial counsel made a strategic decision regarding voir dire is an unreasonable application of *Strickland* and its progeny. As the record and further evidentiary development will show, trial counsel's failures throughout voir dire were wholly deficient. Moreover, the court's determination, made without

a hearing, and ignoring critical evidence in the record, resulted in an "unreasonable determination" of the facts, and therefore does not bar Lehr's claim for habeas relief. *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1001, 1008.

## CLAIM SIXTEEN

**The trial court violated Lehr's Fifth, Sixth, Eighth, and Fourteenth Amendment rights by improperly limiting the defense's voir dire questions**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

First, the trial court unfairly limited Lehr's voir dire based on an incorrect understanding of "stakeout" questions. Then, the trial court unfairly limited defense counsel from discussing specific mitigating facts and even specific categories of mitigation. The trial court's refusal to permit voir dire of prospective jurors regarding aggravating and mitigating circumstances deprived Lehr of his rights to an impartial jury, fair trial, and reliable sentencing proceeding, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### A.    Exhaustion

The limitations in AEDPA only apply to a "claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Lehr raised this issue on direct appeal as constitutional claim twenty, forthrightly recognizing that the Arizona Supreme Court had previously ruled against a similar claim in a different case.[24] (DA2 82 at 83 (citing to *State v. Johnson*, 133 P.3d 735, 750 (Ariz. 2006).) In Lehr's case, however, the Arizona Supreme Court chose not to rule on this issue. *Lehr III*, 254 P.3d at 375. Instead, the Arizona Supreme Court explained "[t]o avoid preclusion, Lehr lists twenty-six additional constitutional claims that tsssshe states have been rejected in previous decisions. The appendix lists these claims and the

---

[24] Lehr argues that his defense counsel was deficient for saying that this argument was foreclosed by Arizona precedent in Claim 31.

1    decisions Lehr identifies as rejecting them." *Id.* at 395. The appendix quoted Lehr's

2    brief, with no additional ruling or analysis. *Id.* The court never ruled on Lehr's

3    claim, incorporated any previous ruling or analysis, or even affirmed that the

4    previous case controlled here. As such, the court was fairly presented with the claim

5    and chose not to address it, so AEDPA does not apply and this Court should

6    consider this claim de novo.

7    However, if the Court finds that the trial court did rule on the merits of this

8    claim, and AEDPA does apply, Lehr asserts that the State court's rejection of his

9    claims was contrary to, or involved an unreasonable application of, clearly

10   established federal law, as determined by the Supreme Court. *See* 28 U.S.C. §

11   2254(d)(1). Additionally, it constituted an unreasonable determination of the facts

12   in light of the evidence presented. *See id.* § 2254(d)(2).

13   Lastly, to the extent this court finds that this claim was not fully exhausted in

14   state court, Lehr alleges he can overcome any default of this claim by showing cause

15   and prejudice, including because of the ineffective assistance of appellate and post-

16   conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453;

17   *Strickland*, 466 U.S. at 687–88; *but see Davila*, 137 S. Ct. 2058. Lehr will

18   demonstrate through his filings and at an evidentiary hearing that appellate and

19   post-conviction counsel fell below the standards of minimally competent capital

20   attorneys and that those failures prejudiced him. Alternatively, he alleges that any

21   procedural bar is not adequate or independent or that imposing default would be a

22   miscarriage of justice. To the extent this claim has not been adjudicated by the

23   Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do

24   not apply to this Court's review, and the Court may consider the merits of the claim

25   de novo.

26   **B.    The trial court must allow the defense adequate voir dire.**

27   "*Voir dire* plays a critical function in assuring the criminal defendant that his

28   [constitutional] right to an impartial jury will be honored. Without an adequate *voir*

*dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *see also Morgan v. Illinois*, 504 U.S. 721, 729 (1992) ("[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors.") In capital cases the Sixth Amendment requires that defense counsel be permitted to "life-qualify" potential jurors. *See Morgan*, 504 US 721 at 729 (jurors who would impose the death penalty in every murder case and not, in good faith, consider mitigating evidence, should be struck for cause). Although a trial court has some discretion in how to limit life-qualifying voir dire in capital cases, that discretion is "subject to the essential demands of fairness." *Id.* at 730 (internal citation omitted). *See also Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991) (federal courts can review state court voir dire "to enforc[e] the commands of the United States Constitution").

Additionally, the constitution does not allow for aggravated factors that automatically trigger the death penalty, *see Woodson v. North Carolina*, 428 U.S. 280, 301 (1976), nor does it allow for aggravated factors that trigger a prohibition on the presentation or consideration of mitigation, *see Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978). Indeed, Arizona law requires jurors to proceed to the mitigation phase every time the jury finds aggravated factors during the aggravated phase. A.R.S. § 13-752(D). Thus, in order to properly sit on a capital case, a juror must be able to consider mitigating factors no matter what the aggravating factors are that are proven. A juror who cannot even *consider* mitigating factors when certain aggravated factors are present is not able to follow the law. *See Morgan*, 504 U.S. at 739 ("Any juror to whom mitigating factors are … irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial.").

1    Thus, life-qualifying the jury in Lehr's case meant making sure that they

2    could *consider* mitigation if the case proceeded to the final stage.

3    **C.    The trial judge unfairly limited Lehr's voir dire based on an**
       **incorrect understanding of "stakeout" questions.**

4

5    The trial judge was concerned with preventing the defense from asking any

6    "stakeout" questions. (*See* ROA 796 at 3; Tr. Jan. 5, 2009 at 14; Tr. Jan. 12, 2009

7    at 42; Tr. Jan. 14, 2009 at 10, 12.) But, the judge misunderstood what made a voir

8    dire question an impermissible stakeout question, and thus unfairly prohibited the

9    defense from asking a variety of proper questions. The judge correctly described

10   stakeout questions as "ones that seek to get a juror to pledge himself to a future

11   course of action based on case specific facts." (ROA 796 at 3.) But, the judge then

12   impermissibly said that meant the parties could not "ask jurors their views on

13   specific types of mitigation OR aggravation, and can't ask jurors if they would find

14   a particular fact or circumstance which is germane to the case to be a mitigating or

15   aggravating factor." (ROA 796 at 3 (emphasis in original).) The judge also

16   explained that he considered an improper stakeout question to be "giving them facts

17   specific to the case and asking them whether in light of the facts, they can fairly

18   consider mitigation." (Tr. Jan. 5, 2009 at 23.)

19   But stakeout questions are those that "ask a juror to speculate or precommit

20   to how that juror might vote based on any particular facts." *State v. Prince*, 250 P.3d

21   1145, 1158 (Ariz. 2011) (en banc) quoting *United States v. Fell*, 372 F.Supp.2d 766,

22   770 (D. Vt. 2005). Stakeout questions are improper because they ask jurors to

23   commit to a decision before they have heard the evidence or the rules of law in the

24   jury instructions. *See*, *e.g.*, *Richmond v. Polk*, 375 F.3d 309, 329 (4th Cir. 2004) (A

25   stakeout question is a "question aimed at determining a prospective juror's answers

26   to legal questions before being informed of the legal principles applicable to their

27   sentencing recommendation.").

28

366

The prohibition on "stakeout" questions does not mean that counsel may not ask any questions that are case-specific. *See*, *e.g.*, *Prince*, 250 P.3d at 1158. "[T]he [Supreme] Court in *Morgan* held that a defendant is entitled to make an inquiry into potential jurors' ability to impose a life sentence, as well as their ability to impose a death sentence, *on the basis of the facts of the case* and the trial court's instructions on the law, not merely on the basis of the defendant's conviction of a capital case." *United States v. Johnson*, 366 F.Supp.2d 822, 830 (N.D. Iowa 2005) (emphasis added). Thus, questions designed to "determine whether [the] murder fit the juror's definition of a 'well-thought-out crime,' and thus determine whether that juror could consider the death penalty" were proper. *Prince*, 250 P.3d at 1158. And hypothetical questions that "closely mirror[] the facts" of a case are fine when they are part of an inquiry into whether the juror can *consider* a certain penalty. *State v. Garcia*, 226 P.3d 370, 377–78, ¶ 14–16 (Ariz. 2010) (en banc).

The judge's limitations that prevented the defense from asking about anything related to the defense, or from asking about specific mitigation are not supported by the caselaw, and they effectively prevent the defense from being able to life-qualify a jury in such an unusual case as this one, thus depriving Lehr of his rights to an impartial jury, fair trial, and reliable sentencing proceeding, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**D.    The trial judge's unfair limitations prevented Lehr from being able to adequately voir dire the potential jurors.**

The judge's limitations unfairly harmed Lehr's ability to voir dire in three ways: (1) despite the introduction of specific aggravating facts during voir dire, Lehr was prevented from discussing specific mitigating facts; (2) although the judge said Lehr could ask about specific categories of mitigation, the judge repeatedly stopped the defense from doing just that; and (3) although the potential jurors heard about Lehr's other convictions, Lehr was prevented from ensuring that the jurors

1   could still *consider* mitigation.

2       The unique situation in this case meant that the jury learned, during voir dire,

3   that Lehr had already been convicted of murder, multiple counts of sexual assault

4   including the sexual assault of children, and multiple counts of attempted murder.

5   Not only did they hear these damning facts, but the facts were repeated frequently

6   throughout voir dire as the parties tried to explain the procedural situation to the

7   jurors. For example, in trying to explain the situation counsel said

8           Scott Lehr has already been found guilty of First Degree Premeditated
            Murder of Belinda Cronin, and no matter what your decision regarding
9           Wanda Collins, Margaret Christorf or Michelle Morales, you will have
            to determine whether or not to sentence Scott Lehr to death for the death
10          of Belinda Cronin, no matter what, or whether to give him a life penalty.
            In making your decisions, the reason you were given that instruction
11          about other evidence is because Lehr has also been found guilty beyond
            a reasonable doubt of the rape, assault of six other women, the
12          attempted murder of some of those women, heinous crimes.
13

14   (Tr. Jan. 14, 2009 at 164; *see also* Tr. Jan, 13, 2009 at 68–69, 94, 128–29, 135–36,

15   156; Tr. Jan. 14, 2009 at 24, 37, 39–43, 71–74, 86–87, 128–30, 165–66, 185–87,

16   190–93; Tr. Jan. 15, 2009 at 18, 20, 31–37; Tr. Jan. 20, 2009 at 20, 50–52, 74–75;

17   Jan. 21, 2009 at 34–35, 46–51.) Despite repeatedly hearing about the aggravated

18   factors during voir dire, the defense was prevented from discussing any of the

19   specific mitigating factors.

20       The improper suppression of the defense's voir dire became a trend, even

21   spilling over to the judge prohibiting such questions as whether the juror would

22   automatically vote for the death penalty if he finds that the defendant is proved

23   guilty beyond a reasonable doubt, or if the juror would automatically vote for the

24   death penalty if the juror has no doubt in their mind that he is guilty. (Tr. Jan. 13,

25   2009 at 163.) At one point a juror offered that mitigation includes "abuse of a child,

26   abuse of drugs or alcohol, things like that." (Tr. Jan. 14, 2009 at 173.) But the

27   defense was not allowed to follow up by asking "[w]hat of those do you think is

28   important in making" the life or death decision? (Tr. Jan. 14, 2009 at 173.)

The judge repeatedly assured the defense that they would be able to ask about categories of mitigation, even "specific" categories of mitigation. (*See*, *e.g.*, ROA 796 at 3, Tr. Jan. 14, 2009 at 105.) Yet the judge repeatedly shut down the defense's attempts to do just that. For example, the defense was not allowed to ask the general and qualified question of whether a juror "might" consider "a person's behavior in a correctional facility" in mitigation. (Tr. Jan. 13, 2009 at 131.) The next day the defense was prohibited from asking whether a juror would "never" consider "background or family situation as one is growing up." (Tr. Jan. 14, 2009 at 72.)

Finally, in addition to being unfairly limited on mitigation-related questions, the defense also was not allowed to ask whether the jurors could still even consider mitigation in light of the convictions they repeatedly heard about. Before trial the judge ruled that the defense could not ask:

> If, knowing that the defendant has a previous first degree murder conviction and additional convictions for sexual assault, kidnapping, aggravated assault and attempted murder of six other women, three of whom were less than fifteen years of age, could you still consider mitigating circumstances in determining whether a sentence of life or death should be imposed?

(ROA 796 at 3–4; *see also* Tr. Jan. 5, 2009 at 12–13.) Thus, the jurors sat through a voir dire where they were repeatedly reminded of the aggravated factors in Lehr's case, not told of any of the mitigating factors, and not even probed to ensure that they could continue to consider mitigating factors at that point.

By the time jury selection was complete, Lehr's jury had been inundated with evidence of his prior convictions and had been deprived of any meaningful mention of his mitigation. As they say, *first impressions matter*, and Lehr's jury did not get to hear about his mitigation until the very end of his trials, despite having heard about the aggravation from the very beginning.

The judge prohibited these questions before voir dire even began, so the effect of the court's ruling extends far beyond the specific questions the defense tried to ask during voir dire. The defense was prevented from engaging in an entire

area of voir dire, unfairly limiting their ability to life-qualify this jury. *See Morgan*, 504 US at 729. When a jury has been sat without adequate life-qualification, the death sentence must be reversed. *See id*. The trial court's unfair limitation of voir dire thereby deprived Lehr of his rights to an impartial jury, fair trial, and reliable sentencing proceeding, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## CLAIM SEVENTEEN

**The death-qualification jury-selection process deprived Lehr of an impartial jury and a fair and reliable trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

As part of voir dire, the trial court death-qualified the jury, a process in which the trial court excuses venirepersons who indicate that they cannot consider the death penalty as a possible punishment. The use of this procedure in the jury selection process is constitutionally impermissible. Further, the trial court illegally excused at least four jurors who said they could apply the law despite their disagreement with it. The death-qualifying jury selection process utilized by the trial court violated Lehr's rights to an impartial jury, fair trial, and reliable sentencing proceeding, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### A.    Exhaustion

This claim was not raised in state court. Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and post-conviction counsel. *See Martinez*, 566 U.S. at 9, *Edwards*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88. Lehr will demonstrate through his filings and at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital

1   attorneys and that those failures prejudiced him. Alternatively, he alleges that any
2   procedural bar is not adequate or independent or that imposing default would be a
3   miscarriage of justice. Because this claim has not been adjudicated by the Arizona
4   state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply
5   to this Court's review, and the Court may consider the merits of the claim de novo.

6      **B.    The death-qualification process resulted in an illegal jury that was
7             tilted toward conviction and death.**

8          A defendant has the right to an unbiased and impartial jury. *See Morgan v.*
9   *Illinois*, 504 U.S. 719, 726–27 (1992) (identifying an impartial tribunal as a
10  fundamental requirement of due process); *see also Groppi v. Wisconsin*, 400 U.S.
11  505, 509 (1971). Empirical research demonstrates that the death-qualification
12  process facilitates the selection of jurors who are more likely to return a guilty
13  verdict, and then more likely to return a death verdict. *See* Susan D. Rozelle, *The*
14  *Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*,
15  38 Ariz. St. L.J. 769, 784–85 (2006) (reviewing data showing that "[t]he death
16  qualification process today still seats juries uncommonly willing to find guilt, and
17  uncommonly willing to mete out death"); William J. Bowers & Wanda D. Foglia,
18  *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital*
19  *Sentencing*, 39 Crim. L. Bull. 51, 61–66 (2003) (reviewing studies demonstrating
20  that death-qualified jurors are more likely to convict and to return a death verdict).

21         Moreover, research has found that the death-qualification process itself
22  influences jurors to adopt pro-prosecution and pro-death attitudes. *See* Craig Haney,
23  *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification*
24  *Process*, 8 L. & Hum. Behav. 121, 128–29 (1984) (demonstrating through empirical
25  research that repeated discussion of the death penalty during voir dire increases the
26  likelihood that jurors will believe in the defendant's guilt and to conclude that a
27  death sentence is warranted). Because "the *voir dire* phase of the trial represents the
28  jurors' first introduction to the substantive factual and legal issues in a case, . . .

[t]he influence of the *voir dire* process may persist through the whole course of the trial proceedings." *Powers v. Ohio*, 499 U.S. 400, 412 (1991) (internal citations omitted). It is an understatement to say that the process of death qualification does not facilitate the selection of a fair and impartial jury.

The process of death qualification thus deprives a criminal defendant of his right to be tried by an "impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). The death qualification process "stack[s] the deck against the petitioner," *Witherspoon v. Illinois*, 391 U.S. 510, 523 (1968), and "has the purpose and effect of obtaining a jury that is biased in favor of conviction," *Baze v. Rees*, 553 U.S. 35, 84 (2008) (Stevens, J., concurring).

The voir dire process here was almost entirely about the death penalty. (Tr. Jan. 6–7, 2009, Jan. 12–15, 2009, Jan. 20–21, 2009.) As the trial judge explained, "I look at the small panel voir dire as being for the purpose of death-qualifying them. My hope is that we don't waste a lot of time with questions that are either covered by the questionnaire or that really don't relate to death qualification." (Tr. Jan. 13, 2009 at 7.)

The death-qualification process resulted in the trial court excusing at least six prospective jurors who appeared to have been competent jurors but for their views on the death penalty. *See* Juror 31 (ROA 989 at 149–69; Tr. Jan. 14, 2009 at 33–35, 55–56, 91–94, 98; Jan. 15, 2009 at 138; Tr. Jan. 21, 2009 at 35–36, 43–44), Juror 57 (ROA 991 at 170–90; Tr. Jan. 12, 2009 at 11), Juror 62 (ROA 992 at 2–22; Tr. Jan. 12, 2009 at 11), Juror 78 (ROA 983 at 190–210; Tr. Jan. 12, 2009 at 11), Juror 71 (ROA 983 at 43–63; Tr. Jan. 12, 2009 at 18–19; Tr. Jan. 15, 2009 at 16–18, 24, 28, 79–80, 88–98), Juror 72 (ROA 983 at 64–84; Tr. Jan. 15, 2009 at 37–38, 88–94, 98–99, 101–03, 112, 122, 179).

Notably, five of the six jurors excused for this reason were women and the sixth was a Hispanic man. (*See* ROA 814.) Thus the death-qualification process in

1  Lehr's case also impeded his right to a jury venire made up of a fair cross-section

2  of the community on race and gender grounds. *See Taylor v. Louisiana*, 419 U.S.

3  522 (1975).

4          Death qualification winnowed the venire of impartial and representative

5  jurors, influenced the remaining venire toward conviction and a death sentence, and

6  ultimately resulted in a jury biased toward conviction and death. *See Baze*, 553 U.S.

7  at 84. The death-qualification process deprived Lehr of his right to be tried by an

8  impartial jury and violated his right to equal protection because only capital

9  defendants like Lehr are subject to biased, death-qualified jurors. *See id.* The death

10  qualification of prospective jurors generally, and as applied in Lehr's case,

11  constitutes structural constitutional error requiring relief. *See Gray v. Mississippi*,

12  481 U.S. 648, 660 (1987) (reversal required without harmlessness analysis when

13  the trial court excludes venirepersons simply because they have general objections

14  to the death penalty).

15      **C.    The trial court excused at least four anti-death penalty jurors who
16              said they could follow the law despite their disagreement.**[25]

17          Trial courts may not excuse jurors for cause simply because they are opposed

18  to the death penalty, if they can abide by their oath in spite of their personal views.

19  *See Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). The erroneous excusal of

20  such jurors results in a "*per se* rule requiring the vacation of a death sentence." *Gray*

21  *v. Mississippi*, 481 U.S. 648, 659 (1987).

22          Of the six jurors who were excused for anti-death penalty views, four had

23  said that they would follow the law despite their disagreement with it. *See* Juror 57,

24  (ROA 991 at 185), Juror 71, (ROA 983 at 58), Juror 72, (ROA 983 at 79), Juror 78,

25  _____

26  [25] Lehr also argues that his defense counsel was deficient for not trying to
27  rehabilitate the anti-death penalty jurors and to stipulating to their removal for
    cause, in Claim 15. That claim contains a more developed legal analysis of the right
28  to have on the venire jurors who are against the death penalty but can follow the
    law.

(ROA 983 at 205). Although the defense stipulated to the removal of Jurors 57, 72, and 78, the defense objected to the removal of Juror 71. (Tr. Jan. 15, 2009 at 101–04, 112–14.)

The trial court found that Juror 71 had expressed in her questionnaire that she was opposed to the death penalty, and that "[s]he cannot provide assurances to the Court that her views concerning death would not affect her ability to fairly decide the issue in this case." (Tr. Jan. 15, 2009 at 113–14.) The trial court found that her inability to assure the court amounted to "being a juror whose views would prevent or substantially impair the performance of their duties in following the law." (Tr. Jan. 15, 2009 at 113–14.)

But Juror 71 had explicitly said she could and would follow the law even though she disagreed with it. She first said that she would keep an "open mind" regarding the aggravation and mitigation phases of trial. (ROA 983 at 54.) And she said that "[y]es," she was willing to "accept and follow the law as instructed by the Judge, whether or not you personally agree with that law." (ROA 983 at 58.) Then, during the defense's voir dire, Juror 71 confirmed – twice – that even "though [she] ha[s] an opposition to the death penalty, and [she's] philosophically opposed to it, in appropriate circumstances, [she] could impose the sentence." (Tr. Jan. 15, 2009 at 80.) Later, she explained that "I *know* I can keep an open mind and follow the rules of what's instructed, but at the same time, morally I would feel horrible about being responsible for sentencing someone to death." (Tr. Jan. 15, 2009 at 98 (emphasis added).) She went on to confirm – again, twice – that despite not wanting to impose the death penalty, she could do it. (Tr. Jan. 15, 2009 at 98.)

And, Juror 71 was not entirely against the death penalty, instead she said she *would* impose a death sentence in certain circumstances. (*See* ROA 983 at 55 (death penalty would be appropriate for Osama bin Laden or Hitler); ROA 983 at 57 (checking that despite being philosophically opposed to the death penalty, "I would be able to vote for the death penalty if I felt it was appropriate under the facts of the

1  case.").)

2      Defense counsel's objection was correct: Juror 71 should not have been

3  struck for cause. *See Witherspoon*, 391 U.S. at 522. She was opposed to the death

4  penalty, she would not *like* imposing the death penalty, but as she repeatedly said,

5  she would follow the law. The erroneous exclusion of this qualified juror should

6  result in a per se reversal of Lehr's death sentence. *See Gray*, 481 U.S. at 659.

7      As outlined above, the death-qualifying jury selection process utilized by the

8  trial court violated Lehr's rights to an impartial jury, fair trial, and reliable

9  sentencing proceeding, in violation of the Fifth, Sixth, Eighth, and Fourteenth

10  Amendments to the United States Constitution.

## CLAIM EIGHTEEN

**Trial counsel violated Lehr's Sixth Amendment right to autonomy and the effective assistance of counsel under *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018) by making concessions of guilt during voir dire and at trial, without discussing that strategy with Lehr and without obtaining Lehr's consent.**

16  Lehr incorporates by specific reference all facts, allegations, and arguments

17  made elsewhere in this Petition.

18  During his 2009 trial, Lehr's counsel repeatedly conceded his guilt to the jury,

19  starting during voir dire and continuing throughout the trial and guilt phases. Lehr

20  never consented to such a strategy, and indeed has consistently maintained his

21  innocence of these crimes. Lehr's counsel's conduct violated his Sixth Amendment

22  right to autonomy recently confirmed by the Supreme Court's decision in *McCoy*

23  *v. Louisiana*.

### A.    Exhaustion

25  Because *McCoy* had not been decided at the time of Lehr's trial or his appeal,

26  Lehr could not raise such a claim and present it to the Arizona Supreme Court. As

27  such, there is no state-court decision to which this Court must defer under 28 U.S.C.

28  § 2254(d).

To the extent necessary, Lehr should be permitted to return to state court to present this claim to the Arizona courts and fully exhaust it for federal review. *See Rhines v. Weber*, 544 U.S. 269, 278 (2005) (explaining that, "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics . . . the district court should stay, rather than dismiss, the mixed petition," to allow the petition to exhaust the claim in state court). In the alternative, if this Court determines that a stay is not warranted, and that the inclusion of this claim presents the court with a so-called "mixed" petition, "the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." *Id.*; *see also Rose v. Lundy*, 455 U.S. 509, 520 (1982) ("[A petitioner] can always amend the petition to delete the unexhausted claims, rather than returning to state court to exhaust all of his claims").

### B.    Merits

At the time of his 2009 retrial on charges alleging that he had murdered Michelle Morales and Margaret Christorf, Lehr had previously been convicted of the murder of Belinda Cronin. During voir dire, defense counsel conceded that Lehr had been found guilty of Cronin's murder. Questioning jurors about whether they could return a life sentence in light of Lehr's criminal acts, counsel questioned during voir dire: "Mr. Lehr – and I don't want to put any gloss on it – is a murderer. He has been convicted of murder of Belinda Cronin, first-degree murder." (Tr. Jan. 15, 2009 at 31).

Yet counsel went even further later, telling jurors that Lehr "wanted to kill her, he intended to kill her, he thought about killing her, he killed her, cold-blooded, intentional premeditated murder. Can you still give the life penalty in that case?" (Tr. Jan. 20, 2009 at 72.) Co-counsel confirmed to jurors that these "facts that

you've heard in this case . . . are accurate facts." (Tr. Jan. 20, 2009 at 110.) Counsel also told jurors that Lehr was "cold-blooded" without ever telling Lehr that he would make such a statement, and without Lehr having consented to being called a "cold-blooded" killer by his own counsel.

Earlier in voir dire, counsel conceded that Lehr had already "committed between one and three murders," explaining to the jury that "you have to decide whether he's committed just one or two or three, at least one – he's already been convicted of six other rapes and sexual assault, some attempts and some other attempted murders of these women he raped." (Tr. Jan. 14, 2009 at 46.) And after that, counsel told one juror that "Clearly no one is going to forgive Mr. Lehr for what he did," (Tr. Jan. 14, 2009 at 184), which indicated to jurors that Lehr was indeed guilty of all three murders, not just the one murder of Cronin.

Yet again, counsel did not consult with Lehr and inform him that counsel would indicate to jurors that Lehr was guilty of up to three murders, and that he was not entitled to forgiveness "for what he did."

The fact that jurors interpreted counsel's statements during voir dire as a concession of guilt is confirmed by counsel's later arguments during sentencing, at which point counsel acknowledged that Lehr had committed these acts, which counsel said were horrible and heinous:

> That's not in dispute. That's not in dispute that Scott Lehr did heinous, horrible things to many women. We said that during voir dire when we were determining who would be proper people to sit on this jury. We've never disputed that. What Scott Lehr did, not just to Margaret Christorf, Michelle Morales and Belinda Cronin, but what he did to Miss Ross, to Miss Ailshire, to Miss Hancock, to all those other victims, was horrible. Horrible, horrible, horrible.

(Tr. Apr. 14, 2009 at 151–52.) Counsel further argued: "What snapped? What happened in 1991? We will never know. Something happened. Something caused Scott Lehr, starting in 1991, to do these heinous acts." (Tr. Apr. 14, 2009 at 161.)

*McCoy* holds that a defendant has autonomy to expressly assert that the

objective of his defense is to maintain his innocence, and counsel may not overrule that declaration by conceding guilt at any time. *See* 138 S. Ct. at 1508–09. *McCoy* sets forth a two-pronged test for a Sixth Amendment violation of this right to autonomy: First, trial counsel must discuss with a defendant any strategy to concede guilt or make any other damaging concession. *McCoy*, 138 S. Ct. at 1509 ("Counsel, in any case, must still develop a trial strategy and discuss it with her client."). Second, after discussing any such strategy with the defendant, counsel cannot concede guilt unless the defendant consents. *Id*.

In Lehr's case, trial counsel never discussed with Lehr any strategy of: admitting guilt of the Cronin murder; telling jurors that it was "cold-blooded"; making statements to jurors in voir dire that led jurors to think that he was guilty of three murders as well as the sexual assaults; telling jurors that Lehr's actions were horrible and heinous; and telling jurors that Lehr's actions were not worthy of forgiveness. Having not been consulted, Lehr could not have agreed to any such strategy.

Consequently, counsel's actions violated Lehr's right to autonomy under the Sixth Amendment, including as set forth in *McCoy*, and Lehr's convictions and death sentences must be vacated.

## CLAIM NINETEEN

**The trial court's instructions on premeditation and intent denied Lehr due process under the Fourteenth Amendment by lessening the prosecution's burden of proving all elements of the offense beyond a reasonable doubt.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The trial court's instructions on premeditation and intent misstated the State's burden of proving the essential elements of the offense of first-degree murder and denied Lehr due process under the Fourteenth Amendment by lessening the prosecution's burden of proving all elements of the offense beyond a reasonable

1   doubt.

2   **A.  Exhaustion**

3   Lehr raised challenges to the jury instructions during his 2009 trial in his

4   appeal to the Arizona Supreme Court. (*See* DA2 82 at 61–64.) The Arizona

5   Supreme Court rejected this claim, concluding that the jury instructions were

6   "appropriate," "given the facts of the case." *Lehr III*, 254 P.3d at 391. The court's

7   rejection of the claim was contrary to, or involved an unreasonable application of,

8   clearly established federal law, as determined by the United States Supreme Court.

9   *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable

10  determination of the facts in light of the evidence presented. *See* 28 U.S.C. §

11  2254(d)(2).

12  To the extent the Court determines any aspect of the claim was not raised in

13  state court, Lehr alleges he can overcome any default of this claim by showing cause

14  and prejudice, including because of the ineffective assistance of appellate and post-

15  conviction counsel. *See Martinez*, 566 U.S. at 9; *Murray*, 477 U.S. at 488–89

16  (1986); *Strickland*, 466 U.S. at 687–88; *see also Mapes*, 171 F.3d at 427 (analyzing

17  whether omitted issues were "significant and obvious"); *Gray*, 800 F.2d at 646

18  (noting that if "appellate counsel failed to raise a significant and obvious issue, the

19  failure could be viewed as deficient performance").

20  **B.  Merits**

21  The jury instructions at both Lehr's 1996 trial and his 2009 retrial misstated

22  the governing law regarding premeditation and intent. These instructions had the

23  effect of lessening the burden of proof for the prosecution to prove the elements of

24  first-degree murder, denying Lehr due process under the Fourteenth Amendment.

25  **1.  Factual Background**

26  **a.  Jury Instructions on Premeditation.**

27  At Lehr's 1996 trial (at which he was convicted of the first-degree murder of

28  Belinda Cronin), the trial judge provided jurors the following instruction on the

element of premeditation, an essential element of the offense of first-degree murder:

> Premeditation means that the defendant's intention or knowledge existed before the killing long enough to permit reflection. However, the reflection differs from the intent or knowledge that conduct will cause death. It may be as instantaneous as successive thoughts in the mind, and it may be proven by circumstantial evidence.

(Tr. Nov. 20, 1996 at 11.)

At Lehr's 2009 retrial, the trial judge provided the following instruction on the essential element of premeditation:

> 'Premeditation' means that the defendant intended to kill another human being, or knew he would kill another human being, and that after forming that intent or knowledge, reflected on the decision before killing. It is this reflection, regardless of the length of time in which if occurs, that distinguishes first-degree murder from second-degree murder. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion. The time needed for reflection is not necessarily prolonged, and the space of time between the intent or knowledge to kill and the act of killing may be very short.

(Tr. Mar. 24, 2009 at 39.)

The prosecution then argued that jurors should convict Lehr of first-degree murder because "When you've got a rock and you're using that to strike someone in the head, you have time to think about what you're doing before you strike somebody with that rock." (Tr. Mar. 24, 2009 at 52.)

**b. Jury Instructions on Intent.**

At Lehr's 1996 trial, the trial judge provided the following instruction on the essential element of "intent," as required for a conviction of first-degree murder:

> The term intentionally or with intent to, as used in these instructions, means that a defendant's objective is to cause that result *or* engage in that conduct.

(Tr. Nov. 20, 1996 at 13 (emphasis supplied).)

At Lehr's 2009 retrial, the trial judge provided the following nearly identical instruction on the essential element of "intent," as required for a conviction of first-degree murder:

> 'Intentionally' or 'with intent to,' as used in these instructions, means

1  that a defendant's objective is to cause that result or engage in that
2  conduct.

3  (Tr. Mar. 24, 2009 at 37 (emphasis supplied).)

### 2. Jury Instructions On Premeditation and Intent Were Improper and Unconstitutional.

The jury instructions on premeditation and intent denied Lehr due process because they were incorrect statements of the law and otherwise allowed the jurors to convict Lehr of first-degree murder without proof beyond a reasonable doubt of all the essential elements of first-degree murder, including "premeditation" and "intent."

### a. Premeditation

By allowing jurors to convict Lehr of first-degree murder based solely on premeditation defined as something as "instantaneous as successive thoughts in the mind" that "may be proven by circumstantial evidence," the jury instructions at Lehr's first trial lessened the prosecution's burden of proving premeditation beyond a reasonable doubt denying Lehr due process and a fair trial.

Arizona law requires that a defendant engage in actual reflection for there to be "premeditation." *See State v. Thompson*, 65 P.3d 420, 427–28 (2003). "Instantaneous thoughts" do not involve reflection, nor do "instantaneous successive thoughts," especially when jurors were allowed to rely on circumstantial evidence to conclude that Lehr had such instantaneous thoughts. In fact, the jury instructions at Lehr's second trial made clear that an "instant effect" in the mind is *not* premeditation.

Jurors at the first trial were therefore allowed to, and did, convict Lehr of first-degree murder without having to find, beyond a reasonable doubt, premeditation required by Arizona law, in violation of the due process requirements of the Fourteenth Amendment.

Similarly, at his second trial, by allowing the space of time between a thought

of killing and a subsequent act to be "very short," the jury instructions on premeditation also failed to ensure that the jury would find, beyond a reasonable doubt, that Lehr acted with the essential element of premeditation and therefore denied Lehr due process and a fair trial under the Fourteenth Amendment.

At best, the jury instructions on premeditation were ambiguous, in that they allowed jurors to conclude, based on circumstantial evidence, that so long as there was a "very short time" between a thought of killing and a subsequent act, there was premeditation. As such, they relieved the prosecution of proving premeditation beyond a reasonable doubt.

The Arizona Supreme Court's conclusion that the jury instructions were "appropriate," *Lehr III*, 254 P.3d at 391, involved an unreasonable application of controlling Supreme Court precedent. The Arizona Supreme Court did not acknowledge that there was a "reasonable likelihood" that jurors would have interpreted the instruction as allowing conviction based merely on the passage of time, thus making the instructions unconstitutional as a matter of due process. *Boyde v. California*, 494 U.S. 370, 380 (1990).

There was a reasonable likelihood that jurors applied these instructions on premeditation in a way that permitted conviction based on something less than proof of premeditation beyond a reasonable doubt. This risk was heightened, here, because the evidence regarding what occurred with the Morales and Christorf homicides was not clear from the available evidence. *See Lehr I*, 38 P.3d at 1181-83.

The Arizona Supreme Court's denial of relief, therefore, was contrary to, or an unreasonable application of clearly established Supreme Court case law, including *Boyde*, and therefore, federal habeas corpus relief is available under 28 U.S.C. §2254(d)(1).

### b.   Intent

The jury instructions on "intent" were similarly unconstitutional as a matter

of due process. The instructions at both trials allowed jurors to convict Lehr of first-degree murder by finding "intent" to kill by merely finding that he had an intent to "engage in that conduct" that caused death, (Tr. Nov. 20, 1996 at 13), or that his objective was to "engage in that conduct" that caused death, (Tr. Mar. 24, 2009 at 37).

Yet intent to engage in conduct that causes death is *not* intent to kill. While jurors were instructed that they could find that he acted "intentionally" if he sought to "cause [the] result" of death, because the instructions used the disjunctive "or" which allowed conviction based on a finding of "intent to cause death" *or* "intent to engage in conduct," the jury instructions allowed conviction based solely on intent to engage in conduct *without* intending to cause death. Other courts have concluded that such an instruction impermissibly misstates the jury's burden of proving intent to kill beyond a reasonable doubt. *See Cook v. State*, 884 S.W.2d 485 (Tex. Crim. App. 1994).

In this case, the jury was allowed to convict Lehr based solely upon a finding that he intended to engage in conduct – without a finding beyond a reasonable doubt that Lehr actually had intent to kill to kill any of the victims. Consequently, Lehr was denied due process under the Fourteenth Amendment, and is entitled to issuance of the writ.

## CLAIM TWENTY

**Lehr's counsel rendered ineffective assistance during the aggravation phase of Lehr's 2009 capital trial in violation of Lehr's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

There were significant problems in the aggravation phase of Lehr's trial. (*See* Claim 21.) Lehr's counsel failed to object to the aggravating circumstances being applied to his case, depriving Lehr of his rights to counsel, a fair trial, an impartial

jury, due process, and equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

This claim was not raised in state court. Lehr can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and post-conviction counsel. *See Martinez*, 566 U.S. at 9 (2012); *Murray*, 477 U.S. at 488–89; *Strickland*, 466 U.S. at 687–88. Lehr will demonstrate through his filings and at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, any procedural bar is not adequate or independent, and imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

*First*, defense counsel unreasonably allowed the jury to be instructed that convictions that Lehr received *after* the murders could be aggravating factors under A.R.S. § 13-703 (1991 and 1992 editions). (*See* Tr. Apr. 1, 2009 at 74–77; *see also* Claim 4.) This objection would have been based on black-letter constitutional law: that the ex post facto clause of the U.S. Constitution does not allow Lehr's conviction to be aggravated by circumstances that did not exist at the time of the offense. Reasonably effective defense counsel would have objected on this basis. *See Hill v. Lockhart*, 474 U.S. 52, 62 (1985) (White, J., concurring) ("The failure of an attorney to inform his client of the relevant law clearly satisfies the first prong of the *Strickland* analysis . . . as such an omission cannot be said to fall within the wide range of professionally competent assistance demanded by the Sixth Amendment.") (quotation marks omitted).

Lehr's counsel objected to the use of these convictions on various bases, in particular on the lack of proper notice. (*See*, *e.g.*, ROA 928 (Defense Objections to Aggravation/Eligibility Phase Jury Instructions); ROA 946 (ruling granting some

and overruling some defense objections and permitting use of convictions despite inadequate notice).) Unfortunately, they did not object on the basis that the aggravating convictions (and in some cases, the conduct underlying the convictions) were from after the date of the offenses for which he was being sentenced.

Counsel showed that they had no concept at all of the illegality of using a post-offense conviction as a "prior offense" or an offense that Lehr was "previously convicted of" in the aggravation stage. Counsel agreed to stipulate that Lehr had the convictions that were alleged, that certain ones involved violence, and that they had certain statutory sentences. (*See* Tr. Apr. 1, 2009 at 12–15.) As part of that stipulation, defense counsel even agreed to stipulate that the prior convictions *were sufficient to meet* the (F)(1) and (F)(2) aggravators—reserving only the specific objections they had made previously. (*See* Tr. Apr. 1, 2009 at 10.) The stipulation ultimately did not actually stipulate that the convictions were aggravators under the law, but the defense nevertheless failed to object when the trial court asked Lehr if he understood that "the jury will be told that the conviction for all of those counts involved (F)(1) and (F)(2) aggravators." (Tr. Apr. 1, 2009 at 20–21.)

Lehr was prejudiced by his counsel's failure to appreciate how this violated the constitution. If they had objected and the trial court had complied with the constitution, Lehr would not have been eligible for the death penalty. Even if the trial court had not complied with the constitution and had instructed the jury that these convictions could be considered as (F)(1) or (F)(2) prior or previous convictions, defense counsel could have at least argued to the jury that the convictions from after the offenses should not qualify. Instead, the defense was left with nothing to argue during the aggravation phase. (*See* Tr. Apr. 1, 2009 at 84–85.) There is a reasonable probability that if they had argued this to the jury at least one juror would have agreed and chosen not to qualify him for the death penalty.

***Second***, defense counsel allowed the judge to instruct the jury that proof

beyond a reasonable doubt meant "firmly convinced that the alleged aggravating circumstances exist," and that reasonable doubt meant "you think there is a real possibility that the circumstances do not exist." (Tr. Apr. 1, 2009 at 73–74; *see* Claim 21.) An instruction that the jury need only be "firmly convinced" implies a standard lower than that long-required under *In re: Winship*. 397 U.S. 358, 364 (1970). And, requiring the defense to show that there is a real possibility that circumstances do not exist unconstitutionally shifts the burden of proof. *See*, *e.g.*, *United States v. Walton*, 207 F.3d 694, 705 (4th Cir. 2000) (King. J., dissenting).

The defense unreasonably failed to object to these erroneous instructions. *See Hill*, 474 U.S. at 62. There is a reasonable probability that if the jury had been properly instructed on the proof beyond a reasonable doubt standard, at least one may have declined to find the aggravated factor was proven.

## CLAIM TWENTY-ONE

**The aggravation- and mitigation-phase jury instructions violated Lehr's Sixth, Eighth, and Fourteenth Amendment rights.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Lehr raised and preserved these claims on direct appeal as part of his "constitutional challenges to the death sentence raised and preserved for future federal review." (DA2 82 at 79–85.) The Arizona Supreme Court did not reach the merits of any of these claims, but listed them verbatim in its appendix. *Lehr III*, 254 P.3d at 395. Because these claims have not been adjudicated on the merits by Arizona courts, the limits on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of these claims. Even if listing these issues in the appendix is considered to be a decision on the merits, the state court's denial of these claims was contrary to, or involved an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

1

2

## A.  The jury should have been instructed that it could consider mercy and sympathy during the mitigation phase.

3   Lehr argued in his direct appeal that "[t]he trial court improperly omitted

4   penalty phase instructions that the jury could consider mercy or sympathy in

5   evaluating the mitigation evidence and determining whether to sentence the

6   defendant to death." (DA2 82 at 82; *Lehr III*, 254 P.3d at 395.) Indeed, not only did

7   the jury instructions fail to tell the jury this, the instructions said they *could not*

8   consider sympathy. (Tr. Apr. 14, 2009 at 113.)

9   A sentencer in a capital case must consider "as a mitigating factor, any aspect

10   of a defendant's character or record and any of the circumstances of the offense"

11   that warrants a lesser sentence than death. *Lockett v. Ohio*, 438 U.S. 586, 587

12   (1978); *see also Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). The threshold for

13   introducing mitigation evidence is low—mitigating factors may include any

14   evidence of relevance to the disposition of the case. *See Tennard v. Dretke*, 542

15   U.S. 274, 275 (2004). Upon meeting this low threshold, "the Eighth Amendment

16   requires that the jury be able to consider and give effect to a capital defendant's

17   mitigating evidence." *Id*. (internal citation omitted).

18   Pleading for mercy is a constitutionally sufficient mitigation strategy. *See*

19   *Darden v. Wainwright*, 477 U.S. 168, 185–86 (1986) (stating "a simple plea for

20   mercy" can substitute other mitigating evidence). And mercy has a key role in

21   capital sentencing. *See*, *e.g.*, *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016) ("And of

22   course the ultimate question whether mitigating circumstances outweigh

23   aggravating circumstances is mostly a question of mercy."); *see also Kansas v.*

24   *Marsh*, 548 U.S. 163, 176 (2006) (highlighting Kansas jury instructions stating "the

25   exercise of mercy can itself be a mitigating factor you may consider in determining

26   whether the State has proved beyond a reasonable doubt that the death penalty is

27   warranted.").

28   Mercy was not included as a mitigating circumstance, so the court

387

unconstitutionally precluded the jury from determining whether the case warranted mercy as an independent consideration. And by telling the jury that they could not consider sympathy, the instructions improperly limited the factors the jury could rely on in their decision. As a result, the jury did not meaningfully consider all of the mitigating evidence in violation of the Sixth, Eighth, and Fourteenth Amendments. Lehr is therefore entitled to a new penalty phase.

**B.    The jury should have been instructed that it could consider residual doubt in its sentencing decision.**

Lehr argued in his direct appeal that "Refusing to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments and Arizona law." (DA2 82 at 84; *Lehr III*, 254 P.3d at 395.) The trial court made clear to the jury as early as voir dire that they could not consider residual doubt during sentencing. (*See*, *e.g.*, Tr. Jan. 20, 2009 at 25–26.) At sentencing the judge instructed the jury that "[i]n determining the penalty, you cannot reconsider the defendant's guilt and conviction for first-degree murder or the verdict and the finding of the existence of the aggravating circumstances. The defendant's guilt and the aggravating circumstances have already been proved beyond a reasonable doubt." (Tr. Apr. 6, 2009 at 30.) The court did not tell the jury that they could consider any lingering or residual doubt.

Pursuant to the Eighth and Fourteenth Amendments, capital sentencers cannot "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. Residual doubt is fairly a "circumstance[] of the offense," *id.*, and is defined as: "(1) actual, reasonable doubt about guilt of any crime; (2) actual, reasonable doubt that defendant was guilty of a capital offense, as opposed to other offenses; (3) a small degree of doubt about (1) or (2), sufficient to cause the juror not to want

1    to foreclose (by execution) the possibility that new evidence might appear in the
2    future." Christina S. Pignatelli, *Residual Doubt: It's a Life Saver*, 13 CAP. DEF. J.
3    307, 308 (2001) (quotation marks omitted).

4         Residual doubt can be an effective mitigating factor. *See* Stephen P. Garvey,
5    *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 COLUM.
6    L. REV. 1538, 1563 (1998). Arizona courts have accordingly allowed residual doubt
7    to be a mitigating circumstance. *See*, *e.g.*, *State v. Dann*, 79 P.3d 58, 61 (Ariz. 2003)
8    (noting that residual doubt was offered as a mitigating circumstance); *State v.*
9    *Nordstrom*, 77 P.3d 40, 45 (Ariz. 2003) (same); *State v. Jones*, 72 P.3d 1264, 1270
10   (Ariz. 2003) (same). Instructing jurors on residual doubt as a mitigating
11   circumstance does not give them unfettered discretion to reconsider a verdict, but
12   allows them to determine that capital punishment is inappropriate when the
13   defendant's guilt was proven beyond a reasonable doubt, but not beyond any doubt.
14   The trial court prevented the jury from considering residual doubt as mitigation. As
15   a result, the jury did not meaningfully consider all of the mitigating evidence put
16   before it in violation of the Sixth, Eighth, and Fourteenth Amendments. Lehr is
17   entitled to a new penalty phase.

18         **C.    The jury should have been instructed that it could consider the**
19         **proportionality of imposing a death sentence on Lehr.**

20         Lehr argued in his direct appeal that "The refusal to permit Appellant to argue
21   or the jury to consider whether his death sentence would be proportional to other
22   similarly situated defendants violated his rights under the Eighth and Fourteenth
23   Amendments." (DA2 82 at 83; *see also Lehr III*, 254 P.3d at 395.)

24         The Eighth Amendment embodies "broad and idealistic concepts of dignity,
25   civilized standards, humanity, and decency[.]" *Estelle v. Gamble*, 429 U.S. 97, 102
26   (1976) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)). It is a
27   foundational, bedrock principle of the Eighth Amendment that disproportionate
28   punishments are cruel, unusual, and prohibited. *See e.g.*, *id*. at 102–03 & n.7 (citing

cases); *Gregg v. Georgia,* 428 U.S. 153, 187 (1976) (death is the most "extreme sanction, suitable to the most extreme of crimes"). Lehr argues that the state court should have conducted a proportionality review of his sentence. (*See* Claim 27.) But the jury should have conducted one, too.

Unlike courts, jurors do not have adequate information about how other cases are sentenced. If defense counsel had been permitted to present evidence of how infrequently the death penalty is imposed and told the jury about other cases where the defendant's life was spared, the jury may have come to a different conclusion on his sentence. Certainly at least one juror was reasonably likely to choose a life sentence. Lehr's sentence should be vacated.

### D. The jury should not have been instructed that they had to come to a unanimous decision on the sentences.

Lehr argued in his direct appeal that "[t]he jury instruction that required the jury to unanimously determine that the mitigating circumstances were 'sufficiently substantial to call for leniency' violated the Eighth Amendment." (DA2 82 at 83; *see also Lehr III*, 254 P.3d at 395.) The court instructed the jury that they should only impose a life sentence if they find that "the mitigation is sufficiently substantial to call for leniency." (Tr. Apr. 14, 2009 at 120.) And, the instructions told jurors that: "Any verdict of life imprisonment or death must be unanimous." (Tr. Apr. 14, 2009 at 122; *see also* Tr. Apr. 14, 2009 at 123 ("In order to return a verdict, all 12 of you must agree on the sentence to be imposed.").) The instructions offered no option for the jury if they could not reach a unanimous decision, effectively requiring the jury to continue deliberations until they reached a unanimous agreement.

This instruction was unduly coercive. The United States Supreme Court has established that "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). Although the Constitution does not require

giving an instruction on the consequences of failing to. agree on a sentence, "the failure to so inform the jury is certainly one of the contextual circumstances bearing on the question of jury coercion." *Hooks v. Workman*, 606 F.3d 715, 742 (10th Cir. 2010) (citing *Lowenfield*, 484 U.S. at 234); *cf. Jones v. United States*, 527 U.S. 373, 381–82 (1999) (acknowledging Eighth Amendment requires trial court to instruct jury on consequences of failure to agree where failure to do so would affirmatively mislead jury regarding role in sentencing process).

Furthermore, a jury cannot be "affirmatively misled regarding its role in the sentencing process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994); *Bollenbach v. United States*, 326 U.S. 607, 614 (1946) ("A charge should not be misleading."). By presenting the jury with only the option to unanimously reach a life verdict or unanimously reach a death verdict, the trial court misled the jury about their sentencing options. *See United States v. Bagby*, 451 F.2d 910, 927 (9th Cir. 1971) ("[A] conviction should not rest on ambiguous and equivocal instructions to the jury on a basic issue." (citing *Bollenbach*, 326 U.S. at 613); *accord United States v. Straub*, 538 F.3d 1147, 1165 (9th Cir. 2008) ("Convictions cannot rest on ambiguous jury instructions.").

In Lehr's case, the jurors were never given information about the consequences of a hung jury. Instead, the instruction encouraged the jurors to surrender their own conscientiously held beliefs in order to reach a unanimous decision. *See Smalls v. Batista*, 191 F.3d 272, 279 (2d Cir. 1999). Under such circumstances, "[t]he juror in the minority was not made aware of the possibility that, if he or she was not convinced by the views of the majority, he or she should hold on to his or her own conscientiously held belief." *Id*. at 280; *see also Jiminez v. Myers*, 40 F.3d 976, 981 (9th Cir. 1993). The instructions emphasized unanimity, but left a critical gap in information about what would occur if unanimity were impossible. (Tr. Apr. 14, 2009 at 122, 123.)

The Eighth Amendment demands a heightened degree of "reliability in the

1   determination that death is the appropriate punishment in a specific case." *See*
2   *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). A
3   sentencer must make an "individualized determination on the basis of the character
4   of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S.
5   862, 879 (1983). Moreover, the Sixth Amendment requires that an independent and
6   impartial jury, not a judge, make the requisite findings for a death sentence. *See*
7   *Ring*, 536 U.S. at 609. Consequently, for a death sentence to pass constitutional
8   muster, an independent jury must impose it after an individualized determination of
9   the appropriate punishment.

10   Lehr's sentencing jury was coerced into reaching a unanimous verdict, and
11   the coercion deprived him of his right to an individualized sentencing
12   determination. His sentences must be vacated.

13   **E.     The aggravation-phase reasonable doubt instruction lowered the
14           State's burden of proof.**

15   Lehr argued in his direct appeal that "[t]he reasonable doubt jury instruction
16   at the aggravation trial lowered the state's burden of proof and deprived Appellant
17   of his right to a jury trial and due process under the Sixth and Fourteenth
18   Amendments." (DA2 82 at 82; *see also Lehr III*, 254 P.3d at 395.) During the
19   aggravation stage, the trial court defined "reasonable doubt" as "proof that leaves
20   you firmly convinced that the alleged aggravating circumstance is proven." (ROA
21   948 at 6; Tr. Apr. 1, 2009 at 73–74 ("If, based on your consideration of the evidence,
22   you are firmly convinced that the alleged aggravating circumstances exist, you shall
23   so find.").) The judge further explained that reasonable doubt meant "you think
24   there is a real possibility that the circumstances do not exist." (Tr. Apr. 1, 2009 at
25   73–74.)

26   This instruction is inadequate. First, "firmly convinced" is akin to "clear and
27   convincing," and thus erroneously reduces the State's burden below a reasonable
28   doubt. *See United States v. Andujar*, 49 F.3d 16, 23 (1st Cir. 1995) (citation omitted)

1   (warning against defining "reasonable doubt," as it lowers the state's burden of

2   proof and "efforts at clarification result in further obfuscation of the concept").

3   Second, requiring the defense to show that there is a real possibility that

4   circumstances do not exist unconstitutionally shifts the burden of proof. *See United*

5   *States v. Walton*, 207 F.3d 694, 705 (4th Cir. 2000) (King, J., dissenting) (discussing

6   criticism of such instructions and citing *United States v. Porter*, 821 F.2d 968, 973

7   (4th Cir. 1987), and Lawrence M. Solan, *Refocusing the Burden of Proof in*

8   *Criminal Cases: Some Doubt About Reasonable Doubt*, 78 Tex. L. Rev. 105

9   (1999)).

10      This Court cannot affirm this lesser standard. The "reasonable doubt"

11  standard is essential to ensure the community's faith in fair criminal prosecutions.

12  *See In re Winship*, 397 U.S. 358, 364 (1970). "[T]he moral force of the criminal law

13  [must] not be diluted by a standard of proof that leaves people in doubt [of] whether

14  innocent men are being condemned." *Id*. A lesser standard of proof, such as "firmly

15  convinced," violates a defendant's rights to due process. *See id*. The lower court did

16  not need to define "reasonable doubt" in the jury instructions, as "[a]ttempts to

17  explain the term 'reasonable doubt' do not usually result in making it any clearer to

18  the minds of the jury." *Holland v. United States*, 348 U.S. 121, 140 (1954) (citation

19  omitted).

20      This instruction lowered the burden of proof and violated Lehr's Sixth and

21  Fourteenth Amendment rights to a jury trial and due process. His sentences must be

22  vacated.

23      **F.     The jury should have been required to make special findings on**
24              **the proposed mitigating circumstances.**

25      Lehr argued on direct appeal that "[t]he failure to provide the jury with a

26  special verdict on Appellant's proffered mitigation deprived him of his rights to not

27  be subject to ex post facto legislation and right to meaningful appellate review."

28  (DA2 82 at 82; *see also Lehr III*, 254 P.3d at 395.) Lehr argues in Claim 27 that this

failure violated his right to meaningful appellate review. But this failure also violated his due process and Eighth Amendment rights at sentencing.

In non-capital cases, Arizona law requires the trier of fact to state the mitigating and aggravating factors it considered when imposing a sentence outside the presumptive term. *See* A.R.S. § 13–702; *see also State v. Harrison*, 985 P.2d 486, 489 (Ariz. 1999) ("We believe § 13–702 requires the judge to tell the victim, the defendant, the appellate court, and the public what he or she considered as aggravation and mitigation and why he or she imposed an aggravated or mitigated sentence."). It is even more important in a capital case that "the victim, the defendant, the appellate court, and the public" hear why the jury chooses life or death. *Harrison*, 985 P.2d at 489.

In addition to informing the parties and public of what motivated the sentence, making specific findings on each factor ensures that the jury meaningfully considers each and every proposed mitigation factor. It ensures that none of the factors are overlooked or ignored. And it forces jurors to reckon with their reasoning, potentially preventing jurors from making life-and-death decisions based on emotion alone. Indeed, writing out their findings on each specific factor may have influenced how the jurors thought about them and may have caused the jury to reach a different result. *See*, *e.g.*, Kenneth F. Ripple, *Legal Writing in the New Millennium: Lessons from a Special Teacher and a Special 'Classroom,'* 74 NOTRE DAME L. REV. 925, 926 (1999) (explaining the concept of jurists deciding on an opinion, and then changing the opinion while writing it down because it "just won't write.")

Here, the jury employed no such special verdict form and simply returned verdicts of death. (ROA 966; ROA 967.) Because these verdicts lacked any indication which mitigating factors each juror found, the trial court's failure to require special verdict forms—and the fact that one is not statutorily required— violated Lehr's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments

of the United States Constitution. His sentences should therefore be vacated.

## CLAIM TWENTY-TWO

**Trial counsel's ineffective assistance for Lehr's 1997 sentencing deprived him of his right to counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Counsel's performance in preparing and presenting the sentencing hearing in Lehr's 1997 trial fell below the performance of a reasonably competent attorney and undermined confidence in his sentencing proceedings. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel failed to conduct a reasonable mitigation investigation, and therefore presented a constitutionally deficient mitigation case. The acts and omissions of counsel prejudiced Lehr and denied him due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Strickland*, 446 U.S. 688. The fatalistic and uncooperative attitude of Lehr to his attorneys did not excuse their deficient performance in failing to investigate and present mitigation evidence to the jury. In addition, the cumulative effect of these failures undermines confidence in the accuracy and reliability of Lehr's death verdict and non-capital sentences.

Lehr raised this claim in his post-conviction petition. (PCR Pet. at 15–24.) The post-conviction court denied the claim on the merits. (PCR Order at 8–29.) Lehr presented the issue again in his petition for review (PFR 3 at 29–30.) The Arizona Supreme Court denied review without comment in a one-page order. (PRF 29 at 1.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

### A.    Deficient Performance

Under *Strickland*, counsel is constitutionally ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Deficient performance occurs when counsel objectively performed unreasonably in comparison with prevailing professional norms. *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). To show prejudice, a petitioner does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694).

Following Lehr's capital trial in 1996 and the severed trial of the three hypnosis victims in 1997, all convictions were then consolidated for one sentencing proceeding that began in July 1997. Trial counsel Philip Seplow and Michael Reeves failed to assemble a qualified defense team and failed to conduct a reasonable investigation into Lehr's history, family and personal background, including his mental health and brain injury, in order to present compelling mitigating evidence during this sentencing hearing. Indeed, the Arizona Supreme Court in *Lehr I* recognized the mitigating factors presented by counsel were "weak." *Lehr I*, 38 P.3d at 1186. Reeves even conceded that "there is much more that could have been done to develop the mitigation in this case." (PCR Pet. Mot. to Am. Ex. A, Decl. of Reeves at ¶ 3(E), Apr. 20, 2016.) Because of counsel's deficient performance, the court never heard compelling mitigating evidence. This failure constitutes deficient performance and resulting prejudice under *Strickland*, 466 U.S. 668. *See Williams v. Taylor*, 529 U.S. 362, 396–398 (2000); *Wiggins v. Smith* 539 U.S. 510 (2003).

Lead counsel's failure to assemble and manage a functional defense team fell

1   below prevailing professional norms and resulted in an unreasonable mitigation
2   investigation. The court appointed Seplow in 1992 to serve as lead counsel for
3   Lehr's first trial. (PCR Pet. Ex. C at ¶ 2.) Seplow never requested nor did the court
4   appoint a mitigation specialist. (PCR Pet. Ex. C at ¶ 5.) The court denied Seplow's
5   January 1993 request for a second attorney. The 1989 ABA Guideline 2.1 made
6   clear that "two qualified trial attorneys should be assigned to represent the
7   defendant." (PCR Pet. Ex. C at ¶ 7; ROA 23.) Finally, the court appointed Michael
8   Reeves as second chair on January 26, 1995. (ROA 130; PCR Pet. Ex. D at ¶ 2.)

9   During the trial, Reeves mainly focused on DNA evidence. (PCR Pet. Ex. C
10  at ¶¶ 8–11; PCR Pet. Ex. D at ¶ 3.) Reeves was also simultaneously in trial for a
11  federal first degree murder and conspiracy case in federal court; he would appear
12  for trial in one case in the morning, and the second in the afternoon. (PCR Pet. Ex.
13  C at ¶ 12; PCR Pet. Ex. D at ¶ 5.) As a result, Reeves was unable to adequately
14  prepare for Lehr's trial and sentencing hearing. (PCR Pet. Ex. D at ¶ 6.) Reeves
15  absence from trial in effect limited Lehr's capital representation to one attorney;
16  trial counsel were ineffective for failing to ensure Lehr received two capital
17  attorneys. *See Murray v. Schriro*, 2008 WL 1701404, *31 (Apr. 10, 2008), *aff'd*,
18  745 F.3d 984 (9th Cir. 2014) ("Trial counsel cannot be said to be constitutionally
19  ineffective for deciding not to bring in co-counsel, unless there is some reason . . .
20  why the first lawyer is unable to provide adequate representation.") (citing
21  *Pitsonbarger v. Gramley*, 141 F.3d 728, 738 (7th Cir. 1998); *Allen v. Woodford*,
22  395 F.3d 979, 998 (9th Cir. 2005)). Seplow acknowledges counsel was "unable to
23  fully prepare and investigate all of the cases in this complex ten-victim matter."
24  (PCR Pet. Ex. C at ¶ 13.)

25  Neither Seplow nor Reeves conducted any mitigation investigation. (PCR
26  Pet. Ex. C at ¶ 15; PCR Pet. Ex. D at ¶ 9.) Reeves and Seplow were aware of the
27  use of mitigation specialists as early as 1994 but did not seek or obtain funding to
28  hire a mitigation specialist for Lehr's case. (PCR Pet. Ex. C at ¶ 6, 13; PCR Pet. Ex.

D at ¶ 7; PCR Pet. Mot. to Am. Ex. A, Decl. of Reeves at ¶ 3(F), Apr. 20, 2016.) The standard of care in Arizona and elsewhere recognized the critical importance of "adequate supporting services" in preparation for the penalty phase of a capital case, including "expert witnesses capable of testifying at trial and at other proceedings, personnel skilled in social work and related disciplines to provide assistance at pretrial hearings and at sentencings, and trained investigators to interview witnesses and to assemble demonstrative evidence." 1989 ABA Guideline 8.1 cmt. (quoting ABA Standards, Providing Defense Services, Standard 5-1.4 cmt.). Lehr's trial counsel failed to meet these basic requirements set forth by the ABA. In addition, federal law clearly establishes under *Strickland* that trial counsel has a duty to investigate mitigating evidence. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Because of trial counsel's failure to investigate or prepare mitigation evidence, they pursued no mitigation theme throughout the course of the trial. (PCR Pet. Mot. to Am. Ex. A, Decl. of Reeves at ¶¶ 3(H), 3(I), Apr. 20, 2016.) Lehr's first jury returned its guilty verdicts on November 25, 1996 (ROA 439–461), the second jury returned its guilty verdicts on May 16, 1997 (ROA 531–543) and the trial judge set the aggravation/mitigation hearing and sentencing for July 8, 1997 (ROA 549).

Trial counsel did not prepare for mitigation until after the guilt phase of the first trial. (PCR Pet. Mot. to Am. Ex. A, Decl. of Reeves at ¶¶ 3(H), 3(I), Apr. 20, 2016.) The court conducted aggravation/mitigation hearings on July 8, 1997 and July 18, 1997. This gave counsel just 53 days between the end of the second trial and the mitigation hearing to devote their full attention to preparing for sentencing.

During this short period of time, trial counsel failed to conduct a proper investigation by failing to gather relevant information from key mitigation witnesses to present at the aggravation/mitigation hearing. Because Seplow and Reeves did not retain an investigator or mitigation specialist to prepare for the

sentencing hearing, they needed to personally interview potential mitigation witnesses. *See* 1989 ABA Guideline 11.4.1(3)(B) (recognizing the importance of interviewing "witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death"). On June 23, 1997, Seplow and Reeves gave notice of witnesses and evidence anticipated to be used at mitigation, including: Renee Dishong, Lehr's ex-wife; Yvonne Lehr, his mother; Irene Dishong, his mother-in-law; Rhonda Rojko, his sister; and Dr. John Woods, a psychiatrist. (ROA 550.) Despite identifying these potential witnesses, trial counsel failed to present their testimony and thus deprived the sentencing judge from considering critical evidence relevant to Lehr's personal and family background. As Reeves admits "I do not remember a full history being developed of Scott's family as we would develop it today." (PCR Pet.'s Mot. to Am. Ex. A, Decl. of Reeves at ¶ 3E, Apr. 20, 2016.)

When preparing for the aggravation/mitigation hearing, Seplow and Reeves did hire Dr. John Woods, a psychiatrist, to "interview" Lehr. (Tr. July 8, 1997 (AM) at 26.) Because counsel had undertaken virtually no mitigation investigation, counsel could not have selected Dr. Woods on any informed basis, or provided any informed direction for the evaluation. *See Rompilla*, 545 U.S. at 387 n.7 (finding trial counsel ineffective in a case where they had engaged the services of three mental health experts, but failed to conduct the thorough investigation that is essential to reliable assessments and effective mitigation). Moreover, trial counsel failed to provide Dr. Woods with information he would need to withstand the State's cross-examination. For example, the prosecutor elicited testimony on cross that Dr. Woods did not review any school, financial, work, or counseling records as part of his evaluation. (Tr. July 8, 1997 (AM) at 41–42.) He admitted he had not reviewed any written family history and did not obtain any specific details

1  concerning Lehr's childhood. (Tr. July 8, 1997 (AM) at 42.)

2      Trial counsel also failed to investigate Lehr's mental health status, despite

3  concerning symptoms. Reeves admits "I was not sufficiently experienced at the

4  time I represented Mr. Lehr to recognize the fact he was suffering from severe

5  mental illness." (PCR Pet. Reply, Supp. Decl. of Reeves at ¶ 2, Oct. 31, 2016.) At

6  the time, Lehr was presenting with symptoms including a "deep seated fear of

7  authority" – which directly impacted the need for counsel to build a relationship of

8  trust with Lehr. (PCR Pet. Reply, Supp. Decl. of Reeves at ¶ 3, Oct. 31, 2016.)

9      Due to the lack of investigation and insufficient, rushed preparation, the

10  entire aggravation/mitigation hearing lasted approximately two hours. (ROA 556.)

11  Only two witnesses testified on Lehr's behalf. (ROA 555; Tr. Feb. 23, 2001 at 40–

12  44, 51–53.)

13      Dr. Woods, the defense's only expert witness, testified first. Trial counsel

14  failed to hire Dr. Woods until May 1997, after the first trial. (Tr. July 8, 1997 (AM)

15  at 26.) On June 17, 1997, Dr. Woods interviewed Lehr once, for approximately two-

16  and-a-half hours. (Tr. July 8, 1997 (AM) at 26, 27.) Dr. Woods had a brief one-hour

17  phone conversation with Lehr's ex-wife, Renee. (Tr. July 8, 1997 (AM) at 35.) Dr.

18  Woods did not interview Lehr's mother, sister, former co-workers, prior clients or

19  customers, or jail staff familiar with Lehr. (Tr. July 8, 1997 (AM) at 45.)

20      Dr. Woods administered one test, the MMPI-2. (Tr. July 8, 1997 (AM) at 27.)

21  Based on the MMPI-2 test results, Dr. Woods found "paranoid personality"

22  disorder. (Tr. July 8, 1997 (AM) at 27.) Dr. Woods then explained some of the

23  general symptoms of a paranoid disorder but provided no specific examples of how

24  such a condition manifested in Lehr. (Tr. July 8, 1997 (AM) at 28.) According to

25  Dr. Woods, a paranoid personality disorder may mean a "person has no trust…feels

26  and thinks that people are out to do harm to him, that people are conspiring against

27  him, that people are talking behind his back." (Tr. July 8, 1997 (AM) at 28.) "They

28  can have delusions which can be suspicious in nature." (Tr. July 8, 1997 (AM) at

28.) Dr. Woods did clarify that he did not believe Lehr to be a paranoid schizophrenic. (Tr. July 8, 1997 (AM) at 28.) People with a paranoid personality disorder may also isolate themselves and will "usually not form any kind of relationships." (Tr. July 8, 1997 (AM) at 30.) There will be an "ongoing suspiciousness that they are going to be harmed, hurt." (Tr. July 8, 1997 (AM) at 30.) By the time Dr. Woods found this result, it was too late for the trial lawyers to follow up and investigate further mental health mitigation that would have made a difference to the sentencing judge.

Dr. Woods further testified regarding some aspects of Lehr's life. "The information that I could get would indicate that his early life was very chaotic and that he did not form a healthy bond with either his mother or his father." (Tr. July 8, 1997 (AM) at 29.) There was no indication that Lehr had any surrogate adult that stepped in to help him form a healthy parental bond. (Tr. July 8, 1997 (AM) at 29.) Dr. Woods admitted, however, that the only collateral source he interviewed – Lehr's wife, Dishong – could not give detailed answers to questions pertaining to Lehr's upbringing and childhood. (Tr. July 8, 1997 (AM) at 42–43.)

According to Dr. Woods, Lehr would do well in a prison environment. (Tr. July 8, 1997 (AM) at 31–35; PCR Pet. Ex. C at ¶ 15; PCR Pet. Ex. D at ¶ 9.) He found no significant violent incidents. (Tr. July 8, 1997 (AM) at 31.)

Lehr's sister, Rhonda Rojko, testified as well. (Tr. July 8, 1997 (PM) at 4–15.) Lehr's sister testified that growing up they had "regular kids' fights" but get along well as adults and he has been a good brother. (Tr. July 8, 1997 (PM) at 7.) Lehr never knew his natural father growing up. (Tr. July 8, 1997 (PM) at 4.) Their mother was a single-mother who worked. (Tr. July 8, 1997 (PM) at 14.) There was a man that lived with them for a while growing up but he was not their stepfather. (Tr. July 8, 1997 (PM) at 10.) Rojko believes he was a bad influence. (Tr. July 8, 1997 (PM) at 14–15.) Over the summers, Lehr would visit Wisconsin and stay with their maternal grandfather, maternal aunt, and cousins. (Tr. July 8, 1997 (PM) at

1   11.) Rojko testified she was not aware of any abuse by their grandfather or mother.

2   (Tr. July 8, 1997 (PM) at 11.) She felt they were treated fairly and equally by their

3   mother. (Tr. July 8, 1997 (PM) at 12–13.)

4   Rojko testified that Lehr was a good father and "family-type person." She

5   saw him interact with his children, mostly while raising the two twin girls, which

6   he did by himself since they were two years old. (Tr. July 8, 1997 (PM) at 5.) "[H]e

7   did a great job. They loved him. He loved them. They were always together. His

8   life was for them." (Tr. July 8, 1997 (PM) at 5.) She also believed he was a good

9   husband to his ex-wife, Renee Dishong, but provided no examples for the court to

10   consider. (Tr. July 8, 1997 (PM) at 7.) He was a good son to their mother; he was

11   always present on holidays, even dressing up as the Santa Claus or the Easter

12   Bunny. (Tr. July 8, 1997 (PM) at 8.) Their mother would help Lehr financially and

13   also help baby-sit the kids. (Tr. July 8, 1997 (PM) at 11–12.)

14   Rojko shared that both she and her mother spent time with Lehr following

15   his arrest and pointed out that their mother, Yvonne Lehr, was present in the

16   courtroom. (Tr. July 8, 1997 (PM) at 5.) She also emphasized that Lehr's daughters

17   loved for their father: "it would just devastate those girls to have anything happen

18   to Scott." (Tr. July 8, 1997 (PM) at 6–7, 8.) Rojko added "it would be terrifying" if

19   the State were to execute her brother; "I love him, and I'd like to see him stay." (Tr.

20   July 8, 1997 (PM) at 8–9.) Rojko believes Lehr's execution would have the same

21   effect on her mother as well. (Tr. July 8, 1997 (PM) at 9.) She explained that "the

22   way I know him, I just can't believe [that he did these crimes]." (Tr. July 8, 1997

23   (PM) at 14.)

24   The only documentary evidence submitted was the raw data from Dr. Woods'

25   psychological testing (Trial Ex. 225) and the State's Victim Identification List.

26   (ROA 555.) Dr. Woods did not review any school records, financial records, school

27   records, counseling records, or family history documents. (Tr. July 8, 1997 (AM)

28   at 42.) None of these records were introduced into evidence. Failure to obtain

records, and present them as part of mitigation, constituted deficient performance. *See Robinson v. Schriro*, 595 F.3d 1086, 1108–09 (9th Cir. 2010) ("Certain forms of investigation are fundamental to preparing for virtually every capital sentencing proceeding. At the very least, counsel should obtain readily available documentary evidence such as school, employment, and medical records[.]" (citing *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001))).

The court heard oral argument on aggravation/mitigation on July 18, 1997. (Tr. July 18, 1997.) On July 28, 1997, counsel submitted the following list of revised mitigating factors to the court:

1. Defendant was a good father who provided for his family.

2. Defendant was a good son to his mother.

3. Defendant was a good husband (notwithstanding the allegations made by the State and the jury's convictions).

4. No prior criminal record

5. No prior accusations of violence of any kind.

6. Psychiatric testimony that the death penalty is not warranted.

7. Defendant has been a model prisoner while in the custody of the Maricopa County Sheriff's Office.

8. Defendant will not be a predator in prison and has not been a predator while in jail.

9. Lingering doubt as to the actual commission of the murders.

10. More victims will accumulate should Lehr be put to death: his mother, his sister, his wife, and his three daughters.

11. Only one family member out of all the victims requested that the Defendant receive the death penalty.

12. Not only did the Defendant not know his father, he never met his father.

13. The only male influence in the home that he had during his childhood

1    was not a good one as expressed by his sister when she testified.

2    (ROA 563.)[26] Merely submitting this list of mitigating factors is not the same as

3    presenting compelling evidence through witness testimony or documentary

4    evidence regarding Lehr's family background or personal history that provide proof

5    of the factors.

6         The trial court held the sentencing hearing on August 8, 1997 and prior to

7    sentencing heard testimony from the family members of the three murder victims

8    and Clayton read a letter from victim Jennifer Thompson. (Tr. Aug. 8, 1997 at 5–

9    11.) The court then entered the judgment and sentence for each of Lehr's

10   convictions. (ROA 565; Tr. Aug. 8, 1997 at 12–37.) Lehr received the maximum

11   sentences on each count. (ROA 565; Tr. Aug. 8, 1997 at 12–37.) The court

12   subsequently entered a special verdict on the capital counts. (ROA 567; Tr. Aug. 8,

13   1997 at 38–62.)

14        The court found Lehr had shown by a preponderance of the evidence some

15   of the non-statutory mitigating factors: "he was a good father to his children, a good

16   husband to his wife, a good son to his mother and had no prior record of criminal

17   behavior or accusations of violence of any kind." (ROA 567 at 15; Tr. Aug. 8, 1997

18   at 57–58.) The court also found he had been a "'model prisoner' while in custody."

19   (ROA 567 at 15; Tr. Aug. 8, 1997 at 58.) The court did not find, however, "that any

20   of the mitigating factors alone or taken together are sufficiently substantial to

21   outweigh the aggravating circumstances set forth or to call for leniency." (ROA 567

22   at 16; Tr. Aug. 8, 1997 at 59.) The court sentenced Lehr to death for the murders of

23   Cronin, Morales, and Christof. (ROA 567 at 18; Tr. Aug. 8, 1997 at 60–61.)

24

25   _____

26   [26] In a prior list of mitigating factors, counsel included: "During plea negotiations,
     there was no objection to the Defendant receiving a life (no parole) term." (ROA
27   448.) That factors was removed from the final list submitted to the court, however.
     (Cf. ROA 563 with. ROA 448.) The failure to argue this mitigating factor was also
28   ineffective assistance of counsel. (See Claim 12.)

### B.   Trial counsel still has a duty to investigate and present mitigation evidence despite an uncooperative client.

Lehr's uncooperative attitude and resistance to mitigation did not excuse trial counsel's duty to reasonably investigate mitigating evidence, including consultation with experts. *See Hamilton*, 583 F.3d at 1118 (citing ABA Standards for Criminal Justice 4-4.1 (2d ed.1980)) ("the duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's desires to plead guilty"); *Silva*, 279 F.3d at 839 ("Counsel's duty to investigate mitigating evidence is neither entirely removed nor substantially alleviated by his client's desire not to call particular witnesses to the stand."). Moreover, trial counsel also has a "concomitant duty to educate or dissuade the defendant about the consequences of his actions." *Id.* at 847.

When reflecting on Lehr's resistance to mitigation during the first trial, Reeves, 1997 trial counsel, concluded "I did not satisfy the requirements of competent representation of Scott Lehr when I allowed him to dictate the terms of the mitigation presentation…we erroneously acquiesced to his demands." (PCR Pet. Mot. to Am. Ex. A, Decl. of Reeves at ¶ 3(G), Apr. 20, 2016.) Moreover, Reeves "can say with reasonable certainty at this time that Scott Lehr's refusal to participate in mitigation in both the first and second trials was another sign of his mental illness." (PCR Pet. Reply, Supp. Decl. of Reeves at ¶ 3, Oct. 31, 2014.)

Trial counsel's failure to investigate, consult with experts, and to present relevant mitigating evidence, was unreasonable and not strategic, and in violation of Lehr's right to effective assistance of counsel. Federal law clearly establishes under *Strickland* that all capital defendants are entitled to a reasonably competent investigation, even if they are uncooperative, or difficult. Moreover, had trial counsel completed a proper investigation, including consultation with experts, they would have learned that Lehr's resistance was rooted in his own untreated, and undiagnosed mental illness at that time. A finding that Lehr did not cooperate with

1   trial counsel does not excuse counsel's failure to investigate mitigation, including

2   consultation with experts, or to find alternative sources of information in support of

3   mitigation. (*See* Claim 12, Section (E)(4).)

4   **C.   Prejudice**

5   Seplow and Reeves acted unreasonably and performed deficiently in failing

6   to conduct any mitigation investigation, to hire a mitigation specialist, to obtain the

7   necessary experts, or to present compelling mitigation. As a result of their failure to

8   investigate and prepare, defense counsel had no theory of mitigation. The fact that

9   trial counsel presented some evidence does not preclude a determination of

10   prejudice. *See Wiggins*, 539 U.S. at 524 (finding "counsel abandoned their

11   investigation of petitioner's background after having acquired only rudimentary

12   knowledge of his history from a narrow set of sources.") The scope of mitigation

13   that could have presented, but was not due to counsel's failure to investigation, is

14   outlined in detailed above. (*See* Claim 12.) Trial counsel's failure to present

15   mitigation therefore "undermine[s] confidence in the outcome" of the proceedings

16   when the sentencer is deprived of this type of evidence as a result of deficient

17   performance. *Strickland*, 466 U.S. at 694. There is a reasonable probability that trial

18   counsel's errors undermined confidence in the outcome of his trial. *See Brown*, 137

19   F.3d at 1157.

20   **D.   The post-conviction court's ruling was contrary to, and an**
21   **unreasonable application of clearly established law, and an**
22   **unreasonable determination of the facts.**

23   Post-conviction counsel properly raised an ineffective assistance of counsel

24   claim regarding Seplow and Reeves' deficient performance during the sentencing

25   phase of Lehr's 1997 trial. (PCR Pet. at 15–24.) Rather than address these valid

26   sentencing concerns on the merits, the post-conviction court merely found that "the

27   resentencing held in 2009 rendered other pre-2009 capital sentencing claims moot,

28   including any [ineffective assistance of counsel] claims as to the effectiveness of

1    then-trial counsel Seplow and Reeves." (PCR Order at 8.) Because the post-

2    conviction court did not issue a merits adjudication on this aspect of Lehr's

3    sentencing claim, 28 U.S.C. §2254(d) is inapplicable and the Court may consider

4    the merits of the claim de novo. To the extent the state court adjudicated the merits

5    of Lehr's federal claim, its denial of this claim was contrary to, or involved an

6    unreasonable application of, clearly established federal law as determined by the

7    Supreme Court, and was also based on unreasonable factual determinations in light

8    of the record. *See* 28 U.S.C. § 2254(d).

9        The post-conviction court's decision was contrary to clearly established

10   federal law because the ineffective assistance of counsel claims stemming from the

11   1997 sentencing were still relevant to the six non-capital offenses not remanded or

12   reconsidered during the 2009 penalty phase. In 2001, the United States Supreme

13   Court applied *Strickland* to a non-capital sentencing proceeding. *See Glover v.*

14   *United States*, 531 U.S. 198, 202–04 (2001). In March 2012, the Supreme Court

15   made clear: "there exists a right to counsel during sentencing in both

16   noncapital…and capital cases." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). The

17   Ninth Circuit held in February 2016 that "Given *Glover* and *Lafler*, the Supreme

18   Court has clearly established that *Strickland* governs claims for ineffective

19   assistance of counsel in noncapital sentencing proceedings." *Daire v. Lattimore*,

20   812 F.3d 766, 767 (9th Cir. 2016). The post-conviction court, in December 2016,

21   thus improperly denied Lehr's ineffective assistance of counsel claims relevant to

22   the non-capital sentencing by only considering his capital offenses and thus finding

23   the claim moot as to the other offenses. Moreover, the Rule 32 petition was the

24   proper vehicle for Lehr to raise his ineffective assistance of trial counsel claims. *See*

25   *State v. Spreitz*, 39 P.3d 525, 526 (Ariz. 2002) ("Rule 32 set forth the proper

26   procedure for resolving claims of ineffective assistance of counsel"); *State v. Duffy*,

27   No. 2 CA-CR 2018-0071, 2019 WL 5687443, *2 (Ariz. Ct. App. Nov. 1, 2019)

28   (stating that if a defendant "believes particular decisions, acts, or omissions of his

defense attorney at trial rendered his counsel ineffective, such a claim must be raised in a petition for post-conviction relief brought pursuant to Rule 32, Ariz. R. Crim. P.").

As the Supreme Court explained, "ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because 'any amount of [additional] jail time has Sixth Amendment significance.'" *Lafler*, 566 U.S. at 165 (citing *Glover*, 531 U.S. at 203). Here, counsel's deficient performance at the 1997 sentencing as outlined above prevented the court from hearing compelling mitigating evidence, which undermines confidence in Lehr's sentencing. *See Strickland*, 466 U.S. at 687. Lehr was prejudiced by counsel's failure to conduct any mitigation investigation and present relevant mitigating evidence to the sentencing judge.

The Arizona Supreme Court only remanded Lehr's convictions on Collins, Morales, and Christorf (*Lehr I*) and then remanded Cronin for resentencing pursuant to *Ring* (*Lehr II*). The non-capital convictions for Hancock, Ailshire, Thompson, Ross, Zingaro, and Gabriel, remain intact despite *Lehr I* or *Lehr II*. The 1997 sentencing court considered a range of sentences for these non-capital convictions, including sentencing enhancements. (ROA 558.) Absent any compelling mitigation, the court imposed maximum, consecutive sentences. (ROA 565; Tr. Aug. 8, 1997 at 12–37.)

In addition, had Reeves and Seplow presented evidence in mitigation, including evidence of Lehr's mental health, family background, and personal background, Judge Gerst might not have imposed death for the Cronin, Morales, an Christorf murders. If Lehr received a sentence less than death for the Cronin murder, there would have been no resentencing for that case occurring at the same time as the 2009 trial for the Morales and Christorf murders – the joinder of which rendered Lehr's 2009 trial fundamental unfair. (*See* Claim 2.)

Moreover, knowing Lehr faced life in prison based on these maximum

sentences from the first trial, the 2009 sentencing jury may have felt compelled to vote for death in order for some additional punishment be served for the three homicides and one sexual assault they considered. *See, e.g., Witherspoon v. Illinois*, 391 U.S. 510, 519 n.15 (1968) ("[O]ne of the most important functions any jury can perform…is to maintain a link between contemporary community values and the penal system . . . "). In *Caldwell v. Mississippi*, 472 U.S. 320, 341 (1985), the Court vacated the sentence of death finding Eighth Amendment error when "[t]he State sought to minimize the jury's sense of responsibility for determining the appropriateness of death." Here, it is the opposite, the State sought to *maximize* the jury's sense of responsibly for determining the appropriateness of death.

Because the post-conviction court's ruling—made without the benefit of a hearing—contravened clearly established federal law, it is no bar to de novo review and relief by this Court. Moreover, the court's determination, made without a hearing, and ignoring critical evidence in the record, resulted in an "unreasonable determination" of the facts, and therefore does not bar Lehr's claim for relief.

## CLAIM TWENTY-THREE

**Lehr's first appellate attorney's later employment with the Maricopa County Attorney's Office represented a conflict of interest, rising to the level of prosecutorial misconduct and requiring the disqualification of the Maricopa County Attorney's Office from his 2009 retrial.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Attorney Lisa Marie Martin, who represented Lehr on his first direct appeal arising out of his 1996/1997 trials, became employed by the Maricopa County Attorney's Office ("MCAO") after his appeal, and worked at that office throughout his retrial in 2009. Not only did this pose a conflict for the MCAO during Lehr's second trial, but it also prejudiced Lehr because, by refusing to speak to Lehr's new counsel, Martin denied his new counsel access to the information that she had

1    within her files, as well as her personal impressions and recollections of Lehr.

2        Lehr presented this claim in his post-conviction petition and in his petition

3    for review. (PCR Pet. at 52–53; PFR 3 at 46–47.) The post-conviction claim was

4    denied on the merits. (PCR Order at 38–40.) The state court concluded that the

5    MCAO was not conflicted, because a "Chinese wall" was in effect to keep Martin

6    separate from the members of the office prosecuting Lehr in 2009, and because Lehr

7    could not identify any materials to which Martin was privy that Lehr's counsel was

8    not. (PCR Order at 39–40.) Further, it noted that the claim was precluded because

9    it could have been raised on Lehr's second appeal. (PCR Order at 40.) The petition

10   for review was summarily denied by the Arizona Supreme Court. (PFR 29 at 1.)

11       The state court's rejection of this claim was contrary to, or involved an

12   unreasonable application of, clearly established federal law, as determined by the

13   Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

14   unreasonable determination of the facts in light of the evidence presented. *See id.*

15   § 2254(d)(2).

16       Under both American Bar Association standards and federal case law, "a

17   lawyer may not accept employment representing interests adverse to those of a prior

18   client." *United State v. Kitchin*, 592 F.2d 900, 904 (5th Cir. 1979) (citations

19   omitted); Model Rules of Prof'l Conduct R. 1.7 (Am. Bar. Ass'n 1983). The reason

20   for the rule is to maintain confidentiality of information. *Id.* Further, the appearance

21   of impropriety erodes public trust. *Kitchin*, 592 F.2d at 904 ("In addition, public

22   trust in the confidence with which an attorney receives potential evidence from a

23   client would soon disappear if the lawyer were permitted to establish the same

24   fiduciary relationship with an adverse party.") (citations omitted). Such a concern

25   is greatest in criminal, as opposed to civil, cases. *Id.*

26       Here, the conflict of interest and the appearance of impropriety arises from

27   Lehr's attorney during his first appeal, Lisa Marie Martin, accepting employment

28   at the MCAO shortly after completing her work on Lehr's first appeal. She

1    continued to work as a prosecutor in the MCAO for many years, including during

2    the pendency of Lehr's 2009 retrial, during the time of his subsequent direct appeal,

3    and during the time that Lehr filed and litigated his post-conviction petition.

4         Deputy County Attorney William Clayton appeared as counsel of record at

5    both of Lehr's trials. Nevertheless, Martin necessarily brought with her to the

6    MCAO    extensive    knowledge    of    Lehr    and    protected    attorney-client

7    communications, as well as all of the confidential information she had obtained

8    during the course of her representation of Lehr in his appeal from his first trials—

9    on some the same charges he faced in 2009. All of this knowledge was imputed to

10   the entire office of the MCAO. Martin had extensive knowledge of the 1996 and

11   1997 trials, the facts, the DNA and non-DNA evidence involved in each case, the

12   use of 404(b) evidence and what that entailed, and the unique understanding of all

13   aspects of the case against Lehr. Martin necessarily had privileged written and/or

14   direct conversations with Lehr about the many complex issues of his case. Martin

15   had gained particular knowledge about the case from her client.

16        The MCAO should have been disqualified from prosecuting Lehr due to this

17   conflict of interest. *United States v. Pereira*, 312 F. Supp. 3d 262, 275 (D.P.R. 2018)

18   ("The Court may disqualify an attorney to prevent a lawyer's presence from tainting

19   a trial, for perceived conflict of interest to protect the integrity of the judicial process

20   . . . or to maintain public confidence in the legal profession.") (internal quotations

21   omitted) (citations omitted). The conflict of interest and appearance of impropriety

22   arising from Martin's employment in the MCAO during Lehr's second trial should

23   have disqualified the office, even though Prosecutor Clayton claimed that he had

24   not discussed the case with Martin, putting in place a so-called "Chinese wall."

25   Despite those assurances, Martin—apparently because of her current employment

26   at MCAO—refused to cooperate with successor counsel representing Lehr in his

27   second trial.

28        Lehr was denied his rights to due process and a fair trial and the effective

1   assistance of counsel by Martin's employment with the MCAO during this second
2   trial. Cleary, one of Lehr's defense counsel in 2009, attempted to contact Martin
3   "concerning issues that might be relevant to either the defense of the case and/or
4   the mitigation phase." (*See* PCR Pet. at 52.) Martin refused to speak with Cleary.
5   (PCR Pet. at 52.) The ABA Guidelines require counsel in a capital case to cooperate
6   and assist successor counsel. *See* ABA Guideline 10.13 (2003). Martin's refusal to
7   communicate with or assist successor counsel denied Lehr the effective assistance
8   of counsel at his 2009 trial, compounding the conflict of interest and appearance of
9   impropriety engendered by her continued employment in the MCAO during the
10  second prosecution of her former client.

11       The state court's rejection of this claim was contrary to, or involved an
12  unreasonable application of, clearly established federal law, as determined by the
13  Supreme Court, *See* 28 U.S.C. § 2254(d)(1). It was further based on an unreasonable
14  determination of the facts in light of the evidence presented. *See id.* § 2254(d)(2).

15       The post-conviction court's conclusion there were was not evidence of
16  prejudice to Lehr because of the apparent maintenance of a "Chinese wall" ignores
17  the fact that the appearance of conflict, and the risk of impropriety, deprived Lehr
18  of due process even absent a showing of specific information being shared. A
19  violation of a defendant's Sixth Amendment rights exists if a defendant can
20  "establish that an actual conflict of interest adversely affected his lawyer's
21  performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). This test does not
22  require evidence that information wrongly changed hands, in this case from Martin
23  to Clayton. Only that an actual conflict exists—it did—and that it adversely affected
24  his lawyer's performance—which has also been established. Although the post-
25  conviction court recited this standard, it failed to apply it to the facts of Lehr's case.

26       What's more, its conclusion that the claim fails because Lehr did not identify
27  any information to which Martin was privy but to which his later lawyers did not
28  have access, (*see* PCR Order at 40), is patently unreasonable. Lehr could not know

1   the precise contours of the information Martin had gathered and maintained, either

2   in paper records or in her mind, because she refused to speak with Lehr's successor

3   counsel.

4       Because the post-conviction court's decision was contrary to, or involved an

5   unreasonable application of, clearly established federal law, and further was based

6   on an unreasonable determination of the facts, this court may address the merits of

7   Lehr's claim, and should conclude that Lehr's prior counsel's employment with the

8   MCAO created an actual conflict of interest that adversely affected his later

9   counsel's performance, and that he is therefore entitled to issuance of the writ.

10              **CLAIM TWENTY-FOUR**

11  **The trial court violated Lehr's right to present all mitigating**
12  **evidence to the sentencing jury in violation of the Fifth, Sixth,**
13  **Eighth, and Fourteenth Amendments.**

14      Lehr incorporates by specific reference all facts, allegations, and arguments

15  made elsewhere in this Petition.

16      The trial court erred by allowing Lehr to "waive" mitigation, thus preventing

17  the jury from considering all relevant mitigating evidence at his capital trial. First,

18  the trial court failed to conduct any colloquy with Lehr to ensure he understood the

19  consequences of waiving the presentation of mitigating evidence. Second, Lehr's

20  waiver of mitigation was in violation of his constitutional rights to due process and

21  a fair capital sentencing proceeding in violation of the Fifth, Sixth, Eighth, and

22  Fourteenth Amendments to the United States Constitution.

23      **A.    Exhaustion**

24      Lehr raised this claim in his post-conviction petition. (PCR Pet. at 25–26.)

25  The post-conviction court denied the claim on the merits. (PCR Order at 24.) Lehr

26  filed a petition for review (PFR 3), which the Arizona Supreme Court denied

27  without comment in a one-page order. (PFR 29 at 1.) The state court's rejection of

28  this claim was contrary to, or involved an unreasonable application of, clearly

1   established federal law, as determined by the Supreme Court. *See* 28 U.S.C. §

2   2254(d)(1). In addition, it constituted an unreasonable determination of the facts in

3   light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

4         To the extent this court finds that any part of this claim was not fully

5   exhausted in state court, Lehr can overcome any default of this claim by showing

6   cause and prejudice, including the denial of the ineffective assistance of appellate

7   and post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at

8   453; *Strickland*, 466 U.S. at 687–88; *see also Mapes*, 171 F.3d at 427; *Gray*, 800

9   F.2d at 646 (noting that if "appellate counsel failed to raise a significant and obvious

10  issue, the failure could be viewed as deficient performance").

11        Lehr will demonstrate through his filings and at an evidentiary hearing that

12  appellate and post-conviction counsel fell below the standards of minimally

13  competent capital attorneys and that those failures prejudiced him. Alternatively,

14  he alleges that any state procedural bar is not an adequate or independent state

15  procedural bar or that imposing a default would be a miscarriage of justice. To the

16  extent this claim has not been adjudicated by the Arizona state courts, the

17  limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's

18  review, and the Court may consider the merits of the claim de novo.

19        **B.    Factual Background.**

20        The trial court erred by allowing the penalty phase to proceed without the

21  presentation of relevant, and available, mitigating evidence. As outlined above, trial

22  counsel failed to investigate, develop a relationship of trust with Lehr, consult with

23  experts, and present available and known mitigating evidence. (*See* Claim 12.)

24  While Lehr made statements indicating he would "try to get the death penalty again"

25  and sought to "maximize the possibility that the jury will return that verdict" (Tr.

26  Apr. 13, 2009 at 7), trial counsel still had a duty to investigate and present

27  mitigation. Moreover, trial counsel's failure to investigate prevented the

28  presentation of crucial evidence regarding Lehr's mental health disorders and

414

1    traumatic brain injury from being presented to the court for consideration on the
2    critical question of whether to allow Lehr to "waive" the presentation of evidence
3    at the mitigation phase of his trial. (*See* Claim 14.) This crucial information was
4    also kept from Lehr himself, rendering any alleged waiver uninformed, and thus
5    invalid because Lehr did not know what mitigation he was waiving. (*See id.*)

6          The trial court had a number of conversations with Lehr regarding waiver,
7    but those exchanges mainly focused on Lehr's waiver of his presence. There does
8    not appear to be a specific "waiver of mitigation" colloquy conducted on the record.
9    (*See*, *e.g.*, Tr. Oct. 24, 2008; Tr. Oct. 31, 2008; Tr. Dec. 22, 2008; Tr. Feb. 23, 2009;
10   Tr. Mar. 18, 2009; Tr. Apr. 1, 2009; and Tr. Apr. 13, 2009.) Despite failing to elicit
11   a specific waiver of the presentation of all mitigating evidence, the trial court
12   permitted the penalty phase to proceed without the presentation of any meaningful
13   mitigation evidence, notwithstanding the existence of such evidence. The trial court
14   knew that counsel had failed to conduct a reasonable investigation to uncover
15   compelling mitigating evidence, but still allowed the penalty phase to proceed
16   without it. (*See* Claim 12, Section (C)(4).)

17         **C.    The trial court failed to secure a mitigation waiver.**

18         The trial court failed to secure a specific waiver of the presentation of
19   mitigating evidence from Lehr. While the court discussed Lehr's waiver of his
20   presence at the hearing a number of times on the record, there does not appear to be
21   an express colloquy regarding the consequences of waiving mitigation evidence. A
22   capital defendant has a constitutional right to present a mitigation defense, and a
23   "defendant's waiver must be knowing, voluntary and intelligent." *Summerlin v.*
24   *Schriro*, 427 F.3d 623, 639 (9th Cir. 2005) (citing *Whitmore v. Arkansas*, 495 U.S.
25   149 (1990)). The *Summerlin* court explained that the waiver "must be an informed
26   decision" and that the court "must make the determination" to determine whether
27   the defendant "has capacity to appreciate his position and make a rational choice
28   with respect to continuing or abandoning further litigation or on the other hand

1   whether he is suffering from a mental disease, disorder, or defect which may
2   substantially affect his capacity in the premises." *Id.* (quoting *Rees v. Peyton*, 384
3   U.S. 312, 314 (1966)). Only when "all of these conditions have been met" have the
4   courts "sustained a criminal defendant's decision to limit a mitigation defense." *Id.*
5   (quoting *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993)).

6        While the trial court discussed the waiver of Lehr's presence, and the waiver
7   of his right to allocute, due process concerns require the trial court to specifically
8   discuss the waiver of mitigation through a detailed colloquy. Like in *Summerlin*,
9   "the record does not support the conclusion that [the defendant's] spontaneous
10  reaction constituted an unequivocal direction not to conduct any penalty phase
11  defense." *Id.* The fact that the trial court made a determination on the record that
12  Lehr's waiver of his presence was intelligent, knowing, and voluntary does not
13  alleviate the court of its duty to similarly determine whether Lehr's attempt to waive
14  mitigation was knowing and informed. The failure to secure a specific waiver of the
15  presentation of mitigation denied Lehr due process and a full and fair sentencing
16  determination under the Fifth, Eighth, and Fourteenth Amendments.

17      **D.    Allowing the waiver of mitigation violated Lehr's constitutional**
18           **rights.**

19      Should the Court determine that the trial court did secure a valid waiver of
20  the presentation of mitigating evidence from Lehr, the acceptance of such a waiver
21  violated Lehr's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

22          **1.    Eighth Amendment**

23      Under the Eighth and Fourteenth Amendments, death cannot be "wantonly
24  and . . . freakishly imposed." *Furman v. Georgia,* 408 U.S. 238, 310 (1972)
25  (Stewart, J., concurring). To avoid the random and disproportionate imposition of
26  the death penalty, capital sentencing schemes must include an individualized
27  determination of the appropriate sentence on the basis of the character of the
28  individual and circumstances of the crime. *Eddings v. Oklahoma,* 455 U.S. 104,

110–12 (1982); *Gregg v. Georgia,* 428 U.S.153, 188–95 (1976). Moreover, individualized sentencing through presentation to the jury of all relevant available mitigating evidence is a constitutional imperative. "[W]e believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment…requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a *constitutionally indispensable* part of the process of inflicting the penalty of death." *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976) (emphasis added).

But unless the jury is given the whole of the case, it cannot act as the conscience of the community. *Witherspoon v. Illinois,* 391 U.S. 510, 519 (1968). Under the Fifth, Sixth, Eighth, and Fourteenth Amendments the entire capital sentencing structure becomes constitutionally incoherent if "constitutionally indispensable" information can be suppressed at the whim of a damaged person.

Moreover, because "death is different" the Eighth Amendment demands a different barometer when it comes to permitting a defendant to prevent the jury from considering all relevant mitigating evidence. The finality of the death penalty renders it "qualitatively different from a sentence of imprisonment, however long." *Woodson*, 428 U.S. at 30. Because death is different, under the Eighth Amendment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id*.

The community's interest in the proper administration of the death penalty in the capital context under the Eighth Amendment also trumps a defendant's desire to waive the presentation of mitigation and in essence "volunteer" for the death penalty. When there is no mitigating evidence presented, the reviewing court is also denied information it needs to conduct proportionality review on direct appeal.

Additionally, unlike the Fifth or Sixth Amendments, which affirmatively confer rights upon citizens, the Eighth Amendment restricts the state's power to punish. A defendant may not, for example, voluntarily subject himself to an

unconstitutional punishment by waiving the limitations imposed by the Eighth Amendment. As the Pennsylvania Supreme Court explained:

> [W]hile a defendant may normally make an informed and voluntary waiver of rights personal to himself, his freedom to do so must give way where a substantial public policy is involved; in such a case an appeals court may feel fully warranted in seeking to reach an issue. . . . Because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach. . . .[T]he waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence.

*Commonwealth v. McKenna,* 383 A.2d 174, 181 (Pa. 1978) (internal citations omitted); *see also Henry v. State*, 280 S.E.2d 536 (S.C. 1981) (finding banishment as a punishment, even where the defendant agrees, is impermissible); *State v. Brown*, 326 S.E.2d 410, 412 (S.C. 1985) (finding castration as a condition of punishment, even where the defendant agrees, is impermissible.) To allow a defendant to choose his own sentence introduces unconscionable arbitrariness into the capital punishment system. *See Massie v. Sumner,* 624 F.2d 72, 74 (9th Cir. 1980). Indeed, "the waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue—the propriety of allowing the state to conduct an illegal execution of a citizen." *McKenna,* 383 A.2d at 181.

Permitting such waivers allows the defendant, not the justice system with its attendant procedural safeguards, to determine whom the state will execute. *See Lenhard v. Wolff*, 444 U.S. 807, 815 (Mem.) (1979) (Marshall, J., Brennan, J., dissenting) ("This Court's toleration of the death penalty has depended on its assumption that the penalty will be imposed only after a painstaking review of aggravating and mitigating factors. In this case, that assumption has proved demonstrably false. Instead, the Court has permitted the State's mechanism of execution to be triggered by an entirely arbitrary factor: the defendant's decision to acquiesce in his own death. In my view, the procedure the Court approves today amounts to nothing less than state-administered suicide."); *Grasso v. State,* 857

P.2d 802, 811 (Oka. Crim. App. 1993) (Chapel, J., concurring) ("The State must not become an unwitting partner in a defendant's suicide by placing the personal desires of the defendant above the societal interests in assuring that the death penalty is imposed in a rational, non-arbitrary fashion.").

Here, Lehr's underlying mental health issues drove his desire to "try to get the death penalty again," which resulted in him taking actions designed to "maximize the possibility that the jury will return that verdict." (Tr. Apr. 13, 2009 at 7.) (*See also* Claim 14 (discussing how Lehr's mental health and brain injury impacted his waivers).) The trial court erred by failing to conduct a colloquy on the record and making a determination regarding Lehr's attempt to knowingly, voluntarily, and intelligently waive the presentation of mitigating evidence. The trial court further failed to even inquire into Lehr's mental health status. Despite the proper determination, the trial court then improperly permitted the penalty phase to continue with the presentation of all compelling mitigation. As outlined above, the failure to present available, known, compelling mitigating evidence to the jury deprived Lehr of his Eighth Amendment rights. As a violation of the Eighth Amendment, the State cannot prove that it was harmless beyond a reasonable doubt, as required by *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705 (1967).

## 2.    Sixth Amendment

Under the Sixth Amendment, the trial court's acceptance of Lehr's desires to prevent the presentation of compelling mitigating evidence without obtaining an informed and knowing waiver violated the Sixth Amendment right to effective assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984).

*Cronic* error can occur when circumstances other than the deficient performance of counsel arise that make "the adversary process itself presumptively unreliable" – circumstances that prevent counsel from "subject[ing] the prosecution's case to meaningful adversarial testing…." *Id*. at 659. In such a situation, prejudice is presumed because "'the likelihood that any lawyer, even a

fully competent one, could provide effective assistance' is remote." *State v. Tunstall*, 432 S.E.2d 331, 336 (1993) (quoting *Cronic*, 466 U.S. at 659–60; *United States v. Ragin*, 2016 U.S. App. LEXIS 4556, *16 (4th Cir. Mar. 11, 2016)). Such circumstances can include a trial court's ruling that prevents a "fully competent" attorney from "subject[ing] the prosecution's case to meaningful adversarial testing." For example, in *State v. Rogers*, 529 S.E.2d 671 (2000), the court relied on the *Cronic* presumption of prejudice in reversing a conviction for first-degree murder in a capital case where the trial court's denial of defense counsel's motion to continue made it highly unlikely that new defense counsel could have adequately prepared for a complex capital trial.

The trial court's acceptance of Lehr's "waiver" of mitigation, which allowed Lehr's capital trial to proceed without introducing any compelling mitigating evidence, was presumptively prejudicial *Cronic* error because it prevented defense counsel from subjecting the State's case to meaningful adversarial testing. Moreover, the trial court's failure to grant a continuance to allow trial counsel the opportunity to investigate a letter containing "classic mitigation" forced counsel's ineffectiveness by requiring disclosure of the letter prior to allowing defense counsel the ability to fully investigate, obtain and consult with experts, and determine the relevance and strategy for presenting the information contained in the letter. (*See* Claim 12, Section (C)(4)(b).) As a Sixth Amendment error under *Cronic*, this error is automatically reversible and requires a new capital sentencing hearing because it was presumptively prejudicial. *See Cronic*, 466 U.S. at 658; *Rogers*, 529 S.E.2d at 676.

### 3.    Fifth and Fourteenth Amendments

The trial judge erred in allowing Lehr to "waive" his right to present mitigation evidence at the penalty phase in violation of Lehr's due process rights under the Fifth and Fourteenth Amendments. Denial of due process in a criminal trial "is the failure to observe that fundamental fairness essential to the very concept

of justice." *Lisenba v. California*, 314 U.S. 219, 236 (1941). Due process is denied when "the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Id.* The trial court's decision to allow the penalty phase to proceed, well aware of the trial attorney's failure to conduct an adequate mitigation investigation, and knowing counsel were failing to present available, relevant, and compelling mitigating evidence, was a due process violation which denied Lehr a full and fair sentencing determination.

Pursuant to the Fourteenth Amendment, capital juries cannot be precluded from considering any mitigating factors, including the defendant's character and circumstances of the offense. *See*, *e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Penry v. Lynaugh*, 492 U.S. 302, 317–18 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982). And while states may "shape and structure the jury's consideration of mitigation," they are constitutionally prohibited from inhibiting "the jury from giving effect to *any relevant* mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) (emphasis added). The Supreme Court has, repeatedly and for decades, emphasized the constitutional importance of capital sentencing juries getting access to and giving effect to *all* mitigating evidence. *See Lockett*, 438 U.S. at 604; *Penry*, 492 U.S. at 317–18; *Eddings*, 455 U.S. at 113–14.

By allowing Lehr to restrict what evidence was presented at mitigation, the trial court improperly deprived the jury of mitigating evidence that must be considered. The fact that Lehr's sentencing jury heard no compelling mitigating evidence based on the trial court's impermissible acceptance of an invalid "waiver" of mitigation rendered Lehr's penalty phase fundamentally unfair in violation of his due process rights under the Fifth and Fourteenth Amendments.

### 4.   Conclusions

The mitigating evidence that counsel could have presented had the trial court not allowed Lehr to waive mitigation is outlined in full in Claim 12. Considering this mitigating evidence together may well have led one or more jurors to see Lehr

in a different, more complex light. The jury could have seen him not just as a defendant whom they had just convicted of terrible crimes, but also as a person who nevertheless had the capacity to care about others and to help others, and a person who was simultaneously loved and cared for by his family. The jury could have also considered the evidence related to Lehr's mental health and cognitive functioning, which may have impacted its decision on whether a person with these deficits is deserving of the death penalty. In short, this evidence could have evoked enough of a feeling of mercy to lead at least one juror to decide to spare his life by voting for a sentence of life imprisonment instead of a sentence of death.

In sum, the trial court's decision, allowing trial counsel to abide by Lehr's desire not to introduce available and compelling mitigating evidence, violated the Fifth, Sixth, Eighth, and Fourteenth Amendments, by preventing the jury from making a reliable and non-arbitrary capital sentencing decision based on the weighing of aggravating and mitigating circumstances. The trial court's order also violated the Sixth Amendment under *Cronic* and Lehr's due process rights under the Fifth and Fourteenth Amendments. Accordingly, Lehr is entitled to relief.

### E.    The post-conviction court's denial of this claim was contrary to clearly established federal law and an unreasonable determination of the facts.

The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

#### 1.    The state court's determination on the trial court's failure to conduct a specific waiver of mitigation colloquy is contrary to clearly established law and an unreasonable determination of facts.

The post-conviction court ruled that the waiver of mitigation "issue could

have been raised on appeal but was not and therefore has been waived pursuant to Rule 32.2(a)(3)." (PCR Order at 25.) The court then proceeded to reject the claim on the merits. The post-conviction court reasoned that "the trial court and Defendant engaged in a colloquy related to his allocution in which the Court identified possible allocution topics (e.g., remorse …) and the likely effect of his failure to allocute – that is, the jury would be more likely to impose the death penalty. Defendant not only understood, but this was the objective he was seeking." (PCR Order at 25–26.) However, the fact that the trial court asked Lehr if he understood the consequences of waiving allocution has nothing to do with whether the trial court fulfilled its obligation to make a determination regarding Lehr's waiver of mitigation.

Federal law clearly establishes that a specific colloquy must be conducted to allow a capital defendant to waive the presentation of mitigation. "[A] court must make the determination." *Summerlin*, 427 F.3d at 639. The "decision must be made 'in the present posture of things,' that is, a determination of capacity at the time of the decision to forego legal proceedings." *Id.* (internal citation to *Rees*, 384 U.S. at 314). The post-conviction court cites no state court record supporting its conclusion that a specific colloquy was conducted regarding the waiver of the presentation of mitigation. Instead, the post-conviction court points only to Lehr's waiver of allocution on the record. The waiver of one constitutional right does not negate the constitutional requirement that the court make a specific determination on the record that the defendant also knowingly and intelligently waives the presentation of all mitigating evidence. The trial court must make a specific determination regarding a defendant's waiver of mitigation. As such, the post-conviction court's decision is contrary to, and an unreasonable application of, clearly established federal law.

Additionally, the post-conviction court concluded that Lehr "was competent" to waive mitigation. (PCR Order at 29.) First, competency to stand trial and the ability to make an informed, knowing, willing, and voluntary waiver of a

constitutional right are not the same thing, (*see* Claim 14, Section 14(E)(2)(b)). The state court's conflation of these standards is contrary to, and an unreasonable application of, clearly established law. Moreover, the post-conviction court improperly limited its analysis to whether Lehr was competent, but failed to consider whether Lehr's alleged waiver of mitigation was also an informed decision. *See Summerlin*, 427 F.3d at 639. (*See also* Claim 14, Section (C)(4) (arguing Lehr's waivers were not informed, and thus invalid).) As such, the post-conviction court's decision on the waiver of mitigation is contrary to, and an unreasonable application of, clearly established federal law.

### 2. Permitting the waiver of the presentation of all mitigation violated Lehr's constitutional rights.

In regard to the due process violation, the post-conviction court found that Lehr "must show that principles of fundamental fairness were violated, which had the effect of denying him a fair trial." (PCR Order at 24.) The court cited to the following cases:

> *State v. Youngblood*, 173 Ariz. 502, 507–08, 844 P.2d 1152, 1157–58 (1993) ("The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness," citing *State v. Melendez*, 172 Ariz. 68, 71, 834 P.2d 154, 157 (1992); *Chavez v. Dickson*, 280 F.2d 727, 735 (9th Cir. 1960) ("It is only where criminal trials in state courts are conducted in such a manner as amounts to a disregard of that fundamental fairness essential to the very concept of justice that due process is offended and that federal court interference is warranted," citing *Lisenba v. People of State of California*, 314 U.S. 219, 236, 62 S.Ct. 280 (1941)).

(PCR Order at 24.) After listing these cases, the post-conviction court opined that the due process claim "lacks merit because [Lehr] himself had no interest in presenting mitigation evidence to the jury, as previously discussed." (PCR Order at 24.) The post-conviction court previously discussed Lehr's lack of interest in presenting mitigating evidence when evaluating prejudice for Lehr's ineffective assistance of counsel during the penalty phase claim under the *Strickland* standard. (*See* PCR Order at 23.) Despite citing to *Youngblood* and articulating the need to

determine whether due process has been violated based on a "disregard of that fundamental fairness," the post-conviction court failed to conduct any due process analysis pursuant to clearly established federal law.

Merely stating that Lehr had no interest in presenting mitigating evidence does not answer the legal question of whether the trial court violated Lehr's due process rights by improperly allowing him to waive that right. As outlined fully above, the trial court's acceptance of Lehr's "waiver" of mitigation, in order to receive the death penalty, rendered his trial fundamentally unfair, and thus violated his constitutional his right to due process. The court's decision summarily denying this claim on the basis of Lehr's lack of interest in mitigation is contrary to, and an unreasonable application of, clearly established federal law, and is an unreasonable determination of the facts. Thus the state court's decision is unworthy of AEDPA deference. *See*, *e.g.*, *Milke v. Ryan*, 711 F.3d 998, 1006–07 (9th Cir. 2013) (a state court acts contrary to clearly established federal law when it asks the wrong questions and ignores the inquiry required by Supreme Court precedent).

## CLAIM TWENTY-FIVE

**The trial court violated Lehr's right to present all mitigating factors to the sentencing jury in violation of the Fifth, Eighth and Fourteenth Amendments.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The trial court violated Lehr's right to present mitigating evidence to the sentencing jury when it prevented the introduction of testimony from Tracie Hancock-Street Lujan ("Hancock") stating that she opposed the imposition of the death penalty. The convictions of the crimes involving Hancock were used to support the (F)(2) aggravators and her prior testimony regarding her offense was introduced as Rule 404 evidence. The exclusion of relevant mitigating evidence and aggravation rebuttal evidence was prejudicial error as it cannot be said this evidence

1    would have had no effect on the jury's assessment of whether Lehr should live or

2    die. Such exclusion violated Lehr's rights under the Fifth, Eighth, and Fourteenth

3    Amendments

4         Lehr raised this claim in his second direct appeal. (DA2 82 at 73–75.) The

5    Arizona Supreme Court denied the claim on the merits. *Lehr III*, 254 P.3d at 393–

6    94. The state court's rejection of this claim was contrary to, or involved an

7    unreasonable application of, clearly established federal law, as determined by the

8    Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

9    unreasonable determination of the facts in light of the evidence presented. *See* 28

10   U.S.C. § 2254(d)(2).

11        **A.    Right to present mitigation.**

12        Prior to the aggravation phase, trial counsel for Lehr advised the court that

13   they intended to call Hancock as a witness to testify to the fact she had refused to

14   testify in the guilt phase of the trial because she did not want to play any part in

15   assisting the state in securing a death sentence for Lehr. (Tr. Mar. 27, 2009 at 59–

16   67.) Defense counsel then attempted to locate and contact Hancock attorney without

17   success. (Tr. Apr. 13, 2009 at 116.) Near the close of defense evidence during the

18   penalty phase, trial counsel notified the court that he had spoken to counsel for

19   Hancock and she would not appear voluntarily to testify so he intended on reading

20   to the jury Hancock's testimony from the hearing held where the court declared her

21   unavailable. (Tr. Apr. 14, 2009 at 97.)

22        The trial court precluded Lehr from offering Hancock's testimony. (Tr. Apr.

23   14, 2009 at 99–107.) The trial court's ruling was erroneous for several reasons. The

24   Eighth Amendment requires individualized sentencing of capital defendants.

25   *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 4428 U.S. 280

26   (1976). Death is a "qualitatively different" punishment that demands this

27   individualized sentencing. *Woodson*, 428 U.S. at 304. Thus, where the state seeks

28   to take a life as punishment for a crime, an individualized sentencing decision is

1 essential. *Lockett*, 438 U.S. at 605. As such, A.R.S. § 13-751(C) grants a defendant
2 the right to "present any information that is relevant to any [ ] mitigating
3 circumstances" "regardless of its admissibility under the rules of evidence in
4 criminal trials."

5 In this case, Lehr's convictions for crimes committed against Hancock were
6 used in support of the (F)(2) aggravators. Her testimony, therefore was properly
7 admissible as relevant to rebut the existence of those aggravators and relevant to
8 the jury's assessment of the quality of the evidence supporting those aggravators.

9 Additionally, the trial court's ruling in this case also violated Lehr's rights
10 under the Eighth Amendment which mandates individualized sentencing
11 determinations based upon *all* of the available mitigating evidence. *Stringer v.*
12 *Black*, 503 U.S. 222, 230 (1992). The jury must be allowed to consider both the
13 character and record of the defendant and the circumstances of the particular
14 offense. *Woodson*, 428 U.S. at 304. The scope of permissible evidence involves
15 "potentially infinite mitigators" which involve any relevant evidence that may
16 inspire empathy, compassion or mercy. *Ayers v. Belmontes,* 549 U.S. 7 (2006). In
17 *Ayers* the Court reiterated that preventing a jury's consideration of such evidence
18 violates the Eighth Amendment. *See also Abdul-Kabir v. Quarterman,* 550 U.S. 233
19 (2007); *Skipper* v. *South Carolina*, 476 U.S. 1 (1986). The preclusion of this
20 relevant mitigating evidence and aggravation rebuttal evidence was prejudicial
21 error as it cannot be said beyond a reasonable doubt that its absence had no effect
22 on the jury's assessment of whether Lehr should live or die.

23 The United States Supreme Court has repeatedly affirmed the constitutional
24 imperative that states may not preclude the factfinder in a capital case from
25 "consider[ing], *as a matter of law*, any relevant mitigating evidence" a defendant
26 offers. *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982); *Penry v. Lynaugh*, 492 U.S.
27 302, 317 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304
28 (2002); *Lockett*, 438 U.S. 586. These cases "firmly established that sentencing

1  juries must be able to give meaningful consideration and effect to all mitigating
2  evidence that might provide a basis for refusing to impose the death penalty on a
3  particular individual." *Abdul-Kabir*, 550 U.S. at 24; *see also McKoy v. North*
4  *Carolina*, 494 U.S. 433, 442 (1990) ("The Constitution requires States to allow
5  consideration of mitigating evidence in capital cases. Any barrier to such
6  consideration must therefore fall."); *McCleskey v. Kemp*, 481 U.S. 279, at 306
7  (1987) ("States cannot limit the sentencer's consideration of any relevant
8  circumstance that could cause it to decline to impose the penalty. In this respect, the
9  State cannot channel the sentencer's discretion[.]").

10  The testimony of Hancock was relevant mitigating evidence and relevant to
11  rebut the State's Rule 404 evidence and the reliance on her conviction as an (F)(2)
12  aggravator. The exclusion of this relevant mitigating evidence violated the Eighth
13  Amendment. *See Abdul-Kabir*, 550 U.S. at 246. Taken individually and together
14  with the other errors discussed throughout this petition, entitles Lehr to relief.

15  **B.    The Arizona Supreme Court's rejection of this claim on direct**
16  **appeal was contrary to clearly established federal law and**
   **unreasonable.**

17  This claim was raised on direct appeal. (DA2 82 at 73–75.) The state court's
18  rejection of this claim was contrary to, or involved an unreasonable application of,
19  clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C.
20  § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts
21  in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

22  The Arizona Supreme Court found the trial court "did not err" on the basis
23  of *State v. Glassel,* 116 P.3d 1193, 1215 (2005), which held that "a victim's
24  recommendation of what sentence should be imposed in a capital case, whether for
25  or against the death penalty, is simply not relevant." *Lehr III*, 254 P.3d at 394. Based
26  on this case, the Arizona Supreme Court rejected "Lehr's argument that although
27  sentencing recommendations by victims of the capital offense are not admissible,
28  such testimony should be allowed from victims of non-capital offenses who oppose

the death penalty." The Arizona Supreme Court further reasoned that "Such testimony is not relevant for purposes of either A.R.S. § 13–751(C) (allowing defendant to "present any information that is relevant to any [ ] mitigating circumstances") or the Eighth Amendment." *Id.* (citing *Glassel,* 116 P.3d at 1215).

The Arizona Supreme Court's decision is contrary to clearly established federal law that mandates that the jury must be permitted to consider all relevant mitigating evidence. *See Stringer*, 503 U.S. at 230; *Eddings*, 455 U.S. at 114; *Lockett*, 438 U.S. 586; *Woodson*, 428 U.S. at 304. In addition, the Arizona Supreme Court's decision is an unreasonable determination of facts based on the trial court record, which details Hancock's testimony as a Rule 404 witness and the use of convictions based on the facts of her offense as (F)(2) aggravators. *See State v. Stauffer*, 58 P.3d 33 (Ariz. 2002) (distinguishing between the testimony of a 404(b) and (c) witness and a victim).) Moreover, the Arizona Supreme Court's opinion is devoid of any mention of the body of federal case law that required admission of Hancock's testimony. The court did not merely unreasonably apply clearly established federal law; it wholesale ignored it. *See, e.g.*, *Milke v. Ryan*, 711 F.3d 998, 1006–07 (9th Cir. 2013) (a state court acts contrary to clearly established federal law when it asks the wrong questions and ignores the inquiry required by Supreme Court precedent.).

The Arizona Supreme Court's contrary ruling represents an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). The court's determination also resulted in an "unreasonable determination" of the facts, and therefore does not bar this court's consideration of Lehr's claim for habeas relief on the merits. *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1001, 1008.

## CLAIM TWENTY-SIX

**Lehr's Sixth Amendment right to confront witnesses against him was violated by the trial court's ruling that Tracie Hancock-Street Lujan was unavailable and permitting her prior testimony to be read into the record.**

1   Lehr incorporates by specific reference all facts, allegations, and arguments

2   made elsewhere in this Petition.

3   Lehr's right to confront adverse witnesses against him was violated when the

4   trial court ruled that witness Tracie Hancock-Street Lujan ("Hancock"), a woman

5   whom Lehr had been convicted of sexually assaulting, was unavailable to testify as

6   a Rule 404 evidence witness. The trial court ruled that Hancock was unavailable

7   due to her religious objections to the death penalty, and thus permitted the State to

8   read her prior testimony from the 1997 trial into the record. The trial court's ruling

9   thereby deprived Lehr of his Sixth Amendment right to confront Hancock during

10   his capital trial. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)

11   Lehr raised this claim in his direct appeal. (DA2 82 at 49.) The Arizona

12   Supreme Court denied this claim on the merits. *Lehr III*, 254 P.3d at 388. The

13   Arizona Supreme Court concluded that Lehr had an opportunity to cross-examine

14   Hancock at the prior trial and that her refusal to testify made her unavailable. *Id*.

15   The Arizona Supreme Court's rejection of this claim was contrary to, or involved

16   an unreasonable application of, clearly established federal law, as determined by

17   the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

18   unreasonable determination of the facts in light of the evidence presented. *See* 28

19   U.S.C. § 2254(d)(2).

20   ## A.   Factual Background

21   Prior to trial, the State notified the court that it would be seeking to have the

22   court declare several witnesses "unavailable" under Arizona Rules of Criminal

23   Procedure Rule 19.3(c), so that it could read in their prior testimony. (Tr. Jan. 5,

24   2009 at 60–71; ROA 759; ROA 798; ROA 820.) The State had subpoenaed

25   Hancock, one of the victims of sexual assault, to appear to testify as a Rule 404

26   witness. After being subpoenaed for trial, Hancock, through counsel, moved to

27   quash the subpoena based upon the First Amendment and A.R.S. § 41-1493. (ROA

28   821.) The State argued that Hancock, being presented as a 404 witness, did not want

1   to testify in Lehr's capital trial regarding her sexual assault because of her anti-
2   death penalty views, which she asserted were rooted in her deeply-held religious
3   beliefs. (Tr. Jan. 5, 2009 at 60–68.) Hancock had testified against Lehr in a prior
4   trial in 1997, which had been severed from the 1996 trial that included the capital
5   charges.

6        The trial court held an evidentiary hearing at which Hancock testified that
7   she had long been against the death penalty. (Tr. Jan. 26, 2009 at 15–23.) She further
8   testified that she had advised the prosecutor prior to the 1997 trial that she would
9   not testify in a trial that could result in a death sentence. For this reason, she
10  requested that the prosecutor have her "testify separate from the other trials." (Tr.
11  Jan. 26, 2009 at 15–23.) She confirmed that her reasons for not wishing to testify
12  were "religious ethical." She was assured that her testimony in 1997 had "absolutely
13  nothing to do with seeking the death penalty." (Tr. Jan. 26, 2009 at 24–25.) Indeed,
14  Hancock did not testify in the previous capital trial, held in 1996, but in a separate
15  trial that had been severed because three of the witnesses had been subjected to
16  hypnosis: Hancock, Gabriel, and Thompson. Hancock was adamant that her prior
17  testimony not be used in this capital trial: "I don't want my other testimony read if
18  it's a death penalty case." (Tr. Jan. 26, 2009 at 28.) She told the court that she would
19  rather go to jail than be forced to testify in a case that could result in a sentence of
20  death. (Tr. Jan. 26, 2009 at 28–30.)

21       The trial court acknowledged that this was a "case of first impression" but
22  nonetheless ruled that Hancock was "unavailable" based upon her refusal to testify
23  on "First Amendment grounds" and permitted the state to read in her prior
24  testimony. (Tr. Jan. 26, 2009 at 42–44.) The State later read her entire testimony to
25  the 2009 jury—the same testimony that the prosecutor in 1997 promised would
26  have "absolutely nothing to do with seeking the death penalty." (Tr. Jan. 26, 2009
27  at 24–25; Tr. Feb. 11, 2009 at 190–252; Tr. Feb. 12, 2009 at 29–50.)

28

1
### B.    Right to Confrontation

2      The right of an accused to confront and cross-examine an adverse witness, as

3 guaranteed by the Sixth Amendment, has long been considered one of the most

4 important safeguards to a fair trial. Its purpose and scope have been summarized as

5 follows:

6      The primary object of the constitutional provision in question was to
       prevent depositions or ex parte affidavits, such as were sometimes
7      admitted in civil cases, being used against the prisoner in lieu of a
       personal examination and cross-examination of the witness in which
8      the accused has an opportunity, not only of testing the recollection and
       sifting the conscience of the witness, but of compelling him to stand
9      face to face with the jury in order that they may look at him, and judge
10     by his demeanor upon the stand and the manner in which he gives his
       testimony whether he is worthy of belief.
11

12 *Mattox v. United States*, 156 U.S. 237, 242–43 (1895).

13      The Confrontation Clause of the Sixth Amendment provides that "[i]n all

14 criminal prosecutions, the accused shall enjoy the right…to be confronted with the

15 witnesses against him." U.S. Const. amend. VI. "The rights to confront and cross-

16 examine witnesses…have long been recognized as essential to due process.

17 *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (citing *In re Oliver*, 333 U.S.

18 257, 273 (1948)).

19      The Sixth Amendment prohibits testimonial hearsay such as the

20 State's reading of Hancock's testimony from 1997. *See Davis v. Washington*, 547

21 U.S. 813, 823 (2006) (citing *Crawford v. Washington*, 541 U.S. 36, 51(2004)). The

22 Confrontation Clause prohibits the admission of such testimonial hearsay unless:

23 1) the declarant is unavailable; and 2) the defendant had a prior opportunity to cross-

24 examine the declarant. *Crawford*, 541 U.S. at 39. Both Rule 19.3(c) of the Arizona

25 Rules of Criminal Procedure and Rule 804(b)(1) of the Federal Rules of

26 Evidence require similar prerequisites before prior testimony may be presented

27 over a defendant's objections. The prosecution, as the proponent of the

28 evidence, bears the burden of establishing these prerequisites. *See Ohio v. Roberts*,

1    448 U.S. 56, 65 (1980). Furthermore, "[r]estrictions on a criminal defendant's

2    rights to confront adverse witnesses and to present evidence "may not be arbitrary

3    or disproportionate to the purposes they are designed to serve." *Michigan v. Lucas*,

4    500 U.S. 145, 151 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

5          Here, the primary issue was whether the State proved witness Hancock was

6    unavailable. However, the primary concern expressed by the trial court appeared to

7    be more that Hancock's refusal to testify "could adversely impact the State's case"

8    and that "the State's case could be slightly weaker" in the absence of her testimony.

9    (Tr. Jan. 26, 2009 at 30.) The concern under the Sixth Amendment is not the State's

10   ability to "make a good case," especially when such a concern is being balanced

11   against a criminal defendant's constitutional rights. "A state's legitimate interest

12   must be very substantial to trump the defendant's right to confront witnesses by

13   traditional means of cross-examination." *Vasquez v. Jones*, 496 F.3d 564 (6th Cir.

14   2007). Moreover, "nothing entitles a prosecutor to introduce any evidence he

15   wishes; the Constitution, by contrast, entitles the defendant to confront the

16   witnesses against him unless a well-recognized exception to the right of

17   confrontation applies. That there may be significant costs should not lead us to

18   ignore Sixth Amendment protections." *United States v. Shayota*, 934 F.3d 1049,

19   1056 (9th Cir. 2019) (O'Scannlain, J., concurring). As such, Lehr's constitutional

20   rights must be held paramount to the prosecution's ease in making its case. As in

21   *Williams*, the question is not whether the State offered enough evidence to support

22   the admission of Hancock's testimony being read by the State—rather the question

23   is one of Lehr's confrontation rights under the Sixth Amendment and whether

24   Hancock was "unavailable" based on her asserted First Amendment right. *Id.* at 75.

25         Lehr's Sixth Amendment right to confront Hancock on cross-examination,

26   rather than having the State merely read the witness testimony, should have been

27   held paramount to Hancock's asserted religious beliefs rendering her unavailable to

28   testify. *See Shayota*, 934 F.3d at 1053 ("history suggests that the scope of

433

1   unavailability may be narrower than our court has recognized"). Moreover, the trial

2   court did not engage in the proper analysis, as described above. By depriving Lehr

3   of the right to confront Hancock on the basis of her religious beliefs, the jury was

4   unable to properly weigh and consider her credibility as a Rule 404 witness. Such

5   a violation was not harmless as the State directly relied on Hancock as a Rule 404

6   witness to prove Lehr's modus operandi and identity for the Morales, Christorf, and

7   Collins' charges; limiting the prejudicial Rule 404 testimony would have greatly

8   weakened the State's case. (*See* Claim 1 (discussing prejudice from introducing

9   Rule 404 evidence.) Moreover, the facts of Hancock's assault supporting those

10  convictions were used to bring the (F)(2) aggravators against Lehr. By denying Lehr

11  his right to confront Hancock face-to-face, and in front of the capital jury, the

12  Arizona courts improperly violated his rights under the Confrontation Clause.

13      **C.    The state court's decision is contrary to clearly established law and**
14          **an unreasonable determination of the facts.**

15      In denying Lehr's claim, the Arizona Supreme Court explained that "Lehr

16  had an opportunity to cross examine [Hancock] at his first trial. The only

17  Confrontation Clause issue, therefore, is whether [Hancock] was unavailable to

18  testify." *Lehr III*, 254 P.3d at 388. The Arizona Supreme Court then curiously

19  concluded that a witness's refusal to testify renders them unavailable for

20  Confrontation Clause purposes. *Id.* (citing *Jennings v. Maynard*, 946 F.2d 1502,

21  1505 (10th Cir. 1991); *United States v. Bourjaily*, 781 F.2d 539, 543–44 (6th Cir.

22  1986) (holding that a witness was "unavailable because he refused to testify"); *cf.*

23  *United States v. Tirado–Tirado*, 563 F.3d 117, 123 n. 3 (5th Cir. 2009)). Without

24  any further analysis or reasoning, the Arizona Supreme Court concluded the "trial

25  court did not abuse its discretion or violate Lehr's rights under the Confrontation

26  Clause." *Id.*

27      The conclusion of the Arizona Supreme Court that the State had

28  demonstrated that Hancock was unavailable and that Lehr had a previous

opportunity to cross-examine her under oath was an unreasonable application of clearly established federal law. The state court relied on a case out of the Tenth Circuit, *Jennings*, 946 F.2d at 1504, that involved the assertion of Fifth Amendment privilege against self-incrimination as the basis for supporting the witness's refusal to testify. Similarly, the state court cited the Sixth Circuit's case *Bourjaily*, 781 F.2d at 543-44, which dealt with whether to admit the statements of a co-defendant who refused to testify. 781 F.2d at 543. Neither of these cases deal with the distinct factual issue of a witness's asserted First Amendment right as the basis for refusal to testify and thus deprive the defendant of his right to confront an adverse witness.

The Ninth Circuit has recently encouraged determining unavailability in light of the common law, explaining that "the scope of unavailability at common law appeared to be defined by circumstances outside the prosecution's control—the death of the witness, for example, or the prosecution's inability to procure his attendance due to jurisdictional limitations." *Shayota*, 934 F.3d at 1055. These scenarios were not present in Lehr's case and the state court unreasonable applied federal law to cover this unique factual situation where the witness was physically available but asserted her religious beliefs were paramount to the defendant's Sixth Amendment right to confrontation.

Accordingly, for this reason and others, the state court's decision involved an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). In addition, the finding that Hancock was unavailable as well as other factual findings constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

## CLAIM TWENTY-SEVEN

**Arizona's appellate review scheme violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

1   The appellate review applied to Lehr's capital sentence violated his rights

2 under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. First,

3 the Arizona capital-sentencing scheme denied Lehr, and other capital defendants,

4 the benefit of proportionality review. Second, because Lehr's offenses in this case

5 occurred prior to August 1, 2002, the Arizona Supreme Court conducted an

6 independent review of the aggravating and mitigating circumstances and the

7 propriety of the death sentences.[27] *See State v. Andriano,* 161 P.3d 540 (Ariz. 2007).

8 Due to the failure of the trial court to require the use of special verdict forms for

9 mitigation, however, this review is inadequate. Moreover, by not using special

10 verdict forms, Lehr was treated differently than non-capital defendants in Arizona,

11 further depriving him of meaningful independent review.

12  **A. Exhaustion**

13   Lehr raised these claims on direct appeal. (DA2 82 at 75–79, 80–85.) The

14 Arizona Supreme Court did not address the claims on the merits, but only presented

15 verbatim the issue in its appendix. *See Lehr III*, 254 P.3d at 395. Because these

16 claims have not been adjudicated on the merits by the Arizona state courts, the

17 limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's

18 review. If listing these claims in the appendix is considered to be a decision on the

19 merits, then the Arizona Supreme Court's rejection of these claims, was contrary

20 to, or involved an unreasonable application of, clearly established federal law, and

21 was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

22   To the extent the Court determine these claims were not properly presented

23 to the state courts, Lehr can demonstrate cause and prejudice to overcome any

24 default of this claim including because of the ineffective assistance of post-

25 conviction counsel. *See Martinez*, 566 U.S. at 9. Alternatively, he alleges that any

26

27    ——————————————

[27] For crimes committed after August 1, 2002, the Arizona Supreme Court reviews
28 all death sentences and findings in aggravation for an abuse of discretion pursuant
to A.R.S. §13-756(A) (previously codified at § 13-703.05(A)).

1  procedural bar is not adequate or independent or that imposing default would be a

2  miscarriage of justice.

3      **A.      The Eighth and Fourteenth Amendments require proportionality**

4          **review of a sentence of death.**

5          The Arizona Supreme Court failed to conduct a comparative proportionality

6  review of Lehr's death sentences, rendering the sentences unconstitutional. When

7  the United States Supreme Court sanctioned modern death penalty schemes in 1976,

8  it did so based on the belief that state appellate courts would conduct careful and

9  effective proportionality reviews in individual cases to guard against the arbitrary

10 and capricious imposition of the death penalty. *See Gregg v. Georgia*, 428 U.S. 153,

11 203–06 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (highlighting

12 proportionality review on appeal as an important protection against caprice in

13 sentencing); *Proffitt v. Florida*, 428 U.S. 242, 258 (1978) (same); *see also Glossip*

14 *v. Gross*, 135 S. Ct. 2726, 2763 (2015) (Breyer, J., dissenting) (recognizing the

15 importance of comparative proportionality review to avoid arbitrary imposition of

16 the death penalty). The Arizona Supreme Court, however, has abandoned this

17 critical procedural safeguard. *See State v. Salazar*, 844 P.2d 566, 583–84 (Ariz.

18 1992).

19         Where a state's death-penalty statute has sufficient alternative safeguards to

20 protect against the infliction of arbitrary and capricious sentences, proportionality

21 review is not necessarily constitutionality mandated. *Pulley v. Harris*, 465 U.S. 37,

22 44–54 (1984). But Arizona's death penalty statute does not incorporate adequate

23 safeguards against arbitrary application of the death penalty and is further

24 compromised by the absence of any proportionality review.

25         Abandoning the required proportionality review allows the death penalty to

26 be applied arbitrarily in Arizona in violation of the Fifth, Eighth, and Fourteenth

27 Amendments. Lehr's death sentences were obtained as a result of an arbitrary and

28 capricious system and affirmed without any comparative proportionality review or

1    other adequate protections against such arbitrary and capricious imposition in

2    violation of the Fifth, Eighth, and Fourteenth Amendments.

3        **B.    The failure to provide the jury with special verdict forms for**
4            **mitigation deprived Lehr of his right to meaningful appellate**
5            **review under the Fifth, Sixth, Eighth, and Fourteenth**
             **Amendments.**

6        Arizona's failure to statutorily require special verdict forms in capital cases

7    denied Lehr the adequate appellate review protections required by the Fifth, Sixth,

8    Eighth, and Fourteenth Amendments.

9        A state's capital punishment scheme must, at a minimum, provide adequate

10   and principled mechanisms for separating those cases in which death is warranted

11   from those cases in which it is not, *see Furman*, 408 U.S. at 239–40, and ensure the

12   heightened reliability commensurate with the finality of the punishment, *Beck*, 447

13   U.S. at 638. One way to ensure both features is meaningful appellate review. *Gregg*,

14   428 U.S. at 197–198. Indeed, the Supreme Court has "emphasized repeatedly the

15   crucial role of meaningful appellate review in ensuring that the death penalty is not

16   imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991)

17   (citing *Clemons*, 494 U.S. at 749).

18       Under Arizona law, the trier of fact imposes a death sentence if it finds at

19   least one aggravating circumstance and determines that the mitigating

20   circumstances are not "sufficiently substantial to call for leniency." A.R.S. § 13-

21   703(E) (2005) (current version at § 13-751(E)). The decision to impose death once

22   the jury finds aggravating circumstances is a matter for each individual juror to

23   consider. *See* A.R.S. § 13-703(C) (stating that "[e]ach juror may consider any

24   mitigating circumstance found by that juror in determining the appropriate

25   penalty"). Even though the Arizona Supreme Court "independently review[ed] the

26   propriety of Lehr's death sentences to determine whether the mitigation is

27   sufficiently substantial to call for leniency," *Lehr III*, 254 P.3d at 394, that review

28   is not meaningful where the jury failed to submit special verdict forms indicating

1 which mitigating factors each juror found.

2      In order to achieve such meaningful review, "it is important that the record

3 on appeal disclose to the reviewing court the considerations which motivated the

4 death sentence in every case in which it is imposed." *Gardner v. Florida,* 430 U.S.

5 349, 361 (1977) (plurality opinion). Without special findings, the Arizona Supreme

6 Court is unable to know the considerations that motivated the jury to select death

7 and whether the jury's determination is deficient. Compared to the special verdict

8 form provided during Lehr's first capital trial, where the trial judge found, proven

9 by a preponderance of the evidence, the following nonstatutory mitigating

10 circumstances: Lehr "was a good father to his children, a good husband to his wife,

11 a good son to his mother and had no prior record of criminal behavior or accusations

12 of violence of any kind." (ROA 567.) With that special verdict in hand, any

13 reviewing court had clear guidance on the proof provided, and the weight given, to

14 the mitigating evidence. Even though the court's review is independent, the jury's

15 determination can still influence the court as the jury has the best ability to

16 determine the credibility of witnesses. This is particularly true where, as in this case,

17 the Arizona Supreme Court afforded minimal weight to the mitigating

18 circumstances that turned on the credibility of witnesses.

19      Specifically, at the penalty phase, the defense offered evidence that Lehr

20 could successfully adjust to serving a life sentence in prison. (Tr. Apr. 6, 2009 at

21 60–74, 115–16, 124–24; Tr. Apr. 7, 2009 at 6–7, 65–66.) Trial counsel also

22 presented the lay testimony of a court conciliator with the Maricopa County

23 Superior Court, who conducted a custody evaluation on Lehr in 1993 and concluded

24 he could have visitation in jail with his two daughters. (Tr. Apr. 7, 2009 at 21–23;

25 Trial Ex. 404.) Trial counsel also presented Lehr's biological father, Claude Brown,

26 who provided cursory testimony explaining his brief relationship with Lehr's

27 mother in the 1950s and that he never knew he had a son. (Tr. Apr. 13, 2009 at 44–

28 55.) The resentencing court did not require the jurors to utilize special verdict forms

1   identifying the mitigation they found proved, so no record exists of whether some

2   or all jurors found any mitigating circumstance to exist or to be compelling.

3       The Arizona Supreme Court found that Lehr presented the following

4   mitigating evidence: "a natural life sentence would be a viable alternative to the

5   death penalty because he has been sentenced to at least 716 years imprisonment for

6   his non-capital convictions, he has been a well-behaved inmate with few

7   disciplinary problems, and he poses little risk of violent conduct in prison." *Lehr*

8   *III*, 254 P.3d at 394. The court concluded that the fact he would remain in prison

9   for his natural life is entitled to "little mitigating weight" and the fact Lehr was a

10  "model prisoner" is entitled "minimal weight" because "[a]ll prisoners are expected

11  to behave in prison. *Id.* (citing *State v. Kiles*, 213 P.3d 174, 191 (Ariz. 2009)). Even

12  worse, the Arizona Supreme Court appeared to consider information not presented

13  during the 2009 penalty phase in its calculus, thereby further rendering such review

14  unreliable. *Lehr III*, 254 P.3d at 394 ("Even considering the evidence identified by

15  Lehr from the 1996 trial, however, we find it is not significantly mitigating.").

16      The Arizona Supreme Court afforded minimal significance to all of Lehr's

17  mitigating circumstances, but it was not at the trial to evaluate the testimony of the

18  numerous prison witnesses, as was the jury. In the absence of any special verdict

19  forms there is no way to tell whether the Arizona Supreme Court was simply

20  substituting its findings for those of the jury's. Moreover, absent special verdict

21  forms, there is no way to know how the jury weighed the credibility of witnesses,

22  and which mitigating factors they found proven by the preponderance of the

23  evidence.

24      A juror may in fact have appreciated Lehr's good behavior in prison and

25  credited testimony supporting this mitigating circumstance, but nonetheless voted

26  for death in light of all the aggravating circumstances put to the jury. Because the

27  jurors were not provided any way to record their findings related to mitigation, the

28  Arizona Supreme Court could not conduct any meaningful appellate review, in

violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Instead, it should have remanded for resentencing. *See Mills*, 486 U.S. at 381–84 (remanding where jurors may have construed instructions improperly and no evidence existed of the jurors' individual findings regarding mitigation). The Arizona Supreme Court's contrary conclusion turned on an unreasonable application of clearly established federal law demanding reliable, nonarbitrary death sentences, see 28 U.S.C. § 2254(d)(1), and Lehr is entitled to relief.

### C. Arizona's death penalty scheme violates Lehr's right to equal protection under the Fourteenth Amendment since it fails to require the jury to make specific findings of fact and conclusions of law reviewable on appeal.

Arizona's failure to statutorily require special verdict forms in death penalty cases also violated Lehr's right to equal protection under the Fourteenth Amendment, and deprived him of adequate appellate review.

In non-capital cases, Arizona law requires the trier of fact to report the mitigating and aggravating factors it considered when imposing a sentence outside of the presumptive sentence. *See* A.R.S. § 13 702; *see also State v. Harrison*, 985 P.2d 486, 489 (Ariz. 1999) ("We believe § 13–702 requires the judge to tell the victim, the defendant, the appellate court, and the public what he or she considered as aggravation and mitigation and why he or she imposed an aggravated or mitigated sentence.").

While Arizona law allows for meaningful review in non-capital cases, it fails to offer such protections to death-penalty defendants. *See* A.R.S. § 13-701 (C). In capital cases, individual jurors have the discretion to weigh any factor they find to be mitigating when deciding whether to impose the death penalty. *See* A.R.S. § 13-751(C) ("[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty"). But, they do not have to explain or report what factors they considered. *See id.*

1    The verdict form in Lehr's case reflects only the ultimate sentence the jury

2    deemed appropriate for Lehr's first-degree murder convictions, without any other

3    information as to the motivations or decisions underlying the verdict. (ROA 966;

4    ROA 967.) Without a special verdict form, subsequent reviewing courts could not

5    know the considerations that motivated the jury to select death as Lehr's sentence,

6    nor could they analyze whether the jury's determination were deficient.

7    Because Arizona law does not require special verdict forms in capital cases,

8    and because the verdict lacked any indication of which mitigating factors each juror

9    found or rejected, the trial court's failure to require special verdict forms violated

10   Lehr's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Arizona's failure to

11   statutorily require special verdict forms in death penalty cases, while imposing a

12   different standard on non-capital cases, violated Lehr's right to equal protection

13   under the Fourteenth Amendment. Additionally, it deprived him of adequate and

14   meaningful appellate review. As such, this Court should grant evidentiary

15   development and relief.

16   **CLAIM TWENTY-EIGHT**

17
18   **The trial court violated state law, rendering the trial so arbitrary
     and fundamentally unfair, as to violate the Fifth, Eighth, and
     Fourteenth Amendments to the U.S. Constitution.**
19

20   Lehr incorporates by specific reference all facts, allegations, and arguments

21   made elsewhere in this Petition.

22    Lehr did not present this claim to the state court, as a result of previous

23   counsel's deficient performance. The deficient performance of trial, appellate, and

24   post-conviction counsel prejudiced Lehr and provides cause to excuse any

25   procedural default. *See Strickland*, 466 U.S. at 687; *Martinez*, 566 U.S. at 9. Lehr

26   will demonstrate through his filings and at an evidentiary hearing that his counsel

27   were ineffective and fell below the standards of minimally competent capital

28   attorneys when they failed to raise this meritorious claim. Because no state court

1   has decided the merits of this claim, the limitations on relief imposed by 28 U.S.C.
2   § 2254(d) do not apply and this Court's review should be de novo. If the state court
3   decided this claim on the merits, its decision was contrary to or an unreasonable
4   application of clearly established federal law; it was also based on an unreasonable
5   determination of the facts. 28 U.S.C. § 2254(d).

6       The trial court failed to follow Arizona law throughout all phases of the trial.
7   Although, as a general matter, "federal habeas corpus relief does not lie for errors
8   of state law," *McGuire*, 502 U.S. at 67 (quoting *Jeffers*, 497 U.S. at 780), habeas
9   relief is available if the error deprived the petitioner of a fundamentally fair trial
10  and therefore rose to the level of a violation of due process. *See id.* at 71–73; *see
11  also United States v. LeMay*, 260 F.3d 1018, 1026–27 (9th Cir. 2001); *McKinney v.
12  Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993). The violations of state law here deprived
13  Lehr of a fundamentally fair trial. These errors were not harmless, either, as they,
14  individually and cumulatively, "had substantial and injurious effect or influence in
15  determining the jury's verdict." *See Brecht*, 507 U.S. at 623.

16      The trial court made erroneous evidentiary rulings in violation of state law,
17  which include, among others: the admission of prejudicial 404 evidence (*see* Claim
18  1), admission of unreliable eyewitness identifications (*see* Claims 3(B), 10),
19  improper exclusion of third-party defense evidence (*see* Claim 3(G)), failing to
20  exclude testimony on unreliable DNA testing (*see* Claim 7), improper exclusion of
21  relevant mitigating evidence (*see* Claim 25), and denying Lehr the right to confront
22  adverse witnesses during the guilt phase (*see* Claim 26). In addition, the trial court
23  charged the jury with instructions that violated state law. (*See* Claims 19, 20.) The
24  trial court also failed to follow the state law when allowing the State to file an
25  untimely notice of aggravating circumstances. (*See* Claim 5.)

26      These errors, individually and cumulatively, violated Lehr's constitutional
27  rights and prejudiced him. They affected all phases of the trial against him. He is
28  therefore entitled to habeas relief.

# CLAIM TWENTY-NINE

**The State violated Lehr's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution by committing prosecutorial misconduct.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The prosecutor's misconduct in this case violated Lehr's rights to a fair trial, to present a defense, to the due process of law, to a reliable and accurate determination of guilt and penalty, and to be free from cruel and unusual punishment. Lehr's trial was rendered fundamentally unfair due to the prosecutor's repeated improper and inflammatory statements. His convictions and sentence are thus unlawful under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

## A. Exhaustion

Lehr did not present this claim to the state court as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state-court counsel prejudiced Lehr and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. at 687; *Martinez*, 566 U.S. at 9. Lehr will demonstrate through his filings and at an evidentiary hearing that counsel were ineffective and fell below the standards of minimally competent capital attorneys when they failed to raise this meritorious claim.

Because no state court has decided the merits of this claim, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

## B. Merits

Prosecutors occupy a unique position in the Bar and are likewise subject to uniquely rigorous standards. A prosecutor in a criminal case is not simply a party to a controversy; he represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United*

*States*, 295 U.S. 78, 88 (1935). Thus, their interest in a criminal prosecution is not to win a case, but "that justice shall be done." *Id*. at 88; *see also United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (explaining that "prosecutor's job isn't just to win, but to win fairly, staying well within the rules").

While it is their duty to prosecute a case with earnestness, it is "as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88. As the Supreme Court has explained, "the average jury, in a greater or less degree, has confidence that these obligations . . . will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.*

A prosecutor oversteps "the bounds of that propriety and fairness which should characterize the conduct of such an officer" when he, among other things, misstates facts in his cross-examination of witnesses; "put[s] into the mouths of such witnesses things which they had not said"; "suggest[s] by his questions that statements had been made to him personally out of court, in respect of which no proof was offered"; pretends to understand that a witness said something he did not say and persistently cross-examines him on that basis; assumes prejudicial facts not in evidence; bullies and argues with witnesses; and generally conducts themselves in a "thoroughly indecorous and improper manner." *Id.* at 84. A prosecutor further oversteps these bounds when their arguments are "undignified and intemperate" or contain "improper insinuations and assertions calculated to mislead the jury." *Id.* at 85.

Even where a trial court sustains objections to various forms of misconduct, and instructs the jury to disregard them, such conduct may call for "stern rebuke and repressive measures and, perhaps, if these [are] not successful, for the granting of a mistrial." *Id*.

1    To prevail on a prosecutorial misconduct claim, a petitioner must meet one
2 of two standards. They must demonstrate that the prosecutor's conduct either (1)
3 prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 643
4 (1974) (citing *Griffin v. California*, 380 U.S. 609, 623 (1965)), or (2) rendered the
5 trial fundamentally unfair, *see id.* 78. When evaluating various instances of
6 prosecutorial misconduct, the reviewing court must consider the cumulative effect
7 of the harm. *See Berger*, 295 U.S. at 89 (awarding a new trial because of "probable
8 cumulative effect" of instances of prosecutorial misconduct).

9    In determining whether misconduct rises to the level of a due process
10 violation, both federal and Arizona courts have considered whether the misconduct
11 was isolated or part of an ongoing pattern. *See Lincoln v. Sunn*, 807 F.2d 805, 809
12 (9th Cir. 1987); *State v. Minnitt*, 55 P.3d 774, 782 (Ariz. 2002) (explaining that
13 prosecutor's "misdeeds were not isolated events but became a consistent pattern of
14 prosecutorial misconduct that began in 1993 and continued through retrial in
15 1997"); *State v. Jorgenson*, 10 P.3d 1177, 1180 (Ariz. 2000) ("This is perhaps the
16 third or fourth time that the conduct of this same prosecutor has raised the same
17 type of problem. It is unfortunate that he was permitted to try so serious a case and,
18 without proper supervision, permitted to try it in such an improper manner.").

19    A prosecutor's level of experience is also relevant to the consideration of
20 whether the prosecutor committed misconduct. *See Le v. Mullin*, 311 F.3d 1002,
21 1029 (10th Cir. 2002) (Henry, J., concurring) ("An experienced prosecutor should
22 know better—especially considering the frequent criticism of his tactics by both
23 state and federal courts—and should be willing to follow the law he has sworn to
24 uphold.") Here, the prosecutor in Lehr's case, William Clayton, was a seasoned
25 attorney with years of experience at the Maricopa County Attorney's Office
26 ("MCAO").

27    Clayton's improper statements during the guilt phase, include, but are not
28 limited to, the following examples. In closing argument, Clayton repeatedly

referenced the other-acts evidence against Lehr, and the poorly-worded jury instruction, to create a generalized aura of guilt around the defendant. (*See, e.g.*, Tr. Mar. 24, 2009, at 134–35, 141–142 ("It is his way, and it's violent."); *see also esp. id.* at 145–48.) Defense counsel did object to the expansive scope of the prosecution's invocation of the Rule 404 evidence, particularly as a part of the State's rebuttal, (*see id.* at 123–24), to no avail. Clayton even cast the jury in the role of the "next" victim, demanding that the jury not "buy into" the defense's theory of the facts: "[The defense is] telling you your car awaits"; "Don't get in that car." (Tr. Mar. 24, 2009, at 147.) Clayton's closing demonstrates his statements went beyond the scope of permissible use of Rule 404 evidence in order to paint a picture of Lehr as a coercive, untrustworthy, sadistic killer, and to exhort the jury to convict him on *that* basis, and not on the factual question of his guilt for the charges at issue. The prosecutor also impermissibly shifted the burden of proof on Lehr to present evidence to rebut the State's fingerprint testimony in the Zingaro case. (*See* Claim 11.)

The prosecutor's improper statements continued throughout the penalty phase and, include, but are not limited to, the following examples. Clayton repeatedly recharacterized the jury instructions to Lehr's detriment. Clayton improperly argued to the jury that growing up without a father, in a single-parent family is not "an excuse for murder." (Tr. Apr. 14, 2009 at 134.) Indeed, Lehr's character and background is a proper mitigating factor for the jury to consider. *See Eddings*, 455 U.S. at 112; *see also Woodson*, 428 U.S. at 304. The prosecutor told the jury they must set aside moral beliefs and that "the morals are written in our law" (Tr. Apr. 14, 2009 at 149). The Supreme Court has made clear, however, that "the sentence imposed at the penalty stage should reflect a *reasoned moral response* to the defendant's background, character, and crime" *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

1   The prosecutor also made improper emotional appeals to the jury: "In this
2   mitigation phase, you may have been left wanting, seemed cheated. And you may
3   be seeing a baby seat, instead of sufficiently substantial mitigation. The State asked
4   you not to get in that vehicle, to ride off and say, well, it was sufficient. Sufficient
5   to imprison, as opposed to death penalty." (Tr. Apr. 14, 2009 at 148.) *See Darden
6   v. Wainwright*, 477 U.S. 168, 180 (1986) (finding the prosecutor "made several
7   offensive comments reflecting an emotional reaction to the case. These comments
8   undoubtedly were improper.").

9   Clayton also impermissibly ordered retesting of DNA samples in 2002
10  without notifying Lehr's defense team. (Tr. Mar. 17, 2009 at 36–47, 63, 68–69,
11  122–23.) (*See* Claim 8.) Clayton, familiar with death-penalty litigation, had to have
12  known that Lehr was represented by counsel when he ordered the lab analyst to
13  consume the DNA sample without either contacting counsel or advising the analyst
14  to follow lab policy to arrange with the defense for testing with an independent
15  DNA laboratory. (Tr. Mar. 17, 2009 at 43.) Clayton knew the value of the evidence,
16  and knew that Lehr was represented by counsel, and yet disregarded those facts to
17  disobey the laboratory's own policy and proceed with testing the evidence absent
18  any defense oversight, such behavior constitutes prosecutorial misconduct.

19  Moreover, and as discussed throughout this petition, the prosecutor
20  introduced testimony and evidence in violation of Lehr's fair trial, due process, and
21  confrontation rights, and which violated the rules of court and evidence which
22  protect those constitutional rights.

23  In addition to these instances, Attorney Lisa Marie Martin, who represented
24  Lehr on his first direct appeal arising out of his 1996/1997 trials, became employed
25  by the MCAO after his appeal, and worked at that office throughout his retrial in
26  2009. Martin's employment at MCAO during Lehr's 2009 retrial raised a conflict
27  of interest and prejudiced Lehr as she refused to speak with or turn over any of her
28  materials to 2009 trial counsel. (*See* Claim 23.)

Here, to the extent it is necessary to prove any prejudice, the prosecutor's ongoing misconduct in Lehr's case also prejudiced his rights, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974), or rendered the trial fundamentally unfair, *see Berger*, 295 U.S. 78. This misconduct, individually and cumulatively, violated Lehr's constitutional rights and prejudiced him. They affected all phases of the trial against him. He is entitled to relief.

## CLAIM THIRTY

**The cumulative prejudice of trial counsel's deficiency at all stages deprived Lehr of his right to counsel under the Sixth and Fourteenth Amendments and rendered his capital sentence unreliable in violation of the Eighth Amendment**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Lehr raises in this Petition a number of claims for the constitutionally ineffective assistance of counsel he received, both at trial and sentencing. Each of these claims is sufficient to merit relief. Even if not, however, the cumulative impact of his counsel's deficiencies, at all stages, deprived Lehr of his rights to counsel and a fair capital sentencing, in violation of the Sixth, Eighth, and Fourteenth Amendments.

### A.    Exhaustion

In his post-conviction petition, Lehr raised multiple claims for ineffective assistance of his 2009 counsel. He further raised a claim for the "cumulative error" caused by all of the ineffective assistance of his 2009 counsel; the post-conviction court rejected this claim because "Arizona does not recognize the cumulative error rule, other than in the context of prosecutorial misconduct." (PCR Order, at 33.) It further concluded that "there are no cumulative errors to consider," and thus found the claim "not colorable." (PCR Order, at 33.)

In his petition for review, Lehr challenged the post-conviction court's

rejection of his individual claims of ineffective assistance of counsel, (*see generally* PFR 3, at 10–46, 47–48, 49–53), but the Arizona Supreme Court denied review (PRF 29, at 1). The state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, and was also based on unreasonable factual determinations in light of the record before it. See 28 U.S.C. § 2254(d).

## B.    Merits

Even in a case in which error, examined in isolation, is insufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors can still require relief. *See Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (affirming grant of habeas relief on basis of cumulative effect of multiple errors by counsel); *Killian*, 282 F.3d at 1211 (noting that the cumulative effect of errors may be so prejudicial as to require reversal); *Harris ex rel. Ramseyer*, 64 F.3d at 1439 (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial). Lehr's trial counsel committed multiple errors during his trial and resentencing. Even if this Court were to find that none merits relief when considered individually, the cumulative effect of all the errors is so prejudicial that Lehr is entitled to relief on that basis.

The post-conviction court rejected each of Lehr's claims for ineffective assistance of counsel. (*See* PCR Order, at 24, 29, 40.) For the reasons described in the various preceding claims and incorporated herein by reference, those individual rulings were contrary to or rested on unreasonable applications of federal law and on unreasonable factual determinations in light of the state-court record. The court's determination that there was no individual error therefore is no bar to relief. *See* 28 U.S.C. § 2254(d).

Further, with regard to many of Lehr's post-conviction claims, the post-conviction court did not reach the question of prejudice. (*See* PCR Order, at 8, 18, 22, 23, 28, 31, 33, 40.) To the extent it did consider this question, the post-

conviction court declared, in each case, that there could be no prejudice because "[Lehr] and his trial counsel had competing objectives. [Lehr] wanted to secure the death penalty; trial counsel's objective among other was to avoid the death penalty." (PCR Order, at 27; *see also id.* at 18; *id.* at 23.) As explained above, the post-conviction court's conclusion here is incorrect, and contravenes well-established Supreme Court precedent. Counsel's duties are not excused simply because a client is difficult or reluctant to present mitigation. The post-conviction court's analysis of prejudice in this regard is deficient and incomplete, and does not address the actual question of prejudice.

As such, this Court may analyze cumulative prejudice de novo. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003). On de novo review, this Court can find that, taken together, the multiple unreasonable actions and errors of trial counsel warrant relief. To the extent the post-conviction court declined to find cumulative error because the Arizona state courts do not recognize the doctrine of cumulative prejudice, this decision contravenes *Strickland. See White v. Ryan*, 895 F.3d 641, 671 (9th Cir. 2018) (holding that the Arizona post-conviction court erred by separately addressing the prejudice arising from separate deficiencies and observing that "[t]he test is whether it is reasonably likely that the result of the proceeding would have been different but for counsel's 'errors'" (quoting *Strickland*, 466 U.S. at 694)). For these reasons, Lehr is entitled to issuance of the writ.

## CLAIM THIRTY-ONE

**Lehr's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution was violated by his appellate counsel's failure to raise meritorious claims on direct appeal.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Appellate counsel failed to raise several meritorious issues on direct appeal that had a reasonable probability of prevailing, thereby violating Lehr's right to the

1   effective assistance of counsel under the Sixth and Fourteenth Amendments to the
2   United States Constitution.

3       **A.      Exhaustion**

4       Lehr raised the issue of the deficient performance of appellate counsel at
5   multiple places within his post-conviction petition. (*See, e.g.*, PCR Pet. at 31, 32–
6   34, 42, 43.) The post-conviction court denied an evidentiary hearing on this issue,
7   and in large part ignored the allegations of ineffective assistance of appellate
8   counsel. (*See* PCR Order at 24, 25, 29, 31, 32, 37, 40, 42.) Lehr's attorneys further
9   reasoned this issue on his Petition for Review to the Arizona Supreme Court. (PFR
10  3 at 53.) The Arizona Supreme Court denied review in a one-page order without
11  comment. (PCR 29 at 1.)

12      The post-conviction court did not address these claims on the merits. As such,
13  this Court may review Lehr's allegations de novo, free from the strictures of
14  §2254(d). To the extent this Court concludes that the state court did in fact consider
15  and deny this claim on the merits, the state court's rejection of this claim was
16  contrary to, or involved an unreasonable application of, clearly established federal
17  law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition,
18  it constituted an unreasonable determination of the facts in light of the evidence
19  presented. *See id.* § 2254(d)(2).

20      Moreover, to the extent the post-conviction court did address the merits of
21  this claim, the court's treatment of the individual allegations of ineffective
22  assistance of appellate counsel was contrary to, or involved an unreasonable
23  application of, clearly established federal law, and involved unreasonable
24  determinations of fact. *See* § 2254(d). It failed to evaluate the cumulative effect of
25  counsel's error and added an unnecessary additional layer of deference, both
26  contrary to *Strickland*. In fact, the post-conviction court articulated a standard for
27  granting an evidentiary hearing on this issue that incorrectly placed the burden on
28  Lehr to prove his claims of ineffective assistance before a hearing could be granted,

rather than just making a colorable claim for relief. (*See* PCR Order at 32 ("To avoid summary dismissal and achieve an evidentiary hearing on a post-conviction claim of ineffective assistance of appellate counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the outcome of the appeal would have been different.").) *See State v. Gutierrez*, 278 P.3d 1276, 1281 (Ariz. 2012) ("A defendant is entitled to an evidentiary hearing when he presents a colorable claim, that is a claim which, if defendant's allegations are true, might have changed the outcome.") (citation omitted).

The post-conviction court's findings were contrary to and an unreasonable application of clearly established law, and were based on unreasonable determinations of fact, especially in light of the fact that it improperly failed to grant Lehr an evidentiary hearing on his colorable claims. 28. U.S.C. § 2254(d). Accordingly, this court should review the claim de novo and grant relief.

Finally, if this Court finds that this claim was not fully exhausted in state court, Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see Davila*, 137 S. Ct. 2058. Lehr will demonstrate through his filings and at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. To the extent this claim has therefore not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

### B.    Merits

The Due Process Clause of the Fourteenth Amendment guarantees the effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)

("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); *see id*. at 395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits."). As such, "nominal representation" during an appeal "does not suffice to render the proceedings constitutionally adequate." *Id*. at 396.

In *Parker v. Dugger*, 498 U.S. 308, 321 (1991), the Supreme Court recognized "the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *See also Dobbs v. Zant*, 506 U.S. 357, 358 (1993) (citing *Gardner*, 430 U.S. at 361 (plurality opinion)); and *Gregg*, 428 U.S. at 167, 198) (joint opinion of Stewart, Powell, and Stevens, JJ.) (emphasizing "the importance of reviewing capital sentences on a complete record").

Ineffective-assistance-of-appellate-counsel claims are governed by the standard of review set forth in *Strickland*, 466 U.S. at 686–87. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Appellate counsel's representation was ineffective if it "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694. A reasonable probability is one that undermines confidence in the outcome of the proceedings. The ABA Guidelines provide guidance as to the reasonableness of counsel's conduct. *Rompilla*, 545 U.S. at 387.

Federal courts have consistently recognized that *Strickland*'s duties to advocate and to employ "skill and knowledge" include the necessity for counsel to object or otherwise preserve federal issues for review. *See, e.g.*, *Alexander v. Shannon*, 163 F. App'x 167, 173 (3d Cir. 2006); *Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996); *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir. 1994); *Freeman v.*

*Lane*, 962 F.2d 1252, 1259 (7th Cir. 1992) (appellate counsel ineffective for abandoning viable federal claim—cause and prejudice for default established). Appellate counsel performs ineffectively when he fails to discover and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980–81 (9th Cir. 2000). Appellate "counsel should seek to litigate all issues, whether or not previously presented, that are *arguably meritorious*[.]" 2003 ABA Guideline 10.15.1(C) (emphasis added). "'Winnowing' issues in a capital appeal can have fatal consequences. . . . When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited." *Id.* at 10.15.1(C), cmt. "[I]n a capital case, which by definition involves the ultimate societal sanction, appellate attorneys must err on the side of inclusion. . ." *Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001).

To demonstrate prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Robbins*, 528 U.S. at 285–86. Here, appellate counsel failed to raise numerous meritorious issues that were stronger than other issues presented, and there was no reasonable justification for the omission. *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999) (analyzing whether omitted issues were "significant and obvious"); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985) (noting that if "appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance").

In Lehr's case, there are numerous meritorious issues that appellate counsel failed to raise on direct appeal. This list includes, but is not limited to, failing to challenge: the trial court's improper joinder of the Cronin case for resentencing (*see* Claim 2); the use of third-party evidence, including his *Brady* claim (*see* Claim 3(G)); the failure to challenge the unconstitutional application of (F)(1) and (F)(2) aggravators (*see* Claim 4); the introduction of questionable, erroneous, and unreliable DNA testing (*see* Claim 7); numerous penalty phase errors (*see* Claim 12); the constitutional claims stemming from his waiver of certain rights (*see*

1   Claims 13, 14, 24); the trial court improperly limiting voir dire (*see* Claim 16, 17);

2   erroneous jury instructions (*see* Claims 19, 20, 21); prosecutorial misconduct (*see*

3   Claim 29); and the constitutionality of the imposition of the death penalty in Lehr's

4   case (*see* Claims 40, 41, 42, 43, 46, 49.)

5       Moreover, appellate counsel during Lehr's first direct appeal was also

6   ineffective for failing to argue there was insufficient evidence to convict Lehr of his

7   crimes against all victims, not just Morales. (*See* DA1 42 at 89.) A careful review

8   of the evidence shows numerous weaknesses in all cases. For example, in Cronin,

9   the only evidence linking Lehr to the victim was an unreliable statement that he

10  owned a similar looking ring that Cronin once wore. (*See* Claim 3.)

11      Notably, appellate counsel performed deficiently when they failed to stay

12  informed of the law, and thus incorrectly conceded that their voir dire argument was

13  foreclosed by Arizona law. In his direct appeal, Lehr argued "[t]he refusal to permit

14  *voir dire* of prospective jurors regarding their views on specific aggravating and

15  mitigating [circumstances] violates Appellant's rights under the Sixth and

16  Fourteenth Amendments." (DA2 82 at 83.) But, appellate counsel also conceded

17  that the Arizona Supreme Court had rejected this argument in the past, citing to

18  *State v. Johnson*, 133 P.3d 735, 750 (Ariz. 2006). (DA2 82 at 79.) *Johnson* is not

19  such a limiting case, and did not prevent Lehr from making this argument on appeal.

20  *Id*. *Johnson*'s focus was on asking jurors to commit that certain specific facts *would*

21  *be* mitigating in the case. *Id*. In contrast, Lehr simply wanted to ask whether jurors

22  could still *consider* mitigation in light of the specific aggravating facts. (*See* ROA

23  796 at 4.) Further, *Johnson* dealt with a different factual scenario, which did not

24  include the unique situation Lehr faced in this trial of having a murder trial with the

25  same jury as a sentencing trial on a prior murder conviction. *Id*. at 428–29, ¶¶  2–5.

26  *Johnson* does not hold that trial courts may always prevent the defense from raising

27  specific facts during voir dire, and appellate counsel was wrong for conceding that

28  it does.

1    But even if *Johnson* did foreclose Lehr's argument, or even if appellate

2    counsel was not unreasonable for failing to understand that it did not, the Arizona

3    Supreme Court issued an opinion six months before his direct appeal was filed that

4    certainly would have allowed him to raise this argument. *See State v. Garcia*, 226

5    P.3d 370, 378 (Ariz. 2010) (filed March 18, 2010). (*See also* DA2 82 (filed on Sept.

6    7, 2010).) In *Garcia*, the Supreme Court of Arizona recognized that it is appropriate

7    during voir dire for counsel to ask potential jurors about specific sentencing factors,

8    where counsel limits the questions to whether the potential juror can "consider" life

9    or death, and does not ask the potential juror to commit to a certain sentence based

10    on a specific fact. *Garcia*, 226 P.3d at 378 ¶ 15–16 (citing to *United States v. Fell*,

11    372 F. Supp. 2d 766, 769 (D. Vt. 2005)). The types of questions that Lehr's counsel

12    was prohibited from asking were exactly the types of questions permitted in *Garcia*.

13    226 P.3d at 378. (*See* Claim 16.) These types of questions do not ask the juror to

14    commit to a life sentence, but only ask if the juror could still follow the law by

15    considering all available sentences – exactly what *Garcia* permits. 226 P.3d at 378.

16    *Garcia* would have provided strong precedent that Lehr's appellate counsel could

17    have relied on to argue that his rights during voir dire were illegally curtailed.

18    "It is a basic rule of professional conduct that a lawyer must maintain

19    competence by keeping abreast of changes in the law and its practice." *United States*

20    *v. Kwan*, 407 F.3d 1005, 1016 (9th Cir. 2005) (overruled on other grounds); *see*

21    *also* ABA Model Rules of Professional Conduct, Rule 1.1[6]. Lehr's counsel failed

22    to keep abreast of the law and thus, for at least the sixth months before filing his

23    appeal, was unaware that the Arizona Supreme Court had issued an opinion

24    squarely on point to Lehr's argument.

25    Lehr was prejudiced by this erroneous concession. To establish prejudice, a

26    petitioner who shows that his appellate counsel was deficient "must show a

27    reasonable probability" that "but for" the deficiency, "he would have prevailed on

28    his appeal." *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). There is a "reasonable

probability" that Lehr would have won his appeal if his appellate counsel had properly raised it. *Id*. at 285–86. The *Garcia* decision was not a blip in the overall holdings of the Arizona Supreme Court. In the year following *Garcia*, the court, sitting en banc, confirmed its holding. *See State v. Prince*, 250 P.3d 1145, 1158 ¶ 35 (Ariz. 2011) (counsel permitted to ask juror whether the specifics of the crime fit the juror's definition of "well-thought-out crime" to determine whether the juror could consider the death penalty, because the question did not ask the juror to pre-commit to any specific result.)

In Lehr's case, the Arizona Supreme Court did not even engage the issue, likely because the appeal brief so concisely conceded it. Yet the similarities between the acceptable questions in *Garcia* and those that were prohibited in Lehr's case are obvious. Had the Court looked at the specific questions and argument that trial counsel had with the trial judge, there is a reasonable probability that the Court would have agreed that the judge illegally limited the voir dire in Lehr's case.

Improperly limiting life-qualifying voir dire questions is not a minor error. Without these questions, Lehr could only ask whether jurors could "consider mitigation even if there was evidence presented that the defendant had a significant prior criminal history[.]" (Tr. Jan. 5, 2009 at 25.) Yet jurors expressed obvious concern about what they had already heard about Lehr's other cases – some admitting that they could not even be "fair and impartial." (*See e.g.*, Tr. Jan. 15, 2009 at 37–38.) Being fair and impartial is not the same thing as being willing to consider mitigation no matter what the aggravated facts are. There were likely other jurors who, despite feeling like they could be fair and impartial, could or would not consider mitigation in light of the aggravated facts. But defense counsel could not explore that because of the court's rulings.

As the above examples illustrate, appellate counsel performed deficiently by failing to raise these meritorious issues on direct appeal. Appellate counsel's deficient performance also prejudiced Lehr.

To demonstrate prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Robbins*, 528 U.S. at 285–86. Therefore, when appellate counsel fails to raise meritorious issues and there is a reasonable probability it would have resulted in the reversal of a conviction or sentence, counsel has necessarily caused prejudice to the defendant. *See, e.g.*, *Strickland*, 466 U.S. at 694. Individually and cumulatively, the deficiencies in Lehr's case constitute ineffective assistance of appellate counsel. *See Rompilla*, 545 U.S. at 393 (evaluating prejudice based on the evidence "taken as a whole"); *Strickland*, 466 U.S. at 690 (allegations of ineffectiveness must be examined in light of all the circumstances). Appellate counsel's deficient performance was prejudicial. Thus, Lehr is entitled to relief.

## CLAIM THIRTY-TWO

**Pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Lehr was entitled to the constitutionally effective assistance of counsel during his state post-conviction proceedings. However, his counsel performed deficiently and Lehr was prejudiced as a result.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Lehr was entitled to the effective assistance of post-conviction counsel. Lehr's state post-conviction counsel were ineffective and deprived Lehr of his constitutional rights to due process and effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

By the nature of this claim, these proceedings are the first in which Lehr can raise these issues. This claim was not raised in state court because there is no available state court corrective process. *See* 28 U.S.C. § 2254(b)(1)(B)(i). Because no state court has decided the merits of this claim, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply, and this Court's review of this claim should

be de novo.

As explained in *Martinez v. Ryan*, 566 U.S. 1, 4 (2012), Arizona prisoners must raise claims regarding the ineffectiveness of trial counsel in a petition for post-conviction relief, not on direct appeal: "The State of Arizona does not permit a convicted person alleging ineffective assistance of trial counsel to raise that claim on direct review." *See also State v. Spreitz*, 39 P.3d 525, 527 (Ariz. 2002). The same is also true of any other claims that are supported by evidence outside the trial record, even if not raised as a counsel ineffectiveness claim.

In Arizona, because "the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal." *Martinez*, 566 U.S. at 11; *see also Parker v. Dugger*, 498 U.S. 308, 321 (1991) (discussing importance of meaningful review on appeal). Lehr's post-conviction proceedings were his only opportunity to pursue any claims that relied on extra-record evidence. Thus, those post-conviction proceedings were a "first appeal as of right" as to those claims, and he should have a constitutional right to the effective assistance of counsel in those proceedings. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985).[28]

"Without the help of an adequate attorney, a prisoner will have . . . difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim." *Martinez*, 566 U.S. at 11. Ineffective-assistance claims "often require investigative work and an understanding of trial strategy. When the issue cannot be raised on direct review, moreover, a prisoner asserting an ineffective-assistance-of-trial counsel claim" during post-conviction proceedings cannot "rely on a court opinion or the prior

_____

[28] While the Supreme Court initially entertained argument on this issue as part of the *Martinez* litigation, the Court eventually declined to decide this issue because the case could be resolved on equitable grounds instead. 566 U.S. at 9 ("This is not the case, however, to resolve whether that exception exists as a constitutional matter.").

1   work of an attorney addressing that claim." Id. at 11–12. Thus, "[t]o present a claim

2   of ineffective assistance at trial in accordance with the State's procedures . . . a

3   prisoner likely needs an effective attorney." *Id.*

### A.   Post-conviction counsel were ineffective

5   Lehr's state post-conviction team failed to provide effective representation.

6   On November 2, 2011, the court appointed Ken Everett as Lehr's post-conviction

7   counsel. (PCR Order, Nov. 2, 2011 at 1.) Everett had never prepared a post-

8   conviction petition in a capital case before. His co-counsel, Sharmila Roy, similarly

9   had little experience. In addition, Roy was in the middle of a capital evidentiary

10  hearing and unable to devote the required attention to investigating and drafting the

11  petition. The team's dysfunction led to poor communication and a lack of

12  cooperation.

13  The series of events that transpired over Lehr's post-conviction

14  representation culminated in a failure to adequately raise claims and present

15  important mitigation in Lehr's case. The 2003 ABA Guidelines state that post-

16  conviction counsel have a duty to "seek to litigate all issues, whether or not

17  previously presented, that are arguably meritorious under the standards applicable

18  to high quality capital defense representation, including challenges to any overly

19  restrictive procedural rules." 2003 ABA Guideline 10.15.1(C). Everett and Roy

20  failed to do this. Their representation fell below the standards required for

21  constitutionally effective post-conviction counsel, *see Martinez*, 566 U.S. at 11–12,

22  and Lehr was prejudiced.

23  As indicated throughout this Petition, Lehr's state post-conviction counsel's

24  performance fell below the standard of minimally competent assistance. Because

25  Lehr did not receive effective assistance during his state post-conviction

26  proceedings, he failed to have effective post-conviction review of a number of

27  meritorious claims, including ineffective assistance of trial and appellate counsel,

28  before the state courts. The following non-exhaustive examples underscore post-

1   conviction counsel's deficiencies.

2        State post-conviction counsel failed to raise several meritorious claims,
3   which should have been raised in Lehr's state post-conviction proceeding. (*See,*
4   *e.g.*, Claims 3(B), 3(E), 3(F), 3(G), 4, 12(C)(5), 12(C)(6), 12(C)(7), 17, 20, 29, 41.)
5   For example, post-conviction counsel failed to investigate or hire an eyewitness
6   identification expert, forensic expert, or fingerprint expert, and thus did not raise
7   ineffective-assistance claims on these issues. Counsel's failure to raise meritorious
8   claims fell below the standards for post-conviction counsel and prejudiced Lehr.
9   *Martinez*, 566 U.S. at 11; *Strickland*, 466 U.S. at 668; *see also* 2003 ABA Guideline
10  10.15.1(C). In addition, to the extent that post-conviction counsel failed to raise
11  claims for ineffective assistance of appellate counsel, he also fell below objective
12  standards of reasonableness, to Lehr's prejudice. (*See* Claim 31.) Post-conviction
13  proceedings were the first time that Lehr was able to challenge the effectiveness of
14  his appellate counsel; he is constitutionally entitled to effective appellate attorneys,
15  and any failure by his post-conviction attorneys to vindicate that right demonstrates
16  their deficient performance. The post-conviction court's refusal to excuse the
17  default and consider these issues that should have been raised on direct appeal
18  demonstrates the prejudice Lehr has suffered.

19       Many of the claims that Lehr failed to raise are meritorious claims that, if
20  raised, may well have changed the outcome of Lehr's post-conviction proceedings.
21  If they had challenged trial counsel's conduct throughout trial—pretrial through the
22  penalty phase—Lehr would likely have received a new trial or sentencing.

23       Additionally, if they had raised all instances of ineffective assistance of
24  appellate counsel, there is a reasonable probability that Lehr would have received a
25  new appeal. Post-conviction counsel's performance undermines confidence in the
26  outcome of the state-court proceedings. Their failures constituted deficient
27  performance that prejudiced Lehr.

28

**B.** **Post-conviction counsel's ineffectiveness excuses any procedural default of claims raised throughout this Petition.**

This Court may consider the merits of any claims that would otherwise be procedurally defaulted because Lehr can demonstrate cause and prejudice to overcome any default. *See generally Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *see also Smith v. Murray*, 477 U.S. 527, 533 (1986). "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9.

Lehr can demonstrate cause under *Martinez* because the underlying claims (i.e., the allegedly defaulted claims) are substantial, and post-conviction counsel's performance was inadequate. *See id.* at 14. To show his claims are "substantial," Lehr must demonstrate they have "some merit." *Id.* In *Martinez*, the Court specifically cited the standard for issuance of a Certificate of Appealability ("COA"). *Id.* at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). By citing *Miller-El*'s discussion of COA standards, the Court indicated that the COA standard applies when determining if an underlying claim is "substantial." Under the COA standard, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). *Slack*'s holding "would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail." *Miller-El*, 537 U.S. at 337. The COA standard is a low bar intended to screen out only clearly frivolous claims, and therefore, any doubt whether Lehr has advanced a non-frivolous claim should be resolved in his favor. *See Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000). Further, "[a]lthough not dispositive," a death sentence "is a proper consideration" in deciding whether to issue a COA. *Id.* (internal quotation marks omitted).

1          Conducting a full merits review on the undeveloped record would frustrate
2    the intention of *Martinez* to avoid the circumstance of a prisoner never receiving a
3    proper hearing on a claim involving a "bedrock principle," *Martinez*, 566 U.S. at
4    12, the right to effective trial counsel. The Ninth Circuit's jurisprudence on
5    *Martinez* supports these principles. In *Detrich v. Ryan*, a four-judge plurality
6    explained that, where a prisoner demonstrates that his post-conviction counsel
7    performed deficiently and failed to raise a "substantial" claim of ineffective
8    assistance of trial counsel, the prisoner satisfies *Martinez*'s cause-and-prejudice
9    standard. 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc). A petitioner shows cause
10   by showing post-conviction counsel was deficient and demonstrates prejudice by
11   showing that the ineffective-assistance-of-trial-counsel claim is substantial. *Id.* at
12   1245–46. Judge Fletcher explained that, for the "narrow purpose" of showing cause
13   under *Martinez*, a "prisoner need not show actual prejudice resulting from his [post-
14   conviction] counsel's deficient performance, over and above his required showing
15   that the trial-counsel [ineffectiveness] claim be 'substantial[.]'" *Id.* The plurality
16   reasoned that, if a petitioner "were required to show that the defaulted trial-counsel
17   [ineffectiveness] claims fully satisfied *Strickland* . . . this would render superfluous
18   the first *Martinez* requirement of showing that the underlying *Strickland* claims
19   were 'substantial[.]'" *Id.* at 1246.
20        In *Dickens v. Ryan*, an eight-judge majority largely paralleled the plurality's
21   analysis in *Detrich*. 740 F.3d 1302 (9th Cir. 2014) (en banc). In *Dickens*, the Court
22   instructed that the petitioner could show cause for default if he could show the first
23   two *Martinez* elements: "(1) the [defaulted] claim is substantial and (2) his PCR
24   counsel was ineffective under *Strickland*." *Id.* at 1320. Thus, because Lehr's post-
25   conviction counsel was inadequate and substantial claims went un-reviewed in state
26   court, he can show cause to overcome any procedural default.
27        The prejudice element of the cause-and-prejudice test remains settled.
28   Generally, once the petitioner has shown cause, the Court should consider whether

there is prejudice based on the underlying constitutional claim. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 315 (2011) (describing cause and prejudice as "cause for the delay in asserting his claims and actual prejudice resulting from the State's alleged violation of his constitutional rights"); *Smith*, 477 U.S. at 533 ("actual prejudice resulting from the alleged constitutional violation" (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1997))).

Thus, this Court should determine whether there is a reasonable probability that the errors alleged undermined confidence in the outcome of Lehr's proceedings. The Court should bear in mind that *Martinez* provided an equitable avenue for federal courts to review the merits of non-frivolous constitutional violations, and that evidentiary development is necessary to establish cause and prejudice. *See, e.g.*, *Woods v. Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014) (rejecting argument that "*Pinholster* and § 2254(e)(2) categorically bar [habeas petitioners] from obtaining such a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default").

The circumstances described above and those uncovered during habeas counsel's investigation of this case demonstrate post-conviction counsel was ineffective. That ineffectiveness provides cause and prejudice sufficient to excuse the default of the claims raised in this Petition.

### C.    Post-conviction counsel's ineffectiveness entitles Lehr to relief.

While acknowledging contrary authority, *see Coleman v. Thompson*, 501 U.S. 772, 757 (1991), Lehr respectfully asserts that he is constitutionally entitled to the effective assistance of post-conviction counsel, and this Court should grant relief on this basis. Arizona's post-conviction process was inadequate and ineffective to protect Lehr's constitutional right to counsel, and his post-conviction counsel performed deficiently and prejudiced him. As explained in *Martinez*, Arizona prisoners must raise ineffectiveness of trial counsel in a petition for post-conviction relief. *See Spreitz*, 39 P.3d at 527. Lehr's state post-conviction

proceedings were his only opportunity to pursue ineffective-assistance claims (and any other claims that relied on more than the trial record). Thus, those proceedings were a "first appeal as of right" as to those claims, and he should have a constitutional right to the effective assistance of counsel in those proceedings. *See Lucey*, 469 U.S. at 396.

In Arizona, post-conviction proceedings are part of an established, mandatory appellate process, initiated by the Arizona Supreme Court. *See* Ariz. R. Crim. P. 32.4(a) (on issuance of mandate affirming conviction and death sentence on direct appeal, clerk of court files automatic notice for post-conviction relief); *State v. Bolton*, 896 P.2d 830, 839 (Ariz. 1995) (explaining that Rule 32 proceeding is mandatory on affirmance of death sentence). Here, state post-conviction proceedings are not only automatic on the affirmance of a death sentence; they are also a defendant's only chance to present constitutional claims based on evidence outside the record, including the ineffective assistance of trial and appellate counsel. They are, thus, appeals "as of right" for these claims, and the State must provide the effective assistance of counsel. *See Jackson v. State*, 732 So. 2d 187, 190 (Miss. 1999) ("The reality is that post-conviction efforts, though collateral, have become an appendage, or part, of the death penalty appeal process at the state level."). By not assuring competent counsel for these claims, post-conviction review of the competence of capital attorneys becomes a "meaningless ritual." *See Lucey*, 469 U.S. at 394 (internal quotation marks omitted); *see also Jackson v. Weber*, 637 N.W.2d 19, 24–25 (S.D. 2001) ("If the defense attorney was ineffective in the original criminal proceeding and habeas counsel was thereafter ineffective in ferreting out the invalidity of the conviction, we may never know if the convicted person had a fair trial or, God forbid, was actually innocent.").

Further, because Arizona entitles a defendant to the appointment of state post-conviction counsel and has standards that attempt to ensure counsel's competence, due process requires that counsel be effective. The implementation of

this statutory right must comport with due process: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Lucey*, 469 U.S. at 401. Due process demands that when a statutory right to counsel is established, the concomitant right to effective assistance of counsel must also be recognized; otherwise, the statutory right is meaningless. *See id*. at 396 ("[A] party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all.").

Other state courts have recognized that, because their state statutes provide for counsel in post-conviction proceedings, due process demands that counsel perform effectively: "[W]e will not presume that our legislature has mandated some 'useless formality' requiring the mere physical presence of counsel as opposed to effective and competent counsel." *Jackson*, 637 N.W.2d at 23. Their reasoning has been based on the well-established principle that the right to counsel means the right to the effective assistance of counsel. The Due Process Clause of the Constitution ensures fundamental fairness. If Arizona ignores the dictates of its own statute and appoints incompetent counsel, the petitioner is entitled to relief. *Cf. Lozada v. Warden*, 613 A.2d 818, 822 (Conn. 1992) ("[F]undamental fairness opens the door for relief by habeas corpus when the state, in discharging its statutory duty, appoints incompetent counsel.").

In sum, Lehr's post-conviction counsel were ineffective. This deprived him of his constitutional rights to due process and the effective assistance of counsel, and also provides cause and prejudice to overcome the procedural default of any claims raised in this Petition. Lehr is entitled to evidentiary development and relief.

## CLAIM THIRTY-THREE

**Arizona's capital-sentence scheme violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it fails to require cumulative consideration of multiple**

1
2

**mitigating factors and prohibits the consideration of mitigation evidence that is not proven to a preponderance of the evidence.**

3
4

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

5
6
7
8
9

In capital penalty-phase trials juries must consider any and all mitigating evidence about a defendant. In violation of this principle, Arizona's capital sentencing law fails to require the cumulative consideration of multiple mitigating factors. Further, it prohibits the jury's consideration of mitigation evidence that is proven to less than a preponderance of the evidence.

10

### A.    Exhaustion

11
12
13
14
15
16
17
18
19
20
21
22
23
24

Lehr argued in his direct appeal that Arizona's death penalty statute "unconstitutionally fails to require the cumulative consideration of multiple mitigating factors . . ." (DA2 82 at 80; *Lehr III*, 254 P.3d at 395.) He also argued "Arizona's death statute creates an unconstitutional presumption of death and places an unconstitutional burden on Appellant to prove mitigation is 'sufficiently substantial to call for leniency.'" (DA2 82 at 82.) The Arizona Supreme Court did not reach the merits of either claim, but listed them verbatim in its appendix. *Lehr III*, 254 P.3d at 395. Because these claims have not been adjudicated on the merits by Arizona courts, the limits on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of these claims. Even if listing these issues in the appendix is considered to be a decision on the merits, the state court's denial of these claims was contrary to, or involved an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

25

### B.    Merits

26
27
28

The Eighth and Fourteenth Amendments of the United States Constitution require that in capital cases the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978) (emphasis in original). "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing [the] sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Boyde v. California*, 494 U.S. 370, 377–78 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). As such, the law is clear that juries must be permitted to consider all relevant mitigating evidence. *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004).

Furthermore, imposing a standard that limits the mitigating evidence considered by the jury violates the Eighth Amendment's requirement that the sentencer be allowed to consider any aspect of the defendant's character or record that counsels in favor of a sentence other than death. *See Smith v. Texas*, 543 U.S. 37 (2004) (per curium); *Tennard*, 542 U.S at 285; *Lockett*, 438 U.S. at 604. As a result, due process requires that a jury be fully and correctly instructed regarding the law related to its sentencing discretion and powers in order to prevent an unconstitutional and arbitrary deprivation of the defendant's liberty. *See Hicks v. Oklahoma*, 447 U.S. 343, 346–47 (1980). The ultimate responsibility for such instruction rests with the judge, not with counsel. *See Taylor v. Kentucky*, 436 U.S. 478, 488–89 (1978) (holding that the "arguments of counsel cannot substitute for instructions by the court").

Pursuant to the Arizona death penalty statute, A.R.S. § 13-751(C) (2009), Lehr's jury was instructed that they could only consider mitigating factors that had been proven to a preponderance of the evidence, (ROA 963 at 9, Tr. Apr. 14, 2009 at 119–20). This meant that Lehr's jury was prohibited from considering any mitigation evidence that was proven to less than a preponderance of the evidence, violating the clear rule that juries must consider and give effect to *any* and *all*

1   potential mitigation evidence. *See Tennard*, 542 U.S. at 275. There was limited
2   mitigation evidence presented in this case, and the mitigation related to Lehr's
3   personal life was presented primarily through a secondhand report. (Trial Ex. 404;
4   Tr. Apr. 14, 2009 at 128, 130.) It is likely that at least one juror discounted
5   otherwise-compelling evidence because of concerns that it did not meet the high
6   evidentiary burden imposed by the preponderance standard. Lehr's sentence must
7   be vacated.

8       Additionally, pursuant to the Arizona statute that does not require it, *see*
9   A.R.S. §§ 13-751, 752 (2009), the court never instructed the jury that they should
10  consider the mitigation evidence cumulatively. (Tr. Apr. 14, 2009 at 112–24). But
11  "even if [specific mitigating facts] are not in themselves cause for a sentence less
12  than death, they are still relevant to mitigation and must be weighed in conjunction
13  with other factors to determine if all of the circumstances together warrant a lesser
14  sentence." *Smith v. McCormick*, 914 F.2d 1153, 1168 (9th Cir. 1990); *see also*
15  *Boyde*, 494 U.S. at 377–78 (Eighth Amendment requires capital sentencers to
16  consider "all relevant mitigating evidence" offered by defendant). In violation of
17  this principle, the instructions in Lehr's case implied that the jury should *not*
18  consider the mitigating factors cumulatively and should evaluate them
19  independently. (*See* Tr. Apr. 14, 2009 at 115–16, 120.)

20      The instructions in Lehr's case discussed the *aggravation* analysis as a
21  cumulative one: "you must decide how compelling or persuasive are the *totality* of
22  the aggravating factors and the facts and circumstances of the case." (Tr. Apr. 14,
23  2009 at 121 (emphasis added).) But then none of the instructions used the term
24  "totality" or similar term to describe how to analyze the *mitigation* evidence.
25  Rather, the instructions simply listed the individual factors that had been
26  highlighted by the defense. (Tr. Apr. 14, 2009 at 115–16.) At times the Court used
27  singular language, implying that, although it was a cumulative approach for
28  determining the aggravation, it was a divide-and-conquer approach for determining

the mitigation. (*See* Tr. Apr. 14, 2009 at 118 ("one juror may find *one factor* is substantial to call for life imprisonment, while another juror may give *the same factor* no value." (emphases added); Tr. Apr. 14, 2009 at 119 ("each of you must decide individually whether any mitigating *circumstance* exists") (emphasis added).)

At least one juror likely would have voted for life if the statute required—and thus the court instructed—that the mitigation evidence be considered cumulatively. Instead, the jury was left with the impression that they should employ a one-by-one analysis, tossing away any mitigation evidence that was not proven to a preponderance or that was not, individually, sufficiently substantial to call for leniency. Lehr's sentencesss must be vacated.

## CLAIM THIRTY-FOUR

**The Arizona death-penalty scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it fails to narrow the class of people eligible for the death penalty, and fails to provide sufficient guidance to jurors for selecting which defendants should be sentenced to death.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

In light of the qualitative difference between a sentence of death and a sentence to a term of imprisonment, the Eighth Amendment demands a higher degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). The Supreme Court's "capital punishment cases under the Eighth Amendment address two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision." *Tuileapa v. California*, 512 U.S. 967, 971 (1994). The Arizona death-penalty scheme fails in both aspects. It fails to genuinely narrow the class of cases that are eligible for the death penalty. And, it fails to provide sufficient guidance to the jury

1    during the selection decision. Each of these are discussed, below.

2        **A.    Exhaustion**

3        Lehr raised and preserved this claim on direct appeal as part of his

4    "constitutional challenges to the death sentence raised and preserved for future

5    federal review." (DA2 82 at 79–85.) Specifically, he argued:

6    •    Claim 3: Arizona's death penalty statutory scheme is

7         unconstitutional because it permits jurors unfettered discretion to

8         impose death without adequate guidelines to weigh and consider

9         appropriate factors and fails to provide principled means to

10        distinguish between those who deserve to die or live.

11   •    Claim 5: Arizona's death statute is unconstitutional because there

12        are no statutory standards for weighing.

13   •    Claim 6: The prosecutor's discretion to seek the death penalty

14        unconstitutionally lacks standards.

15   •    Claim 19: The failure to instruct the jury that only murders that are

16        "above the norm" may qualify for the death penalty violates the

17        Sixth, Eighth and Fourteenth Amendments.

18   (DA2 82 at 79–85.)

19       The Arizona Supreme Court did not reach the merits of any of these claims,

20   but listed them verbatim in its appendix. *Lehr III*, 254 P.3d at app. Because these

21   claims have not been adjudicated on the merits by Arizona courts, the limits on

22   relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of these

23   claims. Even if listing these issues in the appendix is considered to be a decision on

24   the merits, the state court's denial of these claims was contrary to, or involved an

25   unreasonable application of, clearly established federal law, and was based on an

26   unreasonable determination of the facts. 28 U.S.C. § 2254(d).

27

28

1
2

**B.   The Arizona death penalty scheme does not genuinely narrow the cases for the death penalty.**

3   Under *Gregg v. Georgia*, 428 U.S. 153 (1976), and *Furman v. Georgia*, 408
4   U.S. 238 (1972), a state's "capital sentencing scheme must 'genuinely narrow the
5   class of persons eligible for the death penalty and must reasonably justify the
6   imposition of a more severe sentence on the defendant compared to others found
7   guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant
8   v. Stephens*, 462 U.S. 862, 877 (1983)). "If a State has determined that death should
9   be an available penalty for certain crimes, then it must administer that penalty in a
10   way that can rationally distinguish between those individuals for whom death is an
11   appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S.
12   447, 460 (1984), *overruled on other grounds by Hurst v. Florida*, 136 S. Ct. 616
13   (2016). If a State's scheme offers "no principled way" of making that distinction,
14   *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980) (plurality opinion), the death penalty
15   is "cruel and unusual in the same way that being struck by lightning is cruel and
16   unusual," *Furman,* 408 U.S. at 309 (Stewart, J., concurring).

17   The narrowing process must, moreover, be established by statute. *See Gregg*,
18   428 U.S. at 207 (explaining that the selection of the persons eligible to be
19   prosecuted and ultimately sentenced to death "[must] always [be] circumscribed by
20   . . . legislative guidelines"); *Lowenfield*, 484 U.S. at 246 (the "legislature" must
21   provide a means of "narrow[ing] the class of death eligible murderers"). "Part of a
22   State's responsibility in this regard is to define the crimes for which death may be
23   the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey*,
24   446 U.S. at 428 (alteration in original) (quoting *Gregg*, 428 U.S. at 196). Where
25   discretion is afforded to a sentencing body "on a matter so grave as the
26   determination of whether a human life should be taken or spared," that discretion
27   must be "suitably directed and limited so as to minimize the risk of wholly arbitrary
28   and capricious action." *Gregg*, 428 U.S. at 189.

1      The Arizona death penalty scheme fails on all fronts in its duty to genuinely
2   narrow the class of people eligible for the death penalty. It starts with Arizona's
3   first-degree murder law. A broad range of conduct constitutes first-degree murder
4   and is thus eligible for capital punishment, including intentional killings,
5   premeditated killings, killings committed in the course of a number of other crimes,
6   and the killings of law-enforcement officers in the line of duty. *See* A.R.S. § 13-
7   1105(A); *see also Hidalgo v. Arizona*, 138 S. Ct. 1054, 1055 (2018) (Breyer, J.,
8   respecting denial of certiori) ("Arizona's capital murder statute makes all first-
9   degree murderers eligible for death and defines first-degree murder broadly to
10  include all premeditated homicides along with felony murder based on 22 possible
11  predicate felony offenses.")

12      This initial "pool" of individuals eligible for the death penalty is so broadly
13  defined that it encompasses the vast majority of murders committed. This is evident
14  by a reading of the statute, which fails to meaningfully distinguish first-degree
15  murder and second-degree murder. *Compare* A.R.S. § 13-1105(A) *with* A.R.S. §
16  13-1104 (defining "second-degree murder" not by enumerating specific offenses,
17  but by the mens rea at the time of the offense). It is further evident by a review of
18  the actual cases, which demonstrate that almost all murders in Arizona could, in
19  fact, be categorized as first-degree murder. *See*, *e.g.*, *Hidalgo*, 138 S. Ct. at 1054–
20  57. Thus, Arizona's first-degree murder law fails at the outset to narrow the class
21  of people eligible for the death penalty. *See*, *e.g.*, *id*. at 1055 ("Arizona did not argue
22  below and does not suggest now that the State's first-degree murder statute alone
23  can meet the Eighth Amendment's narrowing requirement.")

24      Next, there is also no genuine narrowing at the charging stage: Arizona
25  affords prosecutors unbridled discretion to seek the death penalty, limited only by
26  their individual whim. *See State v. Harding*, 670 P.2d 383, 397 (Ariz. 1983). Each
27  prosecutor has the sole authority and complete discretion to determine whether to
28  seek the death penalty as a sentencing option, following their unreviewable

1    determination that one or more aggravating circumstances exist.

2    It fails at the next step as well: Arizona's law is ostensibly narrowed by the

3    requirement that a jury find at least one aggravating factor for a case to proceed to

4    the death penalty sentencing stage. *See Hidalgo*, 138 S. Ct. at 1055 (quoting

5    *Lowenfield*, 484 U.S. at 246 ("Because Arizona law broadly defines capital murder,

6    the State has sought to comply with the narrowing requirement through the second

7    method—namely, by setting forth statutory 'aggravating circumstances' designed

8    to permit the 'jury . . . at the penalty phase' to make 'findings' that will narrow the

9    legislature's broad definition of the capital offense."); *see also* A.R.S. § 13-703(F)

10   (2004) (setting forth aggravating circumstances) (current version at A.R.S. § 13-

11   751(F)). But Arizona's aggravating circumstances are so broad that they do not

12   meaningfully separate out defendants whose crimes are so egregious they should be

13   death penalty eligible from those who should not. *See Hidalgo*, 138 S. Ct. at 1056

14   (reviewing unrebutted evidence that "one or more aggravating circumstances were

15   present in" 98 percent of first-degree murder cases between 2002 and 2012 in

16   Maricopa County, Arizona.). *Compare State v. Wallace*, 728 P.2d 232, 238 (Ariz.

17   1986) (stating that a murder with no apparent motive was death-eligible); *and State

18   v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding that the defendant used

19   insufficient force to cause immediate death and was therefore death-eligible); *with

20   State v. Smith*, 687 P.2d 1265, 1266–67 (Ariz. 1984) (discussing crime committed

21   with specific motive of eliminating a witness), *and State v. Summerlin*, 675 P.2d

22   686, 696 (Ariz. 1983) (finding that the defendant used excessive force and so was

23   death-eligible). The proliferation of aggravating factors under the Arizona scheme

24   has made virtually every person convicted of first-degree murder in Arizona eligible

25   for the death penalty, so the aggravated factors do not genuinely narrow the death-

26   penalty eligible class.

27   Furthermore, under Arizona law, the sentencer must impose a death sentence

28   whenever it "finds one or more of the aggravating circumstances . . . and then

1   determines that there are no mitigating circumstances sufficiently substantial to call
2   for leniency." A.R.S. § 13-703(E) (2004).

3   Because Arizona's definition of first-degree murder and its aggravating
4   circumstances sweep so broadly, the Arizona statute fails to perform the
5   constitutionally required function of channeling the jury's discretion. *See*
6   *Lowenfield*, 484 U.S. at 244. At least four Supreme Court justices have already
7   recognized that Arizona's failure to narrow the class of cases eligible for the death
8   penalty "points to a possible constitutional problem." *Hidalgo*, 138 S. Ct. at 1057.
9   Because of this failure, Lehr's death sentences are unconstitutional and must be
10   vacated.

11   **C.** **The Arizona death penalty scheme fails to give sufficient guidance**
12   **to juries during the selection decision.**

13   A death-sentencing procedure is unconstitutional when it provides "no
14   meaningful basis for distinguishing the few cases in which [death] is imposed from
15   the many cases in which it is not." *Furman*, 408 U.S. at 313 (White, J., concurring)
16   (per curiam); *see also*, *e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988);
17   *Godfrey v. Georgia*, 446 U.S. 420, 427–28 (1980) (plurality opinion). "*Furman*
18   mandates that where discretion is afforded a sentencing body on a matter so grave
19   as the determination of whether a human life should be taken or spared, that
20   discretion must be suitably directed and limited so as to minimize the risk of wholly
21   arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

22   To avoid the arbitrary and inconsistent imposition of death on a "jury-by-
23   jury" basis, clear instructions must be provided to ensure that juries faced with
24   similar evidence will return similar verdicts. *See Eddings v. Oklahoma*, 455 U.S.
25   104, 112 (1982) ("capital punishment [must] be imposed fairly, and with reasonable
26   consistency, or not at all."); *see also Hicks v. Oklahoma*, 447 U.S. 343, 346–47
27   (1980). The ultimate responsibility for such instruction rests with the judge, not
28   with counsel. *See Taylor v. Kentucky*, 436 U.S. 478, 488–89 (1978) (holding that

1    the "arguments of counsel cannot substitute for instructions by the court").

2           Arizona's death penalty statute provides no objective standards to guide the

3    jury in weighing aggravating and mitigating circumstances. *See* A.R.S. § 13-703.

4    Indeed, the court's penalty-phase instructions in Lehr's case failed to give adequate

5    guidance on the appropriateness of the death penalty, or to otherwise channel the

6    jury's discretion. (*See* Tr. Apr. 14, 2009 at 112–23.) The only standard that the judge

7    gave the jury was circular: that they should choose a life sentence only if they find

8    that the mitigation is sufficient to call for a life sentence. (Tr. Apr. 14, 2009 at 120–

9    21.) Specifically, jurors were instructed to impose the death penalty if there were

10   "no mitigating circumstances sufficiently substantial to call for leniency." (Tr. Apr.

11   14, 2009 at 121.) And they were instructed that "'[s]ufficiently substantial for

12   leniency' means that mitigation must be of such quality or value that it is adequate,

13   in the opinion of an individual juror, to persuade that juror to vote for a sentence of

14   life in prison." (Tr. Apr. 14, 2009 at 120.) Circular instructions like this do not give

15   the jury any real guidance and thus do not guarantee that Lehr's death sentences

16   were not arbitrarily imposed or imposed as a result of unfettered discretion.

17          The death penalty is the ultimate punishment, and as such it is intended to be

18   reserved for only those murders that are "above the norm." This intended limitation

19   on death sentences also serves as mitigating information because it informs the jury

20   that not every homicide or even death penalty case warrants the death penalty and

21   that this case may be one that does not. Therefore, the jury should have been

22   instructed that only murders "above the norm" may qualify for the death penalty so

23   that their deliberations and ultimate sentence reflected that fact. The lack of any

24   guidance to the jury cannot serve to prevent the "wanton[] and freakish[]"

25   imposition of the death penalty. *Furman*, 408 U.S. at 310 (Stewart, J., concurring).

26   Lehr's death sentences must be vacated.

27

28

1

**CLAIM THIRTY-FIVE**

2

3

4

**Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments by requiring the death sentence whenever one aggravating and no mitigating circumstances are found.**

5

6

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

7

8

9

Arizona's law is unconstitutional because it has a presumption of death once an aggravated factor is found and then uses a screening mechanism that prevents the jury from sparing the defendant's life unless the mechanism is met.

10

**A.    Exhaustion**

11

12

13

14

15

16

17

18

19

20

21

22

Lehr raised this claim in his second direct appeal. (DA2 82 at 81.) This capital-sentencing scheme violates Lehr's rights under the Eighth and Fourteenth Amendments. The Arizona Supreme Court did not reach the merits of this claim but listed it verbatim in its appendix. *Lehr III*, 254 P.3d at 396. As this decision did not constitute an adjudication on the merits, the limitations on available relief, as prescribed by 28 U.S.C. § 2254(d), do not apply to this Court's review of this claim. Should it be found that the listing of this issue within an attached appendix qualifies as a decision on the merits, then the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). In either incident, § 2254(d) presents no bar on relief, and this Court may consider the merits of this claim de novo.

23

**B.    Merits**

24

25

26

27

The court instructed the jury during the penalty phase that "[y]ou shall impose a sentence of death if you have found one or more aggravating circumstances then determine that there are no mitigating circumstances sufficiently substantial to call for leniency." (ROA 963 at 11.)

28

Death is the ultimate penalty. The sentencer must provide an "individualized

determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *see also Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (acknowledging that death is a punishment "different from all other sanctions."). Under Arizona law, the trier of fact must impose a death sentence whenever it "finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." A.R.S. § 13-703(E) (renumbered at § 13-751(E)). Arizona's statute effectively places a "'thumb [on] death's side of the scale,' thus 'creat[ing] the risk [of] treat[ing] the defendant as more deserving of the death penalty.'" *Sochor v. Florida*, 504 U.S. 527, 532 (1992) (citations omitted). Functionally, death is the default once the State proves one aggravating circumstance. Here, instructing the jury in this manner created the presumption of death for Lehr.

Moreover, mitigating evidence is not all considered where there is the use of a screening mechanism designed to prevent the sentencer from considering such evidence. *See*, *e.g.*, *State v. Ramirez*, 871 P.2d 237, 252–53 (Ariz. 1994) (requiring the defendant to prove mitigating evidence by a preponderance of the evidence before the sentencer must "accept" the evidence as mitigating). In Lehr's case, the jury was instructed consistently with this screening mechanism that "the Defendant must convince you by the evidence presented that it is more probably true than not true that such a mitigating circumstance exists." (ROA 963 at 9). As a result, a sentencer is not free to consider any circumstance for a sentence less than death if it was not proven by the defendant by a preponderance of the evidence. *See Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 622 (1993) (defining a "preponderance of evidence" as "more probable" than not that it is true). The use of such a screening mechanism, coupled with the Arizona statute where the default sentence is death, deprives the jury of discretion to impose a sentence other than death, in violation of the Eighth

and Fourteenth Amendments. *See Woodson*, 428 U.S. at 302–03. Lehr's death sentences are therefore constitutionally infirm, and he is entitled to relief.

## CLAIM THIRTY-SIX

**Arizona's death-penalty statute and the trial court's jury instructions created a presumption of death and required Lehr to prove that he is entitled to life, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Lehr presented this claim in his direct appeal. (DA2 82 at 82.) The Arizona Supreme Court did not address this claim on the merits, but only presented the issue verbatim in its appendix. *Lehr III*, 254 P.3d at 396. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. Even if listing this issue in the appendix is considered a decision on the merits, the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court. See 28 U.S.C. § 2254(d)(1). In addition, it was an unreasonable determination of the facts. *See id*. § 2254(d)(2).

Arizona's death-penalty statute codifies a presumption in favor of death for first-degree murders accompanied by one aggravating circumstance:

> In determining whether to impose a sentence of death or life imprisonment, the trier of fact shall take into account the aggravating and mitigating circumstances that have been proven. The trier of fact shall impose a sentence of death if the trier of fact finds one or more of the aggravating circumstances enumerated . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency.

A.R.S. § 13-703(E) (2004) (emphasis added) (current version at A.R.S. § 13-751(E)). Here, the trial court's instruction mirrored this language:

> You shall impose a sentence of death if you have found one or more aggravating circumstances and then determine that there are no mitigating circumstances or no mitigating circumstances sufficiently

1    call for leniency.

2    (Tr. Apr. 14, 2009 at 121.)

3         The law and instructions thereby required Lehr to overcome a presumption

4    that death is the appropriate punishment and prove his entitlement to life. This

5    violates the Fifth, Sixth, Eighth, and Fourteenth Amendments. If a defendant does

6    not carry his burden of persuasion the jury has no choice but to return a death

7    sentence. *Contra Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The law

8    and instructions thereby prevent "consideration of whatever mitigating

9    circumstances may be relevant to either the particular offender or the particular

10   offense," *Roberts v. Louisiana*, 431 U.S. 633, 637 (1977) (per curiam), and "create[]

11   the risk that the death penalty will be imposed in spite of factors which may call for

12   a less severe penalty," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). Moreover, "[a]n

13   instruction that death is presumed to be the appropriate sentence tilts the scales by

14   which the jury is to balance aggravating and mitigating circumstances in favor of

15   the state." *Jackson v. Dugger*, 837 F.2d 1469, 1474 (11th Cir. 1988). Because an

16   Arizona capital defendant bears the burden of persuading a jury to spare his life, the

17   statute is unconstitutional. *See Kansas v. Marsh*, 548 U.S. 163, 178 (2006)

18   ("Significantly, although the defendant appropriately bears the burden of proffering

19   mitigating circumstances—a burden of production—he never bears the burden of

20   demonstrating that mitigating circumstances outweigh aggravating

21   circumstances."). And, in light of the jury deliberations notwithstanding the

22   presence of several aggravating circumstances the State cannot demonstrate that the

23   error was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

24        The statute therefore is infirm because it places the burden on the defendant

25   to prove his innocence of capital murder. Even if it placed no burden on the

26   defendant, however, the statute would still be infirm for a related reason. It

27   impermissibly relieves the State of its burden to prove beyond a reasonable doubt

28   that the proffered mitigation is not sufficiently substantial to call for leniency—and

relieves the jury of its duty to make such a finding beyond a reasonable doubt. *See Hurst v. Florida*, 136 S. Ct. 616, 622 (2016) (invalidating Florida's capital-sentencing scheme which did not require the jury to find beyond a reasonable doubt that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances" (quoting Fla. Stat. § 921.141(3))). Lehr's death sentences pursuant to this statute and instructions violates the Fifth, Sixth, Eighth, and Fourteenth Amendment. *See Woodson*, 428 U.S. at 305; *Patterson v. New York,* 432 U.S. 197, 210–11 (1977). *But see Walton v. Arizona*, 497 U.S. 639, 651–52 (1990). Accordingly, Lehr's death sentences are unconstitutional, and he is entitled to habeas relief.

## CLAIM THIRTY-SEVEN

**Arizona's capital sentencing scheme is unconstitutional because it does not require that the jury find that the aggravating factors outweighed mitigating circumstances beyond a reasonable doubt, and the trial court's similarly flawed instruction violated Lehr's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Arizona's capital sentencing scheme is unconstitutional because it does not require that the jury find that the aggravating factors outweigh the mitigating circumstances beyond a reasonable doubt. This flaw violates established Supreme Court precedent, as confirmed by the Court's recent decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016). The trial court's instructions at Lehr's trial similarly violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### A.    Exhaustion

Lehr presented this claim in his second direct appeal. (DA2 82 at 84.) The Arizona Supreme Court did not reach the merits of this claim, but only listed the issue verbatim in its appendix. *Lehr III*, 254 P.3d at 396. Because this claim has not been adjudicated on the merits by Arizona courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of this claim. Even if

1   listing this issue in the appendix is considered to be a decision on the merits, the

2   state court's denial of this claim was contrary to, or involved an unreasonable

3   application of, clearly established federal law, and was based on an unreasonable

4   determination of the facts. 28 U.S.C. § 2254(d).

5       **B.    Merits**

6       Before the jury may impose a death sentence, Arizona's capital sentencing

7   scheme requires the jury to find that aggravating circumstances outweigh mitigating

8   circumstances. However, Arizona's capital sentencing scheme does not impose any

9   particular burden of persuasion on either party with regard to the weighing of

10  aggravating and mitigating circumstances. *See* A.R.S. § 13-703(E) (renumbered at

11  § 13-751(E)). Therefore, the sentencing scheme does not require the prosecution to

12  prove beyond a reasonable doubt that aggravating circumstances outweigh

13  mitigating circumstances, and, in turn, relieves the jury of having to determine

14  beyond a reasonable doubt that death is the appropriate punishment. This violated

15  Lehr's clearly established rights.

16      The United States Supreme Court has repeatedly held that "any fact (other

17  than prior convictions) that increases the maximum penalty for a crime must be

18  charged in an indictment, submitted to a jury, and proven beyond a reasonable

19  doubt." *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999); *see also Apprendi v.*

20  *New Jersey*, 530 U.S. 466, 476 (2000) (applying this principle to states through the

21  Fourteenth Amendment). The Court affirmed this principle in the context of a

22  capital case in *Ring v. Arizona*, 536 U.S. 584, 602 (2002): "If a State makes an

23  increase in a defendant's authorized punishment contingent on the finding of a fact,

24  that fact—no matter how the State labels it—must be found by a jury beyond a

25  reasonable doubt." *See also id.* at 610 (Scalia, J., concurring) ("[T]he fundamental

26  meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential

27  to imposition of the level of punishment that the defendant receives—whether the

28  statute calls them elements of the offense, sentencing factors, or Mary Jane—must

1  be found by the jury beyond a reasonable doubt.").

2  Because aggravating circumstances must be found to outweigh mitigating

3  circumstances before a death sentence can be imposed in Arizona, under *Ring* and

4  its antecedents, it is a fact that must be found by a jury beyond a reasonable doubt.

5  *See Murdaugh v. Ryan*, 724 F.3d 1104, 1115 (9th Cir. 2013) ("In [*Ring*], the

6  Supreme Court described several determinations that had to occur under Arizona

7  law before a defendant became death-eligible, including the judge's determination

8  that 'there are no mitigating circumstances sufficiently substantial to call for

9  leniency.'").

10  The validity of this claim was made explicit when the Supreme Court decided

11  *Hurst*, 136 S. Ct. at 621. There, the Court held that the failure to require a jury to

12  determine the relative weight of aggravating and mitigating circumstances beyond

13  a reasonable doubt violates the Sixth Amendment right to a jury trial, as well as the

14  Fourteenth Amendment's Due Process Clause. The Court reiterated the Sixth

15  Amendment's basic requirement that "any fact that 'expose[s] the defendant to a

16  greater punishment than that authorized by the jury's guilty verdict' is an 'element'

17  that must be submitted to the jury." *Id.* (quoting *Apprendi*, 530 U.S. at 494). The

18  Court also emphasized that under *Ring*, this principle applies with equal force to

19  death penalty statutes: "The Sixth Amendment requires a jury, not a judge, to find

20  each fact necessary to impose a sentence of death." *Id.* at 619. Under *Alleyne v.*

21  *United States*, 133 S. Ct. 2151, 2156 (2013), "each element of a crime [must] be

22  proved to a jury beyond a reasonable doubt." *Id.* at 621; *see also Apprendi*, 530 U.S.

23  at 498 (Scalia, J., concurring) (explaining that charges against the accused, and the

24  corresponding maximum exposure he faces, must be determined "beyond a

25  reasonable doubt by the unanimous vote of 12 of his fellow citizens").

26  In *Hurst*, the State of Florida argued that the weighing process fell outside

27  the ambit of *Ring* and *Apprendi*, as the defendant was death-eligible after the jury

28  found at least one aggravating circumstance. 136 S. Ct. at 622. The Court rejected

1   this contention. *Hurst* therefore reinforced what prior Sixth Amendment precedent
2   had already established: It is not constitutionally sufficient that a jury merely find
3   the existence of at least one aggravating circumstance beyond a reasonable doubt,
4   because a determination regarding the relative weight of aggravating and mitigating
5   circumstances is *also* a factual finding necessary to a defendant's eligibility for a
6   sentence of death. *Id.*; *see also Rauf v. State*, 145 A.3d 430 (Del. 2016) (per curiam)
7   (striking down Delaware's capital sentencing scheme on the basis of *Hurst* and
8   determining that the Sixth Amendment requires a jury to find, beyond a reasonable
9   doubt, each aggravating circumstance and that the aggravation outweighs
10  mitigation); *Hurst v. State*, 202 So. 3d 40, 57 (Fla. 2016) (finding that *Hurst*
11  "mandates that all the findings necessary for the imposition of a death sentence are
12  'elements' that must be found by a jury" and holding that "before the trial judge
13  may consider imposing a sentence of death, the jury in a capital case
14  must . . . unanimously find that the aggravating factors outweigh the mitigating
15  circumstances").

16      *Hurst* built upon *Ring* and *Apprendi* but did not create new law. Lehr is
17  therefore entitled to relief under either de novo review or § 2254(d)(1) because the
18  state court's failure to recognize the violation of his rights was an unreasonable
19  application of clearly established federal law.

20      In the alternative, if *Hurst* did not simply apply existing precedent and instead
21  created a new rule of constitutional law, that ruling applies retroactively on
22  collateral review. *But see Ybarra v. Filson*, 869 F.3d 1016, 1033 (9th Cir. 2017). As
23  an initial matter, in cases that pre-date *Teague v. Lane*, 489 U.S. 288 (1989), the
24  Supreme Court consistently held that decisions establishing a requirement of proof
25  beyond a reasonable doubt apply retroactively. *See, e.g.*, *Hankerson v. North*
26  *Carolina*, 432 U.S. 233 (1977); *Ivan V. v. City of New York*, 407 U.S. 203, 205
27  (1972) (per curiam). Looking at these decisions under *Teague*'s framework, rules
28  about the standard of proof fit into the first exception for substantive rules. *See*

*Welch v. United States*, 136 S. Ct. 1257, 1264 (2016); *Schriro v. Summerlin*, 542 U.S. 348, 352 n.4 (2004) (explaining that substantive rules "are more accurately characterized as" not "subject to the bar" on retroactive application under *Teague*).

Such rules are substantive because they lessen the "risk that a defendant . . . faces a punishment that the law cannot impose upon him." *Summerlin*, 542 U.S. at 351–52; *cf. In re Winship*, 397 U.S. 358, 363 (1970). *Hurst* categorically prohibits the State from imposing the death penalty for those made eligible for the penalty other than by a jury finding beyond a reasonable doubt that aggravation outweighs mitigation; it does not regulate "the manner of determining the defendant's culpability," which would be procedural. *Montgomery v. Louisiana*, 136 S. Ct. 718, 729–30 (2016) (internal citations omitted and emphasis omitted). The Ninth Circuit articulated the distinction between substantive and procedural rules: "The failure to apply a procedural rule does not necessarily invalidate every result, whereas failure to apply a substantive rule leaves no possibility of a legitimate outcome." *Alfaro v. Johnson*, 862 F.3d 1176, 1185 n.5 (9th Cir. 2017). *Hurst*'s rule fits into the latter description.

Even if it is deemed procedural and not substantive, *Hurst*'s beyond-a-reasonable-doubt holding would constitute a "watershed" procedural rule under *Teague*. *See Powell v. State*, 153 A.3d 69, 74–75 (Del. 2016) (finding retroactive its prior decision in *Rauf*, which invalidated Delaware's death penalty statute under *Hurst*, because it fell "squarely within the second exception set forth in *Teague* requiring retroactive application of 'new rules' of criminal procedure"). This is because *Hurst* "implicate[s] the fundamental fairness and accuracy," of sentencing, *Welch*, 136 S. Ct. at 1264, by mandating the use of the beyond-a-reasonable-doubt standard, which "is a prime instrument for reducing the risk of convictions resting on factual error," *Ivan V.*, 407 U.S. at 205. *Hurst*, if deemed procedural, would therefore constitute a watershed new rule and would be retroactive. Therefore, if the Court finds that *Hurst* announced a new rule of

1  constitutional law, it is retroactive and Lehr is entitled to relief.

2  **CLAIM THIRTY-EIGHT**

3  **Lehr was subjected to a second trial, with a different jury, which**
4  **violates the double jeopardy guarantee of the Fifth and Fourteenth**
   **Amendments to the U.S. Constitution.**

5  Lehr incorporates by specific reference all facts, allegations, and arguments
6  made elsewhere in this Petition.

7  The maximum sentence that Lehr could have received at the time of the guilt
8  phase in the Cronin matter, based on that jury's findings, was life imprisonment.
9  Empaneling a new jury for resentencing to consider re-imposing his death sentence
10 violated Lehr's double jeopardy rights under the Fifth Amendment to the United
11 States Constitution.

12 **A.    Exhaustion**

13 Lehr raised and preserved this claim as Argument 9 of the constitutional
14 issues raised in his direct appeal. (DA2 82 at 81 ("Subjecting Appellant to a second
15 trial on the issue of aggravation and punishment before a new jury violates the
16 double jeopardy clause of the Fifth Amendment.").) Only listing the issue verbatim
17 in its appendix, the Arizona Supreme Court did not reach the merits of this claim.
18 *Lehr III*, 254 P.3d at 395. Because this claim has not been adjudicated on the merits
19 by Arizona courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not
20 apply to this Court's review of this claim. Even if this Court finds listing this issue
21 in the appendix a decision on the merits, the state court's denial of this claim was
22 contrary to, or involved an unreasonable application of, clearly established federal
23 law, and also was based on an unreasonable determination of the facts. *See* 28
24 U.S.C. § 2254(d).

25 **B.    Merits**

26 Capital-sentencing proceedings are trials for purposes of double jeopardy
27 analysis. *See Arizona v. Rumsey*, 467 U.S. 203, 209–11 (1984); *Bullington v.*
28 *Missouri*, 451 U.S. 430, 438, 444–46 (1981). Thus, once a defendant is sentenced

1   to life, the state cannot again place a defendant in jeopardy of death, and certainly

2   not at the mercy of a second, different jury. *See Arizona v. Rumsey*, 467 U.S. 203,

3   205 (1984); *Wade v. Hunter*, 336 U.S. 684, 689 (1949) (recognizing "a defendant's

4   valued right to have his trial completed by a particular tribunal"); *see also Ex Parte*

5   *Lange*, 85 U.S. (18 Wall.) 163, 173 (1873) ("It is the punishment that would legally

6   follow the second conviction which is the real danger guarded against by the

7   Constitution.").

8       At the time of guilt phase in the Cronin matter, life imprisonment was the

9   maximum punishment to which Lehr was exposed based on the jury's verdict alone.

10   *See State v. Ring*, 25 P.3d 1139, 1151 (Ariz. 2001), *reversed by Ring*, 536 U.S. 584.

11   The Arizona Supreme Court explained that under the law in effect at the time of the

12   guilt phase, "a defendant [could not] be put to death solely on the basis of a jury's

13   verdict, regardless of the jury's factual findings. The range of punishment allowed

14   by law on the basis of the verdict alone [was] life imprisonment...." *Id*.

15       Thus, when jeopardy attached at Lehr's original guilt phase for Cronin, the

16   jury's verdict—by itself—did not permit a death sentence. At that time, a life

17   sentence was the greatest lawful sentence. Imposition of a death sentence by a judge

18   had been struck down in *Ring* and no replacement statute had yet been enacted. *See*

19   *Ring*, 536 U.S. at 584. Taken together, the guilt-phase jury verdict and the *Ring*

20   decision operated to direct a life sentence for Lehr. Once those two controlling

21   events occurred, Lehr should have been re-sentenced to life imprisonment, the only

22   legally allowable sentence at that time, given his death sentence was invalidated as

23   a matter of law.

24       Instead, Arizona impermissibly subjected Lehr to double jeopardy by

25   impaneling a new jury to adjudicate the question of penalty—an issue already

26   decided based on the jury verdict returned in the guilt phase and the law at that time.

27   This result finds support in *People v. Harvey*, 76 Cal. App. 3d 441 (1978). There,

28   the defendant was tried, convicted, and sentenced to death under a capital-

punishment scheme that was subsequently struck down. *Id*. at 444, 446–47. The state legislature enacted a new death-penalty statute while the defendant's appeal was pending. *Id*. at 447. The state argued that the new statute could lawfully be applied to evaluate the appropriateness of the defendant's death sentence, but the California Court of Appeals disagreed, holding that it would constitute double jeopardy. *Id*. The court observed that as a practical matter, the intervening invalidation of the statute under which the defendant was sentenced "automatically reduced the appellant's sentence to life imprisonment" as of the date the statute was struck down. *Id*. Because the Double Jeopardy Clause applies "to all cases where a second punishment is attempted to be inflicted for the same offense by a judicial sentence," the court held that the state could not impose the more serious punishment made available by the new statute. *Id*. at 448–49 (quoting *Lange*, 85 U.S. at 173). The proscription on double jeopardy demands the same result here. This constitutional violation, when considered individually and cumulatively with other errors identified in this petition, entitles Lehr to evidentiary development and relief.

## CLAIM THIRTY-NINE

**Resentencing Lehr pursuant to a statute not in effect at the time of guilt-phase trial violated his rights to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Applying Arizona's new death-penalty statute to resentence Lehr in the Cronin case violated his due process rights because Lehr's counsel prepared the guilt-phase trial assuming that the trial judge, not an unknown jury, would be deciding his sentence. Resentencing Lehr pursuant to a statute not in effect at the time of guilt-phase trial violated Lehr's rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution.

### A.   Exhaustion

Lehr preserved this claim in the list of constitutional issues raised in his direct appeal. (DA2 82 at 81.) There, he argued "[i]mposition of a death sentence under a statute not in effect at the time of Appellant's trial violates due process under the Fourteenth Amendment." (DA2 82 at 81.) Only listing the issue verbatim in its appendix, the Arizona Supreme Court did not reach the merits of this claim. *Lehr III*, 254 P.3d at 395. Because this claim has not been adjudicated on the merits by Arizona courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of this claim. Even if listing this issue in the appendix is found by this Court to be a decision on the merits, the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

### B.   Merits

During the entirety of the 1996 guilt phase proceedings, the Cronin-related portions of the case against Lehr were handled by his trial counsel based on the understanding that the trial judge would ultimately decide the penalty. Irrespective of any ex post facto problems (*see* Claim 40), sentencing Lehr to death under a statute that was not in effect at the time of his trial violated due process and requires a new trial. *See Coleman v. McCormick*, 874 F.2d 1280 (9th Cir. 1989).

In *Coleman*, the Ninth Circuit, sitting en banc and relying on "fundamental principles of procedural fairness" set forth by the U.S. Supreme Court, reversed a death sentence where the petitioner prepared for trial in reliance on a sentencing scheme that was subsequently invalidated and was then resentenced under a newly enacted scheme for which he did not prepare. *Id.* at 1285–86 (citing *Presnell v. Georgia*, 439 U.S. 14, 16 (1978), *Gardner v. Florida*, 430 U.S. 349, 357 (1977), and *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 161 (1951) (Frankfurter, J., concurring)); *see also Coleman*, 874 F.2d at 1288 ("The Supreme

490

Court has stressed the great need for reliability in capital cases requiring that 'capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." (quoting *Strickland v. Washington*, 466 U.S. 688, 704 (1984) (Brennan, J., concurring in part and dissenting in part))).

The court reversed in *Coleman* because the petitioner had made strategic decisions that may have been different had he initially been tried under the second scheme. *Id*. at 1285–87. As the Ninth Circuit succinctly put it, "The defendant is due at least that amount of process which enables him to put on a defense during trial knowing what effect such a strategy will have on the subsequent capital sentencing, the results of which may be equally if not more critical to the defendant than the conviction itself." *Id*. at 1288. The court provided one example of how a shift in sentencing schemes could have affected his trial decisions, which is pertinent to Lehr's case:

> The new death penalty statute also impacted the delicate decision of whether to challenge the trial judge. At the time Coleman was tried, Montana permitted a party to a criminal case to remove the assigned judge without cause. Indeed, the prosecution removed the first judge assigned to Coleman's case because of a belief that he was prejudiced against the prosecution's position. Coleman might have elected to remove the next judge who was assigned the case. He did not. But he did not know that under the new statute his trial judge would become his sentencer, if he were convicted. It is one thing to accept a judge for the purpose of conducting a fair trial, and quite another to accept that judge not only to conduct the trial but to become the sole decisionmaker on the question of life or death. Coleman had no reason to consider these factors under the old law. They became relevant only under the new law. Realistically, therefore, Coleman never had the opportunity to make an informed decision whether to challenge the trial judge, and thereby prevent him from becoming the sentencer. That scenario simply did not present itself under the old law. And yet, Coleman had to bear the consequence of sentencing under the new law as if such a decision had been made.

*Coleman*, 874 F.2d at 1287 (citation omitted). Here, too, Arizona law allows parties to challenge judges. *See*, *e.g.*, Ariz. R. Prof. Conduct 8.4 (comment to experimental 2001 amendment to 8.4(G)) ("Arizona is one of only a few states that allow by

judicial rules a party to notice a change of judge without cause."). Lehr's trial team had to determine whether to challenge the trial judge without knowing that ultimately that judge would not be responsible for sentencing. To rephrase the *Coleman* decision, it is one thing to accept a judge based on his perceived favorable sentencing determinations, and quite another to accept the same judge when his views on sentencing may be irrelevant. *See id.*

In *Coleman*, the Ninth Circuit also squarely rejected harmless error analysis. *Id.* at 1288–89. Given the type of error—the defendant preparing his case based on considerations no longer applicable at the time of sentencing—the court emphasized the "reviewing court's inability to determine whether such violations were in fact harmless beyond a reasonable doubt." *Id.* at 1289 ("To apply harmless error analysis under such circumstances would require the reviewing court to engage in an inquiry that was purely speculative." (internal quotation marks omitted)). The due process violation therefore requires reversal absent harmlessness analysis. When considered individually and cumulatively with other errors identified in this petition, this constitutional violation entitles Lehr to relief.

## CLAIM FORTY

**The trial court violated the Ex Post Facto Clause of the U.S. Constitution by sentencing Lehr under Arizona's post-Ring capital-sentencing statute.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Using Arizona's new, post-*Ring* death-penalty statute to sentence Lehr was an ex post facto violation. The new sentencing law provided new aggravating factors which are essentially new elements to the charge.

### A.    Exhaustion

While this claim alleges an ex post facto violation, Lehr submits that the claim is exhausted based on his argument on direct appeal that the "[i]mposition of

a death sentence *under a statute not in effect at the time* of Appellant's trial" violated his rights. (*See* DA2 82 at 81 (emphasis added).) Only listing the issue verbatim in its appendix, the Arizona Supreme Court did not reach the merits of this claim. *Lehr III*, 254 P.3d at 395. Because this claim has not been adjudicated on the merits by Arizona courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of this claim. Even if listing this issue in the appendix is found by this Court to be a decision on the merits, the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

To the extent the Court determines that this claim was not raised in state court, Lehr alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Moreover, there was an absence of available state corrective process or circumstances exist that rendered the process ineffective, thereby excusing the failure to exhaust. *See* 28 U.S.C. § 2254(b)(1)(B). Alternatively, Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland*, 466 U.S. at 687–88. Lehr will demonstrate through his filings and at an evidentiary hearing that state court counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

## B.    Merits

The trial court's application of Arizona's newly enacted death-penalty statute to Lehr violated the ex post facto clause of the United States Constitution.

Lehr was convicted of first-degree murder in the Cronin, Morales, and

1   Christorf cases in 1996, and sentenced to death in those cases in 1997. Lehr's retrial
2   and sentencing on the Christorf and Morales offenses and resentencing in Cronin
3   occurred in 2009. But the offenses for which he was convicted and sentenced
4   occurred in 1991 and 1992. (ROA 1 at 4, 8–9.) On June 24, 2002, the U.S. Supreme
5   Court invalidated Arizona's death-penalty statute after finding that it
6   unconstitutionally directed the judge, rather than the jury, to find those facts making
7   a defendant eligible for the death penalty. *Ring*, 536 U.S. at 588–89.

8       The Arizona legislature did not amend Arizona's death-penalty statute to
9   comply with *Ring* until August 1, 2002. *See* 2002 Ariz. Legis. Serv. 5th Sp. Sess.,
10   Ch. 1 (West). Accordingly, for a period of 38 days in June and July of 2002, Arizona
11   had no death-penalty statute in effect. The trial court's application of the newly
12   enacted death-penalty statute to Lehr's case violated the prohibition on the
13   retroactive application of substantive changes in laws that increase possible
14   criminal punishment. *See Weaver v. Graham*, 450 U.S. 24, 28–29 (1981).

15       Article I, Section 10, of the Constitution prohibits ex post facto laws. In
16   *Weaver*, the U.S. Supreme Court noted that critical to the ex post facto prohibition
17   is a concern for "the lack of fair notice and governmental restraint when the
18   legislature increases punishment beyond what was prescribed when the crime was
19   consummated." 450 U.S. at 30. *Weaver* set forth two critical elements by which to
20   examine whether a law is being applied in violation of the ex post facto clause of
21   the U.S. Constitution. Application of a newly enacted law violates the Ex Post Facto
22   Clause if: (1) the law is retrospective, meaning that it "appl[ies] to events occurring
23   before its enactment," and (2) the law disadvantages the defendant. *Id*. at 29. A law
24   disadvantages a defendant if it is "more onerous than the law in effect on the date
25   of the offense." *Id*. at 30.

26       Although "no ex post facto violation occurs if the change effected is merely
27   procedural," the "[a]lteration of a substantial right" such as an "'increase [in] the
28   punishment'" or "'change [in] the ingredients of the offense or the ultimate facts

1   necessary to establish guilt'" are not procedural. *Id*. at 29, n.12 (quoting *Hopt v.*

2   *Utah*, 110 U.S. 574, 590 (1884)). "The inquiry looks to the challenged provision,

3   and not to any special circumstances that may mitigate its effect on the particular

4   individual." *Weaver*, 450 U.S. at 33.

5          The statute in effect at the time the crimes occurred and Lehr was convicted

6   was deemed unconstitutional. *Ring*, 536 U.S. 584. The capital-sentencing statute

7   that applied to Lehr was not enacted until August 1, 2002. 2002 Ariz. Legis. Serv.

8   5th Sp. Sess., Ch. 1 (West). Therefore, the application of the newly enacted capital-

9   sentencing statute to Lehr was retrospective, applying to events occurring before its

10   enactment. *See Weaver*, 450 U.S. at 29.

11          The new, retrospective statute also constituted a substantive change in law

12   that disadvantaged defendants. For 38 days prior to the statute's enactment, the

13   death penalty was not an available punishment and the maximum sentence available

14   was life imprisonment. In addition, the Arizona legislature created a new category

15   of first-degree murder, capital murder with aggravating circumstances functioning

16   as elements of the new crime. In *Ring*, the Supreme Court found that Arizona's

17   enumerated aggravating circumstances operate as "the functional equivalent of an

18   element of a greater offense" and that the Sixth Amendment therefore required them

19   to be found by a jury. 536 U.S. at 609. Thus, the new sentencing law that was

20   applied to Lehr in his 2009 trial included new aggravating factors which are new

21   elements to the charges he faced for offenses which occurred in the early 1990s.

22   These elements were not part of the charges under the pre-*Ring* law which was in

23   place at the time of the offenses. This is constitutionally impermissible. Moreover,

24   the new law disadvantaged defendants in sentencing because the State was no

25   longer allowed only to rebut evidence of mitigation, but to present "any evidence

26   that demonstrates that the defendant shall not be shown leniency." A.R.S. § 13-

27   703.01(G) (2004) (current version at A.R.S. § 13-752(G)).

28          Any application by the trial court of statutes enacted after Lehr was convicted

495

(rather than of those in effect at the time of the offenses) violated his constitutional rights. Application of the new death-penalty statute violated the prohibition against ex post facto laws and, as a result, Lehr's sentencing under the new death-penalty statute violated his constitutional rights. Lehr is therefore entitled to habeas relief.

## CLAIM FORTY-ONE

**The imposition of the death penalty on a person with brain damage violates the Eighth and Fourteenth Amendments.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

As explained in Claim 12, Lehr suffers from a range of mental illnesses that include obsessive compulsive disorder, paranoia, and depression. Those mental-health impairments, along with the neurological impairments from Lehr's documented brain injury, render him ineligible for the death penalty under the Eighth and Fourteenth Amendments to the United States Constitution.

### A.    Exhaustion

Because this is a categorical bar on the death penalty, Lehr's prior counsel's failure to identify and raise this claim does not bar this Court's consideration of its merits. Further, not reviewing this claim would lead to a fundamental miscarriage of justice. If, however, the Court finds that it is subject to the necessity of exhaustion, this claim was not raised in state court. Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Lehr will demonstrate through his filings and at an evidentiary hearing that post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because

1    this claim has not been adjudicated by the Arizona state courts, the limitations on

2    relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the

3    Court may consider the merits of the claim de novo.

4        Under the Supreme Court's Eighth Amendment jurisprudence, whether

5    someone is constitutionally eligible for the death penalty turns on whether they are

6    sufficiently personally "culpable" to deserve the penalty of death. *See, e.g.*, *Tison*,

7    481 U.S. at 149; *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J.,

8    concurring). Personal culpability hinges on a defendant's ability to make fully

9    reasoned decisions and conform his behavior to societal norms. *Thompson v.*

10   *Oklahoma*, 487 U.S. 815, 835 (1988) (plurality opinion). For these reasons, in

11   *Atkins v. Virginia*, 536 U.S. 304 (2002); *Roper v. Simmons*, 543 U.S. 551, 560–61

12   (2005), and *Ford v. Wainwright*, 477 U.S. 399 (1986), the Supreme Court affirmed

13   the constitutional prohibition on executing, respectively, intellectually disabled

14   individuals, juveniles, and those who are incompetent.

15       The evolving standards of decency embodied in the Eighth and Fourteenth

16   Amendments, as explained in those three Supreme Court decisions, require that the

17   imposition of the death penalty on defendants with mental illness and organic brain

18   impairment no longer be considered constitutional. The reasoning the Court applied

19   in *Atkins*, *Simmons*, and *Ford* applies with equal logic to those suffering from

20   serious mental illnesses and neurological impairments. Those who suffer from those

21   mental and neurological disorders are likewise less culpable because they are less

22   able to make fully reasoned decisions and conform their behavior to societal norms.

23   Therefore, Lehr and other defendants who suffer from serious mental illness or

24   neurological impairments should be protected from execution.

25   **B.    Infliction of capital punishment upon individuals who suffer from
26          brain impairment at the time of the offense makes no measurable
27          contribution to the acceptable goals of punishment.**

28   The United States Supreme Court has held that the death penalty violates the

Eighth Amendment when it "'makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering[.]'" *Penry v. Lynaugh*, 492 U.S. 302, 335 (1989) (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). The Court has identified "'two principal social purposes'" served by capital punishment: "'retribution and deterrence of capital crimes[.]'" *Penry*, 492 U.S. at 335–36 (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)). In *Enmund v. Florida*, 458 U.S. 782 (1982), the Court held that, "[u]nless the death penalty when applied to those in [the defendant's] position measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." *Enmund*, 458 U.S. at 798 (citation omitted). In *Atkins*, the Court held that the death penalty, when applied to the intellectually disabled, advances neither of these goals. *Atkins*, 536 U.S. at 319–20.

The Court's reasoning in *Atkins* dictates that capital punishment inflicted on individuals who suffer from cognitive impairments due to brain damage at the time of the offense is nothing more than the purposeless and needless imposition of pain and suffering. It makes no measurable contribution to the acceptable goals of punishment and fails to serve any legitimate penal purpose more effectively than a less severe penalty.

### 1. Retribution is not served by executing those who have brain impairment at the time of the offense.

The Supreme Court has recognized that "'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Penry*, 492 U.S. at 319 (quoting *California*

*v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113–15 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978).

The Court has also stated that "retribution as a justification for executing [offenders] . . . very much depends on the degree of [their] culpability[.]" *Enmund*, 458 U.S. at 800. Moreover, culpability is not based solely upon the magnitude of harm resulting from the offense. "For purposes of imposing the death penalty, . . . punishment must be tailored to [a defendant's] personal responsibility and moral guilt." *Id.* at 801. The rationale of the Court's acceptance in *Atkins* that intellectually disabled murderers are so lacking in moral blameworthiness as to be ineligible for the death penalty dictates that those with brain damage should likewise be ineligible:

> Because of their impairments, . . . [intellectually disabled persons] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . . . Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins*, 536 U.S. at 318. These characterizations apply with equal force to those who have brain impairment at the time of the offense. If intellectually disabled individuals warrant exemption from capital punishment due to their cognitive and behavioral limitations, so, too, do persons who suffer from brain damage at the time of their offense. Because of their significantly reduced moral culpability, the execution of those with organic brain impairment does not advance the goal of retribution.

### 2. Deterrence is not served by executing those who have organic brain damage at the time of the offense.

In *Atkins*, the Court said that for intellectually disabled offenders, the "cold calculus" of cost and benefit is "at the opposite end of the spectrum from behavior[.]" *Atkins*, 536 U.S. at 319–20. As Justice Powell observed, "the death

penalty has little deterrent force against defendants who have reduced capacity for considered choice." *Skipper v. South Carolina*, 476 U.S. 1, 13 (1986) (Powell, J., concurring). The same is true for those who have brain impairment at the time of their offenses. As described above, organic brain impairment prevents people from being able to exercise impulse control and to make reasoned decisions. As such, these individuals, who often have little control over their impulses, are not meaningfully deterred by the threat of capital punishment.

The death penalty can serve no legitimate purpose when applied to defendants who have organic brain impairment at the time of the offense. In such circumstances, the death penalty amounts to the purposeless infliction of needless pain and suffering because it fails to advance either retribution or deterrence.

### C. The rationale for protecting those with intellectual disabilities and juveniles from execution applies equally to the seriously mentally ill and neurologically impaired.

The same principles outlined above apply to people with mental health disorders, like Lehr. Seriously mentally ill and neurologically impaired individuals exhibit characteristics equivalent to those characteristics which the Supreme Court found dispositive in finding the death penalty unconstitutional when imposed on individuals with intellectual disabilities and juveniles. It should not be the label that merits constitutional protection, but the underlying reasons for it.

When considering the retributive aim of the death penalty in *Atkins* the Court considered "[t]he diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment." *Hall*, 134 S. Ct. at 1993. Similarly, juveniles are protected because their "lack of maturity" and "'underdeveloped sense of responsibility'" often "'result[s] in impetuous and ill-considered actions and decisions.'" *Simmons*, 543 U.S. at 569 (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). As a group, people with serious or multiple mental illnesses have certain characteristics that diminish their culpability in precisely the ways the Supreme Court has relied on in establishing categorical

exemptions. For instance, in *Atkins* one characteristic found to decrease culpability was "significant limitations in adaptive skills such as communication, self-care, and self-direction." *Atkins*, 536 U.S. at 318. Mild brain impairments or mental health disorders are also associated with impairments in activities of daily living and deficits in decisionmaking, and impaired social functioning. *See, e.g.*, S. Duke Han, et al., *Mild Cognitive Impairment Is Associated with Poorer Decision-Making in Community-Based Older Persons*, 63 J. Am. Geriatrics Soc. 676, 681 (2015); Marie-Theres Pertl, et al., *Decision Making and Ratio Processing in Patients with Mild Cognitive Impairment* 48 J. Alzheimer's Disease 765, 765–79 (2015); Julie D. Henry, et al. *Social Behavior in Mild Cognitive Impairment and Early Dementia*, 34 J. Clinical & Experim'l Neuropsychology 806, 806–13 (2012).

Likewise, serious mental illness results in extreme functional impairments and limitations in adaptive behavior. *See* Helen Shin, Note, *Is the Death of the Death Penalty Near? The Impact of* Atkins *and* Roper *on the Future of Capital Punishment for Mentally Ill Defendants*, 76 Fordham L. Rev. 465, 488 (2007); *cf.* A.R.S. § 36-550(4) (2003) (requiring individuals to exhibit a "long-term limitation of their functional capacities for primary activities of daily living" in order to be designated seriously mentally ill for purposes of statewide residential treatment).

As for reliability and culpability, those with neurological impairments or disorders suffer from cognitive deficits that include impaired memory, executive functioning, and decisionmaking, similar to an intellectually disabled person. *See, e.g.*, Pertl, et al., *Decision Making and Ratio Processing in Patients with Mild Cognitive Impairment*, 48 J. Alzheimer's Disease at 765–79. The directly analogous nature of neurological impairments to the cognitive impairments of the intellectually disabled is clear.

The second penological aim of the death penalty is deterrence. As the *Simmons* Court explained, the limitations of juveniles and intellectually disabled persons make them less likely to engage in the "cost-benefit analysis that attaches

any weight to the possibility of execution." *Simmons*, 543 U.S. at 572 (quoting *Thompson*, 487 U.S. at 837). The same is true of those with serious mental illness. They suffer from directly comparable deficits in cognitive and adaptive functioning, such that the possibility of execution does not act as an effective deterrent. Any type of decision-making process is infected by the deficits in perception that are characteristic of serious mental illness; in short, "[c]ertainly no one believes that the death penalty can deter people from becoming psychotic." Amnesty Int'l, *United States of America: The Execution of Mentally Ill Offenders* 50, Al Index AMR 51/003/2006 (Jan. 31, 2006), http://www.amnesty.org/en/documents/AMR51/003/2006/en/.

The Supreme Court has also recognized,

> A further reason for not imposing the death penalty on a person who is intellectually disabled is to protect the integrity of the trial process. These persons face "a special risk of wrongful execution" because they are more likely to give false confessions, are often poor witnesses, and are less able to give meaningful assistance to their counsel.

*Hall*, 134 S. Ct. at 1993 (quoting *Atkins*, 536 U.S. at 320–21). The same is true of those with serious mental illness. *See, e.g.*, Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1067 (2010) ("[P]olice have long known that suspects may admit to crimes that they did not commit for a range of reasons, including mental illness."); Saul M. Kassin, et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & Hum. Behav. 3, 22 (2010) ("[M]ost mentally disordered offenders exhibited insufficient understanding of *Miranda* [warnings], particularly when the warnings required increased levels of reading comprehension.").

The unifying theme of *Atkins*, *Simmons*, and *Ford* is that a prisoner's diminished mental capacity—whether gauged by intellectual ability, maturity, or mental health—bars his eligibility for capital punishment. The imposition of the death penalty on the seriously mentally ill and neurologically impaired, like its imposition on the intellectually disabled, juveniles, and the incompetent, does not

further either retribution or deterrence. It therefore violates the Eighth and Fourteenth Amendments. Moreover, because there is no rational or legitimate reason to distinguish between the seriously mentally ill and neurologically impaired and the other groups that are protected from the death penalty, failing to protect them from the death penalty violates the Equal Protection Clause of the Fourteenth Amendment, which forbids the differential treatment of similarly situated classes of persons.

> **D.   Like intellectual disability, aspects of organic brain impairment and mental health disorders undermine the strength of the procedural protections that our nation's capital jurisprudence steadfastly guards.**

In *Atkins*, the Court pointed to "the reduced capacity" of intellectually disabled offenders as a justification for a categorical bar against their execution. "The risk 'that the death penalty will be imposed in spite of factors which may call for a less severe penalty' is enhanced," in part, "by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation[.]" *Atkins*, 536 U.S. at 320 (quoting *Lockett*, 438 U.S. at 605). "Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.* at 320–21.

Moreover, intellectual disability as a mitigating factor can act as a "two-edged sword" by increasing the likelihood the defendant will be found a future danger by the jury. *Id.* at 321. This concern is equally applicable to those with organic brain impairment.

The Supreme Court has noted that a state may not attach the aggravating label "to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." *Zant v. Stephens*, 462 U.S. 862, 885 (1983). The Court cited *Miller v. Florida*, 373 So.2d 882, 885–86 (Fla. 1979), which found a constitutional violation where it was "clear from the trial judge's sentencing order

that he considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness." Because of the risk that a jury will treat evidence of brain impairment, which is similar to an "incurable and dangerous mental illness" as an aggravating factor based on a misunderstanding of future dangerousness, due process and the Eighth Amendment require that such decisions be removed from the purview of the jury.

Capital juries are likely to treat organic brain impairment or mental health disorders as aggravating because they incorrectly assume that such impairment increases future dangerousness. Lay persons are ill-equipped to appreciate the role of brain impairment or mental health in behavior. Misuse of brain impairment or mental illness evidence unbalances the process by which mitigating and aggravating factors are weighed and impermissibly increases the chances that an offender with mental illness or a brain injury will receive the death penalty. As with intellectually disabled persons, only a categorical ban on executing offenders with brain impairment and/or serious mental health disorders at the time of the crime can adequately protect their constitutional rights. Indeed, these offenders require more such protection than other groups, precisely because of the stigma and misunderstanding surrounding their impairments.

In short, it is not enough to allow jury consideration of brain impairment or mental health as mitigation. Rather, as with intellectual disability, this Court must recognize that the Eighth Amendment contains a categorical exemption for those who have brain impairment and/or mental illness at the time of their offense.

### E.   Objective indicia indicate the existence of a consensus under the evolving standards of decency against the execution of those with compromised brain function

In both *Roper* and *Atkins*, the United States Supreme Court's analysis of the evolving standards of decency was informed by a broad range of objective factors, which formed one of the bases of its finding that consensus had developed against the imposition of the death penalty on juveniles and the intellectually disabled.

These objective factors included state legislation, sentencing practices, public opinion, stances of professional organizations, as well as international law and practice. A review of those objective factors related to the imposition of the death penalty on those with organic brain damage leads unavoidably to the conclusion that the execution of those with organic brain damage and/or mental illness offends contemporary standards of decency.

Professional consensus is relevant to Eighth Amendment jurisprudence. *See Hall*, 572 U.S. at 721–22. The American Psychiatric Association, the American Psychological Association, the Mental Health America (formerly known as the National Mental Health Association), and the National Alliance for the Mentally Ill have issued policy statements recommending the outright ban on the death penalty for persons with severe brain damage (dementia and traumatic brain injury)[29] whose conditions diminish their responsibility for their crimes.[30]

In 2006, the American Bar Association published recommendations stating

---

[29] Am. Psychiatric Ass'n, *Position Statement on Death Sentences for Persons with Dementia or Traumatic Brain Injury* (approved Nov. 2005; reaffirmed Dec. 2014), APA Document Ref. No. 20058 (Dec. 2005), http://www.psychiatry.org/ File%20Library/Learn/Archives/Position-2014-Death-Sentence-Cognitive-Impairment.pdf (recommending ban on execution of persons with dementia or traumatic brain injury whose impairments are similar to those with mental retardation); Am. Psychol. Ass'n, *Report of the Task Force on Mental Disability and the Death Penalty* (Mar. 2005), www.apa.org/pubs/info/reports/mental-disability-and-death-penalty.pdf (same); Mental Health Am., *Position Statement 54: Death Penalty and People with Mental Illnesses* (approved June 14, 2016), http://www.mentalhealthamerica.net/positions/death-penalty (same).

[30] Am. Psychiatric Ass'n, *Position Statement on Diminished Responsibility in Capital Sentencing* (approved Dec. 2004; reaffirmed Dec. 2014), APA Document Ref. No. 200406, http://www.psychiatry.org/File%20Library/Learn/Archives/ Position-2014-Capital-Sentencing-Diminished-Responsibility.pdf (recommending ban on execution of mentally ill defendants whose mental capacity was diminished at the time of their crime); Am. Psychol. Ass'n, *Report of the Task Force on Mental Disability and the Death Penalty*, *supra* (same); Mental Health Am., *Position Statement 54*, *supra* (same); Nat'l Alliance on Mental Illness, *Public Policy Platform of NAMI: Criminal Justice and Forensic Issues § 10.9: Death Penalty* (Dec. 2016), https://www.nami.org/NAMI/media/NAMI-Media/downloads/Public-Policy-Platform_9-22-14.pdf (same).

1   that persons with "a severe mental disorder or disability" should not be executed or
2   sentenced to death. Am. Bar Ass'n, Section of Individual Rights and
3   Responsibilities, Res. 122A (2006), https://files.deathpenaltyinfo.org/
4   legacy/documents/ 122AReport.pdf (last visited December 10, 2019). These
5   recommendations have since been endorsed by a wide range of leading mental
6   health organizations, including the National Alliance on Mental Illness, the
7   American Psychiatric Association, and the American Psychological Association.
8   Ronald J. Tabak, *Overview of Task Force Proposal on Mental Disability and the*
9   *Death Penalty*, 54 Cath. U.L. Rev. 1123, 1123 (2005); Am. Psychiatric Ass'n,
10  *Position Statement on Diminished Responsibility in Capital Sentencing*, *supra*.

11      Given widespread public misconceptions about neurological impairments,
12  the opinions of professional organizations are of particular import in reviewing
13  objective indicia of a national consensus in this context. *See Atkins*, 536 U.S. at
14  315–16 (taking into account unpopularity of legislation protecting convicted
15  criminals in determining whether national consensus existed against execution of
16  intellectually disabled individuals).

17      The prohibition on executing those with neurological functioning
18  compromised by disease, illness, disorder, or impairment is also an established
19  norm of international law. For example, the United Nations Commission on Human
20  Rights has called on countries "[n]ot to impose the death penalty on a person
21  suffering from any form of mental disorder." *See, e.g.*, U.N. Comm'n on Human
22  Rights Res. 2004/67, U.N. Doc. E/CN.4/RES/2004/67 at 2 (Apr. 21, 2004). A broad
23  international consensus has developed against imposing the death penalty on those
24  with neurological impairments. Across the United States and around the world,
25  standards of decency have evolved such that it has become constitutionally
26  unacceptable to execute individuals like Lehr.

27      **F.    Lehr is categorically ineligible for the death penalty.**
28      Lehr's traumatic brain injury causes neurological impairments and his mental

health disorders cause him to experience obsessive and compulsive thoughts, paranoia, and depression. Such conditions render him ineligible for the death penalty. Because Lehr has brain damage, documented through neuroimaging (*see* PCR Pet. Ex. L), in addition to a range of mental health disorders (*see* PCR Pet. Ex. J, K), he lacks culpability in the same way as those who are intellectually disabled. In addition to violating the national consensus against executing neurologically impaired persons, his execution would not serve the purported aims of the death penalty, and his personal characteristics lead to an intolerable danger that the investigation and proceedings against him were constitutionally unreliable. Accordingly, the Eighth and Fourteenth Amendments prohibit Lehr's execution. He is thus entitled to habeas relief.

## CLAIM FORTY-TWO

**Executing Lehr after his lengthy incarceration on death row would violate Lehr's right to be free from cruel and unusual punishment.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The State of Arizona first sentenced Lehr to death in 1997 – over twenty-two years ago. Lehr's execution after spending so many years on death row serves no penological purpose. He has already been punished and continues to be punished. His execution would provide no value in deterrence or in retribution. Therefore, Lehr's execution would be cruel and unusual in violation of the Eighth Amendment of the United States Constitution.

### A.    Exhaustion

This claim was not raised in state court. It was not ripe for review until now. *See Panetti v. Quarterman*, 551 U.S. 930, 947 (2007) (holding claim raised for the first time in second habeas corpus application was not barred when the claim was not ripe at the time the first application was filed). Alternatively, Lehr alleges he can overcome any default of this claim by showing cause and prejudice,

including because of the ineffective assistance of appellate and post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see Davila*, 137 S. Ct. 2058. Lehr will demonstrate through his filings and at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. In addition, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

## B.    Merits

The State capitally charged Lehr over twenty-seven years ago. (ROA 001.) The trial court sentenced Lehr to death in 1997. (ROA 567.) After spending four years on death row, the Arizona Supreme Court reversed two of Lehr's death sentences in 2002 (*Lehr I*) and the third death sentence in 2003 pursuant to *Ring* (*Lehr II*). While Lehr's death sentences were vacated, Lehr remained housed on death row at the Arizona Department of Corrections and made just a few trips to the county jail because he waived his presence at trial. Following his retrial and resentencing, a jury then imposed two of the death sentences in 2009. Executing Lehr after he has served this substantial amount of time under his death sentences would violate his Eighth and Fourteenth Amendment rights.

Executing Lehr after his lengthy imprisonment would be unconstitutional because no penological justification would support the punishment. The Supreme Court has recognized deterrence and retribution as the justifications for the death penalty. *See Enmund v. Florida*, 458 U.S. 782, 798 (1982); *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). But when these aims can no longer be advanced, an execution "is nothing more than the purposeless and needless imposition of pain and suffering and hence an

unconstitutional punishment." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002) (internal quotation marks and citation omitted); *see also Furman v. Georgia*, 408 U.S. 238, 279–80 (1972) (Brennan, J., concurring).

Executing Lehr would provide little, if any, deterrent effect that is not achieved by a lifetime of imprisonment. *See, e.g.*, *Valle v. Florida*, 564 U.S. 1067, 1068 (2011) (Breyer, J., dissenting from denial of stay) ("It is difficult to imagine how an execution following so long a period of incarceration could add significantly to that punishment's deterrent value."); *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in denial of certiorari) ("[T]he deterrent value of incarceration during that period of uncertainty [confined under a death sentence] may well be comparable to the consequences of the ultimate step itself."); *Lackey v. Texas*, 514 U.S. 1045, 1046 (1995) (Stevens, J., mem. respecting denial of certiorari).

The "longer the delay, the weaker the justification for imposing the death penalty in terms of punishment's basic retributive or deterrent purposes." *Knight v. Florida*, 528 U.S. 990, 990 (1999) (mem.) (Breyer, J., dissenting from denial of certiorari); *see also Lackey*, 514 U.S. at 1045 (Stevens, J., mem. dissenting from denial of certiorari) ("It is arguable that neither [retribution nor deterrence] retains any force for prisoners who have spent some 17 years under a sentence of death."). The lengthy delay between the day of incarceration and the day of execution "can inflict 'horrible feelings' and 'in (sic) immense mental anxiety amounting to a great increase of the offender's punishment.'" *Foster v. Florida*, 537 U.S. 990, 992 (2002) (Breyer, J., mem. dissenting from denial of certiorari). After inflicting such anxiety on the petitioner by making him wait long periods before carrying out his death sentence, the state hardly furthers the goal of retribution by finally executing him. *See, e.g.*, *Dist. Att'y for the Suffolk Cty. Dist. v. Watson*, 411 N.E.2d 1274, 1287 (Mass. 1980). Further, the added deterrent effect of executing someone who has spent a long time on death row awaiting his execution is slight indeed. *See*

1    *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., mem. respecting denial

2    of certiorari). When the death penalty ceases to realistically further the purposes of

3    retribution and deterrence, its imposition is simply "the pointless and needless

4    extinction of life with only marginal contributions to any discernible social or public

5    purposes." *Lackey*, 514 U.S. at 1046 (Stevens J., mem. dissenting from denial of

6    certiorari) (quoting *Furman*, 408 U.S. at 312 (White, J., concurring)). "A penalty

7    with such negligible returns to the State would be patently excessive and cruel and

8    unusual punishment violative of the Eighth Amendment." *Id*.

9         Studies on the question of the death penalty's deterrent value are

10   contradictory and inconclusive, and therefore insufficient to justify Lehr's

11   execution. *See Glossip v. Gross*, 135 S. Ct. 2726, 2767–68 (2015) (Breyer, J.,

12   dissenting) (comparing sources); *Baze v. Rees*, 553 U.S. 35, 79 (2008) (Stevens, J.,

13   concurring); *Ring*, 536 U.S. at 614–15 (2002) (Breyer, J., concurring). Nor would

14   retribution be a sufficient justification for Lehr's execution. *See Glossip*, 135 S. Ct.

15   at 2769 (Breyer, J., dissenting); *Coleman*, 451 U.S. at 960 (Rehnquist, J., dissenting

16   from denial of certiorari) ("There can be little doubt that delay in the enforcement

17   of capital punishment frustrates the purpose of retribution."). Because neither

18   penological justification for the death penalty has much, if any, force after an

19   excessive period of confinement under a death sentence, such an execution would

20   be gratuitous.

21        Moreover, Lehr's time on death row, in and of itself, has been a severe

22   punishment due to his housing in solitary confinement, making the additional

23   punishment of execution excessive. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209

24   (2015) (Kennedy, J., concurring) (discussing years in solitary confinement as an

25   "added punishment"); *Hutto v. Finney*, 437 U.S. 678, 685 (1978) ("Confinement in

26   a prison or in an isolation cell is a form of punishment subject to scrutiny under

27   Eighth Amendment standards."); *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d

28   549, 563–64, 566–69 (3d Cir. 2017) (discussing the harsh conditions of death row,

its deprivations compared to those of general population, and studies of the severe psychological consequences of solitary confinement), *cert. denied sub nom. Walker v. Farnan*, 138 S. Ct. 357 (2017), *and cert. denied sub nom. Williams v. Wetzel*, 138 S. Ct. 357 (2017). Time spent in solitary confinement awaiting execution is "an additional punishment of the most important and painful character," *In re Medley*, 134 U.S. 160, 171 (1890), and "research still confirms what [the] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring).

Accordingly, the American Bar Association and the United Nations Special Rapporteur on Torture have recommended limitations on the use of solitary confinement. *See Glossip*, 135 S. Ct. at 2765 (Breyer, J., dissenting). Indeed, foreign courts have found that extended delay in the imposition of a death sentence "renders ultimate execution inhuman, degrading, or unusually cruel." *Knight v. Florida*, 528 U.S. 990, 995 (1999) (Breyer, J., dissenting from denial of certiorari); *see also Foster*, 537 U.S. at 992–93 (Breyer, J., dissenting from denial of certiorari). By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). It therefore forbids punishments that are excessive. *See id.* In addition, the Eighth and Fourteenth Amendments require that state-imposed punishment remain within civilized standards. *See Robinson v. California*, 370 U.S. 660, 675 (1962) (Douglas, J., concurring). Execution after prolonged solitary confinement is cruel and unusual. Lehr has been severely punished through his imprisonment, and exacting the additional punishment of an execution would be excessive.

In addition, the stress of living under threat of death for lengthy periods is so oppressive that it, on its own, can constitute cruel and inhuman treatment. "The dehumanizing effect of solitary confinement is aggravated by uncertainty as to whether a death sentence will in fact be carried out." *Glossip*, 135 S. Ct. at 2765

(Breyer, J., dissenting). The United States Supreme Court has recognized the toll that waiting for execution can take on a prisoner, writing over a century ago—of a delay of just four weeks—that "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." *In re Medley*, 134 U.S. at 172; *see also Valle*, 564 U.S. at 1067 (Breyer, J., dissenting from denial of stay); *Knight*, 528 U.S. at 994–95 (Breyer, J., dissenting from denial of certiorari); *Furman*, 408 U.S. at 288–89 (Brennan, J., concurring). Conditions of confinement on death row can be "so degrading and brutalizing to the human spirit as to constitute psychological torture." *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972), *superseded as stated in Strauss v. Horton*, 207 P.3d 48 (Cal. 2009); *see also Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("[T]he onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."). "Whatever one believes about the cruelty of the death penalty itself, this violence done to the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest." *Watson*, 411 N.E.2d at 1291 (Liacos, J., concurring). Certainly, then, such cruel treatment also renders any further punishment, namely execution, unconstitutional.

Given the length of time Lehr has spent on death row, the conditions of confinement, including the unique stress of living under threat of execution, historical understandings of "cruel and unusual" punishment, and the evolving standards of decency, executing Lehr at this time would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. He is therefore entitled to relief.

## CLAIM FORTY-THREE

**Due Process requires that this Court re-evaluate Lehr's death sentences in light of the significant changes to Lehr's person and**

**circumstances in the past twenty-two years since he was convicted and originally sentenced to death.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Due process requires that this Court re-evaluate Lehr's death sentences in light of the significant changes to Lehr's circumstances in the almost twenty-two years since he was originally sentenced to death, and ten years since his resentencing in 2009.[31] Lehr's death sentences must be re-evaluated to satisfy the due-process and reliability requirements of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

This claim was not raised in state court because this claim previously was not available or ripe for review, and there is no longer any mechanism for state merits review. *See* 28 U.S.C. § 2254(b); *see also Panetti v. Quarterman*, 551 U.S. 930, 947 (2007). Because this claim has not been adjudicated by the state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not restrict review, and the Court may consider the claim de novo. *See Dickens v. Ryan*, 740 F.3d 1302, 1320–21 (9th Cir. 2014) (en banc). Alternatively, Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see Davila*, 137 S. Ct. 2058. Lehr will demonstrate through his filings and at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced him. In addition, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice.

---

[31] The trial court sentenced Lehr to death in 1997. The Arizona Supreme Court reversed two of Lehr's death sentences in 2002 (*Lehr I*) and the third death sentence in 2003 pursuant to *Ring* (*Lehr II*). Following his retrial and re-sentencing, a jury then imposed two of the death sentences in 2009.

1    Lehr is sixty years old and has a positive prison record. The record shows he
2  has successfully adjusted to life in prison. In light of these circumstances, due
3  process requires that his death sentences be re-evaluated.

4    "The fundamental requirement of due process is the opportunity to be heard
5  'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S.
6  319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). A capital
7  sentencing "must satisfy the requirements of the Due Process Clause," *Gardner v.
8  Florida*, 430 U.S. 349, 358 (1977) (plurality opinion). Capital defendants retain a
9  liberty interest in life even after conviction and sentence. *See Ohio Adult Parole
10  Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and
11  concurring in the judgment, joined by Souter, J., Ginsburg, J., and Breyer, J.). In
12  accordance with these principles and the heightened reliability requirement for the
13  death penalty, if a defendant's circumstances change significantly between the time
14  when his death sentence is imposed and the time when it will be carried out, due
15  process requires that the propriety of the sentence be re-evaluated in light of the
16  changed circumstances and characteristics of the defendant. *See Kelly v. Brewer*,
17  525 F.2d 394, 399–400 (8th Cir. 1975) (finding due process required meaningful
18  periodic reviews of inmates in segregation to determine if segregation is still
19  appropriate).

20    The Court should consider whether a capital sentence is still appropriate for
21  Lehr. Since Lehr was first sentenced to death in 1997, not only has Lehr proven to
22  be non-violent in prison, but he has been a model of good behavior. *See State v.
23  Watson*, 628 P.2d 943, 945 (Ariz. 1981) (setting aside death sentence in part because
24  of defendant's good conduct while in prison); *State v. Richmond*, 886 P.2d 1329,
25  1336–37 (Ariz. 1994) (reducing death sentence to life imprisonment in part because
26  of evidence of the defendant's changed character).

27    During Lehr's 2009 trial, experts in criminal justice and staff from the
28  Arizona Department of Corrections ("ADOC") testified regarding Lehr's positive

1   adjustment to prison. Michael McCarville, a deputy warden with ADOC assigned

2   to the Special Management Unit ("SMU") during Lehr's incarceration (Tr. Apr. 6,

3   2009 at 69–95) stated that Lehr read and kept to himself (Tr. Apr. 6, 2009 at 76).

4   Similarly, Wendy Hackney, a correction lieutenant with the Arizona Department of

5   Corrections who worked as a correctional officer in SMU-2 during Lehr's

6   incarceration there (Tr. Apr. 6, 2009), did not recall have any problems with Lehr

7   (Tr. Apr. 6, 2009 at 99).

8        Expert witnesses also testified regarding Lehr's ability to successfully adjust

9   to a life sentence. Professor Jonathan Sorenson noted Lehr's age and opined that

10  "the older an inmate the less likely he is to be involved in disciplinary infractions."

11  (Tr. Apr. 6, 2009 at 169–75.) At the time of trial, Lehr had been non-violent for

12  over fifteen years and had minimal disciplinary infractions. (Tr. Apr. 6, 2009 at

13  175.) Additionally, Professor Sorenson states that "He's been behaviorally qualified

14  for the lowest internal risk score . . ." (Tr. Apr. 6, 2009 at 175.) Professor Sorenson

15  also explained that people incarcerated for murder are "no less well-behaved than

16  other inmates." (Tr. Apr. 6, 2009 at 177.) Lehr's "age, nonviolent behavior patter

17  in prison, and the high school and precious marriage, and also his absence of prior

18  adult prison incarcerations" decreases his risk assessment score. (Tr. Apr. 7, 2009

19  at 6–7.)

20       Assessing Lehr's prison behavior, Chase Riveland, another prison expert,

21  described Lehr's behavior in county jail as "very positive" despite "a couple of

22  flaws," which included just two primary disciplinary reports. (Tr. Apr. 7, 2009 at

23  54, 58.) In reviewing Lehr's state prison record, Riveland found "indicators in [Mr

24  Lehr's] file that his behavior was generally very positive [in that] [h]e never made

25  threats toward staff or other inmates." (Tr. April 7, 2009 at 59–60.) Even since these

26  assessments in 2009, Lehr has continued to demonstrate he can be safely housed in

27  the institution without concern for himself or others.

28       In July 2017, Arizona made significant changes to the housing of death-row

prisoners, which diminish the differences between the incarceration conditions of those sentenced to life without the possibility of parole and those sentenced to death. *See generally* Gabriella Robles, Condemned to Death—And Solitary Confinement, The Marshall Project (July 23, 2017), https://www. themarshallproject.org/2017/07/23/condemned-to-death-and-solitary-confinement (explaining ADOC policy change allowing death-row prisoners with suitable disciplinary records to be housed in lower-security settings). Under the old rules, death-row prisoners were automatically classified as maximum security and kept in solitary confinement. New rules permit death-row prisoners who do not pose a security threat to be kept in lower-security settings with more out-of-cell time, contact visits with family and legal counsel, outdoor group recreation, and the opportunity to work or take education courses. Lehr is no longer housed in a maximum security unit and has been approved for close custody because he met the prison's requirements for reclassification. He continues to do well in this setting.

In addition, these changes mean that Lehr is not housed in the strictest manner merely because he is on death row. Because these changes occurred after Lehr's 2009 trial, the jury could not have known that sentencing Lehr to death could very well place him in the same custodial setting as though he had been sentenced to life imprisonment.

Lehr is now sixty years old. He is not the same person who was sentenced to death in 1997, or 2009. He has not committed any violence in this setting, and is unlikely to do so in the future. Due process dictates that Lehr have the appropriateness of his death sentences re-evaluated in light of the changes that have occurred since he was sentenced. Through his filings and at an evidentiary hearing, Lehr will demonstrate that these changes are significant and that they change the calculus of whether his death sentences are an appropriate punishment. Accordingly, Lehr is entitled to relief.

## CLAIM FORTY-FOUR

**Arizona's lethal injection protocol violates the Eighth Amendment's prohibition on cruel and unusual punishment.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Arizona's execution protocol, as applied to Lehr, violates the Eighth Amendment's prohibition on cruel and unusual punishment, in two ways. First, as practiced in Arizona, lethal injection cannot be administered in a humane way that comports with the evolving standards of decency that mark the progress of a maturing society. Second, Arizona's method of execution, using lethal injection and administered as set forth in Arizona's protocol, presents a substantial risk of severe pain, while other, alternative methods of execution exist that would significantly reduce that risk, and which Arizona declines to use, further in violation of the Eighth Amendment.

### A.    Exhaustion

In his amended post-conviction petition, Lehr raised a challenge to Arizona's execution protocol. (PCR Pet.'s Mot. to Am., Dec. 11, 2014.) The post-conviction court rejected this claim as premature, concluding without further analysis that "this issue is not yet in controversy and is not ripe for determination.") (PCR Order, at 41.) Lehr further raised this claim before the Arizona Supreme Court. (PFR 3, at 49.) The court rejected his petition for review without comment. (PFR 29, at 1.)

Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See*

1   28 U.S.C. § 2254(d)(2).

2   **B.    Merits**

3   The State of Arizona sentenced Lehr to death by lethal injection on April 15,

4   2009. (ROA 974.) A.R.S. § 13-757(A) provides that "[t]he penalty of death shall be

5   inflicted by an intravenous injection of a substance or substances in a lethal quantity

6   sufficient to cause death, under the supervision of the state department of

7   corrections." There is no additional statutory guidance provided to ADOC in

8   carrying out the execution. Arizona's current execution protocol involves the

9   administration of a single large dose of either pentobarbital or sodium thiopental,

10  both of which are drugs of a type known as barbiturates.

11
12          **1.    Lethal injection in Arizona does not comport with the Eighth Amendment.**

13  The procedures implemented and the drugs used during the last decade

14  demonstrate that Arizona's lethal-injection process is cruel and unusual.

15  Since the time that Lehr was sentenced to death, Arizona has carried out 29

16  executions—all via lethal injection using various combinations of drugs.[32] Based

17  on ADOC's actions in those many executions, there are three reasons that ADOC

18  cannot constitutionally carry out executions via lethal injection: First, ADOC has

19  not complied with the law in obtaining the substances to be used in executions. A

20  state cannot violate the law while carrying out the law. Second, ADOC has been

21  unable to follow its written protocol time and time again. Third, ADOC has selected

22  drugs that result in botched executions.

23  *First*, ADOC has not complied with the law in obtaining execution drugs.

24  Arizona executed Jeff Landrigan on October 26, 2010, using the drug sodium

25  thiopental obtained from, at that time, an unknown foreign source. *See Landrigan*

26

27  ───────────────
28  [32] *See* ADOC, Executions Prior to 1992 & Execution Methods, *available at* https://corrections.az.gov/public-resources/death-row/executions-prior-1992-execution-methods (last visited Dec. 16, 2019).

1    *v. Brewer*, No. CV-10-02246-PHX-ROS, 2010 WL 4269559, at *4 (D. Ariz. Oct.
2    25, 2010), *stay of execution aff'd*, 625 F.3d 1144 (9th Cir. 2010), *stay vacated*, 562
3    U.S. 996 (2010). Several months later, on May 4, 2011, 18 hours before its
4    scheduled execution of Donald Beaty, ADOC announced that it intended to use a
5    different drug because "the Department of Justice informed ADC that its supply of
6    sodium thiopental was imported without compliance with the Controlled Substance
7    Act." *See West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 6724628, at *10
8    (D. Ariz. Dec. 21, 2011). As was later shown, the drug sodium thiopental used in
9    Landrigan's execution (and the one carried out after his) was imported in violation
10   of federal law. *See, e.g.*, *Cook v. FDA*, 733 F.3d 1, 11–12 (D.C. Cir. 2013).

11       Again, recently, ADOC imported sodium thiopental that has been detained
12   by the Food and Drug Administration. *See* Defs.' Notice in Resp. to Ct. Order at 1–
13   2, *Wood v. Ryan*, No. 2:14-cv-01447-NVW (D. Ariz. filed Nov. 3, 2015), ECF No.
14   79. Since that time, ADOC has revised Department Order 710 ("D.O. 710"), which
15   sets out the procedures for carrying out an execution, to remove the one limitation
16   on the source of the lethal chemicals to be used in an execution: that ADOC obtain
17   compounded execution drugs only from a certified or licensed compounding
18   pharmacist or pharmacy in good standing with the appropriate licensing board.[33]
19   Accordingly, nothing in D.O. 710 requires that the lethal drugs be obtained from a
20   legal, properly licensed source. *See id.* It is cruel and unusual punishment that
21   ADOC, charged with enforcing laws, violates drug laws to carry out executions.

22       Recently, the U.S. Department of Justice issued an opinion, determining that
23   the federal Food & Drug Administration does not have jurisdiction to regulate

24

25   _____

26   [33] *See* ADOC, Dep't Order: 710—Execution Procedures (eff. Mar. 25, 2019), Att.
27   D § C.2, *available at*
     https://corrections.az.gov/sites/default/files/policies/700/0710_032519.pdf (last
28   visited Dec. 16, 2019).

1    execution drugs, including with respect to their importation.[34] At the same time, the

2    State of Arizona has renewed its application for a license from the DEA to allow it

3    import pentobarbital from abroad,[35] strongly suggesting that Arizona will once

4    again revert to the practice of acquiring its execution drugs from unknown,

5    unlicensed, and unreliable sources outside the United States.

6        *Second*, ADOC has been repeatedly shown to be unable to follow its written

7    protocol.

8        In December 2011, the district court held a trial, issued an opinion, and found

9    that "[f]ive prisoners were executed by lethal injection between October 2010 and

10   July 2011. At the direction of those responsible for administering these executions,

11   ADC failed to follow certain components of its execution protocol." *West v. Brewer*,

12   No. CV-11-1409-PHX-NVW, 2011 WL 6724628, at *7 (D. Ariz. Dec. 21, 2011).

13   In January 2012, ADOC amended its protocol and removed many of the provisions

14   it was found to have violated—including minimum qualifications for and training

15   of the IV team members.

16       In February 2012, with execution dates pending, two prisoners, Robert

17   Moorman and Robert Towery, challenged the change to the protocol. On appeal,

18   the court noted, "[e]ven after the appeal was filed and hours before the argument,

19   Arizona yet again changed course as to its plans for the executions." *Towery v.*

20   *Brewer*, 672 F.3d 650, 652 (9th Cir. 2012) (per curiam). ADOC changed the drug

21   formula because it discovered at the last minute that one of the drugs had expired.

22   *Id.* During that case, the court upheld the denial of a preliminary injunction but *only*

23   —————————————————

24   [34] Whether the Food and Drug Administration Has Jurisdiction over Articles
     Intended for Use in Lawful Executions (May 3, 2019), *available at*
25   https://www.justice.gov/olc/opinion/file/1162686/download (last visited Dec. 16,
     2019).
26

27   [35] Importer of Controlled Substances Application: Arizona Department of
     Corrections, *available at*
28   https://www.deadiversion.usdoj.gov/fed_regs/imprt/app/2018/fr1214_2.htm  (last
     visited Dec. 16, 2019).

based on the protocol "as amended by the State during oral argument," and it further noted that "the State's frequent changes to its protocol during litigation are not sustainable." *Id.*

After the Ninth Circuit allowed the executions to go forward, known problems occurred during the execution of Towery. Those concerns were raised by another prisoner facing execution, Samuel Lopez. *See Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012). Those problems included concerns with setting the IV lines. *See id.* "Although [the court] uph[e]ld the district court's decision, [it] caution[ed], yet again, that Arizona's ad hoc approach risks going beyond *Baze*'s safe harbor." *Id.* at 1075. The court expressed grave concern with the State's method of changing its protocol hours before an execution, in which the State essentially asked the court to "trust that it will exercise its discretion in a constitutionally permissible manner." *Id.* at 1070.

Indeed, in response to the lawsuit brought related to Lopez's execution, several Ninth Circuit judges noted, "In case after case, [the court has] been forced to rely on the ad hoc representations of the state's counsel in conducting one of the gravest responsibilities that [it is] asked to perform: approving the state's plan to take a human life." *Lopez*, 680 F.3d at 1095 (mem.) (Reinhardt, J., dissenting from denial of rehearing en banc). As explained, "[t]he trouble that plagued Towery's execution highlights the practical problems this obsessive secrecy creates for any meaningful litigation in the constricted time periods permitted by Arizona's moving target approach to execution procedures." *Lopez*, 680 F.3d at 1083 (Berzon, J., concurring in part and dissenting in part).

The "obsessive secrecy" taints the entire execution process. There are several aspects of the execution that are never revealed to the prisoner or the public. For example, D.O. 710 provides for disclosure of the chain of custody and storage conditions of the drugs procured for and to be used in the execution, thus defeating any ability of the prisoners to evaluate whether the drugs have been continuously

1   stored, e.g., within the temperature limits appropriate for that particular drug.

2       Arizona has made it impractical to determine the constitutionality of its

3   protocol and procedures by keeping critical information secret and releasing it only

4   after a court orders it to do so. *See Schad v. Brewer*, No. CV-13-2001-PHX-ROS,

5   2013 WL 5551668, at *10 (D. Ariz. Oct. 7, 2013); *Wood v. Ryan*, 759 F.3d 1076,

6   1088 (9th Cir. 2014), *stay of execution vacated*, 135 S. Ct. 21 (2014) (mem.).

7       *Third*, Arizona has a history of botched executions.

8       Arizona's most recent execution occurred on July 23, 2014. Arizona executed

9   Joseph Wood using experimental drugs; it took nearly two hours for Wood to die.

10  *See Glossip*, 135 S. Ct. at 2783 (Sotomayor, J., dissenting). The concoction to be

11  used—50 milligrams of hydromorphone and 50 milligrams of midazolam—had

12  never been used by Arizona, and the combination (albeit in different amounts) had

13  been used *with problems* in January 2014 in Ohio.[36] Arizona had no scientific or

14  medical basis for its formula.

15      Wood lay on the gurney gasping for breath for over an hour. Around 3:00

16  p.m., the district court held a hearing while the execution was occurring. During the

17  emergency hearing, at 3:25 p.m., the attorney for the State represented that Wood

18  was given a "second dose of drugs." *Wood*, No. 2:14-cv-01447-NVW, Tr. July 23,

19  2014 at 7. Wood was still alive, but died during the hearing at 3:49 p.m. The State

20  later revealed that Wood was given 15 doses of the drugs—and it had already

21  administered 12 doses at the time the State's attorney told the court that two doses

22  had been given.[37]

23  _____

24  [36] *See* Lawrence Hummer, *I Witnessed Ohio's Execution of Dennis McGuire. What
    I Saw Was Inhumane*, The Guardian (Jan. 22, 2014), https://www.theguardian.com/

25  commentisfree/2014/jan/22/ohio-mcguire-execution-untested-lethal-injection-

26  inhumane.

27  [37] *See* Michael Kiefer, *Arizona inmate injected 15 times, records show*, The Arizona
    Republic, (Aug. 1, 2014),

28  http://www.azcentral.com/story/news/local/Arizona/2014/08/01/arizona-botched-

1      The use of 15 doses of the drug formula was not in the written protocol, but
2  the Director claimed that there was nothing wrong with the execution. In fact, in a
3  press release, ADOC indicated that the administration of 750 milligrams of drugs
4  was "permitted" under the protocol. *See* ADOC Press Release, Independent Review
5  Process for Wood Execution Underway, (Aug. 1, 2014). Wood's execution resulted
6  in human experimentation and failed to comply not only with ADOC's written
7  protocol, but also with the Eighth Amendment.

8      ADOC has since agreed not to use midazolam, or any other benzodiazepine,
9  or any paralytic in any executions. *See* Stipulated Settlement Agreement at 1, *Wood*
10  *v. Ryan*, No. 2:14-cv-01447-NVW (D. Ariz. filed Dec. 19, 2016), ECF No. 152;
11  Stipulated Settlement Agreement at 4, *Wood v. Ryan*, No. 2:14-cv-01447-NVW,
12  (D. Ariz. filed June 21, 2017), ECF No. 186. But ADOC does not promise to abide
13  by any other limitations of the types of drugs that it could designate for use in
14  executions in future versions of D.O. 710. And, as noted above, ADOC has refused
15  any limitation on the sources of any execution drugs.

16      As demonstrated by the above, the State of Arizona cannot carry out lethal
17  injection in a manner that comports with the Constitution. As Judge Kozinski noted
18  regarding lethal injection, "Whatever the hopes and reasons for the switch to drugs
19  [from prior methods], they proved to be misguided. Subverting medicines meant to
20  heal the human body to the opposite purpose was an enterprise doomed to failure."
21  *Wood*, 759 F.3d at 1102 (Kozinski, J., dissenting from denial of rehearing en banc).
22  In 2019, in Arizona, the State has reached the point that lethal injection cannot be
23  carried out in a manner consistent with principles of dignity, that does not impose
24  a lingering death, and that avoids pain and suffering. For these reasons, lethal
25  injection is unconstitutional, and Lehr's death sentences should be vacated.

26
27  execution-report-injections/13492511 (last visited Dec. 16, 2019). Further
    Documentation of Wood's execution is available at
28  http://archive.azcentral.com/ic/pdf/wood-execution-documentation.pdf (last
    visited Dec. 16, 2019).

1

2

       **2.**    **Arizona's execution protocol presents a substantial risk of severe pain, when compared with known and available alternative methods of execution.**

3

4

5

6

7

8

9

An inmate may challenge a State's method of execution if he can establish that the method "presents a risk that is 'sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers.' To prevail on such a claim, 'there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015) (quoting *Baze v. Rees* 553 U.S. 53, 50 (2008)).

10

11

12

13

14

15

Arizona's protocol, as embodied in D.O. 710, poses such a risk, for several reasons. First, as discussed above, and incorporated here by reference, D.O. 710 lacks critical guardrails with respect to multiple key areas. There is no prohibition on using imported, unlicensed, and potentially adulterated drugs. There is significant secrecy. And Arizona has a history of botched executions, including involving the placement of IV lines.

16

17

18

19

20

21

22

23

24

25

26

27

And its chose method, utilizing pentobarbital or sodium thiopental, also poses a grave risk to Lehr. Although Arizona has admirably foresworn the use of midazolam, its chosen drugs are not themselves without numerous risks. Pentobarbital is a highly alkaline drug, the injection of which, at large doses, will have an injurious, caustic effect on blood vessels. What's more, once injected, the drug will travel to the right side of the heart, and then to the lungs, where it will induce non-cardiogenic pulmonary edema, which is the movement of fluid into the spaces in the lungs where there should be air. This sudden edema will produce sensations similar to drowning or asphyxiation, an intolerable state invoking panic and terror. The signs of this sudden and acute pulmonary edema have been observed by eyewitnesses and confirmed by autopsies in numerous states using the same or similar administration method as Arizona.

28

Further, should Arizona use compounded pentobarbital, additional risks

arise. Even with the quantitative analysis provide under D.O. 710 (which is to be produced within two days after the State seeks a Warrant of Execution), Lehr cannot be sure that the drugs the State intends to use in his execution will be suitably pure, uncorrupted, unexpired, and without contaminants. Such risks are commonplace and well-documented in compounding pharmacies, including those used by States to compound execution drugs. These issues further increase the risk that Lehr will suffer cruel and unusual pain and suffering if executed under Arizona's Protocol. In addition, D.O. 710 does not provide for documentation and disclosure of how the drugs are stored, especially the temperature, humidity, and sterile conditions of the storage, which can further degrade the drugs.

In comparison to Arizona's method, several alternative methods exist, which are "feasible, readily implemented, and in fact significantly reduce[] a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737 (internal quotations omitted). These alternatives need not be ones currently authorized by Arizona law. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019).

Lehr alleges two alternatives here: First, that Arizona adopt and implement a method of execution involving the inhalation of an inert gas such as nitrogen or helium. Such a method would cause rapid unconsciousness and death, eliminating multiple risks of severe pain posed by Arizona's current protocol, such as the threat of bungled IV insertion, the burning pain of injection, and the infliction of pulmonary edema and accompanying sensations of drowning and panic. Several States are currently seeking to implement such a method, including Oklahoma, Mississippi, and Alabama. Arizona could adopt the same or similar protocol as any one of those States eventually implement. *See id.* (to satisfy his burden of alleging an alternative, "a prisoner may point to a well-established protocol in another State as a potentially viable option.").

Second, that Arizona use only FDA-approved, manufactured pentobarbital (Nembutal). At least one state, Missouri, has obtained FDA-approved pentobarbital

in the recent past. The use of FDA-approved pentobarbital, with its guarantee of potent, non-contaminated drugs, would eliminate significant risk presented by Arizona's current method.

To be sure, to succeed in this challenge to Arizona's execution protocol, Lehr's "proposal [for his alleged alternative methods of execution] must be sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly." *Bucklew*, 139 S. Ct. at 1129 (internal quotation omitted). When he raised this claim in state court, the post-conviction court dismissed it as untimely; Lehr acknowledges that his claim here in habeas may also not yet be ripe, as his execution is not imminent and he cannot be sure yet what method of execution Arizona will seek to apply to him. Lehr can and will amend this claim will additional, detailed allegations as necessary, if and when the possibility of his execution becomes imminent. Lehr is entitled to habeas relief.

## CLAIM FORTY-FIVE

**Capital punishment is categorically cruel and unusual, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Lehr raised this claim on direct appeal. (DA2 82 at 80–85.) The Arizona Supreme Court did not address the claim on the merits, but only presented the issues verbatim in its appendix. *See Lehr III*, 254 P.3d at 395. Because the claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. Even if listing this issue in the appendix is considered to be a decision on the merits, the state court's denial of this claim was contrary to, or involved an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

To the extent thus claim is found to be not properly presented to the state

courts, Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carrier*, 477 U.S. at 488–89; *Strickland*, 466 U.S. at 687–88. Lehr will demonstrate through his filings and at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital attorney and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice.

The Eighth Amendment precludes the imposition of punishments that are "cruel and unusual," as assessed according to the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958). The past 40 years have demonstrated that capital punishment is cruel and unusual and serves no penological purpose. Accordingly, it does not comport with the dictates of the Eighth Amendment.

The death penalty is cruel for two distinct reasons: it is both unreliable and arbitrarily imposed. First, in spite of the need for heightened reliability in a proceeding when a person's life is at stake, *see Woodson v. North Carolina*, 428 U.S. 208, 305 (1976), capital punishment is unreliable because of the significant risk that an innocent person will be sentenced to death or even executed. Between 1989 and 2012, there were 115 exonerations of persons sentenced to death; there were six more exonerations because of findings of actual innocence in 2014 alone. *Glossip v. Gross*, 135 S. Ct. 2726, 2757 (2015) (Breyer, J., dissenting). Indeed, research demonstrates that 4.1 percent of the people on death row are likely actually innocent. *See id.* at 2758 (citing Samuel R. Gross et al., *Rate of False Conviction of Criminal Defendants Who Are Sentenced to Death*, 111 Proc. of the Nat'l Acad. of Sci. 7230 (2014)). Unsurprisingly, there is compelling evidence that innocent individuals have in fact been executed. *See, e.g.*, David Grann, *Trial by Fire: Did Texas Execute an Innocent Man?*, the New Yorker (Sept. 7, 2009),

1   http:www.newyorker.com/magazine/2009/09/07/trial-by-fire (describing the
2   conviction and execution of Cameron Todd Willingham for the house fire that killed
3   his children, despite the invalidity of scientific analysis deeming fire intentional).

4        In addition to being unreliable, the death penalty is wholly arbitrary. The
5   imposition of the death penalty should turn on the serious nature of the murder and
6   the offender's culpability not on arbitrary factors such as race, gender, economic
7   status, or geography. Capital punishment in this country is to be reserved for "those
8   offenders who commit 'a narrow category of the most serious crimes' and whose
9   extreme culpability makes them 'the most deserving of execution.'" *Roper v.*
10  *Simmons*, 543 U.S. 551, 568 (2005) (quoting *Atkins v. Virginia*, 536 U.S. 304, 319
11  (2002)). But research demonstrates that a number of irrelevant factors, including
12  the race and gender of the victim or defendant and the geographic location of the
13  crime, have an impermissible bearing on the probability of a death sentence. *See,*
14  *e.g.*, Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics:*
15  Furman, McCleskey*, and a Single County Case Study*, 34 Cardozo L. Rev. 1227,
16  1244–56 (2013) (citing studies finding gender, racial, and geographic disparities in
17  imposition of death sentences). Even within one geographic location, the likelihood
18  of execution turns largely on the local government's resources. That the death
19  penalty is both unreliable and turns on constitutionally irrelevant factors renders it
20  cruel. *Cf. Furman v. Georgia*, 408 U.S. 238, 309–10 (1972) (Stewart, J., concurring)
21  (deeming "cruel and unusual" the "wanton[] and freakish[]" imposition of death
22  sentences).

23       Further, the systems that states have developed to address the problems
24  identified in *Furman* and *Gregg* have not worked. As Justice Kennedy observed in
25  *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008), it "is an established principle that
26  decency, in its essence, presumes respect for the individual and thus moderation or
27  restraint in the application of capital punishment." The Supreme Court has sought
28  to define and implement this principle by: (1) insisting on general rules that ensure

1    consistency in determining who receives a death a sentence; and (2) ensuring

2    restraint and moderation by judging the "character and record of the individual

3    offender and the circumstances of the particular offense." *Id.* at 436 (internal

4    quotation marks omitted) (citing cases).

5          But, the "tension between general rules and case-specific circumstances has

6    produced results not altogether satisfactory." *Id.* "This has led some Members of

7    the Court to say we should cease efforts to resolve the tension and simply allow

8    legislatures, prosecutors, courts, and juries greater latitude." *Id.* For others,

9    however, "the failure to limit these same imprecisions by stricter enforcement of

10   narrowing rules has raised doubts concerning the constitutionality of capital

11   punishment itself." *Id.* at 436–37.

12         The death penalty has also become unusual. Both the number of death

13   sentences and the number of executions nationally have plummeted over the last

14   fifteen years. *See Glossip v. Gross*, 135 S. Ct. 2726, 2775 (2015) (Breyer, J.,

15   dissenting). Fewer and fewer states use the death penalty—31 have abolished

16   capital punishment or have not conducted an execution in ten years—and the use of

17   the death penalty is now concentrated in only a handful of counties. *See* Death

18   Penalty Information Center ("DPIC"), *Jurisdictions with no recent executions*,

19   https://deathpenaltyinfo.org/jurisdictions-no-recent-executions (last visited Dec.

20   17, 2019); *see also* Richard C. Dieter, DPIC, *The 2% Death Penalty: How a*

21   *Minority of Counties Produce Most Death Cases at Enormous Costs to All*, 1

22   (2013), http://www.deathpenaltyinfo.org/documents/TwoPercentReport.pdf

23   ("Over half of the executions carried out since 1976 come from cases originating in

24   2% of U.S. counties."). Perhaps most striking is the "consistency of the direction of

25   change," *Atkins v. Virginia*, 536 U.S. 304, 315 (2002); seven states have abolished

26   the death penalty since 2007, and in four other states, governors have instituted

27   moratoriums on executions beginning as early as 2011, making capital punishment

28   increasingly unusual. *See* DPIC, *States With and Without the Death Penalty*,

https://deathpenaltyinfo.org/states-and-without-death-penalty (last visited Dec. 17, 2019).

Finally, capital punishment serves no permissible penological purpose. In 1976, the Supreme Court emphasized that the death penalty was "said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (footnote omitted). However, the Court recognized that a "sanction imposed cannot be . . . totally without penological justification." *Id.*; *see also Enmund v. Florida*, 458 U.S. 782, 798 (1982) ("Unless the death penalty when applied . . . measurably contributes to one or both of these goals [retribution and deterrence], it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality))). Over time, empirical evidence and philosophical critiques have emerged that have eroded these two justifications for the death penalty, leaving the death penalty with no discernible purpose at all. *See, e.g.*, John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794, 843 (2005); Carol S. Steiker, *No, Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751 (2005).

Because the death penalty is cruel and unusual, and because it serves neither the goal of retribution nor that of deterrence, capital punishment is unconstitutional. Accordingly, Lehr's sentences are constitutionally infirm under the Eighth Amendment, and he is entitled to relief.

## CLAIM FORTY-SIX

**The death penalty violates Lehr's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution because it is irrationally and arbitrarily imposed; there is no meaningful distinction between those who receive sentences of death and those who are sentenced to life imprisonment.**

1    Lehr incorporates by specific reference all facts, allegations, and arguments

2    made elsewhere in this Petition.

3    This claim was not raised in state court. Lehr alleges he can overcome any

4    default of this claim by showing cause and prejudice, including because of the

5    ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 9.

6    Alternatively, he alleges that any procedural bar is not adequate or independent or

7    that imposing default would be a miscarriage of justice. Because this claim has not

8    been adjudicated by the Arizona state courts, the limitations on relief imposed by

9    28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

10   the merits of the claim de novo.

11   In 1972, the Supreme Court struck down all existing death-penalty statutes

12   because the Court concluded that the death penalty was being imposed in an

13   arbitrary and irrational manner. *Furman v. Georgia*, 408 U.S. 238 (1972). The death

14   penalty continues to be imposed in an arbitrary and irrational fashion by Arizona

15   courts.

16   The arbitrary application of the death penalty in Lehr's case amounts to cruel

17   and unusual punishment in violation of the Eighth Amendment and violates his right

18   to due process under the Fourteenth Amendment. *See Glossip v. Gross*, 135 S. Ct.

19   2726, 2755–56 (2015) (Breyer, J., dissenting) ("Today's administration of the death

20   penalty involves three fundamental constitutional defects: (1) serious unreliability,

21   (2) arbitrariness in application, and (3) unconscionably long delays that undermine

22   the death penalty's penological purpose."); *Callins v. Collins*, 510 U.S. 1141, 1144

23   (1994) (Blackmun, J., dissenting); *Jeffers v. Lewis*, 38 F.3d 411, 425 (9th Cir. 1994)

24   (en banc) (Noonan, J., dissenting) ("[T]he administration of the death penalty in

25   Arizona is so arbitrary as to constitute cruel and unusual punishment in violation of

26   the Eighth Amendment[.]").

27   Finally, capital punishment serves no permissible penological purpose. In

28   1976, the Supreme Court emphasized that the death penalty was "said to serve two

531

principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). However, the Court recognized that a "sanction imposed cannot be . . . totally without penological justification." *Id.*; *see also Enmund v. Florida*, 458 U.S. 782, 798 (1982) ("Unless the death penalty when applied . . . measurably contributes to one or both of these goals [retribution and deterrence], it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion))). Over time, empirical evidence and philosophical critiques have emerged that have eroded these two justifications for the death penalty, leaving the death penalty with no discernible purpose at all. *See, e.g.*, John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794, 843 (2005); Carol S. Steiker, *No, Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751 (2005).

Because Lehr's death sentences were imposed arbitrarily when compared with other cases involving either a sentence of death or a sentence of life imprisonment, and because the death penalty serves no valid penological purpose, Lehr's death sentences are unconstitutional. There is no rational, constitutionally permissible basis for distinguishing Lehr's case, or the few cases in which the death penalty has been imposed in Arizona and in the United States, from the many cases in which it has not been imposed. Because Lehr's sentences violate his Eighth and Fourteenth Amendment rights, he is entitled to relief.

## CLAIM FORTY-SEVEN

**Arizona's capital-sentencing scheme discriminates against indigent, minority, male defendants with white victims, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments

1    made elsewhere in this Petition.

2        **A.    Exhaustion**

3        Lehr raised this claim on direct appeal. (DA2 82 at 80–85.) The Arizona

4    Supreme Court did not address the claim on the merits, but only presented the issues

5    verbatim in its appendix. *See Lehr III*, 254 P.3d at 395. Because the claim has not

6    been adjudicated by the Arizona state courts on the merits, the limitations on relief

7    imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim.

8    Even if listing this issue in the appendix is considered to be a decision on the merits,

9    the state court's denial of this claim was contrary to, or involved an unreasonable

10   application of clearly established federal law, and was based on an unreasonable

11   determination of the facts. 28 U.S.C. § 2254(d). To the extent thus claim is found

12   to be not properly presented to the state courts, Lehr alleges he can overcome any

13   default of this claim by showing cause and prejudice, including because of the

14   ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 9;

15   *Carrier*, 477 U.S. at 488–89; *Strickland*, 466 U.S. at 687–88. Lehr will demonstrate

16   through his filings and at an evidentiary hearing that post-conviction counsel fell

17   below the standards of a minimally competent capital attorney and that those

18   failures prejudiced him. Alternatively, he alleges that any procedural bar is not

19   adequate or independent or that imposing default would be a miscarriage of justice.

20       **B.    Merits**

21       Lehr was sentenced to death pursuant to a statutory scheme that is

22   discriminatorily applied. The Eighth and Fourteenth Amendments guarantee that no

23   state shall "deny to any person within its jurisdiction the equal protection of the

24   laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause protects criminal

25   defendants from being sentenced based on purposeful discrimination. *McCleskey v.*

26   *Kemp*, 481 U.S. 279, 292 (1987). Still, Arizona's death row is overwhelmingly

27   populated by indigent males. Although women commit 11.5% of all murders and

28   non-negligent manslaughters, only three of the 116 persons on Arizona's death row

(2.6%) are women. *See* FBI, *Crime in the United States 2015*, *Table 42: Arrests by Sex*, *2015*, https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-42 (last visited December 10, 2019); ADOC, *Death Row Demographics*, http://corrections.az.gov/node/431 (last visited December 10, 2019). Indeed, research suggests that "women homicide defendants receive more favorable treatment at each stage of the criminal process," even in capital cases. Shatz & Dalton, *Challenging the Death Penalty with Statistics: Furman, McCleskey, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1251–53 (citing studies finding gender disparities in the imposition of death sentences). Moreover, "numerous studies . . . have concluded that individuals accused of murdering white victims, as opposed to black or other minority victims, are more likely to receive the death penalty." *Glossip v. Gross*, 135 S. Ct. 2726, 2760–61 (Breyer, J., dissenting) (citing studies establishing the impact of victims' race on capital-murder charges and death sentences).

If a defendant similarly situated to Lehr happened to be a woman, or if no victim in this case had been white, there likely would have been no sentence of death imposed. The discriminatory application of the death penalty in Arizona denied Lehr the Due Process and Equal Protection protections of the Eighth and Fourteenth Amendments. These errors, individually and cumulatively, violated Lehr's constitutional rights and prejudiced him. They affected all phases of the trial against him. Lehr is entitled to evidentiary development and relief.

## CLAIM FORTY-EIGHT

**The death penalty violates human rights and international law and thereby violates Lehr's rights under the Eighth and Fourteenth Amendments to the United States Constitution.**

Lehr incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

### A.    Exhaustion

Lehr raised this claim on direct appeal. (DA2 82 at 80–85.) The Arizona

Supreme Court did not address the claim on the merits, but only presented the issues verbatim in its appendix. *See Lehr III*, 254 P.3d at 395. Because the claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. Even if listing this issue in the appendix is considered to be a decision on the merits, the state court's denial of this claim was contrary to, or involved an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). To the extent thus claim is found to be not properly presented to the state courts, Lehr alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carrier*, 477 U.S. at 488–89; *Strickland*, 466 U.S. at 687–88. Lehr will demonstrate through his filings and at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital attorney and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice.

## B. Merits

Prevailing international norms weigh in favor of finding that the death penalty as applied in the United States constitutes an Eighth Amendment violation. According to the Supreme Court:

> The prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework we have established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual.

*Roper v. Simmons*, 543 U.S. 551, 560–61 (2005) (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) (plurality opinion)); *see also Miller v. Alabama*, 567 U.S. 460, 469–70 (2012); *Graham v. Florida*, 560 U.S. 48, 58 (2010); *Kennedy v. Louisiana*,

535

554 U.S. 407, 419 (2008); *Atkins v. Virginia*, 536 U.S. 304, 311 (2002). Since its decision in *Trop*, the Supreme Court has "referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'" *Roper*, 543 U.S. at 575 (collecting cases). The Court accordingly cited the international community's "overwhelming" disapproval of executing the intellectually disabled and juvenile offenders in concluding that such executions violated the Eighth Amendment. *Id.* ("Our determination that the death penalty is disproportionate punishment for offenders under 18 finds confirmation in the stark reality that the United States is the only country in the world that continues to give official sanction to the juvenile death penalty."); *see also Atkins*, 536 U.S. at 316 n.21.

Similarly, the United States also stands virtually alone among the nations of the world in confining individuals for periods of many years continuously under a death sentence. The international community is increasingly recognizing that prolonged confinement under these circumstances is cruel, degrading, and in violation of international human rights law. *See Foster v. Florida*, 537 U.S. 990 (2002) (mem.) (Breyer, J., dissenting from denial of certiorari) ("Courts of other nations have found that delays of 15 years or less can render capital punishment degrading, shocking, or cruel."); *see also Knight v. Florida*, 120 S. Ct. 459, 463 (1999) (mem.) (Breyer, J., dissenting) (collecting cases). The Canadian Supreme Court cited such delays as "a relevant consideration" in its decision that extradition of a murder suspect to the United States without assurances that the death penalty would not be imposed "violates principles of 'fundamental justice.'" *Foster v. Florida*, 537 U.S. 990 (2002) (citing *United States v. Burns*, 1 S.C.R. 283, 353 (2001)). This developing international consensus demonstrates that, in addition to being cruel, the death penalty in the United States is also "unusual" within the meaning of the Eighth Amendment. To the extent that the death penalty cannot be reliably administered without also subjecting prisoners to extraordinary delays, it

1   violates Lehr's rights under the Due Process Clause of the Fourteenth Amendment.

2       International law has also clearly established a norm against the infliction of

3   the death penalty as a regular form of punishment. This norm is codified in such

4   international agreements as the Universal Declaration of Human Rights, the

5   International Covenant on Civil and Political Rights ("ICCPR"), and the American

6   Declaration of the Rights and Duties of Man. In particular, the ICCPR holds that

7   "[e]very human being has the inherent right to life. . . . No one shall be arbitrarily

8   deprived of his life." Int'l Covenant on Civil and Political Rights, adopted Dec. 19,

9   1966, art. 6 para. 1, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976).

10      As discussed throughout this Petition, Lehr was sentenced to death pursuant

11  to Arizona's arbitrary and capricious sentencing scheme. As a result, his death

12  sentences were imposed in violation of international law as well as the Eighth and

13  Fourteenth Amendments. Because the Constitution also specifies that states are

14  bound by international treaties, U.S. Const. art. VI, cl. 2, Lehr's sentences are

15  unconstitutional and thus he is entitled to relief.

16                      **CLAIM FORTY-NINE**

17      **Lehr will be denied a fair clemency process in violation of the**
18      **Eighth and Fourteenth Amendments.**

19      Lehr incorporates by specific reference all facts, allegations, and arguments

20  made elsewhere in this Petition.

21      This claim was not raised in state court. Lehr has not yet presented this claim

22  to the Arizona courts because his opportunity to seek executive clemency has not

23  yet become ripe. Lehr presents this claim now in order to avoid difficulties with

24  raising this claim in future federal habeas proceedings. *See Stewart v. Martinez-*

25  *Villareal*, 523 U.S. 637, 643–46 (1998). Ineffective assistance of counsel at "initial-

26  review collateral proceedings may establish cause for a prisoner's procedural

27  default on a claim of ineffective assistance at trial." *See Martinez v. Ryan*, 566 U.S.

28  1, 9 (2012). Because this claim has not been adjudicated by the Arizona state courts,

the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

Lehr has a right to seek executive clemency before execution. *See* Ariz. Const. art. V, § 5; A.R.S. § 31-401. Executive clemency ensures the reliability of criminal convictions and the propriety of sentences. *See Herrera v. Collins*, 506 U.S. 390, 415 (1993). Accordingly, Lehr has a due process liberty interest in the impartiality of the system by which clemency may be afforded to him. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

In capital cases, the Eighth Amendment requires reliability of the guilt determination. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Herrera*, 506 U.S. at 407 n.5. And, it prohibits executing "a person who is innocent of the crime for which he was convicted." *Herrera*, 506 U.S. at 398. "Guilt or innocence must be determined in some sort of judicial proceeding." *Id.* (internal quotations omitted). Executive clemency provides one avenue for vetting actual innocence claims discovered past the deadline to file for a new trial. *Id.* at 417. But, clemency proceedings are not judicial proceedings, and they are not designed to enhance the reliability of the adjudicatory process. *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 284 (1998). Arizona's clemency proceeding allow the board to determine whether the sentence issued is supported by the evidence presented. *See* A.R.S. § 31-402. Allowing a clemency board to review the reliability of Lehr's sentences violates the Eighth Amendment.

Further, clemency proceedings require "notice" and "an opportunity to participate in the proceedings." *Schad v. Brewer*, No. CV-13-01962-PHX-ROS, 2013 WL 5524547, at *7 (D. Ariz. Oct. 4, 2013), *aff'd,* 732 F.3d 946 (9th Cir. 2013). Lehr's clemency proceedings will not be impartial because of the conflict of interest inherent in the State's selection process for members of Arizona's Board of Executive Clemency ("the Board"). The Board has five members appointed by the Governor with input from the Director of the Department of Corrections, the

1   Director of Public Safety, and three other individuals of their choosing. *See* A.R.S.
2   § 31-401(A). The Governor may remove members of the Board for cause. *See id.*
3   § 31-401(E). The Attorney General's Office—the office that advocated for his
4   death in state appellate and post-conviction proceedings—advocates for his death
5   before this Court and trains the Board members responsible for executive clemency
6   proceedings. Lehr has no visibility into the clemency hearings, evidence used
7   therein, or opportunity to defend his clemency claim. As such, Arizona's clemency
8   procedures do not comport with the clemency protections acknowledged by District
9   Courts. Lehr is entitled to habeas corpus relief.

## CLAIM FIFTY

**Lehr's conviction and sentences must be vacated due to the cumulative prejudicial effect of the errors in this case.**

13   Lehr incorporates by specific reference all facts, allegations, and arguments
14   made elsewhere in this Petition.

15   Lehr's convictions and sentences must be vacated due to the cumulative
16   prejudicial effect of the errors in this case. The combination of errors in this case
17   deprived Lehr of his fundamental constitutional rights, including his right to a fair
18   trial, trial by an impartial jury, due process, effective assistance of counsel,
19   presentation of a defense, a reliable determination of guilt and penalty, and
20   fundamental fairness. *See Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978). As a
21   result of the cumulative effect of the errors in the guilt and penalty phases of the
22   trials against Lehr, his convictions and sentences are unlawfully and
23   unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth
24   Amendments to the United States Constitution.

25   This claim was not raised in state court because it could not have been.
26   Because of the bifurcated nature of state proceedings, in no earlier proceeding could
27   Lehr have had the cumulative consideration of all the claims presented here.
28   Because no state court has decided the merits of this claim, the limitations on relief

1    imposed by 28 U.S.C. § 2254(d) do not apply.

2        When evaluating cumulative error, while only guilt-phase errors may be

3    relevant to Lehr's convictions, "*all* errors are relevant to the sentence." *Darks v.*

4    *Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (emphasis added). As stated above,

5    Lehr incorporates by specific reference all facts, allegations, and arguments made

6    elsewhere in this document. In addition, he re-urges all objections, arguments, and

7    claims of error made at his trials and during his direct appeals and his

8    post-conviction proceeding, and incorporates by reference herein those prior

9    objections, arguments, and claims of error.

10       Even in cases where no single trial error examined in isolation is sufficiently

11   prejudicial to warrant reversal, the Ninth Circuit recognizes that the cumulative

12   effect of multiple errors may still prejudice a defendant. *See Parle v. Runnels*, 505

13   F.3d 922, 934 (9th Cir. 2007) (finding habeas relief warranted when combined

14   effect of multiple trial errors resulted in injurious effect on jury's verdict); *Alcala v.*

15   *Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (affirming grant of habeas relief

16   where multiple errors by court and counsel deprived defendant of a fundamentally

17   fair trial); *Killian*, 282 F.3d at 1211 (stating that the cumulative effect of errors may

18   be so prejudicial as to require reversal); *Harris ex rel. Ramseyer*, 64 F.3d at 1438–

19   39 (holding that the cumulative impact of numerous deficiencies in defense

20   counsel's performance was prejudicial to the defense, rendering the proceedings

21   improper and warranting habeas relief); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th

22   Cir. 1992) (per curiam) (finding that counsel's deficiencies taken in combination

23   with two other errors constituted a denial of petitioner's due process rights).

24       As the preceding claims illustrate, multiple grievous errors were committed

25   during Lehr's several trials and sentencing proceedings. Even if the each of the

26   errors tallied in this Petition are deemed harmless when viewed individually, their

27   cumulative effect substantially prejudiced Lehr, and when viewed cumulatively in

28   the totality of the circumstances, Lehr did not receive a fair trial or sentencing.

1   "[T]he cumulative effect of two of more individually harmless errors has the

2   potential to prejudice a defendant to the same extent as a single reversible error."

3   *Darks*, 327 F.3d at 1018 (quotation and internal citations omitted).

4   Here, the cumulative effect of the errors in this case resulted in an abridgment

5   of the fundamental fairness of the trial process during all phases. A collection of

6   weak evidence, questionable forensics, and dubious eyewitness identifications were

7   bolstered by a fundamentally unfair agglomeration of all the charges against Lehr,

8   which were presented to the jury together and which served to reinforce each other

9   through the cross-admission of each piece of evidence levied against Lehr. At his

10  retrial, these parallel convictions again served to unfairly augment the mediocre

11  evidence of his guilt for the capital charges, and his jury was further tainted by the

12  knowledge that they would also be asked to sentence him on another murder

13  conviction. The result of these fundamentally unfair proceedings were numerous

14  convictions and two death sentences, in which this Court cannot have confidence.

15  Each of these errors deprived Lehr of important constitutional rights

16  including, but not limited to, his right to due process, equal protection, effective

17  counsel, to present a defense and confront the witnesses against him, an impartial

18  jury, and to be free of cruel and unusual punishment.

19  The aggregate harm of these constitutional violations warrants the granting

20  of this Petition without any determination of whether these violations individually

21  substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*,

22  507 U.S. 619, 638 n.9 (1993). Furthermore, these constitutional violations so

23  infected the integrity of the proceedings that the errors cannot be deemed harmless.

24  In any event, these violations of Lehr's rights had a substantial and injurious effect

25  or influence on the penalty judgment, rendering it fundamentally unfair.

26  Considering all the errors above, this Court must conclude that Lehr was denied a

27  fair trial, and the writ should issue.

28

# PRAYER FOR RELIEF

WHEREFORE, Lehr respectfully prays this Court to:

1. Order that he be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit him to utilize the processes of discovery set forth in Rules 26-37 of the Federal Rules of Civil Procedure, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2. Order that upon completion of discovery, Lehr be granted leave to amend his Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that he be granted leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the Petition;

3. Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this Petition;

4. Issue a writ of habeas corpus to have Lehr brought before this Court to the end that he may be discharged from his unconstitutional confinement and restraint;

5. In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Lehr brought before it to the end that he may be relieved of his unconstitutional sentences;

6. Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

Respectfully submitted this 17th day of December, 2019

Deborah L. Williams
Federal Public Defender
Southern District of Ohio

1

2   David C. Stebbins

3   Julie C. Roberts
    Adam M. Rusnak

4

5   s/ Julie C. Roberts
    Counsel for Petitioner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Certificate of Service**

2    I hereby certify that on December 17, 2019, I electronically filed the

3  foregoing Petition for Writ of Habeas Corpus with the Clerk's Office by using the

4  CM/ECF system. I certify that all participants in the case are registered CM/ECF

5  users and that service will be accomplished by the CM/ECF system.

6

7  s/ Julie C. Roberts

8  Capital Habeas Unit

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28